017318



017319



U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT  DIRECTOR

RECLAMATION   SERVICE
F. H. NEWELL  CHIEF ENGINEER      A. P. DAVIS  ASSISTANT CHIEF ENGINEER

KLAMATH  PROJECT  CALIF-OREGON

EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS

ALIGNMENT AND PROFILE   EAST BRANCH CANAL

STATIONS 494 TO 979

SPECIFICATIONS NO. 96

J. B. LIPPINCOTT   SUPERVISING ENGINEER     D. W. MURPHY  PROJECT ENGINEER
T. H. HUMPHREYS   ASSISTANT PROJECT ENGINEER

CONSULTING BOARD
J. B. LIPPINCOTT      L. H. TAYLOR      D. W. MURPHY   AND    T. H. HUMPHREYS

ACCESSION NO. 8078     DRAWING NO. 2 OF 8
MAY 1908

DRAWING NO. 3



U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT   DIRECTOR
RECLAMATION SERVICE
F. H. NEWELL   CHIEF ENGINEER      A. P. DAVIS   ASSISTANT CHIEF ENGINEER
KLAMATH PROJECT CALIF-OREGON
EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS
ALIGNMENT AND PROFILE   EAST BRANCH CANAL
STATIONS 979 TO 1464
SPECIFICATIONS NO. 96

J. B. LIPPINCOTT   SUPERVISING ENGINEER      D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER
CONSULTING BOARD
J. B. LIPPINCOTT    L. H. TAYLOR    D. W. MURPHY   AND   T. H. HUMPHERYS
ACCESSION NO. 8079      DRAWING NO. 3 OF 6
MAY 1906



# EAST BRANCH CANAL
## STA. 494   TO STA. 719+49.2

DRAWING NO. 4

### TYPICAL SECTION IN LEVEL CUTTING

$$S = .000132$$
$$n = .025 \quad V = 1.74 \text{ per Sec.}$$
$$a = 150° \quad Q = 261 \text{ Sec. ft.}$$

### TYPICAL SIDE HILL EARTH SECTION

### ROCK SECTION IN THROUGH CUT

SCALE OF FEET

U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT   DIRECTOR

RECLAMATION   SERVICE
F. H. NEWELL   CHIEF ENGINEER   A. P. DAVIS   ASSISTANT CHIEF ENGINEER

KLAMATH PROJECT   CALIF.-OREGON

EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS

## CROSS SECTIONS OF EAST BRANCH CANAL
## AND NORTH AND SOUTH POE VALLEY LATERALS

SPECIFICATIONS NO. 96

J. B. LIPPINCOTT   SUPERVISING ENGINEER   D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER

CONSULTING BOARD
J. B. LIPPINCOTT   L. H. TAYLOR   D. W. MURPHY   AND   T. H. HUMPHERYS

ACCESSION NO. 7899   DRAWING NO. 4 OF 8

MAY 1906



DRAWING NO. 5

FLASHBOARD DETAILS

SCALE OF INCHES
0   3   6   9   12

SECTION ON CENTER LINE

EVATION

Notes for Wooden Checks
1— All lumber to conform to Specifications and be of red fir unless the use of yellow pine is permitted by Engineer.
2— All nailing and bolting shall be done to satisfaction of Engineer.
3— Paving shall be laid at ends of structure if considered necessary by Engineer.

Notes for concrete checks.
1— Concrete shall be mixed and laid in accordance with general specifications for Concrete.
2— All Paving shall be laid in accordance with the Specifications.

U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT   DIRECTOR
RECLAMATION SERVICE
F. H. NEWELL   CHIEF ENGINEER   A. P. DAVIS   ASSISTANT CHIEF ENGINEER
KLAMATH PROJECT   CALIF.-OREGON
EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS
GENERAL PLANS OF CHECKS   CONCRETE AND WOOD
SPECIFICATIONS NO. 96
J. B. LIPPINCOTT   SUPERVISING ENGINEER   D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER
CONSULTING BOARD
J. B. LIPPINCOTT   L. H. TAYLOR   D. W. MURPHY   AND   T. H. HUMPHERYS
ACCESSION NO. 7900   DRAWING NO. 5 OF 8
MAY 1906



DRAWING NO. 6

Notes for Wooden Turnouts
1— All lumber to conform to Specifications and be of red fir unless the use of yellow pine is is permitted by Engineer.
2— All nailing and bolting shall be done to satisfaction of Engineer.
3— Paving shall be laid at ends of structure if considered necessary by Engineer.

**SECTION ON CENTER LINE**

**HALF ELEVATION**

Notes for Concrete Turnouts
1   Turnouts are to be used only where diversion gates across main canal are not required.   Where such gates are required a special plan will be prepared for each individual case
2   The pipe will be built in place and will be continuous without joints.
3   Concrete shall be mixed and laid in accordance with the General Specifications for Concrete.
4   Care must be taken to secure an even compact bearing for the pipe, and if necessary a concrete base shall be added for reinforcement.
5   Height from Turnout grade to Canal grade may be varied to suit conditions.
6   Depth from Turnout grade to bottom of Bulkhead  or Parapet Walls shall not be less than 2 ft. and shall not extend less than one foot below natural surface of ground, except that in foundations of rock or hard cemented material the depth may be varied to suit.
7   Concrete paving may be substituted for dry rubble paving when desirable.
8   All paving shall be laid in accordance with the Specifications.   The amount will vary according to conditions.

### DATA

| Functions | Normal Size of Pipe | | | | | |
|---|---|---|---|---|---|---|
| | 18" | 24" | 30" | 36" | 42" | 48" |
| a | 7" | 8" | 9" | 10" | 10" | 10" |
| b | 9" | 10" | 11" | 12" | 13" | 14" |
| c | 3" | 4" | 5" | 6" | 7" | 8" |
| d | 18" | 24" | 30" | 36" | 42" | 48" |
| e | 6'0" | 7'8" | 9'4" | 11'0" | 12'8" | 14'4" |

U.  S.  GEOLOGICAL  SURVEY
CHARLES D. WALCOTT   DIRECTOR

R E C L A M A T I O N    S E R V I C E
F. H. NEWELL   CHIEF ENGINEER      A. P. DAVIS   ASSISTANT CHIEF ENGINEER

K L A M A T H   P R O J E C T    C A L I F.- O R E G O N

EAST  BRANCH  CANAL  AND  NORTH  AND  SOUTH  POE  VALLEY  LATERALS

## GENERAL PLANS OF TURNOUTS   CONCRETE AND WOOD

SPECIFICATIONS  NO.  96

J. B. LIPPINCOTT   SUPERVISING ENGINEER      D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER

CONSULTING BOARD
J. B. LIPPINCOTT   L. H. TAYLOR    D. W. MURPHY    AND    T. H. HUMPHERYS

ACCESSION NO. 7901        DRAWING NO. 6 OF 8
MAY 1906



DRAWING NO. 7

**LONGITUDINAL SECTION**
CIRCULAR CULVERTS

TOP VIEW

FRONT VIEW
FOR MULTIPLE CONSTRUCTION

FRONT VIEW

Canal
Not less than 2'

Cut-off Walls to extend
1' from outside of Culvert.
1' thick, footings 6" wide, 6" deep

SCALE OF FEET

**LONGITUDINAL SECTION**
RECTANGULAR CULVERTS

TOP VIEW

FRONT VIEW

Canal
Not less than 2'

Cut-off Walls to extend 1 ft. from
sides and top of Culvert. Thickness
1', with 6" footings 6" deep.

shall be built in place and must be continuous

all be mixed and laid in accordance with the
ions for Concrete.

be taken to secure an even and compact bearing
semi-circumference of culverts and pipe,
nd the bottom of culvert must have the same
orcement as the top.

dation is rock or hard cemented material the
arapet Walls and Portals may be omitted
ust be laid in accordance with the Specifications.
ving may be substituted for dry rubble paving

ust be tightly wired at all crossings and
rust and scales before being imbedded

n face of steel rods to face of concrete

U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT    DIRECTOR

RECLAMATION    SERVICE
F. H. NEWELL   CHIEF ENGINEER      A. P. DAVIS   ASSISTANT CHIEF ENGINEER

KLAMATH   PROJECT   CALIF.-OREGON

EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS

CULVERTS    CIRCULAR AND RECTANGULAR

SPECIFICATIONS NO. 96

J. B. LIPPINCOTT   SUPERVISING ENGINEER     D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER

CONSULTING BOARD
J. B. LIPPINCOTT     L. H. TAYLOR     D. W. MURPHY     AND     T. H. HUMPHERYS

ACCESSION NO. 7902        DRAWING NO. 7 OF 8
MAY 1906

017325



## DATA Wooden Bridges

| Length of Span | Size of Joists | Nº of Posts 1 Side | Bottom width of piers Outside | Bottom width of piers Center |
|---|---|---|---|---|
| 10' | 2"x12" | 3 | 1'4"x1'4" | 1'6"x1'6" |
| 11 | " | " | " | " |
| 12 | " | " | " | " |
| 13 | 3"x12" | " | " | " |
| 14 | " | " | 1'6"x1'6" | 2'x2' |
| 15 | " | " | " | " |
| 16 | " | " | 2'x2' | " |
| 17 | 4"x12" | 4 | " | " |
| 18 | " | " | " | " |
| 19 | " | " | " | " |
| 20 | 4"x14" | " | " | 2'3"x2'3" |
| 21 | " | " | " | " |
| 22 | 4"x16" | " | " | " |
| 23 | " | " | " | " |
| 24 | " | " | " | " |
| 25 | " | 5 | " | 2'6"x2'6" |
| 26 | 4"x18" | " | " | " |
| 27 | " | " | " | " |
| 28 | " | " | " | " |
| 29 | 5"x18" | " | " | " |
| 30' | " | " | " | " |

### DETAIL OF THRUST BEAM
MATERIAL MEDIUM STEEL

Cover Plates ⅜"x w x ¾" long
2 B - 16' long as per Table
5 Rivets
Open holes for Truss Rods Diameter = d
16" overall

### DETAIL OF SADDLE C.I.

### SECTION A-B

2"x6" Railing
2"x8" Hubguard
4"x6"Wheelguard
4"x4"Post
Shims 2"x6"x12"
2"x12x18
Thrust beam (see detail)
2x12x28
17'5ill.
⅝"x24"flag bolt

### Notes for Wooden Bridges
1– Piers to extend not less than 18' below natural surface of ground. Size of footings may be varied to suit soil conditions, and for bridges less than 16 foot span dry rubble piers of suitable dimensions may, at the option of the Engineer be substituted for the concrete piers shown. Such piers to be paid for at the contract price for dry rubble.
2– Posts and railings to be painted with two coats of brown metallic mixed with pure linseed oil.
3– Joists secured to sills with 3-30d wire nails at each intersection.
4– Floor planking secured to joists with 2-60d wire nails at each intersection and laid with ¼" open joists.
5– Posts secured to joists with 2½" bolts with 2" washers.
6– Railing secured to posts with 2-20d wire nails at each intersection.
7– Braces secured to posts and planking with 2-30d wire nails at each intersection.
8– Wheel guards secured to planking with ½" x 12" drift bolts, spaced about 4 feet C. to C.; the drift bolt holes being bored with a ⅞" auger bit.
9– Bridging secured to joists with 1-20d wire nail at each intersection.
10– Furring secured to joists with 1-40d wire nail at each intersection.
11– Bulkhead timber 6" x 8" secured at top with 3-60d wire nails.
12– Bulkhead planks secured to furring with 2-20d wire nails at each intersection.

### Notes for Iron Bridges
1. Piers to extend not less than 18' below natural surface of ground. Size of footing may be varied to suit soil conditions.
2. Posts and railings to be painted front, back and sides with two coats brown metallic mixed with pure linseed oil.
3. Joists secured to Sills and Floor beams with 3-30d wire nails at each intersection.
4. Floor planking secured to Joists with 2-60d wire nails at each intersection and laid with ¼" open joists.
5. Posts secured to Joists with two ½" bolts.
6. Railing " Posts " 2-20d wire nails at each intersection.
7. Braces secured to Posts and planking with 2-30d wire nails at each intersection.
8. Wheel guards secured to Planking with ½" x 12" drift bolts spaced about 4' apart, the drift bolt holes being bored with a ⅞" auger bit.
9. Bridging secured to Joists with 1-40d wire nail at each intersection.
10. Furring secured to Joists with 1-40d wire nail at each intersection.
11. Bulkhead Timber 6"x8" secured at top with 3-60d wire nails.
12. Bulkhead Planks secured to Furring with 2-20d wire nails at each intersection.
13. Truss rods to be screwed up tightly to effect slight camber in bridge.

## DATA Iron Bridges

| Length of Span | Size of Joists | Size of End Sills | Nº of Posts 1 Side | Floor beams Nº & Size | Floor beams Length of bolts | Bot. Size Piers Ordinary Soils Outside | Bot. Size Piers Ordinary Soils Center | Truss Rods Length | Truss Rods Diam Normal | Truss Rods Diam Upset | Thrust Beams d | Thrust Beams w | Thrust Beams Channels |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32' | 3"x12" | 10"x10" | 5 | 32" | | 2'x2' | 3'x3' | 17'-4" | 1¼ | | | | |
| 34 | " | " | 6 | | | " | " | 18'-4" | 1⅜ | 1½ | | | |
| 36 | " | " | " | | | " | " | 19'-4" | 1⅜ | 1½ | 1⅝ | 4⅝ | |
| 38 | " | 10"x12" | " | | | 2'3"x2'3" 3'3"x3'3" | | 20'-4" | 1½ | | | | |
| 40 | " | " | " | | | " | " | 21'-4" | 1½ | 1⅝ | 1¾ | 4⅝ | |
| 42 | 4"x12" | " | 7 | | | " | " | 22'-4" | 1⅝ | 1¾ | | | |
| 44 | " | " | " | | | " | " | 23'-4" | | 1¾ | 5 | | |
| 46 | 4"x14" | " | " | | | 2'6"x2'6" 3'6"x3'6" | | 24'-5" | 1⅝ | 2" | 5⅜ | | |
| 48 | " | " | " | | | " | " | 25'-5" | 1¾ | 2" | 5⅜ | | |
| 50 | " | 12"x12" | " | 34" | | " | " | 26'-5" | | | | | |
| 52 | " | " | 8 | | | " | " | 27'-5" | 1¾ | | 5⅝ | 2⅝ 6⅜ | |
| 54 | " | " | " | | | " | " | 28'-5" | | 2⅛ | 5⅝ | | |
| 56 | 4"x16" | " | " | | | 2'9"x2'9" 3'9"x3'9" | | 29'-6" | 1¾ | | | | |
| 58 | " | " | 9 | | | " | " | 30'-6" | 1¾ | 2¼ | 2¼ | 5⅝ | |
| 60' | 4"x16" | 12"x12" | 9 | 34" | | " | " | 31'-6" | 1¾ | | | | |

### U. S. GEOLOGICAL SURVEY
CHARLES D. WALCOTT   DIRECTOR

#### RECLAMATION SERVICE
F. H. NEWELL   CHIEF ENGINEER      A. P. DAVIS   ASSISTANT CHIEF ENGINEER

## KLAMATH PROJECT   CALIF-OREGON

EAST BRANCH CANAL AND NORTH AND SOUTH POE VALLEY LATERALS

### BRIDGES   SPANS 8 TO 30 FEET   SPANS 30 TO 60 FEET

SPECIFICATIONS NO. 95

J. B. LIPPINCOTT   SUPERVISING ENGINEER   D. W. MURPHY   PROJECT ENGINEER
T. H. HUMPHERYS   ASSISTANT PROJECT ENGINEER

CONSULTING BOARD
J. B. LIPPINCOTT    L. H. TAYLOR    D. W. MURPHY    and    T. H. HUMPHERYS

ACCESSION NO. 7903    DRAWING NO. 8 OF 8
MAY 1906

# ADVERTISEMENT.

DEPARTMENT OF THE INTERIOR,
U. S. GEOLOGICAL SURVEY,
RECLAMATION SERVICE.

*Washington, D. C., February 12, 1907.*

Sealed proposals will be received at the office of the United States Reclamation Service, Portland, Oregon, until 2 o'clock p. m., April 15, 1907, for the excavation of the Keno Canal, near Klamath Falls, Klamath Project, Oregon-California, involving about 80,000 cubic yards of earth and rock excavation.

Plans, specifications and forms of proposal may be obtained by application to the Chief Engineer of the United States Reclamation Service, Washington, D. C., the Supervising Engineer, 307 Tilford Building, Portland, Oregon, or the Project Engineer, Klamath Falls, Oregon.

E. A. HITCHCOCK,

*Secretary.*

(5)

017327

## NOTICE TO BIDDERS.

Contractors may submit proposals for a single schedule, any combination of schedules or all schedules as they may desire.

Each proposal must be accompanied by a certified check, amounting to $1,000 for each and every schedule, payable to the order of the Secretary of the Interior, as a guaranty that the bidder will, if successful, promptly execute a satisfactory contract and furnish bond for the faithful performance of the work as required by Paragraph 5 of the Specifications. Each proposal must also be accompanied by the guaranty of responsible sureties to furnish bond as required, if the proposal is accepted.

The proposal must be markt: "Proposal for Excavation of Keno Canal, Klamath Project," and address: "United States Reclamation Service, Portland, Oregon." The name of the bidder should be written on the envelop enclosing the proposal. The address slip printed below may be used by the bidder if desired.

(7)

*United States Reclamation Service,*

*Portland, Oregon.*

*Proposal for excavation of Keno Canal,*
*Klamath Project.*

*From*

017328

# PROPOSAL.

Under the Act of Congress approved June 17, 1902 (32 Stat. L., 388).

*For the Excavation of Keno Canal, near Klamath Falls, Klamath Project, Oregon-California.*

................................................*1907.*

To the Secretary of the Interior,

## *Washington, D. C.*

SIR: The undersigned propose....to do all the work and furnish all the material, in accordance with the advertisement and plans and specifications, for the excavation under schedules............... .... .... of the Keno Canal, Klamath Project, and bind....................................................................., on the acceptance of this proposal, to enter into and execute a contract, with necessary bond, of which this proposal and the said advertisement and specifications shall be made a part, for the construction and completion of said work and the supplying of said material at the prices and within the time named respectively in the schedules and specifications hereto annext.

...............................furthermore agree....that in case of.............................default in executing such contract with necessary bond, the check accompanying this proposal and the money payable thereon shall be and remain the property of the United States.

It is further understood that the bids are for material in place.

Signature................

CORPORATE SEAL.

Address................

Names of individual members of firm :

Name of president of corporation :..

Name of secretary of corporation :

Corporation is organized under laws of the State of....

(9)

· 017329

# GUARANTY OF BOND.

We agree to furnish bond for this bidder as required by these specifications and the regulations of the Department of the Interior in case contract is awarded on the basis of this proposal.

Signature :........................................................................................ [Seal.]

Address :........................................................................................

Signature :........................................................................................ [Seal.]

Address :........................................................................................

Signature :........................................................................................ [Seal.]

Address :........................................................................................

(10)

017330

*Paquet, etc. [handwritten annotation]*

## SCHEDULE 1.

*Keno Canal—Stations 6 to 21+90.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| | Excavation : | ✓ | |
| 1. | Class 1 | 9,530 cubic yards at................ | |
| | | (Words) $0.75 | |
| | | ($ 0.25 ) per cubic yard... | $2382.50  7,147.50 |
| | | ✓       $0.85 | |
| 2. | Class 2 | 3,300 cubic yards at................ | |
| | | (Words) 0. | |
| | | ($ 0.50 ) per cubic yard... | $1,650.00  2,805.00 |
| | | ✓          $1.00 | |
| 3. | Class 3 | 4,280 cubic yards at................ | |
| | | (Words) | |
| | | ($ 1.50 ) per cubic yard... | 6,420.00  4,280.00 |
| | | Total........................ | 10,452.50  17,232.50 |

## SCHEDULE 2.

*Keno Canal—Stations 21+90 to 42+60.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| | Excavation : | ✓ | |
| 4. | Class 1 | 18,440 cubic yards at................ | |
| | | (Words) $0.75 | |
| | | ($ 0.25 ) per cubic yard... | $4610.00  13,830.00 |
| | | ✓ | |
| 5. | Class 2 | 3,540 cubic yards at................ | |
| | | (Words) $0.85 | |
| | | ($ 0.50 ) per cubic yard... | $1,770.00  3,009.00 |
| | | ✓ | |
| 6. | Class 3 | 1,920 cubic yards at................ | |
| | | (Words) $1.00 | |
| | | ($ 1.50 ) per cubic yard... | $2,880.00  1,920.00 |
| | | Total........................ | 9,260.00  18,759.00 |

(11)

017331

## SCHEDULE 3.

Keno Canal—Stations 42+60 to 54+40.

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| 7... | Excavation : Class 1............ | 12,530 cubic yards at.................... 0.75 (Words) | 9,397.50 |
| | | ....................................($ 0.25 ) per cubic yard... $3,132.50 | 4,360.50 |
| 8... | Class 2............ | 5,130 cubic yards at.................... 0.85 (Words) | |
| | | ....................................($ 0.50 ) per cubic yard... $2,565.00 | 3,400.00 |
| 9... | Class 3............ | 3,400 cubic yards at.................... $ 1.00 (Words) | |
| | | ....................................($ 1.50 ) per cubic yard... $5,100.00 | |
| | | Total.................... $10,797.50 | 17,158.00 |

## SCHEDULE 4.

Keno Canal—Stations 54+40 to 64.

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| 10... | Excavation : Class 1............ | 6,650 cubic yards at.................... 0.75 (Words) | 4,987.50 |
| | | ....................................($ 0.25 ) per cubic yard... $1,662.50 | 3,952.50 |
| 11... | Class 2............ | 4,650 cubic yards at.................... 0.85 (Words) | |
| | | ....................................($ 0.50 ) per cubic yard... $2,325.00 | 3,740.00 |
| 12... | Class 3............ | 3,740 cubic yards at.................... $ 1.00 (Words) | |
| | | ....................................($ 1.50 ) per cubic yard... $5,610.00 | |
| | | Total.................... $9,597.50 | 12,680.00 |

(12)

# SPECIFICATIONS.

## GENERAL CONDITIONS.

1. *Form of proposal and signature.*—The proposal must be made on the form provided for that purpose and must be inclosed in a sealed envelop, markt and addrest as required in the notice to bidders. The bidder must state in words and in figures the unit prices or the specific sums, as the case may be, for which he proposes to supply the materials and perform the work required by the contract. If the proposal is made by an individual it must be signed with the full name of the bidder, whose address must be given; if it is made by a firm it must be signed with the copartnership name by a member of the firm, and the name and full address of each member must be given; and if it is made by a corporation it must be signed by an officer in the corporate name, and the corporate seal must be attacht to such signature. No telegraphic proposal or telegraphic modification of proposal will be considered.

2. *Proposal.*—Blank spaces in the proposal must be properly filled in, and the phraseology of the proposal must not be changed. Additions must not be made to the items mentioned therein. Any unauthorized conditions, limitations or provisos attacht to a proposal will be liable to render it informal and may cause its rejection. Alterations by erasure or interlineation must be explained or noted in the proposal over the signature of the bidder. When the unit price and the total amount named by a bidder for any item do not agree, it will be assumed that the error was made in computing the amount, and the unit price alone will be considered as representing the bidder's intention. If a bidder wishes to withdraw his proposal he may do so before the expiration of the time during which proposals may be submitted, without prejudice to himself, by communicating his purpose in writing to the officer who holds it. No proposals received after said time will be considered. Bidders are invited to be present at the opening of the proposals. The right is reserved to reject any or all proposals, to accept one part of a proposal and reject the other, and to waive technical defects, as the interests of the United States may require.

3. *Certified check.*—Each bidder must submit with his proposal a certified check for the sum stated in the notice to bidders, drawn to the order of the Secretary of the Interior. The proceeds of said check shall become the property of the United States if, for any reason whatever, the bidder refuses to execute the required contract and bond in case his proposal is accepted. Checks will be returned after the approval of the contract and bond executed by the successful bidder or at the expiration of 45 days from the date of opening of the proposals.

4. *The contract.*—The bidder to whom award is made will be required to execute a written contract with the United States and to furnish good and approved bond as herein specified, within ten days after receiving such contract for execution. The contract shall be, in its general provisions, in the form adopted by the Reclamation Service. This form may be examined at the offices of the Reclamation Service, or copies will be furnisht, if desired, to parties proposing to bid. If the bidder to whom the first award is made fails to enter into a contract as herein provided, the award may be annulled and the contract let to the next most desirable bidder in the opinion of the Secretary of the Interior; and such bidder shall fulfill every stipulation embraced herein as if he were the original party to whom the award was made. A copy of the advertisement, proposal, general conditions and detail specifications will be attacht to and form part of the contract. A corporation to which a contract is awarded will be required, before the contract is finally executed, to furnish certificate as to its corporate existence and evidence that the officer signing the contract is duly authorized to do so on behalf of the corporation.

5. *Contractor's bond.*—The contractor shall furnish a bond in the sum of 20 per cent of the estimated aggregate payments to be made under the contract, unless a different sum is specified in the notice to bidders or proposal, conditioned upon the faithful performance by the contractor of all the covenants, stipulations and agreements in the contract. If at any time during the continuance of the contract the sureties, or any of them, shall die, or, in the opinion of the Secretary of the Interior, become

(13)

017333

(14)

irresponsible, the Secretary shall have the right to require additional and sufficient sureties, which the contractor shall furnish to the satisfaction of that officer within ten days after notice, and in default thereof the contract may be suspended by the Secretary of the Interior and the work completed as provided in Paragraph 22.

6. *Transfers.*—Transfer of a contract or of any interest therein is prohibited by law.

7. *Eight-hour law, foreign labor and convict labor.*—In all construction work eight hours shall constitute a day's work, and no Mongolian labor shall be employed thereon.  The importation of foreigners and laborers under contract to perform labor in the United States or the Territories or the District of Columbia is prohibited.  (Sec. 3738, Rev. Stat., U. S.; act Aug. 1, 1892, 27 Stat. L., 340; section 4, act June 17, 1902, 32 Stat. L., 388; act Feb. 26, 1885, 23 Stat. L., 332; and act Feb. 23, 1887, 24 Stat. L., 414.)  In the performance of this contract no persons shall be employed who are undergoing sentences of imprisonment at hard labor that have been imposed by courts of the several States, Territories or municipalities having criminal jurisdiction.  (Executive order, May 18, 1905.)

8. *Engineer.*—The word "engineer" used in these specifications or in the contract, unless qualified by the context, means the Chief Engineer of the Reclamation Service.  He will be represented on the work by assistants and inspectors with authority to act for him and direct the work.  Upon all questions concerning the execution of the work, the classification of material in accordance with the specifications and the determination of costs, the decision of the chief engineer shall be binding on both parties.

9. *Contractor.*—The word "contractor" used in these specifications or in the contract means the person, firm or corporation with whom the contract is made by the United States.  The contractor shall give his personal attention to the faithful prosecution of the work and shall keep the same under his personal control.  During the absence of the contractor from the work his foreman or a designated agent shall be held to represent him.  When two or more contractors are engaged on work in the same vicinity the engineer shall be authorized to direct the manner in which each shall conduct his work so far as it affects other contractors.  Instructions and information given by the engineer to the contractor's foreman or agent on the work shall be considered as having been given to the contractor himself.

10. *Transportation.*—The contractor shall afford opportunity to the engineer to obtain copies of the expense bills for transportation charges on all machinery, materials and supplies shipt to or from the project in connection with the work under this contract.  The contracts between the United States and the railroad companies concerning freight rates do not provide for any concessions in rates to contractors, who will not therefore be entitled to claim any benefits under such contracts.

11. *Local conditions.*—Bidders must satisfy themselves as to all local conditions affecting the work, and no information derived from the maps, plans, specifications, profiles or drawings, or from the engineer or his assistants, will in any way relieve the contractor from any risk or from fulfilling all the terms of his contract.  The accuracy of the interpretation of the facts disclosed by borings or other preliminary investigations is not guaranteed.  Each bidder or his representative should visit the site of the work and make himself familiar with local conditions; failure to do so when the intelligent preparation of bids depends on a knowledge of local conditions may be considered sufficient cause for rejecting a proposal.

12. *Mortgaging of plant, etc.*—The contractor shall not under any circumstances give or execute any mortgage, deed of trust or other conveyance or instrument of any description, affecting or intended to affect his right, title, interest or property in or to any plant, machinery, tools, appliances, supplies, materials or animals that may at any time be used in the prosecution of this contract.

13. *Damages.*—The contractor will be held responsible for and required to make good, at his own expense, any and all damages, of whatsoever nature, to persons or property caused by carelessness, neglect or want of due precaution on the part of the contractor, his agents or employes.  He must not allow any of his agents or employes to trespass upon premises or lands in the vicinity of the works.  He must discharge, at the request of the engineer, anyone in his employ who violates these requirements.

14. *Specifications and drawings.*—The contractor shall keep on the work a copy of the specifications and drawings, and access thereto shall at all times be accorded to the engineer.  Any drawings or plans that may be listed in the detail specifications shall, together with such detail specifications, be regarded as forming part hereof and of the contract.  Anything mentioned in the specifications and not

017334

(15)

shown in the drawings, or shown in the drawings and not mentioned in the specifications, must be done as the shown or mentioned in both. The engineer will furnish from time to time such detail drawings, plans, profiles and information as he may consider necessary for the contractor's guidance.

15. *Experience.*—Bidders must, if required, present satisfactory evidence that they have been regularly engaged in the business of constructing such work as they propose to execute and that they are fully prepared with the necessary capital, machinery and material to begin the work promptly and to conduct it as required by the specifications.

16. *Character of workmen.*—The contractor shall discharge from his service when required by the engineer any disorderly, dangerous, insubordinate or incompetent person employed on or in the vicinity of the works under construction by the United States.    None but skilled foremen and workmen shall be employed on work requiring special qualifications.

17. *Staking out work.*—The work to be done will be staked out for the contractor, who shall provide such material and give such assistance as may be required by the engineer.

18. *Methods and appliances.*—The methods and appliances adopted by the contractor must be such as will secure a satisfactory quality of work and will enable him to complete the work in the time agreed upon.    If at any time such methods and appliances appear inadequate, the engineer may order the contractor to improve their character or increase their efficiency, and the contractor must conform to such order ; but the failure of the engineer to order such improvement of methods or increase of efficiency will not relieve the contractor from his obligations to perform good work and to finish it in the time agreed upon.

19. *Samples or specimens.*—The contractor shall submit samples or specimens of any or all materials proposed to be used in the work if required to do so by the engineer.

20. *Material and workmanship.*—All materials must be of the specified quality and fully equal to approved samples when samples are required.    All work must be done and completed in a thoro workmanlike manner by mechanics skilled in their various trades, notwithstanding any omission from the specifications or drawings.    All materials furnisht and all work done must be satisfactory to the engineer and will be subject to rigid inspection, and if not in accordance with the specifications, in the opinion of the engineer, shall be made to conform thereto.    Unsatisfactory material will be rejected and, if so ordered by the engineer, shall be immediately removed from the vicinity of the work at the cost of the contractor.

21. *Delays.*—The contractor shall not be entitled to any compensation for delays or hindrances to the work, except that if, in the judgment of the engineer, direct and unavoidable extra cost to the contractor of any part of the work covered by these specifications is caused by the failure of the United States to provide right of way or material, then upon the presentation of a written claim by the contractor not later than 30 days after the close of the month during which such extra cost is claimed to have been incurred, such claim, if found correct by the engineer, will be approved.    Extension of time will be allowed for unavoidable delays that may result from unforseen causes that, in the opinion of the engineer, approved by the Secretary of the Interior, are undoubtedly beyond the control of the contractor.    If the work is delayed by specific orders to stop work given by the Secretary of the Interior or by the engineer , or if any delay or hindrance is caused by their failure to provide material sufficient to carry on the work, or to provide necessary right of way, or on account of extra work duly ordered, then such delay will entitle the contractor to an extension of time equivalent to the time lost by such delay, provided the contractor shall have submitted to the engineer written claim within thirty days from the cause thereof.    Any extension of time, however, shall not release the sureties from their obligations, which shall remain in full force and effect until the discharge of the contract.    Any application for an extension of time must be accompanied by the formal consent of the sureties thereto, and such application must be submitted in proper form in time for the full consideration and the approval thereof before the extension is to take effect.

22. *Suspension of contract.*—Should the contractor fail to begin the work within the time required, or fail to begin the delivery of material as provided in the contract, or fail to prosecute the work or delivery in such a manner as to insure a full compliance with the contract within the time limit, or if

017335

(16)

at any time the contractor is not properly carrying out the provisions of his contract in their true intent and meaning, notice thereof in writing will be served upon him; and, should he neglect or refuse to provide means for a satisfactory compliance with the contract within the time specified in such notice, the Secretary of the Interior in any such case shall have the power to suspend the operation of the contract. Upon such suspension the Secretary of the Interior may take possession of all machinery, tools, appliances, animals, materials and supplies of any kind employed or used on any of the works to be constructed under the contract or that have been shipt or delivered by or on account of the contractor for use in connection with the work, and he may use the same for the completion of the work either directly by the United States or by other parties for it ; or the Secretary of the Interior may employ other parties to carry the contract to completion, subsiitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, supplies and animals at the contractor's expense as may be necessary for the proper conduct of the work and for the completion thereof.   Any excess of cost arising therefrom over and above the contract price will be charged against the contractor and his sureties, who shall be liable therefor.   In the determination of the question whether there has been such noncompliance with the contract as to warrant the suspension thereof, the decision of the Secretary of the Interior shall be binding on both parties.

23.  *Climatic conditions.*—The engineer may order the contractor to suspend any work that may be damaged by inclemency of the weather or other climatic conditions, and due extension of time will be made to the contractor for the time actually lost by him on account of such suspension.

24.  *Quantities and unit prices.*—The quantities noted in the schedule or proposal are approximations given for the purpose of comparing bids, and no claim shall be made against the United States on account of any excess or deficiency in the same, absolute or relative.   Payment at the prices agreed upon will be in full for the completed work and will cover all materials, supplies, labor, tools, machinery and other expenditures of whatsoever nature incident to satisfactory compliance with the contract.

25.  *Changes in quantities.*—The Secretary of the Interior reserves the right to make such changes in the quantities of work or material as may be deemed advisable, without notice to the surety or sureties on the bond given to secure compliance with the contract, by adding thereto or deducting therefrom at the unit prices of the contract.   These changes will include modifications of shapes and dimensions of canals, dams and structures of whatsoever nature, particularly foundation work, to suit conditions disclosed as the work progresses.   Should any change be made in a particular piece of work after it has been commenced, so that the contractor is put to extra expense, the engineer will make reasonable allowance therefor, which action shall be binding on both parties.   Extra work or material shall be charged for as hereinafter provided.

26.  *Extra work or material.*—In connection with the work covered by this contract the engineer may order work of a character not covered by the contract or material for which no price is named in the contract.   Such work or material will be classed as extra work and will be ordered in writing. No extra work will be paid for unless ordered in writing.   Extra work will be charged for at actual necessary cost, as determined by the engineer, plus 15 per cent for profit, superintendence and general expenses.   The actual necessary cost will include all expenditures for materials, labor and supplies furnisht by the contractor, but will not include any allowance for the use of tools or machinery, office expenses, general superintendence or other general expenses.   At the end of each month the contractor shall present his claims in writing for any extra work or extra material furnisht or delivered.   The contractor shall, when requested by the engineer, furnish itemized statements of the cost of the work ordered, and give the engineer access to accounts, bills and vouchers relating thereto.

27.  *Changes at contractor's request.*—Should the contractor, by reason of conditions developing during the progress of the work, find it impracticable to comply strictly with the specifications, and apply in writing for a modification of structural requirements or of methods of work, such change may be authorized by the engineer provided it is not detrimental to the work and is without additional cost to the United States.

28.  *Inspection of work.*—The engineers and inspectors appointed by the Secretary of the Interior shall at all times have the right to inspect the work and materials.   The contractor shall furnish such

017336

(17)

persons reasonable facilities for obtaining such information as they desire respecting the progress and manner of the work and the character of the material, including all information necessary to determine the cost of the work, such as the number of men employed, their pay, the time during which they worked on the various classes of construction, etc.   He shall when required furnish the engineer and his assistants meals and camp accommodations at reasonable prices at any camp under his control. Whenever the contractor shall be permitted or directed to perform night work or to vary the period during which work is carried on each day, he shall give due notice to the engineer so that proper inspection may be provided for.   Such work shall be done under regulations to be furnish in writing by the engineer, and no extra compensation shall be allowed therefor.

29. *Removal of defective work.*—The contractor shall remove and rebuild at his own expense any part of the work that has been improperly executed, even tho such work has already been included in the monthly estimates.   If the contractor refuses or neglects to replace such defective work, it may be replaced by the United States at the contractor's expense.

30. *Protection of work and cleaning up.*—The contractor will be held responsible for any material furnish to him and for the care of all work until final completion and acceptance, and he will be required to make good at his own cost any damage or injury it may sustain from any cause.   He shall take all risks from floods and casualties of every description and make no charge for detention from such causes.   He may, however, be allowed a reasonable extension of time on account of such detention, as provided herein.   Rubbish, unused material and false work must be removed from the vicinity of the completed work.

31. *Errors and omissions.*—The contractor will not be allowed to take advantage of any error or omission in these specifications.   Full instructions will always be given when such error or omission is discovered.

32. *Roads and fences.*—All roads crossing the work and subject to interference therefrom must be kept open during the progress of the work, and all fences crossing the work must be kept up by the contractor until the work is finisht.

33. *Bench marks, stakes, etc.*—All bench marks and all witness, side-slope and other survey stakes must be carefully preserved by the contractor, and in case of their destruction or removal by him or any of his employes, such stakes will be replaced by the engineer at the contractor's expense.

34. *Right of way.*—The right of way for the works to be constructed and for all necessary borrow pits, channels, spoil banks, ditches, roads, etc., will be provided by the United States.

35. *Sanitation.*—The chief engineer may establish sanitary and police rules and regulations for all forces employed under this contract; and should the contractor fail to enforce these rules the engineer may enforce them and assess against the contractor the cost thereof, which will be deducted from any sum due on the contract.

36. *Intoxicants.*—The use or sale of intoxicating liquor is absolutely prohibited on the work except under the direction and supervision of the engineer or his agent and then only for medicinal purposes.

37. *Contractor's financial obligations.*—The contractor shall promptly make payment to all persons supplying labor and materials in the prosecution of the work, and a condition to this effect shall be incorporated in the bond to be given by the contractor, in pursuance of the act of Congress approved February 24, 1905, (33 Stat. L., 811), and acts amendatory thereof.   The contractor shall make such financial arrangements that his employes will not be subject to loss in securing their pay.

# DETAIL SPECIFICATIONS.

## GENERAL PROVISIONS.

38. *The requirement.*—It is required that there be constructed and completed in accordance with these specifications and the drawings hereinafter listed the Keno Canal, near Klamath Falls, Klamath project, Oregon-California.

39. *List of drawings:*
No. 1 (9132).   General map.
No. 2 (9131).   Profile and cross sectoins.

40. *Time of beginning and completing work.*—The contractor shall commence the work within thirty days after the signing of the contract by the Secretary of the Interior and shall thereafter prosecute the work with a force adequate in the opinion of the engineer to complete all work under the contract on or before November 15, 1907. All work under this contract shall be completed on or before November 15, 1907.

41. *Failure to complete work in time agreed upon.*—Should the contractor fail to complete the work required under any schedule within the time agreed upon or within such extra time as may have been allowed for delays by formal extensions granted by the Secretary of the Interior, a deduction of $10 will be made for each and every day that the work under said schedule remains uncompleted. The said amount is hereby agreed upon as liquidated damages for the loss to the United States on account of the employment of engineers, inspectors, and other employes after the expiration of the time for completion, including all disbursements on the engineering account properly chargeable thereto, and the value of the operation of the irrigation works dependent thereon, and will be deducted from any money due the contractor under his contract, and the contractor and his sureties shall be liable for any excess.

42. *Payments.*—Progress payments will be made to the contractor upon the certification of the chief engineer of payment due. At the end of each calendar month the engineer will make an approximate measurement of all the work done and the material delivered up to that date, and an estimate of the value of the same on the basis of the prices agreed upon in the contract. A deduction of 10 per cent will be made from this estimated amount, and from the balance will be deducted the amount of all previous payments. The remainder will be paid to the contractor upon the approval of the accounts. The 10 per cent so deducted will be retained by the United States until the work shall have been completed to the entire satisfaction of the chief engineer, whereupon the same will become due and payable. In case of default of the contractor, said 10 per cent shall be and become the sole and absolute property of the United States. When the terms of the contract shall have been fully complied with to the satisfaction of the chief engineer, and when a release of all claims against the United States on account of the contract shall have been executed by the contractor, final payment of the balance due will be made.

43. *Test pits.*—The Moore Brothers' old canal along a portion of the route and test pits sunk along the line of the proposed canal offer opportunities for the contractor to inspect the character of the material to be excavated. The United States, however, does not guarantee that the material shown at these points is a true indication of the character of all of the material that will be encountered.

## EXCAVATION.

44. *Description.*—Under the head of excavation will be included all work of making excavations and embankments required for the canal, as shown in the drawings. The price bid for excavation shall cover the clearing, grubbing and plowing under embankments and all other work, that may arise, necessary to maintain the excavations and embankments in good order during construction.



*Upper Side Bar.*
*Section CC.*



*Lower Side Bar.*
*Section DD*

Identified at State Eng Off

Encl J. of #1

Rec. May 6, 1908.

## Department of the Interior.
### United States Reclamation Service.
F.H. Newell, Director,        A.P. Davis. Chief Engineer.

# KLAMATH PROJECT, OREGON-CALIFORNIA
## KENO CANAL HEADGATES.

D.C. Henny Supervising Engineer.   E.G. Hopson, Asst Sup'r Eng'r
D.W. Murphy, Project Engineer.
Revised Plan, Supervising Engineers Office, Portland Or.
July 3 - 1907. - L.W. Hall

K-1-10-6

K 10

Supervising Office No 1411a.

Finish
Finish
Finish



½ Rear View.

Finish

Side & Bottom Angle.

Scale 3"=1'

Chamfer

DEPARTMENT OF THE INTERIOR
UNITED STATES RECLAMATION SERVICE
F.H.Newell, Director      A.P. Davis, Chief Engineer
KLAMATH PROJECT OREGON
KENO CANAL
Turnout and Penstock
for Government Power Plant.
D.C.Henny, Supervising Engineer
E.G.Hopson, Assistant Supervising Engineer.
D.W.Murphy, Project Engineer.
Drawn by L.W.H
Traced by Q.R.H                    Portland, Oregon, June 1909.
Supervising Office No. 1481
12-201-3541



Top slab
4-⅛"sq bars

½"vertical rods
14" long, 16 cen.

⅜"bent sq bars,15'long 9"
through ½ punched
holes in deck beam

7"I beams, 15", 11'0" long
2-3"x2½"x ¾ L's
¾"x12" Mch bolts
12" centers

## Detail of Pier Heads.
Scale ½"=1'



End View

Center Sec.

Screen

Screens

DEPARTMENT OF THE INTERIOR
UNITED STATES  RECLAMATION SERV.
F.H.Newell, Director        A.P.Davis, Chief Eng.
Klamath Project, Oregon-California.

# HEADWORKS FOR KENO CANAL
D.C.Henny, Supervising Engineer   E.G.Hopson, Asst Sup.
D.W.Murphy, Project Engineer.
Portland, Oregon.                June 1907.
Drawn by
Traced by
Supervising Office No.

12-201-35

Specifications No. 150

DEPARTMENT OF THE INTERIOR
UNITED STATES RECLAMATION SERVICE

## ADVERTISEMENT, PROPOSAL AND SPECIFICATIONS

# KLAMATH PROJECT, OREGON-CALIFORNIA

## SOUTH BRANCH CANAL

*marked*
*Stamped*

*Exh "K"*
*Received May 6 1908*

# CONTENTS.

Advertisement.
Notice to bidders.
Proposal:
    Guaranty of bond.
    Schedules.
Specifications:
    General conditions:
      1. Form of proposal and signature.
      2. Proposal.
      3. Certified check.
      4. The contract.
      5. Contractor's bond.
      6. Transfers.
      7. Eight hour law, foreign labor and convict labor.
      8. Engineer.
      9. Contractor.
      10. Transportation.
      11. Local conditions.
      12. Mortgaging plant, etc.
      13. Specifications and drawings.
      14. Experience.
      15. Damages.
      16. Character of workmen.
      17. Staking out work.
      18. Methods and appliances.
      19. Samples or specimens.
      20. Material and workmanship.
      21. Delays.
      22. Suspension of contract.
      23. Climatic conditions.
      24. Quantities and unit prices.
      25. Changes in quantities.
      26. Extra work or material.
      27. Changes at contractor's request.
      28. Inspection of work.
      29. Removal of defective work.
      30. Protection of work and cleaning up.

Specifications—continued.
      31. Errors and omissions.
      32. Roads and fences.
      33. Bench marks and survey stakes.
      34. Right of way.
      35. Sanitation.
      36. Intoxicants.
      37. Contractor's financial obligations.
Detail specifications:
    General provisions:
      38. The requirement.
      39. List of drawings.
      40. Beginning and completion of work.
      41. Failure to complete work in time agreed upon.
      42. Progress, estimates and payments.
      43. Complaints.
      44. Test pits.
      45. Canal sections.
      46. Overhaul.
      47. Borrow pits.
      48. Drainage and irrigation.
      49. Access to work.
Schedules 1 and 3.
      50. Description.
      51. Classification.
      52. Preparation of surface.
      53. Formation of embankments.
      54. Disposal of excess material.
      55. Blasting.
      56. Excavation in rock.
Schedule 2.
      57. Description.
      58. Classification.
      59. Preparation of surface.
      60. Formation of embankments.
      61. Water supply.
      62. Alternate method of construction.

(3)

# ADVERTISEMENT.

DEPARTMENT OF THE INTERIOR
## UNITED STATES RECLAMATION SERVICE

*Washington, D. C., Feb. 1, 1908.*

Sealed proposals will be received at the office of the United States Reclamation Service, Portland, Oregon, until 2 o'clock, p. m., April 1, 1908, for the construction of the South Branch Canal, located about ten miles southeast of Klamath Falls, Oregon, Klamath project, Oregon-California. This work consists of the construction of about 5½ miles of canal, involving the excavating and embanking of about 300,000 cubic yards of material, mainly earth.

For particulars address the United States Reclamation Service, Washington, D. C., 307 Tilford Building, Portland, Oregon, or Klamath Falls, Oregon.

JAMES RUDOLPH GARFIELD,
*Secretary.*

(5)

017344

## NOTICE TO BIDDERS.

Bidders may submit proposals for a single schedule, any combination of schedules, or all schedules, as they may desire.

Each proposal must be accompanied by a certified check amounting to $400 for each of schedules 1 and 3 and $900 for schedule 2, payable to the order of the Secretary of the Interior, as a guaranty that the bidder will, if successful, promptly execute a satisfactory contract and furnish bond for the faithful performance of the work as required by Paragraph 5 of the Specifications. Each proposal must also be accompanied by the guaranty of responsible sureties to furnish bond as required, if the proposal is accepted.

The proposal must be markt "Proposal for Construction of South Branch Canal, Klamath Project," and addrest "United States Reclamation Service, Portland, Oregon." The name of the bidder should be written on the envelop enclosing the proposal. The address slip printed below may be used by the bidder, if desired.

(7)

*Proposal for construction of South Branch Canal, Klamath Project.*

From,-----------------------------------------------------------------------

### United States Reclamation Service,

#### Portland,

##### Oregon.

017345

# PROPOSAL.

Under the Act of Congress approved June 17, 1902 (32 Stat. L., 388).

*For construction of South Branch Canal, about 10 miles southeast of Klamath Falls, Klamath Project, Oregon-California.*

..........................1908.

To the Secretary of the Interior,
*Washington, D. C.*

Sir:

The undersigned propose...to do all the work and furnish all the material, in accordance with the advertisement and plans and specifications, for the construction of the South Branch Canal, Klamath project, and bind.................., on the acceptance of this proposal, to enter into and execute a contract with necessary bond, of which this proposal and the said advertisement and specifications shall be a part, for the construction and completion of said work and the supplying of said material at the prices and within the time named respectively in the schedule and specifications hereto annext.

..........................furthermore agree that, in case of.................default in executing such contract with necessary bond, the check accompanying this proposal and the money payable thereon shall be and remain the property of the United States.

It is further understood that the bids are for material in place.

Signature ..................................

CORPORATE SEAL.

Address ..................................

Names of individual members of firm :   ........................................

........................................

........................................

Name of president of corporation........................................................

Name of secretary of corporation........................................................

Corporation is organized under laws of the State of ..................................

(9)

# GUARANTY OF BOND.

We agree to furnish bond for this bidder as required by these specifications and the regulations of the Department of the Interior in case contract is awarded on the basis of this proposal.

Signature................................[SEAL]

Address...................................

Signature................................[SEAL]

Address...................................

Signature................................[SEAL]

Address...................................

(10)

11

## SCHEDULE 1.

*Excavation for Canal, from Station 493 to Station 560.*

| Item No. | Work or Material. | Quantity and Price. | Amount |
|---|---|---|---|
| 1... | Excavation : Class 1............ | 38,160 cubic yards at................................................................................ (Words) ....................................... ($.....................) per cubic yard...... | $.................... |
| 2... | Class 2............ | 12,000 cubic yards at................................................................................ (Words) ....................................... ($.....................) per cubic yard...... | $.................... |
| 3... | Class 3............ | 3,000 cubic yards at................................................................................ (Words) ....................................... ($.....................) per cubic yard...... | $.................... |
| | | Total......... ..................................................................................... | $.................... |

017348

12

## SCHEDULE 2.

*Embankment for Canal, from Station 603 to Station 675.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| | Embankment : | | |
| 4... | Class A ............ | 72,280 cubic yards at.....................................................................<br>(Words) | $............. ... |
| | | .......................................... ($...............) per cubic yard... | |
| 5... | Class B........... | 104,580 cubic yards at.................................................................<br>(Words) | |
| | | .............................................. ($...............) per cubic yard... | $.................... |
| | | Total.......................................... | $.................... |

13

## SCHEDULE 3.

*Excavation for Canal, from Station 675 to Station 830.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| 6... | Excavation : Class 1............ | 65,880 cubic yards at.................................................................................<br>(Words)<br><br>.......................................................... ($...................) per cubic yard... | $.................... |
| 7... | Class 2............ | 4,000 cubic yards at ...........................................................................<br>(Words)<br><br>....................................................... ($...................) per cubic yard... | $.................... |
| | Class 3............ | 100 cubic yards at...........................................................................<br>(Words)<br><br>...................................................... ($...................) per cubic yard... | $.................... |
| | | Total......................................................................................... | $.................... |

017350

7-294.                          Construction.

## SPECIFICATIONS.

### GENERAL CONDITIONS.

1. *Form of proposal and signature.*—The proposal shall be made on the form provided therefor and shall be inclosed in a sealed envelop markt and addrest as required in the notice to bidders. The bidder shall state in words and in figures the unit prices or the specific sums, as the case may be, for which he proposes to supply the material and perform the work required by these specifications. If the proposal is made by an individual it shall be signed with his full name, and his address shall be given; if it is made by a firm it shall be signed with the copartnership name by a member of the firm, and the name and full address of each member shall be given; and if it is made by a corporation it shall be signed by an officer with the corporate name attested by the corporate seal. No telegraphic proposal or telegraphic modification of proposal will be considered.

2. *Proposal.*—Blank spaces in the proposal shall be properly filled in, the phraseology of the proposal should not be changed, and no additions should be made to the items mentioned therein. Unauthorized conditions, limitations or provisos attacht to a proposal will render it informal and may cause its rejection. Alterations by erasure or interlineation shall be explained or noted in the proposal over the signature of the bidder. If the unit price and the total amount named by a bidder for any item do not agree, the unit price alone will be considered as representing the bidder's intention. A bidder may withdraw his proposal before the expiration of the time during which proposals may be submitted, without prejudice to himself, by submitting a written request for its withdrawal to the officer who holds it. No proposals received after said time will be considered. Bidders are invited to be present at the opening of proposals. The right is reserved to reject any or all proposals, to accept one part of a proposal and reject the other, and to waive technical defects, as the interests of the United States may require.

3. *Certified check.*—Each bidder shall submit with his proposal a certified check for the sum stated in the notice to bidders, drawn to the order of the Secretary of the Interior, hereinafter styled Secretary. The proceeds of said check shall become the property of the United States if the bidder fails or refuses to execute the required contract and bond within the time specified in Paragraph 4 in case his proposal is accepted. The check of the successful bidder will be returned after the execution of his contract and the approval of his bond by the Director of the Reclamation Service, hereinafter styled Director, and those of the other bidders will be returned at the expiration of forty-five days from the date of opening proposals.

4. *The contract.*—The bidder to whom award is made shall execute a written contract with the United States and furnish good and approved bond within fifteen days after receiving them for execution. The contract shall be in the form adopted by the Reclamation Service. This form may be examined at the offices of the Reclamation Service, or copies will be furnisht, on request, to parties proposing to bid. If the bidder to

15

whom an award is made fails to enter into a contract as herein provided, the award will be annulled and an award may be made to the next most desirable bidder in the opinion of the Secretary; and such bidder shall fulfil every stipulation embraced herein as if he were the original party to whom an award was made. The advertisement, proposal, general conditions and detail specifications will be incorporated in the contract. A corporation to which an award is made will be required, before the contract is finally executed, to furnish certificate of its corporate existence and evidence that the officer signing the contract is duly authorized to do so.

5. *Contractor's bond.*—Unless another sum is specified in the notice to bidders or the proposal, the contractor shall furnish bond in the sum of twenty per cent of the estimated aggregate payments to be made under the contract, conditioned upon faithful performance by the contractor of all covenants and stipulations in the contract. If during the continuance of the contract any of the sureties die, or, in the opinion of the Director, are irresponsible, the Director may require additional sufficient sureties, which the contractor shall furnish to the satisfaction of that officer within ten days after notice, and in default thereof the contract may be suspended by the Director and the work completed as provided in Paragraph 22.

6. *Transfers.*—Transfer of a contract or of any interest therein is prohibited by law.

7. *Eight-hour law, foreign labor and convict labor.*—In all construction work eight hours shall constitute a day's work and no Mongolian labor shall be employed thereon. The importation of foreigners and laborers under contract to perform labor in the United States or the Territories or the District of Columbia is prohibited. (Sec. 3738, Rev. Stat., U. S., Acts: Aug. 1, 1892, 27 Stat. L., 340; June 17, 1902, section 4, 32 Stat. L., 388; Feb. 26, 1885, 23 Stat. L., 332; and Feb. 23, 1887, 24 Stat. L., 414.) In the performance of this contract no persons shall be employed who are undergoing sentences of imprisonment at hard labor imposed by courts of the several States, Territories or municipalities having criminal jurisdiction. (Executive order, May 18, 1905.)

8. *Engineer.*—The word "engineer" used in these specifications or in the contract, unless qualified by the context, means the Chief Engineer of the Reclamation Service. He will be represented on the work by assistants and inspectors authorized to act for him and direct the work. On all questions concerning the execution of the work, the classification of material and the determination of cost, the decision of the chief engineer shall bind both parties.

9. *Contractor.*—The word "contractor" used in these specifications or in the contract means the person, firm or corporation with whom the contract is made by the United States. The contractor shall give his personal attention to the faithful prosecution of the work and shall keep it under his personal control, and in his absence his foreman or a designated agent shall represent him. Instructions and information given by the engineer to the contractor's foreman or agent on the work shall be considered as having been given to the contractor. When two or more contractors are engaged on work in the same vicinity the engineer shall be authorized to direct the manner in which each shall conduct his work so far as it affects other contractors.

10. *Transportation.*—The contractor shall furnish the engineer copies of expense bills for transportation charges on all machinery, materials and supplies shipt to or from the project in connection with the work under this contract. The contracts be-

16

tween the United States and the railroad companies concerning freight rates do not provide for any concessions in rates to contractors, who will not therefore be entitled to claim any benefits under such contracts.

11. *Local conditions.*—Bidders shall satisfy themselves as to local conditions affecting the work, and no information derived from the maps, plans, specifications, profiles or drawings, or from the engineer or his assistants, will relieve the contractor from any risk or from fulfilling all of the terms of his contract. The accuracy of the interpretation of the facts disclosed by borings or other preliminary investigations is not guaranteed. Each bidder or his representative should visit the site of the work and familiarize himself with local conditions; failure to do so when intelligent preparation of bids depends on a knowledge of local conditions may be considered sufficient cause for rejecting a proposal.

12. *Mortgaging plant, etc.*—The contractor shall not give or execute any mortgage, deed of trust or other conveyance affecting his right, title, interest or property in or to any plant, machinery, tools, appliances, supplies, materials or animals that may at any time be used in the prosecution of this contract.

13. *Specifications and drawings.*—The contractor shall keep on the work a copy of the specifications and drawings, and shall at all times give the engineer access thereto. Any drawings or plans listed in the detail specifications shall be regarded as part thereof and of the contract. Anything mentioned in these specifications and not shown in the drawings, or shown in the drawings and not mentioned in these specifications, shall be done as tho shown or mentioned in both. The engineer will furnish from time to time such detail drawings, plans, profiles and information as he may consider necessary for the contractor's guidance.

14. *Experience.*—Bidders shall, if required, present satisfactory evidence that they have been regularly engaged in constructing such work as they propose to execute and that they are fully prepared with necessary capital, machinery and material to begin the work promptly and to conduct it as required by these specifications.

15. *Damages.*—The contractor will be held for, and required to make good, at his own expense, all damage to person or property caused by carelessness or neglect on the part of the contractor, his agents or employes.

16. *Character of workmen.*—The contractor shall not allow his agents or employes to trespass on premises or lands in the vicinity of the work. When required by the engineer, he shall discharge any person who commits trespass or is disorderly, dangerous, insubordinate or incompetent, employed on or about the works under construction by the United States. None but skilled foremen and workmen shall be employed on work requiring special qualifications.

17. *Staking out work.*—The work to be done will be staked out for the contractor, who shall provide such material and give such assistance as may be required by the engineer.

18. *Methods and appliances.*—The methods and appliances adopted by the contractor shall be such as will secure a satisfactory quality of work and will enable him to complete the work in the time agreed upon. If at any time such methods and appliances appear inadequate, the engineer may order the contractor to improve their character or efficiency, and the contractor shall conform to such order; but failure of the

17

engineer to order such improvement of methods or efficiency will not relieve the contractor from his obligation to perform good work and to finish it in the time agreed upon.

19. *Samples or specimens.*—The contractor shall submit samples or specimens of such materials to be used in the work as the engineer may require.

20. *Material and workmanship.*—All materials must be of the specified quality and equal to approved samples.  All work shall be done and completed in a thoro, workmanlike manner by mechanics skilled in their trades, notwithstanding any omission from these specifications or the drawings.  All materials furnisht and all work done must be satisfactory to the engineer, and, if not in accordance with the specifications in the opinion of the engineer, shall be made to conform therewith.  Unsatisfactory material will be rejected, and, if so ordered by the engineer, shall, at the contractor's expense, be immediately removed from the vicinity of the work.

21. *Delays.*—The contractor shall receive no compensation for delays or hindrances to the work, except that, if in the judgment of the engineer direct and unavoidable extra cost to the contractor is caused by the failure of the United States to provide necessary information, material or right of way, then on presentation of a written claim by the contractor not later than thirty days after the close of the month during which extra cost is claimed to have been incurred, such claim, if found correct by the engineer, will be approved.  The decision of the chief engineer as to the amount of such extra cost shall be conclusive and binding on both parties.  Extension of time will be allowed for unavoidable delays that result from unforeseen causes that, in the opinion of the engineer, approved by the Secretary, are undoubtedly beyond the control of the contractor.  If delay is caused by specific orders to stop work given by the Director or by the engineer, or caused by the performance of extra work duly ordered by either of them, or by their failure to provide sufficient material or necessary instructions for carrying on the work, or to provide necessary right of way, then such delay will entitle the contractor to an equivalent extension of time.  An application for extension of time must be accompanied by the formal consent of the sureties, but an extension of time whether with or without the consent of the sureties, shall not release them from their obligations, which shall remain in full force until the discharge of the contract.

22. *Suspension of contract.*—If the contractor fails to begin the work or the delivery of material as provided in the contract or to prosecute the work or delivery in such a manner as to insure a full compliance with the contract within the time limit, or if the contractor is not carrying out the provisions of his contract in their true intent and meaning, notice in writing will be served on him to provide within a specified time for a satisfactory compliance with the contract, and, if he neglects or refuses to comply with such notice, the Director may suspend the operation of all or any part of the contract.  Upon such suspension the Director may in his discretion take possession of all or any part of the machinery, tools, appliances, animals, materials and supplies used on the work covered by the contract or that have been shipt or delivered by or on account of the contractor for use in connection therewith, and he may use the same for the completion of the work suspended either directly by the United States or by other parties for it; or the Director may employ other parties to perform the work, substitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, supplies and animals at the contractor's expense as may be necessary for the proper conduct and completion of the work.  Any cost arising therefrom in excess of the contract price will be charged to the contractor and his sureties, who shall be liable therefor.  If, in the opinion of the engineer, there is an

emergency for the performance of certain work or the furnishing of certain material under the contract, and if the contractor fails to perform such work and to furnish such material within a reasonable time fixt by written notice from the engineer to the contractor, then the engineer shall have the power to perform such work or to furnish such material at the expense of the contractor and his sureties, who shall be liable therefor. In the determination of the question whether there has been such non-compliance with the contract as to warrant its suspension or the performance of work or the furnishing of material as herein provided, the decision of the Director shall bind both parties.

23. *Climatic conditions.*—The engineer may order the contractor to suspend any work that may be damaged by climatic conditions. When delay is caused by an order to suspend work, given on the account of abnormal climatic conditions that could not have been reasonably foreseen, such delay will entitle the contractor to an equivalent extension of time.

24. *Quantities and unit prices.*—The quantities noted in the schedule or proposal are approximations for comparing bids, and no claim shall be made against the United States for excess or deficiency therein, absolute or relative. Payment at the prices agreed upon will be in full for the completed work, and will cover materials, supplies, labor, tools, machinery and all other expenditures incident to satisfactory compliance with the contract.

25. *Changes in quantities.*—The Secretary reserves the right to make such changes in the quantities of work or material as may be deemed advisable, without notice to the sureties on the contractor's bond, by adding thereto or deducting therefrom at the unit prices of the contract. These changes will include modifications of shapes and dimensions of canals, dams and structures of whatsoever nature, particularly foundation work, to suit conditions disclosed as work progresses. If any change is made in a particular piece of work after it has been commenced, so that the contractor is put to extra expense, the engineer will make reasonable allowance on account thereof, which action shall bind both parties. Extra work or material shall be charged for as hereinafter provided.

26. *Extra work or material.*—In connection with the work covered by this contract the engineer may order work or material not covered by the contract. Such work or material will be clast as extra work and will be ordered in writing. No extra work will be paid for unless ordered in writing. Extra work shall be charged for at actual necessary cost, as determined by the engineer, plus fifteen per cent for profit, superintendence and general expenses. The actual necessary cost will include all expenditures for materials, labor and supplies furnisht by the contractor, but will not include any allowance for the use of tools or machinery, office expenses, general superintendence or other general expenses. At the end of each month the contractor shall present in writing his claims for extra work, and, when requested by the engineer, shall furnish itemized statements of the cost of extra work ordered and give the engineer access to accounts, bills and vouchers relating thereto.

27. *Changes at contractor's request.*—If the contractor, on account of conditions developing during the progress of the work, finds it impracticable to comply strictly with these specifications and applies in writing for a modification of structural requirements or of methods of work, such change may be authorized by the engineer if not detrimental to the work and if without additional cost to the United States.

28. *Inspection of work.*—All material furnisht and work done under this contract will be subject to rigid inspection. The duly authorized engineers and inspectors of the Reclamation Service shall have the right to inspect the work and the materials. The contractor shall furnish such persons reasonable facilities for obtaining such infor-

mation as they desire respecting the character of the materials and the progress and manner of the work, including all information necessary to determine its cost, such as the number of men employed, their pay, the time during which they worked on the various classes of construction, etc. He shall, when required, furnish the engineer and his assistants meals and camp accommodations at reasonable prices at any camp under his control. Whenever the contractor is permitted or directed to do night work or to vary the period during which work is carried on each day, he shall give the engineer due notice, so that inspection may be provided for. Such work shall be done without extra compensation and under regulations to be furnish in writing by the engineer.

29. *Removal of defective work.*—The contractor shall remove and rebuild at his own expense any part of the work that has been improperly executed, even tho it has been included in the monthly estimates. If he refuses or neglects to replace such defective work, it may be replaced by the United States at the contractor's expense.

30. *Protection of work and cleaning up.*—The contractor shall be responsible for any material furnisht him and for the care of all work until its completion and acceptance, and he shall at his own expense replace damaged or lost material and repair damaged parts of the work, or the same may be done at his expense by the United States. He shall take all risk from floods and casualties and shall make no charge for detention from such causes. He may, however, be allowed a reasonable extension of time on account of such detention, subject to the conditions hereinbefore specified. Rubbish, unused material and false work shall be removed from the vicinity of completed work.

31. *Errors and omissions.*—The contractor will not be allowed to take advantage of any error or omission in these specifications. Instructions will be given when such error or omission is discovered.

32. *Roads and fences.*—Roads subject to interference from the work covered by this contract shall be kept open, and fences subject to interference shall be kept up by the contractor until the work is finisht.

33. *Bench marks and survey stakes.*—Bench marks and survey stakes shall be preserved by the contractor, and in case of their destruction or removal by him or his employes, they will be replaced by the engineer at the contractor's expense.

34. *Right of way.*—The right of way for the works to be constructed and for necessary borrow pits, channels, spoil banks, ditches, roads, etc., will be provided by the United States.

35. *Sanitation.*—The chief engineer may establish sanitary and police rules and regulations for all forces employed under this contract; and if the contractor fails to enforce these rules the engineer may enforce them at the expense of the contractor.

36. *Intoxicants.*—The use or sale of intoxicating liquor is absolutely prohibited on the work except under the direction and supervision of the engineer, and then only for medicinal purposes.

37. *Contractor's financial obligations.*—The contractor shall promptly make payment to all persons supplying labor and materials in the execution of the contract, and a condition to this effect shall be incorporated in the contractor's bond, pursuant to the Act of February 24, 1905 (33 Stat. L., 811), and acts amendatory thereof. The contractor shall make such financial arrangements that his employes will not suffer loss in securing their pay.

## DETAIL SPECIFICATIONS.
### General Provisions.

38. *The requirement.*—It is required that there be constructed and completed in accordance with these specifications and the drawings hereinbelow listed about 5½ miles of canal, the same being a portion of the South Branch Canal, Klamath Project, located about ten miles southeast from Klamath Falls, Oregon.

39. *List of Drawings:*

    1.  (10057) General map and location map.

    2.  (10058) Profile, alignment and sections.

40. *Beginning and completion of work.*—The contractor shall commence the work within thirty days after the signing of the contract by the Director, and shall thereafter prosecute the work with the force necessary, in the opinion of the engineer, to complete Schedule 2 from station 639 to station 675 on or before October 1, 1908, and the remainder of Schedule 2 and all of Schedules 1 and 3 on or before November 15, 1908. All work under these specifications shall be completed on or before November 15, 1908.

41. *Failure to complete work in time agreed upon.*—Should the contractor fail to complete the work under any schedule in the time agreed upon in the contract or in such extra time as may have been allowed for delays by formal extensions granted by the Secretary, a deduction of $20 will be made for each and every day, including Sundays and holidays, that the work under said schedule remains uncompleted after the date required for its completion. The said amount is hereby agreed upon as liquidated damages for the loss to the United States on account of all expense due to the employment of engineers, inspectors and other employes after the expiration of the time for completion and on account of the value of the operation of the irrigation works dependent thereon and will be deducted from any money due the contractor under his contract and the contractor and his sureties shall be liable for any excess.

42. *Progress estimates and payments.*—At the end of each calendar month the engineer will make an approximate measurement of all work done and material delivered up to that date, classified according to items named in the contract, and will make an estimate of the value of the same on the basis of the unit prices named in the contract. To the estimates made as above set forth will be added the amounts earned for extra work to the date of the progress estimate. From the total thus computed a deduction of ten per cent will be made and from the remainder there will be further deducted any amount due to the United States from the contractor for supplies or material furnisht or services rendered and any other amounts that may be due to the United States as damages for delays or otherwise under the terms of the contract. From the balance thus determined will be deducted the amount of all previous payments and the remainder will be paid to the contractor upon approval of the accounts. The ten per cent deducted as above set forth will become due and payable to the contractor upon completion of the work to the satisfaction of the chief engineer. In case of the suspension of the contract, the said ten per cent shall be and become the sole and absolute property of the United States to the extent that the same may be necessary to repay to the United States any excess in the cost of the work above the contract price. When the terms of the contract shall have been fully complied with to the satisfaction of the chief engineer, and when a release of all claims against the United States under or by virtue of the contract shall have been executed by the contractor, final payment of any balance due will be made.

43. *Complaints.*—The material moved will be classified by the engineer during the progress of the work. A copy of the classification by stations will, on application, be furnisht

017357



the contractor monthly for completed portions of the work.   Complaints, if any, must be furnish in writing within thirty days after receipt of copy of classifications.

44.   *Test pits.*—Test pits along the line of the proposed canal offer opportunities for the bidder to inspect the character of the material to be excavated.   The United States, however, does not guarantee that the material shown at these points is a true indication of the character of all of the material that will be encountered, and the bidder must satisfy himself as to the nature of this material.

45.   *Canal sections.*—The canal when finisht shall conform accurately to sections similar to those shown on Drawing No. 2, as staked out by the engineer.   The side slopes and bottom shall be made even and regular, and runways shall not be cut into the side slopes below the proposed water surface of the canal.

46.   *Overhaul.*—All material taken from excavation shall be placed where directed by the engineer.   In hauling excavated material required for embankments three hundred feet will be considered the limit of free haul and any haul in excess of this distance, measured from the center of mass of the material as excavated to the center of mass of the material as deposited, will be termed overhaul.   Whenever the engineer requires such material to be hauled more than three hundred feet, the contractor will be paid for overhaul at the rate of one and one-half cents per cubic yard per one hundred feet for the haul in excess of three hundred feet, but no overhaul will be allowed for material wasted, unless specifically ordered in writing by the engineer to be deposited beyond the limits of free haul.

47.   *Borrow pits.*—The location of borrow pits shall be determined by the engineer.   No borrow pit shall be closer than twenty feet to the toe of the canal embankment.   Pits shall be excavated to reasonably regular lines and depth, dependent, however, upon the nature and quantity of material available.

48.   *Drainage and irrigation.*—If it is necessary in the prosecution of the work to interrupt or obstruct the natural drainage of the surface or the flow of artificial drains or irrigation ditches, the contractor shall provide for the same during the progress of the work in such manner as not to damage either public or private interests, and the cost of such work shall be included in the unit prices bid for the various items of the schedules.   If the contractor neglects so to provide for either natural or artificial drainage or irrigation that he may have interrupted, he shall be liable for all damages that may result therefrom.

49.   *Access to work.*—The contractor shall afford all reasonable facilities for access to his work to other contractors or agents of the Government engaged on work adjacent to or in the vicinity of the work included in this contract

## SCHEDULES 1 and 3.

50.   *Description.*—Under the head of excavation will be included all work of making excavations and embankments required for the canal under schedules 1 and 3 as shown in the drawings.

51.   *Classification.*—Material excavated will be measured in excavation and will be classified as follows:

Class 1:   All material that can be plowed by a six-horse team, each animal weighing not less than fourteen hundred pounds, attached to a suitable breaking plow, all well handled by at least three men; also material that can be, without plowing, handled in scrapers, including all detacht masses of rock two cubic feet or less in volume.

Class 2:   Indurated material of all kinds that cannot be loosened by plows, as described under Class 1, but that when loosened by powder or other suitable means can be removed by the use of plows and scrapers, and all detacht masses of rock more than two and less than twenty cubic feet in volume, not included in Class 1.

22

Class 3. All rock in place, not included in classes 1 and 2, and all detacht masses of rock twenty cubic feet or more in volume, not included in classes 1 and 2.

If any material be required to be excavated which in the opinion of the engineer cannot be properly included in any of the above three classes, the engineer will determine the actual necessary cost of excavating it and disposing of it, and this work will be paid for as extra work under the provisions of Paragraph 26 of these specifications.

52. *Preparation of surface.*—The surface of all excavations and borrow pits shall be cleared of brush or objectionable organic matter before material is excavated. The ground under all canal embankments shall be thoroly grubbed and cleared of roots, brush and other vegetable matter, and material thus removed shall be disposed of to the satisfaction of the engineer. The ground under the canal embankment shall be well plowed. The cost of this work shall be included in the prices bid for items 1, 2 and 3, Schedule 1, and items 6, 7 and 8, Schedule 3.

53. *Formation of embankments.*—All embankments forming part of the waterway of the canal shall be built in layers not exceeding 12 inches in thickness at any point, and the material shall be deposited by teams and scrapers or by such other methods as the contractor may select, provided that any method of deposition used shall, in the opinion of the engineer, enable segregation and consolidation of the embankment material to be executed in a manner as satisfactory as by the team and scraper method. If deposited by teams and scrapers, the teams shall be driven on the embankments so as to secure the requisite tamping and compacting of the materials. The embankments shall be made true to line, grade and slope furnisht by the engineer; and the material forming the embankment shall be obtained from such places as the engineer may direct. No material that is unsuited for the purpose shall be used in any embankment intended to be water-tight, but coarse material may be used to form the outer slope, as directed by the engineer. In order to discover and stop all holes made by burrowing animals under the canal bed, the contractor shall, when required by the engineer, excavate a trench in a direction parallel to the canal and of such width and depth as the engineer may require. All holes that may be discovered shall be followed up and stopt as the engineer may direct, and the trench shall be refilled with compacted material. Digging and refilling the trench and stopping the holes will be paid for as extra work under the provisions of Paragraph 26.

54. *Disposal of excess material.*—Where the material in excavation is in excess of that normally required for the embankments, such excess shall be used for reinforcing the embankments or otherwise, as the engineer may direct. All waste material shall be deposited in a regular and uniform manner, as directed by the engineer.

55. *Blasting.*—Blasting likely to injure the slopes or bottom of excavation will not be permitted.

56. *Excavation in rock.*—All excavation in solid rock shall be made as nearly as practicable to the neat lines shown on the plans or as establisht by the engineer, and no points of rock will be permitted to project inside the neat lines. The bed of the canal when in rock excavation shall be leveled with rock debris or earth to the true section shown on the plans, the cost of same being included in the unit price bid for Item 3, Schedule 1, and Item 8, Schedule 3.

### Schedule 2.

57. *Description.*—The work under Schedule 2 includes the building of the canal in embankment, as shown on Drawings Nos. 1 and 2, between station 603 and station 675.

58. *Classification.*—Material will be measured within the neat lines of the finisht embankment and will be classified as follows:

23

Class A.  All material constituting the outer part, as shown on Drawing No. 2.   This material shall be deposited as specified in Paragraph 53, for canal embankments under Schedules 1 and 3.

Class B.   All material constituting the inner part of the embankment as shown on Drawing No. 2.   This material shall be spread in horizontal layers, wet and rolled or deposited as specified in Paragraph 62.

59.  *Preparation of surface.*—The methods of preparing the surface of all excavations and borrow pits and the ground under all canal embankments shall be the same as those described in Paragraph 52.   The cost of this work shall be included in the prices bid for items 4 and 5, Schedule 2.

60.  *Formation of embankments.*—The material vertically below the outer slopes of the embankment, as shown on Drawing No. 2, shall be deposited in the same manner as specified in Paragraph 53 for embankments under schedules 1 and 3.   So far as practicable, the coarsest material obtained from the borrow pits shall be deposited in this portion of the embankment, and payment therefor will be made under Item 4, Schedule 2.   The material in the remainder of the embankment lying between the outer triangles and forming the inner portion of the embankment as shown on Drawing No. 2, shall be selected so far as practicable from the finest material obtained from the borrow pits.   It shall be deposited in horizontal layers not exceeding six inches in thickness after consolidation.   It shall be evenly spread by road graders or other suitable means and shall be wet and rolled to produce, in the judgment of the engineer, the greatest practicable consolidation.   The roller shall weigh not less than one ton for each foot of tread, and shall be of the grooved type and satisfactory to the engineer.   Payment for this inner part of the embankment will be made under Item 5, Schedule 2.   No frozen material shall be placed in the embankment nor shall any material be placed in the embankment when the embankment itself is frozen.

61.  *Water supply.*—Whenever water is carried in the Main and Ankeny Canals, the contractor will have the right to obtain, so far as it is not required for irrigation, a supply therefrom for the legitimate requirements of the work specified in paragraphs 60 and 62.

62.  *Alternate method of construction.*—Depositing material in a standing pond of water will be considered equivalent to spreading, wetting and rolling, and such construction will be permissible subject to approval by the engineer of the contractor's methods.

817361

Specifications No. 151

DEPARTMENT OF THE INTERIOR
UNITED STATES RECLAMATION SERVICE

ADVERTISEMENT, PROPOSAL AND
SPECIFICATIONS

# KLAMATH PROJECT, OREGON-CALIFORNIA

## CLEAR LAKE DAM AND DIKES

# CONTENTS.

Advertisement.
Notice to bidders.
Proposal:
    Guaranty of bond.
    Schedules.
Specifications:
    General conditions:
        1. Form of proposal and signature.
        2. Proposal.
        3. Certified check.
        4. The contract.
        5. Contractor's bond.
        6. Transfers.
        7. Eight-hour law, foreign labor and convict labor.
        8. Engineer.
        9. Contractor.
        10. Transportation.
        11. Local conditions.
        12. Mortgaging plant, etc.
        13. Specifications and drawings.
        14. Experience.
        15. Damages.
        16. Character of workmen.
        17. Staking out work.
        18. Methods and appliances.
        19. Samples or specimens.
        20. Material and workmanship.
        21. Delays.
        22. Suspension of contract.
        23. Climatic conditions.
        24. Quantities and unit prices.
        25. Changes in quantities.
        26. Extra work or material.
        27. Changes at contractor's request.
        28. Inspection of work.
        29. Removal of defective work.
        30. Protection of work and cleaning up.
        31. Errors and omissions.
        32. Roads and fences.
        33. Benchmarks and survey stakes.
        34. Right of way.
        35. Sanitation.
        36. Intoxicants.
        37. Contractor's financial obligations.

Detail specifications:
    General provisions:
        38. The requirement.
        39. List of drawings.
        40. Beginning and completion of work.
        41. Failure to complete work in time agreed upon.
        42. Progress estimates and payments.
        43. Cement.
        44. Metal work.
    Work under Schedule 1:
        45. Description.
    Excavation:
        46. Classification.
    Concrete:
        47. Classification.
        48. Measurement and payment.
        49. Composition.
        50. Sand.
        51. Gravel and broken stone.
        52. Water.
        53. Mixing.
        54. Placing.
        55. Joining work.
        56. Initial set.
        57. Forms.
        58. Finishing concrete surfaces.
        59. Sprinkling.
        60. Setting iron and steel.
    Construction of dam:
        61. Preparation of dam site.
        62. Trenches under dam.
        63. Spillway excavation.
        64. Excavation for outlet works.
        65. Rockfill.
        66. Material for embankment.
        67. Formation of embankment.
        68. Overhaul.
        69. Hydraulicking.
        70. Rock pitching.
    Work under Schedule 2.
        71. Description.
        72. Preparation of foundation.
        73. Trenches.
        74. Earth embankment.
        75. Rock pitching.

(3)

# ADVERTISEMENT.

### DEPARTMENT OF THE INTERIOR
## UNITED STATES RECLAMATION SERVICE

*Washington, D. C., February 3, 1908.*

Sealed proposals will be received at the office of the United States Reclamation Service, Portland, Oregon, until 2 o'clock p. m., April 15, 1908, for the construction of Clear Lake dam and dikes located about 55 miles southeast from Klamath Falls, Klamath Project, Oregon-California.  The dam requires the placing of about 54,000 cubic yards of earth and rockfill, together with the building of necessary spillway and outlet structures.  The dikes require the placing of about 25,000 cubic yards of earth and rockfill.

For particulars address the United States Reclamation Service, Washington, D. C., Tilford Building, Portland, Oregon, or Klamath Falls, Oregon.

JAMES RUDOLPH GARFIELD,
*Secretary.*

(5)

## NOTICE TO BIDDERS.

The work is divided into two schedules, as follows:  Schedule 1, Clear Lake Dam and appurtenant structures; Schedule 2, Clear Lake Dikes.  Bidders may submit proposals on one or both of said schedules, and may condition their bids upon the acceptance of either one or both, as they desire.

Each proposal must be accompanied by a certified check amounting to $2,000 for Schedule 1 and $500 for Schedule 2, payable to the order of the Secretary of the Interior, as a guaranty that the bidder will, if successful, promptly execute a satisfactory contract and furnish bond for the faithful performance of the work as required by Paragraph 5 of. the specifications. Each proposal must also be accompanied by the guaranty of responsible sureties to furnish bond as required, if the proposal is accepted.

The proposal must be markt:  "Proposal for Construction of Clear Lake Dam and Dikes, Klamath Project," and addrest:  "United States Reclamation Service, Tilford Building, Portland, Oregon."  The name of the bidder should be written on the envelop enclosing the proposal.  The address slip printed below may be used by the bidder if desired.

(7)

*Proposal for construction of Clear Lake Dam and Dikes, Klamath Project.*

From............................................................................................

*United States Reclamation Service,*

*Tilford Building,*

*Portland, Oregon.*

017365

# PROPOSAL.

Under the Act of Congress approved June 17, 1902 (32 Stat. L., 388).

*For the construction of Clear Lake Dam and Dikes, about 55 miles southeast from Klamath Falls, Klamath Project, Oregon-California.*

........................190S.

To THE SECRETARY OF THE INTERIOR,
    *Washington, D. C.*

SIR:

The undersigned propose...to do all the work and furnish all the material, in accordance with the advertisement and plans and specifications, for the construction and completion of Clear Lake Dam and Dikes, Klamath project, and bind .................................., on the acceptance of this proposal, to enter into and execute a contract with necessary bond, of which this proposal and the said advertisement and specifications shall be a part, for the construction and completion of said work and the supplying of said material at the prices and within the time named, respectively, in the schedules and specifications hereto annext.

........................furthermore agree that, in case of...................default in executing such contract with necessary bond the check accompanying this proposal and the money payable thereon shall be and remain the property of the United States.

It is further understood that the bids are for material in place.

Signature ...................................

CORPORATE SEAL.

Address ...................................

Names of individual members of firm:    ....................................

....................................

....................................

Name of president of corporation....................................

Name of secretary of corporation....................................

Corporation is organized under laws of the State of ...................................

(9)

## GUARANTY OF BOND.

We agree to furnish bond for this bidder as required by these specifications and the regulations of the Department of the Interior in case contract is awarded on the basis of this proposal.

Signature................................[SEAL]

Address.....................................

Signature................................[SEAL]

Address.....................................

Signature................................[SEAL]

Address.....................................

(10)

## SCHEDULE 1

*Clear Lake Dam and appurtenant structures.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| | Excavation above elevation 4516 : | | |
| 1... | Class 1 ............ | 26,000 cubic yards at................................................................ <br> (Words) <br> .........................................................($.............) per cubic yard... | $................... |
| 2... | Class 2 ............ | 700 cubic yards at ................................................................ <br> (Words) <br> ..................................($.............) per cubic yard... | $................... |
| 3... | Class 3 ............ | 24,000 cubic yards at................................................................ <br> (Words) <br> ..................................($.............) per cubic yard... | $................... |
| | Excavation below elevation 4516 : | | |
| 4... | Class 1 ............ | 1,500 cubic yards at ................................................................ <br> (Words) <br> ..................................($.............) per cubic yard... | $................... |
| 5... | Class 2 ............ | 150 cubic yards at ................................................................ <br> (Words) <br> .........................($.............) per cubic yard... | $................... |
| 6... | Class 3 ............ | 1,500 cubic yards at ................................................................ <br> (Words) <br> .........................($.............) per cubic yard... | $................... |
| | Concrete : | | |
| 7... | Class A............ | 230 cubic yards at ................................................................ <br> (Words) <br> ..............................($.............)per cubic yard... | $................... |
| 8... | Class B ............ | 240 cubic yards at................................................................ <br> (Words) <br> ..............................($.............) per cubic yard... | $................... |
| 9... | Handling reinforcing steel........ | 12,000 pounds at................................................................ <br> (Words) <br> ..................................($.............) per pound... | $................... |
| 10... | Handling structural steel in tower ............ | 3,000 pounds at................................................................ <br> (Words) <br> ..................................($.............) per pound... | $................... |
| 11... | Handling gates, guides, stems and lifting devices...... | 7,500 pounds at................................................................ <br> (Words) <br> ..................................($.............) per pound... | $................... |
| | | Total ................................................................ | $................... |

## SCHEDULE 2.

*Clear Lake Dikes.*

| Item No. | Work or Material. | Quantity and Price. | Amount. |
|---|---|---|---|
| 12... | Excavation for embankment ...... | 14,600 cubic yards at.................................................<br>            **(Words)**<br>.............................................($.................) per cubic yard... | $.................... |
| 13... | Rock pitching in embankment ...... | 10,300 cubic yards at.................................................<br>            **(Words)**<br>.............................................($.................) per cubic yard... | $.................... |
| | | Total ................ ............................................... | $.................... |

(12)

7-294.                                                    Construction.

## SPECIFICATIONS.

### GENERAL CONDITIONS.

1. *Form of proposal and signature.*—The proposal shall be made on the form provided therefor and shall be inclosed in a sealed envelop markt and addrest as required in the notice to bidders.  The bidder shall state in words and in figures the unit prices or the specific sums, as the case may be, for which he proposes to supply the material and perform the work required by these specifications.  If the proposal is made by an individual it shall be signed with his full name, and his address shall be given; if it is made by a firm it shall be signed with the copartnership name by a member of the firm, and the name and full address of each member shall be given; and if it is made by a corporation it shall be signed by an officer with the corporate name attested by the corporate seal.  No telegraphic proposal or telegraphic modification of proposal will be considered.

2. *Proposal.*—Blank spaces in the proposal shall be properly filled in, the phraseology of the proposal should not be changed, and no additions should be made to the items mentioned therein.  Unauthorized conditions, limitations or provisos attacht to a proposal will render it informal and may cause its rejection.  Alterations by erasure or interlineation shall be explained or noted in the proposal over the signature of the bidder.  If the unit price and the total amount named by a bidder for any item do not agree, the unit price alone will be considered as representing the bidder's intention.  A bidder may withdraw his proposal before the expiration of the time during which proposals may be submitted, without prejudice to himself, by submitting a written request for its withdrawal to the officer who holds it.  No proposals received after said time will be considered.  Bidders are invited to be present at the opening of proposals.  The right is reserved to reject any or all proposals, to accept one part of a proposal and reject the other, and to waive technical defects, as the interests of the United States may require.

3. *Certified check.*—Each bidder shall submit with his proposal a certified check for the sum stated in the notice to bidders, drawn to the order of the Secretary of the Interior, hereinafter styled Secretary.  The proceeds of said check shall become the property of the United States if the bidder fails or refuses to execute the required contract and bond within the time specified in Paragraph 4 in case his proposal is accepted.  The check of the successful bidder will be returned after the execution of his contract and the approval of his bond by the Director of the Reclamation Service, hereinafter styled Director, and those of the other bidders will be returned at the expiration of forty-five days from the date of opening proposals.

4. *The contract.*—The bidder to whom award is made shall execute a written contract with the United States and furnish good and approved bond within fifteen days after receiving them for execution.  The contract shall be in the form adopted by the Reclamation Service.  This form may be examined at the offices of the Reclamation Service, or copies will be furnisht, on request, to parties proposing to bid.  If the bidder to

14

whom an award is made fails to enter into a contract as herein provided, the award will be annulled and an award may be made to the next most desirable bidder in the opinion of the Secretary; and such bidder shall fulfil every stipulation embraced herein as if he were the original party to whom an award was made. The advertisement, proposal, general conditions and detail specifications will be incorporated in the contract. A corporation to which an award is made will be required, before the contract is finally executed, to furnish certificate of its corporate existence and evidence that the officer signing the contract is duly authorized to do so.

5. *Contractor's bond.*—Unless another sum is specified in the notice to bidders or the proposal, the contractor shall furnish bond in the sum of twenty per cent of the estimated aggregate payments to be made under the contract, conditioned upon faithful performance by the contractor of all covenants and stipulations in the contract. If during the continuance of the contract any of the sureties die, or, in the opinion of the Director, are irresponsible, the Director may require additional sufficient sureties, which the contractor shall furnish to the satisfaction of that officer within ten days after notice, and in default thereof the contract may be suspended by the Director and the work completed as provided in Paragraph 22.

6. *Transfers.*—Transfer of a contract or of any interest therein is prohibited by law.

7. *Eight-hour law, foreign labor and convict labor.*—In all construction work eight hours shall constitute a day's work and no Mongolian labor shall be employed thereon. The importation of foreigners and laborers under contract to perform labor in the United States or the Territories or the District of Columbia is prohibited. (Sec. 3738, Rev. Stat., U. S., Acts: Aug. 1, 1892, 27 Stat. L., 340; June 17, 1902, section 4, 32 Stat. L., 388; Feb. 26, 1885, 23 Stat. L., 332; and Feb. 23, 1887, 24 Stat. L., 414.) In the performance of this contract no persons shall be employed who are undergoing sentences of imprisonment at hard labor imposed by courts of the several States, Territories or municipalities having criminal jurisdiction. (Executive order, May 18, 1905.)

8. *Engineer.*—The word "engineer" used in these specifications or in the contract, unless qualified by the context, means the Chief Engineer of the Reclamation Service. He will be represented on the work by assistants and inspectors authorized to act for him and direct the work. On all questions concerning the execution of the work, the classification of material and the determination of cost, the decision of the chief engineer shall bind both parties.

9. *Contractor.*—The word "contractor" used in these specifications or in the contract means the person, firm or corporation with whom the contract is made by the United States. The contractor shall give his personal attention to the faithful prosecution of the work and shall keep it under his personal control, and in his absence his foreman or a designated agent shall represent him. Instructions and information given by the engineer to the contractor's foreman or agent on the work shall be considered as having been given to the contractor. When two or more contractors are engaged on work in the same vicinity the engineer shall be authorized to direct the manner in which each shall conduct his work so far as it affects other contractors.

10. *Transportation.*—The contractor shall furnish the engineer copies of expense bills for transportation charges on all machinery, materials and supplies shipt to or from the project in connection with the work under this contract. The contracts be-

15

tween the United States and the railroad companies concerning freight rates do not provide for any concessions in rates to contractors, who will not therefore be entitled to claim any benefits under such contracts.

11. *Local conditions.*—Bidders shall satisfy themselves as to local conditions affecting the work, and no information derived from the maps, plans, specifications, profiles or drawings, or from the engineer or his assistants, will relieve the contractor from any risk or from fulfilling all of the terms of his contract. The accuracy of the interpretation of the facts disclosed by borings or other preliminary investigations is not guaranteed. Each bidder or his representative should visit the site of the work and familiarize himself with local conditions; failure to do so when intelligent preparation of bids depends on a knowledge of local conditions may be considered sufficient cause for rejecting a proposal.

12. *Mortgaging plant, etc.*—The contractor shall not give or execute any mortgage, deed of trust or other conveyance affecting his right, title, interest or property in or to any plant, machinery, tools, appliances, supplies, materials or animals that may at any time be used in the prosecution of this contract.

13. *Specifications and drawings.*—The contractor shall keep on the work a copy of the specifications and drawings, and shall at all times give the engineer access thereto. Any drawings or plans listed in the detail specifications shall be regarded as part thereof and of the contract. Anything mentioned in these specifications and not shown in the drawings, or shown in the drawings and not mentioned in these specifications, shall be done as tho shown or mentioned in both. The engineer will furnish from time to time such detail drawings, plans, profiles and information as he may consider necessary for the contractor's guidance.

14. *Experience.*—Bidders shall, if required, present satisfactory evidence that they have been regularly engaged in constructing such work as they propose to execute and that they are fully prepared with necessary capital, machinery and material to begin the work promptly and to conduct it as required by these specifications.

15. *Damages.*—The contractor will be held for, and required to make good, at his own expense, all damage to person or property caused by carelessness or neglect on the part of the contractor, his agents or employes.

16. *Character of workmen.*—The contractor shall not allow his agents or employes to trespass on premises or lands in the vicinity of the work. When required by the engineer, he shall discharge any person who commits trespass or is disorderly, dangerous, insubordinate or incompetent, employed on or about the works under construction by the United States. None but skilled foremen and workmen shall be employed on work requiring special qualifications.

17. *Staking out work.*—The work to be done will be staked out for the contractor, who shall provide such material and give such assistance as may be required by the engineer.

18. *Methods and appliances.*—The methods and appliances adopted by the contractor shall be such as will secure a satisfactory quality of work and will enable him to complete the work in the time agreed upon. If at any time such methods and appliances appear inadequate, the engineer may order the contractor to improve their character or efficiency, and the contractor shall conform to such order; but failure of the

16

engineer to order such improvement of methods or efficiency will not relieve the contractor from his obligation to perform good work and to finish it in the time agreed upon.

19. *Samples or specimens.*—The contractor shall submit samples or specimens of such materials to be used in the work as the engineer may require.

20. *Material and workmanship.*—All materials must be of the specified quality and equal to approved samples. All work shall be done and completed in a thoro, workmanlike manner by mechanics skilled in their trades, notwithstanding any omission from these specifications or the drawings. All materials furnisht and all work done must be satisfactory to the engineer, and, if not in accordance with the specifications in the opinion of the engineer, shall be made to conform therewith. Unsatisfactory material will be rejected, and, if so ordered by the engineer, shall, at the contractor's expense, be immediately removed from the vicinity of the work.

21. *Delays.*—The contractor shall receive no compensation for delays or hindrances to the work, except that, if in the judgment of the engineer direct and unavoidable extra cost to the contractor is caused by the failure of the United States to provide necessary information, material or right of way, then on presentation of a written claim by the contractor not later than thirty days after the close of the month during which extra cost is claimed to have been incurred, such claim, if found correct by the engineer, will be approved. The decision of the chief engineer as to the amount of such extra cost shall be conclusive and binding on both parties. Extension of time will be allowed for unavoidable delays that result from unforeseen causes that, in the opinion of the engineer, approved by the Secretary, are undoubtedly beyond the control of the contractor. If delay is caused by specific orders to stop work given by the Director or by the engineer, or caused by the performance of extra work duly ordered by either of them, or by their failure to provide sufficient material or necessary instructions for carrying on the work, or to provide necessary right of way, then such delay will entitle the contractor to an equivalent extension of time. An application for extension of time must be accompanied by the formal consent of the sureties, but an extension of time whether with or without the consent of the sureties, shall not release them from their obligations, which shall remain in full force until the discharge of the contract.

22. *Suspension of contract.*—If the contractor fails to begin the work or the delivery of material as provided in the contract or to prosecute the work or delivery in such a manner as to insure a full compliance with the contract within the time limit, or if the contractor is not carrying out the provisions of his contract in their true intent and meaning, notice in writing will be served on him to provide within a specified time for a satisfactory compliance with the contract, and, if he neglects or refuses to comply with such notice, the Director may suspend the operation of all or any part of the contract. Upon such suspension the Director may in his discretion take possession of all or any part of the machinery, tools, appliances, animals, materials and supplies used on the work covered by the contract or that have been shipt or delivered by or on account of the contractor for use in connection therewith, and he may use the same for the completion of the work suspended either directly by the United States or by other parties for it; or the Director may employ other parties to perform the work, substitute other machinery or materials, purchase the material contracted for in such manner as he may deem proper, or hire such force and buy such machinery, tools, appliances, materials, supplies and animals at the contractor's expense as may be necessary for the proper conduct and completion of the work. Any cost arising therefrom in excess of the contract price will be charged to the contractor and his sureties, who shall be liable therefor. If, in the opinion of the engineer, there is an

17

emergency for the performance of certain work or the furnishing of certain material under the contract, and if the contractor fails to perform such work and to furnish such material within a reasonable time fixt by written notice from the engineer to the contractor, then the engineer shall have the power to perform such work or to furnish such material at the expense of the contractor and his sureties, who shall be liable therefor. In the determination of the question whether there has been such non-compliance with the contract as to warrant its suspension or the performance of work or the furnishing of material as herein provided, the decision of the Director shall bind both parties.

23. *Climatic conditions.*—The engineer may order the contractor to suspend any work that may be damaged by climatic conditions. When delay is caused by an order to suspend work, given on the account of abnormal climatic conditions that could not have been reasonably foreseen, such delay will entitle the contractor to an equivalent extension of time.

24. *Quantities and unit prices.*—The quantities noted in the schedule or proposal are approximations for comparing bids, and no claim shall be made against the United States for excess or deficiency therein, absolute or relative. Payment at the prices agreed upon will be in full for the completed work, and will cover materials, supplies, labor, tools, machinery and all other expenditures incident to satisfactory compliance with the contract.

25. *Changes in quantities.*—The Secretary reserves the right to make such changes in the quantities of work or material as may be deemed advisable, without notice to the sureties on the contractor's bond, by adding thereto or deducting therefrom at the unit prices of the contract. These changes will include modifications of shapes and dimensions of canals, dams and structures of whatsoever nature, particularly foundation work, to suit conditions disclosed as work progresses. If any change is made in a particular piece of work after it has been commenced, so that the contractor is put to extra expense, the engineer will make reasonable allowance on account thereof, which action shall bind both parties. Extra work or material shall be charged for as hereinafter provided.

26. *Extra work or material.*—In connection with the work covered by this contract the engineer may order work or material not covered by the contract. Such work or material will be clast as extra work and will be ordered in writing. No extra work will be paid for unless ordered in writing. Extra work shall be charged for at actual necessary cost, as determined by the engineer, plus fifteen per cent for profit, superintendence and general expenses. The actual necessary cost will include all expenditures for materials, labor and supplies furnisht by the contractor, but will not include any allowance for the use of tools or machinery, office expenses, general superintendence or other general expenses. At the end of each month the contractor shall present in writing his claims for extra work, and, when requested by the engineer, shall furnish itemized statements of the cost of extra work ordered and give the engineer access to accounts, bills and vouchers relating thereto.

27. *Changes at contractor's request.*—If the contractor, on account of conditions developing during the progress of the work, finds it impracticable to comply strictly with these specifications and applies in writing for a modification of structural requirements or of methods of work, such change may be authorized by the engineer if not detrimental to the work and if without additional cost to the United States.

28. *Inspection of work.*—All material furnisht and work done under this contract will be subject to rigid inspection. The duly authorized engineers and inspectors of the Reclamation Service shall have the right to inspect the work and the materials. The contractor shall furnish such persons reasonable facilities for obtaining such infor-

18

mation as they desire respecting the character of the materials and the progress and manner of the work, including all information necessary to determine its cost, such as the number of men employed, their pay, the time during which they worked on the various classes of construction, etc. He shall, when required, furnish the engineer and his assistants meals and camp accommodations at reasonable prices at any camp under his control. Whenever the contractor is permitted or directed to do night work or to vary the period during which work is carried on each day, he shall give the engineer due notice, so that inspection may be provided for. Such work shall be done without extra compensation and under regulations to be furnish in writing by the engineer.

29. *Removal of defective work.*—The contractor shall remove and rebuild at his own expense any part of the work that has been improperly executed, even tho it has been included in the monthly estimates. If he refuses or neglects to replace such defective work, it may be replaced by the United States at the contractor's expense.

30. *Protection of work and cleaning up.*—The contractor shall be responsible for any material furnish him and for the care of all work until its completion and acceptance, and he shall at his own expense replace damaged or lost material and repair damaged parts of the work, or the same may be done at his expense by the United States. He shall take all risk from floods and casualties and shall make no charge for detention from such causes. He may, however, be allowed a reasonable extension of time on account of such detention, subject to the conditions hereinbefore specified. Rubbish, unused material and false work shall be removed from the vicinity of completed work.

31. *Errors and omissions.*—The contractor will not be allowed to take advantage of any error or omission in these specifications. Instructions will be given when such error or omission is discovered.

32. *Roads and fences.*—Roads subject to interference from the work covered by this contract shall be kept open, and fences subject to interference shall be kept up by the contractor until the work is finisht.

33. *Bench marks and survey stakes.*—Bench marks and survey stakes shall be preserved by the contractor, and in case of their destruction or removal by him or his employes, they will be replaced by the engineer at the contractor's expense.

34. *Right of way.*—The right of way for the works to be constructed and for necessary borrow pits, channels, spoil banks, ditches, roads, etc., will be provided by the United States.

35. *Sanitation.*—The chief engineer may establish sanitary and police rules and regulations for all forces employed under this contract; and if the contractor fails to enforce these rules the engineer may enforce them at the expense of the contractor.

36. *Intoxicants.*—The use or sale of intoxicating liquor is absolutely prohibited on the work except under the direction and supervision of the engineer, and then only for medicinal purposes.

37. *Contractor's financial obligations.*—The contractor shall promptly make payment to all persons supplying labor and materials in the execution of the contract, and a condition to this effect shall be incorporated in the contractor's bond, pursuant to the Act of February 24, 1905 (33 Stat. L., 811), and acts amendatory thereof. The contractor shall make such financial arrangements that his employes will not suffer loss in securing their pay.

017375



PLAN OF DAM

DRILL HOLES

TEST PITS

Clay
Sand
Boulders and Clay
Hard Lava, seams of clay and sand
Soft Brown Lava

DEPARTMENT OF THE INTERIOR
UNITED STATES RECLAMATION SERVICE
KLAMATH PROJECT   OREGON-CALIFORNIA
CLEAR LAKE DAM AND DIKES
GENERAL MAP AND PLAN OF DAM
SPECIFICATIONS NO. 151

017376



017377



FRONT ELEVATION. LINE AA.

LONGITUDINAL SECTION ON LINE BB.

SECTION EE.

HORIZONTAL SECTION ELEV. 4521.6

DETAILS OF GATE WALLS.

SECTION DD.            SECTION CC.

CLEAR LAKE DAM AND DIKES
DETAILS OF OUTLET WORKS

017378



017379



# DETAIL SPECIFICATIONS.

## GENERAL PROVISIONS.

38. *The requirement.*—It is required that there be constructed and completed in accordance with these specifications and the drawings hereinbelow listed a dam with appurtenant structures at the outlet of Clear Lake, Modoc County, California, and two dikes at the southern extremity of said lake, situated thirteen miles from the dam, both dam and dikes being approximately fifty-five miles southeast from Klamath Falls, Oregon.

39. *List of drawings.*—

  1. (10082) General map and plan of dam.
  2. (10083) Sections of dam and spillway.
  3. (10084) Details of outlet works.
  4. (10085) Details of spillway.
  5. (10086) Plan and details of dikes.

40. *Beginning and completion of work.*—The contractor shall commence work under Schedule 1 promptly after the date of signing the contract by the Director and shall complete the excavation and refilling of trenches under the dam, all of the outlet works and not less than 20 per cent of the rockfill portion of the dam on or before November 1, 1908, and all of the work under the schedule as a whole on or before October 1, 1909; and he shall prosecute the work with a force sufficient, in the opinion of the engineer, to complete the several parts and the whole of the work on or before the respective dates specified for completion. The contractor shall commence the work under Schedule 2 on April 1, 1909, or as soon thereafter as the weather will permit, and shall complete it on or before October 1, 1909. The amount of work performed under Schedule 1 during 1908 shall be limited to an aggregate cost of $65,000 on the basis of the unit prices bid.

41. *Failure to complete work in time agreed upon.*—Should the contractor fail to complete the work under either schedule or the portion of the work under Schedule 1 specifically enumerated in Paragraph 40 within the time agreed upon in the contract or within such extra time as may have been allowed for delays by formal extensions granted by the Secretary, there will be made for each and every day, including Sundays and holidays, that the said work remains uncompleted after the date required for its completion, a deduction, respectively, of $25 for the said enumerated portion of Schedule 1, $50 for Schedule 1 as a whole, and $25 for Schedule 2. The said amount is hereby agreed upon as liquidated damages for the loss to the United States on account of all expenses due to the employment of engineers, inspectors and other employes after the expiration of the time for completion and on account of the value of the operation of the irrigation works dependent thereon, and will be deducted from any money due the contractor under his contract, and the contract and sureties shall be liable for any excess.

42. *Progress estimates and payments.*—At the end of each calendar month the engineer will make an approximate measurement of all work done and material delivered up to that date, classified according to items named in the contract, and will make an estimate of the value of the same on the basis of the unit prices named in the contract. To the estimates made

19

20

as above set forth will be added the amounts earned for extra work to the date of the prog-
ress estimate. From the total thus computed a deduction of 10 per cent will be made and
from the remainder there will further be deducted any amount due to the United States from
the contractor for supplies or material furnisht or services rendered and any other amounts
that may be due to the United States as damages for delays or otherwise under the terms of
the contract. From the balance thus determined will be deducted the amount of all previous
payments and the remainder will be paid to the contractor upon approval of the accounts.
The 10 per cent deducted as above set forth will become due and payable to the contractor
upon completion of the work to the satisfaction of the chief engineer. In case of the suspen-
sion of the contract the said 10 per cent shall be and become the sole and absolute property
of the United States to the extent that the same may be necessary to repay to the United States
any excess in the cost of the work above the contract price. When the terms of the contract
shall have been fully complied with to the satisfaction of the chief engineer, and when a re-
lease of all claims against the United States under or by virtue of the contract shall have been
executed by the contractor, final payment of any balance due will be made.

~~42~~ 43. *Cement.*—All cement will be furnisht by the United States on board cars at the rail-
road station that, in the opinion of the engineer, is most convenient to the work. The con-
tractor shall haul the cement from the railroad station to the work and shall be responsible for
all demurrage charges. He shall furnish suitable warehouses for storing the cement until
used, and will be held responsible for any loss or injury to cement after its delivery at the rail-
road station. If the cement is shipt in sacks the contractor will be held responsible for the
return of the full number of sacks to the railroad station in as good condition as when received,
and will be charged for all lost or damaged sacks at the same rate as paid by the United
States. The contractor shall give the engineer sixty days notice in writing as to when he will
require the cement and shall state definitely the amount in barrels that he will require. The
work of hauling and caring for cement will be paid for under items **X** and **X**, Schedule 1.

~~44~~ 44. *Metal work.*—All gates, gate frames, steel in tower, reinforcing steel, bolts and other
metal fixtures will be furnisht by the United States on board cars at the railroad station that,
in the opinion of the engineer, is most convenient to the work. The contractor shall haul the
material from the railroad station to the work and shall be responsible for all demurrage
charges. He will be held responsible for the condition of the material until it is set in place
and the work satisfactorily completed. The work of hauling, caring for and setting all metal
work will be paid for under items ~~9~~, ~~10~~ and ~~11~~, Schedule 1.

~~WORK UNDER SCHEDULE 1.~~

~~45~~ 45. *Description.*—Schedule 1 covers all of the work in connection with the construction
of a dam, spillway and outlet works at ~~the north end of Clear Lake. Rock for the rockfill~~
~~part of the dam will be obtained mainly from the excavation of the spillway, and earth for~~
~~the earth part of the dam will be obtained mainly from borrow pits on the south side hill,~~ up-
stream from the dam. ~~For convenience the different portions of the fill will hereafter be re-~~
~~ferred to as "embankment" and "rockfill."~~

above do b 7

EXCAVATION. & Embankment

~~46~~ 46. *Classification.*—All material required to be excavated in connection with the con-
struction of the dam, spillway and outlet works, ~~except as provided in Paragraph 51,~~ will be
measured in excavation and classified for payment as follows:

Class 1 (Schedule 1, items 1 ~~and 4~~). All material that can be plowed by a six-horse
team, each animal weighing not less than fourteen hundred pounds, attacht to a suitable

017382

44. <u>Character of Material</u>. — Existing Excavations along the line of the proposed canal, and at the dam site offer opportunities for the bidder to inspect the character of the material to be Excavated. Records of borings ~~made along the line~~ can also be inspected at the office. ~~by etc.~~ The United States, however, does not guarantee that the material ~~indicates~~ revealed is a true indication of the character of all the material that will be encountered, and the bidder must satisfy himself as to the nature of this material

23

directions of the engineer, and payment therefor will be made on the basis of extra work, as provided in Paragraph 26.

62. *Trenches under dam.*—Trenches running lengthwise with the dam shall be excavated as shown on the plans or as indicated by the engineer. The upper or cut-off trench shall be cut down to bed-rock to a width of 30 inches, if practicable, and in the event that the engineer decides that a concrete cut-off wall shall be built in such trench, such cut-off wall shall be not less than ten inches in thickness at the top and of such other dimensions as may be determined by the engineer. The concrete in such cut-off wall will be paid for under Item 8, Schedule 1. Forms shall be removed as soon as permitted by the engineer and the remaining space between the sides of the trench and the wall shall be refilled with the best material available, properly wet and tampt. If the engineer deems the contruction of such concrete wall unnecessary, dependent upon the nature of the material encountered, the trench shall be re-filled with the best available material, properly wet and hand tampt. The excavation of the trench will be paid for under items 1 to 6, Schedule 1. The refilling will be paid for as extra work under the provisions of Paragraph 26. The lower trench under the dam at the downstream toe shall be excavated to bed rock and the material taken therefrom, if deemed suitable by the engineer, shall be placed in the earth section of the dam and there disposed of as specified in Paragraph 67; otherwise it shall be wasted as directed by the engineer. The excavation of the lower trench will be measured in excavation and paid for under items 1 to 6, Schedule 1.

63. *Spillway excavation.*—The spillway will be excavated at the north end of the dam, as shown on drawings 1, 2 and 4. All material excavated therefrom shall be placed in the dam in the manner specified in paragraphs 65, 66 and 67, except that if material is excavated that in the opinion of the engineer is unsuitable for incorporation in the dam, it shall be wasted at locations reasonably convenient, as directed by the engineer. If there is an excess of rock from the spillway excavation, the excess shall be deposited on the lower slope of the dam in accordance with lines and grades to be establisht from time to time by the engineer. The spillway excavation shall be carried on with reasonable care in blasting so as not to shatter rock outside of the neat lines of excavation, and the contractor will be required at his own expense to fill with loose rock or concrete to the satisfaction of the engineer any holes that may be made in either the sides or bottom, due to careless or excessive use of powder. Payment for excavation of material used in concrete shall be included in the unit prices bid for items 7 and 8, Schedule 1. All other excavation will be paid for under items 1 to 6, Schedule 1, and the prices bid for said items shall include disposal of the material in the dam as specified in paragraphs 65, 66 and 67.

64. *Excavation for outlet works.*—The excavation for outlet works shall be done to lines as shown on drawings 1, 3 and 4, or as directed by the engineer. Unsound rock or rock of a seamy nature below concrete work shall be removed as the engineer may require. The contractor shall refill with concrete at his own expense, as may be required by the engineer, all holes due to careless or excessive use of powde or careless blasting. Trimming by hand without explosives may be required by the engineer in case such trimming is necessary to prevent shattering the rock. Payment for excavation of material used in concrete shall be included in the unit prices bid for items 7 and 8, Schedule 1. All other excavation for the outlet works will be paid for under items 1 to 6, Schedule 1, and the prices bid for said items shall include the disposal of the material in the dam as specified in paragraphs 65, 66 and 67.

65. *Rockfill.*—The main portion of the dam shall be built of rockfill as indicated on Drawing 2, to be obtained from the excavation for the spillway and other works. In this

24

portion of the dam the largest obtainable rock shall be dumpt along the downstream face. The material shall be dumpt in such manner that the spaces between the large rocks are to the greatest possible extent filled with smaller rocks, which work shall be done to the satisfaction of the engineer.  The dumping of rock shall be so arranged that the upstream portion of the rockfill shall be made of small fragments so far as afforded by the quarry and not required in the rock pitching specified in Paragraph 70.  Rockfilling over the outlet culvert shall not be done until after the concrete shall, in the opinion of the engineer, have sufficiently set, and any injury done to concrete work by carelessness shall be promptly made good by the contractor at his own expense.  Rock for refilling the trench over the outlet culvert shall be placed by hand to a depth of at least three feet and small rocks and spawls shall be used for filling spaces between the larger rocks.  In case the rock is dumpt from a trestle, all trestle timbers except posts shall afterward be removed from the dam.  Payment for rockfill will be included in payment for excavation under items 3 and 6, Schedule 1.

66.  *Material for embankment.*—In the embankment shall be used such earthy, suitable materials as are taken from the excavations for the spillway, outlet works and trenches, and the necessary additional material shall be borrowed in the vicinity of the dam site.  Test pits indicate that material on the south side hill upstream from the dam will be satisfactory for earth embankment, but all borrow pits must be approved by the engineer, both as to location and quality of material to be excavated therefrom.  Excavation from borrow pits will be measured in excavation and will be paid for at the unit price bid for Item 1, Schedule 1, unless Class 2 material is excavated from such borrow pits under the specific instructions of the engineer, in which event the excavation of such material will be paid for at the unit price bid for Item 2, Schedule 1.  Disposing of the material in the dam, in accordance with the provisions of Paragraph 67, shall at all times be subject to the approval of the engineer, and payment therefor shall be included in the unit prices bid for excavation. The surface of all borrow pits shall be carefully cleared of brush, and all roots of more than ½ inch in diameter hauled on the embankment shall be removed therefrom.  Payment for clearing and removal of roots shall be included in the unit prices bid for excavation under items 1 and 2, Schedule 1.

67.  *Formation of embankment.*—The embankment shall be built in layers not exceeding six inches in depth after rolling.  The layers shall be thoroly watered and shall be rolled with grooved rollers, weighing not less than 2,000 pounds per foot of tread, both watering and rolling to be satisfactory to the engineer.  No earth shall be placed in the embankment when either the earth or the embankment is frozen, or when the embankment is too wet to permit satisfactory rolling and consolidation.  The embankment shall be finisht to lines and grades furnisht by the engineer, who will make due allowance for future settlement in furnishing such lines and grades.  Payment for construction of the embankment, as herein specified, shall be included in the unit prices bid for excavation, under items 1 and 2, Schedule 1.

68.  *Overhaul.*—The average haul of all material placed in the embankment will be measured on completion of the work, and if it is found to exceed 600 feet, the contractor will be paid for overhaul at the rate of 1½c per cubic yard per 100 feet for the entire mass for such distance as the average haul may be found to exceed 600 feet.

69.  *Hydraulicking.*—The contractor may at his option build the embankment by the hydraulic method.  If so constructed the embankment shall be built to true lines and grade and due allowance shall be made for future settlements, as the engineer may direct.  The contractor shall so plan his work that, so far as practicable, the coarser parts of the earth shall be deposited next to the rockfill and the finer parts next to the water slope.  If the embankment

is constructed by the hydraulic process the material placed therein will be measured for payment to the neat lines shown on the drawings or establisht by the engineer, and no allowance will be made for overhaul, wastage or shinkage during construction. Payment for material placed by this process will be made at the unit price bid for excavation under Item 1, Schedule 1.

70. *Rock pitching.*—Part of the rock excavated from the spillway shall be dumpt in place on the water face of the dam, forming a layer two feet in thickness. The twelve inches of this layer next to the embankment shall consist of the finer portion of the quarry material, and the remainder of the layer shall be of larger stones, none of which shall exceed in volume one-half cubic foot. The slopes shall be finisht to the neat lines of the dam shown on drawings 2 and 3 or establisht by the engineer. Payment for rock pitching shall be included in the unit prices bid for excavation under items 3 and 6, Schedule 1.

## WORK UNDER SCHDULE 2.

71. *Description.*—Schedule 2 covers all work in connection with the construction of two dikes located at the southern extremity of Clear Lake. Plans and details of the work are shown on Drawing 5. The main dike between stations 0 and 16 will consist of earthfill and rock pitching. The low dike between stations 19 and 35+50 will consist principally of loose rock pitching.

72. *Preparation of foundation.*—The ground under the earth fill portion of the main dike shall be thoroly plowed to a depth of twelve inches and all vegetable matter shall be removed from the site of the dike. Payment for this work shall be included in the unit price bid for excavation for embankment under Item 12, Schedule 2.

73. *Trenches.*—Cut-off and drainage trenches shall be excavated as shown on the drawings or as required by the engineer. Material thus excavated shall be placed in the earth fill portion of the dike unless deemed unsuitable by the engineer, in which case it shall be wasted as he may direct. Excavation for cut-off and drainage trenches will be measured in excavation and will be paid for under Item 12, Schedule 2. The price bid shall include the disposal of the material.

74. *Earth embankment.*—The material for earth embankment shall be obtained from the cut-off and drainage trenches so far as deemed suitable by the engineer, and the remainder shall be taken from borrow pits selected by the contractor as most convenient to the work and approved as to location and character of material by the engineer. No pit shall be closer than 25 feet to the toe of the finisht dike. The pits shall be cleared of brush and roots shall be removed the same as specified for the embankment in Paragraph 66. All earth material placed in the dike shall be suitable for water-tight embankment. It shall be spread in layers, sprinkled and rolled, the same as specified for embankment in Paragraph 67. The limit of free haul shall be 200 feet. Overhaul when ordered by the engineer will be paid for at the rate of 1½c per cubic yard per 100 feet of haul. Payment for the earth embankment will be made on the basis of measurement in excavation under Item 12, Schedule 2. Proper reduction of earth excavation and addition to rock pitching will be made for stones removed from earth embankment and placed in rock pitching by order of the engineer.

75. *Rock pitching.*—Rock pitching shall consist of rock to be obtained from the surface of the ground in the vicinity, which shall be dumpt in place in the dike. Dumping shall be done in such manner as to fill the spaces between the large rocks with small rocks, as far as practicable. The larger rocks shall be placed near the downstream toe and the smaller rocks towards the water face and on the top and slope of the earth fill. The slopes shall be finisht

017386

26

to the neat lines shown on Drawing 5 or establisht by the engineer.  Where the low dike consists of rock pitching alone, the material used and work done shall be the same as above specified for the rock pitching in connection with the earth embankment.  The bidder must satisfy himself as to the average length of haul required to obtain the necessary material for rock pitching, and he is expected to make his bid accordingly, no payment being allowed for overhaul.  The rock pitching will be measured in embankment to the neat lines shown on Drawing 5 or establisht by the engineer and payment therefor will be made at the unit price bid for Item 13, Schedule 2.

017387

## Stas. 1598 - 1958.



$$n = .025 \qquad V = 1.62\,f/s$$
$$Q = 78\,s.f \qquad r = 2.35$$
$$a = 48^{\,s'} \qquad S = .00025$$

## Stas. 1958 - 2478.



$$n = .025 \qquad V = 1.58\,f/s$$
$$Q = 62\,s.f. \qquad r = 2.12$$
$$a = 39.27^{\,s'} \qquad S = .000276$$

U.S. RECLAMATION SERVICE
F.H. Newell, Director, A.P. Davis, Chief Engineer

Upper Klamath Project Ore - Cal.

# Cross Sections of Canals

Scale 1" = 10'       March 1908

D.C. Henny, Supervising Engr. E.G. Hopson, Asst. Supv. Engr.
D.W. Murphy, Project Engineer

K - 1 - 9 - 12
12 - 201 - 1722



Cross Section of
Outlet Tunnel
Scale  1 in = 5 ft.

Loose Rock

Slope 1½ to 1

Slope 3 to 1   r. Riprap

Earth

Maximum  Cross Section  of Dam

Earth & Boulders

Scale of Feet

1 inch = 30 feet

Reclamation  Service  U.S.G.S.
KLAMATH PROJECT
Proposed Plan of Dam for
HORSEFLY RESERVOIR

017388

Portland, Oregon, May / 1908.

Hon. John H. Lewis,

    State Engineer,

        Salem, Oregon.

Dear Sir:

    Pursuant to the provisions of section 2 of the legislative act of Oregon, dated February 22, 1905, I am forwarding herewith for filing in your office enclosures marked in alphabetical order from A to H, being plans and specifications of the various features of the Klamath Project, Oregon-California, United States Reclamation Service.

    Inasmuch as notice of appropriation of the waters of the Klamath Basin, Klamath County, Oregon was filed in your office in accordance with the provisions of the above mentioned statute May 18, 1905, the above papers are being sent to you for filing as a second step in compliance with this statute.

    In pursuance of the policy of cooperation between the Reclamation Service and your office, I am also enclosing for your files four photographs of completed structures under the Klamath Project and a certificate to the effect that the construction of the works has been authorized by the United States; that the contracts have been entered into and that the work is now under way.

Very respectfully yours,

(Signed) D. C. Henny,

Supervising Engineer

017390

1                                       R.O. Draft 8/26-1970

2                           UNITED STATES

                     DEPARTMENT OF THE INTERIOR        Contract No.

3                      BUREAU OF RECLAMATION         14-06-200-5737A

                Klamath Project, Oregon-California

4         CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND

5           DALE A. FLEMING AND JANICE M. FLEMING

         PROVIDING FOR PROJECT WATER SERVICE AND

6            PAYMENT OF CONSTRUCTION CHARGES

7         THIS CONTRACT, made this   18   day of  January , 1972,

8 in pursuance generally of the Act of June 17, 1902 (32 Stat. 388),

9 and acts amendatory thereof or supplementary thereto, all collectively

10 hereinafter referred to as the Federal reclamation laws, between THE

11 UNITED STATES OF AMERICA, hereinafter referred to as the United States,

12 represented by the Secretary of the Interior or his duly authorized

13 representative, hereinafter referred to as the Secretary or Contracting

14 Officer, and   DALE A. FLEMING AND JANICE M. FLEMING, his wife

15                 , hereinafter referred to as the Contractor,

16         WITNESSETH, That:

17         WHEREAS, the United States has constructed the Klamath

18 Irrigation Project in the States of Oregon and California and has

19 available for delivery therefrom a supply of water; and

20         WHEREAS, the Contractor desires to contract with the United

21 States for a water supply for the irrigable area of the land herein

22 described: 30.3 acres in the $SW\frac{1}{4}SW\frac{1}{4}$ and 30.0 acres in the $SE\frac{1}{4}SW\frac{1}{4}$,
Section 25, in Township 39 South, Range 9 East, Willamette Meridian,
containing in all 60.3 acres of irrigable land.

002260

1       All in Section 25, Township 39 South, Range 9 East, Willamette

2    Meridian--

3              SW¼SW¼        –        30.3 irrigable acres

4              SE¼SW¼        –        30.0

5                                     60.3 Total irrigable acres

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1(a)

002261

017392

1    NOW, THEREFORE, in consideration of the covenants herein

2 contained, it is hereby agreed as follows:

3    1.  Upon the terms and conditions set forth below the United

4 States will provide irrigation water for delivery to and for

5 beneficial use upon the irrigable lands of the Contractor described

6 as follows:

7    2.  Delivery of water to the Contractor's irrigable lands will

8 be made through Klamath Project distribution facilities operated

9 and maintained by Klamath Irrigation District.  The Contractor shall

10 schedule all water to be delivered with Klamath Irrigation District

11 and pay all assessed charges for operation and maintenance to that

12 District or its successors in interest.

13    3.  In consideration of the delivery of water by the United

14 States, in accordance with the schedule of delivery submitted by

15 the Contractor to the Klamath Irrigation District and the terms

16 and conditions of this contract, the Contractor agrees to pay to the

17 United States $ 2,562.75  in 80 equal semiannual installments, which

18 shall be due and payable on June 30 and December 31 of each year,

19 commencing on June 30 following the date of execution of this

20 contract.

21

22

002262

1      4.   The United States assumes no responsibility for and neither

2   it nor its officers, agents, or employees shall have any liability

3   for or on account of:

4            (a)   The quality of water to be diverted by the Contractor;

5            (b)   The control, carriage, handling, use, disposal, or

6         distribution of said water outside the facilities being operated

7         and maintained by the United States;

8            (c)   Claims of damage of any nature whatsoever, including,

9         but not limited to, property loss or damage, personal injury,

10        or death arising out of or connected with the control, carriage,

11        handling, use, disposal, or distribution of said water outside

12        of the hereinabove referred to facilities; and

13           (d)   Any damage whether direct or indirect arising out of

14        or in any manner caused by a shortage of water whether such

15        shortage be on account of errors in operation, drought, or

16        unavoidable causes.

17     5.   The Contractor shall pay a penalty on installments or charges

18  which become delinquent computed at the rate of 0.5% per month of the

19  amount of such delinquent installments or charges for each day from such

20  delinquency until paid:  Provided, That no penalty shall be charged to

21  the Contractor unless such delinquency continues for more than 30 days.

3

017394

1    d.  For the purpose of securing payment to the United States of

2    the obligations described in Article 3, according to the conditions

3    herein stated, a lien in favor of the United States in the amount of

4    the total obligation described in Article 3, is hereby created and

5    made a charge upon all of the said land.  Upon the failure of the

6    Contractor for 2 or more successive years to make payments described

7    in Article 3 and at the times and in the manner therein described,

8    the United States is hereby authorized to foreclose the lien hereby

9    created and to sell said land to satisfy the obligation due the

10   United States:  Provided, however, That no water shall be made

11   available to the Contractor after any 12-month period in which the

12   Contractor may be in arrears in the payment of charges accruing

13   under this contract.

14       2.  The United States reserves the right to collect for use

15   on the Klamath Project all waste and seepage water coming from the

16   lands of the Contractor.  The Contractor shall have the right to

17   discharge waste and seepage water into the drainage system of the

18   Klamath Project.

19       3.  (a)  The Secretary reserves the right to make, after an

20   opportunity has been afforded to the Contractor for consultation,

21   rules and regulations consistent with the provisions of this

22   contract, the laws of the United States, and the State of Oregon,

6

1   to add to or to modify them as may be deemed proper and necessary

2   to carry out this contract, and to supply necessary details of

3   its administration which are not covered by express provisions of

4   this contract.  The Contractor agrees to observe such rules and

5   regulations.

6        (b)   Where the terms of this contract provide for action

7   to be based upon the opinion or determination of either party to

8   this contract, whether or not stated to be conclusive, said terms

9   shall not be construed as permitting such action to be predicated

10  upon arbitrary, capricious, or unreasonable opinions or determinations.

11  The Secretary's decision on all questions of fact arising under this

12  contract shall be made only after consultation with the Contractor

13  and shall be conclusive upon the parties thereto.

14       9.   The Contractor agrees to submit through the Klamath Irrigation

15  District to the Contracting Officer or his authorized representative,

16  on or before December 31 of each year, a report of crop and livestock

17  production in such form as the Contracting Officer may request.

18       10.  The Contractor agrees that the proper officials, agents,

19  or employees of the United States shall have the right of ingress to

20  and egress from the property as described in Article 1 above, at all

21  proper times and places as may be necessary to carry out the provisions

22  of this contract.

002265

017396

1      11.  The expenditure or advance of any money or the performance

2    of any work by the United States hereunder which may require appropri-

3    ation of money by the Congress or the allotment of funds shall be

4    contingent upon such appropriation or allotment being made.  The

5    failure of the Congress to appropriate funds or the absence of any

6    allotment of funds shall not relieve the Contractor from any

7    obligations under this contract.  No liability shall accrue to the

8    United States in case such funds are not appropriated or allotted.

9      12.  No Member of or Delegate to Congress or Resident Commissioner

10    shall be admitted to any share or part of this contract or to any

11    benefit that may arise herefrom.  This restriction shall not be

12    construed to extend to this contract if made with a corporation for

13    its general benefit.

14      13.  (a)  Any notice, demand, or request authorized or required

15    by this contract shall be deemed to have been given when mailed,

16    postage prepaid, or delivered to the Regional Director, Region 2,

17    Bureau of Reclamation, 2800 Cottage Way, Sacramento, California  95825

18    on behalf of the United States and to   Dale A. Fleming

19    Rt. 2, Box 580     Klamath Falls     Oregon

20    97601    , on behalf of the Contractor.  The designation of

21    the addressee or the address may be changed by notice given in the

22    same manner as provided in this article for other notices.

002266

017397

1       14.   The provisions of this contract shall apply to and bind

2   the successors in interest and assigns of either party hereto.

3          IN WITNESS WHEREOF, the parties hereto have executed this

4   contract the day and year first hereinabove written.

5

6                                    THE UNITED STATES OF AMERICA

7

8                       Acting By _Robert Hammond_

9                                    Regional Director, Region 2
                                     Bureau of Reclamation

10

11                                   CONTRACTOR:

12

13                                   _Dale A. Fleming_
                                     Dale A. Fleming

14                                   _Janice M. Fleming_
15                                   Janice M. Fleming

16

17

18

19

20

21

22

7

002267

STATE OF OREGON   )
                  )  ss.
COUNTY OF KLAMATH )

On this ___18___ day of ___January___, in the year 19 72,

before me, _____W. G. Ely_____, a notary public

in and for said County and State, residing therein, duly commissioned

and sworn, personally appeared ___Dale A. and Janice M. Fleming___

_____, known to me to be the person whose names

is subscribed to the within instrument, and acknowledged to me that he

executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed

my official seal the day and year in this certificate first above

written.

_____
Notary Public in and for the
County of Klamath, State of Oregon

(SEAL)

My commission expires ___12-4-73___

017399

HAY L. ROBERTS, MANAGER
JOHN A. MARSHALL, PRESIDENT          WILLIAM BAJNUS, DIRECTOR          E. O. BORN, DIRECTOR          JOHN L. STEWART, JR., SECRETA

# KLAMATH IRRIGATION DISTRICT

HEADQUARTERS OFFICE
6640 K. I. D. LANE ~ (503) 882-6661
KLAMATH FALLS, OREGON 97601

December 7, 1971

Mr. Dale A. Fleming
Route 2, Box 580
Klamath Falls, Oregon - 97601

Dear Mr. Fleming:

The following Resolution was adopted at regular meeting of the Board of Directors, held on Friday, December 3, 1971:

"WHEREAS, Dale A. Fleming is now by purchase from the United States, the owner of land within the Klamath Irrigation District, and water is available for the 60.30 irrigable acres for which a water-right is desired, and

"WHEREAS, the United States is preparing an individual contract with Mr. Fleming, whereby the United States will collect original construction charges, and

"WHEREAS, water for use during the first half of the 1972 irrigation season, being through June 30, 1972, will be sold to Mr. Fleming on a rental basis at one half of the gravity Operation & Maintenance rate per acre,

"NOW, THEREFORE, BE IT RESOLVED: That 60.30 acres of the 64.60 irrigable acres in Mr. Fleming's ownership, be and are hereby placed on the Fiscal Year 1972-1973 assessment roll of the Klamath Irrigation District for Operation & Maintenance and Supplemental Construction charges."

☆ ☆ ☆ ☆ ☆

It was agreed that the supplemental construction charges would be prorated on assessment roll in accordance with the contracts, as follows:

| Supplemental Pump | | - 10 years @ 41¢ per acre per year |
| " | C-Flume | - 11 " @ 66¢ " " " " |
| " | Drainage | - 20 " @ 42¢ " " " " |

OF RECLAMATION
RECEIVED
DEC 17 1971
KLAMATH FALLS, OREGO'

Very truly yours,

KLAMATH IRRIGATION DISTRICT

_____
Secretary & Office Manager

Please acknowledge by signing in space provided and return the original in the self-addressed stamped envelope enclosed.

Date: _____ 1971                    _____
                                            DALE A. FLEMING

002269

017400

Vol. *173* Page ___1581___

R.O. Draft 8/26-1970
Rev. R.O. 1/28-1972

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

Contract No.
14-06-200-7191A

CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND
Guy A. Galletti
PROVIDING FOR PROJECT WATER SERVICE AND
PAYMENT OF CONSTRUCTION CHARGES

THIS CONTRACT, made this ___10___ day of ___January___,

19 _73_, in pursuance generally of the Act of June 17, 1902 (32 Stat. 388),

and acts amendatory thereof or supplementary thereto, all collectively

hereinafter referred to as the Federal reclamation laws, between THE

UNITED STATES OF AMERICA, hereinafter referred to as the United States,

represented by the Secretary of the Interior or his duly authorized

representative, hereinafter referred to as the Secretary or Contracting

Officer, and ___Guy A. Galletti, a single person___

___, hereinafter referred to as the Contractor,

WITNESSETH, That:

WHEREAS, the United States has constructed the Klamath

Irrigation Project in the States of Oregon and California and has

available for delivery therefrom a supply of water; and

WHEREAS, the Contractor desires to contract with the United

States for a water supply for the irrigable area of the land herein

described;

002270

017401

1582

1    NOW, THEREFORE, in consideration of the covenants herein

2    contained, it is hereby agreed as follows:

3        1.   Upon the terms and conditions set forth below the United

4    States will provide irrigation water for delivery to and for

5    beneficial use upon the irrigable lands of the Contractor described

6    as follows:    3.5 irrigable acres located in
           Portion of Lot 2, Section 28, Township 39 South,
7          Range 9 East, W.M., Klamath County, Oregon.
           Purchased from the Bureau of Reclamation in
8          accordance with terms of contract 14-06-201-2317.

9

10

11

12       2.   Delivery of water to the Contractor's irrigable lands will

13   be made through Klamath Project distribution facilities operated and

14   maintained by Klamath Irrigation District.  The Contractor shall schedule

15   all water to be delivered with Klamath Irrigation District and pay all

16   assessed charges for operation and maintenance to that District or its

17   successors in interest.

18

19

20

21

22

2

002271

017402

1583

1       3.  In consideration of the delivery of water by the United States,

2   in accordance with the schedule of delivery submitted by the Contractor

3   to the Klamath Irrigation District and the terms and conditions of this

4   contract, the Contractor agrees to pay to the United States $ 148.75

5   ~~for 86 equal semiannual installments~~, which shall be due and payable on *per G.G.*

6   ~~June 30 and December 31 of each year commencing on June 30 following~~ *per G.G.*

7   the date of execution of this contract.

8       4.  The United States assumes no responsibility for and neither it

9   nor its officers, agents, or employees shall have any liability for or

10  on account of:

11          (a)  The quality of water to be diverted by the Contractor;

12          (b)  The control, carriage, handling, use, disposal, or

13  distribution of said water outside the facilities being operated

14  and maintained by the United States;

15          (c)  Claims of damage of any nature whatsoever, including,

16  but not limited to, property loss or damage, personal injury, or

17  death arising out of or connected with the control, carriage,

18  handling, use, disposal, or distribution of said water outside

19  of the hereinabove referred to facilities; and

20          (d)  Any damage whether direct or indirect arising out of

21  or in any manner caused by a shortage of water whether such

22  shortage be on account of errors in operation, drought, or

23  unavoidable causes.

3

017403

1584

1        5.  The Contractor shall pay a penalty on installments or charges

2    which become delinquent computed at the rate of 0.5% per month of the

3    amount of such delinquent installments or charges for each day from

4    such delinquency until paid:  Provided, That no penalty shall be charged

5    to the Contractor unless such delinquency continues for more than 30 days.

6        6.  For the purpose of securing payment to the United States of

7    the obligations described in Article 3, according to the conditions

8    herein stated, a lien in favor of the United States in the amount of

9    the total obligation described in Article 3, is hereby created and made

10    a charge upon all of the said land.  Upon the failure of the Contractor

11    for 2 or more successive years to make payments described in Article 3

12    and at the times and in the manner therein described, the United States

13    is hereby authorized to foreclose the lien hereby created and to sell

14    said land to satisfy the obligation due the United States:  Provided,

15    however, That no water shall be made available to the Contractor after

16    any 12-month period in which the Contractor may be in arrears in the

17    payment of charges accruing under this contract.

18        7.  The United States reserves the right to collect for use on the

19    Klamath Project all waste and seepage water coming from the lands of

20    the Contractor.  The Contractor shall have the right to discharge waste

21    and seepage water into the drainage system of the Klamath Project.

22

002273

017404

1585

8.    (a)   The Secretary reserves the right to make, after an opportunity has been offered to the Contractor for consultation, rules and regulations consistent with the provisions of this contract, the laws of the United States, and the State of Oregon, to add to or to modify them as may be deemed proper and necessary to carry out this contract, and to supply necessary details of its administration which are not covered by express provisions of this contract.   The Contractor agrees to observe such rules and regulations.

(b)   Where the terms of this contract provide for action to be based upon the opinion or determination of either party to this contract, whether or not stated to be conclusive, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations.   The Secretary's decision on all questions of fact arising under this contract shall be made only after consultation with the Contractor and shall be conclusive upon the parties thereto.

9.   The Contractor agrees to submit through the Klamath Irrigation District to the Contracting Officer or his authorized representative, on or before December 31 of each year, a report of crop and livestock production in such form as the Contracting Officer may request.

017405

1586

10. The Contractor agrees that the proper officials, agents, or employees of the United States shall have the right of ingress to and egress from the property as described in Article 1 above, at all proper times and places as may be necessary to carry out the provisions of this contract.

11. The expenditure or advance of any money or the performance of any work by the United States hereunder which may require appropriation of money by the Congress or the allotment of funds shall be contingent upon such appropriation or allotment being made. The failure of the Congress to appropriate funds or the absence of any allotment of funds shall not relieve the Contractor from any obligations under this contract. No liability shall accrue to the United States in case such funds are not appropriated or allotted.

12. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise herefrom. This restriction shall not be construed to extend to this contract if made with a corporation for its general benefit.

13. (a) Any notice, demand, or request authorized or required by this contract shall be deemed to have been given when mailed, postage prepaid, or delivered to the Regional Director, Region 2, Bureau of Reclamation, 2800 Cottage Way, Sacramento, California  95825, on behalf

002275

017406

1587

1  of the United States and to ___Guy A. Calletti_____, 8130

2  Spring Lake Road_____, ___Klamath Falls_____, ___Oregon  97601___

3  _____, on behalf of the Contractor.  The designation of

4  the addressee or the address may be changed by notice given in the same

5  manner as provided in this article for other notices.

6      14.  The provisions of this contract shall apply to and bind the

7  successors in interest and assigns of either party hereto.

8          IN WITNESS WHEREOF, the parties hereto have executed this

9  contract the day and year first hereinabove written.

10

11                         THE UNITED STATES OF AMERICA

12                         By_____

13                         Acting Regional Director, Region 2
                              Bureau of Reclamation

14

15

16                         CONTRACTOR:

17

18

19

20

21

22

017407

1588

STATE OF OREGON )
) ss.
COUNTY OF KLAMATH )

On this    10    day of    January    , in the year 19 73 ,

before me,    W. G. Ely    , a notary public

in and for said County and State, residing therein, duly commissioned

and sworn, personally appeared    Guy A. Galletti

, known to me to be the person whose name

is subscribed to the within instrument, and acknowledged to me that he

executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed

my official seal the day and year in this certificate first above

written.

Notary Public in and for the
County of Klamath, State of Oregon

(SEAL)

My commission expires    12-4-73

STATE OF OREGON
Filed for record at request of

this    13th day of    February    A. D. 19 73    2:38    PM    and

duly recorded in Vol    M73    , of    Deeds

Bureau of Reclamation

1581

By

FEE $ 6.00

INDEXED

002277

017408

R.O. Draft 6/2-1958
Revised R. O. 1/13-1959

Contract No.
14-06-200-6636
Amendatory

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

CONTRACT BETWEEN THE UNITED STATES AND THE
HORSEFLY IRRIGATION DISTRICT AMENDING
CONTRACT OF SEPTEMBER 16, 1957

THIS CONTRACT, made this 16th day of ___June___, 1959,

pursuant to the Act of Congress approved June 17, 1902 (32 Stat. 388),

and acts amendatory thereof or supplementary thereto, all of which

acts are commonly known and referred to as the Federal reclamation

laws, between THE UNITED STATES OF AMERICA, hereinafter referred to

as the United States, represented by the Secretary of the Interior,

or his duly authorized representative, hereinafter referred to as the

Secretary of the Interior, and the HORSEFLY IRRIGATION DISTRICT, here-

inafter referred to as the District, a public corporation organized

and existing under the laws of the State of Oregon, with its prin-

cipal place of business in the town of Bonanza, Klamath County,

Oregon,

WITNESSETH, That:

WHEREAS, the United States and the District entered into

contract number 14-06-200-6636 on September 16, 1957; and

WHEREAS, subdivision (a) (4) of Article 9 of said contract

provides an erroneous formula for the computation of costs properly

chargeable to the District for operation and maintenance of the Lost River Diversion works, which error the United States and the District wish to correct;

NOW, THEREFORE, in consideration of the mutual and dependent covenants herein and in said contract of September 16, 1957, contained, it is hereby agreed that said contract shall be and hereby is amended by deleting all of subdivision (a)(4) of Article 9 and substituting in lieu thereof the following:

"(4)  Thirteen and five-tenths (13.5) percent of the cost of operation and maintenance of the Lost River Diversion Dam and Diversion Channel; and

"(5)  The proportionate part of the total annual estimated cost to the United States of operating and maintaining Link River Dam and of regulating Upper Klamath Lake equal to the proportion that the amount of water diverted from the Klamath River through the Diversion Channel to the Lost River for replacement of water used by the District from Lost River, bears to the total irrigation releases and diversions that year from Upper Klamath Lake and Klamath River."

Except as herein modified, said contract shall be and remain in full force and effect as originally written and executed.

002279

IN WITNESS WHEREOF, the parties hereto have hereunto affixed their names the day and year first above written.

THE UNITED STATES OF AMERICA

By   /s/   B. P. Bellport
      Regional Director, Region 2
      Bureau of Reclamation

(SEAL) - Affixed

HORSEFLY IRRIGATION DISTRICT

Attest:

By   /s/   Benson Dixon
      President

/s/   J. F. Hayden
   Secretary

3

017411

# HORSEFLY IRRIGATION DISTRICT
P. O. BOX 167
BONANZA, OREGON

April 7, 1959

Mr. D. A. Gray
Klamath Project Manager
Bureau of Reclamation
P. O. Box 312
Klamath Falls,  Oregon

Dear Mr. Gray:

You will find enclosed five copies of the Secretarial approval of  the
amendatory contract with the Horsefly Irrigation District for the
correction  of computation procedures of cost allocation.
You will find enclosed five copies of the resolution authorizing the
execution of the contract by the president and secretary as follows:
" A motion was made by John W. Urbach and seconded by Cecil C. Hunt
that the following resolution be made.  This motion carried by a
regular vote of all members present."
"Be it so resolved:  The Horsefly Irrigation District accept Contract
No.  14-06-200-6636  Amendatory.  Benson Dixon, President and J. F.
Heyden, Secretary be so authorized  to sign this contract."
Your interest in our irrigation district is appreciated.

Horsefly  Irrigation District

Benson Dixon,  President

J. F. Heyden,  Secretary


If further information is desired, please contact our office.

Sincerely yours,
Horsefly Irrigation District

J. F. Heyden,  Secretary

002281

017412

R.O. Draft 3/9-1976
Rev. R.O. 4/26-1976
Rev. R.O. 7/28-1976

Contract No.
14-06-200-6636
Amendatory

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND
HORSEFLY IRRIGATION DISTRICT AMENDING
CONTRACT NO. 14-06-200-6636

Table of Contents

| Article No. | | Title | Page No. |
|---|---|---|---|
| | | Preamble | 1 |
| | | Explanatory Recitals | 1- 2 |
| | | REVISIONS OF EXISTING ARTICLES OF WATER SERVICE CONTRACT | |
| 1 | | | |
| | (a) | Article 7 (Area to be Served) | 2- 3 |
| | (b) | Article 13 (Penalty for Delinquency, and title changed to Interest for Delinquent Payments | 3- 4 |
| | (c) | Article 16 (General Obligations of the District), and title changed to General Obligation--Benefits Conditioned upon Payment | 4 |
| | (d) | Article 20 (Changes in District Organization) | 5 |
| | (e) | Article 21 (Secretary to Make Regulations), and title changed to Rules and Regulations | 5 |
| | (f) | Article 25 (Nondiscrimination), and title changed to Equal Opportunity | 5- 8 |
| | (g) | Exhibit "A" deleted and substituted Exhibit "A" attached | 9 |
| | | ADDITIONS TO THE WATER SERVICE CONTRACT | |
| 2 | | | |
| | (a) | Article 26 (Determination of Findings of Facts) | 9 |
| | (b) | Article 27 (Quality of Water) | 9-10 |
| | (c) | Article 28 (Environment Protection and Pollution Control) | 10 |
| | (d) | Article 29 (Notices) | 10-11 |
| | (e) | Article 30 (Assignment Limited--Successors and Assigns Obligated) | 11 |
| | (f) | Article 31 (Title VI, Civil Rights Act of 1964) | 11-12 |
| | (g) | Article 32 (Certification of Nonsegregated Facilities) | 12-14 |
| 3 | | Provisions of the Water Service Contract to Remain Effective | 14 |
| | | Signature Page | 15 |
| | | Exhibit A - Map | |

002282

017413

Contract No.
14-06-200-6636
Amendatory

1    UNITED STATES
     DEPARTMENT OF THE INTERIOR
2    BUREAU OF RECLAMATION
     Klamath Project, Oregon-California
3

     CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND
4    HORSEFLY IRRIGATION DISTRICT AMENDING
          CONTRACT NO. 14-06-200-6636
5

6         THIS AMENDATORY CONTRACT, made this 24th day of August,

7    1976, in pursuance generally of the Act of June 17, 1902 (32 Stat. 388),

8    and acts amendatory thereof or supplementary thereto, all collectively

9    hereinafter referred to as the Federal reclamation laws, between THE

10   UNITED STATES OF AMERICA, hereinafter referred to as the United States,

11   represented by the Secretary of the Interior, or his duly authorized

12   representative, hereinafter referred to as the Secretary of the Interior

13   or the Contracting Officer, and the HORSEFLY IRRIGATION DISTRICT, herein-

14   after referred to as the Contractor or the District, a public agency of

15   the State of Oregon, duly organized, existing, and acting pursuant to

16   the laws thereof, with its principal place of business in the town of

17   Bonanza, Klamath County, Oregon,

18        WITNESSETH, That:

19                    EXPLANATORY RECITALS

20        WHEREAS, the United States and the Contractor entered into a

21   contract, No. 14-06-200-6636 on September 16, 1957, entitled Contract

22   Between the United States and the Horsefly Irrigation District Amendatory

Preamble
Explanatory Recitals--

002283

017414

1   of And Supplementary To The Contracts Dated July 10, 1919, and March 27,

2   1922, As Amended, which, among other things, designated a specific area

3   to be served by water made available to the Contractor from the Klamath

4   Project; and

5          WHEREAS, Contract No. 14-06-200-6636 dated September 16, 1957,

6   was amended on June 16, 1959; and

7          WHEREAS, the Contractor wishes to exclude certain lands

8   presently within the area to be served which are not receiving Project

9   water and include certain lands within the District boundaries that are

10  not presently within the service area as defined in said contract; and

11         WHEREAS, the Contractor and the United States wish to amend

12  the contract so as to provide a method by which future inclusion and

13  exclusion of lands when required can be accomplished without further

14  contractual amendments;

15         NOW, THEREFORE, in consideration of the covenants herein

16  contained, it is agreed as follows:

17     REVISIONS OF EXISTING ARTICLES OF WATER SERVICE CONTRACT

18     1.  (a)  Article 7 of the contract, No. 14-06-200-6636, dated

19  September 16, 1957, as amended, is hereby deleted and the following

20  is inserted in lieu thereof.

21

22

2                              --Explanatory Recitals
                                Article 1--

002284

017415

7.   (a)   The area of the District to be served under Articles 2, 3, and 4 hereof shall be as set forth in the map attached hereto and made a part hereof.  Said map is dated May 9, 1952; Rev. May 1976, and is designated as Exhibit "A".  The total area to be served shall consist of 9,842.8 acres.  The obligation of the United States to furnish water under this and previous contracts shall not exceed the quantities specified and in no event shall such quantities exceed the requirements of beneficial use.

(b)   While this contract is in effect, no change in the District's area to be served, as set forth in Exhibit "A", shall be made by inclusion or exclusion of lands, by dissolution, consolidation, merger, or otherwise except upon the express written consent of the Contracting Officer, which consent shall be obtained in advance.  In no event, however, shall the total service area to be served exceed 9,842.8 acres.

(b)   Article 13 of the contract is hereby deleted and the following is inserted in lieu thereof.

INTEREST FOR DELINQUENT PAYMENTS

13.   The Contractor shall pay interest on installments or charges which become delinquent computed at the rate of 1% per month of the amount of such delinquent installments or charges

3                    --Article 1--

002285

017416

1    for each day from such delinquency until paid:  Provided,

2    That no interest shall be charged to the Contractor unless

3    such delinquency continues for more than 30 days in which

4    event the interest shall accrue from the initial date of

5    delinquency.

6        (c)  Article 16 of the contract is hereby deleted and the

7    following is inserted in lieu thereof.

8        GENERAL OBLIGATION--BENEFITS CONDITIONED UPON PAYMENT

9        16.   (a)  The obligation of the Contractor to pay the United

10   States as provided in this contract is a general obligation of

11   the Contractor notwithstanding the manner in which the obliga-

12   tion may be distributed among the Contractor's water users and

13   notwithstanding the default of individual water users in their

14   obligations to the Contractor.

15        (b)  The payment of charges becoming due hereunder is

16   a condition precedent to receiving benefits under this contract.

17   No water will be made available to the Contractor through Project

18   facilities during any period in which the Contractor may be in

19   arrears in the advance payment of any charges due the United

20   States.  The Contractor shall not furnish water made available

21   pursuant to this contract for lands or parties which are in

22   arrears in the advance payment of charges or in arrears more than

23   12 months in the payment of water rates as levied or established

24   by the Contractor.

                    4                  --Article 1--

017417

1        (d)   Article 20 of the contract is hereby deleted and the

2    following is inserted in lieu thereof.

3                    CHANGES IN DISTRICT ORGANIZATION

4        20.   While this contract is in effect, no change shall be

5    made in the organization of the District, either by inclusion

6    or exclusion of lands, by consolidation or merger with another

7    District, by proceedings to dissolve, or otherwise, except upon

8    the written assent thereto of the Secretary of the Interior or

9    as provided in amended Article 7(b).

10       (e)   Article 21 of the contract is hereby deleted and the

11   following is inserted in lieu thereof.

12                       RULES AND REGULATIONS

13       21.   The Contracting Officer, after offering the Contractor

14   an opportunity for consultation, shall make rules and regulations

15   and supply necessary details for administration of this contract.

16   Such rules and regulations shall be consistent with the provi-

17   sions of this contract, the laws of the United States, and the

18   State of Oregon.  The Contracting Officer may add to or modify

19   them as may appear necessary and the Contractor shall observe

20   such rules and regulations.

21       (f)   Article 25 of the contract is hereby deleted and the

22   following is inserted in lieu thereof.

002287

017418

1    EQUAL OPPORTUNITY

2        25.   During the performance of this contract, the Con-

3    tractor agrees as follows:

4            (a)  The Contractor will not discriminate against

5        any employee or applicant for employment because of race,

6        color, religion, sex, or national origin.  The Contractor

7        will take affirmative action to ensure that applicants are

8        employed, and that employees are treated during employment,

9        without regard to their race, color, religion, sex, or

10       national origin.  Such action shall include, but not be

11       limited to, the following:  Employment, upgrading, demotion,

12       or transfer; recruitment or recruitment advertising; layoff

13       or termination; rates of pay or other forms of compensation;

14       and selection for training, including apprenticeship.  The

15       Contractor agrees to post in conspicuous places, available

16       to employees and applicants for employment, notices to be

17       provided by the Contracting Officer setting forth the

18       provisions of this Equal Opportunity clause.

19           (b)  The Contractor will, in all solicitations or

20       advertisements for employees placed by or on behalf of

21       the Contractor, state that all qualified applicants will

22       receive consideration for employment without regard to

23       race, color, religion, sex, or national origin.

6                              --Article 1--

002288

017419

1     (c)   The Contractor will send to each labor union

2     or representative of workers with which it has a collec-

3     tive bargaining agreement or other contract or understanding,

4     a notice, to be provided by the Contracting Officer, advising

5     the labor union or workers' representative of the Con-

6     tractor's commitment, under this Equal Opportunity clause,

7     and shall post copies of the notice in conspicuous places

8     available to employees and applicants for employment.

9     (d)   The Contractor will comply with all provisions

10    of Executive Order No. 11246 of September 24, 1965, as

11    amended, and of the rules, regulations, and relevant orders

12    of the Secretary of Labor.

13    (e)   The Contractor will furnish all information and

14    reports required by said amended Executive Order and by

15    the rules, regulations, and orders of the Secretary of

16    Labor, or pursuant thereto, and will permit access to its

17    books, records, and accounts by the Contracting Officer

18    and the Secretary of Labor for purposes of investigation

19    to ascertain compliance with such rules, regulations, and

20    orders.

21    (f)   In the event of the Contractor's noncompliance

22    with the Equal Opportunity clause of this contract or with

002289

017420

1  any of the said rules, regulations, or orders, this contract

2  may be canceled, terminated, or suspended, in whole or in

3  part, and the Contractor may be declared ineligible for

4  further Government contracts in accordance with procedures

5  authorized in said amended Executive Order, and such other

6  sanctions may be imposed and remedies invoked as provided

7  in said Executive Order, or by rule, regulation, or order

8  of the Secretary of Labor, or as otherwise provided by law.

9       (g)  The Contractor will include the provisions of

10  paragraphs (a) through (g) in every subcontract or purchase

11  order unless exempted by rules, regulations, or orders of

12  the Secretary of Labor issued pursuant to Section 204 of

13  said amended Executive Order, so that such provisions will

14  be binding upon each subcontractor or vendor.  The Con-

15  tractor will take such action with respect to any subcontract

16  or purchase order as the Contracting Officer may direct as a

17  means of enforcing such provisions, including sanctions for

18  noncompliance:  Provided, however, That in the event the

19  Contractor becomes involved in, or is threatened with

20  litigation with a subcontractor or vendor as a result of

21  such direction by the Contracting Officer, the Contractor

22  may request the United States to enter into such litigation

23  to protect the interests of the United States.

8                    --Article 1--

002290

1    (g)   Exhibit "A" attached to and made a part of the contract

2  is hereby deleted and the Exhibit "A" attached hereto and made a part

3  hereof is substituted in lieu thereof.

4                    ADDITIONS TO THE WATER SERVICE CONTRACT

5      2.    (a)   Article 26 is hereby added to the contract to read as

6  follows:

7                    DETERMINATION OF FINDINGS OF FACTS

8          26.   Where the terms of this contract provide for action to

9      be based upon the opinion or determination of either party to

10     this contract, said terms shall not be construed as permitting

11     such action to be predicated upon arbitrary, capricious, or

12     unreasonable opinions or determination, whether or not stated to

13     be conclusive.   If the Contractor questions any determination

14     made by the Contracting Officer, the findings of facts shall be

15     made by the Secretary after consultation with the Contractor and

16     shall be binding upon the parties.

17         (b)   Article 27 is hereby added to the contract to read as

18  follows:

19                    QUALITY OF WATER

20         27.   The operation and maintenance of Project facilities

21     shall be performed in such manner as is practicable to maintain

22     the quality of raw water made available through such facilities

23     at the highest level reasonably attainable as determined by the

24     Contracting Officer.   The United States does not warrant the

                            9              --Articles 1 - 2--

017422

1    quality of water and is under no obligation to construct or

2    furnish water treatment facilities to maintain or better the

3    quality of water.

4        (c)  Article 28 is hereby added to the contract to read as

5    follows:

6        ENVIRONMENT PROTECTION AND POLLUTION CONTROL

7        28.  The Contractor shall, within its legal authority,

8    comply fully with all applicable Federal laws, orders, and

9    regulations, and the laws of the State of Oregon, all as

10   administered by appropriate authorities, concerning protection

11   of the environment and pollution of air, streams, reservoirs,

12   groundwater, or water courses with respect to thermal pollution

13   or the discharge of refuse, garbage, sewage effluent, industrial

14   waste, oil, mine tailings, mineral salts, or other pollutants.

15       (d)  Article 29 is hereby added to the contract to read as

16   follows:

17                    NOTICES

18       29.  Any notice, demand, or request authorized or required

19   by this contract shall be deemed to have been given, on behalf of

20   the District, when mailed, postage prepaid, or delivered to the

21   Regional Director, Mid-Pacific Region, Bureau of Reclamation, 2800

22   Cottage Way, Sacramento, CA  95825, and on behalf of the United

23   States, when mailed, postage-prepaid, or delivered to the

002292

017423

1    Board of Directors of the Horsefly Irrigation District, Post

2    Office Box 188, Bonanza, Oregon 97623. The designation of

3    the addressee or the address may be changed by notice given

4    in the same manner as provided in this article for other

5    notices.

6        (e)   Article 30 is hereby added to the contract to read as

7    follows:

8        ASSIGNMENT LIMITED--SUCCESSORS AND ASSIGNS OBLIGATED

9        30.   The provisions of this contract shall apply to and bind

10   the successors and assigns of the parties hereto, but no assign-

11   ment or transfer of this contract or any part or interest therein

12   shall be valid until approved by the Contracting Officer.

13       (f)   Article 31 is hereby added to the contract to read as

14   follows:

15       TITLE VI, CIVIL RIGHTS ACT OF 1964

16       31.   (a)   The Contractor agrees that it will comply with

17   Title VI of the Civil Rights Act of July 2, 1964 (78 Stat. 241)

18   and all requirements imposed by or pursuant to the Department

19   of the Interior Regulation (43 CFR 17) issued pursuant to that

20   title, to the end that, in accordance with Title VI of that Act

21   and the Regulation, no person in the United States shall, on the

22   grounds of race, color, sex, or national origin be excluded from

11                    --Article 2--

002293

017424

1   participation in, be denied the benefits of, or be otherwise

2   subjected to discrimination under any program or activity for

3   which the Contractor receives financial assistance from the

4   United States and hereby gives assurance that it will immedi-

5   ately take any measures to effectuate this agreement.

6        (b)  This assurance is given in consideration of and

7   for the purpose of obtaining any and all Federal grants, loans,

8   contracts, property, discounts, or other Federal financial

9   assistance extended after the date hereof to the Contractor

10  by the United States, including installment payments after

11  such date on account of arrangements for Federal financial

12  assistance which were approved before such date.  The Con-

13  tractor recognizes and agrees that such Federal financial

14  assistance will be extended in reliance on the representations

15  and agreements made in this assurance, and that the United

16  States shall reserve the right to seek judicial enforcement of

17  this assurance.  This assurance is binding on the Contractor,

18  its successors, transferees, and assignees.

19       (g)  Article 32 is hereby added to the Contract to read as

20  follows:

21

22

12                    --Article 2--

002294

017425

# CERTIFICATION OF NONSEGREGATED FACILITIES

32.   The Contractor hereby certifies that it does not main-
tain or provide for its employees any segregated facilities at
any of its establishments, and that it does not permit its
employees to perform their services at any location, under its
control, where segregated facilities are maintained.   It certifies
further that it will not maintain or provide for its employees
any segregated facilities at any of its establishments, and that
it will not permit its employees to perform their services at any
location, under its control, where segregated facilities are
maintained.   The Contractor agrees that a breach of this certifi-
cation is a violation of the Equal Opportunity clause in this
contract.   As used in this certification, the term "segregated
facilities" means any waiting rooms, work areas, rest rooms and
wash rooms, restaurants and other eating areas, time clocks,
locker rooms and other storage or dressing areas, parking lots,
drinking fountains, recreation or entertainment areas, transporta-
tion and housing facilities provided for employees which are
segregated by explicit directive or are in fact segregated on the
basis of race, creed, color, or national origin, because of habit,
local custom, or otherwise.   The Contractor further agrees that
(except where it has obtained certifications from proposed

002295

1    subcontractors for specific time periods) it will obtain

2    identical certifications from proposed subcontractors prior

3    to the award of subcontracts exceeding $10,000 which are not

4    exempt from the provisions of the Equal Opportunity clause;

5    that it will retain such certifications in its files; and

6    that (except where the proposed subcontractors have submitted

7    identical certifications for specific time periods) the Con-

8    tractor will forward the following notice:

9    NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
     CERTIFICATIONS OF NONSEGREGATED FACILITIES

10   A certification of Nonsegregated Facilities must be
     submitted prior to the award of a subcontract exceeding

11   $10,000 which is not exempt from the provisions of the
     Equal Opportunity clause.  The certification may be

12   submitted either for each subcontract or for all sub-
     contracts during a period (i.e., quarterly, semiannually,

13   or annually).  Note:  The penalty for making false state-
     ments in offers is prescribed in 18 U.S.C. 1001.

14   PROVISIONS OF THE WATER SERVICE CONTRACT TO REMAIN EFFECTIVE

15       3.  The provisions of the original contract, as amended by the

16   contract dated June 16, 1959, shall remain in full force and effect

17   as originally written and executed except as modified herein.

18

19

20

21

22

                         14            --Articles 2 - 3

017427

1          IN WITNESS WHEREOF, the parties hereto have executed this

2     amendatory contract the day and year first above written.

3

4                                    THE UNITED STATES OF AMERICA

5                                    By _____

6                                    Acting Regional Director, Mid-Pacific Region
                                        Bureau of Reclamation

7

8                                    HORSEFLY IRRIGATION DISTRICT
      (SEAL)
9
                                     By _____
10    Attest:                           President

11

12    _____
      Secretary
13

14

15

16

17

18

19

20

21

22

                    15                          Signature Page

002297

017428

RESOLUTION

The Board of Directors hereby approves the Amended Contract, Rev. RO 7/28-1976, between the United States and Horsefly Irrigation District amending Contract #14-06-200-6636. and authorize the President and Secretary to sign the Amended Contract on behalf of the District.

The above Resolution was adopted by the Board of Directors of Horsefly Irrigation District on the ____12th____ day of ____August____, 1976.

HORSEFLY IRRIGATION DISTRICT,

By ____Reginald E. Thomas____
                                    Secretary.

002298

017429



RECORDED

# United States Department of the Interior

### BUREAU OF RECLAMATION
### WASHINGTON, D.C.  20240

IN REPLY
REFER TO:  440

832.-

## JUL 1 4 1976

Memorandum

To:        Secretary of the Interior

From:      Commissioner of Reclamation

Subject:   Proposed Amendatory Contract between the United States
           and the Horsefly Irrigation District--Klamath Project,
           Oregon-California

1. <u>Type and Purpose of Contract</u>:  Enclosed is a proposed amendatory
contract between the United States and the Horsefly Irrigation District.
The present contract No. 14-06-200-6636 defines a specific contractual
service area within the boundaries of the district but does not provide
a method by which inclusion and exclusion of lands to and from the
service area can be accomplished.  The proposed amendatory contract
would authorize the inclusion and exclusion of certain lands to and
from the service area and provide a method by which future actions of
this nature can be facilitated without having to execute subsequent
amendatory contracts.

2. <u>Contracting Entity</u>:  The district was organized on September 6, 1911,
in Klamath County, Oregon, and first contracted with the United States
on July 10, 1919, pursuant to the Reclamation Act of 1902 (32 Stat. 388)
and the Warren Act of 1911 (36 Stat. 925).  The 1919 contract has been
superseded by contract No. 14-06-200-6636, which was executed on
September 16, 1957.  Under the 1957 contract, as amended on June 16, 1959,
the district receives a water supply from the Klamath Project and pays a
proportionate share of the project's operation and maintenance charges.



776635 JUL 23 1976



017430

3. Background: The 1919 contract with the district provided a water supply for 4,400 acres of land and imposed a construction charge on the district for repayment of a proportionate share of project costs. Subsequent amendatory and supplementary contracts provided for additional diversions of project water for a total of 9,842.8 acres of district lands. The district completed repayment of its construction obligation on December 31, 1968.

The 9,842.8 acres are specified as the contractual service area in article 7 of the present contract and illustrated on the incorporated map labeled "Exhibit A." However, certain lands now included in the service area are no longer being farmed. The district desires to exclude said lands from the contractual service area and include other acreage that can beneficially utilize project water. Thus, an amendment to the present contract is necessary to reflect the desired exclusions and inclusions of land, and to provide for orderly processing of future acreage changes of this nature, without further amendment of the contract.

4. Contractual Arrangements: Article 7 of the contract, including the service-area map designated "Exhibit A," has been amended, as article 7(a), to reflect the acreage changes desired by the district. Approximately 20 acres of irrigable land will be replaced in the contractual service area. The total service-area limit will remain at 9,842.8 acres.

Article 7 has been amended further, as article 7(b), to provide for future replacement of nonproductive irrigable land in the service area by approval of the contracting officer.

Article 20, Changes in District Organization, has also been amended by the addition of the words "...or as provided in amended Article 7(b)." This additional language was included at the request of the district.

Various standard articles have been revised or added to update the contract as necessary.

017431

5.  Environmental Considerations:  The proposed contract change would affect approximately 20 acres of district land and any future acreage changes are expected to be of comparable significance.  It has been determined that the proposed action is not a major Federal action and that formal environmental documentation is unnecessary.

6.  Legal Considerations:  The Regional Solicitor, Sacramento, California, and the Associate Solicitor - Energy and Resources have reviewed the amendatory contract and find it to be legally sufficient.  The district is an acceptable legal entity to the United States.  The contract was approved by the district's board of directors on April 6, 1976.

7.  Findings and Recommendations:  The requested acreage changes in the district's contractual service area are necessary to assure the optimal distribution and use of project water.  The amendatory contract will allow future acreage changes to be expeditiously accomplished with the approval of the contracting officer.  For these reasons, the amendatory contract is determined to be in the best interests of the United States and the Housefly Irrigation District.  Your approval should be with the understanding that prior to contract execution, the contracting officer can approve minor contract revisions in line with overall contract objectives.

Thereafter, the Regional Director, Mid-Pacific Region, will execute the contract in behalf of the United States and will serve as contracting officer on your behalf.

8.  Urgency of Approval:  The district is anxious to provide a water supply to productive lands in the district, to assess an operation and maintenance charge for those lands, and to discontinue service to acreage no longer requiring project water.  In the interest of optimal allocation of project resources, we request that this amendatory contract be approved as to form as soon as practicable.

Enclosures

Approved:

DENNIS M. _____
Assistant

Secretary of the Interior

JUL 2 - 1976

Date

002301

017432



002302

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

9-16-59

CONTRACT BETWEEN THE UNITED STATES AND THE HORSEFLY IRRIGATION
DISTRICT AMENDATORY OF AND SUPPLEMENTARY TO THE CONTRACTS DATED
JULY 10, 1919, AND MARCH 27, 1922, AS AMENDED

## Table of Contents

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 1-2 |
| 1 | Superseding Previous Contracts | 2 |
| 2 | Right to Flow of 59 Cubic Feet Per Second at Or Below Bonanza Springs | 2-3 |
| 3 | Right to Water from Clear Lake Reservoir | 3 |
| 4 | Right Granted to Divert Additional 3,685.6 acre-feet Annually | 3 |
| 5 | Delivery of Water Supply | 3-4 |
| 6 | Measurement of Water | 4 |
| 7 | Area to be Served | 4 |
| 8 | Construction Charges to be Paid by District | 5 |
| 9 | Operation and Maintenance Charges to be Paid by District | 5-7 |
| 10 | District Responsible for Diversion, Pumping, and Distribution | 7-8 |
| 11 | Inspection of District Operations | 8 |
| 12 | District Entitled to Use Return Flows | 8 |
| 13 | Penalty for Delinquency | 8-9 |
| 14 | United States Not Liable for Water Shortage | 9 |
| 15 | District to Use All Powers to Collect Charges | 10 |
| 16 | General Obligations of the District | 10 |
| 17 | Excess Land Provisions | 10 |
| 18 | Information to be Furnished by District | 11 |
| 19 | Inspection of Books and Records | 11 |
| 20 | Changes in District Organization | 11-12 |
| 21 | Secretary to make Regulations | 12 |
| 22 | Assurance Relating to Validity of Contract | 12 |
| 23 | Officials Not to Benefit | 12-13 |
| 24 | Expenditures by United States Contingent Upon Appropriations | 13 |
| 25 | Nondiscrimination | 13-14 |

017434

Sacramento Office
Draft 2/15/1956
Revised W. O. 11/20/56
Revised W. O. 3/6/57

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

CONTRACT BETWEEN THE UNITED STATES AND THE ROOSEVELT IRRIGATION
DISTRICT AMENDATORY OF AND SUPPLEMENTARY TO THE CONTRACTS DATED
JULY 10, 1919, AND MARCH 27, 1922, AS AMENDED

THIS CONTRACT, made this ____ day of _____, 195_ ,
pursuant to the Act of Congress approved June 17, 1902 (32 Stat. 388),
and acts amendatory thereof or supplementary thereto, all of which acts
are commonly known and referred to as the Federal reclamation laws,
between THE UNITED STATES OF AMERICA, hereinafter referred to as the
United States, represented by the Secretary of the Interior, or his duly
authorized representative, hereinafter referred to as the Secretary of
the Interior, and the ROOSEVELT IRRIGATION DISTRICT, hereinafter referred
to as the District, a public corporation organized and existing under the
laws of the State of Oregon, with its principal place of business in the
town of Bonanza, Klamath County, Oregon:

WITNESSETH, THAT:

EXPLANATORY RECITALS

WHEREAS, the District has heretofore entered into contracts
with the United States, dated July 10, 1919, and March 27, 1922, whereby
the District assumed liability for and agreed to pay to the United States
certain charges for water, construction charges, and operation and maintenance

002305

charges, which contracts were amended and supplemented by contracts dated October 12, 1922; October 15, 1923; May 7, 1929; April 13, 1931; and January 11, 1934; and

WHEREAS, pursuant to said contracts, the United States has agreed to furnish water for lands of the District; and

WHEREAS, it is desired by the parties hereto to increase the quantity of water available to the District and to identify the area of the land for which the water is to be furnished and to modify the payments both in amount and in time for payment due from the District to the United States;

NOW, THEREFORE, in consideration of the mutual and dependent stipulations and covenants herein contained, it is hereby mutually agreed by and between the parties hereto as follows:

## SUPERSEDING PREVIOUS CONTRACTS

1.  This contract supersedes all previous contracts between the United States and the District, insofar as they affect the District, with respect to all matters mentioned herein.  All provisions of said contracts not in conflict with this contract shall remain in full force and effect.

## RIGHT TO FLOW OF 59 CUBIC FEET PER SECOND AT OR BELOW BONANZA SPRINGS

2.  The United States recognizes that the aforesaid contracts entitle the District to a constant flow of fifty-nine (59) cubic feet per second

002305

002306
017436

from Lost River within the boundary of the District, at or below Bonanza

Springs, during the irrigation season each year, for irrigation of not

to exceed five thousand nine hundred (5,900) acres.

## RIGHT TO WATER FROM CLEAR LAKE RESERVOIR

3.  The United States recognizes that the aforesaid contracts entitle

the District to the annual use of four thousand two hundred (4,200) acre-

feet of water from Clear Lake Reservoir for irrigation of two thousand one

hundred (2,100) acres.

## RIGHT GRANTED TO DIVERT ADDITIONAL 3,685.6 ACRE-FEET ANNUALLY

4.  The District shall be entitled to divert from Lost River three

thousand six hundred eighty-five and six-tenths (3,685.6) acre-feet of

water annually and may use that water for the irrigation of one thousand

eight hundred forty-two and eight-tenths (1,842.8) acres of land in the

District.  The District shall pay a construction charge of Thirty-six

Thousand Eight Hundred Fifty-six Dollars ($36,856.00) for the right to

divert said three thousand six hundred eighty-five and six-tenths (3,685.6)

acre-feet of water.

## DELIVERY OF WATER SUPPLY

5.  When and to the extent that water can be made available in Lost

River without infringing upon water rights which are senior to those granted

by the aforesaid contracts and this contract, the water supply described

in Articles 3 and 4 shall be delivered in Lost River and measured at the

boundary of the District located in section twenty-nine (29), Township

3

002307
017437

thirty-nine (39) South, Range twelve (12) East, Willamette Meridian, or at such other location or locations as may be acceptable to the Project Manager or other officer in charge of the Klamath Project, hereinafter referred to as the Project Manager.

## MEASUREMENT OF WATER

6. All water diverted shall be measured by such measuring and controlling devices or such automatic gauges or both as shall be satisfactory to the Project Manager. Said measuring and controlling devices shall be furnished and installed by the District at its sole expense. The maintenance, including future repairs and renewals when necessary to the proper operations of the measuring and controlling devices, also shall be the responsibility of the District: _Provided_, That said measuring and controlling devices shall be and remain at all times under the control of the United States, whose representative may at all times have access to them over the lands of the District.

## AREA TO BE SERVED

7. The area of the District to be served under Articles 2, 3, and 4 hereof shall be as set forth in the map attached hereto and made a part hereof, marked Exhibit "A", consisting of nine thousand eight hundred forty-two and eight-tenths (9,842.8) acres. The obligation of the United States to furnish water under this and previous contracts shall not exceed the quantities specified and in no event shall such quantities exceed the requirements of beneficial use.

4

002308

017438

## CONSTRUCTION CHARGES TO BE PAID BY DISTRICT

8.   The District shall pay to the United States for construction charges the sum of Eighty-four Thousand Eight Hundred Fifty-nine Dollars and Ninety-nine Cents ($84,859.99) in twenty-four (24) equal installments, payable semiannually, to be due on June 30 and December 31 of each year. The first payment shall be due on June 30, 1957.  The foregoing install-ments merge the payments required under the contract of Jaunuary 11, 1934, and this contract as of June 30, 1957.

## OPERATION AND MAINTENANCE CHARGES TO BE PAID BY DISTRICT

9.   (a)  In addition to the sums agreed to be paid by the District to the United States in Article 8, and in lieu of the operation and main-tenance charges set forth in the contracts of July 10, 1919, and March 27, 1922, and the operation and maintenance charges set forth in the amendatory contracts, the District agrees to pay to the United States each year in advance the proportion of estimated costs of Project operation and main-tenance to be performed by the United States, in such amounts as may be fixed by the Secretary of the Interior, as follows:

        (1)  The proportionate part of the total estimated annual cost of the operation and maintenance of Clear Lake Dam and Reser-voir that two thousand one hundred (2,100) acres bear to the total acreage, as determined by the Secretary of the Interior, receiving benefits from said reservoir;

002308

002309
017439

(2)  The proportionate part of the total estimated annual cost of the delivery of water from Clear Lake Reservoir to the Malone Diversion Dam for the use of the District and the Langell Valley Irrigation District that two thousand one hundred (2,100) acres bear to the total acreage, as determined by the Secretary of the Interior, receiving benefits from said reservoir;

(3)  9,064/21,546 of the total estimated annual cost of operating and maintaining the channel dredged in Clear Lake Reservoir; and

(4)  The proportion of the total annual estimated cost of operating and maintaining Lost River Diversion Works (including the diversion dam, the diversion channel, and appurtenant structures) and of regulating Upper Klamath Lake equal to the proportion that the additional water supplied under Article 4 of this contract, plus the fifty-nine (59) cubic feet per second which are recognized as the Bonanza Springs rights bears to the total water, as determined by the Secretary of the Interior, that is transferred from the Klamath River to the Lost River by the Lost River Diversion Channel.

(b)  The total of such operation and maintenance costs for each irrigation season shall be set forth in an estimate to be furnished to the District by the Secretary of the Interior, on or before September 1 of each year.  One-half of such charges shall be due and payable on January 1 following, and the balance thereof shall become due and payable

002309

July 1 following.  The estimate to be furnished each year shall take account of any surplus or deficiency resulting from the estimate of the previous year being too high or too low.  Whenever, in the opinion of the Secretary of the Interior, funds so advanced will be inadequate to operate and maintain the works being operated by the United States, the Secretary of the Interior may give supplemental operation and maintenance charge notices stating therein the amount of additional funds required and the District shall furnish such additional amount on or before the date specified in any supplemental notice.  Funds advanced by the District in excess of the amounts expended or obligated each year by the United States shall be credited on the advance due for the following year.

### DISTRICT RESPONSIBLE FOR DIVERSION, PUMPING, AND DISTRIBUTION

10.  The District will pump or divert the water from Lost River at its own cost and convey the same to the place of use and perform all acts required by law or custom in order to maintain its control over such water and secure its proper diversion for the beneficial application of the same upon the lands of the District.  The United States shall not be responsible for the control, carriage, handling, use, disposal, or distribution of water which may be furnished to the District hereunder, outside the facilities then being operated and maintained by the United States, nor for claim of damage of any nature whatsoever, including but not limited to property damage, personal injury or death, arising out of

017441

or connected with the control, carriage, headline, use, disposal, or
distribution of such water outside of such facilities.

## INSPECTION OF DISTRICT OPERATIONS

11.  Water supplied under the terms of this contract shall be for
the purpose of distribution by the District to the individual water users,
and such water shall be supplied to only such areas and used only in the
manner prescribed by law for lands in private ownership and shall be used
solely for the purpose of irrigation and domestic purposes incidental
thereto.  The United States shall have the right to place inspectors at
any point in the District during the irrigation season and to make such
measurements, investigations, or observations as are, or may be, necessary
in the judgment of the Project Manager for the enforcement of this pro-
vision.

## DISTRICT ENTITLED TO USE RETURN FLOWS

12.  The District shall be entitled to use all return flows origi-
nating from lands of the District so long as such flows remain within
the boundaries of the District.

## PENALTY FOR DELINQUENCY

13.  Upon every installment of money required to be paid by the
District to the United States pursuant to this contract which shall remain
unpaid after the same shall have become due and payable, there shall be
imposed a penalty of one-half ($\frac{1}{2}$) of one (1) per cent of such delinquent
installment on the day following the due date, and there shall be added

002312
017442

a like penalty of one-half ($\frac{1}{2}$) of one (1) per cent of the remaining unpaid amount on the first day of each calendar month thereafter so long as such default shall continue. The District hereby agrees to pay said penalty. In case the District neglects or refuses to make any or all of the payments as provided herein when due, the United States may, in its discretion, refuse to deliver water to the District until such payments shall have been made, in which event the District shall save the United States harmless from any claims for damages. Upon request of the United States, the District shall refuse water service to all lands which may be in default for more than one year in the payment of any assessment levied hereunder. The provisions of this article are not exclusive and any action taken pursuant hereto shall not prejudice or preclude the United States from exercising any other remedy to enforce collection for any amounts due hereunder.

## UNITED STATES NOT LIABLE FOR WATER SHORTAGE

14. On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such shortages.

9

002312

002313
017443

## DISTRICT TO USE ALL POWERS TO COLLECT CHARGES

15.   The District agrees that it will cause to be levied and collected all necessary assessments and use all the powers and resources of the District, including the taxing power and the power to withhold delivery of water, to collect and pay to the United States all charges provided in this contract in full on or before the day the same become due.

## GENERAL OBLIGATIONS OF THE DISTRICT

16.   The District as a whole is obligated to pay to the United States the full amount herein agreed upon according to the terms stated, regardless of individual default in the payment of any assessment levied by the District.

## EXCESS LAND PROVISIONS

17.   Pursuant to the provisions of the Federal reclamation laws, water supplied to the District under the terms of this contract shall not be delivered to more than one hundred sixty (160) irrigable acres in the ownership of any one person except that delivery may be made to lands held in excess of this limitation in accordance with the provisions of Section 46 of the Act of May 25, 1926 (44 Stat. 639), as amended by the Act of July 11, 1956 (70 Stat. 524). The provisions of this article shall cease to operate when the construction charge obligation allocable to such land has been paid in full to the United States.

002313

002314
017444

## INFORMATION TO BE FURNISHED BY DISTRICT

18.   To such extent and in such manner and form as may be prescribed by the Secretary of the Interior, the District shall establish and maintain accounts and other books and records and furnish to the Secretary of the Interior reports and statements as to information contained therein pertaining to (a) accounts and financial transactions of the District, insofar as such information pertains to this contract and operation thereunder, (b) crops raised and agricultural or livestock products produced on the lands within the District, a report thereon to be furnished to the Secretary of the Interior annually on or before December 31, or such date or dates as may be fixed by the Secretary of the Interior.

## INSPECTION OF BOOKS AND RECORDS

19.   The proper officials of the District shall have full and free access to the Project books and official records of the United States Bureau of Reclamation, so far as they relate to the matters covered by this contract and the right at any time during office hours to make copies of and from the same, and the representatives of the United States shall have the same right in respect to the books and records of the District.

## CHANGES IN DISTRICT ORGANIZATION

20.   While this contract is in effect, no change shall be made in the organization of the District, either by inclusion or exclusion of lands, by consolidation or merger with another district, by proceedings

002314

002315
017445

to dissolve, or otherwise, except upon the written assent thereto of the Secretary of the Interior.

## SECRETARY TO MAKE REGULATIONS

21.  There is reserved to the Secretary of the Interior the right to make regulations and to modify the same in his discretion in general harmony, however, with this contract, to the end that the true intent of the law and of this contract shall be carried into full effect.

## ASSURANCE RELATING TO VALIDITY OF CONTRACT

22.  The execution of this contract shall be authorized by the qualified electors of the District at an election held for that purpose. Thereafter, without delay, the District shall file and prosecute to a final decree, including any appeal therefrom if grounds for appeal be laid, in a court of competent jurisdiction, a proceeding for judicial confirmation of the proceedings of the District Board of Directors and the District leading up to and including the making of this contract and the validity of the provisions thereof, and this contract shall not be binding on the United States until decision favorable to the contract shall have been finally made.

## OFFICIALS NOT TO BENEFIT

23.  No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract, or to any benefit that may arise herefrom, but this restriction shall not be construed to

002315

002316
017446

extend to this contract if made with a corporation or company for its general benefit.

## EXPENDITURES BY UNITED STATES CONTINGENT UPON APPROPRIATIONS

24.  The expenditure of any money or the performance of any work by the United States herein provided for which may require appropriations of money by Congress or the allotment of funds shall be contingent upon such appropriations or allotments being made.  The failure of Congress to so appropriate funds or the failure of an allotment of funds will not relieve the District from any obligations under this contract and no liability shall accrue to the United States in case such funds are not appropriated or allotted.

## NONDISCRIMINATION

25.  (a)  In connection with the performance of work under this contract, the District agrees not to discriminate against any employee or applicant for employment because of race, religion, color, or national origin.  The aforesaid provision shall include, but not be limited to, the following:  employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The District agrees to post hereafter in conspicuous places, available for employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of the nondiscrimination clause.

002316

017447

(h)  The District further agrees to insert the foregoing provisions in all subcontracts hereunder, except subcontracts for standard commercial supplies or raw materials.

IN WITNESS WHEREOF, the parties hereto have hereunto affixed their names the day and year first above written.

THE UNITED STATES OF AMERICA

By _____
    Regional Director, Region 2
    Bureau of Reclamation

(SEAL)                          HOSSEFLY IRRIGATION DISTRICT

Attest:                         By _____
                                        President

_____
        Secretary

14

017448

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION                     IIr-112
KLAMATH PROJECT

CONTRACT WITH LANGELL VALLEY IRRIGATION DISTRICT
AND HORSEFLY IRRIGATION DISTRICT,  REDUCING
CONTRACT OBLIGATIONS FOR WATER SUPPLY TO
HORSEFLY IRRIGATION DISTRICT

THIS AGREEMENT, Made this       11th       day of         January

1934, in pursuance of the Act of Congress of June 17, 1902 (32 Stat.,

388), and acts amendatory thereof or supplementary thereto, between

the UNITED STATES OF AMERICA, herein styled the United States, re-

presented by the officer executing this contract, and the LANGELL

VALLEY IRRIGATION DISTRICT, an irrigation district, herein styled the

Langell District, and the HORSEFLY IRRIGATION DISTRICT, an irrigation

district, herein styled the Horsefly District.

WITNESSETH, That:

2.    WHEREAS, in addition to certain contracts dated July 10,

1919, and October 12, 1922, between the United States and the Horse-

fly District for natural flow water of Lost River below Bonanza

Springs, commonly referred to as Bonanza Springs water (which con-

tracts are not intended to be in any way modified hereby), the United

States has entered into contracts with the Horsefly District under

dates of

March 27, 1922
October 15, 1923
May 7, 1929, and
April 13, 1931

three of which contracts (those of March 27, 1922, October 15, 1923,

and April 13, 1931) are contracts among all of the parties hereto,

002317

017449

and the remaining contract (that of May 7, 1929) is between the
United States and the Horsefly District; and

3.   WHEREAS, article 16 of said contract of March 27, 1922,
provides as follows:

"16.   The United States hereby sells and conveys
to the Horsefly District for the sum of Twenty-six
Thousand Two Hundred Fifty Dollars ($26,250) the annual
use of Four Thousand Two Hundred (4,200) acre-feet of
water from Clear Lake Reservoir to be delivered in Lost
River at the point of diversion herein specified, the
same being Two (2) acre-feet of water per acre for
approximately Two Thousand One Hundred (2,100) acres of
land within the District, at a charge of Six Dollars and
Twenty-five Cents ($6.25) per acre-foot.";

and

4.   WHEREAS, the Horsefly District later desired to increase
its storage water supply and for that purpose the contract of
October 15, 1923, was executed, by the terms of article 6 of which
the storage water supply for the Horsefly District was increased
to 9,064 acre-feet for use upon an increased acreage aggregating
4,532 acres of land and at an increased cost to the said Horsefly
District of $30,400; and

5.   WHEREAS, it has been ascertained in the years following
the execution of said contract of October 15, 1923, that the increase
in the Horsefly District's stored water supply was unnecessary and
the said Horsefly District desires to release the United States from
its obligation to furnish said district with the additional 4,864
acre-feet of Clear Lake storage as provided in said contract of
October 15, 1923, and the said district in turn desires to be relieved
of its obligation to pay therefor and to have a readjustment of the

-2-

017450

time of payment of its obligations under its other contracts, afore-
mentioned, to all of which the Langell District has no objection;

NOW, THEREFORE, it is agreed that:

6.    The United States be and is hereby released from any and
all obligations to deliver to the Horsefly District any part of the
four thousand eight hundred and sixty-four (4,864) acre-feet of
Clear Lake storage contracted to be delivered to said district
under the terms of said supplemental contract of October 15, 1923,
and the Horsefly District is relieved of its obligation to pay for
any of said four thousand eight hundred and sixty-four (4,864) acre-
feet of storage to the same intent and purpose as though said con-
tract of October 15, 1923 had never been executed.

7.    The Horsefly District is obligated under the terms of its
contracts of March 27, 1922, May 7, 1929, and April 13, 1931, and
under the Secretary's notices to the District of September 9, 1927,
and May 28, 1932 (as herein amended) to pay to the United States
construction charges (in addition to the construction and other
charges referred to in the next to the last sentence of Article 8)
in the aggregate sum of $97,865.74, of which $4,052.52 has been
paid in cash and $230.52 in credits under Subsection I of Section 4
of the Act of Congress of December 5, 1924, leaving an unpaid balance
of $93,582.70, of which $1,072.08 is deferred (by Departmental Notice
of June 15, 1932, as herein amended, under the provisions of the act
of Congress of April 1, 1932) and bears interest, payable annually,
on December 31 of each year, at the rate of 5 per cent per annum.
The change in the amount of said deferment, which is larger than

-3-

002319

the amount stated in said Departmental Notice of June 15, 1932, re-sults from the credits for 1930 and 1931 to the Horsefly District under said Subsection I being decreased by reason of the Horsefly District's purchase, as herein indicated, of a decreased supply of Clear Lake water. By reason of such decreased purchase, the amount of such credits for the years 1930 and 1931 (and applied upon the Horsefly District's construction indebtedness for 1931 and 1932, respectively) has been reduced from $503.05 to $230.52 and applied as follows: Upon the instalment due Dec. 31, 1931, $154.04, and upon the instalment due June 30, 1932, $76.48.

8. It is further agreed that the terms of said contracts of March 27, 1922, May 7, 1929, and April 13, 1931, be and the same are hereby amended to obligate the said Horsefly District to pay said unpaid balance of $93,582.70 to the United States in instalments and at times as follows, to wit:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| June 30, 1933 | $ 150.00 | Dec. 31, 1933 | $ 150.00 |
| June 30, 1934 | 150.00 | Dec. 31, 1934 | 150.00 |
| June 30, 1935 | 150.00 | Dec. 31, 1935 | 150.00 |
| June 30, 1936 | 150.00 | Dec. 31, 1936 | 150.00 |
| June 30, 1937 | 150.00 | Dec. 31, 1937 | 150.00 |
| June 30, 1938 | 150.00 | Dec. 31, 1938 | 150.00 |
| June 30, 1939 | 150.00 | Dec. 31, 1939 | 150.00 |
| June 30, 1940 | 150.00 | Dec. 31, 1940 | 150.00 |
| June 30, 1941 | 150.00 | Dec. 31, 1941 | 150.00 |
| June 30, 1942 | 1,000.00 | Dec. 31, 1942 | 1,000.00 |
| June 30, 1943 | 1,000.00 | Dec. 31, 1943 | 1,000.00 |
| June 30, 1944 | 1,000.00 | Dec. 31, 1944 | 1,000.00 |
| June 30, 1945 | 1,000.00 | Dec. 31, 1945 | 1,000.00 |
| June 30, 1946 | 1,200.00 | Dec. 31, 1946 | 1,200.00 |
| June 30, 1947 | 1,200.00 | Dec. 31, 1947 | 1,200.00 |
| June 30, 1948 | 1,200.00 | Dec. 31, 1948 | 1,200.00 |
| June 30, 1949 | 1,400.00 | Dec. 31, 1949 | 1,400.00 |
| June 30, 1950 | 1,400.00 | Dec. 31, 1950 | 1,400.00 |

-4-

017452

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| June 30, 1951 | $1,400.00 | Dec. 31, 1951 | $1,400.00 |
| June 30, 1952 | 1,400.00 | Dec. 31, 1952 | 1,400.00 |
| June 30, 1953 | 1,600.00 | Dec. 31, 1953 | 1,600.00 |
| June 30, 1954 | 1,600.00 | Dec. 31, 1954 | 1,600.00 |
| June 30, 1955 | 1,600.00 | Dec. 31, 1955 | 1,600.00 |
| June 30, 1956 | 1,600.00 | Dec. 31, 1956 | 1,600.00 |
| June 30, 1957 | 2,300.00 | Dec. 31, 1957 | 2,300.00 |
| June 30, 1958 | 2,300.00 | Dec. 31, 1958 | 2,300.00 |
| June 30, 1959 | 2,300.00 | Dec. 31, 1959 | 2,300.00 |
| June 30, 1960 | 2,300.00 | Dec. 31, 1960 | 2,300.00 |
| June 30, 1961 | 2,300.00 | Dec. 31, 1961 | 2,300.00 |
| June 30, 1962 | 2,300.00 | Dec. 31, 1962 | 2,300.00 |
| June 30, 1963 | 2,300.00 | Dec. 31, 1963 | 2,300.00 |
| June 30, 1964 | 2,300.00 | Dec. 31, 1964 | 2,300.00 |
| June 30, 1965 | 2,300.00 | Dec. 31, 1965 | 2,300.00 |
| June 30, 1966 | 2,300.00 | Dec. 31, 1966 | 2,300.00 |
| June 30, 1967 | 2,305.31 | Dec. 31, 1967 | 2,305.31 |
| June 30, 1968 | 536.04# | Dec. 31, 1968 | 536.04# |

 #  Adjusted deforments under act of April 1, 1932.

It is fully agreed and understood that the foregoing instalments
are in addition to the amounts agreed to be paid under the contracts
of July 10, 1919, and October 12, 1922 for the said Bonanza Springs
water, which contracts remain unchanged and in full force and effect.
It is also agreed and understood that the said sum of $93,582.70,
due and payable in the above listed instalments, is exclusive of the
semi-annual interest payments on the amount deferred under the act
of April 1, 1933 and that the said interest charges will be paid
in addition to the instalments above set out.

 9.   The first two sentences of paragraph 10 of the contract
of May 7, 1929, are hereby amended so that for the year 1933 and
annually thereafter the Horsefly District shall pay (a) that
proportionate part of the total estimated annual cost of the
operation and maintenance of Clear Lake Reservoir that 2,100 acres

002321

017453

bears to the total irrigable acreage receiving benefits from the reservoir during the year as determined by the Secretary of the Interior, and (b) 2100/2350 of the total estimated annual cost, as determined by the said Secretary, of the delivery of water for the Horsefly District and the Langell District from Clear Lake Reservoir to the Diversion Dam in Lost River near the California-Oregon boundary line. For the year 1933 and annually thereafter the Langell District is to pay 6250/8350, or the remainder, of the cost under the foregoing subhead (b).

10. The Langell District has subscribed to this contract for the purpose of expressing its consent to the changes hereby made in the said contracts hereby modified.

11. In all other respects the provisions of said contracts of July 10, 1919, March 27, 1922, October 12, 1922, May 7, 1929, and April 13, 1931, shall remain unaffected by the terms hereof. It is particularly understood that under the schedule of payments in Article 8 hereof the Horsefly District is to pay to the United States 9064/21564 (the proportion fixed in said contract of April 13, 1931) of the cost of dredging Clear Lake Reservoir under said contract, said 9064/21564 being $12,479.43 as stated in the Secretary's notice to the Horsefly District of May 28, 1932. The Horsefly District is also to retain, unaffected hereby, its liability (under Art. 2? of the the Contract of April 13, 1931) to pay 9064/21564 of the annual cost of operating and maintaining the channel dredged by the United States under the provisions of said contract of

002322

017454

April 13, 1931.

12.  No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon.  Nothing, however, herein contained shall be construed to extend to this contract if made with a corporation for its general benefit.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written.

<div style="margin-left: 40%;">

UNITED STATES OF AMERICA

By /s/T. A. Walters

First Assistant Secretary
of the Interior

LANGELL VALLEY IRRIGATION DISTRICT

</div>

(SEAL)

<div style="margin-left: 40%;">

By     G. M. Loomis
President.

</div>

Attest:

O. S. Campbell
Acting   Secretary

<div style="margin-left: 40%;">

HORSEFLY IRRIGATION DISTRICT

</div>

(SEAL)

<div style="margin-left: 40%;">

By   Irl Davis
President

</div>

Attest:

Dorothy J. Eyers
Secretary

-7-

002323

017455

Per'h approved by the Department
Nov. 9th, '31.

DEPARTMENT OF THE INTERIOR

UNITED STATES RECLAMATION SERVICE

KLAMATH IRRIGATION PROJECT

$\mathcal{I} / r - 112$

Contract made by the United States, the Langell Valley Irri-
gation District, and the Horsefly Irrigation District, pro-
viding for the construction of irrigation works and the fur-
nishing of a

## INDEX

Subject                                                          Article

Purposes of Agreement..............................................  2 - 7
Irrigation Works for Joint Use of Districts.......................   8
Irrigation Works for use of Langell Valley District..             9
Irrigation Works for Use of Horsefly District.........            10
Changes in Plans for Irrigation Works.....................        11
Limit of Expenditures for Irrigation Works..............          12
Construction of Irrigation Works Subject to Appr'n...             13
Rights of Way......................................................  14
Water Supply for Langell Valley District..................         15
Water Supply for Horsefly District........................         16
Water Supply to be Beneficially Used......................         17
Water Supply to be used subj. to Reclamation law......            18
Shortage in Water Supply..........................................  19
Payment of Const. Costs. Costs by Langell Valley District...      20
Payment of Construction Costs by Horsefly District...             21
Terms of Payment of Construction Costs....................         22
Payment of O. & M. Costs by Districts.....................         23
Computation of Costs..............................................  24
Levy and Assessment of Taxes by Districts.................         25
Default by Individual Landowners..........................         26
Refusal of Water in case of Default.......................         27
Penalty for Delinquency in Payment........................         28
Operation of Irrigation System by Districts...............         29
Employment by Districts of Irrigation Manager.........            30
Access to Books and Records...............................         31
Changes in Organization of Districts......................         32
Assurances Relating to Validity of Contract...........            33
Member of Congress Clause.................................         34

002324

017456

THIS AGREEMENT, made this 27th day of March, 1922, between THE UNITED STATES OF AMERICA, herein styled the United States, acting for this purpose through E. C. Finney Acting, Secretary of the Interior, herein styled the Secretary, under the provisions of the Act of June 17, 1902 (32 Stat., 388), and acts amendatory thereof or supplementary thereto, herein styled the Reclamation Law, and the LANGELL VALLEY IRRIGATION DISTRICT, herein styled the Langell Valley District, a public corporation organized and existing under the laws of the State of Oregon and having its principal place of business at Klamath Falls, Oregon, and the HORSEFLY IRRIGATION DISTRICT, herein styled the Horsefly District, a public corporation organized and existing under the laws of the State of Oregon, having its principal place of business at Bonanza, Oregon, both herein styled the Districts, witnesseth:

Purpose of Agreement

2. WHEREAS, the United States has constructed and completed in connection with the Klamath Federal irrigation project, a certain storage reservoir in Modoc County, Calif., known as Clear Lake Reservoir, and has storage capacity in excess of the needs of that project and those contracting for

017457

002326

the use of waters therefrom; and,

3. WHEREAS, the Langell Valley District contains within its boundaries on the south side of Lost River approximately 6,250 acres of land which is arid and requires water and facilities for the proper irrigation thereof; and,

4. WHEREAS, the Horsefly District contains within its boundaries, adjacent to the lands of the Langell Valley District, approximately 8,100 acres of land which can be furnished with said water if facilities for carrying the same from Lost River through the Langell Valley District are provided; and,

5. WHEREAS, both Districts desire to cooperate with the United States under the Reclamation Law, and secure the right to the use of said excess storage capacity and the construction of certain irrigation works and canals needed in connection with the carriage of said water; and,

6. WHEREAS, the Langell Valley District desires to further cooperate with the United States under said law in the construction of pumping facilities and certain distribution laterals necessary for the irrigation of the lands of that District.

7. NOW, THEREFORE, in consideration of the premises and the covenants herein contained, it is agreed between the parties as follows:

## Irrigation Works for Joint Use of Districts.

8.    The United States will construct for the joint use of the Districts, the following irrigation works:

(a)  A diversion dam on Lost River near the California-Oregon boundary line;

(b)  A canal leading from said dam to a point within the Langell Valley District at or near the northwest corner of Section 4, Township 40 South, Range 15 East, Willamette Meridian;

(c)  The necessary structures for diverting and carrying not to exceed 140 cubic feet per second of water from said point of diversion to Station 320, and not to exceed 125 cubic feet per second from Station 320 to the said terminus.

## Irrigation Works for Use of Langell Valley Dist.

9.    The United States will construct for the use of the Langell Valley District the following irrigation works:

(a)  A pumping plant, to be connected with power facilities to be furnished by the Langell Valley District, located at a feasible point to be selected by the United States, on or near Section 4, Township 40 South, Range 15 East, Willamette Meridian, for elevating water for 3600 acres of the lands of the Langell Valley District to a maximum elevation of approx-

-5-

017459

## Irrigation Works for Joint Use of Districts.

8.   The United States will construct for the joint use of the Districts, the following irrigation works:

(a)   A diversion dam on Lost River near the California-Oregon boundary line;

(b)   A canal leading from said dam to a point within the Langell Valley District at or near the northwest corner of Section 4, Township 40 South, Range 13 East, Willamette Meridian;

(c)   The necessary structures for diverting and carrying not to exceed 140 cubic feet per second of water from said point of diversion to Station 320, and not to exceed 125 cubic feet per second from Station 320 to the said terminus.

## Irrigation Works for Use of Langell Valley Dist.

9.   The United States will construct for the use of the Langell Valley District the following irrigation works:

(a)   A pumping plant, to be connected with power facil-ities to be furnished by the Langell Valley District, located at a feasible point to be selected by the United States, on or near Section 4, Township 40 South, Range 13 East, Willamette Meridian, for elevating water for 3800 acres of the lands of the Langell Valley District to a maximum elevation of approx-

-5-

002328

imately 65 feet above the grade of the canal;

(b)   Distribution laterals with the necessary structures and turnouts for each 160-acre tract, to irrigate the lands under the canal and pumping plant in the Langell Valley District.

### Irrigation Works for Use of Horsefly District.

10.   The United States will construct for the use of the Horsefly District, a drop or suitable structure for delivery into Lost River of the proportionate part of the water carried through the canal for the Horsefly District, the same to be built at or near the terminus of said canal.

### Changes in Plans for Irrigation Works.

11.   The plans for the construction of the irrigation works herein provided for are necessarily dependent on conditions variable and uncertain.   Such plans are, therefore, partially tentative, and to the end that the construction work may be carried on so as to attain the best results and keep within the specified limit of expenditures, the United States may, subject to the approval of the respective boards of directors of the Districts, change the plans as conditions developing from time to time may justify and render necessary or advisable.   No change, however, shall be made which will

-4-

017461

defeat the general purpose sought to be accomplished nor
subvert the general tenor of this contract.

### Limit of Expenditure for Irrigation Works.

12. The United States will expend Three Hundred Sixty-
eight Thousand Dollars ($368,000) for construction of the
irrigation works described herein, or so much thereof as may,
in the opinion of the Secretary, be necessary for the purpose;
and when such expenditure shall have been made such construc-
tion work shall discontinue and shall be considered completed
within the meaning of this contract.

### Construction of Irrigation Works Subject to appropriati

13. This contract is subject to appropriations being
made by Congress from year to year of moneys sufficient to do
the work provided for herein.   No liability shall accrue
against the United States by reason of such moneys not being
appropriated.   Should only a portion of the moneys above
named be so provided, then the amount to be repaid by the Dis-
tricts to the United States for such work shall be reduced
to an amount equal to the sum actually expended.

### Rights of Way

14. So far as is practicable, the United States will,

-8-

017462

without change, utilize in connection with the construction work hereunder its ditch and canal rights of way reserved by the act of August 30, 1890 (26 Stat., 391), but the Districts shall, upon request of the United States, at their own cost secure releases to the United States as to all damage done in the work of construction to improvements on such rights of way. Moreover, the Districts shall, upon request of the United States, at their own cost, secure and confer upon the United States pursuant to law, all further easements and rights of way required for the Districts' works, including distributaries. The obligations of the Districts under this article are additional to their obligations elsewhere defined herein.

### Water Supply for Langell Valley District.

15.   The United States hereby sells and conveys to the Langell Valley District for the sum of Seventy-eight Thousand One Hundred Twenty-five Dollars ($78,125) the annual use of Twelve Thousand Five Hundred (12,500) acre-feet of water from Clear Lake Reservoir to be delivered in Lost River at the point of diversion herein specified, the same being Two (2) acre-feet of water per acre for approximately Six Thousand Two Hundred Fifty (6,250) acres of land within the District, at a charge of Six Dollars and Twenty-five

002331

017463

Cents ($6.25) per acre-foot.

### Water Supply for Horsefly Dist.

16.   The United States hereby sells and conveys to the Horsefly District for the sum of Twenty-six Thousand Two Hundred Fifty Dollars ($26,250) the annual use of Four Thousand Two Hundred (4,200) acre-feet of water from Clear Lake Reservoir to be delivered in Lost River at the point of diversion herein specified, the same being Two (2) acre-feet of water per acre for approximately Two Thousand One Hundred (2,100) acres of land within the District, at a charge of Six Dollars and Twenty-five Cents ($6.25) per acre-foot.

### Water Supply to be Beneficially Used.

17.   The Basis, the measure, and the limit of the right of the respective Districts to the use of the water herein provided for shall rest perpetually in the beneficial application of the same to the lands of the respective Districts, and the Districts shall cause said water to be put to beneficial use with due diligence in accordance with law.

### Water Supply to be used subject to Reclamation Law

18.   In the distribution of the water supply provided for herein the respective Districts shall comply with all of the

-- 7 --

002332

017464

applicable provisions of the Reclamation Law and the regulations of the Secretary thereunder.

## Shortage in Water Supply

19. On account of drought or other cause there may occur at times a shortage in the water supply provided for herein, and while the United States will use all reasonable means to guard against such shortages, in no event shall any liability accrue against the United States for any damage direct or indirect arising therefrom, and the payments due hereunder shall not be reduced because of any such shortage.

## Payment of Construction Costs by Langell Valley Dist.

20. The Langell Valley District hereby agrees to pay to the United States the following construction costs:

(a) On account of the irrigation works for joint use of the Districts described in Article 8, that proportion of the total cost of said works that 6,250 acres to be irrigated in the Langell Valley District bears to 8,550 acres the total area for which said works are to be constructed;

(b) The total cost of the irrigation works to be constructed for the Langell Valley District described in Article 9;

(c) The sum of Seventy-eight Thousand One Hundred Twenty



002333

017465

five Dollars ($75,125) for water supply described in Arti-
cle 15;

Provided, That the aggregate sum payable under
this contract by the Langell Valley District to the United
States for construction costs, exclusive of penalties, shall
not exceed the sum of $587,000.

## Payment of Construction Costs by Horsefly District.

21.   The Horsefly District hereby agrees to pay to the
United States the following construction costs;

(a)   On account of the irrigation works for joint use
of the Districts described in Article 6, that proportion of
the total cost of said works that 2,100 acres to be irrigated
in the Horsefly District bears to 8,350 acres the total area
for which said works are to be constructed;

(b)   The total cost of the irrigation works to be con-
structed for the Horsefly District described in Article 10;

(c)   The sum of Twenty-six Thousand Two Hundred Fifty
Dollars ($26,250) for water supply described in Article 16;

Provided, That the aggregate sum payable under this
contract by the Horsefly District to the United States for
construction costs, exclusive of penalties, shall not exceed
the sum of $87,000.

-9-

017466

## Terms of Payment of Construction Costs.

22.   Upon completion of the irrigation works described herein or the discontinuance of expenditures thereon, the Secretary of the Interior shall announce to each District the total amount of construction costs payable by the District to the United States hereunder.   Payment of the amount so announced shall be made by each of the respective District to the United States in 40 semi-annual instalments on June 30 and December 31 of each year, beginning June 30 of the year first following the year in which the Secretary of the Interior makes said announcement.   The first eight of such semi-annual instalments shall each be one percentum (1%), the next four instalments shall each be two per centum (2%), and the following twenty-eight instalments shall each be three percentum (3%) of the total amount due from each District respectively.

## Payment of Operation and Maintenance Costs by Districts

23.   In addition to the construction costs provided for herein, the Districts agree to pay annually to the United States, the following operation and maintenance costs:

(a)   That proportionate part of the total cost of the operation and maintenance of Clear Lake Reservoir, that the 6,350 acres of irrigable land in the Districts bears to the

-10-

002335

017467

total irrigable area receiving benefits from the reservoir
during the year;

(b)  The total cost of delivery of the Districts' water
from the reservoir to the point of proposed diversion in Lost
River.

Operation and Maintenance costs shall be paid by the
respective Districts to the United States according to their
irrigable acres and in the proportions described in Article
20 (a) and Article 21 (a).   The total amount of such costs
due from each of the Districts to the United States shall
be set out in a statement to be furnished annually to the Dis-
tricts by the United States, and shall be due and payable on
December 31 of the year following the irrigation season on
account of which the costs were incurred.

### Computation of Costs.

24.  The costs both of construction and of operation
and maintenance which under this contract the Districts
obligate themselves to pay, shall embrace all expenses of
whatsoever kind in connection with, growing out of, or result-
ing from the work described, including the cost of labor,
material, equipment, engineering, legal work, superintendence,
administration, overhead, right of way, property, and damage
of all kinds; and shall specifically include all sums expended

-11-

002336

017468

by the United States in surveys and investigations in connection with the irrigation of the Districts' lands prior to the execution of this contract.   In determining the total amount of all such costs, the project books of the United States Reclamation Service shall be accepted as conclusive.

### Levy and Assessment of Taxes by Districts.

25.  The Districts agree that they will each cause to be levied and collected all necessary assessments and will use all the powers and resources of the Districts, including the taxing power of the Districts, and the power to withhold delivery of water, to collect and pay to the United States all charges provided in this contract in full on or before the day that the same become due.

### Default of Individual Landowners.

26.   The Districts as a whole are each obligated to pay to the United States the full amount herein agreed upon according to the terms stated, regardless of individual default in the payment of any assessment levied by the Districts.

### Refusal of Water in case of Default.

27.  The United States reserves the right to refuse to deliver water to the Districts, or either of them, in the event of default for a period of more than one year in any

-18-

payment due the United States under this contract. Upon
request of the United States, the District shall refuse
water service to all lands which may be in default for more
than one year in the payment of any assessment levied there-
under. The provisions of this article are not exclusive,
and shall not in any manner hinder the United States from
exercising any other remedy to enforce collection of any
amount due hereunder.

### Penalty for Delinquency in Payment.

18.    To every installment of money required to be paid
under this contract which shall remain unpaid after the same
shall have become due, there shall be added at once a penalty
of one per centum (1%) thereof, and thereafter a like penalty
of one per centum (1%) on the first of each month so long as
such default shall continue; and the District hereby agree
to pay said penalty.

### Operation of Irrigation System by District.

19.    The District will operate and maintain the Irriga-
tion system to be constructed hereunder to the satisfaction
of the United States. The United States assumes no respond-
sibility whatever for the safety, integrity or operation of
the same or any portion thereof, and the District will hold
the United States and its assigns, officers, agents and
employees harmless from any and all claims arising in con-

-18-

017469

002338

nection therewith.

### Employment by Districts of Irrigation Manager.

30. Until payment to the United States of all construction costs, the Districts will employ as manager or superintendent a competent irrigation engineer or manager who shall have had at least three years' experience as manager or superintendent in the operation of similar irrigation works, the selection of such person to be subject to the approval of the Chief Engineer of the United States Reclamation Service. Upon notice from the Chief Engineer that any manager or superintendent employed by the Districts is unsatisfactory, the Districts will promptly terminate the employment of such unsatisfactory manager or superintendent and employ one approved by the Chief Engineer.

### Access to Books and Records.

31. The proper officials of the Districts shall have full and free access to the project books and official records of the United States Reclamation Service, so far as they relate to the matters covered by this contract and the right at any time during office hours to make copies of and from the same, and the representatives of the United States shall have the same right in respect to the books and records of the Districts.

002339

## Changes in Organization of Districts.

22. While this contract is in effect, no change shall be made in the organization of the Districts, either by the inclusion or exclusion of lands, by consolidation or merger with another district, by proceedings to dissolve, or otherwise, except upon the written assent thereto of the Secretary of the Interior.

## Assurances Relating to Validity of Contract.

23. The execution of this contract shall be authorized by the qualified electors of the Districts at elections held for that purpose. Thereafter, without delay, the Districts shall prosecute proceedings in court for a judicial confirmation of the organization of the Districts, and the making of this contract. The United States shall not be obligated to make any expenditure hereunder until a confirmatory judgment in such proceedings shall have been rendered; and if ground for appeal from such judgment shall have been left, until decision favorable to the contract shall have been finally made. The Districts shall furnish the United States for its files, certified copies of all proceedings relating to their respective organization, and to the election upon this contract.

017471

002340

## Member of Congress Clause.

34. No Member of or Delegate to Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified and during his continuance in office, and no officer, agent, or employee of the Government, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon. Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract or agreement is made for the general benefit of such incorporation or company, as provided in section 116 of the act of Congress approved March 4, 1909 (55 Stat., 1109).

IN WITNESS WHEREOF the parties hereto have hereunto signed their names the day and year first above written.

THE UNITED STATES OF AMERICA

By   E. C. Finney

Acting Secretary of the Interior
April 29, 1922

LANGELL VALLEY IRRIGATION DISTRICT

By   H. J. Ticknor
President.

HORSEFLY IRRIGATION DISTRICT

By   Jacob Enock
President

(Seal)

Attest:

A. L. Wishard
Secretary

Attest:

Wm. W. S. Chase
Secretary.

(Seal)

-16-

002341

017473

Resolution of the Board of Directors of the Langell Valley Irrigation District of Klamath County, Oregon, authorizing the execution of a certain contract with the United States of America.

The following resolution was made, seconded and unanimously carried:

WHEREAS a joint contract between the Langell Valley Irrigation District, the Horsefly Irrigation District and the United States of America wherein and whereby the United States agrees to construct an irrigation system and furnish a water right for 6,250 acres of land within the Clear Lake Division of the Langell Valley Irrigation District has been approved by the Board of Directors and by the qualified legal electors of said District at an election duly and regularly held upon the 22nd day of March, 1922, by a majority of the votes cast at said election, and

WHEREAS the returns of said election have been duly and regularly canvassed by the Board of Directors of said District and found to be correct, and said canvassing Board has declared said election to have carried in favor of the District entering into said contract by a majority of the votes cast,

NOW THEREFORE BE IT RESOLVED that the President and Secretary of the District be and they are hereby authorized to execute said contract for and on behalf of the Langell Valley Irrigation District.

I, A. L. Wishard Secretary of Klamath Falls, Oregon, do hereby certify that the above and foregoing resolution is a true and correct copy of the resolution as passed by the Board of Directors of the Langell Valley Irrigation District at the meeting held by said Board on the 27th day of March, A.D. 1922, and as the same appears on the minutes of said Board meeting.

Dated at Klamath Falls, Oregon, this 27th day of March, A. D. 1922.

A. L. Wishard,
Secretary of the Board of Directors
of the Langell Valley Irrigation District of Klamath County, Oregon.

(Seal)

017474

Resolution of the Board of Directors of the
Horsefly Irrigation District of Klamath County,
Oregon, authorizing the execution of a certain
contract with the United States of America.

Whereas : The Board of Directors of the Horsefly Irrigation District
of Klamath County, Oregon, did, on the 17th day of February, 1922,
by resolution formally presented and duly passed by said board,
order an election to be held within and by the Horsefly Irrigation
District, for the purpose of having the electors thereof decide by
their ballots whether a certain contract should be made between the
United States of America, the Langell Valley Irrigation District
and the said Horsefly Irrigation District, wherein and whereby the
maximum amount to be assumed by the said Horsefly Irrigation District
is $87,000.00 and the proportionate cost of the operation and
maintenance charge for the Clear Lake Reservoir and Storage Works,
and;

Whereas: Such election was duly advertised in the
Klamath Herald, for four successive and consecutive weeks, being
five publications therein and thereof and the publisher's affidavit
of such publication having been received and placed on file with
the records of this office, and;

Whereas: The affidavit of the secretary of this board, as
to the posting of the required notices of such election, has also
been received, approved and filed with the records of this office,
and;

Whereas: Such election has been held and due returns thereof have been made and delivered to the secretary, and thereafter, on the 27th day of March, A.D. 1922, said returns were canvassed by the Board of Directors sitting as a canvassing board for that purpose and the result as thus returned and determined was duly entered on the minutes of this board, and;

Whereas: It appears that all formal proceedings have been observed, and that the electors have, by their ballots, fully authorized this Board of Directors to enter into and execute the foregoing contract:

THEREFORE BE IT RESOLVED: That the president of this board, Jacob Rueck, and the secretary of this board, Wm.F.B.Chase, be authorized, and they are hereby authorized to execute said contract with the United States of America.

| Attest: | JACOB RUECK, | President. |
| Wm. F. B. Chase, | ... J. LITLE | Director |
| Secretary of the Board. | WM. IRWIN | Director |

I, Wm. F.B.Chase, of Bonanza, Oregon, do hereby certify that the above and foregoing resolution is a true and correct copy of the resolution as passed by the Board of Directors of the Horsefly Irrigation District at the meeting held by the said Board on the 11th day of April A.D. 1922, and as the same appears on the minutes of said board meeting.

Dated at Bonanza, Oregon, this
13th day of April A.D. 1922

(Seal)

Wm. F. B. Chase,
Secretary of the Board of Directors
of the Horsefly Irrigation District of Klamath County, Oregon.

002344

Form 7—Edit
(Revised July, 1920)

017476

DEPARTMENT OF THE INTERIOR

Project Manager

UNITED STATES RECLAMATION SERVICE

**Klamath** Project **Klamath Falls, Oregon, April 15, 1922**
(Place.)                                              (Date.)

**Director thru**
Project Manager to Chief Engineer, through District Counsel.

execution
Subject: Forwarding contract dated **Mar. 27, 1922,** for ~~approval~~
deed                                                        acceptance

With **Langell Valley and Horsefly Irrigation Districts**
From

Estimated amount involved, $474,000.00          Authority No.
Accompanied by bond and 2 copies      **No**      or Clearing Acct.
(Insert "Yes" or "No" bond.)
Purpose:  **Furnishing irrigation water.**

Advise Project Manager at  **Klamath Falls, Oregon**
(Post office address.)

District Counsel at  **Portland, Oregon**
(Post office address.)

and  **Chief Engineer at Denver, Colorado,**

execution
of the ~~approval~~ of the above, using extra copy hereof.
acceptance

NOTE.—Before submitting contract or deed, see that the instructions on reverse hereof have been FULLY complied with.  See also par. 16, page 205, Vol.
I of Manual.

Inclosures from project office:
Original and  copies of this form letter.
Original and  copies of contract.
deed
**Resolution of Langell Valley Irrigation District**
**Resolution of Horsefly Irrigation District**

*Herbert D. Newell*
(Signature.)
**Project Manager**

Denver, Colo.,
The above-described contract, and bond if any, approved

by                      Chief Engineer, on

Denver, Colo.,  **April 21, 1922**

Chief Engineer to Director:

executed
It is recommended that the above-described contract be ~~approved~~
accepted
and bond if any, approved.                **R. F. Walter**
Inclosures listed on reverse.
(Signature.)

Washington, D. C.,

xx  The above mentioned contract was executed by Mr. E. C. Finney,
Acting Secretary, on April 29, 1922.
Morris Bien, Assistant Director    APR 24 1922  37376

017477

Inclosures from Denver office:

    Original and 8   copies of this form letter.
    Original and 2   copies of contract.

    Orig. & 1 copy of resolution of Langell Valley Irri.Dist.
    Orig. & 1 copy of resolution of Horsefly Irri. Dist.
    2 letters from P.M. to C.E. dated Dec.21,1921
    Copy of letter from C.E. to P.M. dated Jan. 6, 1922.
    Letter from P.M. to C.E. dated Feby. 2, 1922
    Copy of wire from Actg.C.E. to P.M. Feby. 9, 1922.


                    Remarks:


        See the following correspondence:  Letters August 9,
1921, Project Manager to Chief Engineer; September 10, 1921,
Chief Engineer to Director; November 8, 1921, Chief Counsel to
District Counsel; November 9, 1921, Director to Secretary of
the Interior; February 2, 1922, Project Manager to Chief Engineer,
January 6, 1922, Chief Engineer to Project Manager - and other
correspondence.


## INSTRUCTIONS

1. This form is devised to render unnecessary the writing of various routine letters in reference to contracts and deeds.  If the contract submitted is not of the class for approval in Denver (see par. 2a–g, C. L. 896), the chief engineer will forward with his recommendation to Washington for appropriate action.

2. This form shall be used only in the case of contracts to be executed or approved at Washington or Denver (see pars. 2 and 3, C. L. 896) and for deeds and easements which are accepted only at Washington.

3. The office in which the contract or deed originates will transmit *three* (3) *copies* of this form *in excess* of the number of offices to be advised of approval, execution, or acceptance, one copy to be held by the district counsel pending approval, execution, or acceptance.  For example, in the usual case where the project manager and the district counsel are to be advised, five (5) copies and one (1) original (6 in all) should be sent to the district counsel, who will forward to Denver four copies and one original (5 in all).

4. With every contract or deed submitted involving an expenditure, the authority number (Form 7–681) or clearing account to which charges will be made must be given in the space provided on this form letter.  (See par. 41, p. 213, Vol. I of Manual.) The amount of probable expenditure or collection must also be shown (see par. 11, p. 204, Vol. I of Manual).  Any other special matter or information relative to the contract or deed too long to write on this form should be set out in a statement or certificate and submitted with the contract or deed.

5. Reference should be made to previous correspondence of importance, especially if form of contract or deed was approved in advance, *giving dates*, stating whether a telegram or letter, and from and to whom.

6. The office in which the contract or deed originates should list all inclosures in the space on the face of this form.  If the space is not sufficient, list on separate sheet.

7. All quitclaim or donation deeds and easements (see par. 47, p. 265, and par. 10, p. 290, Vol. I of Manual) shall be transmitted through Denver to Washington for acceptance, a copy of such deeds and easements with related papers being furnished for the files of the Denver office and the district counsel.

002346

017478

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
KLAMATH IRRIGATION PROJECT          Ilr-112

CONTRACT BETWEEN THE UNITED STATES AND THE LANGELL
VALLEY IRRIGATION DISTRICT AND THE HORSEFLY IRRIGA-
TION DISTRICT, FOR DREDGING CLEAR LAKE TO
RELIEVE WATER SHORTAGE

THIS AGREEMENT, Made this ____13th____ day of____April____,

1931, in pursuance of the act of Congress of June 17, 1902, (32

Stat., 388) and acts amendatory thereof or supplementary thereto,

all hereinafter styled the reclamation law, between the UNITED

STATES OF AMERICA, hereinafter styled the United States, repre-

sented by the contracting officer executing this contract, and the

LANGELL VALLEY IRRIGATION DISTRICT and the HORSEFLY IRRIGATION

DISTRICT, irrigation districts of the State of Oregon, hereinafter

styled the Districts,

WITNESSETH:

## Explanatory Recitals

2.   WHEREAS, the parties hereto entered into an agreement

dated March 27, 1922, providing for the construction by the United

States of certain irrigation works for the Districts and, Whereas,

the parties hereto, as a supplement to said agreement, entered

into later agreements for the construction of additional irrigation

and drainage works for the Districts by the United States, which

said supplemental contracts are under dates of and are described as

the contracts of June 15, 1922 with the Langell Valley Irrigation

002347

017479

District; June 18, 1923, with the Langell Valley Irrigation District; October 15, 1923 with both districts; October 17, 1925, with the Langell Valley Irrigation District; January 7, 1927, with the Langell Valley Irrigation District; July 1, 1927, with the Langell Valley Irrigation District, and May 7, 1929, with the Horsefly Irrigation District, all of said contracts being hereinafter referred to as the contract of 1922 as amended; and

3.    WHEREAS, the Districts need an augmented water supply which may be provided by dredging a certain channel in Clear Lake Reservoir, and the Langell Valley Irrigation District requires additional water which may be supplied by the installation near the West Canal in the $SW\frac{1}{4}$ of section 4, T. 40 S., R. 13 E. of a vertical pumping plant with 600 feet of 20-inch steel discharge pipe and flap valve, and the construction of approximately 270 feet of lateral from the west canal to the pumping plant forebay; and

4.    WHEREAS, an emergency exists by reason of the low precipitation upon the watershed draining into Clear Lake and there is danger of a serious shortage in the water supply of the Districts:

NOW, THEREFORE, it is agreed that:

### Works to be Constructed by the United States

5.    The United States will expend the sum of Thirty-five thousand dollars ($35,000.00), or so much thereof as the Secretary of the Interior (hereinafter referred to as the Secretary) or the officer of the United States authorized by him shall find necessary or advisable for that purpose, toward the dredging of a channel from a point near the outlet of Clear Lake to a point in the $NE\frac{1}{4}$ Sec. 27,

-2-

017480

T. 47 N., R. 7 E., M.D.M., or so much thereof as shall be found necessary or advisable by the Secretary.  And the United States will expend the additional sum of Ten Thousand Dollars ($10,000), or so much thereof as the Secretary, or such other officer shall find necessary or advisable for that purpose, toward the installation, near the West Canal, of a vertical pumping unit with capacity of approximately 15 cubic-second-feet, with 600 feet of 20-inch steel discharge pipe and flap valve, and the construction of approximately 270 feet of lateral from the West Canal to the pumping plant forebay, or so much thereof as shall be found necessary or advisable by the Secretary;  Provided, however, that changes in location may be made during the progress of the work if, in the opinion of the Secretary, such changes are necessary or advisable.

### Construction of Works Subject to Appropriations

6.   No liability shall accrue against the United States by reason of funds, provided for herein, not being appropriated or not being available if appropriated.  Should only a portion of the funds above designated be so appropriated or available, then the amount to be repaid by the Districts to the United States for such work shall be reduced to an amount equal to the sum of money actually expended.

### Payment of Construction Costs by the Districts

7.   The Districts hereby agree to pay to the United States, in the manner and upon the terms and conditions prescribed herein, all the costs incurred and expenditures made by the United States for the dredging of a channel in said Clear Lake reservoir under the terms of this contract, and the Langell Valley Irrigation

002349

017481

District hereby agrees to pay to the United States in the manner and upon the terms and conditions prescribed herein all the costs incurred and expenditures made by the United States for the pumping plant and appurtenant structures hereinbefore described, as the said costs and expenditures are determined by the statement to be furnished by the Secretary as provided herein. It is understood and agreed that both districts are obligated to the United States for the cost of dredging the channel in Clear Lake Reservoir in the ratio and proportion as hereinafter set out and that the Langell Valley Irrigation District only is obligated for the cost of installation of the pumping plant and appurtenant structures as described herein in article 5.

### Secretary's Decision Conclusive

8.   The decision and determination by the Secretary as to any and all matters which, by the terms hereof, are left to the discretion of the Secretary, or are agreed to be decided or determined by him, shall be final and conclusive and binding on all parties.

### Districts' Share in Storage Water Made Available

9.   The dredging herein provided for is for the purpose of making available to the Districts storage in Clear Lake Reservoir below elevation 4522.9, and it is agreed that the Districts shall share in the additional storage made available by the construction of said channel in the same ratio or proportion as in the storage heretofore made available in said reservoir, to wit, in the proportion of 12500/21564 to the Langell Valley district and 9064/21564 to the Horsefly District and shall share in the payment of the cost

-4-

017482

thereof in the same proportion: Provided, however, that the total quantity of water to be delivered to the districts by reason of such dredging shall not exceed the quantities specified in the contract of 1922 as amended.

### Langell Valley Irrigation District Sole Beneficiary of Pumping Unit Installation

9½.   The pumping plant herein provided for is for the purpose of making available to lands of the Langell Valley Irrigation District additional water for irrigation, and it is agreed that the additional water made available by such installation shall be for the sole benefit of such district; Provided, however, that the total quantity of water to be delivered to the Langell Valley Irrigation District by reason of such pumping facilities shall not exceed the quantity specified in the contract of 1922 as amended.

### Water Supply may be Reduced by Drouth or Other Causes

10.   It is understood that the amount of water available from the Clear Lake Reservoir and from the improvement thereof and the pumping unit installed as provided in this contract may be reduced at times on account of drouth or low water, and that the United States does not guarantee any specified amount of water from said reservoir or any specified increase by reason of the channel construction provided for herein or by reason of the installation of said pumping unit, and that neither the United States nor its officers, employees, or assigns shall be liable on account of any shortage in the water supply available from said reservoir or from such pumping facilities or any alleged inaccuracies or mistakes in the division thereof, and that none of the payments provided for

002351

017483

herein, or in said contract of 1922 as amended, shall be reduced on account of any such water shortage.

## Terms of Payment

11.  Upon completion of the dredging in said Clear Lake Reservoir work, herein provided for, or the discontinuance of expenditures thereon, the Secretary shall furnish to each of the districts a written statement of the total amount of construction costs payable by each of the Districts to the United States hereunder. The said cost of such construction as shown by said statements from the Secretary will be due and payable by each of the respective districts in thirty-five equal annual instalments. The sums annually payable shall be divided into two equal instalments payable June 30 and December 31 of each year, beginning with June 30 of the year following the year in which the Secretary shall announce that the said dredged channel is completed so far as deemed necessary by the Secretary, or that construction thereon has terminated, or that said channel is ready to begin the release or conveyance of water from said reservoir. It is agreed and understood that the payments herein provided for are in addition to those provided for in all the previous contracts of the Districts with the United States, some of which are herein referred to. Upon completion of the installation of said pumping unit and appurtenant structures for the Langell Valley Irrigation District, herein provided for, or the discontinuance of expenditures thereon, the Secretary shall furnish to the Langell Valley Irrigation District a written statement of the total amount of construction costs payable by such

002352