017625

hereof require a determination of fact to be made, the Secretary is hereby designated as the arbiter of such questions and as the one required to make such determination of fact. His decision therein shall be conclusive and binding on the parties hereto. In all acts, matters and determinations provided in this contract to be done, determined, or decided by the Secretary or by the United States, it is agreed that the acts, decisions, findings, and determinations by the Secretary shall be final and conclusive as to all the parties to this contract and as to all persons claiming any rights under or by virtue of this contract or in anywise based upon or arising out of this contract or any act or proceeding carried on thereunder.

## Representative of Secretary

37. Where this contract provides for action by the Secretary, said action may be taken for and on behalf of the Secretary by his representative duly authorized in writing by him.

## Changes in Organization of the District

38. While this contract is in effect, no change shall be made in the District, either by inclusion or exclusion of lands, by partial or total consolidation or merger with another district, by proceedings to dissolve or otherwise, except upon the Secretary's written assent thereto. The map attached, marked Exhibit A, shows the present boundaries of the District.

## Assignment Prohibited: Successors and Assigns Obligated

39. The provisions of this contract shall apply to and bind the successors and assigns of the parties hereto but no assignment or transfer of this contract or any part thereof or interest therein shall be valid

002494

017626

until approved by the Secretary.  All rights of action for breach of this contract are reserved to the United States as provided in Section 3737 of the Revised Statutes of the United States.

### Contingent on Appropriations or Allotment of Funds

40.  The expenditure of any money or the performance of any work by the United States herein provided for, which may require appropriations of money by Congress or the allotment of funds, shall be contingent upon such appropriations or allotments being made.  The failure of Congress so to appropriate funds, or the failure of an allotment of funds, shall not relieve the District from any obligations under this contract and no liability shall accrue against the United States in case such funds are not so appropriated or allotted.

### This Contract Not to Affect Contract of May 25, 1940

41.  This contract does not change or affect in any way the provisions of that certain contract dated May 25, 1940, between the United States and the District, which provides for certain expenditures and work by the Biological Survey (now the Fish and Wildlife Service) of the United States and certain agreements to be performed by the District.

### Confirmation of Contract

42.  The District agrees that upon the execution of this contract it will promptly proceed to secure a final decree of the proper Court of the State of Oregon approving and cinforming this contract and decreeing and adjudging the same to be a lawful, valid and binding general obligation of the District, and decreeing the same to be lawful and binding.  The District shall furnish certified copies of such decree to the Secretary.  In the

002495

017627

event that in the opinion of the Secretary a satisfactory confirmation decree is not secured promptly as herein provided, the Secretary by giving notice in writing to the District may terminate this contract.  In the event of such termination the Government-District contract shall be deemed as having been continuously in full force and effect, unmodified by this contract; and all sums due the United States under the Government-District contract on the date of such termination, which have not been paid or have been paid only in part because of the operation of this contract, shall become immediately due and payable.

### Procedure for Amendment

43.  Amendments to this contract may be made by mutual agreement of the parties hereto without further approval by Congress if, in so far as the United States is concerned, those amendments are within the scope of statutory authority theretofore or hereafter granted to the Secretary: Provided, That no such amendment providing for a longer repayment period than permitted by the Reclamation Project Act of 1939 (53 Stat. 1187), as it may be amended, shall be effective until approved by an act of Congress.

### Officers Not to Benefit

44.  No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise herefrom, but this restriction shall not be construed to extend to this contract if made with a corporation or company for its general benefit.

002496

017628

IN WITNESS WHEREOF, the parties hereto have caused this contract to be executed the day and year first above written.

UNITED STATES OF AMERICA
(Sgd) Michael W. Straus

By _____
Assistant Secretary of the Interior

KLAMATH DRAINAGE DISTRICT

By  /s/ John Liskey_____
President

(Corp. Seal)

By  /s/ G. L. Langslet_____
Secretary

002497

017629

THIS AGREEMENT made this 25 day of May, 1940, between the United States, acting for this purpose through the   Acting Secretary of the Interior, hereinafter referred to as the Secretary, and the Klamath Drainage District, a quasi-municipal corporation organized under the laws of the State of Oregon and having its principal place of business at Klamath Falls, Oregon, hereinafter referred to as the District.

WHEREAS, the said Klamath Drainage District includes within its boundaries that part of the bed of Lower Klamath Lake that is located within the State of Oregon, and

WHEREAS, the said Lower Klamath Lake is  included in the Klamath Reclamation Project under the Reclamation Act of June 17, 1902 (32 Stat. 389) and was established as a preserve and breeding ground for native birds by Executive Order No. 924 of August 8, 1908; and

WHEREAS, through the withholding of water in connection with said reclamation project, that part of the Lower Klamath Lake bed in Oregon, now included in the Klamath Drainage District, was reclaimed for agriculture and put into cultivation, but that portion of the lake bed which lies in California was found to be generally unsuitable for agriculture, is the source of dust storms that have become a nuisance to adjacent communities, and was generally rendered unsuit-able for wildlife habitat; and

WHEREAS, after careful study and investigation, it has been de-cided that through the development of the Modoc Unit of the Klamath Project, involving the reclamation of arid lands in said Unit under said Reclamation Act of June 17, 1902, the protection of certain lands of the Tule Lake Division of the Klamath Project against flood, dust-storm, and alkali damage, can be assured, and improved facili-ties provided for National Wildlife refuge purposes in both Tule Lake Sump and Lower Klamath Lake; and

WHEREAS, the said proposed Modoc Unit contemplates the pumping of water from the Tule Lake Sump into Lower Klamath Lake, which action, together with the construction of a dike across the Lower Klamath Lake Bed, just below the State line in California, and the enlargement and extension of the District canal  from Ady, Oregon to the State line, will improve facilities for wildlife in both areas; and

WHEREAS, the District desires to cooperate with the United States insofar as consistent with the full protection of the interests

COPY:GAB

002498

017630



of the District and its landowners and is willing to permit the United States to reconstruct the intake structures and to enlarge its South canal for the purpose of enabling the Federal Government to send water through said South Canal to the California lands for irrigation and other purposes.

Now, therefore, in consideration of the mutual covenants herein contained, it is agreed as follows:

The United States will, at its own expense, construct a dike across Lower Klamath Lake in the State of California at or near the State line. In the construction and operation of said dike, the United States will provide a collecting basin on the northerly side of the dike for the drainage water of the District and will permit the District to dispose of its drainage water in the sump area controlled by the United States in California, with this proviso, however, that if at any time the said sump area proves insufficient to take care of the drainage water from Tule Lake and Klamath Drainage District lands consistently with the operation of the area as a migratory waterfowl refuge, the District will, at its own expense, dispose of excess water in the proportion that the water put into the area by the District bears to all water in the area.

The United States will, at its own expense, perform the necessary work to reconstruct the intake structures of the District at or near Ady, Oregon, and to enlarge the South Canal from Ady, Oregon, to the State line to enable the United States to carry water through said South Canal to and from the California lands for irrigation and other purposes. Said intake structures shall be reconstructed and said South Canal shall be enlarged according to plans and specifications marked Exhibit "A" and attached hereto.

The United States shall commence said work without unnecessary delay, and shall carry the same forward as rapidly as practicable, and in performing said work, the same shall be carried on at all times so as not unnecessarily to interfere with the proper service of the lands in the District.

The District shall have the right to install, at its own expense, such turnouts and structures in the South Canal, in addition to those set out in Exhibit "A" as may be necessary properly to serve the lands in the District.

Any road or roads that may be constructed on the banks or right-of-way of the enlarged South Canal shall be used only by the duly authorized officers and employees of the United States and of the District or by parties having written permits from the United States or the District. Under no conditions shall such roads become public

002499

017631

highways.

The District will provide necessary rights-of-way for the South Canal and intake structures, the title to said rights-of-way to be taken in the District.

The District hereby grants to the United States the perpetual right and easement to use the enlarged South Canal for the purpose of carrying water to and from the California lands for irrigation and other purposes to the extent of the enlarged capacity in said canal created by the reconstruction and enlargement work of the United States as hereinabove set forth, with this understanding, however, that said South Canal shall be enlarged, operated, and maintained at all times with all reasonable precaution against damage to the farm lands adjacent thereto, and it is further agreed that said South Canal shall be enlarged, operated, and maintained at all times so as properly to serve the lands within the Klamath Drainage District dependent thereon. The District shall at all times have a prior right to the use of the South Canal for an amount of water equal to the capacity of the canal prior to the reconstruction and enlargement work provided for herein, and the United States shall at all times have a prior right to the use of the South Canal for the transportation of an amount of water in excess of the capacity of said canal prior to said reconstruction and enlargement, provided, however, that this agreement shall not in any way affect any water right now or hereafter enjoyed by or through either party hereto.

The intake structures and South Canal shall at all times be under the control and supervision of the Board of Supervisors of the Klamath Drainage District. The United States shall at all times bear its proportionate share of the cost of maintaining, operating, and replacing said intake structures at Ady, Oregon, and said South Canal in the proportion that the number of acre-feet of water carried through the canal for use by the United States is to the total number of acre-feet carried through such canal, with this agreement, however, that the United States shall be permitted to carry its proportionate share of such cost by the use of its machinery, equipment, and later, computed at rates to be mutually determined from time to time.

Nothing in this contract shall in any manner modify or affect any rights or obligations of the Klamath Drainage District or the United States under any contract or contracts heretofore entered into pursuant to the act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto.

No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this contract, or to any

002500

benefit that may arise therefrom, but this restriction shall not be construed to extend to this contract if made with a corporation or company for its general benefit.

Where the operations of this contract extend beyond the current fiscal year, it is understood that the contract is made contingent upon the availability of necessary funds through appropriation by Congress and allocation by the Bureau of Biological Survey for expenditures hereunder after such current year has expired. In case such appropriation and allocation are not made, the District hereby releases the United States from all liability to the extent of such failure of availability of funds, provided, however, that if such contingencies should arise and the United States should not bear its proportionate share of the cost of maintaining, operating, and replacing said intake structures, and South Canal as hereinabove provided, the rights and obligations of the parties under this contract shall be in suspense until the United States shall meet its proportionate share of such costs.

In Witness Whereof, the parties hereto have caused this instrument to be executed the day and year first above written.

UNITED STATES OF AMERICA

By /s/ E. K. Burlew
June 19, 1940        Acting Secretary of the Interior

KLAMATH DRAINAGE DISTRICT

By /s/ John Liskey
President

Attest: /s/ E. F. Taylor
Secretary

Approved as to form: May 10, 1940

W. C. WENDENHALL

Acting Under Secretary of the Interior.

4

017633

UNITED STATES
DEPARTMENT OF THE INTERIOR
WATER AND POWER RESOURCES SERVICE
MID-PACIFIC REGION

Letter Agreement made this 29th day of May , 1980, between

the United States and the Klamath Drainage District pertaining to

Contract Number Ilr-402.

It is mutually agreed by and between the parties hereto that:

1.  The Kuchel Act funds received by the District have been

fully amortized, and, effective July 1, 1979, the private and District

lands will no longer receive a $1.25 per acre credit to amortize

these funds.  Additionally, the Area K lands will no longer be

charged a $0.15 per acre administrative charge.

2.  The District will maintain better accounting records and

will provide a copy of their annual financial statement and audit

report to the Project Manager of the Klamath Project Office as soon

as it is available.

3.  Effective January 1, 1980, the District will reimburse the

Service for those operation and maintenance costs allocated to both

the District and the Area K lands for the Lower Klamath Lake outlet

drain, canal and pumping plants.  These costs will be charged equally

to all acres served by the District.

4.  The District will treat the Service as one landowner within

the District with as many votes as acres.  The number of votes

applicable to the Area K lands will be mutually determined by the

017634

Project Manager of the Klamath Project Office and the District's engineer by using the same method as is used to determine votes of the other landowners within the District.

5. The Service agrees to open negotiations with the other parties involved in the Lower Klamath Lake outlet drain, canal and pumping plants allocation to see what revisions are necessary. It is recognized that these discussions may include other items besides the allocation of operation and maintenance costs. In this regard, it may be a good time to clarify, and possibly resolve, these other matters.

6. In May of each year, the Service will be billed for services provided to the Area K lands. The annual rate charged and the per acre basis used to determine the total amount billed the Area K lands shall be the same as for the private lands served by the District. Payment shall be due the District on June 10 of each year.

7. The District's cash balance belongs to the private and Area K lands within the District in proportion to each party's share as determined in number 4 above.

8. The District will not be required to refund any past over-charges to the Area K lands as of June 30, 1979, if any.

9. The District will withdraw its May 21, 1979, billing to the Service and consider the 1979 water charges applicable to the Area K lands paid in full.

10. The District will deliver water to Area K lands and accept drainage. The District will provide the same level of water oper-ation, maintenance and drainage service to Area K lands as are

2

002503

017635

provided to the private lands within the District.  However, it is understood that the Service, as any other private landowner of his or her lands, shall be responsible for Area K development, internal operation and maintenance it may desire.

UNITED STATES OF AMERICA
WATER AND POWER RESOURCES SERVICE

By _B.E. Martin_____
Regional Director, Mid-Pacific Region


KLAMATH DRAINAGE DISTRICT

By _Murel Long_____
President

By _W.S. Ely_____
Secretary-Treasurer

3

002504

017636

UNITED STATES       Symbol Ilr-402
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
KLAMATH IRRIGATION PROJECT

Contract between The United States of America and the Klamath
Drainage District, amendatory of and supplementary to
contracts dated November 30, 1917, and August 24, 1921.

1. THIS AGREEMENT, made this ___6th___ day of ___July___ ,
nineteen hundred and twenty-nine, between THE UNITED STATES OF
AMERICA, acting for this purpose by /s/Jos. M. Dixon, First
___Assistant___ Secretary of the Interior (hereinafter referred
to as the Secretary), pursuant to the provisions of the Act of
Congress approved June 17, 1902, (32 Stat., 388); and acts amenda-
tory thereof or supplementary thereto, all of which acts are
commonly known and referred to as the National Reclamation Laws,
and particularly pursuant to the provisions of Section 4 of the
Act of Congress approved December 5, 1924, (43 Stat., 672), and
the Act of Congress approved May 25, 1926, (44 Stat., 636), the
party of the first part, hereinafter referred to as the United
States, and the KLAMATH DRAINAGE DISTRICT, a public corporation
created, organized and existing under and by virtue of the laws
of the State of Oregon, with its principal place of business in
the City of Klamath Falls, Oregon, the party of the second part,
hereinafter referred to as the District;

WITNESSETH:

Explanatory Recitals

2. WHEREAS, the parties hereto have heretofore, to wit,

on the 30th day of November, A. D. 1917, entered into an agree-
ment in writing whereby, among other things, the United States
agreed to and did close the gates in the channel connecting
Klamath River and Lower Klamath Lake (said channel being more
commonly referred to as the Klamath Strait) to aid the District
in the reclamation of its lands, and performed certain work
necessarily incidental thereto, for which the District agreed
to pay; and

3.   WHEREAS, the parties hereto have entered into a
further agreement bearing date August 24, 1921, wherein and
whereby the United States inter alia, agreed to furnish the
District with a supply of irrigation water under the terms and
conditions in said agreement particularly described; and

4.   WHEREAS, the District has made written application
for amendment of its existing agreements with the United States
to the extent that it may receive the benefits of subsection
"H" of Section 4 of the Act of Congress approved December 5,
1924, (43 Stat., 672,703), and of Section 45 of the Act of
Congress approved May 25, 1926, (44 Stat., 636,648); and

5.   WHEREAS, the District is now delinquent in the payment
of charges which became due on December 1, 1928, under the pro-
visions of Article 6 of the said contract of November 30, 1917,
and is also delinquent in payment of the charges which became

002506

017638

due December 31, 1928, under the provisions of Article 8 (a) of said contract of August 24, 1921.

NOW, THEREFORE, it is agreed as follows:

Extension of Payments under Contract of 1917

6.   The instalment of $6,565.10, which became due from the District to the United States on December 1, 1928, under the provisions of Article 6 of the aforesaid agreement of November 30, 1917, is to be paid over a period of five years.  Ten per centum thereof shall be due and payable to the United States on June 30th and December 31st of each year, commencing with the year 1929, and ending with the year 1933, both years inclusive, interest to be paid on deferred instalments at the rate of six per centum per annum, payable semi-annually on June 30th and December 31st of each year.  Interest at said rate upon the entire instalment of $6,565.10 shall begin on December 2, 1928, inclusive.  Deferred instalments of $6,565.10 payable under said Article 6 on December 1st of each year, beginning with the year 1929, and ending with the year 1936, are hereby extended and the due dates thereof are hereby changed so that said instalments, shall become due and payable from the District to the United States on the following dates and in the following amounts:

June 30, 1929, - $1,641.27
Dec. 31, 1929, -  1,641.27
June 30, 1930, -  1,641.27
Dec. 31, 1930, -  1,641.27
June 30, 1931, -  1,641.27

- 3 -

```
Dec. 31, 1931, -  $1,641.27
June 30, 1932, -   1,641.27
Dec. 31, 1932, -   1,641.27
June 30, 1933, -   1,641.27
Dec. 31, 1933, -   1,641.27
June 30, 1934, -   1,641.27
Dec. 31, 1934, -   1,641.27
June 30, 1935, -   1,641.27
Dec. 31, 1935, -   1,641.27
June 30, 1936, -   1,641.27
Dec. 31, 1936, -   1,641.27
June 30, 1937, -   1,641.27
Dec. 31, 1937, -   1,641.27
June 30, 1938, -   1,641.27
Dec. 31, 1938, -   1,641.27
June 30, 1939, -   1,641.27
Dec. 31, 1939, -   1,641.27
June 30, 1940, -   1,641.27
Dec. 30, 1940, -   1,641.27
June 30, 1941, -   1,641.27
Dec. 31, 1941, -   1,641.27
June 30, 1942, -   1,641.27
Dec. 30, 1942, -   1,641.27
June 30, 1943, -   1,641.27
Dec. 31, 1943, -   1,641.27
June 30, 1944, -   1,641.27
Dec. 31, 1944, -   1,641.43
```

7.   The instalment of $5,000.00, which became due from the District to the United States on December 31, 1928, under the provisions of Article 8 (a) of the aforesaid agreement of August 24, 1921, is to be paid over a period of five years. Ten per centum thereof shall be due and payable to the United States on June 30th and December 31st of each year, commencing with the year 1929, and ending with the year 1933, both years inclusive, interest to be paid on deferred instalments, at the rate of six per centum per annum payable semi-annually on June 30 and December 31 of each year.   Interest at said rate upon the entire instalment of $5,000 shall begin on January 1,

- 4 -

1929, inclusive.  Deferred instalments of $5,000.00 payable under said Article 8 (a) on December 31st of each year, beginning with the year 1929 and ending with the year 1935, are hereby extended and the due dates thereof are hereby changed so that said instalments, shall become due and payable from the District to the United States on the following dates and in the following amounts:

| | | |
|---|---|---|
| June 30, 1929, | - | $1,250.00 |
| Dec. 31, 1929, | - | 1,250.00 |
| June 30, 1930, | - | 1,250.00 |
| Dec. 31, 1930, | - | 1,250.00 |
| June 30, 1931, | - | 1,250.00 |
| Dec. 31, 1931, | - | 1,250.00 |
| June 30, 1932, | - | 1,250.00 |
| Dec. 31, 1932, | - | 1,250.00 |
| June 30, 1933, | - | 1,250.00 |
| Dec. 31, 1933, | - | 1,250.00 |
| June 30, 1934, | - | 1,250.00 |
| Dec. 31, 1934, | - | 1,250.00 |
| June 30, 1935, | - | 1,250.00 |
| Dec. 31, 1935, | - | 1,250.00 |
| June 30, 1936, | - | 1,250.00 |
| Dec. 31, 1936, | - | 1,250.00 |
| June 30, 1937, | - | 1,250.00 |
| Dec. 31, 1937, | - | 1,250.00 |
| June 30, 1938, | - | 1,250.00 |
| Dec. 31, 1938, | - | 1,250.00 |
| June 30, 1939, | - | 1,250.00 |
| Dec. 31, 1939, | - | 1,250.00 |
| June 30, 1940, | - | 1,250.00 |
| Dec. 31, 1940, | - | 1,250.00 |
| June 30, 1941, | - | 1,250.00 |
| Dec. 31, 1941, | - | 1,250.00 |
| June 30, 1942, | - | 1,250.00 |
| Dec. 31, 1942, | - | 1,250.00 |

8.   Article 8 (c) of the aforesaid agreement of August 24, 1921, is hereby amended so as to provide that the annual operation and maintenance charges due from the District

- 5 -

017641

thereunder shall be paid semi-annually in advance of the delivery
of water, beginning with the year 1929. One-half of such cost
shall be due and payable on or before January 1st of each year,
beginning with the year 1930, and the balance thereof shall be
due and payable on or before July 1st of each year, beginning
with the year 1930, and no water shall be delivered to any water
user until such charges have been paid by the District to the
United States. For the year 1929 the district is to pay an
operation and maintenance charge of $_____ one-half of which
amount is to be paid on the date of this agreement and the
remainder on or before July 1, 1929. On or before September 1,
1929, and on or before September 1 of each year thereafter, the
District will be furnished with a statement by the United States
covering the estimated cost of operation and maintenance for
the succeeding year and any difference that may later develop
between the estimated cost and the actual cost of operation and
maintenance, will be adjusted in the next estimates made after
the amount of such difference is definitely ascertained. Pro-
vided, however, that if the amount advanced by the District
should in any year prove or threaten to be less than the District's
proportionate part of the actual cost (as estimated by the
Secretary), the Secretary may call upon the district to pay the
additional amount estimated by the Secretary to be need ed to

- 6 -

002510

017642

continue the operation and maintenance during the current

year, and if such additional payment is not made when demand-

ed, the United States will be under no further obligations

to continue the delivery of water to the district during

such year.

### Penalties and Interest Reduced

9.   The penalty or interest against delinquent accounts

as provided in previous agreements, is hereby reduced to one-

half of one per centum per month, which said penalty shall

apply to all instalments of charges, or any part thereof, due

from the District to the United States subsequent to December

5, 1924, and on all such instalments or any part thereof, that

may remain unpaid by the District to the United States after

the same becomes due, there shall be added to the amount un-

paid a penalty of one-half of one per centum and a like

penalty of one-half of one per centum of the amount unpaid on

the first day of each month thereafter so long as such default

shall continue.  Where amounts have heretofore and subsequently

to December 5, 1924, become due under either of the aforesaid

contracts of 1917 and 1921, and interest or penalty thereon

has been paid at a rate in excess of the rate herein in this

article stated, the accounts or bills will be adjusted accord-

ingly, and credit will be allowed the district on current or

- 7 -

017643

future bills.

Existing Contracts Affected only as Expressly Modified.

10.   Except as expressly modified hereby, the agreements of November 30, 1917, and August 24, 1921, between the United States and the District shall be and remain in full force and effect.

## Member of Congress Clause

11.   No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit to arise therefrom.  Nothing, however, herein contained shall be construed to extend to any incorporated company if the contract be for the general benefit of such corporation or company.

IN WITNESS WHEREOF, the said parties have caused these presents to be subscribed by their duly authorized representatives the day and year first above written.

THE UNITED STATES OF AMERICA

By   /s/ Jos. M. Dixon
First Assistant Secretary of the Interior

Attest:

KLAMATH DRAINAGE DISTRICT

C. R. DeLap
Secretary

By     M. Motschenbacher
President.

SEAL

017644

# KLAMATH PROJECT

# CONTRACT

# AUG. 24, 1921

# KLAMATH DRAINAGE DISTRICT.

5-6-58

002513

017645

ORIGINAL TO

Field [illegible] and return [illegible]
General Acc[illegible] office  Oct. 29, 1921
Engineer not[illegible]
Copy [illegible]

112.402

[illegible] OF THE INTERIOR

UNITED STATES RECLAMATION SERVICE

KLAMATH PROJECT, OREGON

For[illegible] [illegible] contract between the United States and the
Klamath Drainage District, approved by the Depart-
ment of the Interior, August 9, 1921.

THIS AGREEMENT made and entered into this ___24th___
day of ___August___  A.D. 192_1_, in pursuance of the Act
of Congress of June 17, 1902 (32 Stat., 388) known as the
Reclamation Act, and acts amendatory thereof or supplement-
ary thereto, and in particular Section 8 of the Act of Con-
gress approved February 21, 1911 (36 Stat., 925) known as
the Warren Act, by and between the United States of America,
acting in this behalf by E.C. Finney First Ass[illegible]
hereinafter styled the "United States", and the Klamath
Drainage District, a public corporation organized and exist-
ing under the laws of the State of Oregon, with its principal
place of business in Klamath County, Oregon, and its office
at Klamath Falls, Oregon, hereinafter styled the "District",

WITNESSETH:

2.   WHEREAS the United States and the District entered
into a contract dated the 30th day of November, A.D. 1917,
under and by the terms of which the United States has [illegible]

002514

closed the gates in the channel connecting the Klamath River and Lower Klamath Lake, and known as the Klamath Straits, in Klamath County, Oregon, which has resulted in uncovering certain lands in Lower Klamath Lake, and

3.  WHEREAS such uncovered area includes lands in the State of Oregon, which lands are within the boundaries of the Klamath Drainage District, and also lands in the State of California, and

4.  WHEREAS the District desires to secure from the United States a water right for the lands of said District,

NOW THEREFORE, for and in consideration of the mutual and dependent covenants herein contained, it is hereby agreed as follows:

5.  The United States shall deliver to the District during the irrigation season each year at the strait opening in the railroad embankment on the northern boundary of the District, a sufficient quantity of water for the irrigation of the irrigable lands of the District, not exceeding 2750 acres. The United States shall not be liable for failure to supply water under this contract caused by hostile diversion, drought, interruption of service made necessary by repairs, damages caused by floods, unlawful acts or unavoidable accidents.

6.  The United States shall install at its own expense permanent iron gates at the place of delivery for the control

-2-

- 3 -

of water through the strait opening in said railroad embankment.

7. Beneficial use shall be the basis and limit of all rights acquired by the District hereunder. The water hereby specified to be delivered shall be supplied solely to District lands within the limits of the District as now organized and shall be used solely for irrigation and purposes incidental thereto.

8. The District agrees:

(a) To pay to the United States the sum of Fifty Thousand Dollars ($50,000) in ten annual installments of Five Thousand Dollars ($5,000) each, the first of such installments to be due and payable December 31 of the year first following the year when water is first used for irrigation of the District lands, as determined by the Project Manager of the U. S. Reclamation project, but in any event not later than December 31, 1936.

(b) The sum to be paid by the District under Article 8 (a) hereof is conditioned upon the storage works at the outlet of Upper Klamath Lake being constructed by the California-Oregon Power Company under the provisions of a certain contract between the United States and said Company dated February 24, 1917. Should such storage works be constructed otherwise than under the provisions of said contract, the quantity of water to which the District shall be entitled under this

00296.9

017647

017648

contract shall be such proportion of the storage capacity
provided by such works as Fifty Thousand Dollars bears to
the total expenditure by the United States in utilizing Upper
Klamath Lake as a storage reservoir.   The right to the use
of available additional water, in such event, may be acquired
by the District at a rate to be fixed by the Secretary of the
Interior.

(c)  To pay to the United States, as an operation
and maintenance charge, on the 31st day of December each year,
first following the year when water is first used for irri-
gation of the District lands, as determined by the Project
Manager of the U. S. Reclamation Project, its proper propor-
tion of the cost of regulating the water level of Upper Klamath
Lake and any cost incurred by the United States in delivering
to the District any water as provided by this contract, in-
cluding such amount for overhead charges as may be fixed by
the Secretary of the Interior, the determination of the Secre-
tary of the Interior of such amounts to be conclusive.

(d)  To so construct its main irrigation canals
that they may be utilized for the irrigation of the uncovered
lands of Lower Klamath Lake in California, and the District
hereby grants to the United States the right to enlarge and
extend said main canals of the District, and to convey water
through such channels for the irrigation of said lands in

-4-

002517

017649

California; provided however, that no part of the cost of
such enlargement shall be borne by the District, and that
the lands in California utilizing such canals shall bear
their proportionate cost of the construction of said canals,
prior to such enlargement, in so far as the canals so built
by the District are utilized for such California lands, and
their proportionate part of the cost of operating and main-
taining said canals.    The California lands shall also bear
all cost of extending or rebuilding bridges over said canals
in the District made necessary by the enlargement of such
canals for the benefit of California lands.

9.   The terms of this contract shall inure to the bene-
fit of and be binding upon the successors in interest and
assigns of either party hereto.

10.   No Member of or Delegate to Congress, or Resident
Commissioner, after his election or appointment or either
before or after he has qualified and during his continuance
in office, and no officer, agent, or employee of the Govern-
ment, shall be admitted to any share or part of this contract
or agreement, or to any benefit to arise thereupon.  Nothing,
however, herein contained shall be construed to extend to any
incorporated company, where such contract or agreement is made
for the general benefit of such incorporation or company, as
provided in section 116 of the act of Congress approved

-5-

002518

017650

March 4, 1909 (55 Stat., L. 1109).

IN WITNESS WHEREOF the parties have hereto signed their names the day and year first above written.

THE UNITED STATES OF AMERICA

( Corporate Seal )

By E C Finney
First Assistant Secretary

KLAMATH DRAINAGE DISTRICT

Copy furnished:
  Mr. E. J. Adams,
    Eugene, Oregon.
Aug. 21, 1923.
OH

By ___M. Motschenbacher, President.

By ___C. R. DeLap, Secretary.

State of Oregon,

County of Klamath, ss.

This Certifies that on this 26th day of August 1921, before me the undersigned, a Notary Public in and for said State and county personally appeared M. Motschenbacher President, and C. R. Delap Secretary respectively of the Klamath Drainage District a corporation, each known to me to be the identical person described in and who executed the within and foregoing instrument, and acknowledged to me that they executed the same freely and voluntarily for the use and purposes therein stated as President and Secretary thereof. And the said C.R.Delap acknowledged to me that the seal affixed to said instrument is the seal of said corporation, and that he was authorized to affix the same thereto by resolution adopted by the Board of Supervisors held at their office on August 24th 1921.

In attestation thereof, witness my hand and notarial seal this the day and year first in this my certificate above written.

Mildred Thrasher
Notary Public for Oregon.
My commission expires Nov.14,
1924.

( Notarial Seal )

-4-

002519

017651

COPY rj

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION

Klamath Project, Oregon

CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND THE KLAMATH DRAINAGE
DISTRICT, AND SUPPLEMENTARY TO CONTRACT OF APRIL 28, 1943.

1.   THIS AGREEMENT, made this 11th day of October, 1947,

pursuant to the Act of Congress approved June 17, 1902 (32 Stat. 388), and

acts amendatory thereof or supplementary thereto, including Section 2 of the

Act of February 29, 1911 (36 Stat. 925) and the Act of August 4, 1939 (53 Stat.

1187), (all said acts being hereinafter referred to inclusively as the Federal

Reclamation Law), between THE UNITED STATES OF AMERICA, hereinafter referred

to as the United States, acting for this purpose by the _____

Secretary of the Interior, hereinafter referred to as the Secretary, and the

KLAMATH DRAINAGE DISTRICT, a public corporation duly organized and existing

under the laws of the State of Oregon, with its principal place of business

at Klamath Falls, Oregon, hereinafter styled the District;

WITNESSETH, THAT:

EXPLANATORY RECITALS

2.   WHEREAS, the United States and the District entered into a contract

dated April 28, 1943, ratified by Act of Congress of June 17, 1944, Public

Law No. 342, 78th Congress, said contract being hereinafter referred to as

the Government-District contract; and

3.   WHEREAS, under the authority of the Federal Reclamation Law, the

United States has constructed and is still constructing that certain irrigation

project in the States of Oregon and California, commonly known and designated

as the Klamath Project, hereinafter referred to as the Project, including the Medoc Unit of the Tule Lake Division thereof; and

4. WHEREAS, the Government-District contract provides, among other things, for the payment to the United States by the District as a part of the expenditures made by the United States in constructing irrigation works and providing a water supply for the District and making investigations for the Project; and

5. WHEREAS, the District boundaries at the present time include approximately 20,000 acres of patented land and approximately 7,000 acres of public lands, which lands have no drainage outlet except that given to the District in pursuance of the contract of May 25, 1940, between the United States, acting for the Biological Survey (now the Fish and Wildlife Service) and the District, the ninth paragraph of which agreement is as follows:

"The United States will, at its own expense, construct a dike across Lower Klamath Lake in the State of California at or near the State line. In the construction and operation of said dike, the United States will provide a collecting basin on the northerly side of the dike for the drainage water of the District and will permit the District to dispose of its drainage water in the sump area controlled by the United States in California, with this proviso, however, that if at any time the said sump area proves insufficient to take care of the drainage water from Tule Lake and Klamath Drainage District lands consistently with the operation of the area as a migratory waterfowl refuge, the District will, at its own expense, dispose of

002521

017653

excess water in the proportion that the water put into the area by the District bears to all water in the area."

6. WHEREAS, in order for the Fish and Wildlife Service of the United States to maintain the water within its bird reserve at satisfactory purity, a drainage outlet is required which is separate from the irrigation system of the District and therefore will permit simultaneous irrigation and drainage; and

7. WHEREAS, the removal of excess accumulated waters is necessary to permit propagation of bird life and to protect adjacent agricultural lands from possible inundation and requires the construction of works which can be designed to remove the return flow and the excess waters that develop in ordinary irrigation operations and in the leaching operations necessary to subdue and prepare both public and private lands of the District for farming; and

8. WHEREAS, private and public lands in the District and in the Lower Klamath Lake area are capable of crop production, if provision is made for the protection of such lands from flooding and for the removal of return flow water; and as a result, among other things, the said public lands will bring increased lease revenues to the United States;

9. NOW, THEREFORE, in consideration of the mutual and dependent stipulations and covenants herein contained, it is hereby mutually agreed by and between the parties hereto, as follows:

UNITED STATES TO CONSTRUCT, OPERATE AND MAINTAIN WORKS

10. The United States will construct, operate and maintain an outlet drain from the low point in the dike along and near the Oregon-California

002522

State line to the inlet structure where the Southern Pacific Railroad Company's tracks cross the Strait between the Klamath River and Lower Klamath Lake (the old inlet channel), an outlet canal, parallel to the Strait, to the Klamath River, and two pumping plants in each of which will be installed two pumps, each with a capacity of 100 cubic feet per second under a 10-foot lift, and all appurtenances needed to furnish an outlet channel from the said State line dike to the Klamath River that will give the United States and the District drainage outlets for waste and excess water. Each of the structures housing the said pumps will be so constructed as to accommodate the installation of an additional pump unit should the necessity for such development arise as determined by the Secretary. Said outlet drain, and appurtenances, will be constructed substantially in accordance with plans and specifications attached hereto and made a part hereof and identified as Exhibit "A". The said construction work will be performed in such a manner as to cause the least possible interference with farming operations in the District. It is understood that the District shall have the right to construct and maintain all lateral drains into said outlet drain necessary to properly drain the lands of the District. The said outlet drain will be available at all times for the proper drainage of the District lands. The height of the water in the said outlet drain shall at all times be maintained at a level low enough to provide adequate drainage, as determined by the Secretary, for all District lands. The obligation of the United States to operate and maintain any of the works to be constructed under this article shall terminate, if and when (1) the United States may turn over to an organization of the water users or to the District, the duty of operating

4

017655

and maintaining said works, with or without any other works of the Klamath Reclamation Project, and (2) such organization shall accept said duty.

## DISTRICT TO PAY OPERATION AND MAINTENANCE CHARGE

11.   The District agrees to pay to the United States an operation and maintenance charge which shall include the District's proper proportion, as determined by the Secretary, of the cost incurred by the United States in operating and maintaining the said outlet drain and canal, pumping plants and all appurtenances, to be constructed as provided in Article 10 hereof, the operation and maintenance of which, in the opinion of the Secretary of the Interior, is of benefit to the District.   Payments of said operation and maintenance charges shall be made each year on the basis of annual estimates made by the Secretary.   Such annual estimates, hereinafter referred to as the operation and maintenance charge notice, shall contain a statement of the estimated cost of operation and maintenance of the project to be incurred in the following calendar year and the amount of the District's share of said estimated cost.   Such operation and maintenance charge notice shall be furnished to the District on or before September 1 of the year preceding the year covered thereby:   Provided, That said notice for the calendar years 1946, 1947 and 1948 may be given upon the execution of this contract and upon receipt of said notice the District agrees to pay its share for the calendar years 1946 and 1947 and one-half its share for the calendar 1948, the remaining one-half its share for the calendar year 1948 to be paid on or before July 1, 1948.   Beginning with the calendar year 1949 and thereafter the District agrees to pay its share of the amounts set out in such operation and maintenance charge notice in two equal installments, the first on or before January 1 following the year in which the notice is given, and the second on or before July 1 of the year for which such charges are due.   Whenever, in the opinion of the Secretary, funds so advanced

002524

017656

002525

will be inadequate to operate and maintain the works being operated and main-
tained by the United States for the year for which the advance was made,
he may give a supplemental operation and maintenance charge notice, stating
therein the amount of additional funds required. The District shall advance
such additional amount on or before the date specified in the supplemental
notice:  Provided, however, That if the District is unable to advance such
amount from its emergency funds on the date specified in such supplemental
notice, production will be granted to the District to defer such payment until
proper levy can be made therefor according to the state law.  If funds ad-
vanced by the District under this article exceed the cost of operation and
maintenance for the year for which advanced, the surplus shall be credited
on the second installment due for the succeeding year.  There shall not be
included in the annual determination of the District's proper proportion of
said operation and maintenance costs any such costs chargeable to unentered
public lands within the District which are not subject to assessment by the
District during the respective year.  If the United States shall turn over
to an organization of water users, other than the District, the duty of
operating and maintaining the works, as provided in the last sentence of
Article 10, the payment provided in Article 11 shall thereafter be made to
such organization, which will also make the estimates and give the notices
to the District, as provided in this article to be made and given by the
United States during the period of Government operation and maintenance of
said works.

## COMPUTATION OF COST

12.  The cost which makes up the respective obligations of the District
to the United States under this contract shall embrace all expenditures of

00526

whatsoever kind incurred by the United States, in relation to the operation or function for which the charge is made, including but not limited to the cost of labor, property, material, equipment, engineering, legal work, superintendence, administration, overhead, General expenses, and damage claims of all kinds.

## GENERAL OBLIGATIONS OF THE DISTRICT

13. The District's obligations hereunder are General obligations under which the District as a whole is obligated to pay to the United States (or as to its successors under the last sentence of Article 10) the full amount or amounts hereinabove agreed upon, according to the terms stated, notwithstanding any default in the payment to the District by any individual water user of any assessments, tolls, or other charges levied by the District. While the District, as far as its powers under the laws of Oregon permit, may distribute said obligations among its landowners in a manner that takes into account the productivity of the various classes of lands of its landowners and the benefits accruing to said lands by reason of this contract with the United States, no such distribution of said obligation shall in any manner be deemed to relieve the District, or any of its landowners, or any lands therein, of the District's a general obligations to the United States, or to its said assessor.

## ASSESSMENTS BY DISTRICT

14. (a)  The District agrees that it will cause to be levied each year all necessary assessments, tolls, or other charges (notwithstanding discounts for prompt payment provided by the law of Oregon and taking into consideration prior and probable future delinquencies in collections), and will use all

7

017658

the power and resources of the District, including its taxing power and its
power to withhold delivery of water to collect sufficient funds for payment
in full, on or before the same become due, of all obligations of the District
to the United States under this contract, and to secure the funds to meet
the annual operation and maintenance cost of the District's irrigation system.

(b)   Whenever required so to do by the Secretary, the District
**shall give the officer of the United States in charge of the Project**, ad-
vance notice of the amount of any assessment, toll, or other charge intended
to be levied.  Whenever practicable, such notice shall be given not less
than fifteen (15) days prior to the intended levy.

### REFUSAL TO DELIVER WATER IN CASE OF DEFAULT

15.  (a)  No water shall be delivered to or for the District under the
**Government-District contract if the District shall be in arrears in the**
**advance payment of operation and maintenance charges due to the United States,**
or more than twelve (12) months in arrears in the payment as required by the
terms of Article 13 of the Government-District contract, of the construction
charge obligation installments, or more than twelve (12) months in arrears
in the payment of any other amounts payable to the United States by the
District under the provisions of this contract or the Government-District
contract.  The District agrees that it will refuse to deliver water to lands
or parties which are in arrears in the advance payment of operation and main-
tenance charges due from said lands or parties to the United States or to
the District, or to lands or parties who are in arrears for more than twelve
(12) months in the payment of the amounts due from said lands or parties to
the United States or to the District for the construction charge obligation

8

002527

6

or for any other amounts due from the District to the United States under this contract or the Government-District contract. The provisions of this article are not exclusive and shall not in any manner prevent the United States from exercising any other remedy given by this contract, or by law, to enforce the collection of any payments due under the terms of this contract or the Government-District contract.

(b)  The District grants to the United States the right, power and license to enter on any of the irrigation works of the District to shut off water being delivered in violation of this article, or of Articles 21 and 32 of the Government-District contract.  In the event that the United States exercises said right, power and license as herein provided, neither the United States, its officers or employees shall be liable for any damage resulting directly or indirectly from any such exercise of said right, power and license, and the District agrees to hold the United States, its officers and employees, harmless from any and all claims of damages.  The words United States as used in Articles 17 shall include its successors under the last sentence of Articles 10 and 11 hereof.

PENALTY FOR DELINQUENCY IN PAYMENT

16.  In the event that any payment by the District to the United States provided for in this contract is not made on or before the date that such payment is due and payable, there shall be added to the amount unpaid a penalty of one-half of one percent (½%) on the day following the due date, and there shall be added a like penalty of one-half of one percent (½%) of the remaining unpaid amount on the first day of each calendar month there-after so long as said default shall continue.

002528
017659

017660

## SECRETARY ARBITER OF DISPUTES INVOLVING QUESTIONS OF FACT

17.   In the event of disputes between the parties hereto arising out of this contract involving questions of fact, in so far as the provisions hereof require a determination of fact to be made, the Secretary is hereby designated as the arbiter of such questions and as the one required to make such determination of fact. His decision therein shall be conclusive and binding on the parties hereto.   In all acts, matters and determinations provided in the contract to be done, determined, or decided by the Secretary or by the United States, it is agreed that the acts, decisions, findings, and determinations by the Secretary shall be final and conclusive as to all the parties to this contract and as to all persons claiming any rights under or by virtue of this contract or in anywise based upon or arising out of this contract or any act or proceeding carried on thereunder.

## REPRESENTATIVE OF SECRETARY

18.   Where this contract provides for action by the Secretary, said action may be taken for and on behalf of the Secretary by his representative duly authorized in writing by him.

## ASSIGNMENT PROHIBITED:   SUCCESSORS AND ASSIGNS OBLIGATED

19.   The provisions of this contract shall apply to and bind the successors and assigns of the parties hereto but no assignment or transfer of this contract or any part thereof or interest therein shall be valid until approved by the Secretary.   All rights of action for breach of this contract are reserved to the United States as provided in Section 3737 of the Revised Statutes of the United States.

## CONTINGENT ON APPROPRIATIONS OR ALLOTMENT OF FUNDS

20.   The expenditures of any money or the performance of any work by the

002529

United States herein provided for, which may require appropriations of money by Congress or the allotment of funds, shall be contingent upon such appropriations or allotments being made. The failure of Congress so to appropriate funds, or the failure of an allotment of funds, shall not relieve the District from any obligations under this contract and no liability shall accrue against the United States in case such funds are not so appropriated or allotted.

## FORMER CONTRACTS NOT AFFECTED

21.   This contract does not change or affect in any way the provisions of the Government-District contract or that certain contract dated May 25, 1940, between the United States and the District which provides (a) for certain expenditures and work by the Biological Survey (now the Fish and Wildlife Service) of the United States and (b) for the performance of certain contractual obligations by the District.

## OFFICIALS NOT TO BENEFIT

22.   No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this contract or to any benefit that may arise herefrom, but this restriction shall not be construed to extend to this contract if made with a corporation or company for its general benefit.

## UNITED STATES NOT LIABLE

23.   In no event shall any liability accrue against the United States, its officers, agents, or employees for any damages, direct or indirect, that may result to the lands within the District by reason of the construction, operation, maintenance and control of the outlet and appurtenant structures.

002530

017662

IN WITNESS WHEREOF, the parties hereto have caused this contract to be executed the day and year first above written.

THE UNITED STATES OF AMERICA

By  /s/

KLAMATH DRAINAGE DISTRICT

BY  /s/  Dick Hensel
         President

Attest:

/s/ C. L. Langslet
        Secretary

002531

017663

THIS AGREEMENT, made and entered into this 30th day of
November   , 1917, in pursuance of the Act of Congress of June 17,
1902 (32 Stat., 388), and acts amendatory thereof and supplementary
thereto, between the UNITED STATES OF AMERICA, hereinafter styled
the United States, acting in this behalf by J. B. Bond, Project
Manager, U. S. Reclamation Service, thereunto duly authorized and
the Klamath Drainage District, a public corporation duly organized
and existing under the laws of the state of Oregon, with its prin-
cipal place of business at Klamath Falls, Oregon, hereinafter styled
the District,

WITNESSETH:   That

WHEREAS the District proposes to reclaim by a process of drainage,
evaporation and irrigation all of the lands within said district con-
sisting of approximately 27,000 acres and being part of the marsh or
swamp lands lying within or adjacent to what is generally known as
Lower Klamath Lake in Klamath County, Oregon, and Siskiyou County,
California, east of the right of way of the California Northeastern
Railway as it crosses said marsh or swamp lands, including a total
area of approximately 54,000 acres; and

WHEREAS said Lower Klamath Lake is at certain seasons of the
year fed with water from the Klamath River through a certain water
way or channel known and herein designated as Klamath Strait, which
passes under said railroad and through its embankment by means of
an opening or culvert which said opening or culvert has been so

constructed as to permit the placing of gates therein for the purpose
of controlling the flow of water through the same; and

WHEREAS the method of reclamation proposed by said District con-
templates the closing of the gates in said Klamath Strait so as to
exclude or control the further flow of water from the Klamath River
into said Lower Klamath Lake and thereby to facilitate the reclamation
of the lands mentioned; and

WHEREAS there are certain owners of marsh or swamp lands within
or bordering on said Lower Klamath Lake who claim or may claim to
have certain rights in or to the waters of said lake either as
riparian owners or as appropriators of water therefrom, and partic-
ularly the Van Brimmer Ditch Company, which has or claims to have
a vested water right in said lake of fifty (50) second feet, which
is now, and for many years has been, according to said Company's
claim, used for the irrigation of lands under its irrigation system,
which rights may be affected by the lowering of the water level of
said lake by the closing of the gates in said Klamath Strait, and
all of which possible rights or claims must be taken into consider-
ation in connection with the proposal to close the gates aforesaid;
and

WHEREAS it is economically practicable to supply the said Van
Brimmer Ditch Company the quantity of water necessary for the proper
irrigation of the lands under and irrigable through its system from
the Government's irrigation system known as the Klamath Project in

-2-

017665

lieu of the supply heretofore had and used by said Company from Lower

Klamath Lake by adapting the distribution system of the Klamath Proj-

ect to such a plan; and

WHEREAS the United States has heretofore expended sums of money,

aggregating $253,225.00, in making investigations as to the practic-

ability and desirability of reclaiming said marsh or swamp lands and

in the building of irrigation works for the storage, diversion, develop-

ment and drainage of waters lying, being/flowing in and about said

Klamath Project looking toward such reclamation and to the closing

of Klamath Strait in connection therewith, and the United States has

not been reimbursed for said expenditures or any part thereof; and

WHEREAS the district, in furtherance of its purpose to accomplish

the reclamation of its lands, as aforesaid, desires the United States

to close or operate the gates in said Klamath Strait so as to prevent

or regulate the further flow of the waters of the Klamath River on

to said lands or into Lower Klamath Lake;

NOW, THEREFORE, in consideration of the premises and of the

promises and covenants herein contained to be kept and performed,

it is mutually covenanted and agreed between the parties hereto as

follows:

1.   The District agrees to deliver to the United States,

simultaneously with the execution of this contract, duly executed

waivers, in form satisfactory to the United States, from all riparian

owners of lands in Oregon bordering on said Lower Klamath Lake, waiving

-3-

002534

017666

claim or claims for any and all damages resulting or that may result, or be claimed to have resulted, to said lands, or to their owners, their heirs or assigns, by reason of said gates in Klamath Strait being closed. Waivers similar in purpose and form shall also be secured by the District from the said Van Brimmer Ditch Company and delivered to the United States as hereinabove provided, together with a similar waiver executed by and on behalf of the District, all of which said waivers shall be recorded by and at the expense of the District within the County in which the respective lands lie.

2.    It is understood and agreed that should the reclamation of said district lands in the manner herein contemplated prove impracticable or be not accomplished in reasonable compliance with the provisions hereof or interfere with the proper reclamation or use of public lands and it should be deemed by the United States necessary or desirable for the purpose of reclaiming or best utilizing the public lands within said marsh or swamp land area, as contemplated by the Oregon Act of January 20, 1905 (General Laws of Oregon, 1905, p. 63), and the California Act of February 3, 1905 (California Statutes, 1905, p. 4), to flood or overflow the same and to that end to open or regulate the gates in said Klamath Strait, the District will release and hereby does release and waive any and all claim for damages against the United States resulting, or that may be claimed to have resulted, to district lands by reason of their being returned on account of the opening of said gates to their normal condition as of

002535

017667

the date hereof, or otherwise, it being the intention that the District shall protect and save harmless the United States against claims of any kind which may arise from owners of or claimants to district lands on account of the execution of this agreement.

3.    The District covenants, promises and agrees to pay to the United States, through the proper officer thereof duly designated to receive such payment, simultaneously with the execution of this contract, the sum of Twenty-three Thousand Five Hundred Dollars ($23,500.00) in cash, to cover the cost incurred or that may be incurred by the United States in adapting the distribution system of the Klamath Project for the delivery of a water supply of fifty (50) second feet each season to the Van Brimmer Ditch Company in lieu of its present water right in that quantity in Lower Klamath Lake.

4.    It is understood and agreed that the fifty (50) second feet of water to be furnished the Van Brimmer Ditch Company from the Klamath Project as hereinabove provided for shall be delivered by the United States to the Van Brimmer Ditch Company at the point where the canal known as the "South Branch Canal" of the Klamath Project intersects the canal known as the "North Lateral" of the system of the Van Brimmer Ditch Company, said point of intersection being near the northwest corner of the NE$\frac{1}{4}$ of Sec. 3, T. 41 S., R. 10 E., W.M., and that the United States will construct and install one turn-out on each side of said "South Branch Canal" at said point of intersection for delivery of water to said Company, said turn-outs to be and remain the property

002536

017668

of the United States, its successors and assigns, and subject to operation and control exclusively by them.

5.   It is further understood and agreed that for the purposes of this agreement the irrigation season during which water shall be furnished to the Van Brimmer Ditch Company as herein provided for shall be considered as extending from May first to October fifteenth, inclusive, of each year; provided that at the option of the United States water may be delivered to said company as early as April fifteenth in any year, upon written request to the United States by the duly authorized representative of the Company.

6.   The District covenants, promises and agrees to assume and pay, and to that end hereby binds itself, its lands and property of every character, that proportion of the total expenditures heretofore made or to be made by or on behalf of the United States in connection with the proposed reclamation of Lower Klamath Lake marsh or swamp lands, including the $23,500 named in paragraph 3 hereof and an additional sum of $30,000 (being an agreed capitalization of the annual charges for the operation and maintenance of the canals and structures necessary for the delivery of the above mentioned fifty (50) second feet of water to the Van Brimmer Ditch Company, herein agreed to be $283,225, that the total acreage of private or patented land included in said District, estimated as 20,000 acres), bears to the total acreage of said marsh or swamp lands within or marginal to Lower Klamath Lake, estimated at 54,000 acres, being 20/54 of $283,225,

002537

or the sum of $104,898.15 which said sum shall be paid to the United States, its successors or assigns, as follows:

```
"$23,500.00 on the execution of this contract
  2,777.78 on December 1, 1918
  2,777.78  "     "      "  1919
  2,777.78  "     "      "  1920
  2,777.78  "     "      "  1921
  4,636.03  "     "      "  1926
  6,565.10  "     "      "  1927
  6,565.10  "     "      "  1928
  6,565.10  "     "      "  1929
  6,565.10  "     "      "  1930
  6,565.10  "     "      "  1931
  6,565.10  "     "      "  1932
  6,565.10  "     "      "  1933
  6,565.10  "     "      "  1934
  6,565.10  "     "      "  1935
  6,565.10  "     "      "  1936  "
```

The District also agrees to pay interest at the rate of eight per cent (8%) per annum from the due date until paid on any and all payments accruing under the terms hereof and not paid when due.  If it is ultimately determined that the total area of private or patented lands within the District exceeds 20,000 acres, as estimated at the date hereof, then the District agrees to pay upon such excess area at the same rate per acre as is hereby fixed for said 20,000 acres, such payment to be made with the final annual installment hereunder.

7.   The United States covenants and agrees that upon the delivery to it by the District of the waivers against claims for damages as hereinabove provided and the payment by the District of the sum of Twenty-three Thousand Five Hundred Dollars ($23,500), and upon the execution and approval of this contract the United States will cause

002538

017670

the gates in said Klamath Strait to be closed and to be kept closed,
except as herein otherwise provided, during the continuance of this
contract, barring acts of God and unavoidable accidents beyond the con-
trol of the United States; provided that the material and labor neces-
sary for the closing thereof shall be provided by and at the expense
of said District, the same to be installed under the direction of
the Project Manager; provided further that the United States shall
have and retain the right to open said gates at the times and in the
manner prescribed and contemplated by paragraph 2 hereof free from
claim or claims for damages by reason thereof; provided further that
should it at any time become advisable or necessary in the judgment
of the District to convey water through said gates in connection with
the reclamation of its lands the control of said gates shall in such
case be under regulations prescribed by the United States.

8.   It is further understood and agreed that the absolute and
complete control of said gates in Klamath Strait shall be and remain
in the United States until full and complete payment to the United
States has been made of the said sum of $203,225, with any accrued
interest, whereupon control thereof may be surrendered by the United
States upon such terms and conditions as may be mutually agreed upon
by the United States and the occupants and owners of a majority of
said 54,000 acres as herein designated.

9.   It is further understood and agreed that the United States
shall not be obligated to construct any portion of the system required

002539

017671

for the irrigation or drainage of said, or any, marsh or swamp lands, nor to operate or maintain such works, nor to expend any further sums toward the reclamation of said marsh or swamp lands, nor does the United States assume any responsibility for the success of their reclamation.

10.  This contract shall be binding on the parties hereto only upon the approval hereof by the Director of the United States Reclamation Service.

11.  No interest in this agreement shall be transferred by the District to any other party without the written consent of the United States, and any such transfer shall cause annulment of the contract so far as the United States is concerned; all rights of action, however, for breach of this contract are reserved to the United States, as provided by section 3737, Revised Statutes of the United States.

12.  No Member of or Delegate to Congress, or Resident Commissioner after his election or appointment, or either before or after he has qualified and during his continuance in office, and no officer, agent, or employee of the Government, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon.  Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract or agreement is made for the general benefit of such incorporation or company, as provided in section 116 of the act of Congress approved March 4, 1909 (35 Stat., L., 1109).

002540

13.   IN WITNESS WHEREOF this instrument has been executed on
behalf of the Klamath Drainage District by its duly elected, qualified
and acting President and Secretary, respectively, thereunto duly
authorized by resolution of its board of Supervisors dated November
13th, 1917, a certified copy of which is hereto attached, and on be-
half of the UNITED STATES OF AMERICA by its duly authorized officer
the day and year first above written.


Signed, sealed and delivered
in the presence of us as
witnesses:

E. V. Hillius

C. C. Hogue


E. V. Hillius

C. C. Hogue

UNITED STATES OF AMERICA

By   J. B. Bond


KLAMATH DRAINAGE DISTRICT

By M. Motschenbacher
                    President

By A. A. Mehaffey
                    Secretary


Approved December 19, 1917
Morris Bien, Acting Director U.S.R.S.

CORPORATE SEAL

002541

017673

## OATH OF DISINTERESTEDNESS.

### (Section 3745, U. S. Revised Statutes.)

_____

I do solemnly swear that the copy of contract hereunto annexed is an exact copy of contract made by me personally with Klamath Drainage District, that I made the same fairly, without any benefit or advantage to myself, or allowing any such benefit or advantage corruptly to the said Klamath Drainage District, or any other person; and that the papers accompanying include all those relating to the said contract, as required by the statute in such case made and provided.

<div align="right">

J. B. Bond
  Project Manager
  U. S. Reclamation Service

</div>

Sworn to and subscribed before me, at Klamath Falls, Oregon this 30th day of November, 1917.

<div align="right">

C. C. Hogue
  Notary Public
  for Oregon

</div>

My commission expires April 22, 1921.

017674

Klamath Falls, Oregon, Nov. 30th, 1917.

STATE OF OREGON            )
                           )
COUNTY OF KLAMATH          )      SS
                           )
The Klamath Drainage District )

     I, A. A. Mehaffey of the Board of Supervisors of the Klamath Drainage District, Klamath County, Oregon, do hereby certify that the following is a true copy of a resolution adopted by the Board of Supervisors of the Klamath Drainage District, and is of record in the minutes of a meeting of said Board of Supervisors, held at the office of said Klamath Drainage District in the City of Klamath Falls, Oregon, on the 10th day of November, 1917.

"BE IT RESOLVED by the Board of Supervisors of the Klamath Drainage District of Klamath County, Oregon, that the President and Secretary of the Board of Supervisors of the Klamath Drainage District be, and they are hereby authorized and directed to execute a waiver waiving all claims for damages against the United States of America, its successors and assigns, that may have been or may hereafter be caused to the Klamath Drainage District either directly or indirectly by the closing, or subsequent opening, of the flood gates in Klamath Strait, as it passes through the railroad embankment forming the dike across Lower Klamath Lake marsh lands in Township 40, South, Range 8 East, W. M. Oregon."

                                       A. A. Mehaffey
                         Secretary of the Board of Supervisors
(Corporate Seal)              of the Klamath Drainage District.

017675

Klamath Falls, Oregon, November 30, 1917.

STATE OF OREGON    )
                    ) SS
COUNTY OF KLAMATH  )

      I, A. A. Mehaffey, Secretary of the board of Supervisors

of the Klamath Drainage District, do hereby certify that the following

is a true copy of the action of the Board of Supervisors of the Klamath

Drainage District relative to the levy of a tax to cover the amount

named in a contract between the said District and the United States

of America, said levy being in accordance with the provisions of

Chapter 186, General laws of Oregon, 1917, all of which appears in

the minutes of a meeting of said board of Supervisors held on the

20th day of September 1917.

"The matter of the levying of sufficient tax of the necessary portion
of benefits on all the lands in the District to which benefits have
been assessed, now coming before the Board, and it appearing to this
Board that the sum of $104,898.15 will be required as payment to the
Government of the United States of America for the closing of the
gates under the railroad embankment leading into Klamath Straits,
and that an additional amount for emergencies under the provisions
of Section 17 of Chapter 340 of the General Laws of Oregon for 1915,
the aggregate of which amounts to approximately $115,387.96, the
following resolution was adopted.
BE IT RESOLVED by the Board of Supervisors of the Klamath Drainage
District, of Klamath County, Oregon, that a tax of $5.77 per acre
be and the same is hereby assessed against the lands within the
boundaries of the Klamath Drainage District to which benefits have
been assessed under the decree of the County Court of the State of
Oregon, for Klamath County, modifying and amending the report of
the Commissioners heretofore appointed to assess such benefits, the
said levy being necessary to pay the costs of the completion of the
proposed works and improvements as shown in said "plan of reclamation"
heretofore adopted and approved by the County Court of the State of
Oregon for Klamath County, and in carrying out the objects of said
District. The foregoing tax to be apportioned to and levied upon
each tract of land in said District in proportion to the benefits

017676

assessed, and the Secretary of the board be and he is hereby
directed to at once prepare a list of all taxes levied and enter
same in a book which shall be endorsed and named a Drainage Tax
record of Klamath Drainage District," said book to be properly
signed and certified to and the seal of the District to be attached
to same in accordance with the provisions of Sec. 17 Chapter 340 of
the General Laws of Oregon for 1915."

                                        A. A. Mehaffey
                            Secretary of the Board of Supervisors
                            of the Klamath Drainage District,
                            Klamath  County, Oregon.

(Corporate Seal)

002545

017677

Klamath Falls, Oregon, November 30, 1917.

STATE OF OREGON )
)  SS.
COUNTY OF KLAMATH )

I, A. A. Mehaffey, Secretary of the board of Supervisors of the Klamath Drainage District, of Klamath County, Oregon, do hereby certify that the following is a true copy of a motion duly adopted by the board of Supervisors of the Klamath Drainage District, and is of record in the minutes of a meeting of said board of Supervisors, held at the office of said Klamath Drainage District in the City of Klamath Falls, Oregon, on the 25th day of July 1917. Also, the action of the said board relative to the plan of reclamation adopted, said action being taken at the meeting aforesaid.

"after consideration of the methods of reclamation recommended in the Engineers report, the Board by motion regularly made, seconded and unanimously carried, adopted recommendation No. 2, to-wit, By damming the flow from Klamath River into the Strait and allowing the water in the Lake to evaporate."

"On motion duly made, seconded and carried, the board accepted an agreement presented by the United States in which for a consideration of $104,898.15 to be paid by the Klamath Drainage District, the United States agrees to dam the flow of water from the Klamath River into the Klamath Strait as recommended in the District Engineers report, the said agreement is hereto attached and made a part of these minutes."

A. A. Mehaffey
Secretary of the board of Supervisors
of the Klamath Drainage District.

(Corporate Seal)

017678

State of Oregon     )
                    ) SS.
County of Klamath   )

      THIS CERTIFIES that on this 30th day of November, 1917, before me, the undersigned, C. C. Hogue, a Notary Public in and for said County and State, personally appeared the within named M. Motschenbacher and A. A. Mehaffey, President and Secretary, respectively, of the within named Klamath Drainage District, a corporation, and they being known to me to be such officers and the identical persons described in and who executed the within instrument for and on behalf of the said corporation, and said corporation being known to me to be the identical corporation for and on whose behalf the said instrument was executed, and said M. Motschenbacher and A. A. Mehaffey did then and there acknowledge to me that they did as such officers as in this certificate described execute the said instrument as and for the act and deed of said corporation in whose name and behalf they executed said instrument, and affixed thereto the corporate seal of said corporation, under authority in them vested by the Board of Supervisors of said corporation.

      WITNESS my hand and Notarial seal the day and year last aforesaid.

                          C. C. Hogue
                          Notary Public for Oregon.

My commission expires April 22, 1921.
(SEAL)

017679

Klamath Falls, Oregon, November 30th 1917

STATE OF OREGON     )
                    )  SS
COUNTY OF KLAMATH    )

    I, A. A. Mehaffey, Secretary of the board of Supervisors of the Klamath Drainage District, Klamath County, Oregon, do hereby certify that the following is a true copy of a resolution adopted by the Board of Supervisors of said Klamath Drainage District, and that it is of record in the minutes of a meeting of said board of Supervisors, held at the office of said Klamath Drainage District in the City of Klamath Falls, Oregon, on the 13th day of November 1917

"WHEREAS, the owners of the lands within the boundaries of the Klamath Drainage District, of Klamath County, Oregon, at an election held upon the 31st day of October 1917 unanimously approved and authorized the creation of an indebtedness amounting to the sum of $115,387.96 for the purpose of carrying out the "plan of reclamation" heretofore adopted by the Board of Supervisors, and approved by the County Court of Klamath County, Oregon, and
WHEREAS, the "plan of reclamation" provides in part for "daming the flow from Klamath River into the Strait,"

NOW, THEREFORE, be it resolved, that the Board of Supervisors of the Klamath Drainage District do hereby authorize and instruct the President and Secretary of said board to execute a contract with the United States of America for "daming the flow from Klamath River into the Strait" by closing the openings in the head gate structure in the California-Northeastern (now S.P) railroad embankment where it crosses the said Strait at Ady, Oregon. A draft of said contract was submitted by the United States and adopted by said board of Supervisors and made a part of the minutes of a meeting held by said Board on the 25th day of July 1917."

                          A. A. Mehaffey
                          Secretary of the Board of Supervisors of the Klamath Drainage District.

(Corporate Seal)

002548

AGREEMENT CONC[illegible] [illegible]ANCE AND OPERATION OF [illegible]KS
CONSTRUCTED ON FE[illegible] [illegible]TION PROJECTS BY FORCES [illegible] THE
CIVILIAN CON[illegible] CORPS OF THE UNITED STATES

THIS AGREEMENT, made and entered into this 1st day of April, 1938, by and between the Klamath Irrigation District, hereinafter called the "District", party of the first part, and the United States of America, hereinafter referred to as the "United States", represented by the contracting officer of the Bureau of Reclamation, Department of the Interior, executing this agreement, party of the second part,

WITNESSETH:

WHEREAS: The Civilian Conservation Corps of the United States is engaged, under the supervision of the Bureau of Reclamation, Department of the Interior, on a program of improvement and rehabilitation of the Klamath Reclamation Project.

NOW, THEREFORE, it is agreed, that, in consideration of the benefits accruing to the District from the aforementioned activities of the Civilian Conservation Corps, all provisions for the operation and maintenance of the works transferred, or to be transferred, to the District, its successors and assigns, included in the contract executed July 6, 1918, as amended, between the District and the United States, shall be considered applicable, without reservation, to any works heretofore or hereafter constructed, improved or rehabilitated by Civilian Conservation Corps forces for the irrigation and development of the lands in the Main Division of the Klamath Federal Reclamation Project.

IT IS FURTHER AGREED, that the District shall hold the [illegible] States, its assigns, officers, agents, employees and CCC enrollees, h[illegible] [illegible]es to

any and all damage to it which may occur either within or without the limits of the District, not only on account of the care, operation and maintenance of the works completed but because of failure to complete, for any reason, works begun by forces of the Civilian Conservation Corps of the United States for the irrigation and development of lands in the _____ Main _____ Division of the Klamath Reclamation Project.

No Member of or Delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this agreement, or to any benefit that may arise therefrom. Nothing, however, herein contained shall be construed to extend to this agreement if made with a corporation for its general benefit.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed the day and year first above written.

THE UNITED STATES OF AMERICA

By _____ B. E. Hayden _____

KLAMATH IRRIGATION _____ DISTRICT

By _____ E. M. Harrous _____

Title President of the Board of _____

(SEAL)

Attest:

Glen L. Terrill _____

Title _____ Secretary

Pursuant Authority granted by resolution of the Board of Directors dated the ___ day of _____, 1939, certified copy of which is attached.

017682

W.O. Draft 12/15-1981
Rev. R.O. 10/20-1983
Rev. R.O. 11/8-1983
(Advancement) 5 years or less--
exempt excess lands

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, California/Oregon

Contract No.
4-07-20-W0331

CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND
THE KLAMATH IRRIGATION DISTRICT
FOR THE ADVANCEMENT AND SUBSEQUENT REPAYMENT OF
FUNDS EXPENDED FOR EMERGENCY WORK

Table of Contents

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 1- 2 |
| 1 | Term and Scope of Contract | 2 |
| 2 | Emergency Work to be Performed | 3- 4 |
| 3 | Contracts with Third Parties | 4 |
| 4 | Availability of Funds | 4- 5 |
| 5 | Advance of Funds to the Contractor | 5 |
| 6 | Failure to Complete Work | 6 |
| 7 | Repayment Obligation---Terms of Repayment | 7- 8 |
| 8 | Books and Records | 8 |
| 9 | Audits | 8 |
| 10 | Operation and Maintenance of Project Works | 9 |
| 11 | Title to Remain in the United States | 9 |
| 12 | Clean Air Act and Federal Water Pollution Control Act | 10-11 |
| 13 | Rules, Regulations, and Determinations | 12 |
| 14 | Contingent on Appropriation or Allotment of Funds | 12 |
| 15 | Assignment Limited---Successors and Assigns Obligated | 12 |
| 16 | Equal Opportunity | 13-15 |
| 17 | Title VI, Civil Rights Act of 1964 | 16 |
| 18 | Certification of Nonsegregated Facilities | 17 |
| 19 | General Obligations---Benefits Condition Upon Payment | 18 |
| 20 | Charge for Late Payments | 18 |
| 21 | Officials not to Benefit | 18 |
| 22 | Changes in Contractor's Organization | 19 |
| 23 | Confirmation of Contract | 19 |
| 24 | Notices | 19 |
| | Signatures | 20 |

017683

017684

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, California/Oregon

Contract No.
4-07-20-W0331

CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND
THE KLAMATH IRRIGATION DISTRICT
FOR THE ADVANCEMENT AND SUBSEQUENT REPAYMENT OF
FUNDS EXPENDED FOR EMERGENCY WORK

THIS CONTRACT, made this 9th day of December, 1983 pursuant

to the Act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or

supplementary thereto, particularly the Act of June 26, 1948 (62 Stat.

1052) amended by the Act of October 1, 1982 (96 Stat. 1185), by and between

the UNITED STATES OF AMERICA, hereinafter called the United States, acting

through the Regional Director, Mid-Pacific Region, Bureau of Reclamation,

hereinafter called the Contracting Officer, and the KLAMATH IRRIGATION

DISTRICT    , hereinafter called the Contractor, organized and existing

under the laws of the State of Oregon        ;

WITNESSETH, THAT:

WHEREAS, the following statements are made by way of explanation:

a.  The United States has constructed the Klamath

Project in the State of California/Oregon pursuant to the reclamation laws, to

convey water to lands of the Contractor.

b.  A partial collapse of the A-Canal tunnel lining occurred

in the spring of 1983.  The A-Canal tunnel is a Klamath Project facility.

_____

Inspection by engineers of the United States has confirmed that an emergency

condition exists and it is necessary to repair the A-Canal Tunnel

lining to a point approximately 50 feet from the inlet portal.

Preamble
Explanatory Recitals

017685

to ensure the continued delivery of water to the lands of the Contractor.

c.   The Contractor does not have sufficient funds to finance the above work and the Board of Directors of the Contractor has requested that emergency funds be made available to accomplish the work, and agreed, by resolution dated October 6, 1983, to repay the cost thereof.

d.   The Commissioner, Bureau of Reclamation, has determined that an emergency exists, funds will be made available to accomplish the above work, and the United States and the Contractor both agree to enter into this contract.

NOW, THEREFORE, in consideration of the above, it is mutually agreed by the parties as follows:

### TERM AND SCOPE OF CONTRACT

1.   (a)   This contract shall become effective upon the date of its execution on behalf of the United States, and its provisions shall remain in effect until the Contractor has paid to the United States the funds provided hereunder and any and all other amounts owing to the United States under this contract.

(b)   The rights and obligations created hereby are supplementary to and do not supersede or affect the rights and obligations under any prior contracts between the United States and the Contractor except as such rights and obligations under prior contracts are inconsistent herewith.



017686

## EMERGENCY WORK TO BE PERFORMED

1

2.    (a)   The Contractor, pursuant to engineering plans and specifications

prepared by a licensed professional engineer registered in the State of

Oregon/California _____ , or pursuant to engineering plans, specifications,

or work program approved by the Contracting Officer, shall:

(1)   Perform all necessary exploratory work to determine

the extent of the A-Canal Tunnel lining distress.

(2)   Prepare all required technical plans, designs, and

specifications for the proposed emergency work.

(3)   Prepare construction cost estimates and select a

contractor to perform the emergency work.

(4)   Perform the required emergency work in accordance

with plans, designs, and specifications approved by the Contracting

Officer.

(b)   The aforementioned work, hereinafter referred to as

"Emergency Work," may be performed by the Contractor or accomplished

under the supervision of the Contractor:  Provided, however, That prior to

starting construction, the Contractor shall furnish the plans, specifications,

or work program for said Emergency Work, and obtain the approval of the

United States to such.  The Contractor shall provide a qualified engineer

to inspect all work in progress.  The United States may also inspect work

002623

017687

1  in progress and completed facilities to assure that the emergency work

2  is being accomplished in accordance with acceptable engineering

3  standards. The Contracting Officer shall use due diligence in

4  processing plans, designs, and specifications submitted by the

5  Contractor and his approval, disapproval, or modification shall be

6  transmitted to the Contractor in writing.

7  (c)  All work to be accomplished with funds provided by this contract

8  shall be completed by April 15, 1984 . If further work is needed after

9  April 15, 1984   , to complete the Emergency Work, it may not be accomplished

10  with Federal funds available pursuant to this contract without written

11  approval from the Contracting Officer for an extension of the above date.

12  CONTRACTS WITH THIRD PARTIES

13  3.  (a)  The Contractor shall require construction contractors
14  to furnish performance bonds and payment bonds equal to 100 percent
15  and 50 percent, respectively, of the contract amount for all contracts
16  exceeding $25,000. Supply and equipment contractors may be required to
17  furnish performance bonds on major supply or equipment contracts when the
18  contract calls for substantial progress payments before delivery of end items.

19  (b)  The United States shall not be party to, or obligated
20  in any manner, by contracts entered into between the Contractor and other
21  parties pursuant to this article.

22  AVAILABILITY OF FUNDS

23  4.  (a)  The United States shall make funds available within the

24  limitations and for the purposes set forth in Article 2, in an amount not

25  to exceed $250,000.00. This amount includes:  (1) $245,000.00 that may be

26  advanced to the Contractor pursuant to Article 5, and (2) $5,000.00   to

27  be retained by the United States to cover its administrative costs in

28  connection with the Emergency Work. The amount retained by the United States

29  shall be included in the total loan repayment obligation of the Contractor.

017688

1   (b)  If the United States performs any engineering supervision,

2   inspection or other work in addition to that which would be accomplished as

3   part of its normal administrative activities, the cost of such work shall be

4   considered as a direct cost of the Emergency Work and will be funded from the

5   amount available to the Contractor under (a) of this article.  The United

6   States shall periodically furnish the Contractor a cost statement of all such

7   work performed and shall credit such cost against available funds in the same

8   manner as an advancement made pursuant to Article 5 thereof.

9   ADVANCE OF FUNDS TO THE CONTRACTOR

10   5.   (a)  The Contractor shall submit to the Contracting Officer estimates

11   covering engineering and construction work to be performed, materials to be

12   furnished, and other direct expenses in connection with the performance of the

13   Emergency Work.  The estimates may include a charge, not to exceed 15 percent,

14   for the Contractor's anticipated administrative expenses for the Emergency Work.

15   (b)  The United States, upon review and approval of the estimates

16   submitted by the Contractor, shall advance to the Contractor as needed, the

17   funds necessary to accomplish the Emergency Work subject to the funding

18   limitations in Article 4:  Provided, That the funds shall be used solely to

19   finance the Emergency Work:  Provided further, That the Contractor shall

20   return any and all unexpended, unobligated, or unencumbered funds within 30

21   days of completion of the Emergency Work but in no event later than June 1, 1984,

22   unless extended by the Contracting Officer pursuant to Article 2(c).

23   (c)  The Contractor shall prepare and furnish to the Contracting

24   Officer a written report, not less than once each month, describing the

25   progress of work performed, status of funds advanced, and costs incurred or

26   funds obligated by the Contractor.

Articles 4 - 5

002625

## FAILURE TO COMPLETE WORK

6.   (a)   In the event that the Contractor for any reason, other than the nonavailability of funds to be furnished by the United States under the terms of this contract, fails to complete the work to be performed hereunder in the manner and to the extent provided in Article 2, upon written notice from the Contracting Officer, the Contracting Officer may adopt either of the following alternatives:

(1)   Perform or cause to be performed all or any part of the work remaining to be performed under and with the limits of the funds provided herein by the United States and by the Contractor for the Emergency Work, and operate and maintain the project works concurrently therewith, in which event the Contractor shall transfer to the United States custody and use of all equipment, materials and supplies used or useful in the performance of such work, permit the United States, its contractors, and its agents ingress to and egress from the lands and project works and facilities of the Contractor and for the performance of such Emergency Work, and assign to the United States its interest in any contract for the performance of work or the supplying of equipment or material in connection with such Emergency Work where requested by the United States and agreed to by the other contracting party; or

(2)   Declare the Emergency Work completed within the provisions of Article 2 hereof by giving written notice to the Contractor, in which event repayment of the loan obligation, including the determination of the amount thereof, shall be carried out in accordance with the provisions of Article 7:   _Provided_, That the first annual payment shall become due in the year following the year in which the Contractor is notified of such declaration of completion.

(b)   In the event that the United States shall proceed as provided in (a)(1) of this article, the United States may, at any time and regardless of the progress of work performed thereunder declare the Emergency Work completed by giving written notice thereof to the Contractor, in which event the provisions of (a)(2) of this article shall apply:   _Provided_, That the loan obligation shall include all expenditures of the United States made pursuant to the provisions (a)(1) of this article including related costs of the character described in Article 4(b) hereof:   _Provided further_, That the loan obligation shall not exceed the limitation specified in Article 4(a) hereof.

(c)   Upon the giving of the written notice to the Contractor as provided in (a)(2) or (b) of this article, the United States shall have the right, without further notice, to take over the care, operation, and maintenance of the project works in the same manner, to the same extent, and upon the same conditions as prescribed in Article 21.(a) of contract No. 14-06-200-3784

Article 6

002626

017690

1                      <u>REPAYMENT OBLIGATION--TERMS OF REPAYMENT</u>

2         7.   (a)  The Contracting Officer will announce the Contractor's

3   repayment obligation as soon as possible following the completion of the

4   Emergency Work.  The Contractor's repayment obligation shall not exceed

5   $250,000.00 , including costs of the Contractor and costs of the United

6   States as described in Article 4.

7        (b)  The Contractor's repayment obligation shall be paid in

8   accordance with the following schedule:  Each year, beginning December 31,

9   1984, the Contractor shall pay the United States in five (5) successive

10   annual installments in amounts equal to one fifth of the repayment obligation

11   as determined by the Contracting Officer in accordance with Article 7.(a):

12

13

14

15

16

17

18

19

20

21

22

23

24

Article 7--

002627

017691

1    Provided, That the final installment returns the remaining unpaid repaym

2    obligation:  Provided further, That the Contractor may at any time, prepay

3    all or a portion of the repayment obligation.

4                            BOOKS AND RECORDS

5        8.   The Contractor shall maintain books of accounts pertaining
6    to the Emergency Work separate and apart from any other of its books or
7    accounts, and so keep them, and all other books, records, and memorandums
8    which support in any way the entries in such books of accounts as to be
9    able to furnish readily full information as to any item included in any
10   account.   Each entry shall be supported by such detailed information as
11   will permit a ready identification, analysis, and verification of all of
12   the facts relevant thereto.  Any such books and records which support
13   entries to the accounts shall be retained until written permission for
14   their destruction is given by the Contracting Officer.

15                            AUDITS

16        9.   The United States, at any time after the date of this contract

17   and extending for a period of three years after completion of the Emergency

18   Work, may audit the records and other material supporting billings subm

19   to the United States for payment thereof and may also audit other cost

20   accounts of the Contractor which are to be maintained as provided in

21   Article 8 herein.  If the audit discloses payment by the United States for

22   costs which cannot be supported or identified to the work, materials, or

23   other items covered by this contract, the Contractor shall reimburse the

24   United States for such costs within 60 days after written notice of

25   disqualification of the payments.  Any such reimbursements to the United

26   States shall be applied to reduce the final installment of the Contractor's

27   obligation under this contract.

002628

017692

1       OPERATION AND MAINTENANCE OF PROJECT WORKS

2           10.  All facilities repaired or replaced pursuant to this contract

3   shall remain a part of the Klamath        Project and shall be operated and

4   maintained by the Contractor in accordance with the provisions of contract

5   No. 14-06-200-3784  , dated November 29, 1954      .

6                TITLE TO REMAIN IN THE UNITED STATES

7           11.  (a)  Title to all works constructed, repaired, or rehabilitated

8   pursuant to this contract shall be, and remain, in the United States

9   until otherwise provided by the Congress.

10              (b)  All additional rights-of-way, which may be required for

11  accomplishing the Emergency Work, shall be acquired by the Contractor, and

12  title thereto shall be transferred to the United States by appropriate

13  conveyance.

14

15

16

17

18

19

20

Articles 10 - 11
002629

017693

## CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT

12.   (a)   The Contractor agrees as follows:

(1)   To comply with all the requirements of Section 114 of the Clean Air Act, as amended (42 U.S.C. 1857, et seq., as amended by Public Law 91-604) and Section 308 of the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq., as amended by Public Law 92-500), respectively, relating to inspection, monitoring, entry, reports, and information, as well as other requirements specified in Section 114 and Section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder before the execution of this contract.

(2)   That no portion of the work required by this contract will be performed in a facility listed on the Environmental Protection Agency List of Violating Facilities on the date when this contract was executed unless and until the EPA eliminates the name of such facility or facilities from such listing.

(3)   To use its best efforts to comply with clean air standards and clean water standards at the facility where the contract work is being performed.

(4)   To insert the substance of the provisions of this article into any nonexempt subcontract, including this paragraph (a)(4).

(b)   The terms used in this article have the following meanings:

(1)   The term "Air Act" means the Clean Air Act, as amended (42 U.S.C. 1857 et seq., as amended by Public Law 91-604).

(2)   The term "Water Act" means Federal Water Pollution Control Act, as amended (33 U.S.C. 1251 et seq., as amended by Public Law 92-500).

(3)   The term "clean air standards" means any enforceable rules, regulations, guidelines, standards, limitations, orders, controls, prohibitions, or other requirements which are contained in, issued under, or otherwise adopted pursuant to the Air Act or Executive Order 11738, an applicable implementation plan as described in Section 110(d) of the Clean Air Act (42 U.S.C. 1857c-5(d)), an approved implementation procedure or plan under Section 111(c) or Section 111(d), respectively, of the Air Act (42 U.S.C. 1857c-6(c) or (d)), or an approved implementation procedure under Section 112(d) of the Air Act (42 U.S.C. 1857c-7(d)).

Article 12 ---

002630

1       (4)   The term "clean water standards" means any
2   enforceable limitation, control, condition, prohibition, standard,
3   or other requirement which is promulgated pursuant to the Water
4   Act or contained in a permit issued to a discharger by the
5   Environmental Protection Agency or by a State under an approved
6   program, as authorized by Section 402 of the Water Act (33 U.S.C.
7   1342), or by local government to ensure compliance with pretreat-
8   ment regulations as required by Section 307 of the Water Act
9   (33 U.S.C. 1317).

10      (5)   The term "compliance" means compliance with clean
11  air or water standards.  Compliance shall also mean compliance with
12  a schedule or plan ordered or approved by a court of competent
13  jurisdiction, the Environmental Protection Agency or an air or
14  water pollution control agency in accordance with the requirements
15  of the Air Act or Water Act and regulations issued pursuant thereto.

16      (6)   The term "facility" means any building, plant,
17  installation, structure, mine, vessel or other floating craft,
18  location, or site of operations, owned, leased, or supervised by
19  a contractor or subcontractor, to be utilized in the performance
20  of a contract or subcontract.  Where a location or site of operations
21  contains or includes more than one building, plant, installation,
22  or structure, the entire location or site shall be deemed to be a
23  facility except where the Director, Office of Federal Activities,
24  Environment Protection Agency, determines that independent facilities
25  are collocated in one geographical area.

11                  --Article 12

## RULES, REGULATIONS, AND DETERMINATIONS

13. (a) The Contracting Officer shall have the right to make, after an opportunity has been offered to the Contractor for consultation, rules and regulations consistent with the provisions of this contract, the laws of the United States and the State of Oregon , to add or to modify them as may be deemed proper and necessary to carry out this contract, and to supply necessary details of its administration which are not covered by express provisions of this contract. The Contractor shall observe such rules and regulations.

(b) Where the terms of this contract provide for action to be based upon the opinion or determination of either party to this contract, whether or not stated to be conclusive, said terms shall not be construed as permitting such action to be predicated upon arbitrary, capricious, or unreasonable opinions or determinations. In the event that the Contractor questions any factual determination made by the Contracting Officer, the findings as to the facts shall be made by the Secretary only after consultation with the Contractor and shall be conclusive upon the parties.

## CONTINGENT ON APPROPRIATION OR ALLOTMENT OF FUNDS

14. The expenditure or advance of any money or the performance of any work by the United States hereunder which may require appropriation of money by the Congress or the allotment of funds shall be contingent upon such appropriation or allotment being made. The failure of Congress to appropriate funds or the absence of any allotment of funds shall not relieve the Contractor from any obligation under this contract. No liability shall accrue to the United States in case such funds are not appropriated or allotted.

## ASSIGNMENT LIMITED—SUCCESSORS AND ASSIGNS OBLIGATED

15. The provisions of this contract shall apply to and bind the successors and assigns of the parties hereto, but no assignment or transfer of this contract or any part or interest therein shall be valid until approved by the Contracting Officer.

002632

1.    ## EQUAL OPPORTUNITY

2.    16.   (a)   The Contractor hereby agrees to incorporate, or cause to
3.   be incorporated, into any contract for construction work, or modifica-
4.   tion thereof, as defined in the regulations of the Secretary of Labor
5.   at 41 CFR, Chapter 60, which is paid for, in whole or in part, with
6.   funds obtained from the Federal Government or borrowed on the credit
7.   of the Federal Government pursuant to grant, contract, loan, insurance,
8.   or guarantee, or undertaken pursuant to any Federal program involving
9.   such grant, contract, loan, insurance, or guarantee, the following
10.  Equal Opportunity (Federally Assisted Construction) clause:

11.                    ### Equal Opportunity
12.                 (Federally Assisted Construction)

13.          During the performance of this contract, the Contractor agrees
14.  as follows:

15.          (1)   The Contractor will not discriminate against any employee
16.  or applicant for employment because of race, color, religion, sex,
17.  or national origin.   The Contractor will take affirmative action
18.  to ensure that applicants are employed, and that employees are
19.  treated during employment without regard to their race, color,
20.  religion, sex, or national origin.   Such action shall include, but
21.  not be limited to the following:  Employment, upgrading, demotion,
22.  or transfer; recruitment or recruitment advertising; layoff or
23.  termination; rates of pay or other forms of compensation; and
24.  selection for training, including apprenticeship.  The Contractor
25.  agrees to post in conspicuous places, available to employees and
26.  applicants for employment, notices to be provided setting forth
27.  the provisions of this nondiscrimination (Federally Assisted
28.  Construction) clause.

29.          (2)   The Contractor will, in all solicitations or advertise-
30.  ments for employees placed by or on behalf of the Contractor, state
31.  that all qualified applicants will receive consideration for employ-
32.  ment without discrimination because of race, color, religion, sex,
33.  or national origin.

34.          (3)   The Contractor will send to each labor union or representative
35.  of workers, with which it has a collective bargaining agreement or other
36.  contract or understanding, a notice to be provided advising the said
37.  labor union or workers' representative of the Contractor's commitments
38.  under this section, and shall post copies of the notice in conspic-
39.  uous places available to employees and applicants for employment.

Article  16---

002633

017697

(4)  The Contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, as amended, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5)  The Contractor will furnish all information and reports required by said amended Executive Order and by the rules, and regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to its books, records, and accounts by the Contracting Officer and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

(6)  In the event of the Contractor's noncompliance with the nondiscrimination (Federally Assisted Construction) clauses of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended, in whole or in part, and the Contractor may be declared ineligible for further Government contracts or federally assisted construction contracts in accordance with procedures authorized in said amended Executive Order and such other sanctions may be imposed and remedies invoked as provided in said Executive Order, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

(7)  The Contractor will include the portion of the sentence immediately preceding paragraph (1) and the provisions of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by the rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of said amended Executive Order so that such provisions will be binding upon each subcontractor or vendor.  The Contractor will take such action with respect to any subcontract or purchase order as the Contracting Officer may direct as a means of enforcing such provisions, including sanctions for noncompliance:  Provided, however, That in the event a Contractor becomes involved in, or is threatened with litigation with a subcontractor or vendor as a result of such direction by the Contracting Officer, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.



(b)  The Contractor further agrees that it will be bound by the above Equal Opportunity (Federally Assisted Construction) clause with respect to its own employment practices when it participates in federally assisted construction work:  Provided, That if the Contractor so participating is a State or local government, the above Equal Opportunity clause is not applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under the contract.

002634

017698

(c)   The Contractor agrees that it will assist and cooperate actively with the Contracting Officer and the Secretary of Labor in obtaining the compliance of contractors and subcontractors with the Equal Opportunity (Federally Assisted Construction) clause and the rules, regulations, and relevant orders of the Secretary of Labor, that it will furnish the Contracting Officer and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist the Contracting Officer in the discharge of his primary responsibility for securing compliance.

(d)   The Contractor further agrees that it will refrain from entering into any contract modification subject to said amended Executive Order with a Contractor debarred from, or who has not demonstrated eligibility for, Government contracts and federally assisted construction contracts pursuant to said amended Executive Order and will carry out such sanctions and penalties for violation of the Equal Opportunity (Federally Assisted Construction) clause as may be imposed upon contractors and subcontractors by the Contracting Officer or the Secretary of Labor pursuant to Part II, Subpart D, of the Executive Order.  In addition, the Contractor agrees that if it fails or refuses to comply with these undertakings the Contracting Officer may take any or all of the following actions:  Cancel, terminate, or suspend, in whole or in part, this contract; refrain from extending any further assistance to the Contractor under the program with respect to which its failure or refusal occurred until satisfactory assurance of future compliance has been received from such contractor; and refer the case to the Department of Justice for appropriate legal proceedings.

--Article 16

002635

017699

## TITLE VI, CIVIL RIGHTS ACT OF 1964

17.   (a)   The Contractor agrees that it will comply with Title VI of the Civil Rights Act of July 2, 1964 (78 Stat. 241) and all requirements imposed by or pursuant to the Department of the Interior Regulation (43 CFR 17) issued pursuant to that title, to the end that, in accordance with Title VI of that Act and the Regulation, no person in the United States shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the Contractor receives financial assistance from the United States and hereby gives assurance that it will immediately take any measures to effectuate this agreement.

(b)   If any real property or structure thereon is provided or improved with the aid of Federal financial assistance extended to the Contractor by the United States, this assurance obligates the Contractor, or, in the case of any transfer of such property, any transferee for the period during which the real property or structure is used for a purpose involving the provision of similar services or benefits.   If any personal property is so provided, this assurance obligates the Contractor for the period during which it retains ownership or possession of the property. In all other cases, this assurance obligates the Contractor for the period during which the Federal financial assistance is extended to it by the United States.

(c)   This assurance is given in consideration of and for the purpose of obtaining any and all Federal grants, loans, contracts, property, discounts, or other Federal financial assistance extended after the date hereof to the Contractor by the United States, including installment payments after such date on account of arrangements for Federal financial assistance which were approved before such date. The Contractor recognizes and agrees that such Federal financial assistance will be extended in reliance on the representations and agreements made in this assurance, and that the United States shall reserve the right to seek judicial enforcement of this assurance.   This assurance is binding on the Contractor, its successors, transferees, and assignees.



002636

## CERTIFICATION OF NONSEGREGATED FACILITIES

18.  The Contractor hereby certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  It certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained.  The Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this contract.  As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, restrooms, and washrooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise.  The Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that it will retain such certifications in its files; and that (except where the proposed subcontractors have submitted identical certifications for specific time periods) the Contractor will forward the following notice to such proposed subcontractors:

## NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR
## CERTIFICATIONS OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).  Note: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

1                  GENERAL OBLIGATION—BENEFITS CONDITIONED UPON PAYMENT

2         19.  (a)  The obligation of the Contractor to pay the United States
3   as provided in this contract is a general obligation of the Contractor
4   notwithstanding the manner in which the obligation may be distributed
5   among the Contractor's water users and notwithstanding the default of
6   individual water users in their obligations to the Contractor.

7              (b)  The payment of charges becoming due hereunder is a condition
8   precedent to receiving benefits under this contract.  The ~~electors of the~~
9   ~~Contractor shall authorize by an election or ratify this contract in order~~
10  ~~to grant to the~~ Contractor the power to levy and collect all necessary taxes
11  and assessments if and when needed.  No water will be made available to the
12  Contractor through Project facilities during any period in which the Con-
13  tractor may be in arrears in the advance payment of any operation and
14  maintenance charges due the United States or in arrears for more than
15  12 months in the payment of any construction charges due the United States.
16  The Contractor shall not furnish water made available pursuant to this
17  contract for lands or parties which are in arrears in the advance payment
18  of operation and maintenance or toll charges or in arrears more than
19  12 months in the payment of construction charges as levied or established
20  by the Contractor.

21                              CHARGE FOR LATE PAYMENTS

22        20.  The Contractor shall pay a late payment charge on installments
23  or charges which are received after the due date.  The late payment charge
24  percentage rate calculated by the Department of the Treasury and published
25  quarterly in the Federal Register shall be used:  Provided, That the late
26  payment charge percentage rate will not be less than 0.5 percent per month.
27  The late payment charge percentage rate applied on an overdue payment will
28  remain in effect until payment is received.  The late payment rate for a
29  30-day period will be determined on the day immediately following the due
30  date and will be applied to the overdue payment for any portion of the 30-day
31  period of delinquency.  In the case of partial late payments, the amount
32  received will first be applied to the late charge on the overdue payment
33  and then to the overdue payment.

34                              OFFICIALS NOT TO BENEFIT

35        21.  (a)  No Member of or Delegate to Congress or Resident Com-
36  missioner shall be admitted to any share or part of this contract or
37  to any benefit that may arise herefrom.  This restriction shall not
38  be construed to extend to this contract if made with a corporation
39  for its general benefit.

40              (b)  No official of the District shall receive any benefit
41  that may arise by reason of this contract other than as a landowner
42  within the Project and in the same manner as other landowners within
43  the Project.

## CHANGES IN CONTRACTOR'S ORGANIZATION

22. While this contract is in effect, no change shall be made in the Contractor's organization, by inclusion or exclusion of lands, by dissolution, consolidation, merger, or otherwise, except upon the Contracting Officer's written consent.

## CONFIRMATION OF CONTRACT

23. The Contractor, upon the execution of this contract, shall promptly secure a final decree of the proper court of the State of Oregon approving and confirming the contract and decreeing and adjudging it and the apportionment of the benefits made thereunder to be lawful, valid, and binding on the Contractor. The Contractor shall furnish to the United States a certified copy of such decree and of all pertinent supporting records.

## NOTICES

24. Any notice, demand, or request authorized or required by this contract shall be deemed to have been given, on behalf of the District when mailed, postage prepaid, or delivered to the Regional Director, Mid-Pacific Region, Bureau of Reclamation, 2800 Cottage Way, Sacramento, California 95825 _____, and on behalf of the United States, when mailed, postage prepaid, or delivered to the Board of Directors _____, of the Contractor, Klamath Irrigation District, 6640 K.I.D. Lane, Klamath Falls, Oregon 97601 _____. The designation of the addressee or the address may be changed by notice given in the same manner as provided in this article for other notices.

017703

1      IN WITNESS WHEREOF, the parties hereto have executed this

2   contract the day and year first above written.

3                                   THE UNITED STATES OF AMERICA

4

5                                   By _____

6                                      Regional Director, Mid-Pacific Region
                                       Bureau of Reclamation
7

8                                   KLAMATH IRRIGATION DISTRICT
                                    CONTRACTOR
9

10  (SEAL)

11                                  By _____
                                       President
12  Attest:

13

14  _____
    Secretary

15

16

17

18

19

20

21

22

23

20                                              Signatures

002640

017704

I hereby certify that at the Meeting of the Board of Directors of

Klamath Irrigation District held at the office of said District on November

30, 1983, the following Resolution was duly adopted by the unanimous vote of

all of the Directors of said District:

"BE IT RESOLVED, that Klamath Irrigation District shall forthwith
enter into said CONTRACT BETWEEN THE UNITED STATES OF AMERICA AND THE KLAMATH
IRRIGATION DISTRICT FOR THE ADVANCEMENT AND SUBSEQUENT REPAYMENT OF FUNDS
EXPENDED FOR EMERGENCY WORK and that said funds shall be repaid by the amount
of the repayment obligations being added to and included in the Operation and
Maintenance Assessments of Klamath Irrigation District levied and assessed as
provided by ORS 545.482 et seq. and the various Contracts between Klamath
Irrigation District and the United States of America and other Irrigation
Districts and Improvements Districts and that the original copies of said
Contract, as so amended by interlineation, shall be forthwith signed by the
President and by the Secretary of Klamath Irrigation District on behalf of
said District and shall be sealed with the Seal of Klamath Irrigation District
and shall be delivered to the proper officials of the United States Bureau of
Reclamation as quickly as possible."

Secretary of Klamath Irrigation District

Attest:

James L. Chapman

Dick Owens

Marty Chin

Directors of Klamath Irrigation District.

002641

017705



# United States Department of the Interior

BUREAU OF RECLAMATION
MID-PACIFIC REGIONAL OFFICE
2800 COTTAGE WAY
SACRAMENTO, CALIFORNIA 95825

IN REPLY
REFER TO:      MP-440
832.

DEC 7 1983

To:        Regional Director, Sacramento, California

From:   .ting   Regional Supervisor of Water and Power Resources Management

Subject:   Proposed Emergency Fund Act (P.L. 80-790) Repayment Contract
with Klamath Irrigation District—Repair of Failed Lining
in the A-Canal Tunnel—Klamath Project, California-Oregon

1. **Introduction:**  Enclosed for your review, approval and execution is
a proposed repayment contract between the United States and the Klamath
Irrigation District (District), Klamath Falls, Oregon.  You are authorized
to approve and execute this contract on behalf of the United States in
accordance with the redelegation of authority contained in a memorandum
from the Commissioner dated February 16, 1983.  The proposed contract,
prepared pursuant to the Act of June 26, 1948 (62 Stat. 1052), as amended
by the Act of October 1, 1982 (96 Stat. 1185), provides for repayment of
an emergency loan of up to $250,000 for repair of the failed lining in the
A-Canal tunnel initially discovered by the District during an inspection in
March 1983 (see Attachment A).  It has been determined that an emergency
exists at the subject tunnel where a potential lining failure at the entrance
portal perils delivery of water to approximately 75,000 acres.  In a faxogram
dated November 4, 1983, the Commissioner approved the use of emergency funds
to repair the failed lining of the A-Canal tunnel.

2. **Contracting Entities and Legal and Policy Considerations:**  The District
has the authority to contract with the United States under Reclamation law,
the power of eminent domain, and the power to levy and collect assessments
and water charges.  The District is located in Klamath County, Oregon, and
lies adjacent to the city of Klamath Falls, Oregon.  The District consists
of 37,754 irrigable acres, of which 33,433 acres are under irrigation.  The
District's agricultural crops include cereal grains, alfalfa hay, irrigated
pastures, and potatoes.

The proposed contract secures repayment of emergency funds advanced to
the District to repair already existing facilities.  The work will not
involve changes in location of facilities or operational procedures.
Therefore, this contractual action is categorically excluded from further
compliance with the National Environmental Policy Act in accordance with
Appendix 9, 516 DM 6, "Maintenance, rehabilitation, and replacement of
existing facilities . . . ."

The District is a public corporation formed under the laws of the State of Oregon and is an acceptable legal entity to contract with the United States. The proposed contract was approved and signed by the District's Board of Directors on November 30, 1983. The proposed contract is consistent with Reclamation law. The contract has been reviewed by the Regional Solicitor, Pacific Southwest Region, and has been found legally sufficient. No formal public participation actions have been initiated to date. A local press release will be issued announcing the execution of the proposed contract.

3.  **Background**:  The tunnel was originally constructed in 1905 as a major feature of the A-Canal system within the Main Division of the Klamath Project. The tunnel has been in continuous operation since that time. Water users depending upon the A-Canal system for their water supply have repaid the total costs of the original construction. Approximately 75,000 acres of irrigated farmland depend directly and solely on the A-Canal for their water supply. Water is conveyed from Upper Klamath Lake through the A-Canal and tunnel to irrigated farmlands within numerous irrigation districts. There is no alternative to bypass the tunnel to provide water service.

The partial failure of the A-Canal tunnel was discovered during an inspection by the District in March 1983. In the first 20 feet of the tunnel, a 4- by 6-foot portion of lining was missing from the left wall. The right wall was badly fractured and bulging. The arch section is cracked and spalling is evident throughout the tunnel.

For a temporary repair, the District filled the void in the left wall with riprap and concrete and installed a bracing system to support the walls. This temporary repair has proved adequate for the 1983 irrigation season. However, it has been determined that permanent repairs must be accomplished prior to the 1984 irrigation season. In a faxogram dated October 25, 1983, the Chief, Division of Water and Land Technical Services, Engineering and Research Center, agreed that unless remedial measures are taken immediately, total failure of the distressed area is likely. The consultant for the District estimates the total cost of the emergency repair work to be $250,000.

4.  **Contract Negotiations, Terms and Conditions**:  The proposed contract requires that the emergency fund loan be repaid in five successive equal annual installments starting December 31, 1984. The District's repayment obligation shall not exceed $250,000 which includes costs of the District and costs of the United States incurred for administration of the contract, including any engineering supervision or inspection associated with the emergency work.

The form of the proposed contract was based on a form contract approved by the Commissioner for use for repayment of emergency funds in a letter dated July 7, 1982. The contract provides for the advance of funds to the

002643

District and the District to perform all necessary emergency repair. The contract does not have to be approved by the District's electorate and, therefore, the standard form contract was modified to delete references to require elections. The modified articles are the "Whereas" article d., "Confirmation of Contract," and "General Obligations--Benefits Condition Upon Payment." All terms and conditions of existing contracts will remain in full force and effect. The District has completed repayment of its constuction obligation and is thereby exempt from the ownership and pricing limitations of Reclamation law.

The critical time frame required to obtain the Commissioner's approval to utilize emergency funds did not allow a comprehensive repayment capacity study. Studies performed in 1977 for two other districts in the Klamath Project area indicated both districts had computed payment capacities of less than their current water costs. The Regional Planning Officer has advised us that a similar study performed today for the Klamath Irrigation District would probably result in similar findings. His recommendation was to accept the District's expressed willingness to repay the $250,000 emergency loan over a 5-year period. This willingness to repay almost certainly exceeds any computed payment capacity which we could develop for the Klamath Project.

5. <u>Findings and Recommendations</u>:  We believe the proposed contract is in the best interest of the United States and the District and recommend that you approve and execute the enclosed form of contract, last designated "Rev. R.O. 11/8-1983," on behalf of the United States.

6. <u>Urgency of Approval</u>:  Your early execution of the proposed contract will facilitate the advancement of funds to the District in order to initiate the required emergency repairs and secure timely repayment of the emergency loan of not to exceed $250,000.



William H. Luce, Jr.

Attachments

Approved:

David L. Houston
Regional Director, Mid-Pacific Region

12/9/83
Date

002644

DEPARTMENT OF THE INTERIOR

UNITED STATES RECLAMATION SERVICE

KLAMATH IRRIGATION PROJECT.

- - -

Contract between the United States and the Klamath Irri-
gation District amendatory of and supplementary to con-
tracts of July 6, 1918, and June 28, 1920.

- - -

THIS AGREEMENT, Made this   10th   day of

_____ April _____ , 192 2 , between the UNITED STATES OF

AMERICA, herein styled the United States, acting for this

purpose through _____ E. C. FINNEY, _____ Acting

Secretary of the Interior, herein styled the Secretary,

under the provisions of the act of June 17, 1902 (32 Stat.,

388), and acts amendatory thereof or supplementary thereto,

herein styled the reclamation law, and the KLAMATH IRRIGATION

DISTRICT, herein styled the District, an irrigation district

organized under the laws of the State of Oregon, having its

principal place of business at Klamath Falls, in said State,

witnesseth:

## Explanatory Recitals

2.   WHEREAS, by contract dated July 6, 1918, made

by the parties hereto and the Klamath Water Users Assocation,

it was agreed that the District should pay to the United

017709

States on account of the costs of the Klamath Federal Irrigation project in Oregon, a maximum sum of $1,363,036.26, exclusive of operation and maintenance charges, penalties and interest, which obligation was intended to cover all construction costs on account of district lands together with certain delinquent operation and maintenance charges against same; and,

3. WHEREAS, the clause "covered by public notices issued pursuant to th e Reclamation Law," appearing in the first paragraph of Article 3 of said contract of July 6, 1918, is unnecessary and might hereafter erroneously be construed to eliminate District liability for payment of operation and maintenance charges with respect to certain so-called vested-right lands within the District, which is not in fact intended; and,

4. WHEREAS, by contract dated June 28, 1920, the parties hereto amended the contract of July 6, 1918, by changing the semi-annual dates of payment thereunder from April 20 and October 20 to June 30 and December 31, respectively, in order better to meet the terms of the tax laws of the State of Oregon, and also provided for additional construction work to be performed by the United States for the District at a cost not exceeding $225,000, of which $50,000 was to be paid as an operation and main-

-2-

tenance charge in five equal instalments of $10,000 each, the first of which was to be included in the operation and maintenance charge for 1920, and the remainder of said $225,000 was to be paid as a supplemental construction charge; and,

5.   WHEREAS, the contract of July 6, 1918, in Article 3, and the contract of June 28, 1920, in Article 7, provide that as to any amount remaining unpaid after its due date the District shall pay the United States a penalty of one per centum a month; and,

6.   WHEREAS, Section 3 of the act of Aug. 13, 1914 (38 Stat., 686), contemplates the payment of such penalties annually and not semi-annually, and it would be equitable to eliminate said penalty as to charges becoming due on June 30 provided they are paid on or before December 31, following, but not as to the penalty on charges becoming due on December 31; and,

7.   WHEREAS, on account of the extreme agricultural depression obtaining on the Klamath project during the past year, it seems advisable to advance for three years payment of each of the last four equal annual instalments of $10,000 each for supplemental construction referred to in Article 4 hereof, so that the second instalment will be added to the operation and maintenance charge for the year 1924 in-

-3-

017711

stead of to the operation and maintenance charge for the year 1921; and,

8.   WHEREAS, the Van Brimmer Ditch Company has or claims to have a vested right to the use for irrigation of fifty second feet of water from Lower Klamath Lake, for lands outside the District, which right can not be exercised because of the lowering of said lake by the United States in connection with the construction of said Klamath Project, and the company is now receiving said amount of water through the Government canal of said project, but no permanent provision has been made to secure annual payment in perpetuity for the cost of delivering such water; and,

9.   WHEREAS, the income from $50,000 invested according to ordinary business methods, would be sufficient perpetually to pay the annual cost of delivering such water to said company, and if the United States would pay that amount to the District by crediting same upon the District obligations under said contracts of July 6, 1918, and June 29, 1920, the District then would assume payment of said annual cost, which payment it is not now obligated to make;

10.   NOW, THEREFORE, in consideration of the mutual covenants herein contained, it is agreed:

-4-

### Par.1, Art.3, Contract July 6, 1918, Clarified.

11.  To clarify and make more certain the meaning and intent of the first paragraph of Article 3 of said contract of July 6, 1918, the same is hereby amended by striking therefrom the words, "covered by public notices issued pursuant to the Reclamation Law."

### Penalty on Instalments due June 30, partly eliminated

12.  Article 3 of contract of July 6, 1918, and Article 7 of contract of June 28, 1920, are amended so as to provide that no penalty shall be added to any unpaid instalment due thereunder from the District to the United States on June 30: Provided, That if any such instalment remains unpaid after December 31 of the same year, the penalty of one per centum per month shall be added after December 31 until paid.

### Method of making certain payments changed.

13.  Article 6(a) of said contract of June 28, 1920, providing for the addition of certain supplemental construction costs to the operation and maintenance charges during a period of five years, is amended to read as follows:

6(a).  Of the sum mentioned in Article

4 hereof, Fifty Thousand Dollars ($50,000) shall be paid by the District to the United States as an operation and maintenance charge in five equal annual instalments of which the first instalment of $10,000 has already

002560

been paid and the second instalment shall be
added to the operation and maintenance charge
for the year 1924, and the subsequent instal-
ments annually thereafter until paid.

### Delivery of Water to Van Brimmer Ditch Company.

14. Beginning with the irrigation season of 1922, the

District hereby assumes liability for and agrees to pay to

the United States on December 31 of each year, commencing

December 31, 1922, the annual cost of carrying and delivering

water from the Klamath project to the Van Brimmer Ditch Com-

pany; and if said cost is not paid when due there shall be

added thereto on the first day of each month a penalty of one

per centum of the amount until payment is made.  In full con-

sideration of this liability assumed by the District, the

United States will pay to the District as of January 2, 1922,

the sum of Thirty Thousand Dollars ($30,000.00) by crediting

that amount upon obligations due the United States under said

contracts of July 6, 1918, and June 28, 1920.

### Agency Clause.

15. The District expressly warrants that it has employed

no third person to solicit or obtain this contract in its

behalf, or to cause or procure the same to be obtained upon

compensation in any way contingent, in whole or in part, upon

-6-

017714

such procurement; and that it has not paid, or promised or agreed to pay, to any third person, in consideration of such procurement, or in compensation for services in connection therewith, any brokerage, commission, or percentage upon the amount receivable by it hereunder; and that it has not, in estimating the contract price demanded by it, included any sum by reason of any such brokerage, commission, or percentage; and that all moneys payable to it hereunder are free from obligation to any other person for services rendered, or supposed to have been rendered, in the procurement of this contract.   It further agrees that any breach of this warranty shall constitute adequate cause for the annulment of this contract by the United States, and that the United States may retain to its own use from any sums due or to become due thereunder an amount equal to any brokerage, commission, or percentage so paid or agreed to be paid: Provided, however, it is understood that this covenant does not apply to the selling of goods through a bona fide commercial representative employed by the District in the regular course of its business in dealing with customers other than the Government and whose compensation is paid, in whole or in part, by commissions on sales made, nor to the selling of goods through established commercial or selling agents or agencies regularly engaged in selling such goods.

<center>-7-</center>

002562

## Member of Congress Clause.

16.  No Member of or Delegate to Congress, or Resident Commissioner, after his election or appointment, or either before or after he has qualified and during his continuance, in office, and no officer, agent, or employee of the Government, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon.  Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract or agreement is made for the general benefit of such incorporation or company, as provided in section 116 of the act of Congress approved March 4, 1909 (35 Stat., 1109).

### Contract binding on Successors and Assigns.

17.  All of the covenants herein contained shall inure to the benefit of and be binding upon the successors and assigns of the respective parties.

IN WITNESS WHEREOF the parties hereto have executed this contract on the day and year first above written.

THE UNITED STATES OF AMERICA

By  (Sgd) E. C. FINNEY
Acting Secretary.

KLAMATH IRRIGATION DISTRICT

(Seal)                              By  G. W. Offield,
                                                    President.

Attest:                                 -8-
     A. L. Wishard,
          Secretary

017716

THIS AGREEMENT, made this sixth day of July, 1918, by and between the UNITED STATES OF AMERICA, acting for this purpose by /s/ F. C. Bradley, Assistant to . the Secretary of the Interior, hereinafter styled the "Secretary", under the provisions of the Act of Congress approved June 17, 1902 (32 Stat., 388), known as the Reclamation Act, and other acts amendatory thereof and supplementary thereto, all of which are hereinafter referred to as the "Reclamation Law", the KLAMATH IRRIGATION DISTRICT, a public corporation duly formed under the laws of the State of Oregon, having its principal place of business at Klamath Falls, Klamath County, Oregon hereinafter styled the "District", and the KLAMATH WATER USERS ASSOCIATION, a private corporation duly formed under the laws of the State of Oregon, hereinafter styled the "Association",

WITNESSETH:  That

WHEREAS the Association executed contract with the United States dated November 6, 1905, whereby its Association guaranteed to the United States the payments for that part of the cost of the irrigation work of the Klamath United States Reclamation Project which should be apportioned by the Secretary to the shareholders of the Association, and it is now the desire of the said shareholders that the said Association be dissolved and cooperation with the United States be carried on through the District; and

WHEREAS the District desires the discharge of liens against the lands of the District for water charges to the and that the said charges may be collected by the District under the general taxing power of the state laws;

NOW, THEREFORE, in consideration of the covenants herein contained, it is agreed as follows:

ARTICLE 1.    It is understood that the irrigable lands of the District comprise, as regards the existence of water rights, the following classes:

(a)  Lands for which water right applications to the United States have been made under the Reclamation Law;

(b)  Lands which have been covered by so-called stock subscriptions to the Association, but which subscriptions have not been consummated by the execution of water right applications to the United States;

017717

(c)  Lands which have not been covered by any of the foregoing forms of instrument but are included within public notices heretofore issued by the Secretary pursuant to Section 4 of the Reclamation Act; and

(d)  Lands which have not been covered by any of the said forms of instrument, and are not within the scope of any public notice yet issued;

(e)  Lands known as the Henley-Ankeny tracts which are understood to have a pre-existing water right under contracts, which lands will not be covered by public notice and whose owners are obligated to pay for no part of the cost of irrigation works heretofore constructed under the authority of the United States.

ARTICLE 2.    Nothing in this contract contained or in the formation of the District shall be deemed in any wise to have abrogated, enlarged or modified the said water right applications to the United States except as herein provided. The Association agrees that when its affairs and the liquidation of its liabilities will permit the lien contained in the stock subscriptions to the Association will be discharged of record.  The United States agrees to assent to the release of the lien by the Association, as aforesaid, and to the discharge of the said corporation from the obligation of the aforesaid contract, dated November 6, 1905, and to the dissolution of the Association, and to release all liens created or evidenced by water right applications for the payment of charges existing in favor of the United States upon any or all lands within said District which are or shall become subject to assessment and levy and to the lien of assessment and levy of the District, except that nothing herein shall be construed as releasing or attempting to release the liens reserved to the United States in connection with patents or water right certificates issued under the act of August 9, 1912 (37 Stat., 265).  The release of liens as in this article provided shall not, however, be made prior to confirmation of this contract, as provided by the Statutes of Oregon.

ARTICLE 3.    The District hereby assumes liability for and will pay to the United States construction instalments and operation and maintenance charges for years subsequent to 1918 the aggregate annual sum due in each year to the United States from District lands covered by public notices

-2-

017718

issued pursuant to the Reclamation Law, and also all delinquent construction, operation and maintenance charges as shall then remain unpaid. Such delinquent charges as accrued prior to August 13, 1914, shall be payable as part of the instalments of construction costs payable under the public notice applicable to the respective tracts of land. Such delinquent charges as accrued subsequent to August 13, 1914, shall be paid in one-half as many years as the said delinquencies have been accruing against the respective tracts unless the years of such delinquency be an odd number, and in such case the next higher integral number of years than one-half of the years of delinquency shall be the period of payment thereof.

The sums annually payable shall be divided into two equal instalments, payable April 20 and October 20 of each year, beginning with the year 1919.

The maximum aggregate sum payable to the United States under this contract, exclusive of operation and maintenance charges, penalties, and interest, shall be One Million, Three Hundred Sixty-three Thousand and Thirty-six Dollars and Twenty-six Cents ($1,363,036.26), provided that said maximum sum does not include any proposed costs for additional drainage, replacement of perishable structures, or any rights to the Ankeny Canal, but covers only amounts expended or authorized to be expended prior to the date hereof.

No interest on deferred payments shall be paid to the United States, but if any of the sums called for by this article shall not be paid on the date when the same shall become due as herein stated a penalty shall be paid to the United States at the rate of one per centum (1%) per month until payment be made by the District.

ARTICLE 4.    There is reserved to the Secretary the right to make reasonable rules and regulations and to modify the same in his discretion, in harmony, however, with this contract, to the end that the true intent of the law and of this contract shall be carried into effect; and the District agrees to use its powers for the purpose of carrying out such rules and regulations and this contract. The Secretary will not, however, withdraw or modify any public notice heretofore issued. The proper officials of the District shall have full and free access to the project books and official records of

002566

017719

the United States Reclamation Service relative to the costs of construction, operation and maintenance of the works constructed or operated by the United States, with the right at any time during office hours to make copies of and from the same. The representatives of the United States shall have the same rights in respect to the books and records of the District.

ARTICLE 5. The Secretary will furnish to the District on request, for its information, in advance and as early as practicable, the items proposed to be contained in the budget for Congressional appropriation for expenditures in connection with District lands.

ARTICLE 6. The United States will continue the operation and maintenance of the project in accordance with existing contracts, rules and regulations, until otherwise provided by contract after vote by the electorate of the District, or until the payments required by the Reclamation Law are made for the major portion of the lands irrigated from the project works; then in the latter case the management and operation of said works shall pass to the District to be maintained at the cost of the District under such rules and regulations as may be acceptable to the Secretary, pursuant to Section 6 of the Reclamation Act, unless the management and control shall have previously passed to the District under contract after vote of the electorate, as in this article hereinbefore provided, and unless provision shall otherwise have been made by Congress.

ARTICLE 7. The Secretary hereby signifies his approval of the plans of the District in compliance with the Act of Congress approved August 11, 1916, entitled "An Act to promote reclamation of arid lands", and hereby designates all public lands situated within the District subject to the provisions thereof.

ARTICLE 8. If the Secretary shall find any lands within the District to be temporarily incapable of successful cultivation on account of seepage, or alkaline or other conditions, he may exempt the District from the payment of construction or of operation and maintenance charges, or both, for such lands for a specified period or until further notice, whereupon the District shall exempt from assessment and levy the lands so specified during the period named. All existing contracts with landowners and departmental orders for the

.4.

002567

017720

exemption of lands from charges on account of such conditions shall be respected by the District during the respective terms for which the same shall run.  Nothing in this article contained shall deprive the Secretary of discretionary power as regards the exemption of the District for the payment of charges for any tract, nor shall the landowners be deemed by any implication to be relieved from responsibility of improving drainage conditions.

ARTICLE 9.   If the Secretary shall deem any lands of the District permanently insusceptible of reclamation on account of seepage or other conditions, he may, in his discretion, contract with the District for the severance of the water rights from such lands and for their becoming appurtenant to other lands within the District or to lands which by appropriate proceedings are brought within the District.  Nothing in this article contained, however, shall be deemed to release the District from its liability for reimbursement of the reclamation fund for the cost of the project works, but if transfers of water right be made to lands without the District, as in this article provided, and the United States shall thereby be satisfactorily secured for proportionate reimbursement, the obligation of the District shall be reduced to the same extent.

ARTICLE 10.   The District and the Association expressly warrant that they have employed no third person to solicit or obtain this contract in their behalf, or to cause or procure the same to be obtained upon compensation in any way contingent, in whole or in part, upon such procurement; and that they have not paid, or promised or agreed to pay, to any third person, in consideration of such procurement, or in compensation for services in connection therewith, any brokerage, commission, or percentage upon the amount receivable by them hereunder; and that they have not, in estimating the contract price demanded by them, included any sum by reason of any such brokerage, commission, or percentage; and that all moneys payable to them hereunder are free from obligation to any other person for services rendered, or supposed to have been rendered, in the procurement of this contract.  They further agree that any breach of this warranty shall constitute adequate cause for the annulment of this contract by the United States, and that the United States may retain to its own use from any sums due or to become due thereunder an amount equal to any brokerage, commission, or percentage so paid or agreed to be paid.

002568

017721

ARTICLE 11.   No Member of or Delegate to Congress, or Resident Commissioner, after his election or appointment or either before or after he has qualified and during his continuance in office, shall be admitted to any share or part of this contract or agreement, or to any benefit to arise thereupon.  Nothing, however, herein contained shall be construed to extend to any incorporated company, where such contract or agreement is made for the general benefit of such incorporation or company, as provided in Section 116 of the Act of Congress approved March 4, 1909 (35 Stat., 1109).

IN WITNESS WHEREOF the parties hereto have caused these presents to be duly executed by their respective officers the day and year first above written.

UNITED STATES OF AMERICA

By ___/s/ E. C. Bradley___
Assistant to the Secretary of the Interior

(Corporate Seal)

KLAMATH IRRIGATION DISTRICT

ATTEST:

By ___G. W. Offield___
President.

___Albert E. Elder___
Secretary

P. O. Address
Klamath Falls, Oregon.

KLAMATH WATER USERS ASSOCIATION

By ___G. W. Offield___
President.

ATTEST:

___A. L. Wishard___
Secretary.
P. O. Address
Klamath Falls, Oregon.
(Corporate Seal)

Witnesses:

J. B. Bond
E. V. Hillius

-6-

002569

017722

STATE OF OREGON      )
                     )  ss.
County of Klamath    )

       THIS CERTIFIES that on this 21st day of August, 1918, before
me, the undersigned, C. C. Hogue, a Notary Public in and for said
County and State, personally appeared the within named G. W.
Offield, President of the Klamath Irrigation District and also of
the Klamath Water Users Association, and Albert E. Elder, Secretary
of the Klamath Irrigation District, and A. L. Wishard, Secretary of
the Klamath Water Users Association, corporations, and they being
known to me to be such officers and the identical persons described
in and who executed the within instrument for and on behalf of said
corporations, and said corporations being known to me to be the
identical corporations for and on whose behalf the said instrument
was executed, and said G. W. Offield, President, and Albert E.
Elder and A. L. Wishard, Secretaries, respectively of the afore-
mentioned corporations, did then and there acknowledge to me that
they did as such officers as in this certificate described execute
the said instrument as and for the act and deed of said corpora-
tions in whose names and behalf they executed said instrument,
and affixed thereto the corporate seals of said corporations,
under authority in them vested by the Board of Directors of the
said respective corporations.

       WITNESS my hand and Notarial seal the day and year last
aforesaid.

                     _C. C. Hogue_      (NOTARIAL SEAL)

My commission expires April 22, 1921
           Notary Public for Oregon

002570

002571

017723

R. O. Draft 12/26-1961
Rev. W. O. 3-29-62

Contract No.
14-06-200-3784
Amendatory

1        UNITED STATES
         DEPARTMENT OF THE INTERIOR
2        BUREAU OF RECLAMATION
         Klamath Project, Oregon-California

3

4        AMENDATORY CONTRACT BETWEEN THE UNITED STATES
         OF AMERICA AND THE KLAMATH IRRIGATION DISTRICT

5        THIS CONTRACT AMENDMENT, made this 25th day of April ___,

6        19 62, in pursuance generally of the Act of June 17, 1902 (32 Stat. 388),

7        and acts amendatory thereof or supplementary thereto, all collectively

8        hereinafter referred to as the Federal reclamation laws, between THE

9        UNITED STATES OF AMERICA, hereinafter referred to as the United States,

10       and KLAMATH IRRIGATION DISTRICT, hereinafter referred to as the District,

11       a political subdivision of the State of Oregon, duly organized, existing,

12       and acting pursuant to the laws thereof, with its principal place of

13       business in Klamath County, Oregon.

14            WITNESSETH, That:

15            WHEREAS, the United States and the District, acting pursuant to

16       the Federal reclamation laws and the laws of the State of Oregon, have

17       previously entered into and subsequently amended a contract dated

18       July 6, 1918, providing for the repayment of the costs of construction

19       of certain Klamath Project Works which benefit the District; and

20            WHEREAS, the United States and the District have also entered

21       into an amendatory contract, No. 14-06-200-3784, dated November 29, 1954,

22       hereinafter called the Operations Contract, pursuant to which responsi-

23       bility for the care, operation, and maintenance of certain of the Klamath

24

25

002572
017724

1    Project Works serving the District, hereinafter referred to as

2    "Transferred Works", was transferred to the District; and

3         WHEREAS, the United States and the Klamath Basin

4    Improvement District, a public corporation of the State of Oregon,

5    hereinafter referred to as KBID, have entered into a contract dated

6    ____April 25_____, 1962_, hereinafter referred to as the

7    Klamath Project Extensions Contract, which provides for the furnish-

8    ing of surplus Klamath Project water for KBID lands and for a loan

9    for the construction of facilities, hereinafter referred to as

10   Project Works, including the enlargement, extension, or other

11   modification of certain of the Transferred Works, required for the

12   delivery of such water; and

13        WHEREAS, the District desires that the Transferred Works be so

14   modified and that the Additional Works (as defined in the contract

15   referred to above) to be constructed by KBID be integrated with the

16   Transferred Works and operated and maintained by the District under

17   the Operations Contract; and

18        WHEREAS, the District and KBID have entered into a contract

19   dated _____April 25_____, 1962__, wherein, among other things,

20   the District agreed to care for, operate, and maintain the Project Works;

21        NOW, THEREFORE, in consideration of the mutual and dependent

22   covenants herein contained it is agreed by the parties as follows:

23        1.  The District will grant to KBID such temporary possession

24   and control of Transferred Works as is necessary to enable their

25

2

002573
017725

1   modification in accordance with the terms of the Klamath Project

2   Extensions Contract.  Notwithstanding such grant, the District shall

3   remain responsible for the care, operation, and maintenance of such

4   Transferred Works under the terms and conditions provided in the

5   Operations Contract.

6        2.  Obligations of KBID stated in the Klamath Project Extensions

7   Contract with respect to care, operation, and maintenance of Project

8   Works are to be performed by the District.  Upon completion of con-

9   struction of the Project Works the District will accept the transfer

10  thereof for operation and maintenance and thereafter will care for,

11  operate, and maintain them as Transferred Works on the terms and con-

12  ditions provided in the Operations Contract.  The Project Works shall

13  be Transferred Works and transferred property within the meaning of

14  Articles 7 and 10, subdivision (c) of Article 13 and Article 21 of

15  the Operations Contract.

16       3.  The Klamath Project Extensions Contract is a contract within

17  the meaning of subdivision (c) of Article 13 of the Operations Contract

18  and the District will carry out to the satisfaction of the Secretary of

19  the Interior the obligations imposed therein upon the United States

20  insofar as they pertain to the carriage and delivery of surplus Klamath

21  Project water.

22       4.  Article 36 of the Operations Contract is hereby amended to

23  read as follows:

24

25

3

1       "36.  In connection with the performance of work

2  under this contract, the District agrees as follows:

3          "(a)  The District will not discriminate

4     against any employee or applicant for employment

5     because of race, creed, color, or national origin.

6     The District will take affirmative action to ensure

7     that applicants are employed, and that employees are

8     treated during employment, without regard to their

9     race, creed, color, or national origin.  Such action

10    shall include, but not be limited to, the following:

11    employment, upgrading, demotion or transfer; recruit-

12    ment or recruitment advertising; layoff or termination;

13    rates of pay or other forms of compensation; and selection

14    for training, including apprenticeship.  The District

15    agrees to post in conspicuous places, available to employees

16    and applicants for employment, notices to be provided by the

17    Contracting Officer setting forth the provisions of this

18    nondiscrimination clause.

19         "(b)  The District will, in all solicitations or

20    advertisements for employees placed by or on behalf of the

21    District, state that all qualified applicants will receive

22    consideration for employment without regard to race, creed,

23    color, or national origin.

24

25                              4

002575
017727

1        "(c)   The District will send to each labor union

2    or representative of workers with which it has a collective

3    bargaining agreement or other contract or understanding, a

4    notice, to be provided by the Contracting Officer, advising

5    the said labor union or workers' representative of the

6    District's commitments under this section, and shall post

7    copies of the notice in conspicuous places available to

8    employees and applicants for employment.

9        "(d)   The District will comply with all provisions

10    of Executive Order No. 10925 of March 6, 1961, and of the

11    rules, regulations, and relevant orders of the President's

12    Committee on Equal Employment Opportunity created thereby.

13        "(e)   The District will furnish all information and

14    reports required by Executive Order No. 10925 of March 6,

15    1961, and by the rules, regulations, and orders of the said

16    Committee, or pursuant thereto, and will permit access to

17    its books, records, and accounts by the Contracting Officer

18    and the Committee for purposes of investigation to ascertain

19    compliance with such rules, regulations, and orders.

20        "(f)   In the event of the District's noncompliance

21    with the nondiscrimination clauses of this contract or with

22    any of the said rules, regulations, or orders, this contract

23    may be cancelled in whole or in part and the District may be

24    declared ineligible for further government contracts in

25

002576
017728

1    accordance with procedures authorized in Executive Order No.

2    10925 of March 6, 1961, and such other sanctions may be imposed

3    and remedies invoked as provided in the said Executive Order or

4    by rule, regulation, or order of the President's Committee on

5    Equal Employment Opportunity, or as otherwise provided by law.

6         "(g)  The District will include the provisions of

7    the foregoing subdivisions (a) through (f) of this article in

8    every subcontract or purchase order unless exempted by rules,

9    regulations, or orders of the President's Committee on Equal

10   Employment Opportunity issued pursuant to section 303 of

11   Executive Order No. 10925 of March 6, 1961, so that such provi-

12   sions will be binding upon each subcontractor or vendor.  The

13   District will take such action with respect to any subcontract

14   or purchase order as the Contracting Officer may direct as a

15   means of enforcing such provisions, including sanctions for

16   noncompliance:  Provided, however, That in the event the

17   District becomes involved in, or is threatened with, litigation

18   with a subcontractor or vendor as a result of such direction by

19   the Contracting Officer, the District may request the United

20   States to enter into such litigation to protect the interests

21   of the United States."

22

23

24

25

6

1          5.  Except as herein modified the Operations Contract shall be

2    and remain in full force and effect as originally written and executed.

3            IN WITNESS WHEREOF, the parties hereto have executed this

4    contract as of the day and year first above written.

5

6    Approved as to Legal            THE UNITED STATES OF AMERICA
     Form and Sufficiency

7    /s/ H. T. Moss                  By /s/ H P Dugan
                                        Regional Director, Region 2
8        Attorney                      Bureau of Reclamation
     Department of Interior

9

10                                   KLAMATH IRRIGATION DISTRICT

11                                   By /s/ J. R. Ratliff
                                        President

12

13   (SEAL) Affixed

14   ATTEST:

15
     /s/ John L. Stewart Jr.
16   Secretary

17

18

19

20

21

22

23

24

25                                7

002578
017730

COPY:em

R E S O L U T I O N

RESOLVED, that proposed amendatory contract R.O. Draft 12/26/1961, Rev. W.O. 3/29/62, between the United States of America and the Klamath Irrigation District, be and the same is hereby approved and the President and Secretary be and they hereby are authorized to execute the same.

I, John L. Stewart, Jr., hereby certify that the foregoing is a full, true and correct copy of the Resolution duly adopted by the Board of Directors of the Klamath Irrigation District at a special meeting held April 25, 1962, with three of the three directors being present and voting.

/s/ John L. Stewart, Jr.

John L. Stewart, Jr., Secretary

SEAL AFFIXED

017731

Contract No.

11-29-54

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

AMENDATORY CONTRACT BETWEEN THE UNITED STATES OF AMERICA
AND THE KLAMATH IRRIGATION DISTRICT

Index

| Article No. | Title | Page No. |
|---|---|---|
| | Preamble | 1 |
| | Explanatory Recitals | 1 |
| 1 | Definitions | 2 |
| 2 | Scope of Contract | 4 |
| 3 | Indebtedness of District | 4 |
| 4 | Transferred Works Turned Over to District | 4 |
| 5 | Selection and Transfer of Property | 5 |
| 6 | Operation and Maintenance of Transferred Works | 6 |
| 7 | Keeping Transferred Works in Repair | 6 |
| 8 | Installation and Maintenance of Measuring Devices and Reporting of Data | 7 |
| 9 | Crop Census | 8 |
| 10 | Inspection of Transferred Property | 8 |
| 11 | Inspection of Books and Records | 9 |
| 12 | Operation and Maintenance of Reserved Works | 9 |
| 13 | Delivery of Water Supply and Assumption by District of Outstanding Contract Obligations of the United States | 10 |
| 14 | Delivery of Water to Tule Lake Lands | 13 |
| 15 | Water for Lands in Klamath Falls, Malin and Merrill | 15 |
| 16 | Charges to be Paid by the District | 15 |
| 17 | General Obligations of the District | 18 |
| 18 | District to Use All Powers to Collect Charges | 19 |
| 19 | Water Rental Agreements | 19 |
| 20 | Refusal of Water to District in Case of Default | 20 |
| 21 | Resumption of Management and Control in Event of Default | 20 |
| 22 | Penalty for Delinquency | 23 |
| 23 | Excess-Land Provisions | 24 |
| 24 | Reserve Fund | 24 |
| 25 | United States Held Harmless | 26 |
| 26 | United States Not Liable for Water Shortage | 26 |
| 27 | Uncontrollable Forces | 26 |

017732

| Article No. | Title | Page No. |
|---|---|---|
| 28 | Waste, Seepage and Return Flow | 27 |
| 29 | Assurance Relating to Validity of Contract | 27 |
| 30 | Notices | 28 |
| 31 | Changes in District Organization | 28 |
| 32 | Selection of Manager or Superintendent | 28 |
| 33 | Adjustment of Disputes | 29 |
| 34 | Rights Reserved under Section 3737, Revised Statutes | 30 |
| 35 | Termination of Contract | 30 |
| 36 | Discrimination Against Employees or Applicants for Employment Prohibited | 31 |
| 37 | Officials Not to Benefit | 31 |
| 38 | Assignment Limited--Successors and Assigns Obligated | 31 |

002580

017733

CERTIFIED COPY

THE BOARD OF SUPERVISORS of the Napa County Flood Control and Water Conservation District met Tuesday, April 24, 1962, at Ten Oclock A. M.

Present:  N. D. Clark, Chairman
Supervisors  Howard H. Dickenson
Julius Caiocca, Jr.

Absent:  Supervisors  Gordon Eby
Andrew G. Fagiani

Upon motion of Supervisor Dickenson, seconded by Supervisor Caiocca, a contract with the Department of the Interior and the Napa County Flood Control and Water Conservation District, for the purchase of water from March 1, 1962, through February 28, 1963, at a cost of $15.00 per acre foot, is approved, and the Chairman and Clerk authorized to execute the same.

AYES:  Dickenson, Caiocca and Clark
NOES:  None
ABSENT:  Eby and Fagiani

THE FOREGOING INSTRUMENT IS A CORRECT COPY OF THE ORIGINAL ON FILE IN THIS OFFICE

ATTEST _____ APR 25 1962 _____

C. S. SHIPPY
COUNTY CLERK AND EX OFFICIO CLERK OF THE BOARD OF SUPERVISORS OF THE COUNTY OF NAPA STATE OF CALIFORNIA

By _____ DEPUTY.

002581

017734

CONTRACT NO.

Regional Office Draft 8-1-54
(Revised W. O. 9-9-54)
Approved W. O. 9-17-54

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF RECLAMATION
Klamath Project, Oregon-California

AMENDATORY CONTRACT BETWEEN THE UNITED STATES OF AMERICA
AND THE KLAMATH IRRIGATION DISTRICT

THIS AMENDATORY CONTRACT, made this ____ day of November

1954, between THE UNITED STATES OF AMERICA, hereinafter called the

United States, acting through the Secretary of the Interior, pursuant to

the Federal reclamation laws, and the KLAMATH IRRIGATION DISTRICT,

organized and existing under and by virtue of the laws of the State of

Oregon, hereinafter called the District:

WITNESSETH, THAT:

EXPLANATORY RECITALS

WHEREAS, under authority of the Federal reclamation laws the

United States has constructed and continues to construct the irrigation

project in the States of Oregon and California, known as the Klamath

Project, consisting of facilities for storing water in Upper Klamath

Lake and Gerber Reservoir in Oregon, and Clear Lake Reservoir in

California, together with works for delivering irrigation water therefrom

to areas where it may be beneficially used; and

WHEREAS, the United States and the District, acting pursuant

to the Federal reclamation laws and the laws of the State of Oregon, have

previously entered into a contract dated July 6, 1918, as amended and

supplemented by contracts dated June 28, 1920, April 10, 1922, June 25,

1927, November 24, 1928, April 1, 1938, and June 2, 1950, for the repay-

ment of the costs of construction of certain of the Project works; and

002582

017735

WHEREAS, the District is obligated, among other things, to repay to the United States that part of the expenditures made by the United States in the construction of the Project which is properly allocable to the District; and

WHEREAS, the District, as the duly authorized representative of the water users within its geographic boundaries, desires to enter into an amendatory contract with the United States, which would provide for the District to take over the operation and maintenance of certain of the Project works;

NOW, THEREFORE, in consideration of the mutual and dependent covenants and stipulations herein contained, it is mutually agreed between the parties hereto as follows:

## DEFINITIONS

1. The following terms, whenever used in this contract, shall have the following respective meanings:

(a)  "District" shall mean the Klamath Irrigation District, except where indicated otherwise.

(b)  "Secretary" shall mean the Secretary of the Interior or his duly authorized representative.

(c)  "Federal reclamation laws" shall mean the Act of June 17, 1902 (32 Stat. 388), and all acts amendatory thereof or supplementary thereto.

(d)  "Reserved works" shall mean all Project works located outside the District boundaries but within Klamath County, Oregon, and

002583

Siskiyou and Modoc Counties, California, which contribute to the irriga-
tion, drainage or flood protection of the District lands but will continue
to be operated and maintained by the United States or by some agency
other than the District, under contract with the United States, plus the
following works located wholly or partly within the District:

    (i)  The entire "J" Canal and distribution system, including
the headworks and Lower Lost River Diversion Dam.

    (ii)  All buildings at the Project headquarters, except
those which may be transferred to the District under provisions
of Article 4(e) of this contract.

    (iii)  Lost River Diversion Dam and the Lost River Diversion
Channel, including all appurtenant control works.

    (iv)  The Project telephone system.

    (v)  Link River Dam.

    (vi)  Enterprise Hydroelectric Plant.

  (e)  "Transferred works" shall mean all of the irrigation
works set forth in Article 4 and such other irrigation works constructed
by the United States for the irrigation of the lands located within the
geographic boundaries of the District which upon agreement between the
United States Bureau of Reclamation and the District may hereafter be
transferred to the District for operation and maintenance.

  (f)  "Operation and maintenance costs" shall mean all costs
properly chargeable to operation and maintenance of the works in reference
to which the term is used, including, without limitation by reason of

002584

017737

this enumeration, the costs of replacements and betterments of such works or any part thereof.

## SCOPE OF CONTRACT

2.   This contract supplements the previous contracts enumerated herein between the United States and the District.   All provisions of such contracts not in conflict with this contract shall remain in full force and effect.

## INDEBTEDNESS OF DISTRICT

3.   The construction cost obligation of the District to the United States as established by previous contracts, or as said contracts may hereafter be amended, is not affected by this contract.

## TRANSFERRED WORKS TURNED OVER TO DISTRICT

4.   Effective January 1, 1955, there is transferred to the District for care and operation and maintenance the real and personal property listed below, used or useful for operative purposes of the Klamath Project, subject to the provisions of Article 5.   Title to said property shall remain in the United States except as provided in Article 5.

(a)   The entire Main or "A" Canal, and the "B", "C", "D", "E", "F" and "G" Canals, including the "C-G Cutoff," (but excluding the Enterprise Hydroelectric Plant) and all their related distribution systems;

(b)   The entire drainage system within the District, including the Melhase-Ryan drainage pumping plant and the "J" Canal North Side

4

002585

Parallel Drain and drainage works constructed pursuant to the agreement of November 24, 1928, as set forth in said agreement;

(c) All structures used in connection with the above canals, distribution and drainage works;

(d) The Adams and Miller Hill Pumping Plants;

(e) The residences, outbuildings, shops, warehouses, and office buildings designated by the District pursuant to the procedure set forth in Article 5 hereof;

(f) All equipment, records and supplies used in connection with the operation and maintenance of the transferred works which the United States desires to transfer with said works and which the District designates pursuant to the procedure set forth in Article 5 hereof.

### SELECTION AND TRANSFER OF PROPERTY

5. Prior to the time that the transferred works are turned over to the District for care and operation and maintenance as provided in Article 4 hereof, the Board of Directors of the District shall determine which, if any, it desires of the Klamath Project residences, outbuildings, shops, offices, warehouses, or other structures to be used in connection with the operation of the District but which are not integral parts of the irrigation and drainage systems, and what equipment, records and supplies it wishes to accept, pursuant to Article 4 hereof. Upon making such determination, the Board shall submit to the Secretary a list of those structures, equipment, records and supplies, whereupon such

5

017739

list shall be appended to and become part of this contract.  Upon the transfer to the District of the operation and maintenance of the works as provided in Article 4, the items on said list shall be transferred to the District for use in connection with the care and operation and maintenance of said transferred works.  Whenever, and to the extent, authorized by law, title to said structures, equipment, records and supplies shall be vested in the District.

### OPERATION AND MAINTENANCE OF TRANSFERRED WORKS

6.  The District accepts the care, operation, and maintenance of the transferred works and will care for, operate, and maintain the transferred works and deliver water therefrom in full compliance with the Federal reclamation laws as they now exist or hereafter may be amended, the regulations of the Secretary now in force or hereafter promulgated, and the terms of this contract and any other contract in force affecting the transferred works.

### KEEPING TRANSFERRED WORKS IN REPAIR

7.  (a)  No substantial change in any of the transferred works shall be made by the District without first obtaining the written consent of the Secretary.

(b)  The District shall promptly make any and all repairs to the transferred works which, in the opinion of the Secretary, are necessary for their proper preservation in as good condition as they were on the effective date of this contract.

6

002587

(c)  In case of neglect or failure of the District for a period of one (1) year to make such repairs, the United States may, at the option of the Secretary, take back the care, operation and maintenance of the transferred works as provided in Article 21 hereof, or may cause suitable repairs to be made and charge the cost thereof to the District, which charge the District shall pay as provided in Article 16.

(d)  In event of major disaster to, or failure of, the transferred works, or any part thereof, which results in damage of such severity or magnitude that immediate repairs to the transferred works are imperative, in the opinion of the Secretary, to protect against substantial hazard to life or property, and the District is then unable or unwilling to promptly accomplish such repairs, the United States may, at the option of the Secretary, immediately take and temporarily retain possession of the transferred works for such time as may be necessary to protect life and property and to prevent further damage to the transferred works.  The District shall pay to the United States, as provided in Article 16, the cost of any emergency repairs made during such period of temporary possession by the United States.

### INSTALLATION AND MAINTENANCE OF MEASURING DEVICES AND REPORTING OF DATA

8.  The District shall, at its expense, and in a manner satisfactory to the Secretary, maintain all water measuring and controlling devices and gages as have been constructed or installed by the United States or by the District in connection with the transferred works,

7

017741

collect the data from such devices and gages, and furnish the United

States with written reports of such data.  If the District at any time

fails to do so, the United States may replace or repair such devices

and collect such data at the expense of the District, which charge the

District shall pay in accordance with Article 16.

### CROP CENSUS

9.  The District shall, at its own expense, keep a reasonably

accurate record of all crops raised, including agricultural and live-

stock products produced on District lands, and furnish the Secretary

on or before December 31 of each year  a crop report, including the

aforesaid data, in a form prescribed by the Secretary.

### INSPECTION OF TRANSFERRED PROPERTY

10.  The Secretary shall cause to be made from time to time a

reasonable inspection of the transferred property to ascertain whether

the terms of this contract are being satisfactorily executed by the

District.  Such inspection may include examinations of the transferred

property and of the books, records, and papers of the District, together

with examinations in the office of the District of all contracts, papers,

plans, records and programs connected with the transferred property.

The actual expense of such inspection as found by the Secretary shall

be paid by the District to the United States as provided in Article 16,

provided that the maximum cost for which the District shall be obli-

gated for such inspection shall not exceed fifteen (15) man-days within

any period of three (3) consecutive years, plus actual travel and per

8

002589

diem expenses.  The foregoing limitation shall not apply to inspections
reasonably necessary to assure that repairs required pursuant to
Article 7 have been satisfactorily completed.  All inspections shall
be held to the minimum necessary to protect the interests of the United
States.

### INSPECTION OF BOOKS AND RECORDS

11.  Subject to applicable Federal laws and regulations, the proper
officers or agents of the District shall have full and free access at
all reasonable times to the Project account books and official records
of the Bureau of Reclamation, insofar as the same pertain to the matters
and things provided for in this contract, relating to the construction,
acquisition, care, operation and maintenance of the transferred property,
the status of individual accounts and the account of the District, and
payments of operation and maintenance and construction charges, with the
right at any time during office hours to make copies thereof, and the
proper representative of the United States shall have similar rights in
respect to the account books and records of the District.

### OPERATION AND MAINTENANCE OF RESERVED WORKS

12.  The reserved works shall be operated and maintained by the
United States or by some other agency under contract with the United
States.  The District will pay to the United States its appropriate
share of the cost of operating and maintaining the reserved works as
provided in Article 16.

9

## DELIVERY OF WATER SUPPLY AND ASSUMPTION BY DISTRICT OF
## OUTSTANDING CONTRACT OBLIGATIONS OF THE UNITED STATES

13.  (a)  The District shall take the water supply for the lands
within the limits of the District, as the same are now or hereafter
defined, to be served by or through the transferred works, at the head-
works of the main canal and other delivery locations now in existence
or that may be constructed in the future, and shall distribute the
same to the water users entitled thereto.

(b)  The District hereby assumes and agrees to carry out,
during the term of this contract, to the satisfaction of the Secretary,
all the obligations imposed upon the United States by the contracts
listed on Exhibit "A", or any amendments or supplements thereto,
appended to and made a part of this contract, for the carriage and
delivery of water, in force as of the effective date of this agreement,
insofar as said contracts relate to the delivery and carriage of
irrigation and drainage water through the transferred works.

(c)  Upon execution by the United States of future water
right contracts providing for carriage and delivery of irrigation and
drainage water through the transferred works to serve the lands of
the Pumping Division of the Klamath Project, or to serve the lands of
individual water users which are outside the District but so located
that they can be served through the transferred works, the District
shall be notified thereof by the Secretary and the District shall
thereupon assume the obligation of carriage and delivery thereunder the

10

017744

same as if said contracts had been in existence at the time of execution hereof: Provided, however, That further contracts shall not be entered into by the United States for carriage or delivery of irrigation water through the transferred works which will require additions to or enlargements of the same unless the expense of said additions or enlargements is borne by the United States or by the contractors.

(d)  During the life of this agreement the District shall be entitled to collect and retain for its own use, but the United States assumes no responsibility whatever for the payment or collection thereof, all revenues payable to the United States under the hereinabove mentioned contracts as annual operation and maintenance charges.  The District shall have the right to withhold delivery of water to any contractor that fails to pay such charges in the amounts and at the time provided in its contract with the United States.  All other provisions of said contracts shall remain unaffected hereby.  The District shall not be responsible for collection of any revenues due the United States under said contracts which became due and payable before the effective date of this contract.

(e)  The District shall deliver water to District lands at the points the United States is now delivering water.  For lands outside the District boundaries, and served through the transferred works, water shall be delivered in the quantities, at the times and at the points of diversion from the transferred works as required from time to time by

11

002592

017745

contractors that have executed contracts with the United States in such manner as to meet obligations which the United States has assumed under said contracts.  Responsibilities of the District for delivery of water outside its boundaries shall be limited to the contracts listed on Exhibit "A" hereto and such other contracts as the United States may henceforth execute with others for delivery of water through the transferred works, provided that the terms of such future contracts with others are not contrary to any of the terms of this contract.

(f)  The District agrees that it will make no water deliveries under contracts mentioned in this article at times when notified by the Secretary that the contracting parties are not entitled to the delivery of irrigation water because of nonpayment of charges due the United States, or for other reasons.

(g)  Within thirty (30) days after the effective date of this contract, the United States shall furnish to the District an itemized statement showing the status of fund accounts with the United States for the District, and for other contractors that receive water through the transferred works, and the status of stores and equipment accounts with the United States for the District.  This statement will include the following items:

(i)  Unexpended balances of funds advanced for operation and maintenance work, itemized by each contractor.

(ii)  Book value of unused materials and supplies purchased with advanced funds.

002593

017746

(iii)  Undepreciated value (book value at date of transfer)
of equipment purchased with advanced funds.

If a credit balance exists in the fund account of the District, the
amount of such balance will be refunded in accordance with Article 24.
If a credit balance exists in the fund account of any other contractor,
the United States will retain that balance on its books to be applied
against the next succeeding payment or payments becoming due on
obligations of the Klamath Irrigation District to the United States.
In consideration of the total of all such credits being allowed the
District, the District will likewise allow corresponding credits to
the other contractors on its subsequent billings to those respective
contractors.  If a debit balance exists in the account of the District
with the United States, the District shall pay to the United States the
amount due on its own account within ninety (90) days after receipt of
statement.  Debit balances existing in the accounts of other contractors
will be collected by the United States.

## DELIVERY OF WATER TO TULE LAKE LANDS

14.  (a)  The United States retains for use in irrigating non-
district lands, and will continue to maintain and operate, or will
contract with another agency to maintain and operate, (1) the diversion
dam and appurtenant works on Lost River at the heading of the "J" Canal,
and (2) the "J" Canal, and the Project buildings at the headworks
thereof, and laterals leading therefrom, and (3) the drainage system

002594

below the "J" Canal as shown on map entitled Exhibit "B" which is appended to and made a part of this contract.  The United States, or another agency acting under contract for the United States, will deliver irrigation water to the Tule Lake lands within the boundaries of the Klamath Irrigation District served by the said "J" Canal, lateral and drainage systems.  The United States will charge the District annually for such service the amount per acre that is charged the Tule Lake lands in California served from the "J" Canal for operation and maintenance, to be paid to the United States in the manner stated in Article 16 hereof.

(b)  The District shall maintain and operate for the United States the irrigation and drainage works serving lands lying between the "D" and "J" Canals and above the "D" Canal in California, as shown on map entitled Exhibit "B", and will deliver irrigation water through the "D" Canal to such of those lands in California served from the "D" Canal, as may be designated by the Secretary.  For gravity delivery of water to lands which were served by the United States prior to the effective date of this contract, the District shall charge the United States annually the amount per acre of land irrigated that is charged to lands within the District in the State of Oregon for operation and maintenance, and the United States will credit said amount to the District annually upon any payments due hereunder, as provided in Article 16.  For future delivery of water to additional lands not

017748

previously served, the District shall charge such amount per acre as may be agreed upon by future supplement to this contract.

### WATER FOR LANDS IN KLAMATH FALLS, MALIN AND MERRILL

15.   The District shall deliver for use on non-district lands within or adjacent to the District, including but not limited to those within or near the corporate limits of the towns of Klamath Falls, Malin, and Merrill, the water supply which said lands are entitled to receive under existing water rental contracts, under water right applications of various individuals, and under public notices issued by the Secretary, as listed in Exhibit "C" attached to and made a part hereof, or under future public notices issued by the Secretary.  The District shall likewise deliver water to any of said lands which may hereafter contract with the United States for a water supply.  Water shall be delivered at the respective points where now received, or as may be agreed upon between the District and such water users.  The District shall be entitled to collect and retain for its own use all revenues payable for such deliveries, in the same manner as for deliveries to other contractors under the provisions of Article 13 hereof and shall be entitled to withhold delivery of water if charges are not paid when due.

### CHARGES TO BE PAID BY THE DISTRICT

16.   (a)  On or before February 1 of each calendar year during the term of this contract, the United States shall furnish to the District an itemized estimate of all costs expected to be incurred by the United

002596

States under the provisions of this contract during that calendar year which are properly chargeable to the District and a statement of the differences between estimated and actual costs for the previous calendar year, with appropriate charges or credits to adjust the previous year's estimate to the total of actual costs for that previous year. The District shall pay to the United States the total of such estimated costs for the current calendar year, as adjusted by the reconciliation of actual and estimated costs for the previous calendar year, within sixty (60) days after receipt of said estimate and statement. Each such annual estimate and statement shall list separately the following types of costs:

(i) The estimated annual general expense, as determined by the Secretary, to be incurred by the United States and apportioned to the Main and Pumping Divisions of the Klamath Project. This estimate shall be itemized by office and by activity but shall not include the costs itemized under other subdivisions of this article. Such costs shall not exceed Five Thousand Dollars ($5,000) per year during the first 5-year period following the transfer of operation and maintenance to the District. At the end of said 5-year period and at the end of other appropriate periods throughout the remainder of the term of this contract the Secretary shall analyze the ser- vices required to be performed by the United States, and upon the basis of such analysis will establish a similar limit of expendi- ture for each such period in the light of the then general cost index.

002597

(ii)  Estimated annual costs of any bookkeeping, accounting, engineering, legal, drafting, clerical or other technical or administrative services which the District has specifically requested from the United States in writing, or which are furnished by the United States pursuant to some mutual agreement in writing, which costs shall be itemized for each type of service.

(iii)  An equitable proportion of the estimated annual costs of operating and maintaining the reserved works, except for the charges provided in subdivision (vii) hereof, as determined by the Secretary.  The estimate for these costs shall show the basis on which total costs for operating and maintaining the reserved works are allocated between the District and other agencies.

(iv)  Estimated cost of repairs to the transferred works, if any, expected to be made by the United States under the provisions of Article 7 hereof.

(v)  Estimated cost of installations, repairs, or maintenance by the United States of measuring and controlling devices and gages, and collection of data, if any, expected to be performed by the United States under the provisions of Article 8 hereof.

(vi)  Estimated cost of all inspections expected to be performed by the United States under the provisions of Article 10 hereof.

(vii)  Estimated water rental charges or estimated costs of operation and maintenance for lands within the District supplied with water from the "J" Canal, in accordance with the provisions of Article 14 hereof.

17

017751

(b)  The District shall pay the United States any actual costs in excess of the previous year's estimate for work performed or services furnished by the United States during that calendar year under provisions of this contract, itemized by each of the preceding subdivisions (i) through (vii) of this article.

(c)  The District shall be credited for any amounts by which the actual costs of work performed or services furnished by the United States during the previous calendar year under provisions of this contract were less than the amounts for such work shown in the previous year's estimate, itemized by subdivisions (i) through (vii) of this article.

(d)  The District shall be credited for operation and mainte-nance charges due the District on lands in California served from the "D" Canal by the District, in accordance with Article 14 hereof.

### GENERAL OBLIGATIONS OF THE DISTRICT

17.  The obligations of the District under this contract shall be considered general repayment obligations and the District agrees to pay to the United States such obligations according to the terms stated in this contract, notwithstanding the individual default in payment by any of the individual water users of assessments or other charges.  Not-withstanding any provisions of this contract, the United States reserves the right to pursue any and all remedies which it may have against the District for default in any payment due under the terms of this contract or under the terms of any contract which the District may have with the United States.

002599

017752

## DISTRICT TO USE ALL POWERS TO COLLECT CHARGES

18.  (a)  The District agrees that it will cause to be made and collected all necessary assessments and charges to cover costs apportioned to it and will use all the authority and resources of the District including, without limitation by reason of this enumeration, its taxing power, the power to create liens in connection with its taxing power, and the power to withhold delivery of water, to meet the obligations of the District to the United States under this contract in full on or before the day such payments become due, and to meet the District's other obligations under this contract.  The District is hereby granted the power to withhold delivery of water from any water users receiving water from the transferred works whose payments to the District are in arrears.

(b)  The District shall make each year a reasonable estimate of probable delinquencies in collections based on past experience, and shall levy assessments or other charges sufficiently large against the lands in the District to meet the requirements stated in (a) of this article, notwithstanding any individual delinquency which may occur in the payment to the District of any District assessments, or other charges.

## WATER RENTAL AGREEMENTS

19.  The District may enter into water rental agreements, in a form approved by the Secretary, providing for the delivery of water from the transferred works to water users other than those holding water rights or those having executed contracts with the United States or the

002600

017753

District.  The charges to be made for such water rentals shall be those stated in Public Notices of Water Charges for the Klamath Project issued by the Bureau of Reclamation:  Provided, That if issuance of such Public Notices by the Bureau be discontinued, the charges to be made in water rental agreements by the District each calendar year shall be established in advance by the Board of Directors of the District.  The District shall collect and retain for its own uses all revenues from water rental agreements executed after the effective date of this contract.  Delivery of water to holders of water rental agreements shall be subordinate to deliveries to other water users, and the rental agreements shall so state.

### REFUSAL OF WATER TO DISTRICT IN CASE OF DEFAULT

20.  The United States reserves the right (in addition to the rights elsewhere herein reserved to the United States) to refuse to deliver water to the District in the event of the default of the District for a period of more than twelve (12) months in any payments due the United States under this contract.  The provisions of this article are not exclusive, and shall not in any manner hinder the United States from exercising any other remedy to enforce collection of any amount due the United States hereunder.

### RESUMPTION OF MANAGEMENT AND CONTROL IN EVENT OF DEFAULT

21.  (a)  In event of default by the District for a period of one (1) year on any payment to the United States provided by this contract, or failure of the District to perform necessary repairs for a period of one (1)

002601

year as provided in Article 7, or of any other violation by the District
of the terms of this contract, the United States may, at the option of
the Secretary, resume operation and maintenance of the transferred works,
or any part thereof, for the purpose of enforcing the provisions of this
contract.

(b)   Prior to resuming operation and maintenance, the Secretary
shall give the District written notice of his intent to exercise such
option, which notice shall inform the District of the specific provisions
of this contract which have been violated or the obligations that are in
default, shall describe the property and works to be returned to the
custody of the United States and shall name the date on which return to
the United States shall be effected, which date shall be not less than
sixty (60) days after the date of notice sent to the District.   The District
agrees that if it fails to make payment of all sums in default, or to
initiate measures that will correct the violations of contract provisions,
prior to the date set by the Secretary in accordance with this article,
it will upon that date relinquish to the United States the custody of
Project works as specified by the Secretary, together with all equipment,
records and supplies appurtenant to the operation and maintenance thereof.

(c)   In event of resumption by the United States of the
operation and maintenance of any or all of the transferred works, the
United States shall, within ten (10) days after taking custody of such
works, furnish to the District an estimate of cost for operation and
maintenance of such works from the date of transfer of custody to the

21.

017755

United States until the end of the calendar year. Within thirty (30) days after receipt of such estimate, the District shall pay to the United States the amount thereof. If the amount so paid to the United States is insufficient to pay the costs of operation and maintenance to the end of the calendar year, the United States shall notify the District, within thirty (30) days after the end of such year, of the amount required to pay the balance of such costs and the District shall within ten (10) days after receipt of such notice pay such amount. Any balance of funds advanced by the District in excess of the amount necessary to pay such costs to the end of the calendar year shall be returned to the District or, at the option of the United States, credited to operation and maintenance costs for the following year.

(d)   Operation and maintenance costs for any subsequent years in which the United States retains the operation and maintenance of said works shall be paid by the District in the manner and at the times provided in the existing contracts between the United States and the District and in contracts with other organizations and with individuals involved in operations under this contract.

(e)   Any resumption of the management and control of said property and works by the United States, as herein provided for, shall not relieve the District of its obligations under this contract.

(f)   Notwithstanding any such resumption of operation and maintenance by the United States  all  or any part of the Project works may, pursuant to this contract, at the election of the Secretary, be

22

002603

017756

retransferred by the United States to the District for operation and maintenance in accordance with the terms of this contract by giving sixty (60) days' written notice to the District of such election, of the property and works to be retransferred, and of the effective date of such retransfer.  The District agrees to accept the retransfer of any property and works on the effective date of such retransfer, as specified in any such written notice.

(g)  It is agreed that in the event the United States, its officers or employees, resume the operation and maintenance of the Project works, or any part thereof, as provided in this contract, neither the United States, nor its officers or employees, shall be liable for any damages resulting directly or indirectly from any such resumption, and the District agrees to hold the United States, its officers and employees, harmless from any and all claims for such damage.

<u>PENALTY FOR DELINQUENCY</u>

22.  In the event the District defaults in the payment of any amount due the United States as provided in this contract, there shall be added to the amount unpaid a penalty of one-half (1/2) of one (1) per cent on the day following the due date, and there shall be added a like penalty of one-half (1/2) of one (1) per cent of the remaining unpaid amount on the first day of each calendar month thereafter so long as such default shall continue.

002604

017757

## EXCESS-LAND PROVISIONS

23.   Pursuant to the provisions of the Federal reclamation laws, water supplied to the District under the terms of this contract shall not be delivered to more than one hundred sixty (160) irrigable acres in the ownership of any one person or corporation, except that, if irrigable lands in excess thereof have been acquired by foreclosure or other process of law, by conveyance in satisfaction of mortgages, by inheritance or devise, water therefor may be furnished temporarily for a period not to exceed two (2) years from the effective date of such acquisition and except that delivery may be made to lands held in excess of this limitation if the excess lands are covered by a recordable contract made in accordance with the provisions of Section 46 of the Act of May 25, 1926 (44 Stat. 649). These limitations shall cease to operate when the construction charge obligation allocable to such land has been paid in full to the United States.

## RESERVE FUND

24.   (a)  Commencing with the calendar year 1955, and continuing until all construction charge obligations to be paid to the United States are paid in full, the District shall include in the annual operation and maintenance assessments to be collected from its water users, amounts sufficient to accumulate and maintain a reserve fund which shall be available only for the purposes and in the circumstances hereinafter set forth.

24

002605

017758

(b)  Said reserve fund shall be accumulated as follows:
The balance of advance operation and maintenance funds held by the
United States for the credit of the District at the time of transfer
of operation and maintenance to the District shall be refunded to the
District and deposited in the reserve fund and become a part thereof;
in addition thereto the District shall, commencing with the calendar
year 1955, and continuing until all construction charge obligations
to be paid to the United States are paid in full, include in the
annual operation and maintenance assessments to be collected from
its water users amounts sufficient to collect annually not less than
Five Thousand Dollars ($5,000) to be deposited in said reserve fund
until the reserve fund thus accumulated shall total Seventy-five Thousand
Dollars ($75,000), which total sum shall be maintained thereafter;
Provided, That upon the depletion of the reserve fund for any of the
purposes hereinafter set forth, the District shall not be required to
replenish said reserve fund by an amount in excess of Five Thousand
Dollars ($5,000) in any one year.

(c)  The reserve fund shall be used only for the purposes of
meeting large, unforeseen costs of operation and maintenance, repairs
and replacements of works transferred hereunder and for ordinary
operation and maintenance costs when the District is otherwise unable
to meet such costs.

(d)  Such funds shall be maintained by the District apart
from other of its funds and shall be deposited with such depository

002606