KRISTEN L. BOYLES (CSBA # 158450)
PATTI A. GOLDMAN (WSBA # 24426)
*[Admitted Pro Hac Vice]*
ASHLEY BENNETT (WSBA # 53748)
*[Admitted Pro Hac Vice]*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104
Ph:  (206) 343-7340
kboyles@earthjustice.org
pgoldman@earthjustice.org
abennett@earthjustice.org

*Attorneys for Plaintiffs Pacific Coast Federation
of Fishermen's Associations, Institute for Fisheries
Resources, and Yurok Tribe*

AMY CORDALIS (CSBA # 321257)
Yurok Tribe
190 Klamath Blvd.
P.O. BOX 1027
Klamath, CA 95548
Ph:  (707) 482-1350
acordalis@yuroktribe.nsn.us

DANIEL CORDALIS (CSBA #321722)
Cordalis Law, P.C.
2910 Springer Drive
McKinleyville, CA 95519
Ph: (303) 717-4618
dcordalislaw@gmail.com

*Attorneys for Plaintiff Yurok Tribe*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES, <br><br> Plaintiffs, <br><br> v. | Case No. 3:19-cv-04405-WHO <br> Related Cases: No. C16-cv-06863-WHO <br> No. C16-cv-04294-WHO <br><br> MEMORANDUM IN SUPPORT OF MOTION TO LIFT STAY AND ENTER TEMPORARY RESTRAINING ORDER |

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   U.S. BUREAU OF RECLAMATION, and          **HEARING REQUESTED PRIOR TO**
2   NATIONAL MARINE FISHERIES SERVICE,       **MAY 15, 2020**

3                           Defendants,
    and
4
    KLAMATH WATER USERS ASSOCIATION,
5
6                           Defendant-Intervenor.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                          *Earthjustice*
                                                     *810 Third Ave., Suite 610*
                                                     *Seattle, WA  98104-1711*
                                                     *(206) 343-7340*

TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................4

ARGUMENT ....................................................................................................8

I. THE STAY SHOULD BE LIFTED BECAUSE OF THE BUREAU'S
DEVIATION FROM THE INTERIM OPERATIONS PLAN. ..............8

II. A TEMPORARY RESTRAINING ORDER SHOULD ISSUE. ...........9

A. The Tribe Is Likely To Succeed On The Merits. .........................9

1. The Adverse Modification Analysis Is Based On Erroneous
Data. ............................................................................10

2. The Adverse Modification Determination Fails to Confront
the Pervasive Violations of NMFS's Habitat Conservation
Standard. ......................................................................11

3. The Tribe Is Likely To Succeed On Its Claim That
Reducing Harm Is Not The Same As Avoiding Jeopardy. ............13

4. The Bureau Is Failing To Comply With ESA Section 7................15

B. The Tribe Has Demonstrated Irreparable Harm Is Likely. ......................15

1. The Bureau's Operation of the Klamath Project Is Causing
Habitat Loss and Disease Outbreaks................................................16

2. Chinook Will Suffer Irreparable Harm Unless Additional
Water Is Available For Spring Flows. ............................................18

3. The Requested Temporary Restraining Order Will Also
Avoid Irreparable Harm to Endangered Suckers. .........................19

4. The Harm to Salmon Causes Irreparable Harm to Plaintiffs. ........21

CONCLUSION.....................................................................................................23

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER          - i -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*ALCOA v. BPA,*
　175 F.3d 1156 (9th Cir. 1999) ...................................................................................15

*Alliance for the Wild Rockies v. Cottrell,*
　632 F.3d 1127 (9th Cir. 2011) ....................................................................................9

*Baley v. United States,*
　942 F.3d 1312 (Fed. Cir. 2019).................................................................................19

*Blake v. Arnett,*
　663 F.2d 906 (9th Cir. 1981) ....................................................................................21

*Cottonwood Envtl. Law Ctr. v. Forest Serv.,*
　789 F.3d 1075 (9th Cir. 2015) ....................................................................................9

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
　698 F.3d 1101 (9th Cir. 2012) ..................................................................................15

*Idaho Dep't of Fish & Game v. NMFS,*
　850 F. Supp. 886 (D. Or. 1994), *vacated as moot,* 56 F.3d 1071 (9th Cir.
　1995) ...........................................................................................................................14

*KWUA v. Patterson,*
　204 F.3d 1206 (9th Cir. 1999) ..................................................................................19

*Nat'l Wildlife Fed'n v. NMFS,*
　886 F.3d 803 (9th Cir. 2018) ..........................................................................9, 14, 15

*NRDC v. EPA,*
　735 F.3d 873 (9th 2013)............................................................................................12

*NRDC v. Forest Serv.,*
　421 F.3d 797 (9th Cir. 2005) ..............................................................................11, 12

*Nw. Envtl. Advocates v. EPA,*
　855 F. Supp. 2d 1199 (D. Or. 2012) .........................................................................14

*PCFFA v. BOR,*
　426 F.3d 1082 (9th Cir. 2005) ..................................................................................13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
　240 F.3d 832 (9th Cir. 2001) ......................................................................................9

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER          - ii -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ................................................................................14, 15

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................9

*Yurok Tribe v. Bureau of Reclamation*,
    231 F. Supp. 3d 450 (N.D. Cal. 2017) ........................................4, 5, 17, 19, 21, 22

**Regulations**

50 C.F.R. § 402.02 ................................................................................................14

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                - iii -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

INTRODUCTION

Plaintiffs Yurok Tribe, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Resources (hereinafter "Yurok Tribe" or "Tribe") submit this memorandum in support of their motion asking the Court to lift the stipulated stay, reinstate their motion for a preliminary injunction, and issue a temporary restraining order.  Plaintiffs request a hearing on this motion on Thursday, May 14, 2020 or Friday, May 15, 2020, in light of the irreparable harm plaintiffs will face if the reduction of Klamath River flows is not halted.  The hearing will be held remotely.

Yurok Tribe asks the Court to issue the following relief:

1. Lift the stipulated stay of litigation entered by the Court on March 27, 2020 (ECF 908), because defendant Bureau of Reclamation ("Bureau") is deviating from and not implementing the 2020-2022 Interim Klamath Project Operations Plan ("Interim Plan") that formed the basis for the Stipulated Stay.  The Bureau's actions provide grounds to lift the stay.  Stipulation ¶¶ 4, 6.  Pursuant to ¶ 8 of the Stipulation, the parties held a meet-and-confer meeting on May 13, 2020, which did not resolve their disagreement.

2. Reinstate Yurok Tribe's motion for a preliminary injunction as modified (ECF 27 & 48), which the Tribe had filed to prevent irreparable harm from inadequate river flows to Southern Oregon/Northern California Coast ("SONCC") Coho Salmon, a species protected under the Endangered Species Act ("ESA").  The motion sought an additional 50,000 acre-feet for river flows, but the Tribe is now seeking less water, a total of 30,000 acre-feet for the 2020 water year to remedy to the following two shortfalls that will cause irreparable harm.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER          - 1 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

a.  First, the Tribe is seeking 23,000 acre-feet in augmented flows to provide habitat for and reduce disease in salmon.  The Interim Plan, developed to resolve the preliminary injunction motion and avoid further litigation over the 2019 biological opinion, provided 40,000 acre-feet in augmented flows in May-June.  While the Tribe does not believe the amount of water allocated to the river under the Interim Plan is sufficient to satisfy the needs of listed salmon, that Plan provided an additional 40,000 acre-feet for desperately needed additional flows in May and June.  The 40,000 acre-feet consisted of 23,000 acre feet from the agricultural allocation and 17,000 acre-feet from Upper Klamath Lake.  The Bureau allocated the 40,000 acre-feet based on April 1, 2020 forecasts in accordance with the Interim Plan, but it has since decided not to provide the 40,000 acre-feet in augmented flows.  Declaration of Vice Chairman Frankie Myers ¶ 9 (May, 13, 2020).  The Tribe asks the Court to order the Bureau to provide 23,000 of the 40,000 acre-feet of the Interim Plan's augmented flows this year, leaving the other 17,000 acre-feet in Upper Klamath Lake to meet the needs of endangered suckers.  The Interim Plan will govern augmented flow allocations in the 2021 and 2022 water years.

b.  Separately, the Bureau has renounced its commitment in the 2019-2024 Klamath Project Operations Plan (2019 Plan)[1] to provide an additional

---

[1] In the 2019 consultation, the Bureau developed a proposed action for 2019-2024 Klamath Project Operations Plan, and defendant National Marine Fisheries Service issued a biological opinion 2019 signing off on that plan with some modifications that had been made during the consultation.  The 2020 Interim Plan required the Bureau to implement the 2019-2024 Plan approved in the 2019 biological opinion ("2019 Plan"), plus the 2020 Interim Plan's augmented

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 2 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

7,000 acre-feet for river flows for the Yurok Tribe's ceremonial and culturally important Boat Dance later in the water year.  Vice Chairman Myers Decl. ¶¶ 2-8 (describing the deep cultural and spiritual importance of the Boat Dance to the Yurok).[2]  The Tribe asks the Court to order the Bureau to restore the separate 7,000 acre-feet of water that had been set aside in accordance with the 2019 Plan for the Yurok Tribe's Boat Dance this year.

Together, these measures will: (1) restore some, but not all, of the flow allocated to the river under the Interim Plan; and (2) remedy the Bureau's violation of the 2019 Plan, which allocated 7,000 acre-feet for the Yurok Tribe's Boat Dance this year.

3.  Enter a temporary restraining order directing the Bureau to resume augmentation flows that the Bureau began cutting off on Monday evening May 11, 2020. Specifically, the Tribe asks the Court to order the Bureau to provide augmented flows to ensure that the daily average Klamath river flows at Iron Gate Dam are the sum of the flows as calculated in the 2019 biological opinion without the 2020 Interim Plan plus an additional 390 cubic feet per second.  All other provisions of the 2019 Plan and biological opinion would continue to apply.  The Bureau had been providing such augmentation flows based on technical staff recommendations, but started cutting off the flows on May 11, 2020 and they will

flow requirements.

[2] Long before the 2020 Interim Plan, the Bureau has set aside 7,000 acre-feet to be used for the Yurok Tribe's biennial ceremonial Boat Dance, and the Bureau continued this practice in making allocations for the 2020 water year.  Inexplicably, the Bureau has now indicated it is unwilling to commit to providing that 7,000 acre-feet allocation for the Boat Dance.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 3 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

cease on May 14, 2020, if the cut-off and ramp-down continues.  The temporary restraining order would remain in place until this Court decides the motion for a preliminary injunction or the additional flows have reached a total water volume of 23,000 acre-feet, including the additional flow volume released between May 1 and May 14.

## BACKGROUND

This Court is familiar with the controversy over inadequate flows for young salmon in the Klamath River.  The Tribe's motion for a preliminary injunction describes the 1997 listing; the worsening condition of the listed Coho salmon due to water withdrawals and drought conditions; the disease infections and mortality in recent years from a parasite known as *Ceratanova shasta* ("*C. shasta*"); this Court's 2017 decision requiring the Bureau to reinitiate formal consultation on Klamath Project Operations when infection rates exceeded the incidental take limit established in the 2013 biological opinion, *Yurok Tribe v. Bureau of Reclamation*, 231 F. Supp. 3d 450, 484-85 (N.D. Cal. 2017) ("*Yurok I*"); and this Court's 2017 injunctions requiring, during the reinitiated consultation process, (1) flushing flows to prevent *C. shasta* outbreaks, and (2) emergency dilution flows if infections exceeded certain thresholds.  ECF 27.

On March 29, 2019, the National Marine Fisheries Service ("NMFS") issued the biological opinion on the 2019 Plan; it is that biological opinion that is challenged in this case. The 2019 Plan increased Upper Klamath Lake levels for endangered suckers, established minimum river flows for salmon, and provided surface flushing flows for Coho salmon in most water years.  NMFS, Biological Opinion for Klamath Project Operations from 2019 through 2024, at 41-42 (ECF 141-1) ("2019 biological opinion" or "2019 BiOp") (NMFS AR 1).  The Plan provided some additional water to the Environmental Water Account ("EWA"), which is dedicated to Klamath River flows.  Using that water, the Plan would provide surface flushing

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                   - 4 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

flows that meet the 2017 injunction's parameters in most years, and particularly in below-to-average water years.  However, the Plan reduced May and June flows to lower than those provided under the previous 2013 biological opinion; these lowered flows would regularly provide less than the amount of available rearing habitat NMFS has deemed necessary for salmon conservation.  2019 BiOp at 146-50, 155, 160.

The first year under the 2019 Plan was an average to above-average water year, yet the Bureau's management of the Project under the Plan led to river flows at near drought-level, leading to inadequate rearing habitat and severe disease outbreaks in May 2019.  *C. shasta* spore counts far exceeded the trigger in the 2017 injunction for emergency dilution flows, and the prevalence of infection of *C. shasta* in sampled fish exceeded 80% in the first three weeks of May, comparable to the infection rates that triggered the obligation to reinitiate consultation in *Yurok I*, and higher than the alternative trigger for dilution flows in the 2017 injunction.  *See* Decl. of Michael Belchik ¶¶ 8-9 (Oct. 17, 2019) (ECF 27-4).

Yurok Tribe commenced this case on July 31, 2019 (ECF 1), amended the complaint on September 30, 2019 (ECF 17), and moved for a preliminary injunction on October 18, 2019 (ECF 27).  The motion, as modified, asked the Court to require the Bureau to provide an additional 50,000 acre-feet of water in the EWA.[3]

Following the filing of the preliminary injunction motion, the Bureau and NMFS acknowledged that the 2019 biological opinion relied on erroneous data in assessing whether the

---

[3] Originally, the motion asked the Court to order the Bureau to operate the Klamath Project in 2020 under the flow regime embodied in the predecessor 2013 biological opinion, plus the surface flushing and emergency dilution flows required in *Yurok I*.  After the federal defendants and defendant-intervenor Klamath Water Users Association ("KWUA") objected to reverting to the 2013 biological opinion, the Yurok Tribe modified the injunction request to use the 2019 biological opinion and Plan as the baseline and to seek the additional 50,000 acre-feet in flows.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 5 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7350*

river flows would provide sufficient habitat for salmon rearing.  The Bureau requested

reinitiation of formal consultation, and NMFS and the Fish and Wildlife Service ("FWS"), which

has jurisdiction over endangered fish in the Upper Klamath Lake, agreed to the reinitiated

consultation.  NMFS AR D-12921, D-12923.  The agencies pursued an expedited consultation

with the goal of completing it before the April 1, 2020 water allocation.

Concurrently, the parties engaged in settlement negotiations that led the Bureau to adopt

the Interim Plan to govern Klamath Project operations through September 2022, and

reinvigorated a collaborative process for developing the next Klamath Project operations plan.

Stipulation at 4 (ECF 908).  In reliance on the Interim Plan, the Tribe entered into the Stipulation

staying this case and withdrew the preliminary injunction motion.

The 2020 Interim Plan built on the 2019 Plan, which already provided for surface

flushing flows in most years and allocated 7,000 acre-feet to the river for the Yurok Tribe's

biennial Boat Dance.  In addition to continued implementation of the 2019 Plan, the Interim Plan

provided that, under certain April 1 forecasted water conditions, the Bureau would add 40,000

acre-feet to the EWA to augment May and June flows.  ECF 907-2, at 2.  The 40,000 acre-feet

would be comprised of 23,000 acre-feet from the Klamath Project supply (*i.e.,* water that would

otherwise be in the irrigation allocation) and 17,000 acre-feet from Upper Klamath Lake.  *Id.*

On April 13, 2020, NMFS concurred with the Bureau's conclusion that the Interim Plan

was "expected to provide additional habitat availability for SONCC coho salmon which would

contribute towards meeting the habitat conservation standard and potentially reduce disease risk

for this species."  NMFS Concurrence Letter at 1-2 (Apr. 13, 2020) (Exh. 4).[4]  NMFS supplied

---

[4] Exhibits cited in this memorandum are attached to the Declaration of Patti Goldman (May 13, 2020), unless associated with a prior ECF filing.

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

supporting analysis that the Interim Plan would reduce disease risk, improve habitat availability, and reduce water temperatures, which, in turn, would improve rearing and outmigrating conditions for juvenile Coho and Chinook salmon and benefit endangered Southern Resident Killer Whales.

In accordance with the Interim Plan, the Bureau added 40,000 acre-feet to the EWA for augmented May and June flows based on the forecasted hydrologic conditions on April 1, 2020. And as required by the 2019 Plan, the Bureau included 7,000 acre-feet for the Yurok Tribe's Boat Dance in its 2020 annual operations plan. 2020 Annual Klamath Project Operations Plan at 1-2 (Apr. 2020) (Exh. 6).

Unfortunately, April 2020 was a dry month, and water conditions worsened and fish disease indicators became elevated. The Bureau sought to delay the surface flushing flow required under the 2019 Plan to preserve Upper Klamath Lake levels to support sucker spawning. The Tribe worked with federal defendants through the Flow Account Scheduling Technical Advisory ("FASTA") Team, embodied in the 2019 biological opinion (at 42), and process and agreed to delay the surface flushing flow. Ultimately, the Bureau reduced the peak flushing flow levels due to infrastructure limitations as well to minimize impacts on Upper Klamath Lake. FONSI at 21-22.

In early May, the Bureau notified the parties of the reduced water supply forecast due to dry conditions in April and sought collaborative solutions. Despite serious concerns about the impact of reduced flows on salmon, the Tribe reluctantly indicated it would agree to reduce the augmented spring flows from 40,000 acre-feet to 23,000 acre-feet, so that the lake's 17,000 acre-feet contribution to such flows could remain in the lake to mitigate adverse effects on the suckers. Yurok Emails to Federal Defendants (May 11-12, 2020) (Exhs. 7, 9, 13).

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                 - 7 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

The Tribe subsequently received alarming sampling results documenting a serious disease outbreak.  While *C. shasta* spore counts dropped from 190 spores to 30 spores in sampling after the surface flushing flow concluded, *C. shasta* infection and disease rates have since skyrocketed.  Bureau of Reclamation, Hydrologic Update (May 8, 2020), at Slide 48 (Exh. 10); FWS Klamath River Outmigrant Monitoring Update (May 8, 2020) (Exh. 14).  The prevalence of infection in sampled juvenile salmon on May 5, 2020 was 98% with 90% of the infections so severe they will likely prove fatal.  Bureau, Hydrologic Update at Slide 49.

Despite these extraordinary conditions, on May 11, 2020, the Bureau began cutting off flow augmentation in the Klamath River.  By Thursday, May 14, 2020, river flows are projected to be reduced to the absolute minimums.  To make matters worse, the Bureau told the Tribe that it intends to violate the 2019 Plan's requirement that 7,000 acre-feet of water be reserved for the Yurok Tribe's ceremonial Boat Dance this summer.  Vice Chairman Myers Email (May 11, 2020) (Exh. 7).  In its motion for a preliminary injunction, the Tribe is asking this Court to require the Bureau to provide 23,000 acre-feet to augment very low May and June flows and to reinstate the separate 7,000 acre-feet of water allocation for the Boat Dance.  In this motion, the Tribe is asking the Court to order the Bureau to resume immediately providing augmentation flows to ensure that the daily average river flows are the flows calculated under the 2019 Plan plus an additional 390 cubic feet per second.

## ARGUMENT

I.   THE STAY SHOULD BE LIFTED BECAUSE OF THE BUREAU'S DEVIATION FROM THE INTERIM OPERATIONS PLAN.

In return for the Bureau's commitment to implement the Interim Operations Plan, the Tribe agreed to stay this litigation and withdraw its motion for a preliminary injunction.  The Bureau, however, has abdicated its responsibility to implement the Interim Plan.  It has

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER          - 8 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

dramatically reduced the 40,000 acre-feet required to be set aside for augmented flows under the Interim Plan, and is cutting off augmented spring flows.  Under the stipulation (approved by this Court on March 27, 2020), the Yurok Tribe may ask the Court to lift the stay if the Bureau "deviates from or modifies the Interim Plan prior to September 30, 2022" or "is not implementing the Interim Plan."  Stipulation ¶¶ 4, 6.  The Tribe has complied with the Stipulation's meet-and-confer obligation to no avail.  Accordingly, the Tribe asks the Court to lift the stay and reinstate the Tribe's motion for a preliminary injunction.

## II.    A TEMPORARY RESTRAINING ORDER SHOULD ISSUE.

In order to obtain a temporary restraining order, the Tribe must meet the same legal standard that applies for the issuance of a preliminary injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001) (analysis is substantially identical for the injunction and the temporary restraining order), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).  The Tribe must show that: (1) it is likely to succeed on the merits; and (2) it is likely to suffer irreparable harm.  *See Winter*, 555 U.S. at 20; *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-34 (9th Cir. 2011) (serious questions on the merits coupled with irreparable harm can support a preliminary injunction).  Congress has predetermined that other injunction factors – inadequate remedies at law, balance of equities, and public interest – favor injunctive relief when the ESA's mandates are violated.  *Cottonwood Envtl. Law Ctr. v. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015); *Nat'l Wildlife Fed'n v. NMFS,* 886 F.3d 803, 817 (9th Cir. 2018) ("*NWF*").

### A.    The Tribe Is Likely To Succeed On The Merits.

In its briefing on the preliminary injunction motion, the Tribe demonstrated that it is likely to succeed on the merits of its challenge to: (1) the 2019 biological opinion's no-jeopardy and adverse modification conclusions; and (2) the Bureau's failure, due to its reliance on the

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                        - 9 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

invalid 2019 biological opinion, to ensure that its operation of the Klamath Project will avoid jeopardizing the survival and recovery of listed Coho salmon and adverse modification of Coho salmon critical habitat.

The 2019 biological opinion continues to provide the foundation for both NMFS and the Bureau's flawed efforts to meet their ESA obligations. The Interim Plan supplemented the 2019 Plan by adding the 40,000 acre-feet in augmented spring flows in certain water years, building upon and expressly requiring continued implementation of all other aspects of the 2019 Plan. For its part, NMFS's review of the Interim Plan relied on and reaffirmed the 2019 biological opinion's conclusions that the measures required under the 2019 Plan would not cause jeopardy or adverse modification. To the extent that the Bureau and NMFS relied on the augmented flows to reduce harm to salmon, that reliance became an empty letter when the Bureau jettisoned the augmented flows on May 11.

> 1.      *The Adverse Modification Analysis Is Based On Erroneous Data.*

The Bureau admitted to using erroneous data in its assessment of whether the reduced spring flows would adversely modify rearing habitat for juvenile Coho salmon. NMFS based its adverse modification of critical habitat analysis on the correlation between river flows and the amount of suitable rearing habitat based on suitability criteria developed by Dr. Thomas Hardy, the leading expert on the Klamath River flow needs of salmon. NMFS calls Dr. Hardy's work, performed under contract with the Department of Interior, "the most comprehensive instream flow and habitat study completed for the Klamath River." 2019 BiOp at 128-29; *see also* Simondet Decl. ¶¶ 6-7 (Hardy study is the best available science); 2019 BiOp 61-63, 128-29, 141-42 (same). However, the 2019 biological opinion relied on erroneous data that represented that far lower river flows will provide suitable Coho salmon fry and juvenile rearing habitat than

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 10 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

is supported by Dr. Hardy's work. *See* Decl. of Dr. Thomas Hardy ¶¶ 10-13 (Oct. 17, 2019) (ECF 27-3).

When Dr. Hardy uncovered the error and provided corrected data, the agencies acknowledged the error and reinitiated consultation. NMFS AR D-12921, D-12923. Indeed, the 2019 biological opinion approved drastically reduced spring flows based on that fundamental error. For example, the 2019 biological opinion stated that 1,400 cubic feet per second ("cfs") were necessary in the Iron Gate to Shasta reach to produce 80% of maximum available habitat for Coho fry, while the corrected curves require 1,984 cfs, a 38% increase. 2019 BiOp 144; NMFS AR B-5907 and B-5508 (in the Shasta to Scott reach, 2019 BiOp called for 1,200 cfs; the corrected curves require 3,317 cfs).[5] Relying on erroneous data renders a decision arbitrary, capricious, and a clear error in judgment. *NRDC v. Forest Serv.*, 421 F.3d 797, 802, 806-07, 810 (9th Cir. 2005).

        2.    *The Adverse Modification Determination Fails to Confront the Pervasive Violations of NMFS's Habitat Conservation Standard.*

NMFS has determined that having flows that produce "at least 80 percent of maximum available habitat provides for the conservation needs of coho salmon." 2019 BiOp at 63. It has used this standard in its adverse modification analysis, deeming 80% of maximum available habitat necessary to maintain the physical and biological features of critical habitat and to not "adversely affect the function" of the critical habitat. *Id.*

To assess the Plan's impacts on rearing habitat, the 2019 biological opinion evaluated how often and to what extent the conservation standard would be met under various water

---

[5] While the NMFS 2020 concurrence letter used the corrected data, without the augmented flows required under the Interim Plan, it signed off on a flow regime that the Bureau has since abandoned.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER        - 11 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

conditions, focusing on reaches that have relatively high habitat availability and are most

influenced because they are closest to Iron Gate Dam, including Trees of Heaven and Seiad

Valley.  *Id*.  For example, even using the flawed weighted useable average ("WUA") curves,

NMFS found that the Plan "will generally decrease available juvenile coho salmon habitat from

[Iron Gate Dam] to the Middle Klamath River reach" and that "available habitat is reduced

below 80 percent of maximum available in most months of the year and in most water year

types."  2019 BiOp at 155; *see also id.* at 146-150, 159-60, 175.  Seiad Valley faced the greatest

reduction in available habitat, even under the flawed curves, meeting the conservation standard

only 17% of the time between March-June. *Id*. at 149, 202-03.

NMFS found that critical habitat was degraded and would remain so under the 2019 Plan

and that the Trees of Heaven and Seiad Valley reaches supported independent populations that

were essential to Coho salmon recovery.  2019 BiOp at 205; Coho Recovery Plan at ES-4, ES-5.

It nonetheless concluded that the 2019 Plan was not likely to appreciably diminish the

conservation value of critical habitat.  2019 BiOp at 205.  It never reconciled this conclusory

statement with its prediction that, even based on the erroneous WUA curves, the 2019 Plan

would lead to violations of NMFS's own conservation standard most of the time in reaches of the

River that it had concluded were essential to support Coho populations.  Decl. of Dave

Hillemeier ¶¶ 16-20, 25-26 (Oct. 17, 2019) (ECF 27-5). [6]

It is arbitrary and capricious for an agency to set a protective standard and then blatantly

contravene that standard.  *See NRDC v. EPA*, 735 F.3d 873, 881-84 (9th Cir. 2013) (agency

cannot find no risk needing mitigation when its own rule of decision identifies such a risk).

---

[6] While the Interim Plan, if implemented, would reduce the frequency and extent to which future
flows will lead to violations of the 80% conservation standard, these reductions disappeared
along with the augmented flows.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

- 12 -

Indeed, the Ninth Circuit threw out a similarly flawed biological opinion covering 2002-2012

Klamath Project operations that failed for years to provide the full amount of the flows NMFS

itself had deemed necessary to avoid jeopardy.  The Ninth Circuit held that NMFS could not

disregard the specific quantitative flow targets it concluded were necessary to avoid jeopardy,

"[n]or can the agency provide only partial protection for a species for several generations without

any analysis of how doing so will affect the species."  *PCFFA v. BOR*, 426 F.3d 1082, 1091,

1094 (9th Cir. 2005).[7]

> 3.   *The Tribe Is Likely To Succeed On Its Claim That Reducing Harm Is Not The Same As Avoiding Jeopardy.*

The 2019 biological opinion predicated its no-jeopardy determination on the prospect that

conditions might improve somewhat compared to the period of record due to the increased

frequency of surface flushing flows.  This rationale is invalid for three reasons.[8]

First, it ignores the dramatic reduction in spring habitat-forming flows and NMFS's

findings that the amount of suitable spring rearing habitat essential for young salmon survival

must increase.  2019 BiOp 83-86, 159, 174-76, 180, 204.  The Coho Recovery Plan sets an 80%

target not only to avoid habitat destruction, but also to meet juvenile Coho biological needs.

Coho Recovery Plan ES 10, 4-5, 4-13 (NMFS AR C-17154).  The biological opinion documents

how often and how much the 2019 Plan will reduce flows below this standard.  While the 2019

---

[7] In asserting that a conservation standard is legally irrelevant to an adverse modification determination, NMFS ignores that it used the standard in its biological opinions in 2002, 2012, and 2019.  In addition, this assertion ignores:  (1) the ESA's definition of critical habitat as those features essential for conservation; (2) the regulatory definition of adverse modification as an alteration that appreciably diminishes the critical habitat's value for conservation of the listed species; and (3) the case law holding that adverse modification can occur when an action impedes progress toward recovery.  Motion for Preliminary Injunction at 8.

[8] NMFS's 2020 concurrence applied similar logic in highlighting that the Interim Plan is likely to reduce harm to salmon without assessing whether salmon can survive and recover in light of the remaining harm.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER        - 13 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Plan provides surface flushing flows in most years, it does so at the expense of spring habitat

flows, which decrease under the 2019 Plan and worsen conditions for Coho.

Second, NMFS cannot rely on a slight improvement over a period of record that included

years with skyrocketing *C. shasta* infection and mortality rates that represented all-time high

levels.  NMFS never claims Coho can withstand a repeat of the worst years in the period of

record, whether measured in terms of observed infection rates in sampled fish or extrapolated

mortality rates.  Yet NMFS has equated the maximum mortality rate on record, which is close to

50%, with no-jeopardy.  Nowhere does the biological opinion explain how Coho can withstand

such a high mortality rate.  Past, elevated infection and mortality rates are an arbitrary point of

comparison.  *See Nw. Envtl. Advocates v. EPA*, 855 F. Supp. 2d 1199, 1225-26 (D. Or. 2012)

(comparison of improved water temperature standards to past water temperatures that violated

previous standards invalid); *Idaho Dep't of Fish & Game v. NMFS*, 850 F. Supp. 886, 893 (D.

Or. 1994), *vacated as moot*, 56 F.3d 1071 (9th Cir. 1995) (comparison arbitrary because baseline

included drought conditions and low run numbers).

Third, slightly improving conditions, even if true, is not the same as avoiding jeopardy.

The ESA implementing regulations, 50 C.F.R. § 402.02, define "jeopardize the continued

existence" as:

> to engage in an action that reasonably would be expected, directly or indirectly, to
> reduce appreciably the likelihood of both the survival and recovery of a listed
> species in the wild by reducing the reproduction, numbers, or distribution of that
> species.

Under this definition, NMFS must assess whether the action reduces the species' reproduction,

numbers, and distribution in a manner or to an extent that impedes the likelihood of survival or

recovery.  *See NWF*, 524 F.3d at 931-32 (assessing whether an action will worsen conditions

compared to the baseline addresses the wrong question).  Slightly lessening the risks (although

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                           - 14 -

reduced spring flows exacerbate them) is meaningless unless linked to what is needed to survive. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010) (jeopardy analysis had to address whether reduced population could hold on); *NWF*, 524 F.3d at 931-32 (NMFS must determine whether action reduces species' reproduction, numbers, and distribution to an extent that impedes likelihood of survival or recovery); *ALCOA v. BPA*, 175 F.3d 1156, 1162 n.6 (9th Cir. 1999) (NMFS must do more than find operations slightly less harmful than past).  Klamath Project operations have unquestionably reduced Coho abundance, reproduction, spatial structure, and diversity and continues to do so under the 2019 Plan.  2019 BiOp 67.  NMFS had to, but did not, assess whether Coho can survive and recover in the face of ongoing threats posed by disease risks, even if reduced somewhat by the increased frequency of surface flushing flows.

### 4.    The Bureau Is Failing To Comply With ESA Section 7.

If the Court finds that the Tribe is likely to succeed in proving the biological opinion invalid, it is also likely to succeed in proving that the Bureau is violating Section 7 by relying on an invalid biological opinion.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1127-28 (9th Cir. 2012) (agency cannot meet its Section 7 obligation by relying on legally flawed biological opinion or by failing to address information that would undercut the opinion's conclusions.); *Wild Fish Conservancy,* 628 F.3d at 532 (same).

### B.    The Tribe Has Demonstrated Irreparable Harm Is Likely.

The Bureau's actions are taking a serious toll on Klamath salmon because its flow regime produces insufficient rearing habitat and conditions that lead to *C. shasta* disease outbreaks.  The 2019 Plan provides for a surface flushing flow in most years, but also reduced May and June flows that provide critical habitat for juvenile salmon rearing.  While a surface flushing flow is designed as a measure to reduce the chances of an infection outbreak, it, alone, is often insufficient.  This year, the surface flushing flow produced a temporary reduction in *C. shasta*

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

- 15 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

spore levels, but soon thereafter a serious *C. shasta* outbreak occurred and still continues.

Infection rates in sampled Chinook salmon reached a sobering 98% in the first week of May, and

most of the infections are so severe that 90% of the infected fish are likely to perish.

Precisely when augmented flows are desperately needed, the Bureau is cutting off the

additional flows provided for under the Interim Plan.  Beginning early the evening of Monday,

May 11, 2020, the Bureau starting ramping down these augmentation flows and it will be

operating the river at the mandatory minimum flow levels by Thursday, May 14th.

> 1.   *The Bureau's Operation of the Klamath Project Is Causing Habitat Loss and Disease Outbreaks.*

The Bureau is pushing threatened Coho further to the brink by reducing spring flows

necessary to produce suitable rearing habitat and reduce disease outbreaks.  Initially listed in

1997 when their population reflected less than 1% of historic abundance, Coho remain in a

precarious state throughout the Klamath River Basin, with inadequate rearing habitat and *C.

shasta* disease among the principal threats impeding Coho survival and recovery.  Coho Status

Review at 26, 34.  The 2016 Coho status review tied the worsening state of the species to high

juvenile disease threats and stressful rearing conditions.  Coho Status Review at 26, 48.  And

conditions for Coho in the Klamath have continued to decline, with most independent

populations falling below the number of adult salmon needed for their survival.  2019 BiOp at

67; Hillemeier Decl. ¶¶ 14-20.

NMFS itself has stated that "the most important action to safeguard SONCC coho salmon

against extinction is to ensure sufficient instream flows."  Coho Status Review at 50.  Although

the 2019-2024 Plan provides for a surface flushing flow in most years, it sets aside no water for

dilution flows to address disease outbreaks and it reduces spring flows to far below what is

necessary to provide suitable rearing habitat.  *Cf.* 2013 BiOp at 270 (Table 11.9) *to* 2019 BiOp at

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                         - 16 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

149 (Table 19); Hardy Decl. ¶ 13; *see infra* at Argument I.A.1.  Even with a modest amount of increased flow to date this spring due to the Interim Plan augmentation, the results have been dire with skyrocketing infection, disease, and likely mortality rates.  And now when augmented flows are so desperately needed, the Bureau is cutting them off.

In analogous circumstances in 2017, this Court held in *Yurok I* that "[i]njunctive relief is appropriate" under controlling Ninth Circuit legal standards.  231 F. Supp. 3d at 479.  It found that plaintiffs "have presented sufficient evidence to show that they will face irreparable harm absent an injunction" because Coho salmon are in a precarious state after years of high *C. shasta* rates and, without protective flows, are likely to face another year of high infection rates that will further weaken an already weakened population.  *Id.* at 483-84.

The 2019 Plan reduces spring flows to a level that provides far less juvenile rearing habitat than the NMFS's conservation standard.  2019 BiOp at 61-63.  The 2019 biological opinion identifies the critical need for spring flows to provide accessible habitat for young salmon for rearing, foraging, and outmigration, as well as to reduce infection and disease risks.  2019 BiOp 83, 129-30, 135-37, 141.  Reducing spring flows so dramatically, as the 2019 Plan does, will reduce habitat to sustain young salmon.  This reduction will cause serious harm in the critical spring months when the 80% standard is frequently violated, particularly in reaches where Coho abundance is so low that only 39 adult Coho returned to the Shasta reach in 2018 and an average of 44 adults per year in 2014-2018.  Hillemeier Decl. ¶ 20 (ECF 27-5).

Insufficient rearing habitat can limit sources of food for juvenile salmon.  2019 BiOp 129-30, 175.  Insufficient rearing habitat also reduces the fitness and survival of coho salmon juveniles because of increased water temperatures and increased susceptibility to predation.  *Id.* at 175-78, 208.  Reduced habitat can also cause overcrowding, heightening the susceptibility of

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 17 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

young salmon to disease.  Hardy Decl. ¶ 4.  The harm that operating the 2019 Plan is causing

threatened Coho is undoubtedly irreparable.

> ### 2.  *Chinook Will Suffer Irreparable Harm Unless Additional Water Is Available For Spring Flows.*

Throughout their oppositions to the preliminary injunction motion, federal defendants

and KWUA argue that the harm to Coho should be discounted because Chinook, which are not

listed under the ESA, will suffer more harm from inadequate spring flows and disease risks than

Coho. This argument is specious.

First, Chinook are the preferred prey for Southern Resident Killer Whales or Orcas,

which are listed as endangered.  The decline in the Orcas' preferred prey poses a fundamental

threat to this population of 74 whales.  2019 BiOp 218, 224-29.  The 2019 biological opinion

documents the Orcas' reliance on Chinook from the Klamath River and the need to increase their

abundance substantially.  2019 BiOp 234-37.  It identifies low spring flows as threats to Chinook

due to reduced rearing habitat and increased *C. shasta* infection and mortality risks.  The 2019

biological opinion also bases its no-jeopardy determination for Orcas on the same flawed

rationale as its Coho determination – providing a surface flushing flow in most years will reduce

*C. shasta* infections and mortalities compared to the period of record.  2019 BiOp 243-56, 259.

The 98% Chinook infection rate with 90% of the infections so severe they are likely to be

fatal in 2020 presupposes unacceptable risks.  The 2019 biological opinion established a limit on

the amount of incidental take of Coho and Chinook that would be consistent with the no-

jeopardy and no-adverse modification conclusions.  It set the limit as 53% prevalence of

mortality for juvenile Chinook salmon, using Chinook as a surrogate for impacts on much rarer

Coho.  The 90% severe infection rate observed in early May indicates a very high likelihood of

exceeding that allowable amount of take.  2019 BiOp at 273-74, 278-79.  While the limit on take

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

- 18 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

serves as a trigger for reinitiating consultation and legal liability for take, it also indicates likely irreparable harm to the species.

Second, Yurok Tribe has protected Tribal fishing rights that the federal agencies, as trustees, have a duty to safeguard. The Tribe's fishing rights include Chinook, Coho, and many other species in the Klamath River. The Ninth Circuit and this Court have held that the Tribe's fishing rights carry a priority date of time immemorial and take precedence over other demands for water. *KWUA v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999); *Yurok Tribe I*, 231 F. Supp. 3d at 486. In a recent decision in which Klamath irrigators sought compensation for an alleged taking when water withdrawals were restricted in 2001, the Federal Circuit confirmed that the Yurok and other Tribes' federal-reserved water rights to support the tribes' fishing rights predate and have priority over Klamath Project water withdrawals. *Baley v. United States*, 942 F.3d 1312, 1336-37 (Fed. Cir. 2019), petition for writ of certiorari pending, No. 19-1134 (Mar. 17, 2020). Further, the Bureau has an affirmative duty to operate the Klamath project in manner that protects the Tribe's rights. *See Patterson*, 204 F.3d 1206.

### 3. The Requested Temporary Restraining Order Will Also Avoid Irreparable Harm to Endangered Suckers.

As this Court recognized in *Yurok I*, the ESA has predetermined that the public interest is served by protecting threatened and endangered species. In the Klamath Basin, ESA protections are afforded both to endangered suckers in Upper Klamath Lake and Coho salmon in the Klamath River. In its 2017 Order, this Court refused to grant relief that would "require reducing water levels below the minimums set for the suckers." *Id.* at 485.

The 2019 Plan increased Upper Klamath Lake levels to provide for the needs of endangered suckers. In the Declaration of Adam Johnson ¶¶ 11-12 (Dec. 10, 2019) (ECF 46-2), Fish and Wildlife Service identifies the critical safeguards as habitat boundary conditions for

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 19 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA 98104-1711*
*(206) 343-7340*

sucker spawning and rearing that provide that Upper Klamath Lake elevations should not fall below 4,142 feet in April or May in two consecutive water years or below 4,138.26 feet at any time.  By using the FWS standards embodied in the 2019 Plan as the baseline, the modified preliminary injunction motion preserved these protections for the suckers.  ECF 48.

The augmentation flows under the Interim Plan would have come, in part, from Upper Klamath Lake.  Specifically, 17,000 acre-feet of the 40,000 acre-feet in augmented flows would come from Upper Klamath Lake, with the remaining 23,000 acre-feet coming from the Klamath Project irrigation allocation.  As water conditions in the Upper Klamath Basin worsened this spring, however, the Tribe voluntarily agreed to forgo the Upper Klamath Lake portion of these augmented flows this year to support the needs of endangered suckers.  As a result, the relief sought in this case – restoration of the remaining 23,000 acre-feet portion of the augmented flows from the Klamath Project – would be neutral as to Upper Klamath Lake levels and can be managed to avoid harm to the endangered suckers, particularly now that the sucker spawning season has largely concluded.  Hydrologic Update Slide 46 (Ex. 10).

The Interim Plan has another safeguard for the suckers that would not be triggered by the requested relief.  If implementation of augmented water releases is likely to result in Upper Klamath Lake elevations going below 4142.00 feet in April or May, the Bureau, Services, Yurok Tribe, and Klamath Tribes, and others must coordinate to best meet the needs of all the federally-listed species.  ECF 907-2, at 4.  This provision becomes operative only after lake levels have reached 4142.00 feet, and it applies only when the portion of the augmented flows that comes from Upper Klamath Lake causes a drop below this elevation.  FONSI at 4 ("when the 40,000 AF EWA augmentation is triggered, 17,000 AF from UKL would be utilized and UKL surface elevation would be maintained above 4142.00 ft through the end of May, to the extent possible,

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

- 20 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

once this elevation has been achieved earlier in the spring.").  This spring, Upper Klamath Lake levels would not have reached or maintained 4142.00 due to existing water conditions. The Interim Plan and augmentation water was not the cause for the lower lake elevations. Furthermore, because the Tribe is willing to forgo the 17,000 acre-feet contribution from the lake this year, this provision is not triggered.

The Tribe recognizes that the Klamath Basin poses challenges because of threatened and endangered species in both Upper Klamath Lake and in the Klamath River.  What the Bureau has done, however, is cut off augmented flows to the river that come from the Klamath Project.  In doing so, the Bureau is acting contrary to priorities Congress has set in the ESA, which makes safeguarding endangered species paramount.

4.      *The Harm to Salmon Causes Irreparable Harm to Plaintiffs.*

Impaired flows are harming Klamath Basin Coho and driving down Chinook populations, which has a devastating effect on the communities that rely on these salmon populations.  Such harm is unquestionably irreparable.  As this Court previously found, the harm salmon are facing would harm the fishing association plaintiffs.  *Yurok,* 231 F. Supp. 3d at 481 ("The fishing associations have shown that they are harmed when salmon abundance drops because the potential salmon harvests decrease."); *see* Decl. of Glen Spain (Oct. 2, 2019) (ECF 27-8).  These fishing dependent coastal communities are already facing near total closures this year of all ocean salmon fisheries within the several hundred miles of coastline because of lost productivity due to high juvenile *C. shasta* mortalities in prior years.  More (and even higher) juvenile salmon mortalities this year will only perpetuate this ongoing fisheries disaster.

Salmon declines likewise cause egregious harm to the Yurok Tribe, whose federally reserved fishing rights are integral to the Yurok way of life.  As the Ninth Circuit has recognized, the Tribal fishery "is not much less necessary to the existence of the [Yurok] than the atmosphere

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER

- 21 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

they breathe." *Blake v. Arnett*, 663 F.2d 906, 909 (9th Cir. 1981) (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)).  In *Yurok I*, this Court recognized that the Tribe is "inextricably linked to salmon" for its subsistence, cultural and spiritual identity, and economic well-being.  231 F. Supp. 3d at 481.  *See also* Decl. of Georgiana Gensaw (Oct. 14, 2019) (ECF 27-7).

Mismanagement of the Klamath Project led to high *C. shasta* infection rates in 2014 and 2015 that resulted in near-record low numbers of salmon returning to the Klamath River as adults in 2016 and 2017.  Because of the low salmon returns, the Tribe, State of California, and the U.S. Department of Commerce have declared the Klamath River Salmon fishery a commercial fishery disaster for the years from 2016 to 2018; a similar determination for the Tribe's 2019 fishery has not yet been made by the Commerce Department, but has been made by resolution of the Yurok Tribal Council.  The decisions to close the Tribe's commercial fisheries were some of the hardest the Yurok Tribal Council has had to make because "a closure means bills will go unpaid and kids may not have clothes for school."  Declaration of Tribal Chairman Joseph James ¶ 17 (Oct. 10, 2019) (ECF 27-6).  The median income on the reservation is $11,000, and many tribal members supplement their food supply by subsistence fishing so they have food to eat.  For the Yurok Tribe, the loss of salmon is a spiritual and cultural loss, as well as an economic and subsistence one. As Chairman James explains (¶ 15):

> The collapse of the fishery has crushed the spirit of our people whose very existence is tied to the salmon runs.  We cannot simply pack up and move to another place – this Yurok Country is our only home.  Without the River and our connection to it, we are no longer the people the creator intended us to be. We would no longer be Yuroks.

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 22 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7310*

CONCLUSION

The Yurok Tribe respectfully asks the Court to lift the stay and order the Bureau to

resume immediately providing augmentation flows to ensure that the daily average river flows

are the calculated flows under the 2019 Plan plus an additional 390 cubic feet per second.

DATED this 13th day of May, 2020.

Respectfully submitted,


*s/ Patti A. Goldman*
PATTI A. GOLDMAN (WSBA # 24426)
*[Admitted Pro Hac Vice]*
KRISTEN L. BOYLES (CSBA # 158450)
ASHLEY BENNETT (WSBA # 53748)
*[Admitted Pro Hac Vice]*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104
Ph:  (206) 343-7340
kboyles@earthjustice.org
pgoldman@earthjustice.org
abennett@earthjustice.org

*Attorneys for Plaintiffs Pacific Coast Federation of*
*Fishermen's Associations, Institute for Fisheries*
*Resources, and Yurok Tribe*


*s/ Amy Cordalis*
AMY CORDALIS (CSBA # 321257)
Yurok Tribe
190 Klamath Blvd.
P.O. Box 1027
Klamath, CA 95548
Ph:  (707) 482-1350
acordalis@yuroktribe.nsn.us

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                    - 23 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*s/ Daniel Cordalis*
DANIEL CORDALIS (CSBA # 321722)
Cordalis Law, P.C.
2910 Springer Drive
McKinleyville, CA 95519
Ph:  (303) 717-4618
dcordalislaw@gmail.com

*Attorneys for Plaintiff Yurok Tribe*

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER                      - 24 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on May 13, 2020, I electronically filed the foregoing

3

*MEMORANDUM IN SUPPORT OF MOTION TO LIFT STAY AND ENTER TEMPORARY*

4

*RESTRAINING ORDER* with the Clerk of the Court using the CM/ECF system, which will send

5

notification of this filing to the attorneys of record and all registered participants.

6

7

8

*/s/ Patti A. Goldman*

PATTI A. GOLDMAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM IN SUPPORT OF
MOTION TO LIFT STAY AND ENTER
TEMPORARY RESTRAINING ORDER          - 25 -

*Earthjustice*
*810 Third Ave., Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*