UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YUROK TRIBE, et al.,

　　　　　　Plaintiffs,

　　v.

U.S. BUREAU OF RECLAMATION, et al.,

　　　　　　Defendants.

Case No.  19-cv-04405-WHO

**ORDER DENYING PLAINTIFFS'
REQUEST TO LIFT STAY AND
MOTION FOR TMPORARY
RESTRAINING ORDER**

　　　　Plaintiffs the Yurok Tribe, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Resources (collectively, "the Yurok Tribe") seek to lift the stay of litigation to which the parties stipulated on March 27, 2020, asserting that defendants U.S. Bureau of Reclamation and the National Marine Fisheries Service ("NMFS") (collectively, the "Bureau") failed to comply with the terms of the stipulation.  The Yurok Tribe also seeks a temporary restraining order ("TRO") requesting that the Court order the Bureau to allocate an additional 16,000 acre-feet ("AF") of water to the Environmental Water Account ("EWA") for the purposes of Klamath River flows.

　　　　The Klamath River basin is in the midst of severely dry conditions.  The Bureau has the difficult task of allocating scarce water to competing interests, including for the habitat of endangered coho salmon that live in the Klamath River and endangered suckers that live in the Upper Klamath Lake ("UKL").  Each endangered species is particularly threatened in this low water year, and their interests directly conflict.  Contrary to the Yurok Tribe's allegations, the record shows that the Bureau has been managing water allocation in accordance with the Interim Plan to which all parties agreed just two months ago.  Because the Yurok Tribe has failed to establish that the Bureau has violated the parties' stipulation or the terms of the Interim Plan, its motion to lift the stay of litigation is DENIED.  Its motion for a TRO is DENIED AS MOOT.

United States District Court
Northern District of California

**BACKGROUND**

## I.        PRIOR PROCEDURAL BACKGROUND

This case concerns the impact of the Klamath Project on Southern Oregon/Northern California Coast Coho Salmon ("SONCC" or "coho") and Klamath River Chinook Salmon populations, the former of which are listed as threatened under the Endangered Species Act ("ESA"). The Klamath Project, operated by the Bureau, determines the level, timing, and rate of water flow in certain portions of the Klamath River. Dkt. No. 17 ¶¶ 1, 35. The Bureau is required to comply with ESA regulations that prohibit it from actions that "take" coho, with "take" defined as "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

The Klamath Project has been the subject of many lawsuits over the years, including one before me involving the same parties and concerning the rate of *Ceratanova shasta* ("*C. shasta*") infection among coho in the Klamath River. *See Yurok Tribe et al. v. United States Bureau of Reclamation, et al.*, Case Nos. 16-cv-06863-WHO (N.D. Cal.) and *Hoopa Valley Indian Tribe et al. v. United States Bureau of Reclamation, et al.*, 16-cv-04294-WHO (N.D. Cal.). In that case, I granted the plaintiffs' request for a preliminary injunction and for summary judgment in February 2017. *See Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450 (N.D. Cal. 2017), *order clarified sub nom. Tribe v. United States Bureau of Reclamation*, 319 F. Supp. 3d 1168 (N.D. Cal. 2018) ("*Yurok I*").

In 2019, the Bureau prepared the 2019-2024 Klamath Project Operations Plan (the "Plan") and 2019 Biological Opinion ("2019 BiOp"). Dkt. No. 17 ¶¶ 61-71. The Yurok Tribe filed the current lawsuit challenging the Plan and the 2019 BiOp on July 31, 2019, and filed an amended complaint on September 30, 2019. Dkt. Nos. 1, 17. On October 18, 2019, it moved for a preliminary injunction, requesting that the court require the Bureau to revert to the flow regime in the prior 2013 Biological Opinion ("2013 BiOp"). Dkt. No. 27 at 1, 4. The Bureau and intervenor Klamath Water Users Association ("KWUA") opposed the motion on December 11, 2019. Dkt. Nos. 45, 46. In the Yurok Tribe's reply filed on January 22, 2020, it modified its request for

United States District Court
Northern District of California

1    injunctive relief, asking only that the court mandate the additional 50,000 additional AF and a

2    reversion to the 2013 BiOp.  Dkt. No. 48 at 2.  The Bureau filed an objection/sur-reply to

3    plaintiffs' reply on February 7, 2020, to which the Yurok Tribe responded on February 14.  Dkt.

4    Nos. 57, 58.

5         Before the Yurok Tribe's preliminary injunction motion was heard, the parties came to a

6    resolution by which all parties would withdraw motions related to the preliminary injunction and

7    the Bureau would implement the Interim Plan until the next Plan and BiOp is developed.  Dkt. No.

8    907.  The parties also agreed to stay this case until September 2022 "provided that the Bureau

9    operates the Klamath Project in accordance with the Interim Plan," and that a party may move to

10   lift the stay if the Bureau "deviates from or modifies the Interim Plan."  Dkt. No. 907 ¶¶ 3-4.  In

11   addition,

12            A party to this litigation may file a motion with the Court seeking to
             lift the stay and resume the litigation *only on the grounds that the*
13           *Bureau is not implementing the Interim Plan or complying with any*
             *term or condition of this Stipulation. No party may seek specific*
14           *performance of any term or condition of this Stipulation or the Interim*
             *Plan.* This prohibition against seeking specific performance has no
15           effect on the enforceability of any pre-existing or independent legal
             rights and obligations to engage in government-to-government
16           consultation with affected Tribes or to protect Tribal fishing and water
             rights.

17   *Id.* ¶ 6 (emphasis added).

18        The parties agreed to the Interim Plan, which will supersede the Plan and 2019 BiOp.  Dkt.

19   No. 907-1.  The Interim Plan provided for a 40,000 AF augmentation to the EWA for the use in

20   flows to the Klamath River under certain hydrologic conditions:

21            As part of the Interim Plan, Reclamation proposes to provide a base
             EWA augmentation of 40,000 acre-feet (AF) in water years with an
22           Upper Klamath Lake (UKL) Supply at or above 550,000 AF and at or
             below 950,000 AF. The 40,000 AF of EWA augmentation would be
23           comprised of 23,000 AF from Project Supply and 17,000 AF from
             storage volume in UKL. An initial determination on whether the
24           40,000 AF of EWA augmentation would occur will be based on the
             March 1 Natural Resources Conservation Service (NRCS) UKL
25           inflow forecast and the resulting UKL Supply. A final determination
             of EWA augmentation would be made in early April, with the April
26           1 NRCS inflow forecast and the resulting UKL Supply.

27   *Id.* at 3.  The parties do not dispute that a final determination was made on April 1, 2020 that the

28   forecast was above 550,000 AF.

1    The Interim Plan further states that when this EWA augmentation is triggered, it will result

2    in a reduction to Project Supply that is limited to, and shall not exceed, 23,000 AF.  *Id.*  In

3    addition, "[t]he EWA augmentation would not otherwise affect Project operations, including

4    Project diversion rates and timing other than that caused by the above-described potential

5    reduction in Project Supply during the spring-summer period."  *Id.*

6        The Interim Plan provides the Bureau with flexibility when the EWA augmentation is

7    triggered.  First, it maintains discretion on the timing and distribution of the flows.  *Id.* at 4

8    ("Reclamation would maintain a flexible approach to utilizing the proposed 40,000 AF of EWA

9    augmentation and enhanced May/June flows. With the exception that the EWA augmentation

10   water and enhanced May/June flows would be utilized within the March through June timeframe,

11   Reclamation would allow for flexibility in the timing and distribution of augmentation volumes.").

12   In addition, "[t]he existing Flow Accounting Scheduling Technical Advisory (FASTA) process

13   would be used to allow salmon and sucker biologists from Reclamation and the Services, as well

14   as other Klamath Basin experts, to provide real-time operational input into the use of this water to

15   maximize ecological benefits to SONCC coho and Southern Resident Killer Whales, whether

16   those benefits be improved habitat conditions, minimized disease conditions, or both, while

17   maintaining UKL elevations and conditions protective of Lost River and shortnose suckers."  *Id.*

18        Finally, and most germane to this motion, the Interim Plan states that:

19        In the event PacifiCorp is unable to provide the water, *and/or if
     modeling shows that implementation of the 40,000 AF of EWA
20       augmentation releases is likely to result in UKL elevations below
     4,142.0 feet in April or May, despite good faith efforts to rearrange
21       the 40,000 AF of EWA releases within reasonable bounds,
     Reclamation will coordinate with the Services and PacifiCorp to best
22       meet the needs of ESA-listed species as well as coordinate and obtain
     input from Yurok and other affected Klamath River Basin Tribes
23       through government-to-government consultation on how to manage
     water. If modeling shows that implementation of the EWA
24       augmentation releases is likely to result in an annual minimum below
     4,138.0 feet in a given water year, Reclamation will coordinate with
25       the Services and PacifiCorp to ensure the annual minimum elevation
     in that water year is achieved as well as coordinate and obtain input
26       from the Yurok and other affected Tribes through government-to-
     government consultation on how to manage water in a way that best
27       meets the needs of Federally-listed species*. With respect to the above
     coordination and ensuing management of 40,000 AF of EWA
28       augmentation releases and consequences for Upper Klamath Lake
     elevations, there can be no effect on Project irrigation supplies/water

United States District Court
Northern District of California

United States District Court
Northern District of California

availability (e.g., no change in quantity, rate, timing) other than that
caused by the above described potential reduction in Project Supply
during the spring-summer period.

*Id.* at 4-5 (emphasis added).

## II.    THE YUROK TRIBE'S MOTION TO LIFT THE STAY AND FOR A TEMPORARY RESTRAINING ORDER

Hydrologic conditions on April 1 were forecast to be 577,000 AF, above the 550,000 AF

minimum set forth in the Interim Plan.  Dkt. No. 919 at 6 n.3.  In accordance with the Interim

Plan, the Bureau added 40,000 AF to the EWA for augmented May and June flows.  Dkt. No. 909-

1 at 7.  However, the April 1 forecast proved to be inaccurate, and water conditions were drier

than anticipated.  The parties do not dispute that in April 2020, the elevations in UKL dropped

below 4,142.00.  Dkt. No. 919 at 7; Dkt No. 922 at 14.

The Bureau worked with the Yurok Tribe through the FASTA, and initially the parties

were able to agree to a modification of the surface flushing flows.  Dkt. No. 909-1 at 7.  In early

May, the Tribe agreed to reduce the augmented flows from 40,000 AF to 23,000 AF.  *Id.*  After

this, the Yurok Tribe received "alarming sampling results" in sampled fish indicating that *C.*

*shasta* infections had spiked to 98% among sampled juveniles, with 90% of infections likely to

prove fatal.  *Id.* at 8.  The Bureau continued some augmented flows through April, until it reduced

augmentation flows to the absolute minimums by May 14, 2020.  Dkt. No. 909-1 at 8; Dkt. No.

919 at 7.

On May 13, 2020, the Yurok Tribe filed a motion to lift the stay and for a TRO.  Dkt. No.

909.  It sought (i) the remaining water in the augmented flows from irrigation allocation (16,000

AF); and (ii) 7,000 AF for the purposes of the its ceremonial annual Boat Dance.  Dkt. No. 909-1

at 2-3; Dkt. No. 922.  The Bureau filed an opposition on May 18, 2020.  Dkt. No. 919.  KWUA

again intervened and filed an opposition, as did intervenor Klamath Tribes.  Dkt. Nos. 916, 917.

In addition, the Klamath Irrigation District filed an amicus brief, and the California Waterfowl

Association renoticed its prior amicus brief in opposition to the preliminary injunction motion.

Dkt. Nos. 914, 920.

The Yurok Tribe filed a reply on May 20, 2020.  Dkt. No. 922.  In reply, the Yurok Tribe

abandoned its request in the TRO for additional water for the Boat Dance, conceding that it was

1   not a cognizable under the operative complaint.  *Id.* at 5.  I heard the matter on May 22, 2020.

2                                  **LEGAL STANDARD**

3          Federal Rule of Civil Procedure 65 governs preliminary injunctions and temporary

4   restraining orders.  Fed. R. Civ. P. 65.  A preliminary injunction may be issued if a plaintiff

5   establishes:  (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the

6   absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an

7   injunction is in the public interest.  *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

8   (2008).  "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear

9   showing that the plaintiff is entitled to such relief."  *Id.* at 22.  The Ninth Circuit has held that

10  "'serious questions going to the merits' and a hardship balance that tips sharply toward the

11  plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test

12  are also met."  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

13                                   **DISCUSSION**

14  **III.    MOTION TO LIFT STAY**

15         The Yurok Tribe argues that the Bureau is in violation of the Interim Plan because it

16  mandated a "take-it-or-leave-it" approach to its decisions regarding the supplemental EWA and

17  because it cut off all augmented flows in late May after it allocated this water based upon the April

18  forecast.  Dkt. No. 922 at 1, 4.  It states that "[t]he Bureau's actions beginning on May 11 do not

19  comport with the letter or spirit of the coordination and consultation requirements in the Interim

20  Plan."  *Id.* at 4.  At oral argument, counsel argued that the Bureau violated the Interim Plan in

21  three ways, because:  (i) once the allocation was made on based upon the April forecast, the

22  Bureau was required to provide it; (ii) the Bureau lacked flexibility to eliminate allocations

23  altogether; and (iii) the Bureau failed to adequately coordinate with the parties in accordance with

24  the Interim Plan.  None of these arguments is persuasive.

25         First, the Yurok Tribe appears to concede that, notwithstanding the April 1 allocation, the

26  4,142-foot trigger in the UKL obligated the Bureau to engage in consultation to rearrange its water

27  allocation, including, if necessary, to the supplemental water added to the EWA.  The Interim Plan

28  provides that if the elevation in UKL falls to 4,142 feet in April or May, the Bureau will

United States District Court
Northern District of California

coordinate with interested parties in order to "rearrange" water in order to meet the needs of endangered species.  Dkt. No. 907-1 at 4-5.  The Yurok Tribe acknowledges that the UKL fell below the 4,142-foot threshold in May, "triggering the Interim Plan's provisions."  Dkt. No. 922 at 14 n.6.  It also apparently recognized that some negotiations with respect to the EWA allocations were necessary, although it disagrees with the Bureau's current decision.  *Id.* at 1.  The Bureau properly reevaluated the water allocation in light of the facts that undermined the April forecast.

Second, although the Yurok Tribe contends that the Bureau may not eliminate supplemental water allocated for the river, the record does not indicate that it did so.  Neither party disputes that some of the 40,000 AF of supplemental water was released in April and May to the Klamath River.  Dkt. No. 919 at 2.  The Bureau did not cut off flow augmentation until May 14, 2020.  Dkt. No. 909-1 at 8.  And for the reasons discussed above, the 4,142-foot trigger obligated the Bureau to consider the competing needs of the UKL.

Third, the record does not support the Yurok Tribe's position that the Bureau's consultation process violated the Interim Plan.  The parties do not dispute that the Bureau entered into extensive negotiations, including the FASTA process, in an attempt to allocate the water appropriately.  The intervenors and amici, though they represent competing interests, have taken the position that the Bureau is implementing the Interim Plan as contemplated by evaluating changing conditions and modifying water allocation accordingly.  *See* Dkt. No. 916 at 5; Dkt. No. 917 at 14-15.  At oral argument, the Yurok Tribe argued that the Bureau's latest communication amounted to an improper "take-it-or-leave-it" ultimatum.  But at the same time, it conceded that it immediately resorted to court intervention instead of continuing negotiations with the Bureau.  And by the Yurok Tribe's own admission, previous consultations were in accordance with the letter and spirit of the Interim Plan.

As intervenors and amici point out, water in the UKL is dangerously low, threatening endangered suckers.  Water allocated to irrigation has been significantly reduced.  Dkt. No. 917 at 11.  That requires the Bureau to exercise its discretion under the Interim Plan to address these competing needs, especially those of *all* endangered species, in a reasonable and informed way.  The Yurok Tribe may disagree with the Bureau's decision, but that disagreement does not provide

grounds to lift the stay.

The Yurok Tribe also argues that the Bureau is in violation of the Interim Plan based upon its future water allocation. It asserts that the 4,412-foot limit exists only in April and May, and not in June. Dkt. No. 922 at 2. The Yurok Tribe states that the Interim Plan thus "provides no barrier to resuming augmented flows in June," and points to evidence that the Bureau does not plan to resume such flows. *Id.* at 3. But the Interim Plan also not require resumption of augmented flows in June if the 4,142-foot trigger occurs in April or May. It does require action if "EWA augmentation releases [are] likely to result in an annual minimum below 4,138.0 feet in a given water year." Dkt. No. 907-1 at 4-5. The language of the Interim Plan suggests that the April/May dates are a yearly trigger, after which the Bureau must, if necessary, rearrange water to ensure that endangered suckers are not threatened. The problem of low lake levels is ongoing and the Bureau is required to address it; the Bureau may not ignore the low lake levels in April and May simply because the requirements for June are not explicitly set.

Similarly, the Yurok Tribe contends that the Bureau is ignoring current forecasts for future rain, flows into UKL, and additional water from PacifiCorp reservoirs. Dkt. No. 922 at 1-2, 4. It suggests that the Bureau should revise its current practices because the dry May conditions will change. This argument is premature at best; at oral argument the Yurok Tribe stated that it had not yet discussed these changed water conditions with the Bureau.

I recognize the exigent needs of the endangered species and the parties with respect to a very limited amount of water. Under the Interim Plan, the Bureau is quite reasonably tasked with responding to ongoing conditions that may change rapidly, as they have this spring. Should water conditions improve, the Bureau will remain under an obligation set forth in the Interim Plan to manage the water appropriately, including negotiations through FASTA with interested entities. But given the difficulty in forecasting future water conditions accurately, it is not inappropriate to respond conservatively to forecasts that have not yet materialized, especially given the current danger to the endangered suckers in UKL due to low water levels. Forecasts do not create a current violation of the Interim Plan that warrants lifting the stay.

Finally, the Yurok Tribe suggests that it can obtain the water it seeks from water allocated

United States District Court
Northern District of California

to irrigation, and not from water in UKL.  Dkt. No. 922 at 1-2.  It is unclear how this is so.  The Klamath Tribe points out that it has a competing interest in maintaining UKL levels, which may require supplementation from other Project operations.  Even if water is not taken directly from UKL, the Bureau may still take water that otherwise could be provided to UKL for the preservation of endangered suckers.  In addition, the Klamath Tribes provided evidence that past flows to the Klamath River resulted in lower elevations in the UKL.  Dkt. No. 916 at 8.  Therefore, I am not persuaded that the Yurok Tribe's requested relief would not harm suckers.

In sum, the Yurok Tribe has not presented evidence that the Bureau's actions have amounted to an abdication of its responsibilities under the Interim Plan, an abuse of the discretion that is entrusted to it, or are unreasonable under the circumstances.  The Bureau has not violated the Interim Plan, either explicitly or in spirit.  Therefore, I DENY the Yurok Tribe's motion to lift the stay.  As a result, its motion for a TRO is DENIED AS MOOT.[1]

### CONCLUSION

For the above reasons, the Yurok Tribe's motion to lift the stay of litigation is DENIED, and its motion for a TRO is DENIED AS MOOT.

**IT IS SO ORDERED.**

Dated: May 29, 2020

William H. Orrick
United States District Judge

---

[1] Although I need not address the parties' arguments as to the factors evaluated in granting or denying a TRO, I note that in this case, the public interest weighs in favor of denial.  In addition to the danger to endangered suckers that is likely to result if the Yurok Tribe's requested relief is granted, the public interest is well-served by a robust consultation process, including input from experts and interested parties, as contemplated by the Interim Plan.  By contrast, the public interest would not be well-served by court intervention, particularly since the parties have agreed to a thoughtful process to resolve their competing needs.