**EXHIBIT B TO**

**STIPULATION AMONG PLAINTIFFS, FEDERAL DEFENDANTS, AND INTERVENOR-DEFENDANT KLAMATH TRIBES REGARDING FEDERAL DEFENDANTS' MOTION FOR LIMITED LIFTING OF STAY**

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
Email: thomas.snodgrass@usdoj.gov

ROBERT P. WILLIAMS, Senior Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-307-6623; Fax: 202-305-0275
Email: robert.p.williams@usdoj.gov

DARON T. CARREIRO, Trial Attorney
Indian Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 202-305-1117; Fax: 202-305-0275
Email: daron.carreiro@usdoj.gov

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| YUROK TRIBE, et al. | ) Case No. 3:19-cv-04405-WHO |
| Plaintiffs, | )<br>) Related Cases: No. C16-cv-06863-WHO |
| v. | ) No. C16-cv-04294-WHO |
| U.S. BUREAU OF RECLAMATION, et al. | )<br>) **UNITED STATES'**<br>) **CROSSCLAIM FOR** |
| Defendants, | ) **DECLARATORY AND**<br>) **INJUNCTIVE RELIEF** |
| and | )<br>) Judge William H. Orrick |
| KLAMATH WATER USERS ASSOCIATION, | )<br>) |

United States' Crossclaim – Case No. 3:19-cv-04405-WHO – Page 1

and

KLAMATH TRIBES,

   Intervenor-Defendants,

_____

UNITED STATES OF AMERICA,

   Cross-Claimant,

   v.

KLAMATH WATER USERS ASSOCIATION,

and

OREGON WATER RESOURCES DEPARTMENT,

   Crossclaim-Defendants.

_____

   Cross-Claimant, the United States of America, brings this crossclaim for declaratory and injunctive relief against Intervenor-Defendant Klamath Water Users Association ("KWUA") and Oregon Department of Water Resources ("OWRD"), asserting as follows.

## INTRODUCTION

1.  The United States seeks declaratory and injunctive relief, including relief from an April 6, 2021 Order issued by OWRD ("OWRD Order" or "Order") to the United States Bureau of Reclamation ("Reclamation") under Oregon state law that would, on its face and if followed, prevent Reclamation from meeting the requirements of the federal Endangered Species Act ("ESA") in operating the Klamath Project, a federal reclamation project that provides water for the irrigation of approximately 230,000 acres in southern Oregon and northern California. The ESA-listed species affected by the OWRD Order include the endangered Lost River and shortnose sucker in Upper Klamath Lake ("UKL") in Klamath County, Oregon, the threatened

Southern Oregon/Northern California Coast ("SONCC") coho salmon in the Klamath River in Siskiyou, Humboldt, and Del Norte Counties, California, and the endangered Southern Resident killer whale in the Pacific Ocean.

2.      Through the ESA, Congress has directed Reclamation to ensure that, in taking actions such as diverting, storing, and delivering water from UKL for irrigation as part of operating the Klamath Project and Link River Dam, it does not jeopardize the continued existence of any listed species or destroy or adversely modify any designated critical habitats. 16 U.S.C. § 1536(a)(2).  The United States owns Link River Dam, which was constructed as part of the Klamath Project and controls releases from UKL, a naturally-occurring lake, to the Klamath River downstream of the Project.  In addition, Congress has forbidden Reclamation from causing unpermitted "take" of any species listed as endangered, subject to civil and criminal penalty, which prohibition has been extended to the threatened SONCC coho salmon by regulation. *Id*. § 1538(a)(1)(B), (G); 50 C.F.R. § 223.203.

3.      Reclamation meets these federal requirements by maintaining certain minimum "boundary conditions" or elevations in UKL, as well as by releasing water from Link River Dam to support minimum streamflows in the Klamath River below UKL and occasional higher flows under certain conditions.  These operations were developed through formal ESA Section 7 consultation between Reclamation and the U.S. Fish & Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS"), each of whom have concluded in written biological opinions ("BiOps") provided to Reclamation that implementing Reclamation's planned operations will comply with ESA Section 7.  In addition, FWS and NMFS have each provided Reclamation with an exemption from the prohibition in Section 9 for anticipated "take" of listed species – known as an incidental take statement – so long as that take occurs incidentally to Reclamation's lawful Project operations and in accordance with the terms and conditions included in the take statements.  The amount or extent of incidental take that is permitted in the statements is predicated on Reclamation maintaining lake elevations and river flows in accordance with Reclamation's planned operations.

4.      The OWRD Order acknowledges that Reclamation has compliance obligations under federal law, including "the Endangered Species Act of 1973 (ESA) (16 U.S.C. §§ 1531-1544, 87 Stat. 844, as amended)," and states that Reclamation "will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations."  The Order further states: "[n]othing in this order alters, relieves, or releases any person, state, or federal agency from any and all rights, duties or obligations arising from other sources of law including without limitation other state laws or rules, federal law and related federal agency regulations, federal or state court orders, or contracts."  However, despite recognizing the existence of potentially conflicting federal requirements, the OWRD Order directs Reclamation to "immediately preclude or stop the distribution, use or release of stored water from the UKL, in excess of amounts that may be put to beneficial use under KA 1000 downstream of Link River Dam."  KA 1000 is a provisionally-adjudicated Oregon state-law based water right held for irrigation purposes.  The Order includes no exemption for releases made pursuant to federal requirements.

5.      Compliance with the ESA requires Reclamation to retain in UKL and release to the Klamath River as much water as is biologically necessary to ensure that operating the Project does not jeopardize the continued existence of listed species or destroy or adversely modify their critical habitat.  As these water volumes are biologically-necessary, water may not be excluded from the volumes based on legal classifications under state law.  Inevitably, operations to ensure against jeopardizing listed species and adversely modifying critical habitat will include some amount of water that OWRD would classify as having been "stored" in UKL under Oregon state water law.  This can occur when minimum flows in the Klamath River are being maintained or when a higher flow release is implemented to mitigate salmon disease risk in the Klamath River.  Non-jeopardizing and non-adversely modifying operations are federally-mandated preconditions for Reclamation's operation of the Project and Link River Dam.

6.      By prohibiting the release of water classified as "stored" in UKL for other than "beneficial use under KA 1000," the OWRD Order would, on its face and if followed, prevent Reclamation from implementing its biologically-based operations to ensure that operating the

Project and Link River Dam do not jeopardize the continued existence of listed species, destroy or adversely modify their critical habitat, and/or cause excess "take" of listed species beyond that permitted in the incidental take statements.

7.     The Order also would interfere with Reclamation's operation of the Project consistent with the downstream tribal reserved water rights of the Yurok and Hoopa Valley Tribes in California, which courts have found at a minimum entitle the Tribes to as much water in the Klamath River as is necessary to prevent jeopardizing the continued existence of the SONCC coho salmon and/or destruction or adverse modification of its critical habitat within the meaning of Section 7 of the ESA.

8.     The OWRD Order arose out of litigation instituted by a member of Intervenor-Defendant KWUA, the Klamath Irrigation District ("KID"), against OWRD in the Marion County Circuit Court. *See Klamath Irrigation Dist. v. Oregon Water Resources Department, et al.* (20CV17922).  KID's lawsuit is grounded solely in Oregon state law and seeks to preclude any releases of water deemed to be in "storage" in UKL for any purposes other than satisfaction of state-law based water rights.  The resulting rulings by the Circuit Court adverse to OWRD and the OWRD Order that is challenged in this crossclaim are similarly grounded in state law without regard to federal requirements.  The OWRD Order is grounded in the concept that water can be "stored" in UKL under Oregon state-law-based water rights and measured as such, notwithstanding that UKL is a naturally-occurring lake whose maximum capacity was not substantially enlarged by the Project.  KWUA has asserted that it intervened in the instant case in part to protect its "member irrigation districts and their patrons" against Plaintiffs' attempt to enforce the ESA against Reclamation.  ECF 20 at 8.  KWUA has filed a motion to lift the stay of this case for the purpose of filing a summary judgment motion that asserts, among other claims, that water classified as "stored" in UKL under Oregon law is immune from ESA Section 7 compliance.  ECF 928-1 at 20-21.

9.     On information and belief, if OWRD determines that Reclamation is releasing "legally stored water" under Oregon state law from UKL for any purpose other than beneficial use under KA 1000, it may issue civil penalties to Reclamation and/or undertake other further

enforcement of its Order.  In fact, OWRD has already issued July 2, 2021 and July 28, 2021 Notices of Violation of the OWRD Order to Reclamation.  On further information and belief, if OWRD determines that Reclamation is releasing "legally stored water" from UKL for purposes other than beneficial use under KA 1000, KWUA and/or its member irrigation district(s) may seek to enforce one or more orders of OWRD against Reclamation.

10.    However, the OWRD Order and all similar, successor orders, including the July 2, 2021 and July 28, 2021 Notices of Violation, related to state law-based water rights associated with the Project (collectively the "Challenged Orders"), are *ultra vires* and facially invalid.  As an Oregon state body, OWRD has jurisdiction that extends solely to the administration of Oregon state water rights.  *See* Or. Rev. Stat. § 536.037(1)(c).  OWRD has no jurisdiction or authority to determine the existence, nature, or extent of a federal agency's obligations under any federal law or regulation, or to issue an order or directive that limits or interferes with a federal agency's ability to comply with any federal law or regulation, including but not limited to the federal ESA and its implementing regulations.  OWRD similarly has no jurisdiction or authority, at least prior to the quantification of the federal reserved water rights of the Yurok and Hoopa Valley Tribes, to issue the Challenged Orders, which impinge upon Reclamation's operation of the Project consistent with the federal reserved water rights of the Yurok and Hoopa Valley Tribes.  By issuing a command to Reclamation prohibiting releases from UKL that is not limited to compliance with state law and includes no exception for compliance with federal law, OWRD has overstepped its jurisdiction beyond matters of state law, improperly impinging on Reclamation's compliance with federal law.  The Challenged Orders are therefore invalid.

11.    In addition to being *ultra vires*, the Challenged Orders are preempted under the Supremacy Clause of the United States Constitution as contrary to the requirements of federal law.  *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012) ("state laws are preempted when they conflict with federal law. . . . This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full

purposes and objectives of Congress,'" (quoting *Hines v. Davidowitz*, 312 U.S. 57, 67 (1941)); *United States v. California*, 438 U.S. 645, 668 n.21 (1978) ("state water law does not control in the distribution of reclamation water if inconsistent with other congressional directives to the Secretary.").

12.     It is the law of this Circuit that Reclamation's operation of the Klamath Project, including releases of water from UKL via Link River Dam, is subject to compliance with the ESA and tribal reserved rights. *See, e.g.*, *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213-14 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000). The OWRD Order prohibits Reclamation from releasing "stored" water from UKL for any purpose other than satisfaction of KA 1000, even when such releases are necessary to meet the requirements of the ESA and are made in order to operate the Project consistent with federal reserved water rights to support tribal fisheries. The Order thus conflicts with federal law and is preempted.

13.     The United States therefore requests declaratory relief, including relief from the Challenged Orders insofar as they prevent Reclamation from operating the Project in compliance with federal law and subject Reclamation to potential improper enforcement actions by OWRD and potentially others for noncompliance. Specifically, the United States seeks a declaration that: (1) the Challenged Orders are invalid because OWRD lacks jurisdiction to issue orders impinging upon Reclamation's compliance with the federal ESA; (2) Reclamation's operation of the Klamath Project, including the exercise of its rights to store water in UKL for irrigation use, is subject to compliance with the ESA; (3) complying with the ESA may require Reclamation to release water from UKL regardless of the water's classification under state law; and (4) to the extent that the Challenged Orders forbid Reclamation from releasing water deemed to have been "stored" in UKL for this federal purpose, those orders are contrary to the ESA and therefore preempted under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, cl.2. Alternatively, as set forth in the Second Cause of Action, if the Court fails to grant the foregoing requested declaratory relief, for further declaratory relief that: (1) at least prior to the quantification of the federal reserved water rights of the Yurok and Hoopa Valley Tribes,

OWRD lacks jurisdiction to issue the Challenged Orders, which impinge upon Reclamation's operation of the Project consistent with the federal reserved water rights to support fisheries of the Yurok and Hoopa Valley Tribes; (2) prior to the quantification of the federal reserved water rights of the Yurok and Hoopa Valley Tribes, which are senior to the irrigation water rights of the Project, Reclamation has authority in its operation of the Project, consistent with those rights, to release from UKL at least as much water to the Klamath River as is necessary to prevent jeopardizing the continued existence of the SONCC coho salmon and/or destruction or adverse modification of its critical habitat within the meaning of Section 7 of the ESA; and (3) to the extent they would forbid Reclamation from releasing water from UKL consistent with Tribal water rights to support fisheries, the Challenged Orders are contrary to these rights and preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, §1, cl.2, and those authorities referred to as the Indian Affairs Powers, including the Indian Commerce Clause, U.S. Const. art. I, §8, cl.3.

14.     In addition, the United States seeks a permanent injunction against any enforcement of the Challenged Orders that would limit and/or prevent Reclamation from operating the Project in conformance with federal law, including through the release of water deemed to have been "stored" in UKL.

**JURISDICTION AND VENUE**

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1345 (United States as Plaintiff), 2201(a) and 2202 (Declaratory Judgment Act).

16.     The United States is authorized to bring actions against states and agencies thereof in federal court. *See United States v. Mississippi*, 380 U.S. 128, 140-41 (1965) ("[N]othing in [the Eleventh Amendment] or any other provision of the Constitution prevents or has ever been seriously supposed to prevent a State's being sued by the United States. The United States in the past has in many cases been allowed to file suits in this and other courts against States."); *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980) ("It is true

that each state has waived its sovereign immunity to the federal government and that the federal government may consequently sue any state without the latter's consent.").

17. There is a justiciable case or controversy concerning the Challenged Orders. While the OWRD Order acknowledges Reclamation's federal law obligations, it nonetheless conflicts with those obligations by prohibiting Reclamation from releasing water deemed to have been "stored" in UKL for purposes other than beneficial use under KA 1000, such as compliance with the ESA. Further, OWRD representatives have recently stated that OWRD may attempt to impose civil penalties against Reclamation and/or undertake other enforcement action should it release water contrary to the Order. *See e.g.*, OAR 690-260-0005 *et seq*. Finally, KWUA and at least some of KWUA's member districts challenge whether Reclamation may release "stored" water from UKL for purposes other than satisfaction of KA 1000 and, upon information and belief, may seek to enforce the OWRD Order against OWRD and/or Reclamation. These districts include KID, which filed litigation in Oregon state court against OWRD that prompted the OWRD Order's issuance in the first place. *See* discussion in paragraphs 87-96, below. KID also has initiated litigation against Reclamation directly seeking to prohibit Reclamation from releasing water from UKL deemed to have been "stored" for purposes other than irrigation without acquiring such water under Oregon state law (Case No.1:21-cv-00504-AA D. Oregon).

18. Venue is proper because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in the Northern District of California. 28 U.S.C. § 1391(b)(2). The Klamath River, the SONCC coho salmon, the SONCC coho salmon's critical habitat, and the Chinook salmon, the primary prey base for the endangered killer whale, are all located in this district. Releases of water from UKL through Link River Dam in Oregon affect these species in California, and the OWRD Order prohibits Reclamation from releasing any water deemed "stored" in UKL for the purposes of satisfying federal law obligations relative to the Klamath River in California. The biological opinion and incidental take statement that analyze the effects of Klamath Project operations, including releases from UKL and their effects on Klamath River flows on ESA-listed species and their critical habitats in California, were prepared in this district by NMFS, whose regional office

is located in this district.  Plaintiff Yurok Tribe and also the Hoopa Valley Tribe, federally-recognized tribes for whom the United States holds reserved tribal fishing and water rights in trust, reside in this district.  Any violation(s) of the ESA with respect to the SONCC coho salmon and/or its critical habitat or by diminishing Chinook salmon prey for Southern Resident Killer Whales that would result from compliance with the Challenged Orders will occur in this district.  Any violation(s) of the Yurok Tribe's and Hoopa Valley Tribe's reserved water rights to support fisheries as a result of compliance with the Challenged Orders will occur in this district.

19.    This Court has personal jurisdiction over Crossclaim-Defendant OWRD because it has had systematic and continuous contacts with California regarding Klamath Project operations throughout many years, and the United States' crossclaim against OWRD relates to the effects of OWRD's actions in California.  California's long-arm statute is co-extensive with federal jurisdictional standards.  *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) ("California's long-arm statute is co-extensive with federal standards, so a federal court may exercise personal jurisdiction if doing so comports with federal constitutional due process."); Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").  "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.' *Int'l Shoe Co. v. Wash. Office of Unemployment*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (1945) (internal quotation marks and citation omitted))."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004).

20.    A three-part test applies in determining "whether the exercise of specific jurisdiction over a nonresident defendant is appropriate: (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities;

and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Boschetto*, 539 F.3d at 1016. If a plaintiff establishes that a non-resident defendant has "purposely directed" its activities at the forum state and that the claim arises out of or relates to those activities, "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable" in order to demonstrate that the exercise of jurisdiction does not comport with "traditional notions of fair play and substantial justice." *Id*. at 1015-16.

21.    Here, OWRD has minimum contacts with California. Through the issuance of the Challenged Orders, OWRD has "purposely directed" activities at the forum state and the crossclaim "arises out of or relates to the defendant's forum-related activities." *Id*. at 1016. Specifically, the OWRD Order is directed at Reclamation's releases of water from UKL for purposes of meeting its federal law obligations in California, and the crossclaim directly arises out of the Challenged Orders. Further, the Challenged Orders concern a significant volume of water, and they will have permanent and systematic (if not continuous) effects on the Klamath River, SONCC coho salmon, SONCC coho salmon critical habitat, and Chinook salmon (prey for killer whales), as well as the Yurok and Hoopa Valley Tribes and the senior federal reserved water rights the United States holds in trust for these Tribes, all of which are located in California. Prior to receiving the OWRD Order, Reclamation advised OWRD in written and verbal communications that it must operate the Project consistent with ESA requirements and tribal reserved water rights with respect to ensuring flows in the Klamath River in California. The OWRD Order expressly acknowledges OWRD's awareness that Reclamation "will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations."

22.    The exercise of personal jurisdiction would also be reasonable, given OWRD's awareness that the Challenged Orders, if followed, would reduce flows in the Klamath River in California and preclude Reclamation from meeting its federal law obligations there. *See City of Milwaukee v. Illinois,* 451 U.S. 304, 308-09 (1981) (Milwaukee's dumping of sewage into interstate waterway established personal jurisdiction in Illinois); *Pakootas v. Teck Cominco*

*Metals, Ltd.*, 452 F.3d 1066, 1076 (9th Cir. 2006); *Horne v. Mobile Area Water & Sewer Sys.*, 897 So. 2d 972, 978 (Miss. 2004) (personal jurisdiction upheld based upon flooding or pollution resulting from actions in the upstream state).

23. In addition, upon information and belief, between 2007 and 2010, representatives of the State of Oregon, including those representing OWRD's interests, traveled to California to attend meetings in Redding and Sacramento (and potentially other locations) regarding what came to be known as the Klamath Basin Restoration Agreement ("KBRA"). The KBRA was a multi-party legal agreement relating to irrigation water rights and environmental water usage in the Klamath River and Klamath Basin in the states of California and Oregon. From May 2007 through January 2010, KBRA meetings were held approximately once every several months in Oregon and California. The KBRA was signed on February 18, 2010 by numerous parties, including OWRD. Following signing, additional meetings believed to have been attended by representatives of the State of Oregon, including those representing OWRD's interests, were held in California (i) to answer questions about the agreement, seek support, and discuss a path for obtaining approval by Congress, and (ii) to begin implementing the KBRA through the Klamath Basin Coordinating Council. OWRD's participation in the KBRA establishes additional minimum contacts with California.

24. OWRD has established additional minimum contacts with California through its issuance of its 2014 Amended and Corrected Finding of Fact and Order of Determination ("ACFFOD")[1] in the Klamath Basin Adjudication, which describes certain water right(s) with points of diversion in Oregon, but places of use in California, and its presumed involvement in the Klamath Basin Compact, an interstate compact between Oregon and California concerning the waters of the Klamath River. 71. Stat. 497 (Aug. 30, 1957).

25. Crossclaim-Defendant KWUA has consented to venue and personal jurisdiction in the Northern District of California through its intervention in this case, and the crossclaim asserted herein arises out of a common nucleus of operative facts as the existing claims. In fact,

---

[1] Hereafter, citations to the ACFFOD are in accordance with the Bates-stamping convention of the ACFFOD, as follows: KBA_ACFFOD_XXXXX [Bates page or pages].

KWUA has filed a motion to lift the stay of litigation in this case so that it may move for summary judgment on two of the Plaintiffs' ESA claims by asserting some defenses that, if accepted, would exempt some or all Klamath Project operations from the requirements of ESA Section 7 and/or prohibit Reclamation from releasing water deemed to have been "stored" in UKL for non-irrigation purposes.  ECF 928.  KWUA also has intervened as a defendant in three previous cases brought in this Court to enforce the requirements of the ESA against Reclamation in regards to its operation of the Klamath Project: *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450 (N.D. Cal. 2017) (*Yurok I*); *Hoopa Valley Tribe v. United States Bureau of Reclamation, et al.*, No. 16-CV-04294-WHO (N.D. Cal); *Klamath Tribes v. U.S. Bureau of Reclamation*, No. 18-cv-03078-WHO, 2018 WL 3570865 (N.D. Cal. July 25, 2018).

## PARTIES

26.     Cross-Claimant is the United States of America, acting through Reclamation within the United States Department of the Interior and NMFS within the United States Department of Commerce.  Reclamation constructed the Klamath Project and has primary authority for managing ongoing Project operations consistent with congressional directives, which include the Reclamation Act of 1902, 43 U.S.C. §§ 372, 383, the ESA, 16 U.S.C. § 1531 *et seq.*, and the federal reserved water and fishing rights of Yurok and Hoopa Valley Tribes on the Klamath River in California and the Klamath Tribes in Oregon.  The United States owns Link River Dam, which controls releases from UKL.  UKL is a natural lake with natural storage capacity that pre-dated the Project.  Project infrastructure allowed Reclamation for the first time to regulate lake levels through its operation of Link River Dam, including the ability to lower the lake to below natural levels, but did not substantially increase maximum capacity or provide significant carry-over storage from one year to the next.  Link River Dam serves as the principal means of storing and regulating flows for Project operations as well as for regulating flows in the Klamath River.  PacifiCorp, a private corporation, operates Link River Dam in coordination with the Bureau of Reclamation to meet certain flow releases at Iron Gate Dam.  NMFS is an agency to whom the Secretary of Commerce has delegated responsibility for administering the ESA with regard to threatened and endangered marine species, including the threatened SONCC coho that

inhabits the Klamath River basin and the endangered killer whale that resides in the Pacific Ocean and depends on non-listed Chinook salmon in the Klamath River for its prey.  The NMFS office charged with administering the ESA with regard to the SONCC coho salmon is located in this District.

27.     Crossclaim-Defendant OWRD is an executive-administrative government agency under the Oregon Water Resources Commission that, acting through the OWRD Director, is authorized by state statute to "[a]dminister and enforce the laws of the state concerning the water resources of this state."  Or. Rev. Stat. § 536.037(1)(c).  In the exercise of this authority, OWRD administers Oregon state water rights provisionally adjudicated in the Klamath Basin Adjudication ("KBA"), which includes rights associated with the Klamath Project.  OWRD has purported to assume control of UKL through orders it has issued to Reclamation under Oregon state law.  The Challenged Orders prohibit Reclamation from releasing any water from UKL through Link River Dam and into the Klamath River that is deemed to have been "stored" in UKL under Oregon state law, except for purposes of satisfying the Project's Oregon state-law based water right held for beneficial use of stored water.

28.     Crossclaim-Defendant KWUA is a non-profit corporation organized under the laws of the State of Oregon.  Members of the association include irrigation and drainage districts and individuals who obtain, deliver, and receive water through facilities constructed by Reclamation, or constructed by the association members, or both.  KID, which initiated the state court litigation leading to the Challenged Orders, is a member of KWUA.  KWUA intervened in this matter to protect its own alleged interests as well as those of its members, including KID, and has filed a motion to lift the stay of the above-captioned litigation, ostensibly on behalf of its individual members including KID.  KWUA moves to lift the stay for the purpose of filing a motion for summary judgment that, if allowed, would raise arguments seeking to exclude some or all Klamath Project operations from the requirements of ESA Section 7.  Some but not all of these arguments are within the scope of this crossclaim and could be raised in defending against this crossclaim.  ECF 928.

## BACKGROUND

### The Reclamation Act

29.    Reclamation's construction and operation of the Klamath Project was authorized by the Reclamation Act of 1902, through which Congress authorized Reclamation to construct and operate water projects in the seventeen western states.  Pub. L. No. 57-161, § 2, 32 Stat. 388 (June 17, 1902), codified at 43 U.S.C. §§ 371, *et seq.*

30.    Section 8 of the 1902 Act, 43 U.S.C. § 383, provides:

> Nothing in this Act shall be construed as affecting or intending to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to or from any interstate stream or the waters thereof.

31.    In accordance with Section 8, Reclamation appropriated water available in 1905 and acquired state-law based water rights for the Klamath Project.  The exercise of those water rights, however, is subject to the mandates of federal law, including the ESA, as well as preexisting rights, including federal reserved fishing and water rights held in trust for the Klamath Basin Tribes, including downstream Tribes in California.  *Patterson*, 204 F.3d at 1213-14; *cf. Baley v. United States*, 942 F.3d 1312, 1319-20 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 133, 207 L. Ed. 2d 1078 (2020).

32.    Further, though Section 8 of the Reclamation Act, 43 U.S.C. § 383, provides as a general matter that state law shall govern the appropriation, distribution, and use of water under federal reclamation projects, this language is limited to the appropriation of water for Project purposes, such as irrigation.  *See Baley*, 942 F.3d at 1319-20 ("Section 8 of the Reclamation Act requires the Secretary of the Interior to comply with state law *regarding the appropriation of water for irrigation*, to the extent such law is not inconsistent with federal law.") (emphasis added).  Section 8 does not direct that Reclamation must appropriate water to comply with other requirements of federal law, such as the ESA, which places a limit on the exercise of existing water rights that would conflict with the statute's mandates rather than directing that water be

appropriated to meet those mandates. Nor does Section 8 affect pre-existing rights, including tribal reserved rights.

33. Finally, the Supreme Court has held that the federal government's deference to state water law is not absolute. Rather, Reclamation must operate "in conformity" with state water laws, but those state laws must cede to federal authority when their application would be inconsistent with federal law. *California v. United States*, 438 U.S. 645, 668-73, nn.21 & 25 (1978).

### The Klamath Project and Water Conveyance

34. The Klamath River basin spans the border between northern California and southern Oregon. In 1905, Congress authorized construction and development of the Klamath Project pursuant to the Act of February 9, 1905, ch. 567, 33 Stat. 714, which is part of the Reclamation Act of 1902, 43 U.S.C. §§ 372, *et seq*. Various Project facilities were built between 1906 and 1966. The Project's infrastructure and operations have substantially modified the hydrology of the Klamath and Lost River Basins, as Reclamation coordinates with PacifiCorp to store, divert, and convey water for agricultural, domestic, and hydroelectric uses in Oregon and northern California. Currently, the Klamath Project consists of over 185 miles of various diversions, canals, and pumping stations. The Project provides irrigation water to approximately 230,000 acres of agricultural land, as well as to four national wildlife refuges within its boundaries.

35. Commencing in or about 1905 and for several years thereafter, Reclamation solicited and executed water contracts with individual landowners in the Project, including members of Crossclaim-Defendant KWUA, and subsequently executed contracts with irrigation districts and other water delivery agencies. Such contracts provided for the repayment by the individuals of the allocated portions of the cost of constructing the Project, and also provided terms and conditions for the diversion and delivery of water for beneficial irrigation use on such lands.

36. Water is diverted and delivered to members of KWUA from UKL and the Klamath River through facilities diverting and rediverting water from UKL, Link River, and the

Klamath River. Link River Dam at the outlet of UKL regulates lake elevations in UKL, diversions to the Klamath Project, and releases into the Klamath River above the Oregon-California border. Releases from UKL through Link River Dam that are not subsequently diverted by Project contractors or private water users flow directly through Iron Gate Dam in Siskiyou County, California, below which the Klamath River flows through California to the Pacific Ocean, where it terminates within the boundaries of the Yurok Reservation, in Klamath, California. Reclamation's operation of the Project affects the level, timing, and rate of water flow in the Klamath River below Iron Gate Dam, the farthest downriver dam.

**The Oregon General Stream Adjudication and Oregon State Law Water Rights**

37.     On December 23, 1975, the State of Oregon commenced a general stream adjudication pursuant to Or. Rev. Stat. chapter 539 to determine certain water rights to the Klamath Basin in Oregon in the Klamath Basin Adjudication. Under the McCarran Amendment, Congress waived the United States' sovereign immunity and consented to the joinder of the United States in an action to determine the water rights to a stream system or source in a state. 43 U.S.C. §666(a). The Ninth Circuit held that the McCarran Amendment waiver applies to the KBA. *United States v. Oregon*, 44 F.3d 758 (9th Cir. 1994).

38.     Pursuant to Oregon's adjudication statute, water rights claims are adjudicated in two phases: an administrative phase before OWRD, and a judicial phase before the state circuit court. Various parties, including Reclamation and members of Crossclaim-Defendant KWUA, filed claims in the KBA. In 2013, near the conclusion of the administrative phase, OWRD issued Findings of Fact and an Order of Determination ("FFOD"), which was amended by the ACFFOD on February 28, 2014. The judicial phase of the adjudication, in which exceptions to the ACFFOD are reviewed, remains ongoing in the Klamath County Circuit Court, though the water rights provisionally determined in the ACFFOD are enforceable under Oregon state law in the interim. Or. Rev. Stat. §§ 539.130(4), 539.170.

39.     The United States is participating in the KBA and asserted water rights for Reclamation to Project storage and use rights in UKL. The United States also asserted water rights on behalf of the Klamath Tribes, located in Klamath County, Oregon, for certain lake

levels in UKL and streamflows in several basin tributaries and in the Klamath River below UKL to protect the Klamath Tribes' federal reserved rights in Oregon, including federal reserved water rights for tribal fisheries. Those rights were largely recognized in the ACFFOD, including for UKL. The Klamath Tribes' determined UKL water right cannot be enforced against the Project water rights while the adjudication is pending under a stipulation entered in the KBA based on an agreement contained in the failed KBRA. *See* KBA_ACFFOD_04938-04989.

40. Neither the Yurok Tribe nor the Hoopa Valley Tribe–located in California–were parties to the Oregon adjudication, and the United States did not assert claims on their behalves. This is because neither the California Tribes nor the United States were required to file claims for tribal water rights in California in the Oregon stream adjudication, and the fact that they were not raised in the KBA "did not affect the existence or nature of their federal reserved rights." *Baley*, 134 Fed. Cl. at 679. Additionally, the United States did not assert—and was not required to assert or hold—any water right for the purposes of meeting the requirements of the ESA that apply to the Project. *See id.* Rather, through the ESA, Congress has limited Reclamation's Klamath Project operations, including its exercise of Project water rights, to the extent such exercise would violate the statute's requirements, and has not directed that Reclamation appropriate water to meet those requirements.

41. The ACFFOD provides that Reclamation is the owner of a right (KA 294) to store water in UKL to benefit the irrigation rights held by KWUA's members and their patrons, among others. KBA_ACFFOD_07060, 07061, 07075, 07084, 07117. The ACFFOD also determined that the Project water users and the United States hold water rights for the beneficial use of water developed in connection with the Project, including KA 1000, which is a right to use water stored by Reclamation under the storage right, KA 294. KBA_ACFFOD_07082. However, the Project's water rights determined in the ACFFOD afford Reclamation some amount of discretion insofar as they only set a maximum amount of water that *may* be diverted, stored, and/or beneficially used under those rights; they do not *mandate* such diversion, storage, or use or determine whether or when water is legally available to the Project, including under the Project water users' contracts with Reclamation and applicable federal law. The ACFFOD also

specifically disclaims any authority over the contracts between Reclamation and the water users. *See* KBA_ACFFOD_07085-07086 (stating that the ACFFOD does not determine "the relative rights of the KPWU entities and the United States to control or operate diversion and distribution works, including headgates, pumps, canals and other structures . . . and does not alter in any way the relative rights of the United States and the irrigation entities to control or operate the irrigation works.").

**The Endangered Species Act**

42.     In 1973, Congress enacted the ESA.  The Supreme Court has described the ESA as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and found that the requirements of Section 7 of the Act reveal a "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 185 (1978).

43.     Section 7(a)(2) of the ESA requires each federal agency to insure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" a listed species or destroy or adversely modify designated critical habitat.  16 U.S.C. § 1536(a)(2).

44.     To assist federal agencies in complying with their duty to avoid jeopardy to listed species or destruction or adverse modification of critical habitat, an interagency consultation process has been established.  If the agency proposing to take an action ("action agency") determines that the action it proposes to authorize, fund, or carry out "may affect" listed species or critical habitat, it must pursue formal consultation with the appropriate consulting agency (NMFS or FWS, or both), unless it determines, with the written concurrence of the consulting agency, that "the action is not likely to adversely affect listed species or critical habitat."  50 C.F.R. §§ 402.13(c), 402.14(a).

45.     If formal consultation is required, the consulting agency must prepare a BiOp "detailing how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), and stating whether the action is likely to "jeopardize the continued existence of"

a listed species or destroy or adversely modify critical habitat, 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

46.    The Supreme Court has found that, while a BiOp serves an advisory function, in practice it has a "virtually determinative effect" on the action agency. *Bennett v. Spear*, 520 U.S. 154, 170 (1997) ("The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment.").

47.    Thus, where a BiOp concludes that the proposed action is not likely to jeopardize a listed species or destroy or adversely modify critical habitat, the action agency may reasonably rely on the BiOp and proceed with the action in compliance with the ESA. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990).

48.    In Section 9 of the ESA, Congress has made it unlawful for any "person" to "take" members of a species listed as endangered, and has extended civil and criminal penalties to anyone who "knowingly" violates this prohibition. 16 U.S.C. §§ 1538(a)(1)(B)-(C), (G); 1540(a)(1), (b)(1); 1532(19); 1533(d). In a regulation issued under ESA Section 4(d), NMFS has extended the take prohibitions of ESA Section 9(a)(1) to threatened West Coast salmonid species, including SONCC coho salmon, except as specifically limited by that regulation. 50 C.F.R. § 223.203. The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19). The term "person" includes "any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State . . . any State, municipality, or political subdivision of a State; or any other entity subject to the jurisdiction of the United States." *Id*. § 1532(13).

49.    The Section 9 "take" prohibition is not absolute. If a consulting agency's BiOp concludes that the proposed action is not likely to cause jeopardy but is reasonably certain to result in some amount of "take" of listed species incidental to that lawful activity, the consulting agency issues an incidental take statement to the action agency. *Id*. § 1536(b)(4). The take

United States' Crossclaim – Case No. 3:19-cv-04405-WHO – Page 20

statement specifies the amount or extent of the anticipated take that is exempted from the prohibition and any reasonable and prudent measures it "considers necessary or appropriate" to minimize the impact of the take. *Id*. § 1536(b)(4)(C)(i)-(ii); 50 C.F.R. § 402.14(i). The take statement also "sets forth the terms and conditions (including but not limited to, reporting requirements)" the action agency must comply with to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(C)(iv).

50. The ESA states that "any taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(b)(4)(iv), (o)(2); *see also* 50 C.F.R. § 402.14(i)(5); *Bennett v. Spear*, 520 U.S. at 170 (because of Section 7(o) of the ESA, "the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.'"). If an agency's action results in a greater amount or extent of taking than is specified in the incidental take statement, the action agency must reinitiate consultation. 50 C.F.R. §§ 402.16(a), 402.14(i)(4).

51. The ESA's implementing regulations set forth additional conditions under which an action agency must reinitiate consultation after it has been completed. 50 C.F.R. § 402.16.

52. The Ninth Circuit has ruled that Reclamation's operation of the Klamath Project, including releases of water from UKL via Link River Dam, is subject to compliance with the ESA. *Patterson*, 204 F.3d at 1213. Notwithstanding the holding in *Patterson*, KWUA continues to contest Reclamation's authority to curtail—or direct the curtailment of—irrigation water deliveries in order to provide more water for ESA-listed fish species, as well as the applicability of ESA Section 7(a)(2). ECF 928-1 at 16 (citing 50 C.F.R. § 402.03 & *Nat'l Assn. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007)).

53. The requirements of Section 7 apply to "all actions in which there is discretionary Federal involvement or control" (50 C.F.R. § 402.03), and the Ninth Circuit has held that, if the agency has "some amount" of discretion over its action, then the requirements of Section 7 apply

to that action. *NRDC v. Jewell*, 749 F.3d 776, 779 (9th Cir. 2014) (*en banc*); *Karuk Tribe v. U.S. Forest Service*, 681 F. 3d 1006, 1024 (9th Cir. 2012) (*en banc*).

54.     Reclamation has "some amount" of discretion in its diversion, storage, and delivery of water for irrigation under the Reclamation Act, Oregon state water law, and the water delivery contracts, which make Klamath Project operations subject to the requirements of ESA Section 7. *Accord San Luis & Delta-Mendota v. Jewell*, 747 F.3d 581 (9th Cir. 2014); *Natural Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014); *O'Neill v. United States*, 50 F.3d 677, 684 (9th Cir. 1995). Reclamation has discretion to store or not store water for irrigation as a threshold matter. Reclamation has discretion over the precise timing and amounts of water deliveries. Reclamation also has discretion, within the meaning of ESA Section 7, in operating the Project consistent with the federal reserved water rights for tribal fisheries in the Klamath Basin. *Accord Baley*, 942 F.3d at 1337, 1340-41; *Baley*, 134 Fed. Cl. at 672-73.

55.     Many of the Project contracts provide Reclamation discretion to apportion available water in the event of shortages and/or state that the United States is not liable for water shortages due to drought and other causes. For instance, the most recent Amendatory Contract Between the United States of America and KID, dated November 29, 1954, states:

UNITED STATES NOT LIABLE FOR WATER SHORTAGE

> On account of drought or other causes, there may occur at times a shortage in the quantity of water available in Project reservoirs and, while the United States will use all reasonable means to guard against such shortage, in no event shall any liability accrue against the United States or any of its officers, agents, or employees for any damage, direct or indirect, arising therefrom and the payments to the United States provided for herein shall not be reduced because of any such shortages."

Contract No. 14-06-200-3784, Art. 26.

56.     Article 6 of that contract with KID further provides:

> The District accepts the care, operation, and maintenance of the transferred works and will care for, operate, and maintain the transferred works and deliver water therefrom in full compliance with the Federal reclamation laws as they now exist or hereafter may be amended, the regulations of the Secretary now in force or hereafter promulgated, and the terms of this contract and any other contract in force affecting the transferred works.

United States' Crossclaim – Case No. 3:19-cv-04405-WHO – Page 22

UKL and Link River Dam are not transferred works.

**ESA Consultations on Klamath Project Operations and the**
**Current 2019 NMFS Biological Opinion and Incidental Take Statement**

57.     FWS first listed the shortnose sucker and Lost River sucker under the ESA as endangered throughout their range in 1988.  53 Fed. Reg. 27,130 (July 18, 1988).  In 2012, FWS designated UKL and its tributaries as critical habitat for the species.  77 Fed. Reg. 73,740 (Dec. 11, 2012).

58.     NMFS first listed the SONCC coho salmon under the ESA as threatened in 1997. 62 Fed. Reg. 24,588 (May 6, 1997).  NMFS designated critical habitat for SONCC coho salmon in 1999 and included most of the Klamath River below Iron Gate Dam in the designation.  64 Fed. Reg. 24,049 (May 5, 1999).  NMFS listed the Southern Resident Killer Whale Distinct Population Segment as endangered under the ESA in 2005.  70 Fed. Reg. 69,903 (Nov. 18, 2005).

59.     Because Reclamation has "some amount" of discretion in operating the Klamath Project and those operations are likely to adversely affect suckers, coho salmon, and killer whales and/or their critical habitats, Reclamation has completed a series of mandatory formal ESA Section 7 consultations with NMFS and FWS dating to the early 2000s.  NMFS and FWS have, respectively, determined in a series of BiOps that Reclamation's operation of the Klamath Project is likely to adversely affect suckers, coho salmon, and killer whales.  Salmon populations in the Klamath River are affected by the amount and timing of river flows, which are influenced by releases from the Klamath Project, principally from Link River Dam.  Diverting or releasing water from UKL through Link River Dam into the Klamath River lowers UKL levels for suckers, a potentially detrimental impact.

60.     Reclamation completed its most recent formal ESA consultation with NMFS on Klamath Project operations on March 29, 2019.  The consultation considered the effects of a new, five-year plan of operations for the Klamath Project for 2019-2024, which was contained in a biological assessment issued on December 21, 2018, later amended on February 15, 2019 ("2018 Plan").  The 2018 Plan and 2019 consultation followed a 2017 summary judgment ruling

by this Court in *Yurok I*, 231 F. Supp. 3d 450, that Reclamation was in violation of the ESA by having delayed reinitiation of consultation on Klamath Project operations.

61.    To meet the requirements of ESA Section 7 for salmon and killer whales, the 2018 Plan includes a minimum Environmental Water Account ("EWA") of 400,000 acre-feet ("AF") (or 407,000 AF in even-numbered years to include an additional 7,000 AF for the Yurok Tribe's ceremonial Boat Dance) of water to be released from UKL through Link River Dam to support minimum streamflows in the Klamath River below UKL and occasional higher flows under certain conditions.  The EWA is designed to provide water volumes that are biologically-necessary to meet the requirements of the ESA.  The 2018 Plan does not discuss the concept of water being "stored" in UKL under Oregon state water law or exclude such water from operations to ensure ESA compliance.

62.    The 2019 reinitiated consultation culminated in a 2019 NMFS BiOp, in which NMFS concluded that implementation of the 2018 Plan was not likely to jeopardize the continued existence of the SONCC coho salmon or the killer whale, or destroy or adversely modify SONCC coho salmon critical habitat.  NMFS's finding of no jeopardy relied in part on the Plan's provision of high flow "flushing flows" from the EWA in the Klamath River. Flushing flows are intended to disrupt the life cycle of *Manayunikia speciose*, a secondary host for the *C. shasta* parasite that adversely impacts the salmonid population in the Klamath River in California.  Flushing flows often utilize some amount of water that OWRD would deem to have been "stored" in UKL under Oregon water law.  NMFS determined in its BiOp that "[t]he increase in frequency of surface flushing flows (i.e., at least 6,030 cfs [cubic feet per second] for 72 hours) is expected to somewhat disrupt the life cycle of *C. shasta* in the mainstem Klamath River between Trees of Heaven (RM 172) and Seiad Valley (RM 129) in May to mid-June."

63.    The incidental take statement that accompanied NMFS' BiOp explains that, if any of four specified thresholds for Klamath River flows "are not met, the amount or extent of incidental take to coho salmon will be considered exceeded unless NMFS determines that extraordinary hydrologic conditions rather than effects of the proposed action" were responsible for the Iron Gate Dam flow reductions or the underspending of the EWA.  This is because NMFS

uses the "minimum average daily flows" at Iron Gate Dam ("IGD") and the "reductions to IGD flows due to UKL control logic" and the EWA used as "surrogates for the amount or extent of incidental take to coho salmon as a result of the [Project] effects."

64.    In the above-captioned case in which this crossclaim is filed (*Yurok II*), Plaintiffs challenge Reclamation's 2018 Plan and NMFS' 2019 BiOp and incidental take statement regarding the 2018 Plan for allegedly failing to ensure sufficient flows in the Klamath River to meet the requirements of ESA Section 7 and allowing excessive take of SONCC coho salmon and killer whales from Project operations, among other claims.  On the basis of alleged violations of the ESA, among other claims, Plaintiffs seek declaratory and injunctive relief directing that Klamath Project operations be amended to provide greater flows in the Klamath River for listed species.

65.    *Yurok II* is currently stayed pending completion of another reinitiated ESA consultation on a long term operations plan, which remains ongoing with a targeted completion date of September 2022.  The stay is predicated on Reclamation operating the Klamath Project in accordance with a 2020 Interim Operations Plan ("2020 IOP"), which specifies certain deviations from the 2018 Plan under certain conditions to provide additional flows in the Klamath River for listed species.  Like the 2018 Plan, the 2020 IOP specifies operations to meet biological need without regard for how water may be classified under Oregon state law.

66.    Reclamation provided the 2020 IOP to NMFS, which provided Reclamation with a letter on April 13, 2020, concurring with Reclamation's determination that, by providing additional flows in the Klamath River under certain conditions, the IOP would have effects consistent with NMFS' finding of no jeopardy and the amount or extent of anticipated incidental take in NMFS's 2019 incidental take statement.

67.    Also in April 2020, Reclamation received a replacement BiOp from FWS for FWS' 2019 BiOp on the 2018 Plan.  FWS's 2020 replacement BiOp analyzed the effects of implementing the 2020 IOP on suckers.  FWS concluded that Reclamation's plan to operate the Project consistent with various specified "boundary elevations" in UKL was not likely to jeopardize the continued existence of suckers or destroy or adversely modify their critical

habitat. FWS issued Reclamation an incidental take statement along with its no jeopardy BiOp that exempts incidental take of suckers caused by Project operations that are consistent with the statement's terms and conditions. Chief among those terms and conditions is avoiding UKL surface elevations below: (1) 4,142.0 feet in April or May in consecutive years or any year in which EWA augmentation is provided under the 2020 IOP, or below the corresponding April or May elevations observed in 2010 (which was a particularly dry year and is considered a benchmark in the BiOp); (2) 4,140.0 feet by July 15 in any year, 4140.5 feet by July 15 in more than one year, or 4140.8 feet by July 15 in more than 2 years; (3) 4,138.25 feet in September in more than one water year; or (4) 4,138.00 feet at any time.

68.    It is not always possible to meet fully all competing needs for water, and planned operations to meet the requirements of ESA Section 7 inevitably may include some amount of water that OWRD would deem to have been "stored" in UKL under Oregon state law.

69.    On April 13, 2021, Reclamation issued temporary operating procedures ("2021 TOP") for the Klamath Project for the 2021 irrigation season that specify certain deviations from the 2018 Plan and 2020 IOP due to unprecedented drought conditions that have made it impossible for Reclamation to simultaneously meet existing operational requirements under the 2018 Plan and 2020 IOP for suckers in UKL and salmon in the Klamath River, even without making any irrigation deliveries. And, on June 3, 2021, Reclamation announced a protocol for adapting operations under the 2021 TOP, if compelled by worsening hydrology.

## ESA Litigation over Klamath Project Operations

70.    For more than two decades, the law of this Circuit has been that Reclamation's operation of the Klamath Project is subject to compliance with the ESA, including Section 7, and in that time courts have adjudicated multiple challenges to Reclamation's compliance with the ESA brought by tribes and project irrigators alike. In 1999, the Ninth Circuit ruled in a case brought by KWUA and other irrigators that Reclamation's operation of Link River Dam at the southern end of UKL is subject to compliance with the ESA. *Patterson*, 204 F.3d at 1213 ("Because Reclamation retains authority to manage the Dam, and because it remains the owner in fee simple of the Dam, it has responsibilities under the ESA as a federal agency. These

responsibilities include taking control of the Dam when necessary to meet the requirements of the ESA, requirements that override the water rights of the Irrigators").

71.     In 2001, this Court ruled in a case brought by fishing and environmental groups that, because Reclamation had not initiated ESA consultation on Klamath Project operations, "it had no basis or authority to implement the 2000 Operations Plan and it violated the ESA when it did so." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1245 (N.D. Cal. 2001).

72.     Also in 2001, the federal district court for the District of Oregon denied a request by KWUA, Project irrigation districts, including KID, and individual irrigators to preliminarily enjoin Reclamation's 2001 Annual Operations Plan, in which Reclamation suspended Project irrigation deliveries in favor of providing instream flows within the Klamath River to satisfy ESA requirements, and consistent with tribal trust obligations. *Kandra v. United States*, 145 F. Supp. 2d 1192, 1207 (D. Or. 2001).  In denying the irrigators' preliminary injunction motion, the court held that: "Plaintiffs first argue that the purpose of the Klamath Project, pursuant to the Reclamation Act, is irrigation. Plaintiffs allege that the RPAs adopted by Reclamation benefit fish to the detriment of irrigation, and the RPAs are therefore inconsistent with the Project's purpose . . . . These arguments are without merit." *Id*. at 1207.  The court further held that plaintiffs had presented no support for their "novel interpretation" that "no provision of the ESA compels Reclamation to take action to release previously stored water to augment the flow of the Klamath River." *Id.*

73.     Additional ESA litigation over Project operations continued for several more years. *See*, *e.g.*, *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1084 (9th Cir. 2005); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 226 F. App'x 715, 718 (9th Cir. 2007).

74.     New litigation challenging Project operation compliance with the ESA was again filed in 2016.  In 2017, this Court granted summary judgment in *Yurok I* to the Yurok and Hoopa Valley Tribes on the grounds that Reclamation was in violation of the ESA by having delayed reinitiating formal ESA consultation on the effects of Klamath Project operations after the metric

for measuring incidental "take" of SONCC coho salmon from Project operations due to *C. shasta* disease was exceeded. *Yurok I*, 231 F. Supp. 3d 450. The Court issued a court-ordered injunctive flow plan that required Reclamation to ensure that its Klamath Project operations provided additional flows in the Klamath River under certain conditions for the benefit of SONCC coho salmon pending completion of reinitiated ESA Section 7 consultation on the effects of Project operations.

75.     In summer 2018, while Reclamation was engaged in reinitiated ESA consultation, the Klamath Tribes brought suit in this Court against Reclamation seeking "a preliminary injunction requiring the Bureau to maintain Upper Klamath Lake elevations at or above certain minimums during the irrigation season of 2018 and through the resolution of th[e] litigation" based on alleged violations of ESA Sections 9 and 7. *Klamath Tribes v. U.S. Bureau of Reclamation*, No. 18-cv-03078-WHO, 2018 WL 3570865, *9 (N.D. Cal. July 25, 2018). The Court denied the motion and the Tribes subsequently dismissed their complaint.

76.     In March and April of 2019, KWUA, among others, and KID filed separate complaints in federal district court in Oregon, alleging among other claims that water "stored" in UKL under Oregon state-law based water rights is immune from the ESA and cannot be released—or retained in storage—to meet the ESA's requirements. On the motion of limited intervenors Klamath Tribes and Hoopa Valley Tribe, the court granted dismissal of those lawsuits for failure to join the Tribes as necessary and indispensable parties due, among other things, to the effect the requested relief would have on those Tribes' interests. *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 489 F. Supp. 3d 1168 (D. Or. 2020), appeal docketed, No. 20-36009 (9th Cir. Nov. 19, 2020).

77.     In May 2020, the Yurok Tribe moved to lift the stay of litigation in the above-captioned case, *Yurok II*, and for entry of a temporary restraining order to compel additional releases from UKL for SONCC coho salmon. *Yurok Tribe v. U.S. Bureau of Reclamation*, No. 19-cv-04405-WHO, 2020 WL 2793945, at *5 (N.D. Cal. May 29, 2020). This Court denied the motion.

78.    On March 29, 2021, KID moved for a preliminary injunction against Reclamation in the KBA, contending that no water classified as "stored" in UKL under state law can be released to meet the ESA's mandates or to operate the Project consistent with federal reserved tribal water and fishing rights, unless Reclamation either possesses an Oregon state water right to do so or condemns, appropriates, or otherwise acquires the right to use that "stored" water in accordance with Oregon state law.  The United States removed the motion from the Klamath County Circuit Court of Oregon to the federal district court in Oregon pursuant to 28 U.S.C. § 1442(a)(1).  *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, Case 1:21-cv-00504-AA (D. Or.).  On April 20, 2021, KID moved to remand its preliminary injunction motion back to state court.  That motion is pending as of the date of this crossclaim.

79.    On April 13, 2021, The Klamath Tribes filed a complaint in U.S. District Court in Oregon against Reclamation and motions for a temporary restraining order and a preliminary injunction seeking to curtail ongoing releases of downstream flows of water from UKL as allegedly violative of ESA requirements for suckers.  *Klamath Tribes v. U.S. Bureau of Reclamation*, Case 1:21-cv-00556-CL (D. Or.).  Those motions were denied.  The case remains ongoing as of the date of this crossclaim.

80.    On April 19, 2021, KWUA filed a motion to lift the stay of *Yurok II* for the purpose of lodging a putative motion for summary judgment that raises issues concerning the applicability of the ESA to Project operations, including whether water deemed to have been "stored" in UKL under Oregon state law is immune from ESA compliance, and whether such water can be released consistent with downstream tribal reserved water rights of the Yurok and Hoopa Valley Tribes.  Some, but not all, of the arguments sought to be raised by the lodged summary judgment motion may be raised as defenses to this crossclaim, but others may not be raised for lack of a waiver of sovereign immunity.

### Tribal Reserved Fishing and Water Rights

81.    In addition to meeting the requirements of the ESA, the Bureau must operate the Klamath Project consistent with reserved Tribal water rights to support fisheries in the Klamath Basin.  *See Patterson*, 204 F.3d at 1214 ("Because Reclamation maintains control of the Dam, it

has a responsibility to divert the water and resources needed to fulfill the Tribes' rights, rights that take precedence over any alleged rights of the Irrigators.  Accordingly, we hold that the district court did not err in concluding that Reclamation has the authority to direct operation of the Dam to comply with Tribal water requirements."); *see also Baley*, 942 F. 3d at 1337, 1340-41 (holding that the federal senior reserved water rights of the Yurok and Hoopa Valley Tribes "[a]t the bare minimum" require the amount of water determined necessary under the ESA to avoid jeopardy to listed salmon, and that Reclamation's operation of the Project to meet the requirements of the ESA is therefore also consistent with the trust obligations owed to the tribes in connection with their reserved water rights to support fisheries); *Kandra*, 145 F. Supp. 2d at 1204, 1207 (holding that the United States, as trustee for the Klamath Basin Tribes, was obligated to protect their rights and resources; that these senior tribal water rights took precedence over the junior rights of irrigators; and that Reclamation had a legal duty to operate the Project consistent with its ESA and tribal trust obligations).

82.     Chinook and SONCC coho salmon are tribal trust resources for the Yurok and Hoopa Valley Tribes.  Both the Yurok and Hoopa Valley Tribes retained reserved fishing rights upon establishment of their reservations.  Securing access to the Tribes' traditional salmon fisheries was a purpose for establishing both reservations.  *See, e.g.*, *Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995); *United States v. Eberhardt*, 789 F.2d 1354 (9th Cir. 1986).

83.     An executive order in 1855 set aside the original Klamath River Reservation, which extended approximately 20 miles up the Klamath River from the Pacific Ocean and included lands one mile in width on either side of the river.  *See* 1 C. Kappler, *Indian Affairs: Laws and Treaties* 815-17 (1904).  An 1876 Executive Order formally set aside the original Hoopa Valley Reservation, a 12-mile square bisected by the Trinity River and extending upstream from the Klamath-Trinity River confluence.  *See id.* at 815.  A third executive order in 1891 formed the extended Hoopa Reservation, which encompassed the original Hoopa Reservation, the Klamath River Reservation, and a strip down the Klamath River from the Klamath-Trinity confluence connecting the two reservations.  *See id.*  In 1988, Congress passed the Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i *et seq.*, which partitioned the extended

reservation between the Hoopa Valley and Yurok Tribes.  Under the Act, the Hoopa Valley Tribe received the 12-mile square, and the Yurok Tribe received the original Klamath River Reservation as well as the connecting strip.  *See id.*  The Yurok Reservation is currently a 45-mile strip (one mile on each side of the Klamath River) extending from the Hoopa Valley Reservation and the Klamath-Trinity confluence downstream to the Pacific Ocean.  *See Mattz v. Superior Court*, 758 P.2d 606, 610 (Cal. 1988).

84.    The Hoopa Valley and Yurok Tribes' reserved fishing rights carry with them concomitant federally-reserved water rights to support fisheries, with a priority date at least as old as each reservation and no later than 1891.  *See Baley*, 134 Fed. Cl. at 670.  These reserved water rights are federal in nature, and are not dependent on state law or state procedures.  *See Baley*, 942 F.3d at 1340-41.

85.    The Hoopa Valley and Yurok Tribes' federally reserved water rights are currently unquantified; however these rights need not be quantified or adjudicated before they can be asserted to protect the Tribes' fishing rights.  *Id*.  Because those as-yet unquantified water rights exist, in part, to support the tribal salmon fisheries, which include the SONCC coho and chinook, courts have held that "the Tribes' water right entitled them to keep at least as much water in … the Klamath River as was necessary to prevent jeopardizing the continued existence of the … coho salmon" under Section 7 of the ESA.  *Baley*, 134 Fed. Cl. at 672-73.

**Oregon Administrative and Circuit Court Proceedings Leading to the OWRD Order**

86.    The Challenged Orders follow an administrative dispute initiated by KID in April 2020 pursuant to Oregon state law and related litigation initiated by KID in May 2020 against OWRD in the Circuit Court for Marion County, Oregon.  In its administrative and court proceedings, KID has asserted claims solely under Oregon state law, and has not named Reclamation as a defendant to any claim.  KID could not name Reclamation as a defendant in the Marion County Circuit Court proceedings because those proceedings did not satisfy the conditions to the waiver of sovereign immunity under the McCarran Amendment.

87.    On the basis of one of two state law claims asserted by KID against OWRD, in April 2020 the Circuit Court ordered OWRD to take charge of UKL, divide or distribute the

water in accordance with the rights of the various users, and stop any release of "stored" water that is not for a permitted purpose under Oregon state law.  Also in April 2020, OWRD purported to take charge of UKL by issuing a Notification of Dispute and Investigation in Aid of Distribution to Reclamation, KID, and PacifiCorp, which operates Link River Dam under contract.

88.     On April 22, 2020, Reclamation notified OWRD that it planned to commence a "flushing flow" operation pursuant to the 2018 Plan and ESA compliance per the NMFS BiOp, and consistent with downstream California tribal reserved water rights.

89.     On April 23, 2020, OWRD issued an Interim Order Concerning Release of Stored Water to Reclamation ordering it to cease releasing any water from UKL deemed to have been "stored" except in accordance with the relative and respective Oregon state law rights calling upon the "stored" water unless and until Reclamation provided OWRD with information including "the rate and volume of each release, and the source(s) of legal authority for each release of stored water released for a purpose other than to satisfy state law rights."  The order also provided: "Nothing in this order relieves any person, state, or federal agency from any and all obligations to comply with federal law and related federal agency regulations or federal court orders as may be relevant to release of water from UKL."

90.     Also on April 23, 2020, the Interior Department Solicitor's Office provided an Initial Response to OWRD's Interim Order stating that Reclamation was making the releases "in compliance with applicable federal law, including but not limited to the [ESA], and also consistent with a stipulated stay of litigation entered in" the above-captioned matter of *Yurok II*, Case No. 3:19-cv-04405-WHO (N.D. Cal).  On or about April 28, 2020, Reclamation provided OWRD with a First Supplemental Response to Interim Order Concerning Release of Stored Water providing the technical information regarding release, including deliveries of water deemed to have been "stored" to the A Canal and listing the applicable legal requirements, namely the ESA and federal reserved water rights.  The "flushing flow" occurred between April 22 and 25, 2020, during which time some 43,125 AF were released from UKL into the Klamath River.

91.     On May 14, 2020, KID filed a petition in the Marion County Circuit Court, *Klamath Irrigation Dist. v. Oregon Water Resources Department, et al.* (20CV17922)), seeking injunctive relief claiming that the watermaster had failed to carry the ACFFOD into effect. Reclamation is not named as a party to that petition, which remains ongoing as of the date of this complaint.  Reclamation could not be named as a party to the suit again because those proceedings did not satisfy the conditions to the waiver of sovereign immunity under the McCarran Amendment.

92.     On October 13, 2020, the Marion County Circuit Court issued an order directing the Watermaster District 17, to:

> … immediately stop the distribution, use and/or release of Stored Water from the UKL without determining that the distribution, use and/or release is for a permitted purpose by users with existing water rights of record or determined claims to use the Stored Water in UKL.

93.     On October 15, 2020, the Watermaster District 17 investigated and determined that "stored" water was not passing the Link River Dam at that time after considering inflows to UKL and outflows passing the Link River Dam.  OWRD has announced that, in the exercise of its continuing obligation under Oregon state law to divide or distribute the water in accordance with the relative and respective rights of the various users until it is no longer required to do so, it will make updated determinations "whenever circumstances change materially but no less frequently than every 30 days throughout 2021."

94.     In a subsequent January 22, 2021 "stored water" determination, OWRD stated that "[s]ubsequent determinations may lead to the Department issu[ing] an order requiring the Bureau to stop the distribution, use and/or release of Legally Stored Water from the Upper Klamath Lake. This order would be issued in the event that the watermaster determines that Legally Stored Water is passing the Link River Dam other than in accordance with ORS 540.410 (prior notice required from reservoir owners using the bed of a stream)[,] the ACFFOD, and/or the October 13, 2020 Order."  OWRD subsequently issued "stored water" determinations on February 23, 2021, March 30, 2021, April 30, 2021, May 27, 2021, and June 29, 2021; and on July 2, 2021 and July 28, 2021, OWRD issued Notices of Violation to Reclamation, finding that

water deemed by OWRD to have been "stored" in UKL had been released in violation of the OWRD Order.  The Notices of Violation follow language in the OWRD Order stating that Reclamation "will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations."

95.    The OWRD Order forbidding any release of water from UKL for instream use that is deemed to have been "stored" is grounded exclusively in Oregon state law and does not purport to exempt releases made to comply with federal law, except to state that nothing in the order alters such requirements or excuses compliance with those requirements.

### FIRST CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

96.    The United States incorporates its previous allegations as though fully set forth herein.

97.    Reclamation has determined that the diversion, storage, and delivery of irrigation water to the Klamath Project, among other Project activities, is subject to the requirements of the ESA, including but not limited to those of Section 7, as those actions may affect listed species and critical habitats, and Reclamation retains some amount of discretion in doing so. Reclamation's determination is in accordance with the ESA, its regulations, and the law of this Circuit, and is subject to a presumption of regularity.

98.    When required under the ESA, water releases from UKL are congressionally-mandated limitations on Reclamation's exercise of the storage and diversion rights in KA 294 and KA 1000, not the "use" of "stored" water by Reclamation.  Releases from UKL required by the ESA are also consistent with federal reserved rights for salmon fisheries that are held by the United States for the Yurok and Hoopa Valley Tribes in California.  Reclamation has not sought to release any water deemed to have been "stored" in UKL in excess of amounts required by the ESA in the 2018 Plan or 2020 IOP.

99.    The operations to implement the EWA and UKL boundary conditions specified in the 2018 Plan have been analyzed by FWS and NMFS and found to be compliant with ESA Section 7 in written BiOps.  The BiOps were accompanied by incidental take statements that provide exemptions from the "take" prohibition of ESA Section 9 for specified incidental take

that may occur in accordance with the specified terms and conditions.  As the water volumes to comply with the ESA that are specified in the 2018 Plan, as amended by the 2020 IOP, are designed to meet species' biological needs, they do not account for how the water is classified under Oregon state water law.

100.    It is not always possible for Reclamation to maintain the biologically-necessary conditions in the Klamath River without releasing water deemed by OWRD to be in "storage" in UKL under Oregon state water law.  Therefore, in prohibiting the release of any "stored" water for non-irrigation purposes, the Challenged Orders would, if followed, prevent Reclamation from implementing the operations that NMFS and FWS have concluded will ensure that Klamath Project operations are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat," and potentially cause Project operations to exceed the amount or extent of incidental take of listed species, per the incidental take statements issued to Reclamation, contrary to the requirements of Section 9 of the ESA.  16 U.S.C. §§ 1536(a)(2), 1538.

101.    OWRD lacks jurisdiction to direct Reclamation to refrain from releasing what OWRD deems to be "legally stored water" from UKL for any purposes other than satisfying water rights under Oregon law—where Reclamation, in consultation with NMFS, has determined such releases are required by the ESA.  Rather, OWRD, acting through its Director, may only "[a]dminister and enforce the *laws of the state* concerning the water resources of this state."  Or. Rev. Stat. § 536.037(1)(c) (emphasis added).

102.    Section 8 of the Reclamation Act does not operate to render the United States subject to the Challenged Orders or related proceedings.  In Section 8, Congress directed that Reclamation is to follow state substantive law in acquiring water rights for federal reclamation projects.  Section 8 does not constitute a waiver of the United States' sovereign immunity to State adjudication of any and all disputes over Klamath Project operations.  In this regard, it is well-established that "the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation."  *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citation omitted);

*Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F.2d 585, 603 (9th Cir. 1981) ("a federal agency performing a federal function is not required to submit to a state regulatory procedure, absent a 'clear and unambiguous' congressional statement to that effect."). Here, there is no "clear and unambiguous" authorization for OWRD to regulate the Klamath Project's compliance with the requirements of federal law. Hence, the Challenged Orders are *ultra vires* in that they limit and/or regulate Reclamation's compliance with federal law.

103. Further, the Project's Oregon state-law based water rights, as determined in the ACFFOD, set a maximum amount of water that *may* be diverted, stored, and/or beneficially used, but they do not *require* Reclamation to undertake such diversion and/or storage or determine whether water is legally available to the Project, including under the Project water users' contracts with Reclamation and applicable federal law. The ACFFOD also specifically disclaims any authority over the contracts between Reclamation and the water users. *See* KBA_ACFFOD_07085-07086 (stating that the ACFFOD does not determine "the relative rights of the KPWU entities and the United States to control or operate diversion and distribution works, including headgates, pumps, canals and other structures . . . and does not alter in any way the relative rights of the United States and the irrigation entities to control or operate the irrigation works.").

104. As to the substance of the Challenged Orders, though Section 8 of the Reclamation Act provides as a general matter that state law shall govern the appropriation, distribution, and use of water under federal reclamation projects for irrigation and other project purposes, the Supreme Court has ruled that "state water law does not control in the distribution of reclamation water if inconsistent with other congressional directives to the Secretary." *California v. United States*, 438 U.S. 645, 668 n.21 (1978). The ESA is such a congressional directive. Further, the language of Section 8 is limited to the appropriation of water for Project purposes, such as irrigation. Section 8 does not direct that Reclamation must appropriate water to comply with other requirements of federal law, such as the ESA. In fact, the ESA in no way contemplates that the United States must appropriate water to meet its requirements, but instead operates as a limit on the exercise of Project water rights, to the extent such exercise would

conflict with the mandates of the ESA.  Nor does Section 8 affect pre-existing rights, including tribal reserved rights, or divest Reclamation of discretion that it holds relative to such reserved rights.

105.    The provisions of the contracts between Reclamation and the Klamath Project water users limit the potential for conflicts between federal law and state water rights by including provisions that: (1) do not require delivery of a specific quantum of water; (2) allow Reclamation to apportion water among Project contractors in times of shortage; (3) absolve Reclamation of liability for shortages resulting from drought and other causes; and/or (4) generally incorporate other requirements of federal law.  However, in the event of a conflict, water delivery contracts are not immune from subsequently enacted legislation, including the ESA, and state water rights are subservient to the requirements of the ESA.  *See*, *e.g.*, *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, 849 F. Supp. 717, 732 (E.D. Cal. 1993), *aff'd sub nom. O'Neill v. United States*, 50 F.3d 677, 686 (9th Cir. 1995), *cert. denied O'Neill v. United States*, 516 U.S. 1028 (1995); *United States v. Glenn–Colusa Irrigation Dist.*, 788 F. Supp. 1126, 1134 (E.D. Cal. 1992).

106.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), states that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  Federal Rule of Civil Procedure 57 states that a "court may order a speedy hearing of a declaratory-judgment action."

107.    For all of the foregoing reasons, Cross-Claimant United States of America is entitled to a declaration under 28 U.S.C. § 2201, that the Challenged Orders are in excess of OWRD's authority and jurisdiction, and therefore invalid.

108.    Cross-Claimant United States of America also is entitled to a declaration under 28 U.S.C. § 2201, that (a) Reclamation's operation of the Klamath Project, including the exercise of its rights to store water in UKL for irrigation use under Oregon law, is subject to the requirements of the ESA, including but not limited to Section 7; (b) the ESA, including but not limited to Section 7, may require Reclamation to release water from UKL regardless of the

water's classification and without appropriating such water; and (c) to the extent that the Challenged Orders forbid Reclamation from making releases of water deemed to have been "stored" in UKL under Oregon law for this federal purpose, the Challenged Orders are contrary to the ESA and therefore preempted under the Supremacy Clause of the United States Constitution. U.S. Const. art. VI, §1, cl.2.

109.    Cross-Claimant also is entitled to a permanent injunction under 28 U.S.C. § 2202 against any attempt to enforce the Challenged Orders, which would limit and/or prevent Reclamation from operating the Project under federal law, including through the release of water deemed to have been stored in UKL.

**SECOND CAUSE OF ACTION**
**(DECLARATORY JUDGMENT)**

110.    The United States incorporates its previous allegations as though fully set forth herein in support of this Second Cause of Action, which is pled as an alternative claim for relief to the first Cause of Action if the Court fails to grant the relief requested under the first count.

111.    It is not always possible for Reclamation to operate the Klamath Project consistent with the federal reserved water rights to support fisheries of the Yurok and Hoopa Valley Tribes in California without releasing water deemed to have been "stored" in UKL. Those reserved rights, though unquantified, are senior to the irrigation water rights within the Project and entitle the California Tribes to keep at least as much water in the Klamath River as is necessary to prevent jeopardizing the continued existence of the SONCC coho salmon under Section 7 of the ESA. In purporting to prohibit Reclamation from making any releases of water deemed to have been "stored" in UKL for non-irrigation purposes, the Challenged Orders, if implemented, would prevent Reclamation from operating the Klamath Project consistent with the senior reserved rights to support fisheries of the Hoopa Valley and Yurok Tribes.

112.    In the alternative to the relief requested under the First Cause of Action, the United States is entitled to a declaration under 28 U.S.C. § 2201, that: (a) at least prior to the quantification of the federal reserved water rights of the Yurok and Hoopa Valley Tribes, OWRD lacks jurisdiction to issue the Challenged Orders, which impinge upon Reclamation's

operation of the Project consistent with the federal reserved water rights to support fisheries of the Yurok and Hoopa Valley Tribes; (b) prior to the quantification of the federal reserved water rights to support fisheries of the Yurok and Hoopa Valley Tribes, which are senior to the irrigation water rights of the Project, Reclamation has authority in its operation of the Project, consistent with those rights, to release from UKL at least as much water to the Klamath River as is necessary to prevent jeopardizing the continued existence of the SONCC coho salmon and/or destruction or adverse modification of its critical habitat within the meaning of Section 7 of the ESA; and, (c) at least prior to the quantification of the federal reserved water rights to support fisheries of the Yurok and Hoopa Velley Tribes, and to the extent the Challenged Orders would forbid Reclamation from releasing water from UKL consistent with Tribal water rights to support fisheries, the Challenged Orders are contrary to these rights and preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, §1, cl.2, and those authorities referred to as the Indian Affairs Powers, including the Indian Commerce Clause, U.S. Const. art. I, §8, cl.3.

113.    Cross-Claimant also is entitled to a permanent injunction under 28 U.S.C. § 2202 against any attempt to enforce the Challenged Orders which would limit and/or prevent Reclamation from operating the Project under federal law, including through the release of water deemed to have been "stored" in UKL.

## PRAYER FOR RELIEF

WHEREFORE, Cross-Claimant United States of America requests that the Court enter an order and judgment against Crossclaim-Defendants OWRD and KWUA as follows:

A.    For declaratory relief that:

1.    the Challenged Orders are invalid because OWRD lacks jurisdiction to issue orders impinging upon Reclamation's satisfaction of its obligations under the federal ESA;

2.    Reclamation's operation of the Klamath Project, including the exercise of its rights to store water in UKL for irrigation use, is subject to compliance with the ESA;

3. complying with the ESA may require Reclamation to release water from UKL regardless of the water's classification under state law; and

4. to the extent that the Challenged Orders would forbid Reclamation from making releases of water deemed to have been "stored" in UKL for this federal purpose, the Challenged Orders are contrary to the ESA and therefore preempted under the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, §1, cl.2; and

B. Alternatively, if the Court fails to grant the foregoing requested declaratory relief, for further declaratory relief that:

1. At least prior to the quantification of the federal reserved water rights of the Yurok and Hoopa Valley Tribes, OWRD lacks jurisdiction to issue the Challenged Orders, which impinge upon Reclamation's operation of the Project consistent with the federal reserved water rights to support fisheries of the Yurok and Hoopa Valley Tribes;

2. Prior to the quantification of those rights, which are senior to the irrigation water rights of the Project, Reclamation has authority in its operation of the Project, consistent with those rights, to release from UKL at least as much water to the Klamath River as is necessary to prevent jeopardizing the continued existence of the SONCC coho salmon and/or destruction or adverse modification of its critical habitat within the meaning of Section 7 of the ESA; and

3. At least prior to the quantification of the federal reserved water rights to support fisheries of the Yurok and Hoopa Velley Tribes, and to the extent the Challenged Orders would forbid Reclamation from releasing water from UKL consistent with such rights, the Challenged Orders are contrary to these rights and preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, §1, cl.2, and those authorities referred to as the Indian

Affairs Powers, including the Indian Commerce Clause, U.S. Const. art. I, §8, cl.3.

C.    For a permanent injunction against enforcement of the Challenged Orders that would limit and/or prevent Reclamation from operating the Project in conformance with federal law, including through the release of water deemed to have been "stored" in UKL, against the United States and/or any agency, instrumentality, and/or employee thereof; and

D.    For such further relief as this Court deems just and proper.

Dated: August 18, 2021

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/
THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
thomas.snodgrass@usdoj.gov

/s/
ROBERT P. WILLIAMS, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-307-6623; Fax: 202-305-0275
robert.p.williams@usdoj.gov

/s/
DARON T. CARREIRO, Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Indian Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202

Telephone: 202-305-1117; Fax: 202-305-0275
daron.carreiro@usdoj.gov

*Attorneys for Federal Defendants*