UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUROK TRIBE, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. BUREAU OF RECLAMATION, et al.,<br><br>    Defendants. | Case No. 19-cv-04405-WHO<br><br>**ORDER DENYING MOTION TO DISMISS CROSSCLAIM, GRANTING MOTION TO DISMISS SUPPLEMENTAL COMPLAINT**<br><br>Re: Dkt. Nos. 991, 992 |

Before me are two motions to dismiss: one filed by the Oregon Water Resources Department ("OWRD") against a crossclaim brought by the United States, the other by OWRD Director Thomas Byler against a supplemental complaint brought by the Yurok Tribe, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Resources (collectively, "the plaintiffs"). There is significant overlap between the crossclaim, supplemental complaint, and corresponding motions to dismiss, which center on the lawfulness of an order issued by the OWRD preventing the U.S. Bureau of Reclamation ("Bureau") from releasing water classified as stored at the Upper Klamath Lake in Oregon.

The OWRD's motion to dismiss the federal government's crossclaim is DENIED. The United States has adequately alleged an injury in fact—namely, a conflict between the OWRD order and the Bureau's obligations under the Endangered Species Act ("ESA")—and otherwise established standing to sue. The matter is also ripe for adjudication.

Byler's motion to dismiss the plaintiffs' supplemental complaint is GRANTED. Although the plaintiffs have standing to bring the complaint, *Ex parte Young* stands in the way, as they have not alleged a violation of federal law by Byler. But because the plaintiffs have alleged a right to relief arising out of the same series of occurrences as in the crossclaim, as well as common questions of law and fact, I will exercise my discretion and allow the permissive joinder of the

plaintiffs to the government's crossclaim. Doing so will not cause prejudice and instead will allow the plaintiffs to be heard on these issues.

**BACKGROUND**

At the heart of this litigation lies the limited water supply of the Klamath River and the often-competing interests of the people and wildlife who depend on it. This case, filed in 2019, now includes numerous parties and claims. For brevity, I will focus on the factual and procedural background most relevant to the motions at hand.[1]

The Klamath River originates in Oregon, flows into California, through the Yurok Reservation, and into the Pacific Ocean. Suppl. Compl. [Dkt. No. 967] ¶ 28. The Klamath Project, authorized by Congress in 1905, is a series of dams, diversions, canals, and pumping stations located in Southern Oregon and Northern California. *Id*. at ¶¶ 29-30. The Bureau is tasked with distributing water via the Klamath Project, which determines the level, timing, and rate of water flow in certain portions of the Klamath River. *See* Cross-cl. [Dkt. No. 963] ¶ 27. The Bureau also controls releases from Upper Klamath Lake ("UKL"), a naturally-occurring lake in Klamath County, Oregon, via the government-owned Link River Dam, which is part of the Klamath Project. *See id*. at ¶¶ 1-2. The level, timing, and flow of this water impacts various stakeholders, who rely on it for food, jobs, culture, and habitat.

As a federal agency, the Bureau must comply with the ESA, meaning its operation of the Klamath Project cannot jeopardize the survival and recovery of listed species, adversely modify their critical habitat, or engage in actions that "take" them in excess. Suppl. Compl. at ¶ 2. This case focuses on the Klamath Project's impact on Southern Oregon/Northern California Coast Coho salmon ("coho") and the Klamath River Chinook salmon populations. *See* First Am. Compl. ("FAC") [Dkt No. 17] ¶ 1. Coho are listed as threatened under the ESA. 62 Fed. Reg. 24,588 (May 6, 1997). Though not listed under the ESA, Chinook salmon are prey for Southern Resident Killer Whales, which are listed as endangered. 70 Fed. Reg. 69,903 (Nov. 18, 2005); FAC at ¶ 1.

Additionally, the Bureau must operate the Klamath Project in a manner consistent with the

---

[1] My prior orders, which I incorporate by reference here, explain the factual and procedural background in further detail. *See, e.g.*, Dkt. Nos. 908, 924, 961.

federally reserved water rights of the Yurok and Hoopa Valley Tribes. *See* Cross-cl. at ¶¶ 82-86. At issue in this case is the Yurok Tribe's right to sufficient water to support its fishery, which include coho and Chinook salmon. *See* Suppl. Compl. at ¶¶ 120-21.

The Yurok Tribe filed suit in 2019, challenging the Bureau's 2019-2024 Klamath Project Operations Plan ("Plan") and a 2019 Biological Opinion ("BiOp") assessing the Plan's impacts on coho and Chinook salmon. Dkt. Nos. 1, 17. On March 27, 2020, the parties agreed to stay the litigation until September 30, 2022, provided that the Bureau operated the Klamath Project in accordance with an Interim Plan until the next Plan and BiOp were developed. Dkt. No. 907 at 4-5. I granted their request. Dkt. No. 908. Upon motions by the parties, I lifted the stay on September 30, 2021, for a limited purpose: to litigate a crossclaim (to be brought by the federal defendants) and a supplemental complaint (by the plaintiffs). *See* Dkt. No. 961.

The crossclaim and supplemental complaint were motivated by an April 6, 2021, order ("the Order") issued by the OWRD's Byler, which directed the Bureau to "immediately preclude or stop the distribution, use or release of stored water from the UKL, in excess of amounts that may be put to beneficial use under KA 1000 downstream of the Link River Dam."[2] *See* Mot. to Dismiss Suppl. Compl. ("Byler MTD") [Dkt. No. 991], DeFever Decl., Ex. A ("Order") at 10. The Order stated that the OWRD had "cause to believe that the Bureau will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations." *See id*. at 8. It also included this language:

> Nothing in this order alters, relieves or releases any person, state, or federal agency from any and all rights, duties or obligations arising from other sources of law including without limitation other state laws or rules, federal laws and related federal agency regulations, federal or state court orders, or contracts.

*Id*. at 10.

On July 2, 2021, and again on July 28, 2021, the OWRD issued notices to the Bureau stating that legally stored water had passed through the Link River Dam in violation of the Order.

---

[2] KA 1000 is a "provisionally-adjudicated Oregon state-law based water right held for irrigation purposes." Cross-cl. at ¶ 4.

3

*See* Cross-cl. at ¶ 9; *see also* Byler MTD, DeFever Decl., Exs. B, C.[3] The July 2 notice warned that the Bureau had one day to correct the violation and if it had not done so by then, "the Bureau may be subject to further agency action or any other lawful remedy." *See* DeFever Decl., Ex. B. ("July 2, 2021 Violation") at 8.

The Bureau contends that it cannot comply with the ESA or its federal tribal trust obligations without releasing stored water in violation of the OWRD Order. *See* Cross-cl. at ¶¶ 6-7. After I lifted the stay, the United States filed its crossclaim, seeking declaratory relief, including that the Order and notices were invalid, contrary to the ESA, and preempted under the Supremacy Clause. *See* Cross-cl. at 40. It also sought a permanent injunction against enforcement of the OWRD Order that would "limit and/or prevent" the Bureau from operating the Klamath Project in compliance with federal law. *See id*. at 41. Alternatively, it sought declaratory relief that the Order was contrary to the federal reserved water rights to support the fisheries of the Yurok and Hoopa Valley Tribes, and preempted by the Supremacy Clause and the Indian Commerce Clause. *See id*.

The plaintiffs filed a supplemental complaint against Byler. They contend that he violated the Supremacy Clause by issuing the Order and notices of violation, and seeking similar declaratory and injunctive relief. Suppl. Compl. at 1, 41-43.

The OWRD and Byler filed their respective motions to dismiss on December 29, 2021. Dkt. Nos. 991, 992. I heard oral arguments on March 2, 2022.

## LEGAL STANDARD

The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by demanding, among other things, that plaintiffs have standing to sue. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Because standing pertains to subject matter jurisdiction, it is properly raised in a Rule 12(b)(1) motion to dismiss. *See White v. Lee*, 227 F.3d

---

[3] Byler requested that I again take judicial notice of the Order as well as the two notices of violation. Byler MTD at 3:9-17 (citing DeFever Decl., Exs. A, B, C). The OWRD echoed his request. Mot. to Dismiss Cross-cl. ("OWRD MTD") [Dkt. No. 992] 1:16-20. I will take notice of these documents, as they are public records whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2). I do so, however, without converting the motions to dismiss into ones for summary judgment. *See Williams v. Facebook, Inc.*, 384 F. Supp. 3d 1043, 1051 (N.D. Cal 2018).

4

1214, 1242 (9th Cir. 2000).

To establish standing, a plaintiff must demonstrate that she "has suffered a concrete and particularized injury that is either actual or imminent" (an injury-in-fact), "that the injury is fairly traceable to the defendant" (causation), "and that it is likely that a favorable decision will redress that injury" (redressability). *See Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). Standing is an issue distinct from the merits of a claim, and therefore "does not require analysis of the merits." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (citation omitted).

A challenge pursuant to Rule 12(b)(1) may be facial or factual. *See White*, 227 F.3d at 1242. In a facial attack, as asserted here, the jurisdictional challenge is confined to the allegations in the pleadings. *See Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004); *see also* Byler MTD at 4 ("This motion is made as a facial jurisdictional challenge . . ."); OWRD MTD at 2 (same). The challenger asserts that the allegations in the pleading are insufficient "on their face" to invoke federal jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve this challenge, the court assumes that the plaintiff's allegations are true and draws all reasonable inferences in her favor. *See Wolfe*, 392 F.3d at 362.

## DISCUSSION

### I. THE CROSSCLAIM

#### A. STANDING

The OWRD first argues that the United States lacks standing because it has not shown an injury-in-fact. OWRD MTD at 4:3-18. It does not contest causation or redressability. *See id*.

To establish an injury-in-fact for the purposes of standing, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (citations and quotation marks omitted). The threatened injury must be "certainly impending;" "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 409 (2013) (citations and quotation marks omitted). A plaintiff facing enforcement action "may establish standing by demonstrating a well-founded fear of enforcement and a threatened injury that is 'sufficiently real and imminent.'" *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 519 (N.D. Cal. 2017)

(citing *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).  The Ninth Circuit has held that plaintiffs are "presumed" to have standing to seek injunctive relief "when it is the direct object of regulatory action challenged as unlawful."  *Los Angeles Haven Hosp., Inc. v. Sebelius*, 638 F.3d 644, 655 (9th Cir. 2011).

The OWRD's argument—that any injury alleged by the United States is hypothetical, not actual or imminent—is threefold.  First, it contends that any injury depends on whether the Bureau actually follows the Order, and nowhere has the United States alleged that it is compelled to follow a state order that it believes is trumped by federal law.  OWRD MTD at 4:21-28.

Next, the OWRD takes issue with the allegation that it may issue civil penalties to the Bureau if the Bureau again violates the Order.  *Id*. at 6:1-7:9; *see also* Cross-cl. at ¶ 9.  The OWRD argues that:  (1) it has not sought civil penalties against the Bureau; (2) it is unclear how it would successfully collect civil penalties from a federal agency; and (3) any threat of civil penalties has not deterred the Bureau from releasing water from the UKL to fulfill its ESA obligations.  OWRD MTD at 6:1-7:9.

Finally, the OWRD asserts that the language of the Order underscores the hypothetical nature of the government's injury, as it "expressly disclaims any alteration to [the Bureau's] federal-law obligations."  *Id*. at 7:13-14.  It points to the Order's final paragraph, which states that the Order does not alter, relieve, or release a federal agency "from any and all rights, duties or obligations arising from other sources of law," including federal laws and regulations.  OWRD Reply [Dkt. No. 1003] 3:12-4:5 (citing Order at 10).  This, the OWRD contends, shows that the Order does not in fact conflict with the ESA.  *See id*. at 3:27-4:5.

These arguments are not persuasive.  First, the United States has adequately alleged an actual—not hypothetical—conflict between the requirements of the Order and the ESA.  As pleaded in the crossclaim, the government contends that in order to comply with the ESA in its operation of the Klamath Project, it "inevitably" must use stored water from the Upper Klamath Lake, either by maintaining minimum water flows or by implementing a higher flow release in the Klamath River.  *See, e.g.*, Cross-cl. at ¶ 5.  The government further alleges that following the Order would not only cause the Bureau to violate its ESA obligations, but also interfere with its

6

management of the Project in a manner consistent with the reserved water rights of the Yurok and Hoopa Valley Tribes. *Id*. at ¶¶ 6-7.

The government's allegations are bolstered by the text of the Order. The Order acknowledges the Bureau's responsibilities under the ESA, stating that it "will, at some near future date, release legally stored water" to comply with its federal tribal trust and ESA obligations. *See id*. at ¶ 4; Order at 8. In other words, the OWRD has already—and expressly—acknowledged the purported conflict it now denies. And the Order provides the Bureau no way to escape any such conflict; the "disclaimer" that OWRD references only requires the Bureau to somehow comply with both federal and state law. *See* Cross-cl. at ¶ 4.

Importantly, it is improper to decide at this stage of the litigation whether the Order in fact conflicts with federal law, as standing "does not require analysis of the merits." *See Maya*, 658 F.3d at 1068. At times, the OWRD's argument veers into a discussion of the merits of the crossclaim. At this point, all the United States must do is adequately allege that such a conflict exists. Assuming that the allegations in the crossclaim are true, and drawing all reasonable inferences in the government's favor, it has done so. *See Wolfe*, 392 F.3d at 362.

Because of the alleged conflict between the Order and the Bureau's obligations under the ESA, the Order thus injures the Bureau in one of two ways. It either follows the ESA and violates the Order, or it follows the Order and violates the ESA. Either scenario opens the door for enforcement action. *See Pacificans for a Scenic Coast v. Cal. Dep't of Transp.*, 204 F. Supp. 3d 1075, 1084 (N.D. Cal. 2016) (noting that an agency that ignores a BiOp "does so at its own peril (and that of its employees)," as those who knowingly "take" an endangered or threatened species "is subject to substantial civil and criminal penalties, including imprisonment."). The injury to the Bureau is therefore not contingent upon whether it follows the Order.

The fact that the OWRD has not yet sought civil penalties or taken other enforcement action does not render the injury hypothetical. Two cases are particularly instructive.

The first is *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010). There, the United States sued to bar enforcement of two municipal ordinances that prohibited federal employees or agents from engaging in military recruitment activities targeting minors. *City of*

7

*Arcata*, 629 F.3d at 988. Per the ordinance, violators were subject to civil penalties. *Id*. The cities had also "expressed their intent to enforce the ordinances against the federal government." *Id*. The Ninth Circuit held that the "adoption and threatened enforcement" of the ordinances "subject the government"—"the sole target of the challenged governmental action"—"to an imminent adverse impact," establishing standing. *See id*. at 989-90.

The Supreme Court came to a similar conclusion in *Pub. Utils. Comm'n v. United States*, 355 U.S. 534 (1958), where it rejected the argument that there was no controversy because there was no allegation that a state commission "had done or had threatened to do anything adverse to the United States." 355 U.S. at 536. The Court held that the commission had "plainly indicated an intent to enforce" the law in question, which regulated the rates charged by carriers to transport federal property. *Id*. at 538. That intent of enforcement, the Court held, was enough to constitute a "present and concrete" controversy. *Id*. at 539.

The OWRD has made its intent to enforce the Order clear, as shown by the two notices of violation that it issued. *See* Cross-cl. at ¶ 9. The government—which is also the direct object of the OWRD's action, as the sole target of the Order and notices—has alleged that it faces civil penalties "and/or . . . other enforcement action" if it releases water in violation of the Order. *Id*. at ¶ 17. This concern is again supported by the OWRD's actions. The first notice expressly warned the Bureau that it "may be subject to further agency action or any other lawful remedy" should it not timely correct its violation. *See* July 2, 2021 Violation at 8.

The Bureau is faced with a similar dilemma as the military recruiters in *City of Arcata*: alter its conduct or face penalties. *See* 629 F.3d at 990. Given the OWRD's actions to date—particularly the issuance of the two notices of violations—the government has shown a "well-founded fear of enforcement and a threatened injury that is 'sufficiently real and imminent.'" *County of Santa Clara*, 250 F. Supp. 3d at 519. In doing so, the government has sufficiently shown an injury-in-fact, as required to establish standing to bring its crossclaim.

**B. RIPENESS**

Crossclaim intervenor-defendant Klamath Irrigation District ("KID") argues that the central flaw in the crossclaim (as well as the supplemental complaint) is ripeness rather than

8

standing.[4]  KID Resp. to OWRD MTD ("KID Resp.") [Dkt. No 996] 3:26-27.

The purpose of the ripeness doctrine is to avoid premature adjudication.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Ripeness prevents courts from "entangling themselves in abstract disagreements over administrative policies" while protecting agencies from "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Id*. at 148-49.  To determine whether a case is in fact ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id*. at 149.

KID contends that under Oregon law, the Order is currently stayed because it is the subject of pending challenges in the District of Oregon and Oregon state court.  KID Resp. at 2:23-3:13.  Because the Order is stayed, KID argues, the question of whether it is preempted by the ESA is a "hypothetical disagreement that has not ripened into a concrete dispute appropriate for adjudication" in this court.  *Id*. at 4:16-20.  Moreover, KID asserts that because the outcomes of these cases are uncertain, "it is unknown whether the OWRD Order being challenged by the United States here will ever retake effect." *Id*. at 3:9-10.

This argument is not persuasive.  The alleged injury arises from the "mere existence" of the OWRD Order.  *See* USA Oppo. at 3 n.3.  The crossclaim and supplemental complaint allege a conflict of state and federal law that prevents the Bureau from fulfilling its obligations under the ESA.  This issue is legal in nature, does not require further factual development, and, importantly, exists regardless of whether the Order is stayed.  *See County of Santa Clara*, 250 F. Supp. 3d at

---

[4] The government objects to the KID's response as an untimely motion to dismiss.  *See* USA Oppo. [Dkt. No. 999] 3 n.3.  It has a point.  When I allowed KID to intervene, I stated that if it intended to file a motion to dismiss related to jurisdiction, it must do so no later than December 27.  *See* Dkt. No. 983.  I also specified that any oppositions or replies to that motion would be set on the same schedule as OWRD's motion to dismiss (with oppositions due on January 28, 2022), so that the two motions could both be heard on March 2, 2022.  *See id*.  KID did not file a motion to dismiss before the December 27 deadline.  Instead, it filed this "response" to the OWRD's motion on January 28.  *See* Dkt. No. 996.  But this "response" is effectively a motion to dismiss, as it raises a new and distinct argument against the crossclaim and supplemental complaint: ripeness.  *See id*.  That said, I will consider KID's argument in order to fully address the jurisdictional questions related to the crossclaim and supplemental complaint.

530 (finding that an issue was fit for review because the claims did not require further factual development and were legal in nature).

While the fact that other challenges to the Order are pending perhaps lessens the hardships the parties will face here, there is no certainty to when those matters will be decided. This case involves high stakes: the valid, yet competing, water needs of myriad stakeholders at a time when water is increasingly scarce. Each of these parties inherently faces hardship the longer these underlying issues linger. This matter is more than ripe for adjudication.

The OWRD's motion to dismiss the federal government's crossclaim is therefore DENIED. The United States has sufficiently alleged an injury in fact: that the Order conflicts with its obligations under the ESA, resulting in a well-founded fear of enforcement action by the OWRD and a threatened injury (including civil penalties) that is sufficiently real and imminent (as evidenced by the two notices of violation). Because causation and redressability are not at issue and the matter is ripe for review, the government may proceed with its crossclaim.

## II.     THE SUPPLEMENTAL COMPLAINT

### A.  STANDING

Turning to the supplemental complaint, Byler also asserts that the plaintiffs lack standing. This time, injury and causation are at issue. *See* Byler MTD at 10:7-8.

#### i.     Injury

Many of Byler's points are reminiscent of those raised by the OWRD. He argues that any injury to the plaintiffs is hypothetical, as "there is no factual basis to assume that the Bureau of Reclamation is likely to obey" the Order, which he also notes is stayed. *Id*. at 10:14-16, 11:14-23.

The first argument carries more weight in this context. As the supplemental complaint alleges, if the Bureau cannot release stored water from Upper Klamath Lake, it cannot sustain Klamath River salmon, which harms the salmon and the plaintiffs who depend on their fisheries. *See* Suppl. Compl. at ¶ 12. The OWRD has indicated that it will enforce the Order, as shown through the two notices of violation. *Id*. at ¶ 83. But unlike the government, the plaintiffs are harmed only if the Bureau follows the Order. Their injury arises if the Bureau cannot use the stored water to sustain the salmon, which differs from the enforcement action that the Bureau

faces whether it ignores the Order or not.  Moreover, the plaintiffs have not alleged any similar threat of enforcement action by Byler.  *See generally id*.

That said, this overlooks the additional injury alleged in the supplemental complaint:  that by limiting the Bureau's ability to provide ESA-compliant water flows to the Klamath River, Byler (vis-à-vis the Order) has impinged upon the Bureau's "ability to act consistent with the Yurok Tribe's federally reserved water rights to support its fishery." *See id*. at ¶¶ 119-128.  Because these water rights are among the Yurok Tribe's "most sacred rights and one of its most protected sovereign interests," the plaintiffs argue that the Order amounts to "an affront to the Tribe's sovereignty."  Pls. Oppo. [Dkt. No. 998] 11:8-12.[5]  And, they contend, "[w]hen one sovereign asserts authority over another, that affront to sovereignty is an injury giving rise to standing." *Id*. at 12:17-18.

Byler contends that this argument is unsupported by existing law, and that I would be "the first to hold that a state agency's regulation of in-state waters can amount to an assertion of authority over a downstream and out-of-state tribal sovereign."  Byler Reply [Dkt. No. 1002] 9:16-18.  This is too narrow of a view of sovereignty for standing purposes.  The Supreme Court noted in *Bowen v. Pub. Agencies Opposed To Soc. Sec. Entrapment*, 477 U.S. 41, 50 n.17 (1986), that there was "no question" that a state had standing to sue because it "alleged a judicially cognizable interest in the preservation of its own sovereignty, and a diminishment of that sovereignty" by the act at issue.  The Yurok Tribe has alleged a similar interest in and diminishment of its sovereignty.  Further, Byler's interpretation of *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir. 1981) is off point.  That case did not address standing but instead the adjudication of tribal water rights, which is expressly beyond the parameters imposed when I lifted the stay to litigate this supplemental complaint. *See generally id*., *see also* Order Granting Reqs. to Lift Stay [Dkt. No. 961] 5:26-6:10.

---

[5] Although this injury is unique to the Yurok Tribe, the "presence of one party with standing assures that [a] controversy before [the] Court is justiciable." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999) (citing cases); *see also Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other . . . plaintiffs have standing to maintain the suit.").

1  The allegation that the OWRD Order amounts to an affront on the Yurok Tribe's water rights and thus, its sovereignty, is sufficient to constitute an injury for the purposes of standing.

### ii. Causation

To establish causation, the plaintiff must show that the injury is "fairly trace[able] to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (citation omitted). Byler contends that the causal link between the alleged injury and the Order is "hypothetical or tenuous," as it is based on the assumption that the Bureau will not release the water and ignores the Order's stay. *See* Byler MTD at 11:24-12:13. However, if the injury is the Order's alleged intrusion on the Yurok Tribe's federal reserved water rights and thus, its sovereign interests, it can be directly traced to the Order. Causation is no issue.[6]

The plaintiffs have therefore sufficiently established standing to bring their supplemental complaint. Whether it may proceed depends on another issue: *Ex parte Young*.

### B. *EX PARTE YOUNG*

The Eleventh Amendment shields states from suits brought by citizens in federal court. *Douglas v. Cal. Dep't of Youth Auth.*, 271 F.3d 812, 817 (9th Cir. 2001), *amended by* 271 F.3d 910 (9th Cir. 2001). An exception to this arises under *Ex parte Young*, 209 U.S. 123 (1908). *Ex parte Young* "provides that the Eleventh Amendment does not bar suits for prospective injunctive relief against state officers in their official capacities, to enjoin an alleged ongoing violation of federal law." *Hason v. Med. Bd. of Cal.*, 279 F.3d 1167, 1171 (9th Cir. 2002) (citations omitted). Whether a suit lies under *Ex parte Young* does not include an analysis of the merits of the claim; an allegation of a violation of federal law suffices. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) (citation omitted); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate federal law.").

The plaintiffs assert jurisdiction under *Ex parte Young*. *See* Suppl. Compl. at ¶ 9. Setting

---

[6] KID raises the same arguments about ripeness as it did against the crossclaim, which Byler references in his reply. *See* Byler Reply at 7:17-8:4; *see also* Dkt. No. 996. My analysis is the same for both the crossclaim and supplemental complaint.

1    aside Byler's arguments on the merits, which he concedes were improper, he contends that the
2    plaintiffs effectively allege violations of the ESA, but cannot bring such claims because they did
3    not meet the ESA's jurisdictional requirements.  *See* Byler MTD 16:1-17:18; *see also* Byler Reply
4    at 10:15-22.  The ESA's citizen-suit provision requires, among other things, a 60-day written
5    notice of an ESA violation to both the Secretary and alleged violator before bringing suit.  16
6    U.S.C. § 1540(g)(2)(A)(i).  Byler argues that the plaintiffs did not show that they provided such
7    notice.  Byler MTD at 17:12-14.

8    The plaintiffs' first response is that they allege "Supremacy Clause claims" rather than
9    violations of the ESA and thus, the citizen-suit provision does not apply.  Pls. Oppo. at 20:19-21.
10   But the Supreme Court has made clear that the Supremacy Clause "creates a rule of decision," not
11   a source of federal rights or cause of action.  *See Armstrong*, 575 U.S. at 324-25.

12   A close reading of the supplemental complaint shows that it lacks more than a conclusory
13   allegation that Byler is violating the ESA.  Paragraph 9 references the "OWRD Director's
14   violations of the federal ESA."  Suppl. Compl. at ¶ 9.  As the plaintiffs later concede, they do not
15   claim that Byler is engaged in the unlawful take of a threatened or endangered species.  *See* Pls.
16   Oppo. at 23:6-8.  Instead, "the claim is that Director Byler is interfering with [the Bureau's] ESA
17   compliance."  *Id*. at 23:13-14.  But *Ex parte Young* requires an allegation of a violation of federal
18   law.  The Supremacy Clause does not provide it.  The ESA does not either, as plaintiffs only
19   allege that Byler's actions will force another entity, the Bureau, to violate the ESA—not that Byler
20   himself is doing so.  Without alleging a violation of federal law by Byler, the plaintiffs' claim does
21   not fall within *Ex parte Young*.[7]

22   In sum, Byler's motion to dismiss the supplemental complaint is GRANTED.  Although
23   the plaintiffs have shown standing via the alleged affront to the Yurok Tribe's sovereignty, they

---

[7] The plaintiffs also assert that the Order violates the intergovernmental immunity doctrine and that they could challenge violations of the ESA under the Administrative Procedure Act ("APA"). *See* Pls. Oppo. at 21:10-15, 23:16-26.  Neither argument resolves the *Ex parte Young* issue.  The intergovernmental immunity doctrine flows from the Supremacy Clause.  *See United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019).  And the supplemental complaint makes no mention of the APA.  *See Barbera v. WMC Mortg. Corp.*, No. C-04-3738-SBA, 2006 WL 167632, at *2 n.4 (N.D. Cal. Jan. 19, 2006) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (citation omitted).

United States District Court
Northern District of California

have not alleged a violation of federal law by Byler as required by *Ex parte Young*. The underlying merits of the supplemental complaint—the OWRD Order's impact on the Bureau's ability to comply with the ESA—will be better addressed via the government's crossclaim.

### III.     PERMISSIVE JOINDER

Federal Rule of Civil Procedure 20(a)(1) allows the permissive joinder of plaintiffs to an action if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." The court must consider whether joinder would "comport with the principles of fundamental fairness or would result in prejudice to either side." *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). "Permissive joinder is to be liberally construed to promote the expeditious determination of disputes, and to prevent multiple lawsuits." *Cuprite Mine Partners LLC v. Anderson*, 809 F.3d 548, 552 (9th Cir. 2015) (citation omitted). Under the Federal Rules, "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966).

With that guidance in mind, I will construe the plaintiffs' supplemental complaint as a request for permissive joinder and exercise my discretion to allow it. The right to relief they seek arises out of the same series of occurrences: the issuance of the OWRD Order and its impact on the Bureau's ability to comply with the ESA. The questions of law and fact raised in the crossclaim and supplemental claim are virtually identical. There is no indication that allowing the plaintiffs to join the crossclaim would cause prejudice, as the underlying issues are the same and the OWRD has notice (via the supplemental complaint) of the plaintiffs' points of view. Importantly, doing so would promote fairness as this litigation proceeds. At oral argument, counsel stated that the plaintiffs' primary concern in bringing the supplemental complaint was being heard on the issues raised by the OWRD Order, as interests important to them are clearly affected. Joinder enables them to be heard.

When I granted KID permissive intervention in December, I did so after determining that

14

1  litigation over its intervention would delay the adjudication of the first phase of issues in this
2  matter.  *See* Dkt. No. 983.  The same is true for any litigation over the plaintiffs' joinder to the
3  crossclaim.  Given the importance and time-sensitive nature of the issues at hand, it benefits all
4  parties to proceed as expeditiously as possible.  Should any of the parties to the crossclaim object
5  to the permissive joinder of the plaintiffs, they may file a motion for reconsideration within one
6  week of the issuance of this Order.

## CONCLUSION

As stated above, the OWRD's motion to dismiss the government's crossclaim is DENIED.  Byler's motion to dismiss the plaintiffs' supplemental complaint is GRANTED.  The plaintiffs may JOIN the government's crossclaim pursuant to Rule 20(a)(1).

**IT IS SO ORDERED.**

Dated: March 24, 2022



William H. Orrick
United States District Judge

15