TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
Email: thomas.snodgrass@usdoj.gov

ROBERT P. WILLIAMS, Senior Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-307-6623; Fax: 202-305-0275
Email: robert.p.williams@usdoj.gov

*Attorneys for Federal Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF RECLAMATION and NATIONAL MARINE FISHERIES SERVICE, <br><br> Defendants, <br><br> and <br><br> KLAMATH WATER USERS ASSOCIATION, THE KLAMATH TRIBES, and KLAMATH IRRIGATION DISTRICT, <br><br> Intervenor-Defendants. <br> ------------------------------------------------------ | Case No. 3:19-cv-04405-WHO <br><br> Related Cases: No. 3:16-cv-04294-WHO, 3:16-cv-06863-WHO, and 3:20-cv-05891-WHO <br><br> **UNITED STATES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON FIRST CAUSE OF ACTION OF CROSSCLAIM AND MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> Fed. R. Civ. P. 56 <br><br> Date: November 9, 2022 <br> Time: 2:00 P.M. <br> Courtroom: Telephonically or by Zoom videoconference <br> Judge: Hon. William H. Orrick |

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Cross-claimant, | ) |
| | ) |
| and | ) |
| | ) |
| YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Cross-claimant by Joinder, | ) |
| | ) |
| v. | ) |
| KLAMATH WATER USERS ASSOCIATION and OREGON WATER RESOURCES DEPARTMENT, | ) |
| | ) |
| | ) |
| Crossclaim-Defendants, | ) |
| and | ) |
| KLAMATH IRRIGATION DISTRICT, | ) |
| Intervenor-Defendant. | ) |
| ------------------------------------------------------ | ) |
| | ) |
| KLAMATH WATER USERS ASSOCIATION, | ) |
| Counterclaimant, | ) |
| v. | ) |
| UNITED STATES OF AMERICA, | ) |
| Counterclaim-Defendant. | ) |
| ------------------------------------------------------ | ) |
| | ) |
| OREGON WATER RESOURCES DEPARTMENT, | ) |
| | ) |
| Counterclaimant, | ) |
| v. | ) |
| UNITED STATES OF AMERICA, | ) |
| Counterclaim-Defendant. | ) |

1

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED .................................................................. 2

SUMMARY OF ARGUMENT ................................................................................. 3

LEGAL BACKGROUND ...................................................................................... 3

    I.    Endangered Species Act ................................................................. 3

        A.    Section 7(a)(2) Duties and the Consultation Process ............................... 3

        B.    Section 9 Prohibition against Take .................................................... 5

    II.    Reclamation Act of 1902 ................................................................. 6

    III.    Supremacy Clause ......................................................................... 7

    IV.    Declaratory Judgment Act ............................................................... 9

    V.    Standard of Review ......................................................................... 9

FACTUAL BACKGROUND AND HISTORY OF ESA LITIGATION INVOLVING
THE PROJECT .................................................................................................. 9

    I.    Klamath Project History and Overview ............................................... 9

        A.    Project Construction and Water Delivery Contracts ................................ 9

        B.    Project Administration through Operations Plans and Drought Plans ...... 11

    II.    Klamath Project Oregon State Law Water Rights ................................. 14

    III.    Federal Reserved Tribal Water Rights ............................................... 16

    IV.    Klamath Project ESA Section 7 Consultation History and Current
Operations ................................................................................... 18

        A.    Overview ................................................................................... 18

        B.    Reclamation's Current Operations and Compliance with ESA
Section 7(a)(2) ........................................................................... 20

        C.    Reclamation's Current Operations and Compliance with ESA
Section 9 .................................................................................... 22

    V.    The Challenged Orders ................................................................... 27

    VI.    Klamath Project ESA Litigation ...................................................... 30

A.    Litigation by Water Users Contesting the Applicability of ESA Section 7 to Project Operations ................................................ 30

B.    Litigation by Tribes, Fishing Interests, and Environmental Groups to Compel ESA Compliance Regarding Project Operations ...................... 37

VII.   Procedural History and Limited Lifting of the Stipulated Stay of Litigation ....... 39

ARGUMENT ...................................................................................................... 42

I.    OWRD Lacks Jurisdiction to Issue Orders Impinging upon Reclamation's Compliance with Federal Law, Including the ESA ............................................ 42

II.   The Challenged Orders Violate the Doctrine of Intergovernmental Immunity .................................................................................................. 45

III.  The Challenged Orders Conflict with the ESA and Therefore are Preempted under the Supremacy Clause of the United States Constitution ........................ 48

IV.   KWUA's Contentions that OWRD's Orders Are Not Preempted Lack Merit ..... 50

A.    The Challenged Orders Squarely Conflict with the Controlling Law of this Circuit, as OWRD Itself Has Conceded ........................ 50

B.    *Patterson* and Related Authority Finding the Klamath Project Subject to Compliance with the ESA Remain Good Law ...................... 51

1.    *Home Builders* Did Not Overrule the Body of ESA Law on the Klamath Project ............................................................ 52

2.    The Project Contract Terms Remain As they Were When the Ninth Circuit Considered them In *Patterson* .......................... 56

3.    The ACFFOD Did Not Eliminate Reclamation's Discretion to Comply with ESA Section 7 ........................................... 61

V.    The United States is Entitled to Permanent Injunctive Relief ............................. 68

CONCLUSION .................................................................................................... 71

1
2

# TABLE OF AUTHORITIES

3

**Cases**

4
*Amoco Prod. Co. v. Village of Gambell*,
5
480 U.S. 531 (1987)........................................................................................ 68
6
*Aransas Project v. Shaw*,
835 F. Supp. 2d 251 (S.D. Tex. 2011) ............................................................ 65
7
*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
8
273 F.3d 1229 (9th Cir. 2001) .......................................................................... 6
9
*Arizona v. United States*,
567 U.S. 387 (2012)........................................................................................ 48
10
*Baley v. United States*,
11
134 Fed. Cl. 619 (2017) .......................................................... 17, 18, 35, 56
12
*Baley v. United States*,
141 S. Ct. 133 (2020) ..................................................................................... 35
13
*Baley v. United States*,
14
942 F.3d 1312 (Fed. Cir. 2019) ............................................................. passim
15
*Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*,
849 F. Supp. 717 (E.D. Cal. 1993) ........................................................ 64, 65
16
*Bennett v. Spear*,
17
520 U.S. 154 (1997)..................................................................................... 4, 6
18
*Blackburn v. United States*,
19
100 F.3d 1426 (9th Cir. 1996) ........................................................... 8, 45, 46
20
*California v. FERC*,
495 U.S. 490 (1990)........................................................................................ 66
21
*California v. United States*,
22
438 U.S. 645 (1978)................................................................................. passim
23
*Columbia Basin Land Prot. Ass'n v. Schlesinger*,
643 F.2d 585 (9th Cir. 1981) ............................................................................ 8
24
*Environmental Protection Information Center v. Simpson Timber Co.*,
25
255 F.3d 1073 (9th Cir. 2001) ........................................................................ 55
26
*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)...................................................................................... 8, 9
27
*Fla. Lime & Avocado Growers, Inc. v. Paul*,
28
373 U.S. 132 (1963).................................................................................... 9, 48

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) ............................................................................................. 8

*Hines v. Davidowitz*,
   312 U.S. 52 (1941) ................................................................................... 9, 48, 50

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
   230 F. Supp. 3d 1106 (N.D. Cal. 2017) ......................................................... 38, 51

*Israel v. Morton*,
   549 F.2d 128 (9th Cir. 1977) ................................................................................. 64

*Kandra v. United States*,
   145 F. Supp. 2d 1192 (D. Or. 2001) ............................................................. passim

*Klamath Drainage Dist. v. Patterson*,
   531 U.S. 812 (2000) ............................................................................................ 34

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*,
   489 F. Supp. 3d 1168 (D. Or. 2020) ................................................................... 36

*Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*,
   No. 1:21-cv-00504-AA, 2022 WL 1210946 (D. Or. Apr. 25, 2022) ......... 36, 37, 44

*Klamath Tribes v. U.S. Bureau of Reclamation*,
   537 F. Supp. 3d 1183 (D. Or. 2021) .................................................................... 39

*Klamath Tribes v. U.S. Bureau of Reclamation*,
   No. 18-cv-03078-WHO, 2018 WL 3570865 (N.D. Cal. July 25, 2018) ............... 38

*Klamath Water Users Ass'n v. Patterson*,
   15 F. Supp. 2d 990 (D. Or. 1998) ............................................... 30, 31, 33, 56

*Klamath Water Users Prot. Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 1999) ...................................................................... passim

*Mattz v. Superior Court*,
   758 P.2d 606 (Cal. 1988) .................................................................................... 18

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ........................................................................ 7, 45

*Nat. Res. Def. Council v. Houston*,
   146 F.3d 1118 (9th Cir. 1998) ............................................................................. 51

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007) ............................................................................................ 52

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   524 F.3d 917 (9th Cir. 2008) ................................................................. 5, 51, 52, 53

*Nat'l Wildlife Fed'n v. NMFS*,
   886 F.3d 803 (9th Cir. 2018) ............................................................................... 70

*North Dakota v. United States,*
   495 U.S. 423 (1990)................................................................................................. 8

*O'Neill v. United States,*
   50 F.3d 677 (9th Cir. 1995) ............................................................... 33, 51, 56

*Or. Nat. Res. Council v. Allen,*
   476 F.3d 1031 (9th Cir. 2007) .................................................................... 6

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
   138 F. Supp. 2d 1228 (N.D. Cal. 2001) ....................................... 10, 37, 51

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
   226 F. App'x 715 (9th Cir. 2007) ........................................................ 38, 51

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
   426 F.3d 1082 (9th Cir. 2005) ............................................................ 38, 51

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
   No. Civ.C02-2006 SBA, 2006 WL 798920 (N.D. Cal. Mar. 27, 2006) ................................. 38

*Pacificans for a Scenic Coast v. Cal. Dep't of Transp.,*
   204 F. Supp. 3d 1075 (N.D. Cal. 2016) ................................................ 49

*Parravano v. Babbitt,*
   70 F.3d 539 (9th Cir. 1995) ................................................................. 17

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
   898 F.2d 1410 (9th Cir. 1990) ............................................................... 5

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) .......................................................... 51, 53

*San Luis Obispo Coastkeeper v. U.S. Dep't of the Interior,*
   394 F. Supp. 3d 984 (N.D. Cal. 2019) .................................................. 44

*Schneidewind v. ANR Pipeline Co.,*
   485 U.S. 293 (1988)............................................................................. 8

*Sierra Club v. Babbitt,*
   65 F.3d 1502 (9th Cir. 1995) .......................................................... 33, 55

*Tenn. Valley Auth. v. Hill,*
   437 U.S. 153 (1978)................................................................. 33, 49, 71

*Tennessee v. Davis,*
   100 U.S. 257, 25 L.Ed. 648 (1879) ...................................................... 46

*United States v. Adair,*
   723 F.2d 1394 (9th Cir. 1983) ............................................................ 16

*United States v. Cappaert,*
   508 F.2d 313 (9th Cir. 1974) .............................................................. 17

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2010) ................................................. 8, 45, 46, 47

*United States v. Eberhardt,*
    789 F.2d 1354 (9th Cir. 1986) ................................................. 17

*United States v. Glenn–Colusa Irr. Dist.,*
    788 F. Supp. 1126 (E.D. Cal. 1992) ................................................. 64, 65

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001) ................................................. 71

*United States v. Oregon,*
    44 F.3d 758 (9th Cir. 1994) ................................................. 14

*WaterWatch of Or. v. Winchester Water Control Dist.,*
    No. 3:20-cv-01927-IM, 2021 WL 4317150 (D. Or. Sept. 22, 2021) ................................................. 44

*Westlands Water Dist. v. U.S. Dep't of Interior,*
    805 F. Supp. 1503 (E.D. Cal. 1992) ................................................. 13, 51

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ................................................. 68

*Winters v. United States,*
    207 U.S. 564 (1908) ................................................. 16, 17

*Yurok Tribe v. U.S. Bureau of Reclamation,*
    231 F. Supp. 3d 450 (N.D. Cal. 2017) ................................................. 20, 38, 51, 71

*Yurok Tribe v. U.S. Bureau of Reclamation,*
    No. 19-cv-04405-WHO, 2020 WL 2793945 (N.D. Cal. May 29, 2020) ................................................. 40

*Yurok Tribe v. U.S. Bureau of Reclamation,*
    No. 19-cv-04405-WHO, 2022 WL 875646 (N.D. Cal. Mar. 24, 2022) ................................................. 41, 50, 68

**Statutes**

16 U.S.C. § 1532(15) ................................................. 4

16 U.S.C. § 1532(19) ................................................. 5

16 U.S.C. § 1533(a)(2) ................................................. 4

16 U.S.C. § 1533(d) ................................................. 5, 48

16 U.S.C. § 1536(a)(2) ................................................. 4, 48, 49, 67

16 U.S.C. § 1536(b)(4)(C)(i)-(ii) ................................................. 5

16 U.S.C. § 1536(e)-(h) ................................................. 49

16 U.S.C. § 1536(o)(2) ................................................. 5

16 U.S.C. § 1538(a)(1)(B), (C), (G) ................................................. 5

16 U.S.C. § 1538(a)(1)(B), (g) ............................................................... 48

16 U.S.C. § 1538(a)(1)(G) ...................................................................... 48

16 U.S.C. §§ 1531-1544 ................................................................... 1, 35

25 U.S.C. § 1300i-1300i-11 .................................................................... 18

28 U.S.C. § 2201 ............................................................................... 9, 42

43 U.S.C. § 373 ............................................................................ 6, 13, 54

43 U.S.C. § 383 ................................................................... 7, 47, 65, 67

43 U.S.C. § 485h-4 ................................................................................. 7

43 U.S.C. § 491 ................................................................................ 6, 53

43 U.S.C. § 666(a) ............................................................................... 14

43 U.S.C. §§ 371-616yyyy ...................................................................... 6

Cal. Water Code § 1475 ....................................................................... 13

Or. Rev. Stat. § 536.037(1)(c) ............................................................... 43

Or. Rev. Stat. § 536.220 ...................................................................... 14

Or. Rev. Stat. § 539.150 ...................................................................... 15

Or. Rev. Stat. § 539.170 ...................................................................... 15

Or. Rev. Stat. § 541.669 ...................................................................... 14

Or. Rev. Stat. § 541.673 ...................................................................... 14

Or. Rev. Stat. § 541.895 ...................................................................... 14

Pub. L. No 85-222, 71 Stat. 497 (1957) ............................................... 13

**Rules**

Fed. R. Civ. P. 56 .................................................................................. 1

Fed. R. Civ. P. 56(a) .............................................................................. 9

**Regulations**

50 C.F.R. § 17.3 ..................................................................................... 5

50 C.F.R. § 222.102 ............................................................................... 5

50 C.F.R. § 223.203 .......................................................................... 5, 48

50 C.F.R. § 402.01(b) ............................................................................. 4

50 C.F.R. § 402.02 .......................................................................... 3, 4, 5

50 C.F.R. § 402.03 (2022) ................................................................. 5, 54

50 C.F.R. § 402.14(a) (2022) ................................................................................ 4

50 C.F.R. § 402.14(a), (b) (2022) ..................................................................... 4, 48

50 C.F.R. § 402.14(g), (h) (2022) ......................................................................... 4

50 C.F.R. § 402.14(i) ............................................................................................ 5

50 C.F.R. § 402.14(i)(2)(i) .................................................................................. 23

50 C.F.R. § 402.14(i)(5) ........................................................................................ 6

**Other Authorities**

1 C. Kappler, *Indian Affairs: Laws and Treaties* 815-17 (1904) ........................ 18

51 Fed. Reg. 19,926 (June 3, 1986) ................................................................... 54

53 Fed. Reg. 27,130 (July 18, 1988) .................................................................. 18

62 Fed. Reg. 24,588 (May 6, 1997) .................................................................... 19

64 Fed. Reg. 24,049 (May 5, 1999) .................................................................... 19

70 Fed. Reg. 69,903 (Nov. 18, 2005) ................................................................. 19

77 Fed. Reg. 73,740 (Dec. 11, 2012) ................................................................. 18

U.S. Const. art. VI, cl. 2 .................................................................................... 7, 8

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2        Cross-claimant United States of America ("United States") provides notice of its Motion

3   for Summary Judgment under Fed. R. Civ. P. 56 on the First Cause of Action of its Crossclaim

4   against the Oregon Water Resources Department ("OWRD") and Klamath Water Users

5   Association ("KWUA") (ECF 963).  The Motion will be heard by phone or by Zoom

6   teleconference on November 9, 2022, at 2:00 p.m. or such other date as the Court may set.

7        The United States' Crossclaim seeks declaratory and injunctive relief from orders and

8   notices of violation (collectively, the "Challenged Orders") issued by OWRD to the United

9   States Bureau of Reclamation (the "Bureau" or "Reclamation"), an agency of the U.S.

10  Department of the Interior, because they forbid Reclamation from releasing certain water from

11  Upper Klamath Lake ("UKL") to comply with the federal Endangered Species Act ("ESA"), 16

12  U.S.C. §§ 1531-1544, and provide flows in the Klamath River consistent with federal reserved

13  tribal water rights of California tribes held for fisheries purposes.  UKL is a naturally-occurring

14  lake that, following extensive modification by Reclamation in the early 1900s, including

15  construction of a dam, known as Link River Dam, now provides the primary means of storage

16  for the Klamath Project, a federal reclamation project managed by Reclamation.  The Klamath

17  Project provides water for the irrigation of up to approximately 230,000 acres in southern

18  Oregon and northern California.  The United States owns Link River Dam, which controls

19  releases from UKL to the Klamath River downstream of the Project.

20        The Challenged Orders forbid Reclamation from releasing any water from UKL that

21  OWRD classifies as "stored" under Oregon state water law for any purpose other than irrigation,

22  even though such releases are needed to meet ESA requirements for the Southern Oregon

23  Northern California Coast ("SONCC") coho salmon and the Southern Resident distinct

24  population segment of killer whale.  The SONCC coho salmon is a threatened species under the

25  ESA that inhabits the Klamath River downstream of the Project in California, and the Southern

26  Resident killer whale is an endangered species that inhabits the Pacific Ocean and relies on

27  anadromous Chinook salmon that inhabit the Klamath River downstream of the Project in

28  California as its primary prey source.  Through formal consultation with Reclamation under

Section 7 of the ESA, the National Marine Fisheries Service ("NMFS") has determined in a biological opinion ("BiOp") and incidental take statement ("ITS") that the ESA's mandates to avoid unlawfully taking any listed species, jeopardizing their continued existence, or destroying or adversely modifying their critical habitat are satisfied by operating the Project in accordance with Reclamation's operations plans, which ensure certain flow conditions in the Klamath River, as hydrologic conditions allow.

The United States' First Cause of Action seeks, among other relief, a declaration that the Challenged Orders exceed OWRD's jurisdiction and authority, violate the doctrine of intergovernmental immunity, and are preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 1, cl. 2.  The United States further requests under its First Cause of Action an injunction against enforcement of the Challenged Orders that would limit and/or prevent Reclamation from operating the Project in conformance with the ESA.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Do the Challenged Orders exceed OWRD's jurisdiction and authority where they are not limited to regulation of state water rights, but rather prohibit Reclamation from undertaking certain operations in compliance with federal law, namely the ESA, 16 U.S.C. §§ 1531-1544?

2.      Do the Challenged Orders violate the intergovernmental immunity component of the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 1, cl. 2, where they are specifically directed to a federal agency and order it to deviate from its manner of complying with federal law, namely the ESA, 16 U.S.C. §§ 1531-1544, without the requisite express congressional authorization?

3.      Are the Challenged Orders preempted under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, § 1, cl. 2, where they forbid a federal agency from taking action that is required by federal law, namely the ESA, 16 U.S.C. §§ 1531-1544?

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**SUMMARY OF ARGUMENT**

The United States is entitled to its requested declaratory and injunctive relief for multiple reasons.  First, the Challenged Orders exceed OWRD's jurisdiction and authority, as OWRD only has jurisdiction under state law to regulate Oregon water rights, and yet its orders command Reclamation to cease operations required by federal law, namely the ESA.  Second, the Challenged Orders violate the Supremacy Clause of the U.S. Constitution under the doctrine of intergovernmental immunity because they directly regulate an agency of the United States in its manner of compliance with federal law where Congress has not expressly authorized such regulation.  Third, the Challenged Orders are preempted under the Supremacy Clause of the U.S. Constitution because they forbid Reclamation from carrying out Project operations to meet the requirements of federal law, namely the ESA.  It is well-settled under Circuit authority that Reclamation's operation of the Klamath Project is a federal action that requires compliance with the ESA.  Under the law of this Circuit, the contracts between Reclamation and irrigation districts for the delivery of Project water do not exempt Project operations from such compliance.  Finally, the United States is entitled to permanent injunctive relief against the Challenged Orders because they place Reclamation in the untenable position of either complying with the Orders and likely causing irreparable harm to ESA-listed species by deviating from operations to meet the requirements of ESA Sections 7 and 9, or subjecting itself to sanctions from OWRD for noncompliance with the orders.

**LEGAL BACKGROUND**

I.   **Endangered Species Act.**

A.   **Section 7(a)(2) Duties and the Consultation Process.**

Section 7(a)(2) of the ESA commands federal agencies ("action agencies") to ensure that any "action"[1] they authorize, fund, or carry out "is not likely to jeopardize the continued

---

[1] "Action" is defined broadly by regulation to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas."  50 C.F.R. § 402.02.  Examples include "actions directly or indirectly causing modifications to the land, water, or air."  *Id.*

existence of" a species listed under the ESA or "result in the destruction or adverse

modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2).  These commands are

typically satisfied by completing a detailed consultation process outlined in the ESA's

implementing regulations.  Under the regulations, federal action agencies must consult with the

appropriate expert consulting agency[2] if their proposed action "may affect" a listed species or

designated critical habitat.  50 C.F.R. § 402.14(a) (2022).  The consultation must be formal

where the proposed action is "likely to adversely affect" a listed species or designated critical

habitat.  *Id*. § 402.14(a), (b).[3]  Formal consultation concludes with the issuance of a written BiOp

by the consulting agency that assesses the likelihood of "jeopardy" to the species and

"destruction or adverse modification" of its critical habitat.  *Id*. § 402.14(g), (h).

As the Supreme Court has observed, the "action agency is technically free to disregard

the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and

that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened

species is subject to substantial civil and criminal penalties, including imprisonment." *Bennett v.*

*Spear*, 520 U.S. 154, 170 (1997) (citations omitted).  Thus, the Supreme Court has found that

BiOps have a "virtually determinative effect." *Id.*  Where a BiOp concludes that the proposed

action is not likely to jeopardize a listed species or destroy or adversely modify its critical

habitat, the action agency may reasonably rely on the BiOp and proceed with the action in

---

[2] Congress divided responsibility for implementing the ESA between the United States Secretary of the Interior, who is generally responsible for terrestrial species and inland fishes, and the United States Secretary of Commerce, who is generally responsible for marine species and anadromous fish species.  *See* 16 U.S.C. §§ 1532(15), 1533(a)(2).  The Secretary of the Interior and the Secretary of Commerce have delegated their ESA responsibilities to the U.S. Fish & Wildlife Service ("FWS") and NMFS (collectively, the "Services"), respectively.  *See* 50 C.F.R. § 402.01(b).  Relevant here, FWS has jurisdiction over the sucker species in UKL, and NMFS has jurisdiction over the SONCC coho salmon in the Klamath River and the Southern resident killer whales that feed on Klamath River Chinook salmon.

[3] "Effects of the action" are defined by regulation as "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action.  A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur.  Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."  50 C.F.R. § 402.02.

compliance with the ESA. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990).

Section 7(a)(2) of the ESA applies broadly "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03 (2022). Thus, even when agency action carries out its primary mission pursuant to separate legislation, it must comply with Section 7(a)(2) of the ESA whenever "Congress has imposed broad mandates which do not direct [the] agenc[y] to perform any specific nondiscretionary actions." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 928 (9th Cir. 2008).

**B.**     **Section 9 Prohibition against Take.**

Section 9 of the ESA prohibits "take"[4] of members of a fish or wildlife species listed as endangered without authorization; pursuant to Section 4(d) of the ESA, this prohibition may be extended to species listed as threatened. 16 U.S.C. §§ 1538(a)(1)(B), (C), (G); 1532(19); 1533(d) ; 50 C.F.R. § 223.203. An action agency can obtain an exemption, or safe harbor, from liability under Section 9 by obtaining an ITS from a consulting agency. A consulting agency issues an ITS if it concludes in its BiOp that the action under consideration is not likely to cause jeopardy under Section 7, but is nonetheless reasonably certain to result in take of listed species that would otherwise be prohibited under Section 9. The ITS specifies the amount or extent of the non-jeopardizing take that is anticipated to result from the action and any reasonable and prudent measures the consulting agency "considers necessary or appropriate" to minimize the impact of the take. 16 U.S.C. § 1536(b)(4)(C)(i)-(ii); 50 C.F.R. § 402.14(i). The ESA states that "any taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2);

---

[4] "Take" is a defined term in the statute that "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Services each have further defined the term "harm" by regulation as an act that "actually kills or injures fish or wildlife." 50 C.F.R. § 222.102; 50 C.F.R. § 17.3. The regulations explain that such an act may include significant habitat modification or degradation where it actually kills or injures fish or wildlife. 50 C.F.R. § 222.102; 50 C.F.R. § 17.3. By joint regulation, the Services have defined "incidental take" as "refer[ring] to takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." *Id*. § 402.02.

*see also* 50 C.F.R. § 402.14(i)(5); *Bennett*, 520 U.S. at 170 (noting that the ITS authorizes the

action agency to take listed species "so long as it respects the Service's 'terms and conditions'");

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007).

As noted above, an action agency and its staff that proceeds with an action without the

safe harbor of an ITS "does so at its own peril . . . subject to substantial civil and criminal

penalties, including imprisonment." *Bennett*, 520 U.S. at 170 (citations omitted).  Additionally,

"if the terms and conditions of the Incidental Take Statement are disregarded and a taking does

occur, the action agency or the applicant may be subject to potentially severe civil and criminal

penalties under Section 9." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229,

1239 (9th Cir. 2001).

## II.    Reclamation Act of 1902.

In the Reclamation Act of 1902, Congress authorized Reclamation to construct and

operate water projects in the seventeen western states.  Pub. L. No. 57-161, § 2, 32 Stat. 388

(June 17, 1902), codified at 43 U.S.C. §§ 371-616yyyy, discussed in *California v. United States*,

438 U.S. 645, 650 (1978).  The Reclamation Act established "a massive program" for the federal

government to construct and operate water projects for irrigation.  438 U.S. at 650.  Congress

also broadly authorized Reclamation to use the reclamation fund "for the operation and

maintenance of all reservoirs and irrigation works constructed under the provisions of this act,"

43 U.S.C. § 491, and "to perform any and all acts . . . as may be necessary and proper" to

implement the statute, 43 U.S.C. § 373.  Congress was concerned that the Act would result in

inconsistent application of state and federal water laws.  43 U.S. at 668-69.  Therefore, Congress

determined that state law should control in two important, but limited, respects: the Secretary

would comply with state law in acquiring the necessary water rights for project purposes –

namely, irrigation – and, once those project water rights were perfected, they would be

administered in conformance with state water law.  *Id*. at 665-67.  Consistent with this, Section 8

of the Act provides:

> Nothing in this act shall be construed as affecting or intended to affect or in any
> way interfere with the laws of any State or Territory relating to the control,
> appropriation, use, or distribution of water used in irrigation, or any vested right

acquired thereunder, and the Secretary of the Interior, in carrying out the
provisions of this act, shall proceed in conformity with such laws, and nothing
herein shall in any way affect any right of any State or of the Federal Government
or of any landowner, appropriator, or user of water in, to, or from any interstate
stream or the waters thereof: *Provided*, That the right to the use of water acquired
under the provisions of this act shall be appurtenant to the land irrigated and
beneficial use shall be the basis, the measure, and the limit of the right.

43 U.S.C. §§ 383, 485h-4.  By its express terms, the Reclamation Act requires the Secretary to

proceed in conformity with state law relative "to the control, appropriation, use, or distribution of

water used *in irrigation*." *Id*. (emphasis added).  The Act says nothing about compliance with

state law outside the irrigation context, nor does it speak to the requirements of federal law under

other statutes.  In fact, the Supreme Court has made it clear that Section 8's deference to state

water law is not absolute: that provision obligates Reclamation to operate "in conformity" with

state water laws only to the extent "not inconsistent" with additional requirements of federal law.

*California*, 438 U.S. at 668-73, nn.21 & 25.  Additionally, the Secretary's acquisition of project

water rights is subject to interstate and other existing rights, including tribal and other federal

reserved water rights.

## III.  Supremacy Clause.

The Supremacy Clause of the Constitution declares that:

[t]his Constitution, and the Laws of the United States which shall be made in
Pursuance thereof; and all Treaties made, or which shall be made, under the
Authority of the United States, shall be the supreme Law of the Land; and the
Judges in every State shall be bound thereby, any Thing in the Constitution or
Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2.  In *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819), the

Supreme Court explained that "[i]t is of the very essence of supremacy, to remove all obstacles

to its action within its own sphere, and so to modify every power vested in subordinate

governments, as to exempt its own operations from their own influence."  Beyond the States'

reach are "all those powers which are conferred by the people of the United States on the

government of the Union, and all those means which are given for the purpose of carrying those

powers into execution."  *Id*. at 430.  The Court therefore held that "the states have no power, by

taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the

1    constitutional laws enacted by congress to carry into execution the powers vested in the general

2    government." *Id*. at 436.  This principle has come to be known as the doctrine of governmental

3    or intergovernmental immunity.  *See North Dakota v. United States*, 495 U.S. 423, 435-36

4    (1990).

5         Under this doctrine, "the activities of federal installations are shielded by the Supremacy

6    Clause from direct state regulation unless Congress provides 'clear and unambiguous'

7    authorization for such regulation."  *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988)

8    (citations omitted); *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 603 (9th Cir.

9    1981) ("[A] federal agency performing a federal function is not required to submit to a state

10   regulatory procedure, absent a 'clear and unambiguous' congressional statement to that effect."

11   (citations omitted)).  A state or local law violates the Supremacy Clause by regulating the United

12   States directly or by discriminating against it.  *See United States v. City of Arcata*, 629 F.3d 986,

13   992 (9th Cir. 2010); *Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) ("[U]nder

14   the intergovernmental immunity component of the Supremacy Clause . . . , states may not

15   directly regulate the Federal Government's operations or property").  The Supreme Court has

16   "adopted a functional approach to claims of governmental immunity, accommodating of the full

17   range of each sovereign's legislative authority and respectful of the primary role of Congress in

18   resolving conflicts between National and State Governments."  *North Dakota*, 495 U.S. at 435.

19        Federal law also can preempt state law under the Supremacy Clause.  *Fid. Fed. Sav. &*

20   *Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982); U.S. Const. art. VI, cl. 2 (federal law

21   "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to

22   the Contrary notwithstanding").  There are three well-recognized types of preemption: express,

23   field, and conflict preemption.  Congress can, of course, expressly command preemption by

24   statute (express preemption).  *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299

25   (1988).  But absent explicit preemption language in a statute's text, Congress may implicitly

26   indicate an intent to occupy a given field to the exclusion of state law (field preemption) or

27   implicitly preempt state law to the extent that it is an obstacle to the accomplishment and

28

execution of congressional purposes and objectives (conflict preemption). *Fid. Fed. Sav. & Loan*, 458 U.S. at 152-53.

As to conflict preemption, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Id.* at 153. "Such a conflict arises when [(1)] 'compliance with both federal and state regulations is a physical impossibility'" or (2) "when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143 (1963), and *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also California*, 438 U.S. at 668 n.21.

## IV.    Declaratory Judgment Act.

The Declaratory Judgment Act authorizes federal courts in cases within their jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Here, this statute authorizes Reclamation to seek a declaration of its rights and obligations relative to the Challenged Orders and whether they violate the doctrine of intergovernmental immunity or are preempted by federal law under the Supremacy Clause.

## V.    Standard of Review.

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**FACTUAL BACKGROUND AND
HISTORY OF ESA LITIGATION INVOLVING THE PROJECT**

## I.    Klamath Project History and Overview.

### A.    Project Construction and Water Delivery Contracts.

The Klamath Project is a federal reclamation project that straddles the border between Oregon and California. The Klamath Project was authorized by the Secretary in 1905 pursuant to the general provisions of the Reclamation Act of 1902. STIPDX-003744. While most Reclamation projects involve damming rivers to create large reservoirs and diversion works for the storage and delivery of water, the Klamath Project was a massive undertaking to drain lands that were flooded on a regular basis and to regulate surface flows to deliver water to these and

other lands for agricultural purposes. "Between 1905 and the 1960s, wetlands in the Upper Klamath River Basin were reduced from 350,000 acres to 75,000 acres (an 80 percent reduction) as these areas were drained, diked, and converted to agriculture" in connection with the Project. STIPDX-006240. "Construction began on the Project in 1906 with the A Canal," STIPDX-002434, which diverts water directly from UKL, and diversions from the A Canal began after its construction was completed in 1907. STIPDX-003745. Additional Project features were constructed over the ensuing decades, STIPDX-003745-51, with UKL selected to be the principal storage feature of the Klamath Project. *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1230 (N.D. Cal. 2001). The California Oregon Power Company, or Copco (now PacifiCorp, a private utility), notched a channel through the reef at the southern end of UKL and, in 1921, completed construction of the Link River Dam just downstream. STIPDX-003747.

Construction of Link River Dam enabled operators to regulate UKL elevations, including to drain the lake below natural levels, 138 F. Supp. 2d at 1230, but did not "substantially increas[e] the maximum surface elevation of the natural lake." STIPDX-003747. "Before [Link River Dam] was constructed in 1921, [the] surface elevation of UKL was observed fluctuating between from 4,140 feet and 4,143.3 feet," STIPDX-002391, whereas after the dam was constructed lake levels have dropped about three feet below original minimum elevations in years of severe water shortages. STIPDX-006526. Link River Dam controls releases from UKL into the Klamath River, an interstate stream that flows from Oregon into California before emptying into the Pacific Ocean. STIPDX-000129. As constructed, the Project "consists of an extensive system of canals, pumps, diversion structures, and dams capable of routing water to approximately 230,000 acres of irrigated land in the upper Klamath River Basin." STIPDX-002434. The Project provides water for irrigation "to hundreds of farms," *Baley v. United States*, 942 F.3d 1312, 1316 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 133 (2020), as well as to the Lower Klamath and Tule Lake National Wildlife Refuges. STIPDX-003740-41.

Before delivering water through Project works, Reclamation entered into contracts with various entities to govern delivery terms and repayment charges. Under the "repayment

contracts," the contractors agreed to repay Reclamation the allocated portions of the construction

costs of the Project and also to reimburse Reclamation for the ongoing operations and

maintenance costs of the Project. *See, e.g.*, STIPDX-007836-37 (discussing Klamath Irrigation

District ("KID") repayment contracts); STIPDX-007850-52 (annual operations, maintenance,

and other costs chargeable to KID); STIPDX-007789-90 (Tulelake Irrigation District ("TID")

construction cost repayment obligation); STIPDX-007803-07 (annual operations, maintenance,

and other costs chargeable to TID).  In exchange for such payment, Reclamation agreed to

deliver water to the contractors through the Project for irrigation, subject to certain conditions.

Other contracts involved the delivery of water on certain terms and conditions, but without

undertaking a repayment obligation for construction costs.  Among the conditions in both types

of contracts, many of the contracts do not specify a required amount of water to be delivered and

also include shortage clauses, which excuse Reclamation from liability for shortages in irrigation

water due to drought and other causes.  *See* Argument Section IV.B.2, below.  In addition, some

of the contracts include express apportionment clauses that provide for the apportionment of

water among various contractors in times of shortage.  *See id*.  Thus, under their contracts,

delivery of water to the irrigators is subject to numerous limiting conditions.  Under the

provisions of federal reclamation law, as amended and supplemented, these contracts define the

basic terms upon which irrigators may receive water for irrigation from the Project.

> **B.**   **Project Administration through Operations Plans and Drought Plans.**

Reclamation is responsible for the administration of the Klamath Project.  That

administration involves the management of water levels in, and the distribution of water from,

UKL in Oregon.  The lake level is managed, in part, by control of the Link River Dam, which is

owned by Reclamation and operated by PacifiCorp.[5]

---

[5] In 1917, the United States entered into a 50-year term contract with Copco to construct and
operate Link River Dam.  That contract vested fee title to Link River Dam in the United States
and gave Copco the authority, pursuant to certain limits, to manage the rate of water being
released from UKL to better manage water flows to Copco's downstream power-producing
dams.  The 1917 contract was replaced by a new contract in 1956, when Copco received from
the Federal Power Commission (the Federal Energy Regulatory Commission's predecessor) a
50-year license to operate those downstream dams.  The 1956 contract was amended in 1997.
Under the 1997 modification, Reclamation took over responsibility for specifying operations of

1    Because of UKL's relatively shallow depth, the average inflow into UKL far exceeds the

2    lake's capacity of approximately 500,000 acre-feet, STIPDX-002291, and the lake also has

3    significant evaporation losses. STIPDX-006281.  The Klamath Project therefore has little

4    carryover storage from one irrigation season to the next.  STIPDX-002291.  Instead, the supply

5    of water is generally limited to the annual inflow into UKL from tributary streams.  Therefore,

6    before making irrigation deliveries, Reclamation must, on an annual basis, determine what

7    quantum of water is available to be delivered as Project supply after accounting for projected

8    inflow, whether that inflow is limited by drought conditions, and other requirements under

9    federal law, and how the available supply will be allocated among contractors.  Reclamation has

10   explained that:

> As a consequence of limited storage in UKL, Reclamation must base its various
> water management decisions each year on stream inflow forecasts issued by the
> Natural Resources Conservation Service (NRCS) between January and June.
> Reclamation makes water management decisions and the March 1 initial
> allocations between the Project, and the Klamath River (Environmental Water
> Account [EWA] supply) and UKL (UKL reserve) based on the March –
> September NRCS inflow forecast.  The final forecast (generally the most
> accurate, but still subject to error) is released in June and can result in adjustments
> to the allocations made on April 1; the EWA supply and UKL reserve can be both
> increased or decreased with the June 1 inflow forecast, whereas Project Supply
> cannot decrease below the April 1 allocation with the issuance of the May and
> June inflow forecasts.  The final determination for Project Supply is made in June
> and is then fixed through the end of September.  *It is important to note that
> delivery of the "fixed" Project Supply is not guaranteed; Reclamation retains
> discretion to curtail deliveries from UKL to comply with unforeseeable legal
> requirements and hydrologic conditions as necessary.*

21   *Id.* (emphasis added); *accord* STIPDX-001575 ("Full Project Supply delivery is not guaranteed;

22   Reclamation, in consultation with the Services, retains discretion to curtail deliveries from UKL

23   to comply with legal requirements and hydrologic conditions as necessary, including ensuring

24   minimum IGD [Iron Gate Dam][6] flows are met"); STIPDX-000983 ("It is important to note that

25   _____

26   Link River Dam according to the Bureau's 1997 Annual Operations Plan.  The 1956 contract
     expired in 2006 contemporaneous with expiration of the downstream dams' license, but

27   PacifiCorp continues to operate Link River Dam under Reclamation's direction without a formal
     extension of the contract.

28   [6] Although the Klamath River originates just below UKL, river flows in the upper end of the
     Klamath River are controlled by a series of four private dams operated by PacifiCorp, which are

delivery of the 'fixed' Project Supply is not guaranteed; Reclamation retains discretion to curtail deliveries from UKL to comply with legal requirements and hydrologic conditions as necessary").  Reclamation issues these decisions through operations plans and drought plans prepared under the broad authority and discretion granted to it under the Reclamation Act.  *See, e.g.*, *Westlands Water Dist. v. U.S. Dep't of Interior*, 805 F. Supp. 1503, 1507 (E.D. Cal. 1992) (noting Congress's "broad grant of authority gives wide discretion to the Secretary over water management under the 1902 Reclamation Act"), *aff'd sub nom. Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667 (9th Cir. 1993); 43 U.S.C. § 373 (authorizing the Secretary of the Interior "to perform any and all acts . . . as may be necessary and proper" to implement the statute).

    In making allocation decisions, Reclamation operates the Project as an integrated whole because diversions at one location can affect other locations.  *See Langell Valley Irrigation Dist. v. Babbitt*, No. 00-6265-HO, slip op. at 8 (D. Or. Aug. 31, 2000) ("[I]t should also be noted that the Klamath Project is a single integrated project consisting of several facilities and two river basins" (copy attached as Ex. A)).  In *Langell Valley*, the court approved Reclamation's decision to make allocation decisions that required delivering water from reservoirs on the east side of the Project (through the Lost River) to irrigation districts on the west side of the Project.  *See also* Pub. L. No 85-222, Art. 1, § A, 71 Stat. 497, 497 (1957) (recognizing as first enumerated purpose of the Klamath Compact the "orderly, integrated, and comprehensive development, use, conservation, and control [of the water resources of the Klamath River Basin] for various purposes . . ."); Cal. Water Code § 1475 ("where a reservoir has been or shall hereafter under the provisions of this division be constructed . . . for the storage of water for a system, which water is to be used at one or more points under appropriations of water and rights held and owned by the person owning the reservoir site and constructing the reservoir, the reservoir, appropriations,

---

not part of Reclamation's Klamath Project.  The lower-most of those dams is known as Iron Gate Dam in northern California, which precludes upstream passage of anadromous fish, such as coho and Chinook salmon.  As discussed below, NMFS has determined in its BiOps on Klamath Project operations that the maintenance of certain minimum and other flows downstream of Iron Gate Dam will avoid the likelihood of jeopardy to the SONCC coho salmon and the Southern Resident killer whale and destruction or adverse modification of the coho's critical habitat.

1  and rights shall, in the discretion of the board constitute a single enterprise"); Or. Rev. Stat. §§

2  536.220 ("A proper utilization and control of the water resources of this state can be achieved

3  only through a coordinated, integrated state water resources policy"); 541.669; 541.673; 541.895.

4  **II.      Klamath Project Oregon State Law Water Rights.**

5          Consistent with the Reclamation Act, the Bureau obtained water rights under Oregon

6  state law for the water it delivers through the Klamath Project for irrigation purposes pursuant to

7  its various repayment contracts with irrigators.  Specifically, the United States adhered to Oregon

8  statutory requirements for appropriating the right to store water in UKL for the benefit of the

9  Project water users, and it is currently participating in the adjudication of that right, among many

10  other water rights held by the United States for both Project and non-Project purposes, in the

11  decades-long and ongoing Klamath Basin Adjudication ("KBA") in Oregon state court.  The

12  KBA is a comprehensive general stream adjudication that is in the process of determining the

13  existence, attributes, and priority of competing water rights claims in the portion of the Klamath

14  Basin located in Oregon.  The United States was joined to the adjudication pursuant to the

15  waiver of sovereign immunity provided by the McCarran Amendment, 43 U.S.C. § 666(a).  *See*

16  *United States v. Oregon*, 44 F.3d 758, 770 (9th Cir. 1994) ("[W]e hold that the Klamath Basin

17  adjudication is in fact the sort of adjudication Congress meant to require the United States to

18  participate in when it passed the McCarran Amendment.").

19          Under the "prior appropriation" doctrine, water rights determined in the KBA are

20  administered by date of priority—*i.e.*, the date by which the water right was initiated, provided it

21  was subsequently perfected with due diligence.  Senior water rights are satisfied in full before

22  rights with junior priority dates are legally entitled to any water.  *See Baley*, 942 F.3d at 1320.

23          Following the initiation of the adjudication in the 1970s, federal court litigation over the

24  propriety of the joinder of the United States, and more than a decade of administrative

25  proceedings conducted before OWRD, OWRD issued an Amended and Corrected Findings of

26  Fact and Order of Determination ("ACFFOD") on February 28, 2014, which provisionally

27  determined the validity and elements of water rights claimed in the KBA.  Exceptions to the

28  ACFFOD, including exceptions filed by the United States, are currently being reviewed by the

Klamath County Circuit Court pursuant to Or. Rev. Stat. § 539.150, but the ACFFOD is presently enforceable, pending the completion of that review. *Id*. § 539.170. Among its many findings, OWRD provisionally determined in the ACFFOD that Reclamation holds a water right for the storage of 486,828 acre-feet of water in the UKL for use by the Project's contractors, with a May 19, 1905 priority date. STIPDX-003790-93; STIPDX-003824. OWRD refers to that water right held for storage as "KA 294." STIPDX-000430. OWRD also provisionally determined in the ACFFOD that the "beneficial user" of Project water "holds a legal interest in water rights appropriate [for the Project] for the purpose of beneficial use." STIPDX-003789. That right to beneficial use "relies on diversion of natural flow and diversion from, or releases of, stored water," STIPDX-003742, and the beneficial users of Project water include the Project contractors and the United States. *See* STIPDX-003793 (summary of claims, with water rights awarded in name of Reclamation, FWS, and the water users). OWRD refers to the water right held for beneficial use of water stored in UKL and natural flow as "KA 1000." STIPDX-000431. The ACFFOD "does not specify what amount of water must be taken from natural flow as opposed to stored water" in the exercise of KA 1000. *Id*.

The Project's water rights determined in the ACFFOD set a maximum amount of water that may be diverted, stored, and/or beneficially used under those rights, but the existence of those rights does not require that such water be diverted, stored, or used. Nor do the rights determine whether or when water is legally available for delivery under the Project contracts and in accordance with the other requirements of federal law, including the ESA. The ACFFOD also specifically disclaims any authority over control of the Project works as between Reclamation and the water users, which control is addressed by the Project contracts. *See* STIPDX-003792-93 (stating that the ACFFOD does not determine "the relative rights of the KPWU entities and the United States to control or operate diversion and distribution works, including headgates, pumps, canals and other structures . . . and does not alter in any way the relative rights of the United States and the irrigation entities to control or operate the irrigation works").

III.    **Federal Reserved Tribal Water Rights.**

OWRD also considered claims filed by the United States on behalf of the Klamath Tribes under the federal reserved water rights doctrine.[7]  The federal reserved water rights doctrine, from *Winters v. United States*, 207 U.S. 564 (1908), and subsequent case law applying that decision, holds that the establishment of a federal reservation implicitly reserves sufficient water to accomplish the purposes of the reservation.  *Id.* at 576; *United States v. Adair*, 723 F.2d 1394, 1410 (9th Cir. 1983) ("at the time the Klamath Reservation was established, the Government and the Tribe intended to reserve a quantity of the water flowing through the reservation not only for the purpose of supporting Klamath agriculture, but also for the purpose of maintaining the Tribe's treaty right to hunt and fish on reservation lands.").  Consistent with that doctrine, OWRD determined in the ACFFOD that the United States holds in trust for the Klamath Tribes federal reserved water rights in UKL and its tributaries necessary to support game and fish populations adequate to sustain hunting, fishing, trapping, and gathering by its members.  *See*, *e.g.*, STIPDX-003687.  These instream tribal water rights have a "time immemorial" priority date (*id.*) and are senior to, and take precedence over, junior water rights, including those held for irrigation by Project beneficiaries.  The Klamath Tribes' reserved right in UKL requires the maintenance of certain water levels in the lake in order to meet the habitat, spawning, and rearing needs of two species of fish that inhabit the lake—the shortnose sucker and Lost River sucker. However, that right is not enforceable until the conclusion of the KBA against the Project water

---

[7] Per the stipulation between the United States, Plaintiffs, and Intervenor The Klamath Tribes, as approved by the Court, the parties in the first phase of summary judgment briefing "may not seek a ruling with respect to tribal rights beyond a ruling on the applicability of the ESA to Klamath Project operations."  ECF 951 ¶ 9.  The United States discusses tribal rights in this memorandum solely for this limited purpose and to provide the Court with a complete background.  In no event shall resolution of the Crossclaim "allow or result in an adjudication or quantification of the Tribes' water rights, including the sources from which such adjudicated or quantified rights may be satisfied."  ECF 951-1; *see also* Order Granting Requests to Lift Stay, ECF 961 at 6 ("To protect tribal sovereignty and avoid the adjudication of tribal water rights, this litigation will not exceed the parameters proposed by the federal defendants, plaintiffs, and Klamath Tribes in Paragraph 7 of their stipulation, which I incorporate by reference here, for so long as the rest of the stay is in effect. Stip., Ex. A at ¶ 7.").

users with a pre-1909 priority by virtue of a stipulation among the United States, the Klamath Tribes, and the water users.[8]  STIPDX-003682-85.

Outside of Oregon and downstream of the Project in California, federal courts have recognized that the Yurok and Hoopa Valley Tribes also hold reserved fishing rights and associated reserved water rights that "[a]t the bare minimum" require the amount of water determined necessary to meet the requirements of ESA Section 7 regarding listed salmon and designated critical habitat.  *Baley*, 942 F.3d at 1337, 1340-41.  These reserved rights reflect that, for generations, both the Yurok and Hoopa Valley Tribes have depended on Klamath River salmon for their nourishment and economic livelihood, *Parravano v. Babbitt*, 70 F.3d 539, 542 (9th Cir. 1995), and that one of the purposes for which these reservations were created was to secure a salmon fishery for the Tribes, on which the Tribes rely for ceremonial, subsistence, and commercial purposes.  *United States v. Eberhardt*, 789 F.2d 1354, 1359 (9th Cir. 1986); *Parravano*, 70 F.3d at 545-46; *Baley*, 942 F.3d at 1323.  Neither the Yurok Tribe nor the Hoopa Valley Tribe—located in California—were parties to the Oregon adjudication, and the United States did not assert claims on their behalves.  This is because neither the California Tribes nor the United States were required to file claims for tribal water rights in California in the Oregon stream adjudication.  The fact that these rights were not raised in the KBA "did not affect [their] existence or nature."  *Baley v. United States*, 134 Fed. Cl. 619, 679 (2017), *aff'd*, 942 F.3d 1312 (Fed. Cir. 2019).

Although these reserved rights have not been quantified in an adjudication, *Winters* rights do not need to be fully adjudicated or quantified in order for courts to recognize them in part and to enjoin off-reservation actions that threaten those rights.  *Winters*, 207 U.S. at 576-77 (enjoining off-reservation diversion to protect senior irrigation rights at Fort Belknap Reservation); *United States v. Cappaert*, 508 F.2d 313, 317-18 (9th Cir. 1974), *aff'd,* 426 U.S. at 138-40 (1976) (upholding injunction of off-reservation groundwater pumping to protect ESA-

---

[8] That stipulation has no effect on overlapping ESA obligations that also require the maintenance of certain UKL levels in the Project's operation to avoid jeopardy to endangered suckers and the destruction or adverse modification of their critical habitat.  *See* discussion, below.

listed species within Devil's Hole (part of Death Valley National Monument)).  The Yurok and

Hoopa Valley Tribes' reserved water rights have a priority date no later than 1891, the year of

the last executive order creating their reservations, and likely date back to 1855 based on the

original Klamath River Reservation, if not earlier to a time immemorial priority date.  *Baley*, 134

Fed. Cl. at 670.  Thus, like the Klamath Tribes' reserved rights, the priority for these rights pre-

date the Project's 1905 priority date and are based on the history of the Yurok and Hoopa Valley

Reservations.[9]

## IV.  Klamath Project ESA Section 7 Consultation History and Current Operations.

### A.  Overview.

The effects of Reclamation's operation of the Klamath Project (*e.g.*, diverting water from

UKL and the Klamath River, storing it, and conveying it for irrigation) on ESA-listed species

and designated critical habitats have been described in federal rules, biological assessments

("BAs"), and BiOps that span some three decades.  Project operations have been found to

adversely affect two species of fish that inhabit UKL and that have been listed as endangered

under the ESA since 1988 – the shortnose sucker and Lost River sucker – as well as their

designated critical habitat, which includes UKL and its tributaries.  53 Fed. Reg. 27130 (July 18,

1988); 77 Fed. Reg. 73740 (Dec. 11, 2012).  Generally, the BiOps have determined that

operation of the Project causes adverse effects by lowering expected lake elevations, thereby

[9] An executive order in 1855 set aside the original Klamath River Reservation, which extended approximately 20 miles up the Klamath River from the Pacific Ocean and included lands one mile in width on either side of the river.  *See* 1 C. Kappler, *Indian Affairs: Laws and Treaties* 815-17 (1904).  An 1876 Executive Order formally set aside the original Hoopa Valley Reservation, a 12-mile square bisected by the Trinity River and extending upstream from the Klamath-Trinity River confluence.  *See id.* at 815.  A third executive order in 1891 formed the extended Hoopa Reservation, which encompassed the original Hoopa Reservation, the Klamath River Reservation, and a strip down the Klamath River from the Klamath-Trinity confluence connecting the two reservations.  *See id.*  In 1988, Congress passed the Hoopa-Yurok Settlement Act, 25 U.S.C. § 1300i-1300i-11, which partitioned the extended reservation between the Hoopa Valley and Yurok Tribes.  Under the Act, the Hoopa Valley Tribe received the 12-mile square, and the Yurok Tribe received the original Klamath River Reservation as well as the connecting strip.  *See id.*  The Yurok Reservation is currently a 45-mile strip (one mile on each side of the Klamath River) extending from the Hoopa Valley Reservation downstream to the Pacific Ocean. *See Mattz v. Superior Court*, 758 P.2d 606, 610 (Cal. 1988).

1    decreasing the quantity and quality of available habitat, including shoreline spawning habitat,

2    causing substantial entrainment of larvae and age-0 juveniles at the A Canal, Link River Dam,

3    Clear Lake Dam, Gerber Reservoir Dam, and other Project infrastructure, and stranding in Clear

4    Lake Reservoir and Project canals following dewatering at the end of the irrigation season.  *See*,

5    *e.g.*, STIPDX-001125-1127.

6         Additionally, Reclamation's operation of the Klamath Project has been found to

7    adversely affect the SONCC coho salmon, a species listed as threatened under the ESA since

8    1997, 62 Fed. Reg. 24588 (May 6, 1997), and its designated critical habitat.  Most of the

9    Klamath River downstream of Iron Gate Dam ("IGD") in California is designated critical habitat

10   for the SONCC coho salmon.  64 Fed. Reg. 24049 (May 5, 1999).  The Klamath River also

11   provides habitat for Chinook salmon.  Though not listed under the ESA, Chinook salmon are a

12   primary prey species for the endangered Southern Resident killer whale.  70 Fed. Reg. 69903

13   (Nov. 18, 2005).  Generally, the BiOps have determined that operation of the Project causes

14   adverse effects by reducing annual Klamath River base flow volumes, spring peak discharges

15   from UKL, deep flushing flows, and variability of river conditions compared to natural

16   conditions, as well as increasing water temperature and dissolved oxygen levels.  *See*, *e.g.*,

17   STIPDX-001699-1723.

18        These reductions have been found to increase risks to coho salmon associated with

19   *Ceratonova shasta* (*C. shasta*) infection, a key factor limiting salmon recovery in the Klamath

20   River.  STIPDX-001703-04.  Klamath Project operations also contribute to lower end-of-season

21   UKL elevations, which increase the amount of water needed to refill the lake the following year.

22   STIPDX-001666.  Adverse effects to critical habitat also have been found to include increased

23   infiltration of fine sediments into spawning gravel beds and a reduction in the maximum

24   available spawning habitat.  STIPDX-001661-99.  NMFS has explained that the factors affecting

25   Chinook salmon in the freshwater environment are identical or very similar to what is discussed

26   for SONCC coho salmon in the Klamath River, STIPDX-001783-1802, and that, by reducing the

27   availability of non-listed Chinook salmon, the Klamath Project adversely affects the endangered

28   Southern Resident killer whale.  STIPDX-001802-05.

1    Section 7(a)(2) of the ESA requires Reclamation to ensure that these adverse effects of

2    Project operations are not likely to jeopardize the continued existence of listed species or destroy

3    or adversely modify their designated critical habitat.  Therefore, dating back to 1991,

4    Reclamation has managed UKL elevations and, dating back to 1999, Klamath River flows at

5    IGD, in accordance with a series of BiOps from the Services.  Generally, in consultation with

6    FWS and NMFS, Reclamation has met the requirements of ESA Section 7 by tailoring its Project

7    operations plans to ensure that enough water is released from UKL to provide sufficient flows

8    downstream in the Klamath River to avoid jeopardizing the SONCC coho salmon or adversely

9    modifying its critical habitat, while at the same time ensuring that sufficient water remains in

10   UKL to avoid jeopardizing the suckers or adversely modifying their critical habitat.  To date,

11   Reclamation has completed some 30 ESA Section 7(a)(2) consultations with FWS regarding the

12   effects of Project operations on suckers and their designated critical habitat and some six

13   consultations with NMFS regarding SONCC coho salmon and its designated critical habitat.

14   STIPDX-002282-88.

15       **B.      Reclamation's Current Operations and Compliance with ESA Section 7(a)(2).**

16       Reclamation is currently operating the Project in accordance with an operations plan that

17   is detailed in a BA issued on December 21, 2018 (STIPDX-002248-002961), later amended on

18   February 15, 2019 (STIPDX-002962-003221) ("2019 BA"), and further modified or

19   supplemented on March 9 (STIPDX-003222-50), March 25, 2019 (STIPDX-003251-68), and

20   October 11, 2019 (STIPDX-003269-71).  The BA, as amended and supplemented, will be

21   referred to as the "2019 Plan."  Reclamation issued the 2019 Plan following the 2017 ruling by

22   this Court in *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 455 (N.D. Cal.

23   2017), that Reclamation had unreasonably delayed completing reinitiated ESA Section 7

24   consultation on Klamath Project operations, and also the issuance of an October 19, 2018

25   presidential memorandum directing the Services to complete the reinitiated consultations on

26   Klamath Project operations by August 2019.  The Project operations set forth in the 2019 Plan

27   are highly complex and the description of those operations consumes over 40 pages.  STIPDX-

28   002973-003015.  Principally, the action consists of three major elements: (1) storing waters of

the Upper Klamath Basin and Lost River; (2) operating the Project or directing operation of Project facilities for the delivery of water for irrigation purposes, subject to water availability, in accordance with the ESA; and (3) performing operation and maintenance activities necessary to maintain Project facilities.  STIPDX-002973.

With regard to protecting UKL surface elevations for suckers, the 2019 Plan follows an operational approach that is expected to avoid UKL surface elevations falling below: (1) 4,142 feet in April or May in two consecutive years (or in any year in which Environmental Water Account ("EWA") augmentation under the Interim Plan, discussed below, is provided); (2) the UKL elevations observed in April or May 2010; (3) 4,138.00 feet at any time; (4) 4,138.25 feet at any time in more than one water year; (5) 4,140.0 feet by July 15 in any year; (6) 4,140.5 feet by July 15 in more than one year; or (7) 4,140.8 feet by July 15 in more than two years. STIPDX-001069-70.  With regard to protecting Klamath River flows for the SONCC coho salmon and Southern Resident killer whale, Reclamation's 2019 Plan includes an EWA with a minimum of 400,000 acre-feet ("AF") of water (407,000 acre-feet in even-numbered years, to include water for a tribal ceremonial boat dance held in August of even-numbered years). STIPDX-002989.  The EWA is to be released from UKL through Link River Dam to support minimum average daily flows at IGD on the Klamath River, namely 1,000 cubic feet per second ("cfs") in March, 1,325 cfs in April, 1,175 cfs in May, 1,025 cfs in June, and occasional higher flows under certain conditions.  STIPDX-003276.  Specifically, the 2019 Plan provides that approximately 50,000 AF within the EWA (in years with March 1/April 1 EWA less than 576,000 AF) can be shaped as a "surface flushing flow" or in another manner that NMFS determines best meets SONCC coho salmon needs.  STIPDX-002990-92.

Reclamation completed ESA Section 7 consultation with FWS in March 2019 on the 2019 Plan and received a BiOp concluding that the operations described were not likely to result in jeopardy to the suckers or destruction or adverse modification of their critical habitat. STIPDX-001919.  Reclamation also completed ESA Section 7 consultation with NMFS on the 2019 Plan in March 2019, and NMFS provided a BiOp concluding that the operations specified in the Plan are not likely to jeopardize the SONCC coho salmon or the Southern Resident killer

whale or destroy or adversely modify the coho's critical habitat.  STIPDX-001809.  NMFS's
conclusions in its 2019 BiOp relied in part on the 2019 Plan's provision of "flushing flows" from
the EWA in the Klamath River, which are intended to disrupt the life cycle of *Manayunkia
speciosa* (currently, the species name is *M. occidentalis*), a secondary host for the *C. shasta*
parasite that adversely impacts the salmonid population in the Klamath River in California.
STIPDX-001668-69, 1674, 1679, 1697, 1699.

       As the Court is aware, following the filing of the above-captioned complaint, in March
2020 Plaintiffs, Federal Defendants, and Defendant-Intervenor KWUA negotiated a supplement
to the 2019 Plan referred to as the "Interim Plan" or "Interim Operations Plan", which formed
the basis of a stipulated stay of this litigation until September 30, 2022.  ECF 908.  Principally,
the Interim Plan supplements the 2019 Plan by calling for an additional 40,000 acre-feet
augmentation of the EWA for Klamath River flows beyond the flows specified in the 2019 Plan
if certain specified hydrological triggers are met.  STIPDX-001397.  The augmentation flows of
the Interim Plan were not triggered in 2021 or 2022 due to exceptional drought conditions, as
explained more fully below.  In light of the changes to the 2019 Plan contained in the Interim
Plan, Reclamation completed a second consultation with FWS in April 2020 and received a
superseding BiOp from FWS that again found the described actions were not likely to cause
jeopardy or destruction or adverse modification of critical habitat.  STIPDX-000942.  In an April
13, 2020 letter, NMFS concurred with Reclamation's determination that the additional Klamath
River augmentation flows under the 2020 Interim Plan were consistent with its analysis in its
2019 BiOp on the 2019 Plan.  STIPDX-000939-41.

       **C.    Reclamation's Current Operations and Compliance with ESA Section 9.**

       Although Reclamation's proposed actions were found not likely to cause jeopardy or
destruction or adverse modification of critical habitat, FWS and NMFS both found that they
were likely to cause take of listed species.  STIPDX-001809-10; STIPDX-001156.  Therefore,
FWS and NMFS each issued Reclamation an ITS with specified terms and conditions that, if
adhered to, would provide Reclamation an exemption from liability under ESA Section 9.
STIPDX-001809-30; STIPDX-001156-86.  With an action of the scale and complexity of the

Klamath Project, where effects are caused through hydrologic changes caused by storing and delivering Project water, it may not be possible to physically measure the amount or extent of incidental take in terms of individual specimens.  Therefore, in such cases the consulting agencies use surrogates for the anticipated amount or extent of incidental take.  50 C.F.R. § 402.14(i)(2)(i).

FWS explained that its determination of the amount of take that will likely result from implementing the proposed action was based on its understanding of how the proposed action would be implemented and historical data in simulations to understand the likely range and distribution of elevations in Project reservoirs over the proposed three-year term of Project operations.  STIPDX-001066-71; STIPDX-001156.  FWS stated that take of adults, juveniles, and larval suckers:

> is anticipated to occur in the form of collect, capture, kill, and harm.  The Service anticipates the proposed action could result in the annual incidental take of up to 174,384 listed suckers of all life stages by killing, 1,185,825 by injury, 36,000 by capture, and 100,000 by collection; approximately 99 percent of the anticipated annual incidental take would be of sucker larvae and eggs.  Overall, the incidental take is expected to be both lethal and nonlethal and result from entrainment into Project facilities, seasonal habitat reductions in Project reservoirs due to water diversions, sucker monitoring and required studies, assisted rearing, and [operation and maintenance] activities associated with the Project, including sucker salvage.

STIPDX-001156.  FWS stated that Project operations other than those that were proposed "could be outside the scope of this BiOp." *Id*.

With specific regard to Section 9 liability, FWS stated that, to be exempt from the prohibitions of Section 9 of the ESA, Reclamation "must fully comply with conservation measures described as part of the proposed action and the [specified] Terms and Conditions" set forth in the ITS.  STIPDX-001168-69.  The ITS emphasizes that the terms and conditions are nondiscretionary and that, "[i]f Reclamation fails to assume and implement the terms and conditions or fails to retain oversight to ensure compliance with these terms and conditions, the exemption provided in section 7(o)(2) may not apply."  STIPDX-001156.  Key among the terms and conditions of the ITS are avoiding UKL surface elevations below: (1) 4,142 feet in April or May in consecutive years or any year in which river augmentation is provided under the 2020

1   Interim Plan, or below the corresponding April or May elevations observed in 2010 (which was a

2   particularly dry year and is considered a benchmark in the BiOp); (2) 4,140.0 feet by July 15 in

3   any year, 4,140.5 feet by July 15 in more than one year, or 4,140.8 feet by July 15 in more than

4   two years; (3) 4,138.25 feet in September in more than one water year; or (4) 4,138.00 feet at any

5   time.  STIPDX-001170.  If elevations lower than the boundary conditions occur, "Reclamation

6   shall determine the causative factors of this decrease and determine whether these factors are

7   within the scope of the proposed action and the effects analyzed in this BiOp."  *Id*.  Additionally,

8   "Reclamation shall immediately consult with the Service concerning the causes to adaptively

9   manage and take corrective actions."  *Id*.

10      The NMFS ITS states that Project operations would "result in incidental take in the form

11   of harm to SONCC coho salmon ESU [Evolutionarily Significant Unit] individuals through

12   increased disease risks, habitat reductions, elevated water temperatures, reductions to dissolved

13   oxygen concentrations, and decreased smolt outmigration rates."  STIPDX-001809-10.  In

14   addition, NMFS anticipated incidental take "in the form of harm to Southern Resident [killer

15   whale] individuals through reduction in prey availability and impairment of foraging behavior."

16   STIPDX-001810.  Since the effects of the proposed action anticipated to result in incidental take

17   are "inextricably linked to flow, which is quantifiable and can be monitored, NMFS use[d]

18   hydrologic-based surrogates, because water availability in the mainstem Klamath River in the

19   spring and summer has a direct effect on these sources of incidental take."  *Id*.  The ITS uses the

20   following surrogates for the amount or extent of incidental take of coho salmon expected as a

21   result of the flow-related effects of the proposed action:

22          (1) the minimum daily average flows described in Table 33 shall be met; (2) the
          daily reduction to IGD flow due to UKL control logic shall not exceed the largest
23          daily reduction to IGD flow modeled in the POR of 74 percent, (3) the percentage
          of the final EWA volume based on June 1 supply and used between March 1 and
24          June 30 shall not be less than the lowest percentage of EWA spent and modeled in
          the POR of 61 percent, and (4) based on annual June 1 EWA supply, EWA
25          released between March 1 and September 30 shall not be underspent by more
          [than] 5 percent.
26

27   STIPDX-001811.  The ITS states that, "[i]f any of these four thresholds are not met, the amount

28   or extent of incidental take to coho salmon will be considered exceeded unless NMFS determines

that extraordinary hydrologic conditions rather than effects of the proposed action were responsible for the IGD flow reductions or EWA underspend." *Id.* Exceeding these flow surrogates also is an exceedance of the anticipated incidental take of Southern Resident killer whales. STIPDX-001821. The ITS makes these same parameters non-discretionary terms and conditions of the Section 9 take exemption, stating that "[i]f the entity to whom a term and condition is directed does not comply with the following terms and conditions, protective coverage for the proposed action would likely lapse." STIPDX-001823.

In addition, the NMFS ITS sets an incidental take limit for the proposed action's contribution to increasing risks to coho fry and juveniles from *C. shasta* infection calculated using a model that estimates the prevalence of mortality ("POM") from *C. shasta* disease among a spring/early summer outmigrating population of juvenile fish. STIPDX-001816. The amount or extent of anticipated incidental take is exceeded if annual Shasta River coho salmon POM (the population with the highest modeled POM for the period of record) exceeds 49 percent. STIPDX-001817. In a similar manner, the NMFS ITS used an estimated prevalence of *C. shasta* infection rate at a certain Chinook salmon trapping location as a surrogate for disease-related effects of the proposed action on juvenile Chinook salmon and ultimately on Southern Resident killer whales. STIPDX-001821-22.

In a water year with average- to above-average hydrologic conditions, Reclamation can operate the Project consistent with ESA requirements for coho salmon and suckers, while also providing substantial irrigation water of approximately 350,000 acre-feet. In drought years, however, such as have occurred in 2020, 2021, and 2022, Reclamation has not been able to fully and simultaneously meet the UKL elevations for suckers and Klamath River flows for SONCC coho salmon described in the Project BiOps, even with reduced deliveries or no deliveries for Project irrigation. In each of these years, Reclamation has therefore needed to adjust operating criteria through adaptive management, in consultation with NMFS and FWS as provided for in the BiOps and ITSs. For instance, 2020 was a severe drought year in which UKL elevation fell below 4,142.0 feet in early April despite minimal irrigation deliveries. Reclamation's implementation of a surface flushing flow in the Klamath River for the SONCC coho salmon in

late April and early May – releasing a total of 43,125 AF from UKL – resulted in a drop in UKL elevations of approximately 0.50 feet.  ECF 919 at 11.  In an attempt to avoid further significant declines in UKL levels, Reclamation allocated the Project a reduced supply of approximately 140,000 acre-feet and reduced the augmentation flows that would have otherwise been released to the river in May and June under the Interim Plan.  *Id*. at 13.

Conditions were even more critical in 2021, with net inflow in the Basin from snowpack and other precipitation being the second lowest of record for the previous 40 years, making it impossible for Reclamation to simultaneously maintain the UKL elevations and Klamath River streamflows described in the 2019 Plan—even with no irrigation deliveries.  STIPDX-000392. Because of these critically dry conditions, Reclamation prepared Temporary Operating Procedures ("TOP") to manage operations in spring and summer (April 15 through September 30).  STIPDX-000392-99.  The 2021 Annual Operations Plan issued in accordance with the 2021 TOP postponed the typical April start date for irrigation deliveries to June 1 (STIPDX-000415) and anticipated an exceptionally low Project supply of 33,000 acre-feet.  STIPDX-000416. However, Klamath Basin inflow forecasts continued to decline and a Klamath Project contractor, the Klamath Drainage District ("KDD"), made unauthorized diversions from the Klamath River contrary to Reclamation's instruction that no water was available to it, which effectively exhausted the entire Project allocation for the irrigation season.  STIPDX-000232.  On May 12, 2021, Reclamation also "announced that after meeting and conferring with the Services no surface flushing flow for the benefit of salmon would be implemented in 2021" due to the increasing extreme drought conditions.  STIPDX-000265 n.1.

Extreme drought conditions have continued for a third straight year in 2022, requiring new TOP to manage operations through spring and summer (April 15 through September 30). STIPDX-000122-28.  Even without any irrigation deliveries or a surface flushing flow for the Klamath River, UKL will again not reach 4,142.0 feet in April and May to enable sucker spawning, nor is the lake expected to meet the July 15 elevation of 4,140.5 feet per the 2019 Plan and FWS BiOp and ITS.  STIPDX-000123.  Consequently, Reclamation projected that a full flushing flow per the 2019 Plan and NMFS BiOp and ITS was unattainable this year (*id*.);

however, Reclamation did propose, and subsequently implemented, a partial flushing flow in
April 2022 with available water in coordination with the Services.  STIPDX-000126.  Per the
2022 TOP, Reclamation's modeling in April indicated that, with a Project supply allocation of up
to 62,000 acre feet, UKL elevation will be above the end-of-year elevation of 4,138.0 feet.
STIPDX-000128.  Any increases in inflow beyond what was projected in April will be split
evenly between an increased Project allocation and additional water retained in UKL to support
lake levels.  STIPDX-000127-28.

**V.   The Challenged Orders.**

OWRD is a state agency charged with administering water rights in Oregon.  On April 6,
2021, OWRD issued a final administrative order ("OWRD Order" or "Order") that commands
Reclamation to "immediately preclude or stop the distribution, use or release" of water deemed
to have been stored in UKL under Oregon state law for any purpose other than beneficial use
under KA 1000, the Oregon state law water right for irrigation use held for the Klamath
Project.[10]  However, as explained above, operating the Project to avoid jeopardizing listed
species and destroying or adversely modifying critical habitat typically requires, at times, either
the retention of water in UKL that OWRD classifies as "stored" under KA 294, the Project's
state water right held for storage by Reclamation, or the release of such "stored water" from
UKL into the Klamath River, notwithstanding irrigation demands for its use.  Under OWRD's
methodology, water is deemed to be released from storage if it exceeds the rate of inflow into
UKL from tributary and groundwater sources.  STIPDX-000432.  For example, OWRD would
consider implementation of a "flushing" flow in the Klamath River at the rate of 6,000 cfs when
inflow into UKL is measured at closer to 1,000 cfs to include "stored water."

---

[10] The OWRD Order resulted from a suit brought against it in Oregon state court in May 2020 by
Intervenor KID, which sought an injunction directing the OWRD Watermaster to stop
Reclamation from diverting water from UKL for Klamath River flows to sustain salmon.
Pursuant to that claim, on October 13, 2020, the court filed a written order requiring the
Department's Watermaster "to immediately stop the distribution, use and/or release of Stored
Water from the UKL, without determining that the distribution, use and/or release is for a
permitted purpose by users with existing water rights of record or determined claims to use the
Stored Water in the UKL."  STIPDX-000238.

The OWRD Order expressly acknowledges that Reclamation has conflicting compliance obligations under federal law, including "the Endangered Species Act of 1973 (ESA) (16 U.S.C. §§ 1531-1544, (Pub. L. No. 93-205, §§ 2-18), 87 Stat. 844, as amended)," and that Reclamation "will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations." STIPDX-000434. Nonetheless, the Order includes no exceptions for meeting such federal obligations. To the contrary, the order flatly prohibits the release of water in excess of the amounts that can be beneficially used for irrigation under the Project's water right, even as it acknowledges that it does not alter, relieve, or release Reclamation from any conflicting obligations it has under federal law and related federal regulations. STIPDX-000436. Thus, adherence to the OWRD Order would result in deviation from the operations that NMFS has concluded are not likely to result in jeopardy to the SONCC coho salmon and the Southern Resident killer whale or destruction or adverse modification of the SONCC coho salmon's critical habitat and also from the mandatory terms and conditions specified in the ITS issued to Reclamation by NMFS. Accordingly, the OWRD Order places Reclamation in the untenable position of either purposefully deviating from the operations designed to meet the requirements of ESA Sections 7 and 9 or being placed at risk of sanctions from OWRD for noncompliance with its Oregon state-law-based orders.

In fact, while Reclamation was implementing operations under the 2019 Plan to meet the requirements of the ESA and be consistent with reserved federal tribal water rights, OWRD served Reclamation with two notices of violation on July 2, 2021, and July 28, 2021, in which OWRD determined that Reclamation released "stored" water in violation of the OWRD Order. In the July 2, 2021 notice of violation, OWRD concluded that:

1. "legally stored water was passing through the Link River Dam in violation of the ORDER dated April 6, 2021"; and
2. the release "has resulted in the lowering of UKL levels which the Department considers a major violation pursuant to OAR 690-260-0040(2)(a)"—defined as a violation "when substantial harm to other water rights, minimum flows, instream water rights, the public health or safety, or other water-based resources is immediate or imminent."

STIPDX-000229.  In accordance with these conclusions, OWRD ordered:

1. "The violation was observed on June 28, 2021.  You have one (1) day from the date of this notice to correct the violation.
2. You may not willfully release water that has been lawfully denied by the Department and must remain in compliance with the terms of this ORDER to avoid further notices of violation.
3. If this violation is not corrected within one (1) day from the date of this notice the Bureau may be subject to further agency action or any other lawful remedy.
4. This Notice of Violation is in effect for three (3) years from the date of service of this ORDER, or as determined by the Watermaster."

STIPDX-000230.

In the July 28, 2021 notice of violation, OWRD again concluded that the Bureau violated the OWRD Order on June 29 and July 2, 2021 and determined:

During the period of June 25 through July 26 the water passing through the Link River Dam was natural flow with three exceptions.  On June 28, June 29, and July 2, 2021, ten cfs of water was released in excess of permitted purposes by users with existing water rights of record or determined claims to use the stored water in UKL.  The Department and the Watermaster, District 17, will continue to monitor conditions in the UKL throughout 2021 and will issue a status determination on a monthly basis or as conditions change.

STIPDX-000218.

At present, enforcement of the OWRD Order is automatically stayed by operation of Oregon Revised Statute section 536.075(5) due to the filing of petitions for judicial review of the order by the United States[11] and Defendant-Intervenor KID.

--------

[11] On the same day that it filed the present action, the United States filed a parallel action in the U.S. District Court for the District of Oregon that included the same claims as are pled in its Crossclaim, as well an additional claim comprised of a petition for judicial review under the Oregon Administrative Procedures Act ("Oregon APA").  *United States v. Oregon Water Resources Department*, No. 1:21-cv-01442 (D. Or.).  The United States based its petition for judicial review claim upon the same violations of federal law that it pleads in its Crossclaim, but pled in the terminology of the Oregon APA.  The United States filed that parallel action in an abundance of caution to provide a fallback action in the event that its Crossclaim is not adjudicated on the merits for any reason and to ensure compliance with Oregon state law, including the statute of limitations under the Oregon APA, to the extent it is deemed to apply to the United States' challenges.  The United States subsequently moved for and obtained a stay of that action, pending the completion of these proceedings.

VI.   **Klamath Project ESA Litigation.**

A.   **Litigation by Water Users Contesting the Applicability of ESA Section 7 to Project Operations.**

Following the listing of the SONCC coho salmon under the ESA in 1997, irrigators brought a series of lawsuits contesting Klamath Project compliance with ESA Section 7.  The leading case was brought by the Klamath Water Users Protective Association as lead plaintiff,[12] joined by other irrigators (collectively referred to as "KWUA"), against Reclamation and PacifiCorp.  *See Klamath Water Users Ass'n v. Patterson*, 15 F. Supp. 2d 990, 996 (D. Or. 1998), *aff'd*, 203 F.3d 1206 (9th Cir. 1999).  Prior to the filing of that suit, Reclamation had proposed an annual operations plan for the Project (STIPDX-007340-47) that maintained certain flows in the Klamath River to avoid jeopardizing the SONCC coho salmon or destroying or adversely modifying its critical habitat, in recognition that there often was insufficient water available in the system to meet ESA requirements and fulfill senior tribal water rights while also meeting power generation and irrigation demands.  Reclamation and PacifiCorp amended the terms of their 1956 contract regarding operation of Link River Dam to make Reclamation, rather than PacifiCorp, responsible for implementing the operations plan.

KWUA brought suit to block the operations plan and contract amendment.  KWUA alleged that the PacifiCorp contract could not be amended without its consent because it was a third-party beneficiary under it.  *Patterson*, 15 F. Supp. 2d at 993.  The court denied KWUA's motion for a temporary restraining order and also its motion for summary judgment on its National Environmental Policy Act claim, after which KWUA voluntarily dismissed its remaining claims.  *Id.*  However, the case proceeded to decision on PacifiCorp's counterclaim against KWUA, to which Reclamation was joined, seeking to establish PacifiCorp's rights and liabilities under the contract.  *Id.*  PacifiCorp's allegations included that, "[i]n the past several years Federal Defendants as well as other federal agencies have directed PacifiCorp to operate the Link River Dam in a manner that insures that water is made available for species listed as

---

[12] The United States understands the "Klamath Water Users Protective Association" is one and the same entity as Intervenor KWUA.  Accordingly, *Patterson* is not only binding precedent as to KWUA generally, but is also binding on KWUA as a litigant in the case.

threatened or endangered under the Endangered Species Act as well as to meet the trust
responsibility of the Secretary of Interior to federally recognized Indian Tribes within the
Klamath Basin," and that KWUA had "alleged that the 1956 Contract obligates PacifiCorp to
operate the Link River Dam in a manner that guarantees that plaintiffs receive adequate irrigation
water, and that the Bureau's only right to control the Dam is to take actions to protect
irrigation."[13]  PacifiCorp Am. Counterclaim ¶¶ 9, 13, *Klamath Water Users Ass'n v. Patterson*,
No. 97-3033-HO (D. Or. Oct. 29, 1997), ECF 147 (copy attached as Ex. B).  PacifiCorp further
alleged that "plaintiffs commenced this action asserting that implementation of the 1997 Plan
would deprive them of adequate irrigation water" and that "the 1997 contract amendment
between the Bureau and PacifiCorp was invalid because the 1956 Contract cannot be modified
without their consent."  *Id.* ¶¶ 11, 12.

KWUA's arguments in opposition to the counterclaim included that Reclamation had no
authority or discretion under the contract to direct PacifiCorp's operation of Link River Dam for
purposes of complying with the ESA and fulfilling reserved tribal rights, and that the ESA did
not apply to PacifiCorp's operation of Link River Dam.  *See, e.g.*, KWUA Opp'n to Defs' Mot.
Summ. J. on Am. Counterclaim at 2, *Klamath Water Users Ass'n v. Patterson*, No. Civ. 97–
3033–HO (D. Or. Dec. 8, 1997), ECF 177 (KWUA arguing that Reclamation's contract with
PacifiCorp gave Reclamation "no right of control over the storage and release of water at Link
River Dam, except for a specified, limited right to protect irrigation supplies") (copy attached as
Ex. C); *see also id.* at 26-28.  KWUA also expressly contested the release of "stored" water for
non-irrigation purposes without an Oregon state law water right, arguing that:

> Under the law of Oregon and other western states, water in storage is a legally
> distinct source from natural flow. . . . To use water from storage, one must have a
> separate water right for the contemplated use of the stored water. . . . The State of

---

[13] PacifiCorp's counterclaim sought "a declaratory judgment that: (1) plaintiffs are not third party
beneficiaries to the 1956 contract with respect to irrigation water, and the contract creates no
rights in plaintiffs to irrigation water; (2) the 1956 contract may be amended with regard to
PacifiCorp's rights and obligations to operate Link River Dam without plaintiffs' consent; and,
(3) PacifiCorp is not liable to plaintiffs under the 1956 contract for implementing Federal
defendants' water allocation decisions for the Klamath Project," which included ESA Section 7
compliance.  *Patterson*, 15 F. Supp. 2d at 996-97; Ex. B at ¶ 17.

1
2
3
4

> Oregon authorized the use of Klamath Lake for storage of water for use for
> irrigation. . . . . There are no rights to use stored water for any other purpose.  For
> example, the various *asserted* federal reserved rights, even if they exist, cannot
> include a right to water in storage. . . .  Under the water right system, the stored
> water in Upper Klamath Lake cannot lawfully be used for purposes other than
> irrigation and power.

5

KWUA Reply to Defs.' Opp'ns to KWUA Mot. Summ. J. on Am. Counterclaim at 9-10,

6

*Klamath Water Users Ass'n v. Patterson*, No. Civ. 97–3033–HO (D. Or. Dec. 22, 1997), ECF

7

196 (internal citations omitted) (copy attached as Ex. D).

8

       Reclamation argued, in response, that the ESA applied to Link River Dam operations

9

because the United States was the owner of the dam in fee simple and it retained authority to

10

manage the dam under the contract, which did not expressly immunize its terms from

11

compliance with subsequently-enacted legislation like the ESA.  Br. for Appellees, *Klamath*

12

*Water Users Prot. Ass'n*, No. 98-35708, 1999 WL 33757677, at *54 n.27 (9th Cir. Jan. 14,

13

1999).  Reclamation further argued that the PacifiCorp contract could not be construed as

14

limiting its discretion or authority to curtail irrigation deliveries to comply with ESA Section 7 –

15

and that the irrigators were not third-party beneficiaries who had a right to veto contract

16

amendments – because the water users receive their water pursuant to the individual repayment

17

contracts, not the PacifiCorp contract, and the repayment contracts gave Reclamation discretion

18

to curtail deliveries.  *Id*. at *17-20, 34-42, 52-59.  Reclamation argued the repayment contracts

19

define the water users' rights and give Reclamation authority and discretion to curtail deliveries

20

where required by federal law, including the ESA, per shortage and reapportionment clauses that

21

acknowledge the party might not receive the full flow of water under the contracts.  Reclamation

22

specifically argued that allowing the plaintiffs to sue PacifiCorp for reducing irrigation deliveries

23

to comply with the ESA and operate consistent with tribal water rights would be inconsistent

24

with the water users' rights and Reclamation's discretion under the repayment contracts.  *Id*. at

25

35 n.16 & 38 n.17.

26

       The district court granted summary judgment to Reclamation and PacifiCorp on its

27

counterclaim against KWUA.  The court found that KWUA had no rights to challenge the

28

amendment of the PacifiCorp contract or the implementation of Reclamation's operations plan

for Link River Dam in compliance with the ESA and consistent with tribal water rights because Reclamation had discretion under the repayment contracts to curtail irrigation deliveries for these purposes, and "allow[ing] plaintiffs to sue for a shortage under the 1956 contract, to which they are not parties, in the face of the hold harmless provision contained in their individual repayment contracts, to which they are parties, would be inconsistent and is not supported by the record." *Patterson*, 15 F. Supp. 2d at 996.  The court further found "plaintiffs' rights to water in the basin, whether as third party beneficiaries to the 1956 contract or under their individual repayment contracts with Reclamation, are subservient to senior tribal water rights and to subsequent legislative enactments by Congress, such as the Endangered Species Act." *Id*. (citing *O'Neill v. United States*, 50 F.3d 677, 680-81 (9th Cir. 1995)).

KWUA appealed, and the Ninth Circuit affirmed.  *Klamath Water Users Prot. Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), *op. am. on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000).  The Court ruled, among other things, that Reclamation's operation of Link River Dam was subject to compliance with the ESA.  The Court explained that:

> Because Reclamation retains authority to manage the Dam, and because it
> remains the owner in fee simple of the Dam, it has responsibilities under the ESA
> as a federal agency.  These responsibilities include taking control of the Dam
> when necessary to meet the requirements of the ESA, requirements that override
> the water rights of the Irrigators.  Accordingly, we hold that the district court did
> not err in concluding that Reclamation has the authority to direct Dam operations
> to comply with the ESA.

*Id*. at 1213.  The Court reached these holdings notwithstanding vigorous opposition from the water users, including, as noted above, their argument that Reclamation had no authority to direct the release of "stored" water retained in UKL for non-irrigation purposes and that ESA Section 7 did not apply to operation of Link River Dam.[14]

---

[14] The Ninth Circuit noted that, "[e]ven in circumstances where the ESA was passed well after the agreement, the legislation still applies as long as the federal agency retains some measure of control over the activity."  *Patterson*, 204 F.3d at 1213 (citing *Sierra Club v. Babbitt*, 65 F.3d 1502, 1510 (9th Cir. 1995)); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (ESA Section 7 applied to dam project that was "was well under way when Congress passed the Endangered Species Act of 1973" because closing the gates of the dam "'carr[ied] out' an action that ha[d] been 'authorized' and 'funded' by a federal agency"); *O'Neill*, 50 F.3d at 680–81

1      KWUA requested rehearing *en banc*, taking particular exception to the district court and

2   Ninth Circuit's holdings that reserved tribal rights "take precedence over any alleged rights of

3   the Irrigators," which KWUA argued could interfere with the then-ongoing KBA in Oregon.

4   The Ninth Circuit denied rehearing, but added a clarifying footnote to its opinion noting that

5   "[o]ur decision in this case and that of that district court relate only to questions involving the

6   Bureau's operation and management of the Project, and not to the relative rights of others not

7   before the court to the use of the waters of the Basin." 204 F.3d at 1208. The water users

8   petitioned for a writ of *certiorari*, which was denied. *Klamath Drainage Dist. v. Patterson*, 531

9   U.S. 812 (2000). Thus, as established in *Patterson*, the law of the Ninth Circuit is that

10  "operation and management of the Project," including water deemed to be "stored" under the

11  Project's water right, is subject to compliance with ESA Section 7(a)(2) and fulfillment of

12  reserved tribal water rights.

13      Notwithstanding this binding and controlling case law, representatives of Project

14  irrigation interests have continued to contest the applicability of ESA Section 7 to Klamath

15  Project operations. In 2001, KWUA and KID, among other parties, brought suit against

16  Reclamation to challenge implementation of its 2001 Klamath Project operations plan, under

17  which "water elevations of Upper Klamath Lake and water flows below Iron Gate Dam [would]

18  be maintained to support endangered sucker fish and threatened coho salmon" and "no irrigation

19  water deliveries [would] be made to the majority of land within the [Project]." *Kandra v. United*

20  *States*, 145 F. Supp. 2d 1192, 1195-96 (D. Or. 2001). Among their claims, the plaintiffs alleged

21  that the operations plan violated their contract rights "by using Project water for purposes other

22  than irrigation," *id*. at 1201, and they sought preliminary injunctive relief "enjoining

23  Reclamation from implementing the Plan and ordering Reclamation to release unspecified

24  'historic' amounts of irrigation water" or, in the alternative, "262,000 acre feet of water, resulting

25  in an Upper Klamath Lake elevation of 4138 at the end of September, which allocates roughly

26  fifty percent of stored water and inflow to Project irrigators." *Id*. at 1196. Citing *Patterson*, the

27

28  (Reclamation lawfully delivered less than the contractually agreed-upon amount of water in
    contracts that pre-dated the ESA).

1    court rejected the allegation, finding that "plaintiffs cannot assert breach of contract based on

2    Reclamation's allocation of water to protect the suckers and salmon," because *"plaintiffs'*

3    *contract rights to irrigation water are subservient to ESA and tribal trust requirements."* *Id*. at

4    1201 (citing *Patterson*, 204 F.3d at 1214).

5           The court also rejected plaintiffs' further allegations that the operations plan was

6    unlawful because it adopted reasonable and prudent alternatives that were "not consistent with

7    the intended purpose of the Project," 145 F. Supp. 2d at 1206, which was limited to irrigation,

8    and because "no provision of the ESA compels Reclamation to take action *to release previously*

9    *stored water* to augment the flow of the Klamath River." *Id*. at 1207 (emphasis added). The

10   court found these allegations to be "without merit" and concluded that "Plaintiffs present no

11   support for this novel interpretation of the ESA." *Id*. The court further noted that, "during oral

12   argument, plaintiffs conceded that Reclamation was bound by the ESA." *Id*. at 1204 n.6.

13          Also in 2001, water users filed suit in the Court of Federal Claims, alleging that

14   Reclamation had committed a taking by "temporarily terminat[ing] water deliveries to the

15   plaintiffs in order to meet the requirements of the Endangered Species Act, 16 U.S.C. § 1531, *et*

16   *seq*." *Baley*, 134 Fed. Cl. at 625. After nearly two decades of litigation, the Federal Circuit ruled

17   that there had been no taking. *Baley v. United States*, 942 F.3d at 1341. The court found that the

18   water users' water rights "were subordinate to the Tribes' federal reserved water rights," *id*., and

19   that, although the California tribes' reserved rights had not been quantified, "the Klamath Project

20   is subject to the requirements of the ESA," *id*. at 1323, and "[a]t the bare minimum, the Tribes'

21   rights entitle them to the government's compliance with the ESA [Section 7(a)(2)] in order to

22   avoid placing the existence of their important tribal resources in jeopardy." *Id*. at 1337. The

23   Supreme Court denied the water users' petition for a writ of *certiorari*. *Baley v. United States*,

24   141 S. Ct. 133 (2020).

25          Again, in 2019, KWUA and KID, joined by other water districts, filed two suits against

26   Reclamation in Oregon federal district court alleging, among other things, that Reclamation lacks

27   discretion in its operation of the Project to be subject to the ESA and that, if Reclamation

28   releases water stored under the Project's water right for any purposes other than irrigation, it

must compensate the water users. Those cases were dismissed in May 2020 for failure to join the Klamath and Hoopa Valley Tribes as necessary and indispensable parties who could not be involuntarily joined due to tribal sovereign immunity. *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 489 F. Supp. 3d 1168 (D. Or. 2020), *appeal filed*, No. 20-36009 (9th Cir. Nov. 19, 2020) and *appeal filed sub nom. Shasta View Irrigation Dist. v. United States,* No. 20-36020 (9th Cir. Nov. 24, 2020) (appeal argued December 7, 2021). Those dismissals are currently on appeal to the Ninth Circuit and argument was heard on December 7, 2021. *Id.*

Additionally, as noted above, KID filed litigation in May 2020 against OWRD that ultimately resulted in the issuance of the OWRD Order and subsequent notices of violation that the United States challenges here. KID's suit in Oregon state court (Marion County Circuit Court) sought to compel OWRD to regulate Reclamation's release of water from UKL, but did not name Reclamation as a Defendant.[15] In granting summary judgment to KID, the court ordered OWRD to stop Reclamation from releasing water stored in UKL under the Project's water right for any purposes other than the satisfaction of the Project's state-based water rights held for irrigation—*i.e.*, water right KA 1000. *See* STIPDX-000238 ("pursuant to ORS 540.740, [OWRD Watermaster] Watson is ordered to immediately stop the distribution, use and/or release of Stored Water from the UKL without determining that the distribution, use, and/or release is for a permitted purpose by users with existing water rights of record or determined claims to use the Stored Water in the UKL"). The court's order and letter opinion did not consider Reclamation's obligations under federal law or the effect of the court's order on those obligations. *Id.* The court entered final judgment on June 14, 2021, STIPDX-000236, and OWRD subsequently appealed to the Oregon Court of Appeals and successfully moved for a stay pending appeal. *See* Order Granting Stay & Expediting Case, *Klamath Irrigation Dist. v. Or. Water Res. Dep't*, Case No. A176270 (Or. Ct. App. Dec. 17, 2021) (copy attached as Ex. E). That appeal has been fully briefed, but has not yet been set for argument.

---

[15] Attempts to join the United States to that litigation would encounter sovereign immunity barriers. *See, e.g.*, *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, No. 1:21-cv-00504-AA, 2022 WL 1210946, at *2 (D. Or. Apr. 25, 2022).

KID brought additional litigation on April 2, 2021, filing a motion in the KBA for an emergency preliminary injunction against Reclamation's release of water from UKL in connection with its ESA and tribal trust obligations.  *See Klamath Irrigation Dist.*, 2022 WL 1210946, at *2.  Reclamation removed that motion to the District of Oregon based on its "position that operations in accordance with its federal obligations—to the downstream tribes and under the ESA—are beyond the jurisdiction of the KBA."  *Id*.  KID then moved to remand its motion back to the KBA court, which motion the United States opposed.  *Id*. at 3.  On April 25, 2022, the District of Oregon issued an order and opinion denying remand on the grounds that the preliminary injunction motion is an action to determine the requirements of federal law under the ESA and tribal reserved rights in California, rather than an action to adjudicate or administer Oregon water rights under the McCarran Amendment.  *Id*. at 5.  The court has not yet ruled on KID's motion for preliminary injunction.

**B.    Litigation by Tribes, Fishing Interests, and Environmental Groups to Compel ESA Compliance Regarding Project Operations.**

Consistent with the case law above, the Ninth Circuit and this Court – in suits brought by tribal, fishing, and environmental interests – have reviewed Reclamation's compliance with the ESA in its Klamath Project operations and repeatedly affirmed that compliance with the ESA is a mandatory condition of operating the Project.  For instance, in *Pacific Coast Federation of Fishermen's Associations v. Bureau of Reclamation*, 138 F. Supp. 2d at 1247, a court in this district ruled that Reclamation

> violate[d] section 7(a)(2) of the ESA by implementing its 2000 Operations Plan, and operating Klamath Project pursuant to that plan for an entire year, (1) without first completing a biological assessment evaluating the plan's potential effects on threatened and endangered species and their critical habitats in the action area, and (2) without ever initiating consultation concerning the plan, even though it knew that consultation was required and that formal consultation, in particular, was warranted.

The court found that, because Reclamation had not completed ESA consultation, "it had no basis or authority to implement the 2000 Operations Plan."  *Id*. at 1245.

Following that decision, on review of NMFS' 2002 BiOp on Klamath Project operations and its Reasonable and Prudent Alternative ("RPA"), the Ninth Circuit ruled that the RPA was

1   arbitrary and capricious and NMFS had "not demonstrated that it has followed the mandate of

2   the ESA to avoid the likelihood of jeopardy to the SONCC coho" where the RPA would provide

3   only 57% of the water needed by SONCC coho salmon over an eight-year period.  *Pac. Coast*

4   *Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093, 1095 (9th Cir.

5   2005) ("Rather than explain how providing 57 percent of the long-term flows will avoid jeopardy

6   to the salmon, the discussion of Phase II explains that the Project provides irrigation to 57

7   percent of the land in the upper Klamath Basin.  The flow level appears to be justified solely on

8   the basis of the Klamath Project's share of responsibility for the water use.  The proper baseline

9   analysis is not the proportional share of responsibility the federal agency bears for the decline in

10   the species, but what jeopardy might result from the agency's proposed actions in the present and

11   future human and natural contexts."); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S.*

12   *Bureau of Reclamation*, No. Civ.C02-2006 SBA, 2006 WL 798920, at *2 (N.D. Cal. Mar. 27,

13   2006) (finding, on remand, that, because the NMFS BiOp on Klamath Project operations was

14   invalid, "in order to comply with the ESA, the federal defendants must reinitiate consultation and

15   produce a new biological opinion"); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of*

16   *Reclamation*, 226 F. App'x 715, 718 (9th Cir. 2007) (affirming district court's injunction upon

17   finding that "[e]njoining diversions of water to ensure that the flow limits specified by NMFS are

18   met is an equitable remedy reasonably calculated to prevent BOR from jeopardizing coho

19   salmon in its Klamath Project operations" as required by ESA Section 7).

20        More recently, in 2017, this Court ruled in cases brought by the Yurok and Hoopa Valley

21   Tribes, respectively, that Reclamation committed a procedural violation of ESA Section 7(a)(2)

22   by operating the Klamath Project without having completed reinitiated consultation and entered

23   an injunction requiring additional releases to the Klamath River to mitigate disease conditions to

24   remain in place until Reclamation completed reinitiated ESA consultation.  *Yurok Tribe*, 231 F.

25   Supp. 3d at 455; *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106

26   (N.D. Cal. 2017).  KWUA participated as a defendant-intervenor in all of the cases described

27   above.  The Klamath Tribes also have filed three actions since 2018 challenging the adequacy of

28   Reclamation's compliance with the ESA.  *Klamath Tribes v. U.S. Bureau of Reclamation*, No.

1   18-cv-03078-WHO, 2018 WL 3570865 (N.D. Cal. July 25, 2018); *Klamath Tribes v. U.S.*

2   *Bureau of Reclamation*, 537 F. Supp. 3d 1183 (D. Or. 2021) (denying motions for temporary

3   restraining order and preliminary injunction; final merits disposition pending); *Klamath Tribes v.*

4   *U.S. Bureau of Reclamation*, No. 1:22-cv-00680-AA (D. Or.) (complaint filed on May 9, 2022).

5   **VII.    Procedural History and Limited Lifting of the Stipulated Stay of Litigation.**

6           Following the filing of this suit in October 2019 and intervention by KWUA, Plaintiffs

7   moved for a preliminary injunction on several of their ESA claims.  However, before that motion

8   was argued, Plaintiffs, Federal Defendants, and KWUA stipulated to a stay of the case on March

9   27, 2020.  ECF 907.  The stay agreement was the end result of intensive negotiations that took

10  place over many weeks, during which the stipulating parties discussed in detail the Interim Plan

11  that would be implemented while the case was stayed and Reclamation completed reinitiated

12  ESA consultation on a longer-term plan for the Project.  The stipulating parties explored

13  different methods of operating the Project while maintaining elevations of UKL to protect

14  suckers and Klamath River flows to protect SONCC coho salmon in light of various potential

15  hydrology scenarios.  In the end, the stipulating parties agreed that the litigation should remain

16  stayed in full until September 30, 2022, so long as Reclamation implemented the Interim Plan.

17  *Id*. at 5, ¶ 3.  The stated purpose of the stipulation was to "avoid further litigation of the

18  Plaintiffs' pending lawsuit, afford more time for completion of the Bureau's ESA consultations,

19  and create opportunity for a more collaborative process for resolving conflicts concerning water

20  in the Klamath Basin."  *Id*. at 5, ¶ 7.  The stipulating parties agreed that it was "in the public

21  interest that the agencies have until September 30, 2022" to complete reinitiated ESA Section

22  7(a)(2) consultation.  *Id*. at 4.  The Court approved the stay on March 27, 2020, the same day the

23  stipulation was filed.  ECF 908.

24          Notwithstanding that KWUA – of which KID is a member – had stipulated to the stay of

25  this litigation for purposes of completing ESA consultations on Project operations, less than two

26  months later, in May 2020, KID initiated the lawsuit against OWRD in Marion County Circuit

27  Court that led to the OWRD Order and notices of violation that Reclamation received while

28

implementing the Interim Plan, and which the United States challenges in this Crossclaim.  *See*

Section VI.A., above.

In addition, also in May 2020, Plaintiffs moved to lift the stay of this case based upon

allegations that Reclamation was not releasing the full amount of augmentation water to the

Klamath River called for under the Interim Plan, and for preliminary injunctive relief compelling

Reclamation to make such releases, as allegedly required by the ESA.  *See* ECF 909.  Federal

Defendants opposed those motions, arguing that the stay should not be lifted because

Reclamation had not deviated from the Interim Plan and otherwise complied with the ESA.  ECF

919.  Notably, KWUA made similar arguments in opposition to lifting the stay and to granting

injunctive relief.  ECF 917.  The Klamath Tribes also intervened at that point to oppose further

releases from UKL out of a desire to protect their treaty interests in the suckers in UKL.  *See*

ECF 918; *see also* ECF 912 and ECF 916 at 1-2.  On May 29, 2020, the Court denied Plaintiffs'

motions, concluding that the Interim Plan gave Reclamation discretion to reduce the

augmentation flows in response to ongoing drought conditions in the Klamath Basin and that the

stay should remain in place.  *Yurok Tribe v. U.S. Bureau of Reclamation*, No. 19-cv-04405-

WHO, 2020 WL 2793945 (N.D. Cal. May 29, 2020).

Nearly a year later, in April 2021, with exceptional drought conditions continuing in the

Klamath Basin, KWUA filed a motion to lift the stay and resume the litigation based upon

alleged deviation from the Interim Plan, including alleged failures by Reclamation to deliver the

full amount of water for irrigation under the Plan.  *See* ECF 928.  KWUA did not propose any

limiting conditions on the lifting of the stay and proffered a motion for summary judgment

against Reclamation alleging that it lacked discretion to release water from UKL to comply with

the ESA.  ECF 928-1.

In June 2021, Federal Defendants filed their own motion to lift the stay for the limited

purpose of allowing the United States to file and prosecute a crossclaim against the Challenged

Orders, which conflict with Reclamation's operations to meet the requirements of the ESA and

the stipulated stay of this litigation.  ECF 938.  To address concerns expressed by the Yurok

Tribe, Intervenor Klamath Tribes, and the Hoopa Valley Tribe (which is not a party to the

litigation) that the United States' crossclaim not result in the adjudication of issues for which there was no waiver of federal or tribal sovereign immunity, Federal Defendants and the tribes engaged in extensive negotiations, which ultimately resulted in a stipulation among Federal Defendants, the Yurok Tribe, and the Klamath Tribes, filed on August 18, 2021.  ECF 951. Federal Defendants also lodged with the stipulation a revised, proposed crossclaim (*id*. at ECF 951-2) and an amended, proposed order that included additional conditions protective of tribal sovereign immunity.  *Id*. at ECF 951-1.  Those conditions included that adjudication of the crossclaim shall not result in an adjudication of any tribal reserved water rights, and bifurcation of the proceedings on those pleadings to hear the First Cause of Action concerning the ESA basis for the crossclaim before proceeding to the Second Cause of Action, if at all, pertaining to the tribal rights.  *Id*. at ECF 951-1 ¶¶ 7, 10.  With those conditions and revisions, those parties stipulated to the granting of Federal Defendants' motion to lift the stay and the denial of KWUA's motion to lift the stay, which did not contain any limiting conditions.

Following the completion of briefing on the United States' motion to lift the stay and also KWUA's competing motion to lift the stay, the Court on September 30, 2021, granted Federal Defendants' motion for a limited lifting of the stay on the stipulated conditions negotiated with the tribes and denied KWUA's motion.  ECF 961.  The next day, on October 1, the United States filed the present Crossclaim against the Challenged Orders.  ECF 963.  OWRD subsequently moved to dismiss the Crossclaim for lack of standing, which the Court denied on March 24. *Yurok Tribe v. U.S. Bureau of Reclamation*, No. 19-cv-04405-WHO, 2022 WL 875646 (N.D. Cal. Mar. 24, 2022).

In accordance with the summary judgment briefing schedule set by the Court, ECF 1014, the United States now submits its opening summary judgment brief.  Pursuant to the United States' stipulation with the Tribes and the bifurcation of these proceedings under the Court's order lifting the stay for limited purposes, the United States' summary judgment motion solely addresses its First Cause of Action concerning the ESA basis for its challenges in the Crossclaim and does not seek summary judgment under its Second Cause of Action pertaining to tribal water

1  rights.  The First Cause of Action specifically requests the following declaratory relief under 28

2  U.S.C. § 2201:

3          that the Challenged Orders are in excess of OWRD's authority and jurisdiction,
           and therefore invalid[; and]

4
           that (a) Reclamation's operation of the Klamath Project, including the exercise of
5          its rights to store water in UKL for irrigation use under Oregon law, is subject to
           the requirements of the ESA, including but not limited to Section 7; (b) the ESA,
6          including but not limited to Section 7, may require Reclamation to release water
           from UKL regardless of the water's classification under state law and without
7          appropriating such water; and (c) to the extent that the Challenged Orders forbid
           Reclamation from making releases of water deemed to have been "stored" in
8          UKL under Oregon law for this federal purpose, the Challenged Orders are
           contrary to the ESA and therefore preempted under the Supremacy Clause of the
9          United States Constitution. U.S. Const. art. VI, § 1, cl.2.

10

11  ECF 963 ¶¶ 108-109.  The First Cause of Action also seeks "a permanent injunction under 28

12  U.S.C. § 2202 against any attempt to enforce the Challenged Orders, which would limit and/or

13  prevent Reclamation from operating the Project under federal law, including through the release

14  of water deemed to have been stored in UKL." *Id*. ¶ 110.

15                                    **ARGUMENT**

16  **I.    OWRD Lacks Jurisdiction to Issue Orders Impinging upon Reclamation's
           Compliance with Federal Law, Including the ESA.**

17
           The April 6, 2021 OWRD Order prohibits Reclamation from releasing "stored" water
18
    from UKL for any purpose other than what is determined a beneficial use under KA 1000.
19
    OWRD issued this prohibition despite expressly recognizing in the Order that Reclamation's
20
    operation of the Klamath Project is subject to compliance with federal law, including "the
21
    Endangered Species Act of 1973 (ESA) (16 U.S.C. §§ 1531-1544, 87 Stat. 844, as amended),"
22
    and that Reclamation "will, at some near future date, release legally stored water through the
23
    Link River Dam to comply with the Bureau's . . . ESA obligations."  STIPDX-000434.  Despite
24
    acknowledging the conflict, the Order further states: "[n]othing in this order alters, relieves, or
25
    releases any person, state, or federal agency from any and all rights, duties or obligations arising
26
    from other sources of law including without limitation other state laws or rules, federal law and
27
    related federal agency regulations, federal or state court orders, or contracts."  STIPDX-000436.
28

Under the Oregon Water Code, OWRD, acting through its Director, is authorized by state statute to "[a]dminister and enforce the laws of the state concerning the water resources of this state." Or. Rev. Stat. § 536.037(1)(c). Neither the Oregon Water Code nor any other state law gives OWRD authority to administer or decide matters of federal law, including whether or how Reclamation's operation of the Klamath Project is subject to the federal ESA or how Reclamation is to comply with the ESA or the Reclamation Act. Nor does OWRD have any authority to interpret contracts between Reclamation and the Project beneficiaries entered into pursuant to the Reclamation Act. In fact, the ACFFOD specifically disclaims any jurisdiction over those contracts. STIPDX-003792-93 (stating that the ACFFOD does not determine "the relative rights of the KPWU entities and the United States to control or operate diversion and distribution works, including headgates, pumps, canals and other structures . . . and does not alter in any way the relative rights of the United States and the irrigation entities to control or operate the irrigation works"). And yet the OWRD Order, by prohibiting the release of "stored" water from UKL for any purpose other than beneficial use under KA 1000 effectively interprets the requirements of the Reclamation Act and contracts, while preventing Reclamation from complying with the ESA. By issuing a categorical command to Reclamation that is not limited to compliance with state law and then serving notices of violation while Reclamation was carrying out operations in compliance with federal law, OWRD has overstepped its jurisdiction beyond matters of state law and improperly impinged on Reclamation's operation of the Project in compliance with federal law.

For instance, in disallowing any releases from UKL without a state water right, the Order effectively interprets the Reclamation Act as depriving Reclamation of discretion to operate the Klamath Project in compliance with the ESA unless it has a state water right to do so. Likewise, the Order effectively interprets federal law and the Project contracts as requiring Reclamation to operate the Project solely for the benefit of Project irrigation. However, as explained above and below, the Reclamation Act and Project contracts include no such limitations, and the ESA includes no such exemption. Rather, ESA Section 7(a)(2) operates as a limit on the storage and subsequent diversion of water from UKL under the Project's water rights to ensure that the

1    exercise of such rights is not likely to result in jeopardy to listed species or destruction or adverse

2    modification of critical habitat, and ESA Section 9 prohibits unauthorized take.

3           Federal courts have recognized the distinction between questions of water rights

4    adjudication and subsequent administration—*i.e.*, those questions that are within OWRD's

5    jurisdiction—and questions of federal law concerning dam operations, including to comply with

6    the ESA.  *See Patterson*, 204 F.3d at 1214 n.3 (recognizing that "questions involving the

7    Bureau's operation and management of the Project" were within the jurisdiction of a federal

8    court and distinguishable from "questions of relative amounts and priorities [of water rights], at

9    least within the State of Oregon," which were being addressed in state court in the KBA);

10   *Klamath Irrigation Dist.*, 2022 WL 1210946, at *5 (finding that questions of federal law

11   concerning dam operations—"most notably Reclamation's release of water to satisfy the

12   instream water rights of the Yurok and Hoopa Valley Tribes and the co-extensive demands of the

13   ESA" – were not within the prior exclusive jurisdiction of the state KBA court, which involved

14   adjudication or administration of state law water rights); *WaterWatch of Or. v. Winchester Water

15   Control Dist.*, No. 3:20-cv-01927-IM, 2021 WL 4317150, at *6 (D. Or. Sept. 22, 2021) (finding

16   that OWRD did not have primary jurisdiction over dam "operations" as opposed to

17   administration of water rights); *see also San Luis Obispo Coastkeeper v. U.S. Dep't of the

18   Interior*, 394 F. Supp. 3d 984, 995 (N.D. Cal. 2019) (distinguishing between action "to enforce

19   state environmental laws requiring sufficient flows of water" for fish and water rights

20   administration matters), *aff'd*, 827 F. App'x 744 (9th Cir. 2020).  OWRD has therefore acted

21   *ultra vires* and in excess of its jurisdiction and authority in issuing orders that are not limited to

22   administration of Oregon water rights recognized in the ACFFOD, but which implicitly interpret

23   federal law and contracts.  Simply stated, Reclamation's obligations under federal law and its

24   manner of compliance with federal law are beyond the jurisdiction of OWRD.  The United States

25   is therefore entitled to a declaration that the Challenged Orders are invalid because "OWRD

26   lacks jurisdiction to issue orders impinging upon Reclamation's satisfaction of its obligations

27   under the federal ESA."  ECF 963 at 40 ¶ A.1 (Crossclaim Prayer for Relief).

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II.     **The Challenged Orders Violate the Doctrine of Intergovernmental Immunity.**

For related reasons, the Challenged Orders are invalid under the Supremacy Clause of the United States Constitution because they violate the principle of intergovernmental immunity, which prohibits a state or locality from directly regulating a federal function or federal agency operations. *Blackburn*, 100 F.3d at 1435 ("states may not directly regulate the Federal Government's operations or property"). The ESA operates as a general prohibition of discretionary federal action that is likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat and that will result in unauthorized take of listed species. The Challenged Orders nonetheless forbid Reclamation from releasing any "stored water" for any purposes other than irrigation under the Project's Water Right – KA 1000 – regardless of whether such releases are required to comply with the ESA. In so doing, the Challenged Orders purport to regulate the United States directly and to limit its manner of compliance with the ESA, all in violation of the doctrine of intergovernmental immunity. *City of Arcata*, 629 F.3d at 991 ("the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." (quoting *McCulloch*, 17 U.S. at 436)).

In *City of Arcata*, voters in the cities of Arcata and Eureka approved two ballot measures that "purport[ed] to bar the federal government from 'recruit[ing], initiat[ing] contact with for the purpose of recruiting, or promot[ing] the future enlistment of any person under the age of eighteen into any branch of the United States Armed Forces.'" 629 F.3d at 988. The measures "also subject[ed] military recruiters to civil penalties for each infraction," and the cities "expressed their intent to enforce the ordinances against the federal government." *Id*. "[T]he United States brought suit against the cities seeking a declaration that the ordinances [were] invalid under the Supremacy Clause of the United States Constitution," including under the doctrine of intergovernmental immunity. *Id*. The district court "determined that the ordinances

impermissibly [sought] to regulate the federal government directly" in violation of the doctrine, *id*. at 990, and the Ninth Circuit affirmed.[16]

The Ninth Circuit reasoned that the ballot measures violated the doctrine because the "ordinances seek to directly regulate the conduct of agents of the federal government." *Id*. at 991.  As the court explained:

> [T]he ordinances—by their express terms—prohibit military recruiters from recruiting or attempting to recruit individuals under the age of eighteen.  By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly. *See Tennessee v. Davis,* 100 U.S. 257, 263, 25 L.Ed. 648 (1879) (noting that the federal government "can act only through its officers and agents").

*Id*. at 991.  Such direct regulation of the federal government by the municipalities constituted a clear violation of the Supremacy Clause.  In fact, the court found that it had previously "relied on intergovernmental immunity in refusing to enforce state statutes against the federal government under circumstances far more ambiguous than those present here":

> For example, in *Blackburn v. United States,* 100 F.3d 1426 (9th Cir.1996), we declined to subject the federal government to a California statute imposing safety requirements on resorts. *Id.* at 1435.  Though the state statute did not target the federal government alone, we nevertheless concluded that "[a]pplication of the [statute] in the present case would violate the Supremacy Clause by constituting a direct and intrusive regulation by the State of the Federal Government's operation of its property at Yosemite." *Id.*  Here, the ordinances do not merely regulate the federal government incidentally; rather, they are expressly intended to do so.

*City of Arcata*, 629 F.3d at 991.

The Challenged Orders here directly violate this binding precedent.  As in *City of Arcata*, the Challenged Orders "do not merely regulate the federal government incidentally; rather, they are expressly intended to do so." *Id*.  By their express terms, they directly regulate – and limit – Reclamation's release of water from UKL in its operation of the Klamath Project.  Further, the Challenged Orders prohibit releases of stored water for any purpose other than beneficial use

---

[16] The Ninth Circuit also affirmed the district court's ruling that the ballot measures discriminated against the United States in violation of the doctrine of intergovernmental immunity by creating an exception to its applicability for non-federal agents.  629 F.3d at 991. The United States does not raise a discrimination argument here in regards to the Challenged Orders.

under KA 1000, notwithstanding the express acknowledgement that Reclamation has conflicting

compliance obligations under federal law, including "the Endangered Species Act of 1973 (ESA)

(16 U.S.C. §§ 1531-1544, (Pub. L. No. 93-205, §§ 2-18), 87 Stat. 844, as amended)," STIPDX-

000430, and that Reclamation "will, at some near future date, release legally stored water

through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA

obligations." STIPDX-000434. Such direct regulation of the federal government's manner of

complying with federal law, particularly where the conflict being created with those federal law

obligations is acknowledged, is a plain violation of the doctrine of intergovernmental immunity.

Section 8 of the Reclamation Act also does not authorize such regulation. As discussed

in more detail below, the United States has consented through Section 8 only to adhere to the

requirements of state law with respect to the acquisition and use of water rights for Project

purposes, including particularly irrigation. 43 U.S.C. § 383. This consent is unrelated to the

separate domain of ESA compliance and neither authorizes OWRD to regulate the Project in this

area nor provides an exemption from the intergovernmental immunity doctrine. Section 8's

statement of non-interference with the laws of a state concerning irrigation does not constitute a

broad license for OWRD to restrict Reclamation's compliance with the ESA. In fact, the Ninth

Circuit in *City of Arcata* rejected the cities' analogous arguments that their ordinances "merely

prohibit conduct 'already forbidden' by federal law." 629 F.3d at 991-92. The Court ruled that

"[a] state or local law that directly regulates the conduct of the federal government or

discriminates against it is invalid, even if it is no more restrictive than federal law." *Id.* The

court further reasoned that, "[i]n any event, the ordinances here would not fit within any such

exception, as they impose greater restrictions on military recruitment than does federal law." *Id.*

at 992. So, too, here, the Challenged Orders are invalid because they directly regulate the

conduct of the federal government, and Congress has not clearly and unambiguously authorized

such regulation under Section 8 of the Reclamation Act.

Simply put, Oregon lacks the authority to regulate Reclamation's compliance with the

commands of Congress in the ESA. The United States is entitled to a declaration that the

Challenged Orders are unlawful because they violate the doctrine of intergovernmental immunity

and the Supremacy Clause by directly regulating and proscribing Reclamation's release of "stored" water from UKL to comply with the ESA.  The Challenged Orders are unlawful under the intergovernmental immunity doctrine whether or not they actually conflict with the ESA; however, as explained below the orders do, in fact, conflict.

## III.   The Challenged Orders Conflict with the ESA and Therefore are Preempted under the Supremacy Clause of the United States Constitution.

Under the Supremacy Clause, in cases of conflict between federal and state law, federal law controls.  *See Arizona v. United States*, 567 U.S. 387, 399–400 (2012) ("state laws are preempted when they conflict with federal law. . . . This includes cases where 'compliance with both federal and state regulations is a physical impossibility,' *Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142–143 (1963), and those instances where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (quoting *Hines*, 312 U.S. at 67)); *California*, 438 U.S. at 668 n.21 ("state water law does not control in the distribution of reclamation water *if* inconsistent with other congressional directives to the Secretary.").

Here, the Challenged Orders conflict with the ESA and are therefore preempted. Reclamation's legal obligations under the ESA are well-established.  As explained above, Reclamation must ensure that operation of the Project does not jeopardize the continued existence of listed species or destroy or adversely modify their critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a)–(b).  In addition, Reclamation must not take members of an endangered species without prior authorization from NMFS or FWS, or "attempt to commit, solicit another to commit, or cause to be committed" such unauthorized take, *see* 16 U.S.C. § 1538(a)(1)(B), (g), and these prohibitions have been extended to threatened SONCC coho salmon under Section 4(d) of the ESA, *see* 16 U.S.C. §§ 1538(a)(1)(G); 1533(d); 50 C.F.R. § 223.203.  The commands of Sections 7 and 9 are satisfied by operating the Project consistent with the written "no jeopardy" BiOps and ITSs from FWS and NMFS, which are based on Reclamation's proposed operations to provide certain elevations in UKL and flows in the Klamath River, as hydrology allows.  As explained above, adherence to the terms and conditions of the ITSs are nondiscretionary to be granted an exemption from Section 9 take liability.

1    Congress has enacted ESA Section 7(a)(2)'s mandates as preconditions for taking

2    discretionary federal action as an initial matter; here, operating the Project.  Reclamation must

3    ensure that it can store water in UKL and subsequently divert it for irrigation purposes without

4    causing jeopardy, destruction or adverse modification of critical habitat, or unauthorized take.  If

5    it cannot meet the requirements of Section 7, then its proposed action cannot lawfully go forward

6    except in the exceedingly rare instance that an exemption is granted by the Endangered Species

7    Committee.  16 U.S.C. § 1536(e)-(h); *see generally Hill*, 437 U.S. 153.  The commands of ESA

8    Sections 7 and 9 take no account of economic impacts of compliance or how water may be

9    classified under state water law.  Congress has commanded compliance with Section 7(a)(2)

10   "whatever the cost," *Hill*, 437 U.S. at 184, based on "the best scientific and commercial data

11   available," 16 U.S.C. § 1536(a)(2).

12   The OWRD Order itself expressly acknowledges that it prohibits Reclamation from

13   implementing operations to comply with the ESA's commands, as those operations inevitably

14   include release (or retention) of some amount of water for non-irrigation purposes that OWRD

15   would consider to be "stored" in UKL.  Indeed, OWRD twice enforced its order against

16   Reclamation by serving it with notices of violation while Reclamation was implementing its

17   operations to comply with the ESA, in accordance with the BiOps and ITSs.  By prohibiting

18   Reclamation from implementing such operations as an initial matter, and then reprimanding

19   Reclamation for doing so, the Challenged Orders conflict with the commands of both Sections 7

20   and 9 of the ESA, and are preempted.  As this Court recognized in denying OWRD's motion to

21   dismiss the Crossclaim:

22          Because of the alleged conflict between the Order and the Bureau's obligations
            under the ESA, the Order thus injures the Bureau in one of two ways.  It either
23          follows the ESA and violates the Order, or it follows the Order and violates the
            ESA.  Either scenario opens the door for enforcement action.  *See Pacificans for a*
24          *Scenic Coast v. Cal. Dep't of Transp.*, 204 F. Supp. 3d 1075, 1084 (N.D. Cal.
            2016) (noting that an agency that ignores a BiOp "does so at its own peril (and
25          that of its employees)," as those who knowingly "take" an endangered or
            threatened species "is subject to substantial civil and criminal penalties, including
26          imprisonment.").

27

28

1    *Yurok Tribe*, 2022 WL 875646, at \*5.  In these circumstances, the Challenged Orders plainly

2    conflict with federal law by, at a minimum, "stand[ing] as an obstacle to the accomplishment and

3    execution of the full purposes and objectives of Congress."  *Hines*, 312 U.S. at 67.  Accordingly,

4    the Challenged Orders are preempted under the Supremacy Clause.

5    **IV.    KWUA's Contentions that OWRD's Orders Are Not Preempted Lack Merit.**

6          In its proffered motion for summary judgment to this Court and in submissions to the

7    Department of the Interior,[17] KWUA has argued that Klamath Project operations, particularly the

8    release of stored water from UKL, are exempt from compliance with ESA Section 7 because

9    Reclamation can only operate the Project to provide irrigation, and cannot tailor its operations

10   for any non-irrigation purpose, including to avoid jeopardy to ESA-listed species and destruction

11   or adverse modification of designated critical habitat.  *See*, *e.g.*, ECF 928-1 at 18-28[18] (summary

12   judgment brief lodged with KWUA's motion to lift the stay); STIPDX-000552-56.  The courts

13   have already rejected these arguments, however, in litigation to which KWUA was a party.

14   KWUA's contention that operation of the Klamath Project, in particular the storing of water in

15   UKL, is not subject to compliance with ESA Section 7 is contrary to the controlling law of this

16   Circuit and incorrect.  KWUA simply seeks to relitigate the existing case law that is adverse to

17   its interests, but to no avail.

18          **A.    The Challenged Orders Squarely Conflict with the Controlling Law of this
             Circuit, as OWRD Itself Has Conceded.**

19

20         As explained above, Ninth Circuit authority specifically evaluating Klamath Project

21   operations controls resolution of the United States' Crossclaim by firmly establishing that those

22   operations, including storing water in, and releasing such water from, UKL, are subject to

23   compliance with the ESA.  Consequently, any argument that the Challenged Orders do not

24   _____

     [17] KWUA's submissions to the Department led to the withdrawal in January 2021 of
25   longstanding memoranda that had concluded that Klamath Project operations were subject to
     compliance with the ESA and the issuance of new memoranda reassessing whether various
26   aspects of Project operations were subject to ESA Section 7(a)(2) compliance.  *See* STIPDX
     000474-546.  However, the current Secretary of the Interior withdrew the new reassessments on
27   April 8, 2021, and reinstated the preceding 1990s memoranda.  *See* STIPDX 000419-20.

28   [18] Citations to ECF filings are to the ECF pagination, not the internal pagination on the filings.

conflict with the statutory commands of the ESA because those commands do not apply to Project operations, is foreclosed by binding and controlling authority.  *See Patterson*, 204 F.3d 1206; *Pac. Coast Fed'n of Fishermen's Ass'ns*, 426 F.3d 1082; *Pac. Coast Fed'n of Fishermen's Ass'ns*, 226 F. App'x 715; *accord Baley*, 942 F.3d 1312; *Pacific Pac. Coast Fed'n of Fishermen's Ass'ns*, 138 F. Supp. 2d 1228; *Kandra*, 145 F. Supp. 2d 1192; *Yurok Tribe*, 231 F. Supp. 3d 450; *Hoopa Valley Tribe*, 230 F. Supp. 3d 1106.[19]  Indeed, OWRD does not appear to dispute that its Challenged Orders conflict with this binding federal case law and the operations required by the ESA, expressly stating as much in its motion to stay the judgment of the Marion County Circuit Court that it filed with the Oregon Court of Appeals.[20]

## B.    *Patterson* and Related Authority Finding the Klamath Project Subject to Compliance with the ESA Remain Good Law.

As explained above, Reclamation operates the Klamath Project under the authority of the Reclamation Act and delivers water in accordance with its contracts with the water users, both of

---

[19] The Ninth Circuit also has recognized that several other Reclamation projects governed by the same or comparably broad statutory mandates as the Klamath Project are subject to compliance with ESA Section 7.  *See, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 640 (9th Cir. 2014); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998); *O'Neill*, 50 F.3d at 687; *Westlands Water Dist.*, 805 F. Supp. at 1507.

[20] *See* OWRD Mot. to Stay J./Order, *Klamath Irrigation Dist. v. Or. Water Res. Dep't*, Case No. A176270 (Or. Ct. App. Oct. 6, 2021) (without attachments) (copy attached as Ex. F) at 11 ("As a result of the judgment and underlying order, the OWRD defendants have been forced to issue orders to the Bureau that, if honored, would arguably violate the treaty obligations of the United States government as well as the provisions of the Endangered Species Act . . . ."); *id*. at 13 ("With regard to the Klamath Project, the BOR must operate the works in a fashion that protects not only the endangered sucker fish in UKL itself, but also threatened species in the lower river in California."); *id*. at 15-16 ("By enjoining the OWRD defendants to order the BOR not to release stored water except to provide water to those holding Oregon state water rights, the trial court set the OWRD defendants on a collision course with contrary orders of the federal courts requiring the BOR to release water to benefit fish in northern California. Those obligations have been repeatedly reaffirmed by the federal courts, in cases where Klamath irrigators, including the Klamath Water Users Association and KID, were parties."); *id*. at 17-18 ("The circuit court injunction has no basis in Oregon law . . . . It has also placed the BOR in the untenable position of being in violation of orders issued by state water regulators or, if it adheres to the state orders, being in violation of federal court orders and potentially liable for 'take' of ESA species in the lower Klamath River.").

which afford Reclamation discretion to comply with ESA Section 7(a)(2).  KWUA asserts that the Supreme Court's decision in *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007), and the provisional completion of the ACFFOD are changes in the law that take away Reclamation's discretion under the Reclamation Act and project contracts to operate the Klamath Project in compliance with ESA Section 7.  That is incorrect.  *Patterson* remains the law.

### 1. *Home Builders* Did Not Overrule the Body of ESA Law on the Klamath Project.

*Home Builders* involved the intersection of two federal statutes, the Clean Water Act ("CWA") and the ESA.  Specifically, the Court considered the statutory command of CWA Section 402(b) and found that, in commanding that the Environmental Protection Agency ("EPA") "shall approve" a state's application where the state showed that the nine criteria specified in the statute had been met, Section 402(b) did not grant EPA discretion to tailor its decision based on other non-enumerated factors like effects to ESA-listed species.  *Id*. at 673.  EPA's approval decision thus did not trigger the requirements of ESA Section 7.  *Id*.

However, the Ninth Circuit has explained that *Home Builders*' reasoning does not apply where, as here, Congress has merely specified broad statutory objectives, while leaving it to the agency to decide how those objectives are to be achieved.  In those circumstances, the action agency retains sufficient discretion to comply with the ESA.  For instance, in *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917 (2008) ("*NWF*"), the court found that the federal statutory commands applicable to the Federal Columbia River Power System ("FCRPS") were distinguishable from that of the CWA in *Home Builders*, making certain operations subject to compliance with ESA Section 7.  The court explained that:

> The Court's concern in *Home Builders* was that "[a]n agency cannot simultaneously obey the differing mandates set forth in § 7(a)(2) of the ESA and § 402(b) of the CWA."  127 S.Ct. at 2534.  In this context, compliance with the CWA provision is problematic because the provision "affirmatively mandates that [a specific action which conflicts with the ESA] 'shall' be [taken] if the specified criteria are met. . . ."  *Id.* at 2533.  Here, in contrast, Congress has imposed broad mandates which do not direct agencies to perform any specific nondiscretionary actions, but rather, are better characterized as directing the agencies to achieve particular goals.

*NWF*, 524 F.3d at 928.  Based on this distinction, the court concluded the agencies operating the FCRPS are "obligated to satisfy the ESA's requirements" because, "while the goals themselves may be mandatory, the agencies retain considerable discretion in choosing what specific actions to take in order to implement them." *Id*. at 929.  "When an agency, acting in furtherance of a broad Congressional mandate, chooses a course of action which is not specifically mandated by Congress and which is not specifically necessitated by the broad mandate, that action is, by definition, discretionary and is thus subject to Section 7 consultation." *Id.*

Subsequently, in *San Luis & Delta-Mendota Water Authority v. Jewell*, the Ninth Circuit considered "after *Home Builders* . . . what counts as a non-discretionary action, to which § 7(a)(2) does not apply" in the context of Reclamation's operation of the Central Valley Project in California.  747 F.3d at 639.  The court held that Reclamation had discretion to trigger the Section 7(a)(2) consultation requirement, noting that:

> The Water Authority has not pointed us to any statutory obligation that Congress has imposed on Reclamation that is both mandatory and inconsistent with its obligations under the ESA. Like the FCRPS in *NWF*, Reclamation has a very broad mandate.

> The Water Authority has pointed us to water contracts between Reclamation and wildlife refuge contractors, water exchange contracts with senior water rights holders, and a decision of the California State Water Resources Control Board. These do not approach the statutory mandate that the Court found EPA was under in *Home Builders*.

*Jewell*, 747 F.3d at 640 & n.45.

The Ninth Circuit's decision in *Jewell* is dispositive here.  As the Ninth Circuit observed, the CWA provision at issue in *Home Builders* that wholly deprived the EPA of discretion was distinguishable from the Reclamation Act and the project contracts, which did not command Reclamation to undertake specific, nondiscretionary acts, but rather imbue Reclamation with discretion over how it accomplishes the statute's broad directives.  For instance, in the Reclamation Act, Congress has broadly authorized Reclamation to "use the reclamation fund for the operation and maintenance of all reservoirs and irrigation works constructed under the provisions of this act," 43 U.S.C. § 491, without specifying the manner in which such operations are to be conducted, and "to perform any and all acts . . . as may be necessary and proper" to

implement the statute, 43 U.S.C. § 373, without requiring the performance of any particular acts.
Because the statute does not dictate any specific form of Project operations, it does not deprive
Reclamation of discretion to plan and conduct those operations in compliance with ESA Section
7's mandates to avoid the likelihood of jeopardy to listed species and the destruction or adverse
modification of critical habitat.  This includes discretion to meet these mandates by releasing
water that OWRD deems "stored" in UKL.  *See Kandra*, 145 F. Supp. 2d at 1207 ("Plaintiffs
first argue that the purpose of the Klamath Project, pursuant to the Reclamation Act, is irrigation.
Plaintiffs allege that the RPAs adopted by Reclamation benefit fish to the detriment of irrigation,
and the RPAs are therefore inconsistent with the Project's purpose . . . . These arguments are
without merit").

KID itself acknowledged in a June 29, 2020 brief filed in its lawsuit against Reclamation
in the District of Oregon that the agency has sufficient discretion to be subject to the ESA.  *See*,
*e.g.*, KID Objs. to Findings & Recommendations of Magistrate Judge Recomm. Granting Mots.
to Dismiss at 12, *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, Case 1:19-cv-00451-
CL (D. Or. June 29, 2020), ECF No. 93 (copy attached as Ex. G) ("KID *does not allege that
Reclamation lacks discretion* in the Klamath Project or that it need not consult with the agencies.
KID specifically acknowledges in its operative complaint Reclamation's discretion, including its
ability to acquire water rights—voluntarily or involuntarily—from KID and other water users.").
The discretionary nature of the mandates under the Reclamation Act do not divest Reclamation
of all discretion to operate the Project to avoid jeopardy to listed species and destruction or
adverse modification of critical habitat, including through the release of water deemed to be
"stored" in UKL.

Lastly, the *Home Builders* decision in 2007 did not represent a change in the law after
*Patterson* and other Klamath Project ESA cases.  The ESA implementing regulation found at 50
C.F.R. § 402.03, stating that "Section 7 and the requirements of this part apply to all actions in
which there is discretionary Federal involvement or control," had been in place for years (since
1986) when *Patterson* and the related body of Klamath Project ESA rulings were handed down.
*See* 51 Fed. Reg. 19926, 19958 (June 3, 1986) ("Section 7 and the requirements of this Part

apply to all actions in which there is discretionary Federal involvement or control.").  Indeed, well before *Home Builders* – and *Patterson* – the Ninth Circuit had recognized that ESA Section 7 does not apply where an agency lacks discretion under federal law to take action that will inure to the benefit of a species.  *See, e.g.*, *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) ("where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.").[21]  The Ninth Circuit panel in *Patterson* was aware of its prior ruling in *Sierra Club* and cited it for the proposition that "[e]ven in circumstances where the ESA was passed well after the agreement, the legislation still applies as long as the federal agency retains some measure of control over the activity."  204 F.3d at 1213.  In its briefing to the Ninth Circuit in *Patterson*, Reclamation distinguished *Sierra Club* by noting that, in that case the court "concluded that BLM had retained *no* power or ability to influence the project in ways that could materially affect listed species," whereas with respect to the Klamath Project, "the Bureau clearly did retain that authority."  1999 WL 33757677, at *57.  Similarly, *Environmental Protection Information Center v. Simpson Timber Co.*, 255 F.3d 1073, 1082 (9th Cir. 2001) ("*EPIC*"), was based on inapposite facts where FWS issued an incidental take permit ("ITP") for private logging operations in which "none of the provisions" of the permit or the agreement to carry out the permit gave FWS the "power to reinitiate consultation . . . to impose measures to protect" listed species onto the permit.

In sum, *Home Builders*, *Sierra Club*, and *EPIC* involved facts and statutory commands inapposite to the Klamath Project.  Those decisions therefore do not undermine the holdings in *Patterson* and related Klamath-specific ESA cases.  Reclamation's operation of the Klamath Project under the broad statutory directives of the Reclamation Act and the Project contracts, which do not deprive Reclamation of discretion to tailor irrigation deliveries for the protection of ESA-listed species, are wholly distinguishable from the right of way in *Sierra Club* and the ITP in *EPIC* that eliminated such discretion.

---

[21] The Court in *Sierra Club* found that "the agency's continuing ability to influence the private conduct [wa]s limited to three factors unrelated to the conservation of" listed species.  *Sierra Club*, 65 F.3d at 1508.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2. **The Project Contract Terms Remain As they Were When the Ninth Circuit Considered them In *Patterson*.**

As explained above, in *Patterson*, the Ninth Circuit held, in part, that PacifiCorp was not liable to the water users in the event that irrigation deliveries were curtailed to meet the requirements of ESA Section 7 because such liability would be inconsistent with the repayment contracts, which gave Reclamation discretion to curtail irrigation deliveries as ESA Section 7 may require. *Patterson*, 15 F. Supp. 2d at 996; *accord O'Neill*, 50 F.3d at 684. Under the Ninth Circuit's rulings in *Patterson* and *O'Neill*, the Project contracts do not divest Reclamation of discretion to modify Project operations, including the release of "stored" water, to comply with ESA Section 7's mandates.

The plain terms of the contracts support this conclusion. First, there is no express statement in the contracts that they will be exempt from "subsequent legislative enactments by Congress, such as the Endangered Species Act." *Patterson*, 15 F. Supp. 2d at 996 (citing *O'Neill*, 50 F.3d at 680-81). Second, though the ESA was passed well after the contracts discussed below were ratified, "the legislation still applies as long as the federal agency retains some measure of control over the activity." *Patterson*, 204 F.3d at 1213 (citation omitted). Here, Reclamation retains ownership and control of Link River Dam, and nothing in the contracts divests Reclamation of discretion to tailor the precise timing and amounts of water deliveries to avoid jeopardy to ESA-listed species or destruction of designated critical habitat. *Id*. The contracts that account for nearly all water delivered from the Klamath Project do not entitle the irrigation districts to a specific amount of water. Most of the contracts also affirmatively authorize Reclamation to reapportion available water in the event of shortages and/or state that the United States is not liable for water shortages due to drought and other causes. The Ninth Circuit (and the Federal Circuit in an opinion specifically addressing the Klamath Project) has held that those "other causes" include requirements of applicable statutes such as the ESA. *See O'Neill,* 50 F.3d at 684 (holding that a repayment contract's "liability limitation is unambiguous and that an unavailability of water resulting from the mandates of valid legislation constitutes a shortage by reason of 'any other causes'"); *accord Baley*, 134 Fed. Cl. at 658 ("the court finds that the phrase 'other cause' in certain Klamath Project Warren Act

shortage provisions is broad enough to encompass shortages caused by the United States' tribal trust and Endangered Species Act obligations"). Taken collectively, the Project contracts reflect Reclamation's broad discretion over Project operations under the Reclamation Act. The terms of these contracts have not changed since the Ninth Circuit decided *Patterson*.

A sampling of some of the contractual terms reflecting that the contracts do not divest Reclamation of discretion include, but are not limited to, the following:

KID Contract. The KID contract, dated November 29, 1954, does not guarantee an amount of water or dates of delivery to KID. *See* STIPDX-007834-72. The contract also absolves the United States from liability in the event of shortages due to "drought or other causes." *See* Art. 26 (STIPDX-007861). In addition to water delivery, the contract transfers operations and management ("O&M") authority to KID related to, among other facilities, the A Canal. Art. 4 (STIPDX-007839-40). However, title remains in the United States, Art. 4 (STIPDX-007839), and KID agrees to "care for, operate, and maintain the transferred works and deliver water therefrom in full compliance with the Federal reclamation laws as they now exist or hereafter may be amended," as well as the "the regulations of the Secretary now in force or hereafter promulgated." Art. 6 (STIPDX-007841). Reclamation retains additional discretion in connection with this transfer by virtue of its authority to resume control of the A Canal in the event of: (1) a need for emergency repairs; (2) neglect or failure to make repairs for a period of at least one year; or (3) default in payment or violation of any term of the agreement. Art. 7(c), (d) (STIPDX-007842); Art. 21(a) (STIPDX-007855-56).

TID Contract. The TID contract, dated September 10, 1956, does not describe a specific amount of water to be delivered to TID or dates of delivery. *See* STIPDX-007786-827. It also contains a waiver of liability for shortages caused by "drought" and "other causes," Art. 26 (STIPDX-007816), and further authorizes Reclamation to "apportion the available supply among the District and others having rights of priority equal to the rights of the District" in the event of such shortages. Art. 33(c) (STIPDX-007820). In addition to water delivery, the contract involves the transfer of operations and O&M authority to TID related to certain Klamath Project facilities. Art. 7(a) (STIPDX-007795). However, title to "the project works, including the

distribution and drainage systems and related works constructed by the United States to serve the lands of the District, shall be and remain in the name of the United States until otherwise provided for by the Congress," Art. 39 (STIPDX-007823).  Reclamation retains further discretion in connection with the O&M transfer by virtue of its authority to resume control of the facilities in the event of: (1) neglect or failure to make repairs for a period of at least one year; or (2) default in payment or violation of any term of the agreement.  Art. 10(c), (d) (STIPDX-007800-01); Art. 21(a) (STIPDX-007810-11).

Malin Irrigation District ("MID") Contract.  The MID contract, dated September 9, 1922, specifies maximum amounts of water that can be provided, but does not mandate minimums. Art. 7 (STIPDX-008212-13) (the water delivered shall not "exceed two acre-feet per acre of irrigable land during the usual irrigation season as established on the Klamath Project, being approximately that period from April 15 to September 30 . . . and in no event shall it exceed 0.6 acre-feet of water per irrigable acre in any month").  The contract also acknowledges that "all rights to the use and delivery of water acquired by the District under this contract are inferior and subject to prior rights reserved for the lands of the Klamath project."  Art. 7 (STIPDX-008213). Finally, the contract states that shortages of water may occur on account of "drought, inaccuracy in distribution or other cause" and provides that, "while the United States will use all reasonable means to guard against such shortages," the United States is absolved of liability on account of any such shortages.  Art. 11 (STIPDX-008214-15).

Shasta View Irrigation District ("SVID") Contract.  The SVID contract, dated August 20, 1948, specifies maximum amounts of water that can be provided, but does not mandate minimums, and gives the Secretary discretion to determine the water supply sufficient for beneficial use.  *See* Art. 13 (STIPDX-007921-22) ("the District shall be entitled to receive a water supply sufficient for beneficial use, as determined by the Secretary, for the irrigable lands in the District during the usual irrigation season as established on the Klamath Project [approximately April 15 to April 30]: Provided, that in no event shall the United States be obligated to furnish water in any one month at a rate of delivery in excess of six-tenths (0.6) of an acre-foot per irrigable acre . . . as determined by the Secretary . . . .").  The contract also

acknowledges that "all rights to the use and delivery of water acquired by the District under this contract are inferior and subject to prior rights reserved for the lands of the Klamath project." Art. 7 (STIPDX-008213). The contract further absolves the United States from liability in the event of shortages "[o]n account of drought, canal breaks, inaccuracy of distribution, or other causes," Art. 18 (STIPDX-007924), and provides that SVID "shall comply with all of the applicable provisions of the Reclamation Law and the regulations of the Secretary thereunder, and will operate and maintain its irrigation system to the satisfaction of the United States." Art. 17 (*id.*).

KDD Contract. The KDD contract, dated April 28, 1943, does not describe a specific amount of water to be delivered, but instead states that "[t]he delivery of water to the District . . . shall be made at such times and in such quantities (compatible with the operation of the project works in connection with the handling and disposition of water to others) as may be arranged between the appropriate representative of the District and the officer of the United States in charge of the Klamath Project." Art. 14(c) (STIPDX-007956). The contract also authorizes the Secretary, in the event of drought, to apportion water between KDD and others "in a manner deemed equitable by the Secretary," Art. 14(a) (STIPDX-007955-56). The contract further provides that times of shortage in water supply for lands of the District may occur due to "drought, canal breaks, inaccuracy in distribution or other causes" and that, "while the United States will use all reasonable means to guard against such shortage," the United States is absolved of liability on account of any such shortages. Art. 24 (STIPDX-007962-63). The United States, acting through the Secretary, also reserves in the contract the right "to make reasonable rules and regulations, and to add to or modify them as the Secretary may deem proper and necessary to carry out the true intent and meaning of the law and of this contract and to supply necessary details of their administration; and the District agrees to observe such rules and regulations." Art. 35 (STIPDX-007970); *see also* Art. 20(a) (STIPDX-007960) ("In the distribution of the water supply provided for herein, the District shall comply with all of the applicable provisions of the Federal Reclamation Law and the regulations of the Secretary thereunder . . . ."). The United States also retains complete control of the gates of Klamath

Strait, which control drainage of water from KDD lands, Art. 28(a), (b) (STIPDX-007966), and has the right "to place inspectors at any point or points in the District to make such measurements, investigations, or observations as in the judgment of the official of the United States in charge of the Project may be necessary for the enforcement of the provisions of this contract and for the interests of the Project generally."  Art. 20(c) (STIPDX-007960).

Klamath Basin Improvement District ("KBID") Contract.  The KBID contract, dated April 25, 1962, does not describe a specific amount of water to be delivered, but instead describes maximum amounts of surplus water that the United States may deliver.  Art. 2(a) (STIPDX-007721) ("the United States will deliver or cause to be delivered to the District each year surplus water in such quantities as can be beneficially used for irrigation of lands included within the District but not to exceed an average of three and six-tenths (3.6) acre-feet per irrigable acre").  The contract also absolves the United States of liability for shortage due to "drought, inaccuracy in distribution, or other cause" and reserves the right in the United States in times of shortage "to apportion the available surplus water supply among the District and others entitled . . . pursuant to the Warren Act, to receive water from the Klamath Project."  Art. 4 (STIPDX-007723).  The contract further recognizes the authority of the federal contracting officer to make operating rules and regulations "consistent with the provisions of this contract, the laws of the United States and of the State of Oregon," and KBID "agrees to observe such rules and regulations."  Art. 27 (STIPDX-007752-53).

Taken collectively, the Project contracts plainly leave Reclamation with discretion to comply with ESA Section 7.  *See Patterson*, 204 F.3d at 1213 ("[e]ven in circumstances where the ESA was passed well after the agreement, the legislation still applies as long as the federal agency retains some measure of control over the activity.").  Because these provisions variously do not require Reclamation to deliver a precise amount of water; absolve Reclamation of liability in times of water unavailability, which can be due to compliance with statutory requirements such as the ESA; give Reclamation authority to apportion water in times of shortage; and otherwise subject the contractors to Reclamation's reasonable rules and regulations and its authority to resume control over transferred works in certain circumstances, they are wholly

unlike the specific statutory command under the CWA in *Home Builders* that divested EPA of all

discretion.  Simply put, the contracts, like the broad directives of the Reclamation Act which

they implement, leave the agency discretion to take action for the benefit of a protected species.

### 3. The ACFFOD Did Not Eliminate Reclamation's Discretion to Comply with ESA Section 7.

The issuance of the ACFFOD in 2014 also did not represent a change in the law that

eliminated Reclamation's discretion to operate the Klamath Project in compliance with ESA

Section 7; nothing in the ACFFOD overruled *Patterson* and the related body of ESA case law on

the Klamath Project or divested Reclamation of its discretion under the Reclamation Act and

contracts to comply with the ESA.  The ACFFOD does not alter the broad statutory mandate of

the Reclamation Act or the contracts between Reclamation and the water users pursuant to which

the water users receive their water.  Reclamation retains the same discretion under the

Reclamation Act and the contracts to comply with ESA Section 7 that it has always had.

The ACFFOD administratively determined the specific terms of the Project's water rights

under Oregon law.  It describes the elements of the Project's water rights and establishes the

manner by which those rights *may* be used under Oregon state law, to the extent water is legally

and physically available.  Those elements include their priority date, points of diversion, places

of use, purposes of use, maximum diversion rate, and, as to the Project's storage right, the

maximum amount of water that *may* be stored in UKL and subsequently diverted to beneficial

use.  However, nothing in the ACFFOD or the water rights that it describes *compels* Reclamation

to store water in UKL or divert it for beneficial use.  To the contrary, the ACFFOD expressly

recognizes that it is limited to determining the elements of the water rights described and does

not determine the manner of operation of Project facilities or the relative rights to control those

facilities as between Reclamation and the Project contractors.  The Partial Order of

Determination for the Project's water rights in the ACFFOD states:

> *A determination of the relative rights of the [Klamath Project Water User]*
> *entities and the United States to control or operate diversion and distribution*
> *works, including headgates, pumps, canals and other structures is not within the*
> *scope of the Adjudication, and must take place in another forum.*  The
> Adjudication is concerned only with establishing the points of diversion that are,
> in fact, used to convey water to the claimed place of use.  These points of

1
2
3

> diversion have been adequately established based on the record of this proceeding.  The description and recognition of these points of diversion in this Partial Order of Determination is not intended to and *does not alter in any way the relative rights of the United States and the irrigation entities to control or operate the irrigation works*.

4   STIPDX-003792-93 (emphasis added).

5          Accordingly, the ACFFOD sets a ceiling on the maximum amount of water that can be

6   stored and subsequently diverted for irrigation under state law.  But it does not dictate when the

7   Project works can be operated for irrigation or override any requirements of federal law that

8   determine when water is legally available for diversion and beneficial use, including the ESA

9   and the Project contracts.  As discussed above, the contracts do not guarantee delivery of a

10  specific quantity of water to the water users, and the ESA can limit the amount that can actually

11  be stored and delivered from storage to irrigation.  The ACFFOD does not require, nor could it,

12  that Reclamation maximize Project deliveries under its state-law-based rights at the expense of

13  other legal mandates under federal law, including those of the ESA.

14         OWRD has confirmed these points in summary judgment briefing before the Marion

15  County Circuit Court in the suit that KID brought against OWRD seeking to compel it to halt

16  releases from UKL for non-irrigation purposes without a state law water right.  As stated by

17  OWRD:

18
19
20
21
22
23
24
25
26

> The ACFFOD permits but does not require the Bureau to store up to a maximum volume of water in UKL reservoir within a calendar year.  It is not the ACFFOD, but rather the parties' contracts, that determine the ownership and operation of the Project's diversion and distribution works.  Moreover, the ACFFOD is not a guarantee that water will be available to the Bureau for storage or to petitioner for beneficial use. . . .  No Oregon law requires the owner of a use right to use any or all of the water allowed under that right. . . .  The ACFFOD sets the maximum permitted volume of water from the Klamath River and its tributaries that may be stored or used, by the Bureau which owns the storage right and petitioner which co-owns a use right.  The ACFFOD does not set a minimum or provide any guarantee that any water at all will in fact be available for storage or for use.  Neither the ACFFOD, nor any of the authorities listed by petitioner, establishes that petitioner is "entitled" to any specific amount of water, including stored water.

27
28

OWRD Resp. to Mot. for Summ. J. & Cross-Mot. for Summ. J. (Injunction Claim), at 10, 12, 13,

*Klamath Irrigation Dist. v. Or. Water Res. Dep't,* No. 20-cv-17922 (Marion Cnty., June 10,

2020) (copy attached as Ex. H) (without attachments).[22]

What this means is that, simply because Reclamation may have the right *under Oregon state law* to store and divert water for Project irrigation in accordance with the rights recognized in the ACFFOD, it does not follow that all water retained by Reclamation is legally available *under federal law*. If diversion of such water to irrigation would not comply with ESA Section 7 because it would likely cause jeopardy to listed species or destroy or adversely modify critical habitat, then it is not available for such use, and must either be retained in UKL or released to the

---

[22] *See also* Ex. F at 12 ("[W]hile KID may have a 'right' to use water under its secondary permits, that right is not absolute. It is not a guarantee that there will always be sufficient water, nor does it allow KID and other irrigators to receive water in violation of their BOR contracts."); *id*. at 13 ("[N]othing in Oregon water law required BOR to store water. Nothing in Oregon water law prevented BOR from allowing stored water to leave UKL. The storage right held by the BOR allows, but does not require, that the BOR store a certain amount of water and release it to its contracted parties for the uses designated in their secondary water right permits. Contrary to the assumption of the trial court, no state law water right was required to allow BOR to forgo storage of water, nor was a state water right required to allow the BOR to meet its other legal obligations by allowing stored water to move downstream."); OWRD Resp. to Emergency Mot. for Prelim. Inj. at 3, *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, Case 1:21-cv-00504-AA (D. Or. Apr. 13, 2021) (copy attached as Ex. I) ("OWRD opposes the PI Motion to the extent it depends upon this Court concluding that the ACFFOD dictates the Bureau's management, contractual, or operational decisions as to KID and other entities with which it contracts. . . . . OWRD also disputes any contention that the ACFFOD provides an entitlement to KID that alters, amends, or supersedes the contractual relationship between the Bureau and the Klamath Project Water Users (KPWU) districts. As discussed below, the ACFFOD expressly states that it does not."); *id*. at 5 ("The PI Motion is part of an ongoing effort by KID to establish – other than through the adjudication process – that KA 1000 confers rights on KID that, in OWRD's view, are not addressed by the determined claims as they are provided in the ACFFOD and are not consistent with Oregon water law generally. KID has brought several actions in Marion County Circuit Court seeking to compel OWRD to stop the release of stored water from the Link River Dam on the grounds that such releases are contrary to KA 1000. As in those actions, OWRD here takes the position that KA 1000 does not confer on KID the right to control or manage stored water held by the Bureau pursuant to its determined claim for storage, KA 294, and nothing in the ACFFOD supersedes the contracts between the Bureau and KID."); *id*. at 7 ("KID refers to the state right expressed in the ACFFOD as a basis for ignoring its contractual obligations with the Bureau. OWRD submits that KID's focus on the ACFFOD is misplaced in light of the fact that KID is precluded from diverting water at the A-Canal by operation of federal law.").

Klamath River to avoid those adverse effects.  In either case, the ESA requires Reclamation to forego or curtail irrigation deliveries.  Operating the Project in this manner to avoid jeopardizing listed species, destroying or adversely modifying their critical habitat, or committing unauthorized take is not a "use" of water for Reclamation's own instream purposes that requires a state water right; it is a congressionally-mandated precondition on the discretionary operation of the Project that determines how much water is available for irrigation in the first instance.  As the Ninth Circuit noted in *Israel v. Morton*, 549 F.2d 128 (9th Cir. 1977):

> Project water . . . would not exist but for the fact that it has been developed by the United States.  It is not there for the taking (by the landowner subject to state law), but for the giving by the United States.  The terms upon which it can be put to use, and the manner in which rights to continued use can be acquired, are for the United States to fix.

*Id*. at 132-33.  As explained above, Reclamation may take water into "storage" for the Project as an initial matter under its state law right on the condition that a portion of that stored water may be held in storage or released from storage to offset and mitigate the adverse impacts of the storage and diversion on listed species and critical habitat in compliance with the ESA; the storage, diversion, and release is all part of Reclamation's action under the 2019 Plan.  Because storing water is part of Reclamation's integrated action, once that action is taken, the effects of doing so are not excluded from ESA compliance simply because the water is then deemed to have been taken "into storage" under Oregon state water law.

Courts have made it clear that the exercise of Project water rights—whether held by the United States or the Project beneficiaries—is not immune from ESA compliance.  For instance, in *Barcellos & Wolfsen, Inc. v. Westlands Water Dist*., 849 F. Supp. 717 (E.D. Cal. 1993), the district court ruled:

> Even assuming, *arguendo*, that the Movants hold water rights based on statutes which are broader than their contractual rights, they are not exempt from compliance with environmental statutes.  "The [Endangered Species Act] provides no exemption from compliance to persons possessing state water rights, and thus [the water district]'s state water rights do not provide it with a special privilege to ignore the Endangered Species Act."  *United States v. Glenn–Colusa Irr. Dist*., 788 F. Supp. 1126, 1134 (E.D. Cal. 1992).  If Congress has directed that the Bureau reserve water for environmental purposes, Movants cannot be heard to insist that their rights require the Bureau to disobey the law.

1  *Id.* at 732 (footnote omitted), *aff'd sub nom. O'Neill v. United States*, 50 F.3d 677 (9th Cir.

2  1995), *cert. denied*, *O'Neill v. United States*, 516 U.S. 1028 (1995).  Rulings from other courts

3  are to similar effect.  *See*, *e.g.*, *Aransas Project v. Shaw*, 835 F. Supp. 2d 251, 280 n.13 (S.D.

4  Tex. 2011) ("The conclusion that the ESA should not yield to state water rights is consistent with

5  case law and commentary in this area"); *Glenn-Colusa Irrigation Dist.*, 788 F. Supp. at 1134

6  (The ESA "provides no exemption from compliance to persons possessing state water rights, and

7  thus the District's state water rights do not provide it with a special privilege to ignore the

8  Endangered Species Act. Moreover, enforcement of the Act does not affect the District's water

9  rights but only the manner in which it exercises those rights.").

10        This case law conforms to the plain language of Section 8 of the Reclamation Act, which

11  states:

12        Nothing in this Act shall be construed as affecting or intended to affect or to in
          any way interfere with the laws of any State or Territory *relating to the control,*
13        *appropriation, use, or distribution of water used in irrigation*, or any vested right
          acquired thereunder, and the Secretary of the Interior, *in carrying out the*
14        *provisions of this Act*, shall proceed in conformity with such laws, and *nothing*
          *herein* shall in any way affect any right of any State or of the Federal Government
15        or of any landowner, appropriator, or user of water in, to, or from any interstate
          stream or the waters thereof.
16

17  43 U.S.C. § 383 (emphases added).  By these terms, Section 8 preserves state laws concerning

18  the acquisition and use of water *for irrigation* and directs the Secretary to proceed in conformity

19  with such laws when "carrying out the provisions of this Act"—*i.e.*, when *acquiring and using*

20  *water for irrigation* for a federal Reclamation project.  Section 8 does not command Reclamation

21  to appropriate water for purposes of complying with other laws, including federal laws such as

22  the ESA, when operating the Project.  As explained above, complying with ESA Section 7 is a

23  precondition for taking discretionary action under the Reclamation Act, not vice versa.  The ESA

24  does not contemplate an appropriation of water by the United States to meet its requirements, but

25  instead operates as a limit on the exercise of Project water rights, to the extent such exercise

26  would conflict with the mandates of the ESA.  It is possible to comply with both Section 8 of the

27  Reclamation Act and the ESA, as the two statutes are fairly read as applying to different subjects.

28  Section 8 applies to acquiring water to carry out Project purposes — *e.g.*, irrigation — not to

1  carrying out Project operations in a manner that avoids jeopardizing ESA-listed species or

2  adversely modifying their designated critical habitat.[23]

3       As the Federal Circuit recently explained in *Baley*: "Section 8 of the Reclamation Act

4  requires the Secretary of the Interior to comply with state law *regarding the appropriation of*

5  *water for irrigation*, to the extent such law is not inconsistent with federal law." *Baley*, 942 F.3d

6  at 1319-20 (emphasis added) (citation omitted); *see also California v. FERC*, 495 U.S. 490, 505

7  (1990) (noting in another context that Section 8 "refers only to 'water used in irrigation' . . .

8  Laws controlling water used in irrigation relate to proprietary rights . . . and § 8 does not indicate

9  the appropriate treatment of laws relating to other water uses that do not implicate proprietary

10 rights"). Because Section 8 only directs Reclamation to "proceed in conformity" with state law

11 in the appropriation and use of water for irrigation, it does not limit Reclamation's ability to

12 fulfill the mandates of the ESA, a subsequently-enacted statute that imposes separate

13 requirements upon federal agencies that must be met independently of the Reclamation Act.

14      Further, in interpreting Section 8, the Supreme Court has made it clear that "state water

15 law does not control in the distribution of reclamation water *if* inconsistent with other

16 congressional directives to the Secretary." *California*, 438 U.S. at 668 n.21. The ESA imposes

17 congressional directives to the Secretary to avoid jeopardy to listed species and destruction or

18 adverse modification of their designated critical habitat when undertaking discretionary action.

19 Therefore, the broad language of the Reclamation Act to act in accordance with state water law

20 is subject to the ESA's unambiguous no-jeopardy mandate and take prohibition, and the

21 Challenged Orders, which are inconsistent with those mandates, do not control.

22      Finally, Section 8 of the Reclamation Act also did not divest Reclamation of the authority

23 to operate the Klamath Project subject to interstate and other pre-existing rights in the Klamath

24 River, including tribal reserved water rights held for fisheries purposes that pre-dated the

25

26 [23] Any claim that the requirements of the ESA could be met in some manner other than
   Reclamation's current operations plan or, conversely, that the current operations plan does not
27 meet the requirements of the ESA, is beyond the scope of the United States' Crossclaim and the
   Court's limited lifting of the stay, pursuant to which Plaintiffs' challenges to the sufficiency of
28 the 2019 Plan and NMFS' BiOp remain stayed.

Project.[24]  *See* Reclamation Act § 8, 43 U.S.C. § 383 ("nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.").  In fact, Section 8 expressly preserved such rights, *id.*, and the federal courts have repeatedly affirmed the existence and seniority of those tribal rights and Reclamation's authority to operate the Project consistent with those rights.  *See Patterson*, 204 F.3d at 1214 ("Because Reclamation maintains control of the Dam, *it has a responsibility to divert the water and resources needed to fulfill the Tribes' rights, rights that take precedence over any alleged rights of the Irrigators.*  Accordingly, we hold that the district court did not err in concluding that Reclamation has the authority to direct operation of the Dam to comply with Tribal water requirements." (emphasis added)); *see also Baley*, 942 F.3d at 1337, 1340-41 (holding that the federal senior reserved water rights of the Yurok and Hoopa Valley Tribes "[a]t the bare minimum" require the amount of water determined necessary under the ESA to avoid jeopardy to listed salmon, and that Reclamation's operation of the Project to meet the requirements of the ESA is therefore also consistent with the trust obligations owed to the tribes in connection with their reserved water rights to support fisheries); *Kandra*, 145 F. Supp. 2d at 1204, 1207 (holding that the United States, as trustee for the Klamath Basin tribes, was obligated to protect their rights and resources; that these senior tribal water rights took precedence over the junior rights of irrigators; and that Reclamation had a legal duty to operate the Project consistent with its ESA and tribal trust obligations).  Reclamation's authority to operate the Project consistent with these pre-existing tribal rights, which are not to be adjudicated or quantified in these proceedings, provides an independent basis for Reclamation to exercise discretion to meet listed species needs and/or tailor Project deliveries, thereby further making Project operations subject to the requirements of ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2).

In sum, the Project's state-law water rights do not deprive Reclamation of discretion to tailor Project operations in compliance with federal law, including the ESA.  Nor do those rights

---

[24] *See* footnote 7 regarding the limited purposes for which tribal water rights are discussed in this memorandum.

1    abrogate Reclamation's discretion to release water consistent with the tribal reserved water rights

2    of the California tribes pre-dating the Project, which Section 8 expressly preserves and which

3    "[a]t the bare minimum" require the amount of water determined necessary to meet the

4    requirements of ESA Section 7 relative to SONCC coho salmon and its designated critical

5    habitat. *Baley*, 942 F.3d at 1337, 1340-41. Rather, the Project water rights merely authorize

6    Reclamation to divert and store *up to* a specific amount of water under the Project's water rights.

7    But, like any property right, they do not confer an absolute right of use and cannot be exercised

8    in violation of the requirements of the ESA (or other federal law). For all these reasons, when

9    Reclamation's exercise of the Klamath Project's storage and diversion rights in KA 294 and KA

10   1000 (including the precise timing and amounts of irrigation deliveries) must be limited to meet

11   the requirements of the ESA, those limitations are congressionally-mandated preconditions to

12   Reclamation's ability to exercise its rights in the first instance in operation of the Project that

13   preempt the conflicting directives of the Challenged Orders.

14   **V.    The United States is Entitled to Permanent Injunctive Relief.**

15          In *Winter v. NRDC*, the Supreme Court held that, to obtain a preliminary injunction, a

16   plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of suffering

17   irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the

18   plaintiff's favor; and (4) that injunctive relief is in the public interest. *See Winter v. Nat. Res.

19   Def. Council*, 555 U.S. 7, 20 (2008). The standard for a permanent injunction is essentially the

20   same, except that to obtain a permanent injunction, the party seeking the injunction must have

21   prevailed on the merits. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12

22   (1987). The United States satisfies all of these prongs for injunctive relief.

23          First, for the reasons discussed above, the United States is entitled to prevail on the

24   merits. Second, as this Court has acknowledged, Reclamation is injured by the Challenged

25   Orders, whether or not they are complied with, and whether or not they are stayed. *Yurok Tribe*,

26   2022 WL 875646, at *5-6. For instance, if the United States complies with the orders, it will

27   likely suffer harm in its capacity as holder of the federal reserved right for the downstream tribes.

28   As explained above, NMFS determined in its 2019 BiOp that the streamflow requirements

described in the operations plan, including the minimum flows and flushing flows, will avoid the likelihood of jeopardy to the SONCC coho salmon and Southern Resident killer whale and destruction or adverse modification of the coho salmon's critical habitat.  Intentionally failing to implement these flows, as the Challenged Orders command, would result in significantly reduced releases of water from UKL, causing harm to SONCC coho salmon and Chinook salmon as trust resources, as well as to endangered Southern Resident killer whales.

Additionally, by purposefully failing to adhere to the terms and conditions of the ITS, Reclamation could lose its exemption from ESA Section 9 take liability.  Such harm to salmon and potential ESA Section 9 liability constitute irreparable harm.  Conversely, if Reclamation did not comply with the Challenged Orders, it would continue to be harmed by increasingly heightened tensions and unlawful diversions in the Klamath Basin, potential further enforcement actions by OWRD, all of which undermine and complicate its administration of, and compliance with, federal law.

OWRD itself has recognized these injuries in twice seeking to stay the Marion County Circuit injunction and judgment that led to issuance of the Challenged Orders, reciting a host of discrete injuries *to Reclamation* that would result if it was not stayed.  OWRD acknowledged in Circuit Court that, because of the injunction, "the Bureau has been expending, and will continue to expend, legal, technical, and staff resources to its detriment."  OWRD Mot. to Stay J., *Klamath Irrigation Dist. v. Or. Water Res. Dep't*, No. 20-cv-17922 (Marion Cnty. June 23, 2021) (copy attached as Ex. J) at 7.  OWRD further explained that the injunction "increases the risk of subjecting . . . the Bureau to inconsistent obligations" in the midst of an ongoing "crisis in the Klamath Basin" and that – as a product of piecemeal litigation that does not address interests of the many stakeholders in the Klamath Basin – the injunction encourages Project water users to pursue "self-help" contrary to Reclamation's directions rather than to work collaboratively with other stakeholders to find a sustainable solution for the basin.  *Id*. at 6, 8.

In seeking a stay of the injunction from the Oregon Court of Appeals after the Circuit Court denied a stay, OWRD similarly recited a litany of injuries to Reclamation, variously stating that: (1) the injunction has "placed the BOR in the untenable position of being in

violation of orders issued by state water regulators or, if it adheres to the state orders, being in violation of federal court orders and potentially liable for 'take' of ESA species in the lower Klamath River"; (2) the injunction "threatens to interfere with the function of federal agencies charged with the daunting task of keeping enough water in [Upper Klamath Lake ("UKL")] to avoid jeopardy to endangered species in the lake, while releasing enough water to ensure survival of threatened [Southern Oregon/Northern California Coast ("SONCC")] coho [salmon] in northern California"; and (3) "[s]taying the circuit court judgment and underlying injunction will allow the state and federal agencies to concentrate on meaningful tasks to ameliorate the impacts of the drought, avoid jeopardy to endangered and threatened species, and focus legal and staff resources elsewhere." Ex. F at 17-18.

The Challenged Orders cause these same injuries, any one of which is sufficient to establish irreparable harm. Indeed, the Court of Appeals agreed with OWRD's assertions of harm and relied, in part, on them in granting the requested stay. Ex. E. The court noted:

> OWRD asserts that, as a 'result of the judgment and underlying order,' it has been forced to issue orders that, if honored, 'would arguably violate treaty obligations of the United States government as well as the provisions of the Endangered Species Act, and have brought' OWRD 'into conflict with the federal government that has led to further litigation and potentially inconsistent judgments.' . . . . OWRD also asserts that the injunction threatens the public interest, in part because it threatens to 'interfere with the function of federal agencies charged with the daunting task of keeping enough water in UKL to avoid jeopardy to endangered species in the lake, while releasing enough water to ensure survival of threatened*** coho [salmon] in northern California.'

> Having considered the parties' arguments under the risk of harm factor, the court is persuaded that, although many of OWRD's arguments relate to issues in separate litigation that have not yet been resolved, OWRD has shown a risk of harm that, when considered alongside the other ORS 19.350 factors, discussed above, persuades the court that it is appropriate to grant a stay in this case.

*Id*. at 5-6.

Lastly, the Ninth Circuit has found that the balance of the equities and public interest factors can be merged in ESA cases, and tip in favor of listed species protection. *Nat'l Wildlife Fed'n v. NMFS*, 886 F.3d 803, 817 (9th Cir. 2018) ("When considering an injunction under the ESA, we presume that remedies at law are inadequate, that the balance of interests weighs in

favor of protecting endangered species, and that the public interest would not be disserved by an injunction" (citation omitted)).  Here, these factors tip heavily, if not entirely, in favor of granting injunctive relief against the Challenged Orders.  In fact, it is difficult to imagine any justification for withholding injunctive relief and leaving the Challenged Orders in place if the United States prevails on the merits of its claims and shows the orders to be unlawful and preempted under the Supremacy Clause of the United States Constitution.

The Supreme Court has explained that, while district courts properly acting as courts of equity have discretion in fashioning equitable relief, they should be guided by congressional intent.  *United States v. Oakland Cannabis Buyers' Co-op*., 532 U.S. 483, 484 (2001).  Here, the pertinent statute is the ESA, and "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."  *Hill*, 437 U.S. at 184; *accord Yurok Tribe*, 231 F. Supp. 3d at 485 ("The intervenor defendants undeniably have genuine and important interests, and the court recognizes that the proposed measures might cause hardship to the farmers, ranchers, and their communities. However, as plaintiffs point out, courts are not permitted to favor economic interests over potential harm to endangered species" (citing *Hill*, 437 U.S. at 184)); *Kandra*, 145 F. Supp. 2d at 1201 ("Threats to the continued existence of endangered and threatened species constitute ultimate harm. 'Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as 'institutionalized caution'" (quoting *Hill*, 437 U.S. at 194)).  Accordingly, the Bureau satisfies all the criteria for injunctive relief.

**CONCLUSION**

For all of the foregoing reasons, the Court should grant summary judgment to the United States on its First Cause of Action in its Crossclaim and enjoin further enforcement of the Challenged Orders.

Dated: May 27, 2022

Respectfully submitted,

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

/s/ Thomas K. Snodgrass
THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
thomas.snodgrass@usdoj.gov

/s/ Robert P. Williams
ROBERT P. WILLIAMS, Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-307-6623; Fax: 202-305-0275
robert.p.williams@usdoj.gov

***Attorneys for Federal Defendants and Cross-Claimant
United States***