UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YUROK TRIBE, et al., | Case No. 19-cv-04405-WHO |
| Plaintiffs, | |
| v. | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT, MOTIONS TO STRIKE, AND MOTION TO STAY** |
| U.S. BUREAU OF RECLAMATION, et al., | |
| Defendants. | Re: Dkt. Nos. 1027, 1029, 1039, 1040, 1043, 1044, 1057, 1058, 1069 |

Before me is the latest set of motions in a case that, at its core, involves the limited water supply of the Klamath River and the important, often-competing interests of the people and wildlife who depend on it. Pending are four motions for summary judgment: one from defendant the United States; another from the Institute for Fisheries Resources, Pacific Coast Federation of Fishermen's Associations, and the Yurok Tribe (collectively, "the plaintiffs"); a third from crossclaim-defendant and counterclaimant Oregon Water Resources Department ("OWRD"); and a final motion from crossclaim-defendant and counterclaimant Klamath Water Users Association ("KWUA"). The parties have also filed related motions to strike and a motion to stay.

The arguments boil down to a central question: Must the United States Bureau of Reclamation ("the Bureau" or "Reclamation") comply with an OWRD order prohibiting it from releasing water from Upper Klamath Lake? This implicates three primary issues: (1) whether the OWRD Order is preempted by the Endangered Species Act ("ESA"); (2) whether OWRD violated the intergovernmental immunity doctrine in issuing the Order; and, relatedly, (3) whether OWRD exceeded its authority in doing so. The material facts are not in dispute and these legal questions suitable for summary judgment.

Answering the first question is ultimately all that is needed. The OWRD Order is

preempted by the ESA because it stands as an obstacle to the accomplishment and execution of Congress's purpose and objective in enacting in ESA: protecting and restoring endangered species.  Summary judgment is GRANTED in favor of the United States and plaintiffs on the first cause of action in the United States' crossclaim: (1) the Bureau must comply with the ESA in operating the Klamath Project ("the Project") and (2) the OWRD Order is preempted by the ESA and thus violates the Supremacy Clause.

Summary judgment is DENIED with respect to KWUA's counterclaim, because the Bureau must comply with the ESA in operating the Project.  Summary judgment is also DENIED regarding OWRD's counterclaim, in that the ESA applies to the Bureau's operation of the Klamath Project.  To the extent that OWRD's counterclaim seeks an injunction requiring the federal government to provide OWRD with information about the Project's operations, OWRD has not shown that it has standing to pursue this form of injunctive relief, which further supports denying its summary judgment motion.

## BACKGROUND

Much like the Klamath River, the history of the Klamath Project and litigation over its operations is long and winding.  What follows is by no means a complete account of that history, but provides the information necessary to understanding the issues at hand.

### I.      THE KLAMATH PROJECT

The Klamath River originates in the high desert of Oregon, flows into California, through the Yurok Reservation, and into the Pacific Ocean.  In 1905, pursuant to the general provisions of the Reclamation Act of 1902 (which provided for the construction and operation of water projects throughout the western United States), the Secretary of the Interior authorized the Klamath Project ("the Project") spanning parts of Oregon and California.  *See* Stip. Docs. [Dkt. No. 1025] at 3744.[1] Today, the Project "consists of an extensive series of canals, pumps, diversion structures, and dams capable of routing water to approximately 230,000 acres of irrigated land in the upper

---

[1] The parties stipulated to the authenticity of nearly 200 documents for the purposes of summary judgment.  *See* Dkt. No. 1025.  When citing to those documents, I will reference the last three or four digits of the Bates number stamped in the upper right corner of each page.

United States District Court
Northern District of California

Klamath River Basin." *Id*. at 2434.

Upper Klamath Lake ("UKL") is central to the Project's operation, serving as its primary storage feature. *See Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 138 F. Supp. 2d 1228, 1230 (N.D. Cal. 2001). The lake is "relatively shallow and has limited storage capacity" of approximately 562,000 acre-feet of water. Stip. Docs. at 2291. It also loses water each year through evaporation. *See id*. at 6281. "As a result, [UKL] cannot store large quantities of spring runoff and lacks storage capabilities in wet years to carryover volumes that could help meet all water needs in subsequent dry years." *Id*. at 2291. Put simply, UKL water is in relatively short supply.

The Bureau is tasked with administering the Klamath Project, in part by managing the water levels in UKL and distributing water from it. The Link River Dam (which is owned by the Bureau and operated by another entity, PacifiCorp) allows for the regulation of UKL elevations and controlled releases into the Klamath River. *See* USA Mot. for Summ. J. ("USA MSJ") [Dkt. No. 1027] 11:20-23.

## II.      THE BUREAU'S OPERATIONS OF THE PROJECT

Operation of the Project is no simple task. As evidenced by the number of parties in this litigation, there are numerous stakeholders who rely on the water that flows through the Klamath Project, including irrigators, Tribes, and wildlife. The Bureau must take a number of considerations into account as it distributes water from UKL.

### A.  The Endangered Species Act

At the heart of this case is the ESA, which provides that "all federal departments and agencies shall seek to conserve endangered species and threatened species." 16 U.S.C. § 1531(c)(1). Two provisions of the ESA are at issue. The first is section 7(a)(2), which provides:

> Each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section.

United States District Court
Northern District of California

*Id.* § 1536(a)(2).  In other words, as a federal agency, the Bureau must ensure that any action that it takes is not likely to jeopardize the continued existence of a listed species or destroy or adversely modify its habitat.[2]  *See id.*  "Action" is defined broadly to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States," and expressly includes "actions directly or indirectly causing modifications to the land, water, or air."  50 C.F.R. § 402.02.

If an agency believes an action "may affect" a listed species or critical habitat, the agency typically must engage in a formal consultation process with either the United States Fish and Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS"), depending on the species.  *See id.* § 402.14(a), (b); 402.01(b).  The agency must provide certain information, including the purpose, duration, timing, and components of the proposed action, along with "the best scientific and commercial data available or which can be obtained . . . for an adequate review of the effects that an action may have upon listed species or critical habitat."  *Id.* § 402.14(c), (d).  The consultation process culminates with the issuance of a written biological opinion ("BiOp") that includes the FWS or NMFS's opinion on the likelihood that the proposed action will "jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat."  *Id.* § 402.14(h).  If the consulting agency opines that the proposed action *will* cause such jeopardy, the BiOp "shall include reasonable and prudent alternatives, if any."  *Id.*

Although an agency is "technically free to disregard the Biological Opinion and proceed with its proposed action . . . it does so at its own peril (and that of its employees)."  *Bennett v. Spear*, 520 U.S. 154, 170 (1997).  That is because of the second ESA provision at issue in this case, section 9.  *See id.*

Section 9 makes it unlawful for "any person" to "take" any member of an endangered or threatened species.  *See* 16 U.S.C. § 1538(a)(1)(B), (C), (G); *see also id.* § 1533.  "Take" is also

---

[2] KWUA challenges section 7(a)(2)'s applicability to the specific action taken by the Bureau at issue in this case.  KWUA Mot. for Summ. J. ("KWUA MSJ") [Dkt. No. 1044] 61:15-80:16.  I do not find its argument convincing, for reasons I later explain.

United States District Court
Northern District of California

defined broadly, and "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). "Harm," in turn, "means an act which actually kills or injures fish or wildlife," and "may include significant habitat modification or degradation" that does so "by significantly impairing essential behavior patterns" such as breeding, feeding, or sheltering. 50 C.F.R. § 222.102; *see also id.* § 17.3. The word "person" as used in section 9 is similarly broad, and includes "any officer, employee, agent, department, or instrumentality of the federal government." 16 U.S.C. § 1532(13).

If the FWS or NMFS determines after the consultation process that an agency's proposed action will not cause jeopardy but will result in "incidental take"—"takings that result from, but are not the purpose of, carrying out an otherwise lawful activity"—it may issue an incidental take statement ("ITS") providing the federal agency safe harbor from section 9 liability. *See* 50 C.F.R. §§ 402.14(i), 402.02; 18 § 1536(b)(4), (o). The ITS specifies the amount or extent of permissible take. 50 C.F.R. § 402.14(i). If the federal agency stays within that limit, the take is not prohibited by the ESA. *Id.* If that limit is exceeded, however, the agency "must reinitiate consultation immediately." *Id.*

Finally, the ESA provides for civil and criminal penalties for any person who knowingly violates the Act. *See* 16 U.S.C. § 1540(a), (b). So, if an agency ignores a BiOp, it and its employees are liable for the "take" of an endangered or threatened species, opening the door for "substantial civil and criminal penalties." *See Bennett*, 520 U.S. at 170. As a result, the Supreme Court has recognized, a BiOp has a "virtually determinative effect." *Id.*

For decades, the Bureau has consulted with the FWS and NMFS over its operation of the Klamath Project to determine its impact on ESA-listed species and critical habitats. *See* USA MSJ at 18:10-13. Four of those species are relevant to this set of motions. First are two species of fish—the shortnose sucker and the Lost River sucker—which the FWS designated as endangered in 1988. *See* 53 Fed. Reg. 27130 (July 18, 1988). Their habitat, including UKL and its tributaries, was designated as critical in 2012. 77 Fed. Reg. 73739 (Dec. 11, 2012). The next species is the SONCC coho salmon, listed as threatened since 1997. 62 Fed. Reg. 24588 (May 6, 1997). Most of the Klamath River downstream of another dam, Iron Gate Dam in California, is designated as

its critical habitat.  64 Fed. Reg. 24049 (May 5, 1999); *see also* USA MSJ at 19:8-10.  The final affected species is the Southern Resident killer whale, which is also designated as endangered and relies on Chinook salmon—whose habitat includes the Klamath River—as its primary prey.  *See* 70 Fed. Reg. 69903 (Nov. 18, 2005); *see also* USA MSJ at 19:10-12.

A simplified summary of the Project's impacts on these species is this: BiOps have determined that operating the Project adversely affects the suckers by lowering expected elevations of UKL, thereby decreasing the quantity and quality of their habitat; and the salmon (and thus, the Southern Resident killer whale) by reducing flows into the Klamath River, increasing the water temperature, and lowering dissolved oxygen levels.  *See, e.g.*, Stip. Docs. at 1125-27, 1699-1723.  The reduced water flows have also been found to increase risks to coho salmon associated with the *C. shasta* parasite.  *Id.* at 1703-04.  To comply with the operative BiOps, the Bureau must therefore strike a balance between ensuring that sufficient water remains in UKL for the sucker fish, while providing sufficient downstream flows in the Klamath River for the salmon (and by proxy, the killer whale).

**B.  Tribal Water Rights[3]**

Since time immemorial, the Yurok Tribe has lived and fished on the Klamath River in northern California.  Pls.' Mot. for Summ. J. ("Pls.' MSJ") [Dkt. No. 1029] 3:22-4:4; *see also* James Decl. ¶ 3.  The river is the Yurok Tribe's "lifeblood"; it provides Yurok people food and economic opportunities, and is central to their culture.  James Decl. ¶¶ 5, 18.  The present-day Yurok Reservation extends for one mile on either side of the river, beginning at its mouth at the Pacific Ocean and extending approximately 45 miles upstream.  *Id.* ¶ 4.

The Yurok Tribe holds federal reserved water rights, which include, but are not limited to, sufficient water to support its fishery.  *See Baley v. United States*, 942 F.3d 1312, 1321-23 (Fed.

---

[3] So that it is abundantly clear: As the federal defendants, plaintiffs, and Klamath Tribes stipulated, and I ordered in lifting the stay to litigate the first cause of action presented in United States' crossclaim (and any new counterclaim), and have since reiterated, "[t]his is not a water rights adjudication or quantification case."  *See* Dkt. Nos. 951, 961.  None of the Tribes, nor the United States, waived their sovereign immunity for the purpose of adjudicating or quantifying water rights.  *See* Dkt. Nos. 951, 1093, 1094.  Any references to water rights in this Order are to provide context necessary to understanding the motions at hand.  In no way should those references be interpreted as an adjudication or quantification of water rights.

United States District Court
Northern District of California

Cir. 2019); *Parravano v. Babbitt*, 70 F.3d 539, 541 (9th Cir. 1995).  The Hoopa Valley Tribe, whose reservation constitutes a nearly 12-mile square at the confluence of the Klamath and Trinity Rivers, also holds federal reserved water rights, as do the Klamath Tribes.  *See Baley*, 942 F.3d at 1321-23.  Courts have recognized the Tribes' rights to "prevent other appropriators from depleting the streams' waters below a protected level in any area" where their non-consumptive right applies, and to take fish from the waters on their reservations.  *See id.* at 1321-22.  The Ninth Circuit has also recognized that "[a]t the bare minimum, the Tribes' rights entitle them to the government's compliance with the ESA in order to avoid placing the existence of their important tribal resources in jeopardy."  *See id.* at 1337.

### C.  Oregon Water Law

Section 8 of the Reclamation Act provides:

> Nothing in this act shall be construed as affecting or intended to affect or in any way interfere with the laws of any state or territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any state or of the federal government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof.

43 U.S.C. § 383.

The applicable state law here is Oregon's, as it is home to UKL.  Under Oregon law, all waters within the state may be appropriated for beneficial use, subject to existing and already-vested rights.  Or. Rev. Stat. § 537.120.  The Oregon Water Code, enacted in 1909, required all users seeking new water rights to obtain a permit or license from OWRD, while expressly preserving water rights vesting prior to 1909.  *See id.*; *see also* §§ 536.007(11), 539.010; *United States v. Oregon*, 44 F.3d 758, 764 (9th Cir. 1994) (describing the law).  Any disputes over the parameters or priorities of the pre-1909 rights are settled through a process called a "general stream adjudication," carried out by the OWRD director.  *See* Or. Rev. Stat. §§ 539.200, 539.005; *see also Oregon*, 44 F.3d at 764 ("Upon petition by a claimant, or on its own initiative, the Oregon Water Resources Department may commence the adjudication of the rights of all claimants to a river or stream.").  At the end of the adjudication process, OWRD makes "findings of fact and an

United States District Court
Northern District of California

order of determination determining and establishing the several rights to the waters of the stream."

Or. Rev. Stat. § 539.130.  It files those findings and order in state circuit court, which then reviews

the OWRD's determinations.  *See id.* §§ 539.130, 539.150.  While that review is pending, the

OWRD order remains in effect and the water divided accordingly.  *Id.* § 539.170.

Almost a half-century ago, in 1975, Oregon began adjudicating Klamath Basin surface

water rights in the still-ongoing Klamath Basin Adjudication ("KBA").  OWRD Mot. for Summ.

J. ("OWRD MSJ") [Dkt. No. 1043] 4:14-15; USA MSJ at 14:7-11.  After much litigation and

many administrative proceedings, on February 28, 2014, OWRD issued an Amended and

Corrected Findings of Fact and Order of Determination ("ACFFOD") that provisionally

determined the water rights claimed in the KBA.  *See* Stip. Docs. at 3679-87.  The ACFFOD

remains under review in circuit court, meaning OWRD's determinations remain in effect.

Two of OWRD's determinations in the ACFFOD are most relevant here.  First, OWRD

determined that the Bureau owns a water right, known as "KA 294," to store 486,828 acre-feet of

water in UKL to benefit irrigators.  *Id.* at 3790-93, 3824.  OWRD also determined that the Bureau

and "beneficial users" (who "hold a legal interest in the water right for the purpose of beneficial

use") co-owned another right, "KA 1000," which "provisionally authorizes the diversion of natural

flow from UKL and water stored in UKL pursuant to KA 294 for beneficial use."  *See id.* at 431,

3789-93, 3793.[4]  The latter right "does not specify what amount of water must be taken from

natural flow as opposed to stored water and does not prohibit the taking of water from both

sources simultaneously."  *Id.* at 431.[5]

Oregon law also divides the state into water districts that are each managed by a

watermaster appointed by the OWRD director.  Or. Rev. Stat. §§ 540.010, 540.020.  Watermasters

must "investigate and respond to all complaints of water shortages or unlawful use."  Or. Admin.

R. 690-250-0100.  If the investigation reveals a valid complaint, the watermaster may begin to

---

[4] The Bureau has entered into several contracts regarding the delivery of water to irrigators throughout the Project.  *See, e.g.,* Stip. Docs. 7836-67, 7786-7824.

[5] Oregon law defines "legally stored water" as "[a]ny water impounded in a reservoir under the provisions of an established right to store water."  Or. Admin. R. 690-250-0010(10)

United States District Court
Northern District of California

regulate the water "in accordance with the relative rights or rotation agreements of the appropriators involved in the complaint or shortage." *Id*. If the dispute involves a reservoir, the watermaster "shall then take exclusive charge" of the reservoir to divide and distribute the water according to the relative and respective water rights of the various users, as determined by OWRD, the circuit court, or any contract between the users. Or. Rev. Stat. § 540.210.

## III.     THE OWRD ORDER

Amid severe drought conditions in 2020, the Bureau did not fully allocate Project water to irrigators, but continued to release water from UKL in an effort to comply with the ESA. *See* USA MSJ at 25:20-24 ("In drought years, however, such as have occurred in 2020, 2021, and 2022, Reclamation has not been able to fully and simultaneously meet the UKL elevations for suckers and Klamath River flows for SONCC coho salmon described in the Project BiOps, even with reduced deliveries or no deliveries for Project irrigation."). In April of that year, the Klamath Irrigation District ("KID") filed a notice of dispute with OWRD, requesting that it "take charge of Upper Klamath Lake Reservoir" and "ensure that stored water is not released out of UKL through the Link River Dam except to meet the needs of secondary water rights holders calling upon the source until the irrigation season" ended in October. Stip. Docs. at 707. OWRD took charge of UKL on April 16, 2020, and issued a notice of dispute and investigation to the Bureau, PacifiCorp, and KID. *Id*. The next day, KID filed a petition for alternative writ of mandamus in Marion County Circuit Court, which ordered OWRD to take charge of UKL "for the purpose of dividing or distributing the water therefrom in accordance with the respective and relative rights of the various users of water." *Id*.

On April 23, 2020, OWRD issued an interim order prohibiting the Bureau from releasing stored water from UKL "except in accordance with the relative and respective state law rights calling upon the stored water unless and until" it provided OWRD certain information about the timing and release of that water. *Id*. at 708.

KID then sued OWRD in Marion County Circuit Court, seeking an injunction under a state law provision that allows injunctive relief when "the watermaster has failed to carry into effect the order of the Water Resources Commission or decrees of the court determining the existing rights

United States District Court
Northern District of California

to the use of water." *Id*. at 237-38. The court granted partial summary judgment in KID's favor and ordered the watermaster to "immediately stop the distribution, use and/or release of stored water from the UKL without determining that the distribution, use and/or release is for a permitted purpose by users with existing water rights of record or determined claims to use the stored water in the UKL." *Id*. at 238.

OWRD began monitoring the releases from UKL and did not observe any releases of stored water between mid-October 2020 and April 2021. *Id*. at 429-30, 434. In mid-March 2021, the Bureau sent KID and OWRD a letter, notifying them that "water is currently unavailable from Upper Klamath Lake (UKL) and the Klamath River for irrigation purposes within the Klamath Project." *Id*. at 447. The letter further stated that given the "critically dry hydrologic conditions," the Bureau anticipated that "it likely will not be possible to simultaneously satisfy the requirements" for designated UKL water levels and Klamath River flows as required by its interim operations plan and the related BiOps. *Id*. This letter, along with forecast water conditions, gave OWRD "cause to believe that the Bureau will, at some near future date, release legally stored water through the Link River Dam to comply with the Bureau's federal tribal trust obligations and ESA obligations." *Id*. at 434.

Pursuant to the state court's order, on April 6, 2021, OWRD issued the order that brings us here today. *Id*. at 427-36 ("OWRD Order" or "the Order"). It ordered the Bureau to "immediately preclude or stop the distribution, use or release of stored water from the UKL, in excess of amounts that may be put to beneficial use under KA 1000 downstream of the Link River Dam." OWRD Order at 436. It also noted that "[n]othing in this order alters, relieves or releases any person, state, or federal agency from any and all rights, duties or obligations arising from other sources of law including without limitation other state laws or rules, federal laws and related federal agency regulations, federal or state court orders, or contracts." *Id*. According to OWRD, the first excerpt was included "to comply with the court's injunction" and the second "to avoid ordering Reclamation to violate federal law." OWRD MSJ at 9:3-16.

On July 2 and July 28, 2021, OWRD issued notices to the Bureau concluding that legally stored water had passed through the Link River Dam in violation of the Order. Stip. Docs. 223-31

United States District Court
Northern District of California

("July 2 Notice"), 210-20 ("July 28 Notice").  The first notice stated that if the violation were not corrected within one day, the Bureau "may be subject to further agency action or any other lawful remedy."  July 2 Notice at 230.  The second said that OWRD would "continue to monitor conditions in the UKL" but did not impose any sanction.  *See* July 28, 2021 at 218.

OWRD has appealed the circuit court's injunction.  The appellate court granted OWRD's request for a stay of the Order in December 2021.  *See KID v. OWRD*, No. A176270 (Or. Ct. App. Dec. 17, 2021).  The underlying appeal is still pending.  OWRD MSJ at 9:19-25.

### IV.   PROCEDURAL HISTORY

Prior to the issuance of the OWRD Order, this case focused on a 2019 BiOp and consultation process between the Bureau and NMFS, which the plaintiffs sued the Bureau and NMFS over in July 2019.  Dkt. No. 1.  In March 2020, after the Bureau reinitiated the consultation process and developed an interim operating plan ("Interim Plan"), the parties (which included intervenor KWUA) stipulated to stay the litigation until September 30, 2022, so long as the Bureau operated the Project in accordance with the Interim Plan.  Dkt. No. 908.

In September 2021, the federal defendants, plaintiffs, and Klamath Tribes requested that I lift the stay so that the United States could file a crossclaim challenging the OWRD Order.  Dkt. No. 961.  KWUA also sought to lift the stay, but without such constraints.  *Id*.  I then lifted the stay for the limited purpose of litigating the federal defendants' crossclaim, the plaintiffs' supplemental complaint, and any crossclaim arising from the federal defendants' crossclaim.  *Id*. The stay was lifted in accordance with parameters proposed by the United States, the plaintiffs, and the Klamath Tribes—namely, that "[t]his is not a water rights adjudication or quantification case," and that neither the United States nor the Tribes had waived sovereign immunity for the purpose of adjudicating or quantifying water rights.  *See* Dkt. Nos. 951-1 ¶ 7, 961.  I also allowed the federal defendants to bifurcate their crossclaim so that the ESA-related questions were litigated prior to any discussion of tribal water rights.  *See* Dkt. Nos. 951 ¶ 10, 961.

The first part of the federal government's crossclaim against OWRD and KWUA seeks declaratory relief that:

(1) The OWRD Order is "invalid because OWRD lacks jurisdiction to issue orders

11

impinging upon Reclamation's satisfaction of its obligations under the federal ESA";

(2) The Bureau's "operation of the Klamath Project, including the exercise of its rights to store water in UKL for irrigation use, is subject to compliance with the ESA";

(3) "complying with the ESA may require Reclamation to release water from UKL regardless of the water's classification under state law"; and

(4) to the extent that the OWRD Order "would forbid Reclamation from making releases of water deemed to have been 'stored' in UKL for this federal purpose," it is "contrary to the ESA and therefore preempted under the Supremacy Clause of the United States Constitution."

USA Cross-cl. [Dkt. No. 963] 40:10-25. It also seeks a permanent injunction against enforcement of the OWRD Order "that would limit and/or prevent Reclamation from operating the Project in conformance with federal law." *Id.* at 41:23-26.

As anticipated, both KWUA and OWRD filed counterclaims of their own against the United States. KWUA's seeks, in relevant part, declaratory relief that:

(1) "The ESA neither authorizes nor requires Reclamation to curtail, or direct the curtailment of, storage, diversion, and delivery of water for irrigation in the Project to benefit ESA-listed species"; and

(2) "Reclamation does not otherwise have an obligation under the ESA to release water from UKL that have the characteristic of stored water in order to benefit ESA-listed fish species."

KWUA Countercl. [Dkt. No. 988] 37:21-25.

OWRD's counterclaim seeks a permanent injunction either;

(1) "[R]equiring Reclamation to provide OWRD with sufficiently detailed information to establish that the quantity of particular releases through the Link River Dam are required by the ESA and, therefore, preempt Oregon law"; or

(2) "[G]ranting a permanent injunction requiring Reclamation to cease releasing stored water through the Link River Dam for any uses that are not expressly allowed in its water rights permit, if the court agrees with KWUA that the ESA does not apply."

OWRD Countercl. [Dkt. No. 1021] 12:8-14.

The United States and plaintiffs separately moved for summary judgment on the first cause of action in the United States' crossclaim, which KWUA and OWRD countered with their own

motions seeking summary judgment on their respective counterclaims.  Dkt. Nos. 1027, 1029, 1043, 1044.  KID moved both to stay and to delay judgment on the United States' and plaintiffs' motions.  Dkt. Nos. 1040, 1041-3.  The State of California sought to participate as amicus.[6]  Dkt. No. 1057.  The Hoopa Valley Tribe joined as a crossclaimant subject to the litigation's limitations.  Dkt. No. 1094.  The Klamath Tribes also responded to the motions.  Dkt. Nos. 1070, 1071.

With that context and history in mind, I turn to the parties' arguments.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

---

[6] California's unopposed motion for leave to file an amicus curiae brief and appear as amicus curiae is GRANTED, as it has an interest in the issues presented, including the scope of state authority to regulate water in federal Reclamation projects and the amount of water in California portions of the Klamath River.  *See* Dkt. No. 1057; *see also NGV Gaming, Ltd. v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) ("District courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved.").  I have considered California's position in deciding these motions.

United States District Court
Northern District of California

# DISCUSSION

## I.    MOTION TO STAY

Intervenor KID moves to stay any decisions on the United States' and plaintiffs' summary judgment motions until the Oregon court completes its decades-pending review in the KBA.  *See* KID Mot. to Stay [Dkt. No. 1040] 24:14-16.  In so arguing, KID invokes five abstention doctrines. *See generally id.*  None of the other parties join KID's motion; the United States, plaintiffs, and Klamath Tribes expressly oppose, KWUA only "emphasizes that the stay motion would not be a basis for staying" its own counterclaim, and OWRD does not appear to take any position.  *See* Dkt. Nos. 1060, 1064, 1068, 1071.

KID's motion is DENIED.  "Abstention from the exercise of federal jurisdiction is the exception, not the rule," and KID has not shown "exceptional circumstances" warranting abstention here.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  The overarching flaw in KID's argument is that, unlike the KBA, the summary judgment motions do not seek to quantify or adjudicate Oregon water rights.  That was made clear when the stay was lifted for the litigation of the crossclaim and resulting counterclaims.  *See* Dkt. No. 951-1 ¶ 7 ("This is not a water rights adjudication or quantification case.").  Resolution of the KBA will not answer the federal questions at the core of the United States' crossclaim, which are whether the OWRD Order is preempted by the ESA and whether OWRD had authority under section 8 of the Reclamation Act to issue it.

It is also worth noting that the KBA has been pending since the mid-1970s, with no clear end in sight.  *See* KWUA Resp. [Dkt. No. 1060] 3:1-3 ("It is most likely the stay would extend through at least the end of the decade, not including any subsequent appellate review and proceedings on remand after appeal.").  KID thus attempts to delay, for an uncertain but likely significant period of time, the resolution of critical issues impacting stakeholders that need timely resolution given the limited water supply at hand.

Although "abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state court litigation," KID has not shown that abstention is warranted under any of the five doctrines that it invokes.  *See Exxon*

1    *Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 282 (2005).  Briefly:

2        Abstention under *Brillhart v. Excess Insurance Company of America*, 316 U.S. 491 (1942)

3    is inapplicable, as the United States notes, because the crossclaim seeks both declaratory and

4    injunctive relief that are independent of one another.  *See Seneca Ins. Co., Inc. v. Strange Land,*

5    *Inc.*, 862 F.3d 835, 840 (9th Cir. 2017) ("So long as the suit seeks more than merely declaratory

6    relief . . . the entire action should be analyzed under the *Colorado River* framework."); *American*

7    *Bankers Mgmt. Co., Inc. v. Heryford*, 885 F.3d 629, 633 (9th Cir. 2018) ("In addition to

8    declaratory relief, however, [plaintiff] seeks injunctive relief that is independent of, but related to,

9    the requested declaratory relief.  *Brillhart* does not apply in such circumstances.").

10        Abstention under *Younger v. Harris*, 401 U.S. 37 (1971) is unavailable because the

11   "unnecessary conflict between state and federal governments" that it seeks to avoid is inherently

12   implicated when the federal government sues a state agency, as the United States has done in its

13   crossclaim.  *See United States v. Morros*, 268 F.3d 695, 707 (9th Cir. 2001) (describing "the

14   policy objective behind *Younger* abstention" as "to avoid unnecessary conflict between state and

15   federal governments") (citations and quotation marks omitted).  The Ninth Circuit made this clear

16   in *Morros*, where the United States filed a complaint in federal district court alleging that a

17   Nevada law, as applied by the state engineer, was preempted under the Supremacy Clause.  *See id.*

18   at 699.  As the court wrote:

19
20           *We hold* that *Younger* is inapplicable here for an even more basic reason.  Whether
             it is labeled "comity," "federalism," or some other term, the policy objective behind
21           *Younger* abstention is to avoid unnecessary conflict between state and federal
             governments.  Like the Third, Fifth, and Eleventh Circuits, we believe this policy
22           lacks force where the United States is a litigant. . . . By the time the United States
             brings suit in federal court against a state, any attempt to avoid a federal-state
23           conflict would be futile. . . . When asserting a superior federal interest against a
             state, the forum of choice for the federal government is the federal court.

24   *Id.* at 707-08 (citations omitted) (emphasis added).  *Morros*—which is a holding from the Ninth

25   Circuit and not, as KID contends, dicta—is on point.  *See* KID Mot. to Stay at 21:7-11.  *Younger*

26   abstention is not available.

27        *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941) also does not apply,

28   primarily because constitutional adjudication cannot be avoided by a state ruling.  *See Wolfson v.*

United States District Court
Northern District of California

*Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010) (citation omitted).  As the Ninth Circuit has stated,

> *Pullman* abstention is appropriate only where (1) there are sensitive issues of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open; (2) constitutional adjudication could be avoided by a state ruling; and (3) resolution of the state law issue is uncertain.

*Id.* (citation and quotation marks omitted).  Any adjudication by the Oregon court in the KBA will determine Klamath Basin water rights, which does not resolve the Supremacy Clause question at the heart of the crossclaim.  Whether the OWRD Order is preempted by the ESA is an entirely separate issue.

Under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), courts may "decline to rule on an essentially local issue arising out of a complicated state regulatory scheme."  *Morros*, 268 F.3d at 705.  For *Burford* to apply, the following showing must be made:

> [F]irst, that the state has chosen to concentrate suits challenging the actions of the agency involved in a particular court; second, that federal issues could not be separated easily from complex state law issues with respect to which state courts might have special competence; and third, that federal review might disrupt state efforts to establish a coherent policy.

*Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 377 (9th Cir. 1982).  Again, *Morros* settles the issue:

> [T]his case does not revolve around "complex state law issues," such as who is entitled to how much water.  Rather, it revolves around whether state law conflicts with federal law, which is plainly not an issue "with respect to which state courts might have special competence."  This is a preemption case, and, as we stated in *Knudsen*, "*Burford* abstention is particularly inappropriate when the plaintiff's claim is based on preemption, because abstaining under *Burford* would be an implicit ruling on the merits."

268 F.3d at 705.  As in *Morros*, the United States' crossclaim poses a question of preemption.  It expressly does not consider the quantification or adjudication of water rights—in other words, "who is entitled to how much water."  *See id.*  *Burford* does not support abstention here.

KID does not challenge these or any other arguments from the United States and plaintiffs regarding the majority of the preemption doctrines upon which it relies.  *See* KID Reply [Dkt. No. 1088] 26:1-28:14.  Instead, it focuses its response on whether abstention is appropriate under the *Colorado River* doctrine.  *See id.*

16

In *Colorado River*, the Supreme Court made clear that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule" and can be justified "only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." 424 U.S. at 813 (citation omitted). The Ninth Circuit has identified eight factors for courts to consider in determining whether to stay a matter under *Colorado River*:

> (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.

*Seneca Ins. Co.*, 862 F.3d at 841-42 (citation omitted). This is "not a mechanical checklist; indeed, some may not have any applicability to a case." *Id.* at 842 (citation and quotation marks omitted). Instead, courts must "examine them in a pragmatic, flexible manner with a view to the realities of the case at hand." *Id.* (same). The presumption is in favor of federal jurisdiction; "[a]ny doubt as to whether a factor exists should be resolved against a stay, not in favor of one." *Id*. at 842 (citation omitted).

Ninth Circuit law clearly forecloses *Colorado River*'s application here. The court has "repeatedly emphasized that a *Colorado River* stay is inappropriate when the state court proceedings will not resolve the entire case before the federal court." *United States v. State Water Res. Control Bd.*, 988 F.3d 1194, 1204 (9th Cir. 2021). It has also noted that "the requirement of 'parallel' state court proceedings implies that those proceedings are sufficiently similar to the federal proceedings to provide relief for *all* of the parties' claims." *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 913 n.4 (9th Cir. 1993) (emphasis added). The United States' crossclaim asserts that the ESA preempts the OWRD Order and that OWRD lacked the authority to issue it. These issues—and thus, the crossclaim—will not be resolved by the KBA, which will determine the nature and scope of water rights within the state of Oregon.

KID misconstrues the crossclaim, arguing that the Bureau "seeks to establish for itself the

most senior water right in UKL via a declaration that it may use stored water from UKL for its preferred environmental purposes, and may not be regulated by OWRD in doing so."  KID Reply at 27:5-13.  This is belied by the express agreement from the federal government (along with the plaintiffs and Tribes) that "[t]his is not a water rights adjudication or quantification case."  *See* Dkt. Nos. 951-1 ¶ 7, 961.  This limitation has guided the litigation of the United States' crossclaim and continues to do so.  No matter how KID attempts to cast the crossclaim, it does not seek an adjudication or quantification of water rights.  Instead, it raises constitutional questions about the OWRD Order.  This proceeding is not parallel with the KBA; a stay under *Colorado River*—or any of the other abstention doctrines proffered by KID—is not warranted.

## II.     MOTIONS FOR SUMMARY JUDGMENT[7]

---

[7] KID moves to strike as irrelevant references to reserved water rights in the United States' and plaintiffs' summary judgment motions, references to and photographs of dead salmon in the plaintiffs' motion, and the entirety of the James and Spain declarations proffered by the plaintiffs. Dkt. No. 1039.  The motion is DENIED.  Although the adjudication or quantification of water rights is not at issue, mere reference to those rights does not ask for such action.  The only substantive argument made regarding water rights is from the United States, which contends that the Tribes' reserved water rights provides an additional source of discretion subjecting the Bureau to section 7(a)(2) of the ESA.  *See* USA MSJ at 66:22-67:24.  Twice in its motion the United States specified the "limited purposes" for which it discusses tribal water rights, none of which run afoul to the limited parameters of this litigation.  *See id.* at 16 n.7, 67 n.24.  Similarly, the references to the dead salmon in the plaintiffs' motion and declarations provide information about the events leading up to this litigation.  And regardless, none of the contested material factored into my consideration of the motions at hand.

The plaintiffs move to strike portions of KWUA's summary judgment motion and two accompanying declarations.  Dkt. No. 1069.  Specifically, they challenge section V.D of KWUA's motion, which they contend seeks rulings on the Yurok Tribe's federal reserved water right and thus exceeds the Tribe's waiver of sovereign immunity.  *See id.*  The motion is GRANTED in part.  KWUA goes beyond the United States' argument that the water rights may provide the Bureau the discretion necessary to trigger section 7(a)(2) by contemplating: (1) whether there are any federal reserved water rights to fish; (2) the priority date of any tribal water rights compared to other water rights; (3) whether the location of instream flow rights would limit the Tribes' rights; (4) the KBA's consideration of water rights; and (5) how the ACFFOD findings would play out "in an adjudication of water rights for flows in California."  *See* KWUA MSJ at 88:25-92:15.  Despite KWUA's attempts to frame this as a hypothetical—by stating that "this issue is not being determined in this case, but it would be a disputed issue in a proper water right proceeding"— KWUA effectively asks me to adjudicate or quantify the Tribes' water rights, which is expressly off-limits.  *See id.* at 91:4-5.  Section V.D is STRICKEN, with the exception of section V.D.6, which argues against the United States' point without veering into adjudication of water rights.

As far as the plaintiffs' objections to KWUA's declarations, the parties have objected to several pieces of evidence submitted with the motions.  Unless otherwise noted in this Order, I did not rely on the disputed evidence in my analysis, rendering the objections moot.

United States District Court
Northern District of California

There is significant overlap between the four motions for summary judgment before me. They present three primary issues, the first of which resolves the motions: Is the OWRD Order preempted by the ESA?  The first cause of action in the United States' crossclaim seeks declaratory judgment that it is.  This question is central to the motions for summary judgment from the United States and the plaintiffs, and answering it necessarily entails a determination of whether the Bureau's operation of the Klamath Project is subject to compliance with the ESA. The latter issue is at the heart of KWUA's first counterclaim and cross-motion for summary judgment.

The other two issues are whether OWRD violated the doctrine of intergovernmental immunity when it issued the Order and whether OWRD exceeded its authority in doing so. Although the United States, the plaintiffs, and OWRD stake out their positions, I need not decide the scope of OWRD's authority to determine whether the Order is valid.  I explain why below.

**A. PREEMPTION**

The Supremacy Clause grants Congress "the power to preempt state law."  *Arizona v. United States*, 567 U.S. 387, 399 (2012).  It can do so either expressly or implicitly.  *See id*.  At issue is a form of implied preemption referred to as conflict preemption—the well-established principle that "state laws are preempted when they conflict with federal law."  *See id*. (citation omitted).  Conflict preemption "includes cases where compliance with both federal and state regulations is a physical impossibility and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. at 399-400 (citing in part *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  The latter is referred to as "obstacle preemption."  *United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (citations omitted). To determine whether it exists, "the Supreme Court has instructed that we employ our judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id*. (citations and quotation marks omitted).

The Ninth Circuit recently reiterated guiding principles of the implied preemption analysis. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201,

United States District Court
Northern District of California

19

1211 (9th Cir. 2020). First among them is that "the purpose of Congress"—evidenced by the text and structure of the statute at issue—"is the ultimate touchstone in every preemption case." *Id*. at 1211 (citations omitted). Second, courts must "start with the assumption that historic police powers of the states are not preempted unless that was the clear and manifest purpose of Congress." *Id*. at 1212 (citation and quotation marks omitted). Taken together, "a high threshold must be met before a court will conclude that a federal law has impliedly preempted a state law." *Id*. (same).

The federal government and the plaintiffs argue that the OWRD Order conflicts with the ESA and is thus preempted. USA MSJ at 48:5-50:4; Pls.' MSJ at 31:14-34:5. My analysis is two-fold. First, I must consider Congress's purpose in enacting the ESA and then, whether the Bureau's compliance with the ESA and OWRD Order is physically impossible or whether the Order stands as an obstacle to the accomplishment of Congress's goals.

### 1. KID's Rule 56(d) Motion

First, a procedural issue. Along with its opposition, KID filed a request under Federal Rule of Civil Procedure 56(d) seeking to extend the hearing date on the United States' and plaintiffs' motions by 90 days so that it could pursue discovery of facts that it contends are essential to opposing summary judgment on the United States' crossclaim. Dkt. No. 1041-3. The United States and plaintiffs opposed the request, KWUA filed a statement of non-opposition, and the Klamath Tribes took no position. Dkt. Nos. 1063, 1067, 1071, 1072. It does not appear that OWRD directly addressed KID's motion.

Under Rule 56(d), if a non-moving party "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may defer considering the motion or allow time for discovery. Fed. R. Civ. P. 56(d). To obtain such relief, the party must show that: "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 662 (9th Cir. 2020) (citation omitted). The party must also show that it has "pursued discovery diligently in the past and that additional discovery would prevent summary judgment." *Huynh v.*

*Quora, Inc.*, 508 F. Supp. 3d 633, 642 (N.D. Cal. 2020) (citations omitted).

KID's motion is DENIED.  It has not shown that the facts that it seeks are essential to opposing summary judgment, nor has it pursued discovery diligently in the past.  KID asks for a laundry list of discovery, spanning 10 topics and nearly a dozen categories of documents in addition to depositions, requests for admissions, and interrogatories.  *See* Dkt. No. 1041-3 at 8:12-9:21.  The sought-after information centers on any efforts the Bureau made to find alternative ways that it could comply with both the OWRD Order and the ESA, including any attempts to reinitiate the ESA consultation process, acquire additional water rights, or obtain water from other river systems.  *See id*. at 8:13-26.  KID argues that this information is essential to countering whether the OWRD Order made it physically impossible for the Bureau to comply with the ESA or stood as an obstacle to carrying out Congress's objectives.  *See id*. at 1:11-2:6.

"[P]reemption is predominately a legal question, resolution of which would not be aided greatly by development of a more complete factual record."  *Atay v. Cnty. of Maui*, 842 F.3d 688, 698 (9th Cir. 2016) (citation and internal modification omitted).  Even if the information KID seeks is relevant, it could make the same argument about alternative methods of compliance without relying on discovery from the government.  For example, it could have brought in an expert testifying to the feasibility of diverting water from other river systems, or the availability of other water rights or licenses to the Bureau.  Either may have shown a dispute of material fact so as to avoid summary judgment.  Moreover, at least some of the documents sought do not appear relevant to this stage of the litigation—for example, "any and all" of the Bureau's "official policy documents" regarding state and tribal water rights.  *See* Dkt. No. 1041-3 at 9:5-6.  And it is not clear that others—i.e., "[i]nternal communications regarding the purchase or potential purchase of UKL water from the Oregon irrigators"—actually exist.  *See id*. at 9:9-10.

KID also did not diligently pursue discovery of this information, and misconstrues the record in arguing that I "fully refused to allow KID to conduct any discovery in this action."  *See id*. at 2:15-3:23.  When I allowed KID to intervene more than a year ago, I stated that once it had reviewed the administrative record, it should specify to the United States the categories of documents or interrogatories it sought, meet and confer to determine what documents should or

could be disclosed, and come to the court with any issues.  Dkt. No. 983.  It appears that KID made one attempt to do this, providing emails that show efforts to discuss discovery with the federal government in December 2021.  *See* Lisieski Decl. [Dkt. No. 1041-4] Exs. A-D.  KID then filed a letter seeking discovery in mid-February, a request I denied because KID failed to follow the ordered procedure and because its requests were overbroad and would delay resolution of the then-forthcoming summary judgment motions.  Dkt. Nos. 1007, 1013.  KID was not precluded from conducting discovery in this matter.  Instead, it made only one dilatory attempt to do so.  And although I noted in denying KID's request that any party could file a Rule 56(d) motion in response to the motions for summary judgment, that one attempt at discovery before filing that motion hardly represents a diligent pursuit supporting 56(d) relief.  *See* Dkt. No. 1013.

For these reasons, KID's request to delay deciding these motions is DENIED.  I turn now to the merits of the parties' arguments.

### 2.  Congressional Purpose

In *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978), the Supreme Court thoroughly considered the purpose of the ESA, an analysis that is helpful here.  When Congress passed the ESA, it was "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tennessee Valley Authority*, 437 U.S. at 180.  "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."  *Id*. at 184.  "This," the Court wrote, "is reflected not only in the stated policies of the Act, but in literally every section of the statute."  *Id*.

The Court cited several ESA provisions that "indicated the seriousness with which Congress viewed this issue": the prohibition on "[v]irtually all dealings with endangered species," including their taking, possession, transportation, and sale; the "extensive power" granted to the Secretary of the Interior to develop regulations and programs preserving endangered and threatened species; and the encouragement of citizen involvement, by way of allowing individuals to petition the Secretary to list species as endangered or threatened, and by allowing civil suits to compel ESA compliance.  *See id*. at 180-81 (citations omitted).  The Court also pointed to section 9's express bar on the "take" of endangered species (along with the broad definition of "take") and

the legislative history behind section 7, which "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species." *Id*. at 184-85.  In all, the Court wrote, "examination of the language, history, and structure of the legislation under review here indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id*. at 174.

I see no reason to depart from the Supreme Court's extensive analysis.  The text and structure of the ESA make clear that Congress's purpose in enacting the ESA was to prioritize the preservation and recovery of endangered and threatened species.  The Ninth Circuit has recognized the same. *See, e.g., National Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 818 (9th Cir. 2018) ("One of the ESA's central purposes is to conserve species."); *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 550-51 (9th Cir. 2016) ("The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers.").  That intent is the "ultimate touchstone" guiding my preemption analysis. *See Volkswagen*, 959 F.3d at 1211.

### 3. Compliance

The question for the purposes of preemption is whether it is physically impossible for the Bureau to comply with both the ESA and the OWRD Order, or whether the Order stands as an obstacle to the accomplishment and execution of Congress's purpose in enacting the ESA. *See Arizona*, 567 U.S. at 399-40.

KWUA's counterargument (and argument in favor of summary judgment on its own counterclaim) presents an issue that must be addressed first.  KWUA contends that the agency action at issue is the use of stored water in UKL and that under the controlling legal authority, the Bureau has no discretion to use that water for purposes other than irrigation—meaning section 7(a)(2) does not apply, so the ESA does not preempt the OWRD Order. *See* KWUA MSJ at 61:15-88:4.  This argument depends on whether a more than 20-year-old decision from the Ninth Circuit—*Klamath Water Users Protective Association. v. Patterson*, 204 F.3d 1206 (9th Cir. 1999), *amended on denial of rehearing*, 203 F.3d 1175 (9th Cir. 2000)—remains the controlling law on whether the ESA applies to the Klamath Project.  It does.

1   *Patterson* arose from a dispute between Klamath Basin irrigators, the Bureau, and

2 PacifiCorp over a contract governing the management of the Link River Dam.  204 F.3d at 1209.

3 The case primarily presented a question of contract law: were the irrigators third-party

4 beneficiaries to the contract between the Bureau and PacifiCorp's predecessor.  *Id*.  That question

5 is not relevant here.

6   What is relevant, however, is the court's rejection of the irrigators' claim that PacifiCorp

7 did not have a legal duty to operate the dam in compliance with the ESA.  *See id*. at 1213.  The

8 court noted that the ESA retroactively applied to a contract "so long as the federal agency retains

9 some measure of control over the activity."  *See id*.  So, the court wrote, because the Bureau

10 "retains authority to manage the dam, and because it remains the owner in fee simple of the dam, it

11 has responsibilities under the ESA as a federal agency."  *Id*.  The court further noted that the

12 ESA's requirements "override the water rights of the irrigators."  *Id*.  It then held that the district

13 court "did not err in concluding that Reclamation has the authority to direct dam operations to

14 comply with the ESA."  *Id*.

15   KWUA tries to write this off as dicta, arguing that the decision centered on the contract

16 dispute and that the Ninth Circuit addressed the ESA only in passing.  *See* KWUA MSJ at 57:8-

17 58:5.  I disagree.  The Ninth Circuit devoted a separate section of the *Patterson* opinion to the

18 application of the ESA, citing multiple cases in its analysis of whether the ESA retroactively

19 applied to the contract at issue.  *See* 204 F.3d at 1213.  As part of that analysis, the court

20 considered the ESA's application to actions by a federal agency.  *See id*.  And the court expressly

21 held that the district court did not err in concluding that the Bureau could direct dam operations to

22 comply with the ESA.  *See id*. ("Accordingly, we hold . . .").  This is not, as KWUA asserts, a

23 statement "made casually and without analysis" or "uttered in passing," or "merely a prelude to

24 another legal issue that commands the panel's full attention."  *See* KWUA MSJ at 57:19-58:5

25 (citing *United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001)).  And even if it *were* dicta, I

26 find *Patterson* persuasive, given the court's unequivocal statements about the ESA.  *See* 204 F.3d

27 at 1209 ("Operation of the dam is also subject to the requirements of federal statutes, such as the

28 Endangered Species Act."), 1213 ("Because Reclamation retains authority to manage the dam, and

because it remains the owner in fee simple of the dam, it has responsibilities under the ESA as a federal agency.").

*Patterson* is far from the only case where courts have recognized that the ESA applies to the Bureau's operation of the Klamath Project. The Ninth Circuit reiterated this as recently as September of 2022. *See Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 940 (9th Cir. 2022) ("Reclamation is also responsible for managing the Klamath Project in a manner consistent with its obligations under the ESA."); *see also Klamath Irrigation Dist. v. United States*, 635 F.3d 505, 508 (Fed. Cir. 2011) ("In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act.").

KWUA contends that the issue is not whether the Bureau is subject to the ESA, but instead whether the Bureau has the discretionary authority to take the specific action at issue—which KWUA asserts is the use of stored water in UKL for purposes other than irrigation—thus triggering section 7(a)(2). *See* KWUA MSJ at 60:5-11, 63:13-64:2, 73:14-20. It argues that the Reclamation Act only authorizes the Bureau to operate the Klamath Project for "reclamation" purposes—the irrigation of reclaimed land—and does not grant it the discretion to take action on behalf of endangered species. *Id*. at 64:5-76:13. According to KWUA, no other authority, including the Bureau's water rights under Oregon law and its contracts with Project beneficiaries, grant it this discretion either. *See id*. at 76:14-88:4.

In support, KWUA relies on *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 669 (2007), where the Supreme Court held that section 7(a)(2) "covers only discretionary agency actions and does not attach to actions . . . that an agency is required by statute to undertake once certain specified triggering events have occurred." The issue in *Home Builders* was discord between section 7(a)(2) of the ESA and section 402(b) of the Clean Water Act, the latter of which required the Environmental Protection Agency ("EPA") to transfer certain permitting powers to state authorities upon a showing that nine enumerated criteria were met. *See* 551 U.S. at 649. The Court considered whether section 7(a)(2)'s consultation requirement "effectively operates as a tenth criterion on which the transfer of permitting power under the

1  [Clean Water Act] must be conditioned." *Id*.  The Court held that it did not, because the Clean

2  Water Act provision *required* transfer once the specified criteria were met, eliminating any

3  discretion by the EPA and thus, failing to trigger section 7(a)(2).  *See id*. at 669, 673.  KWUA

4  reads *Home Builders* as rejecting the lower court's finding that "the ESA acts as an overriding

5  statute that provides independent authority or a separate requirement for federal agencies to

6  protect (or not jeopardize) species."  KWUA MSJ at 40:6-13.

7        According to the Ninth Circuit, "[t]he real question after *Home Builders* is what counts as

8  a non-discretionary action, to which section 7(a)(2) does not apply."  *San Luis & Delta-Mendota*

9  *Water Auth. v. Jewell*, 747 F.3d 581, 639 (9th Cir. 2014).  The court has distinguished *Home*

10  *Builders* based on the specificity of the mandate at issue.  In *National Wildlife Federation v.*

11  *National Marine Fisheries Service*, 524 F.3d 917, 928 (9th Cir. 2008), the court noted that unlike

12  in *Home Builders*, where the Clean Water Act provision affirmatively mandated a specific action

13  that conflicted with the ESA, Congress had imposed "broad mandates which do not direct

14  agencies to perform any specific nondiscretionary actions, but rather, are better characterized as

15  directing the agencies to achieve particular goals."  The *Jewell* court affirmed this distinction.  *See*

16  747 F.3d at 640 ("We distinguished *NWF* from *Home Builders* on the basis of the specificity of

17  the mandate in question. . . . The Water Authority has not pointed us to any statutory obligation

18  that Congress has imposed on Reclamation that is both mandatory and inconsistent with its

19  obligations under the ESA.").

20        KWUA has not pointed to any sufficiently specific statutory obligation that Congress has

21  imposed on the Bureau that is both mandatory and inconsistent with its obligations under the ESA.

22  In arguing that the Klamath Project is a single-use project authorized only for "reclamation"

23  purposes, KWUA relies on a combination of federal and state statutes, Interior Department

24  opinions, and the ACFFOD's interpretation of the Project's purpose.  *See id*. at 64:17-67:17.  But

25  under *National Wildlife Federation* and *Jewell*, it must be Congress who imposes the mandate on

26  the Bureau.  Even if the federal statutes that KWUA invokes—the Reclamation Act of 1902 or the

27  1905 Congressional authorization of the Project—clearly stated that the Klamath Project was

28  authorized for irrigation purposes only (a question I need not decide), KWUA has not identified

1   any provision that is as specific as the Clean Water Act provision in *Home Builders*, mandatory,

2   and inconsistent with the Bureau's obligations under the ESA.  *See Jewell*, 747 F.3d at 640.

3       Instead, the Congressional mandate within the Reclamation Act is broad, like those in

4   *National Wildlife Federation* and *Jewell*.  Congress granted the Secretary of the Interior the

5   authority to "*perform any and all acts* and to make such rules and regulations as may be necessary

6   and proper for the purpose of carrying out the provisions of this Act into full force and effect."  43

7   U.S.C. § 373 (emphasis added).  KWUA attempts to explain away this provision by focusing on

8   the authority to enact rules and regulations, but overlooks the broad authority to perform "any and

9   all acts" to carry out the Act itself.  *See* KWUA MSJ at 70:9-21.  It also ignores another provision

10  authorizing and directing the Secretary to "use the reclamation fund for the operation and

11  maintenance of all reservoirs and irrigation works constructed under the provisions of this Act."

12  *See id.*; *see also* 43 U.S.C. § 491.  Taken together, these provisions show that Congress granted

13  the Secretary of Interior—and by proxy, the Bureau—a broad mandate that did not direct the

14  Bureau "to perform any specific nondiscretionary actions" but instead is "better characterized as

15  directing [the Bureau] to achieve particular goals."  *See National Wildlife Fed'n*, 524 F.3d at 928.

16  This is unlike the specific provision of the Clean Water Act that was inconsistent with the ESA in

17  *Home Builders*.

18      The Ninth Circuit has held that the Bureau must comply with the ESA in operating the

19  Klamath Project.  *See Patterson*, 204 F.3d at 1213; *Klamath Irrigation Dist.*, 48 F.4th at 940.  This

20  alone answers the question.  But even considering the narrower view of agency action set forth by

21  KWUA, KWUA has not identified a specific mandate from Congress, imposed on the Bureau, that

22  is inconsistent with its obligations under the ESA.  Instead, Congress gave the Bureau a broad

23  mandate in carrying out the Reclamation Act, meaning it has discretion in deciding how to do so.[8]

24  Under *Home Builders*, that discretion means that section 7(a)(2) applies.

25      It is worth noting that KWUA does not appear to directly challenge the Bureau's

26  obligations under section 9 of the ESA.  *See generally* KWUA MSJ.  At most, KWUA cites cases

---

[8] Because I find that the Bureau has discretion under the Reclamation Act, I need not address the other potential sources of discretionary authority that the United States and plaintiffs assert.

United States District Court
Northern District of California

that focus on section 9, without attacking the Bureau's section 9 obligations with respect to the matter at hand. *See generally id*. Whether in the form of section 9, section 7(a)(2), or both, the Bureau must comply with the ESA in operating the Klamath Project—including when it releases stored water from UKL.

This brings me to the final question in the preemption analysis, which is whether it is physically impossible for the Bureau to comply with both the ESA and the OWRD Order, or whether the latter stands as an obstacle to the accomplishment and execution of Congress's purpose and objective in enacting the ESA. *See Arizona*, 567 U.S. at 399-40.

This question is relatively easy to answer. At the least, the Order poses an obstacle to the accomplishment and execution of Congress's purpose and objective in enacting the ESA, which is to preserve and restore endangered species, "whatever the cost." *See Tennessee Valley Authority*, 437 U.S. at 184. The April 6, 2021, Order mandates that the Bureau "immediately preclude or stop the distribution, use or release of stored water from the UKL, in excess of amounts that may be put to beneficial use under KA 1000 downstream of the Link River Dam." OWRD Order at 436. In the same breath, the Order states that:

> Nothing in this order alters, relieves or releases any person, state, or federal agency from any and all rights, duties or obligations arising from other sources of law including without limitation other state laws or rules, federal laws and related federal agency regulations, federal or state court orders, or contracts.

*Id*. The conflict is apparent on the face of the Order itself, which simultaneously prohibits the Bureau from distributing, using, or releasing certain amounts of stored water, while still binding the Bureau (a federal agency) to its duties arising from other sources of law (the ESA). *See id.* The Order acknowledges this tension:

> The Department has cause to believe that the Bureau will, at some near future date, release legally stored water through the Link River Dam *to comply with the Bureau's* federal tribal trust obligations and *ESA obligations*.

*Id*. at 434 (emphasis added). By preventing the Bureau from releasing the stored water, the OWRD Order stands as an obstacle to the accomplishment and execution of Congress's purpose and objective in enacting the ESA. As if there was any doubt, the subsequent notices of violations further prove this. *See* July 2 Notice; July 28 Notice.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

It is also worth noting that OWRD "agrees, as it must, that the Supremacy Clause of the U.S. Constitution makes federal law the rule of decision when state law and federal law directly conflict." OWRD MSJ at 12:6-8. Moreover, OWRD "does not dispute that it lacks authority to prevent Reclamation from complying with the Endangered Species Act," and notes that it issued the April 6, 2021, Order "because the Marion County Circuit Court issued an injunction requiring OWRD to do so." *Id*. at 1:22-25. The agency's acknowledgment that its own Order must give way to the ESA supports my finding.

The OWRD Order conflicts with the ESA, at least because it poses an obstacle to the accomplishment and execution of Congress's purpose and objective in enacting the ESA: protecting and restoring endangered species. If the Bureau complies with the Order, it cannot release downstream flows, jeopardizing the coho salmon and Southern Resident Killer Whale and violating either section 7(a)(2) or section (9) of the ESA. If the Bureau carries out its obligations under the ESA, then it violates the Order. This meets the "high threshold" described in *Volkswagen*. *See* 959 F.3d at 1212. The ESA preempts the OWRD Order.

KID, which also argues against preemption, does not make a compelling counterpoint. The inclusion of an express preemption provision in the ESA (voiding certain state laws or regulations that apply "with respect to the importation or exportation of, or interstate or foreign commerce in" endangered or threatened species) "does not foreclose the application of ordinary implied preemption principles." *See* KID Oppo. [Dkt. No. 1041] 50:9-51:22; 16 U.S.C. § 1535(f); *National Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 731 (9th Cir. 2016). Under those principles, the Congressional purpose behind the ESA is clear and the OWRD Order stands in the way of the accomplishment and execution of that purpose, meaning it is preempted. KID's other arguments—that the federal government and plaintiffs improperly rely on BiOps rather than the ESA as the preemptive law, that the OWRD Order is not an obstacle to accomplishing the ESA because section 7 prescribes a consultation process "with only a general end result," and that the United States must show that compliance with the current BiOps and OWRD is "impossible"—are either straw man arguments or misconstrue the applicable law. *See id*. at 51:23-71:19.

29

Nor am I swayed by KWUA's argument that summary judgment should be denied because the United States "has not demonstrated (or even discussed) that it was physically impossible" for the Bureau to comply with both the ESA and the OWRD Order on the days in which OWRD found that the Bureau violated the Order.  *See* KWUA MSJ at 97:16-28.  *Arizona* describes two forms of conflict preemption: "cases where compliance with both federal and state regulations is a physical impossibility *and* those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *See* 567 U.S. at 399-400 (citations and quotation marks omitted) (emphasis added).  The United States and plaintiffs have shown, based on the OWRD Order and subsequent notices of violation, that the Order stands as an obstacle to Congress's purposes and objectives in enacting the ESA.  They need not show that both forms of conflict preemption occurred in order to prevail on summary judgment.

Summary judgment is GRANTED on preemption grounds in favor of the United States and the plaintiffs on the federal government's crossclaim.  The Bureau must comply with the ESA in operating the Klamath Project, and the OWRD Order is preempted under the Supremacy Clause.  KWUA's motion for partial summary judgment is DENIED for the same reasons, as the Bureau's use of stored water in UKL is subject to the same ESA obligations.  To the extent that OWRD's motion relies on KWUA's argument about ESA compliance, it too is DENIED.

### B.  INTERGOVERNMENTAL IMMUNITY

The United States and plaintiffs also argue that the OWRD Order is invalid under the Supremacy Clause because it violates the doctrine of intergovernmental immunity.  USA MSJ at 45:1-16; Pls.' MSJ at 17:20-24.

"The doctrine of intergovernmental immunity arose from the Supreme Court's decision in *McCulloch v. Maryland*, 17 U.S. 316 (1819), which established that 'the states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government.'"  *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).  As the Supreme Court recently noted, the doctrine has evolved over time, and is now understood "as

prohibiting state laws that *either* regulate the United States directly *or* discriminate against the federal government or those with whom it deals (e.g., contractors)." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (citation and internal modifications omitted) (emphasis in original).

The focus here is on the former: direct regulation. "It is well settled that the activities of federal installations are shielded by the Supremacy Clause from direct state regulation unless Congress provides clear and unambiguous authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citations and quotation marks omitted); *see also Blackburn v. United States*, 100 F.3d 1426, 1435 (9th Cir. 1996) ("states may not directly regulate the federal government's operations or property"). In other words, unless Congress has clearly and unambiguously authorized state regulation of the federal government, direct regulation will violate the intergovernmental immunity doctrine. *See Washington*, 142 S. Ct. at 1984 ("We will find that Congress has authorized regulation that would otherwise violate the federal government's intergovernmental immunity only when and to the extent there is a clear congressional mandate.") (citation and quotation marks omitted).

The argument from the United States and the plaintiffs is twofold. First, they contend that the OWRD Order directly regulates the federal government by restricting the Bureau's ability to release water from UKL for any purposes other than irrigation. *See* USA MSJ at 45:9-12; *see also* Pls.' MSJ at 17:17-19. Next, they argue that Congress has not clearly and unambiguously authorized any such regulation by OWRD. USA MSJ at 47:9-25; Pls.' MSJ at 22:10-24:18.

The arguments related to intergovernmental immunity center on whether section 8 of the Reclamation Act functions as clear, unambiguous authorization from Congress allowing such regulation by OWRD. Although the parties generally agree that OWRD has some amount of authority to regulate the Project, they dispute how far that authority extends.

The federal government contends that OWRD's authority under section 8 is limited, as "the United States has consented through section 8 only to adhere to the requirements of state law with respect to the acquisition and use of water rights for Project purposes, including particularly irrigation." USA MSJ at 47:9-12. But, it contends, "[t]his consent is unrelated to the separate domain of ESA compliance" and does not authorize OWRD "to regulate the Project in this area."

*Id*. at 47:12-14.

The plaintiffs make a similar point, arguing that "Reclamation can distribute Klamath Project water for irrigation in accordance with state-determined water rights, but section 8 does not give OWRD a significant role in controlling overall operation of Reclamation projects." Pls.' MSJ at 21:22-22:1. Like the federal government, the plaintiffs concede that "[s]ection 8 allows OWRD to determine the relative priority of state-based water rights in distributing water for irrigation from the Project, and Reclamation must conform to these priorities in distributing water for the Project." *Id*. at 22:17-19; *see also* Pls.' Reply [Dkt. No. 1065] 20:21-23 ("It is undisputed this language [in section 8] gives OWRD authority to regulate water used in irrigation."). But, they argue, that authority does not apply here "because OWRD is applying its state water law to prohibit the release of flows required by the ESA." Pls.' Reply at 21:15-17.

According to OWRD, section 8's "own terms provide that the Reclamation Act does not affect each state's right to regulate water within [its] own borders." OWRD MSJ at 19:18-20. It further argues that it could issue the Order as part of its "authority and duty to regulate water users' respective rights" in certain contexts, including when a senior water rights holder makes a "call" for water during shortages or when a dispute arises between water users. *See id*. at 14:16-20. OWRD contends that the only question is "where the line is drawn between OWRD's lawful regulation of the Klamath Project and Reclamation's independent obligations under the Endangered Species Act, which are not subject to state law." *See id*. at 14:4-7.

Having found that the ESA preempts the OWRD Order, I see no compelling reason to determine whether the Order is also invalid under the intergovernmental immunity doctrine. Preemption and intergovernmental immunity both concern the Supremacy Clause. Ruling on both would be redundant and reach farther than is necessary to answer the question underlying this phase of the litigation: whether the Bureau must follow the OWRD Order. As posed by the parties, the arguments related to intergovernmental immunity go beyond the OWRD Order itself and explore the scope of OWRD's authority under section 8 of the Reclamation Act. I need not define the parameters of that authority to resolve whether the OWRD Order is invalid under the Supremacy Clause. It is because it is preempted.

1    At oral argument, most of the parties conceded that if the Order was preempted, there was

2    no need to delve into intergovernmental immunity.  Only the plaintiffs advocated otherwise,

3    suggesting that KID's arguments on conflict preemption could speak to the meaning of section 8,

4    which would then implicate the intergovernmental immunity doctrine.  But my decision is based

5    on obstacle preemption, which does not require a determination of KID's arguments about

6    whether it is physically impossible for the Bureau to comply with both the ESA and the OWRD

7    Order.  And I see no other reason why I must rule on intergovernmental immunity—or any other

8    arguments regarding OWRD's authority to issue the Order—along with preemption.  Any decision

9    about OWRD's authority under section 8 would have implications far more reaching than the

10   Order at hand, as it would shape the dynamics between state and federal agencies in the operation

11   of Reclamation projects across the United States.  I do not need to go that far in resolving the

12   current dispute.

13   It is, however, worth briefly addressing the remainder of OWRD's counterclaim.  It seeks

14   two forms of injunctive relief: (1) an injunction "requiring Reclamation to provide OWRD with

15   sufficiently detailed information to establish that the quantity of particular releases through the

16   Link River Dam are required by the ESA and, therefore, preempt Oregon law"; or (2) an

17   injunction "requiring Reclamation to cease releasing stored water through the Link River Dam for

18   any uses that are not expressly allowed in its water rights permit, if the court agrees with KWUA

19   that the ESA does not apply."  OWRD Countercl. at 12:8-14.  As I have explained, I do not agree

20   with KWUA that the ESA does not apply, which leaves the injunction that would require certain

21   information from the Bureau.

22   OWRD has not identified any law requiring the Bureau to give it the information that it

23   desires.  It points to section 8 of the Reclamation Act and two state administrative rules directing

24   the watermaster to "investigate and respond to all complaints of water shortages or unlawful use

25   based on a review of appropriate records and performance of field inspections" and allowing the

26   OWRD director to "investigate to determine if a violation" of statutes, rules, orders, permit

27   conditions, or standards occurred.  *See* OWRD Reply [Dkt. No. 1086] 6:4-19 (citing Or. Admin.

28   R. 690-250-0100(1); 690-260-0020(1)).  But neither of the cited provisions obligate the Bureau (or

United States District Court
Northern District of California

33

1   any water user, for that matter) to provide OWRD with the information it seeks. They only stand

2   for the proposition that OWRD may investigate alleged violations, and that the watermaster's

3   review is based on records and inspections. They are not, as OWRD asserts, evidence of

4   "Reclamation's legal obligation to comply with [its] information requests." *See id.* at 6:20-23.

5        As a matter of comity, it makes sense for the Bureau to cooperate with OWRD in

6   providing information reasonably requested. Indeed, the Bureau is doing so. *See* USA Reply

7   [Dkt. No. 1072] 16:19-26, Ex. 1. But OWRD has not shown that it was injured by the Bureau's

8   failure to provide the sought-after information because it has not shown that it was legally entitled

9   to that information. It has not shown a concrete and particularized injury that is "actual and

10  imminent, not conjectural or hypothetical," as required to establish standing for injunctive relief.

11  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). OWRD "bears the burden of

12  showing that [it] has standing for each type of relief sought." *Id.* The agency has not shown that

13  it has standing to pursue an injunction requiring the Bureau to provide information about releases

14  through the Link River Dam. This too supports denying OWRD's motion for summary judgment.

**CONCLUSION**

15

16       The United States' and plaintiffs' motions for summary judgment are GRANTED: the

17  ESA preempts the OWRD Order. The OWRD Order is invalid under the Supremacy Clause. To

18  the extent that OWRD attempts to enforce its Order, it is ENJOINED from doing so.

19       KWUA's motion for summary judgment is DENIED; the Bureau is required to comply

20  with the ESA in operating the Project. OWRD's motion for summary judgment is DENIED for

21  the same reasons, and also because it has not shown that it has standing to pursue the information-

22  seeking injunctive relief.

23       **IT IS SO ORDERED.**

24       Dated: February 6, 2023

25

26  

27  William H. Orrick
    United States District Judge

28

*United States District Court*
*Northern District of California*