**WANGER JONES HELSLEY PC**
265 East River Park Circle, Suite 310
Fresno, California 93720
Telephone: (559) 233-4800
Facsimile: (559) 233-9330

John P. Kinsey #215916
 jkinsey@wjhattorneys.com
Nicolas R. Cardella #304151
 ncardella@wjhattorneys.com

**RIETMANN LAW, P.C.**
1270 Chemeketa Street NE
Salem, Oregon 97301
Telephone: (503) 551-2740

Nathan R. Rietmann #053630
 nathan@rietmannlaw.com
*Pro hac vice*

Attorneys for:        Intervenor/Cross-Defendant KLAMATH IRRIGATION DISTRICT

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

YUROK TRIBE, et al.,

                  Plaintiffs,

        v.

U.S. BUREAU OF RECLAMATION, et al.,

                  Defendants,

and

KLAMATH WATER USERS ASSOCIATION,

and

KLAMATH TRIBES,

                  Intervenor-Defendants,

Case No. 3:19-cv-04405-WHO

Related Case Nos.: C16-cv-06863-WHO
                                C16-cv-04294-WHO

**OPPOSITION TO PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

**(DOC. 1117)**

{7756/006/01591807.DOCX}

UNITED STATES OF AMERICA,

    Cross-Claimant,

  v.

KLAMATH WATER USERS ASSOCIATION,

and

OREGON WATER RESOURCES
DEPARTMENT,

    Cross-Defendants,

and

KLAMATH IRRIGATION DISTRICT,

    Intervenor-Cross-Defendant

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND .......................................................................... 2

      A.    The 2019 NMFS BiOp ....................................................................... 2

      B.    Reinitiated Consultation .................................................................... 4

      C.    The Interim Operations Plan ............................................................. 4

      D.    The 2022 Annual Operations Plan .................................................... 5

      E.    Fish & Wildlife Services' 2023 Biological Opinion........................... 6

      F.    Reclamation's 2023 Temporary Operating Plan ............................... 6

III.  STANDARD OF REVIEW ............................................................................ 8

IV.   ARGUMENT ................................................................................................. 9

      A.    Plaintiffs Have Failed to Show a Likelihood of Success on the Merits.......................... 9

            1.    Plaintiffs Have Failed to Show a Reasonably Certain,
                  Actual or Imminent Future Violation of the ESA............................. 10

                  a.    Plaintiffs Have Failed to Show Reclamation's Implementation of the
                        2023 TOP Violated Section 9's Prohibition Against Unlawful Take.... 10

                  b.    Plaintiffs Have Failed to Show Reclamation's Implementation of the
                        2023 TOP Violated Section 7's Consultation Requirement ................. 12

                  c.    Plaintiffs Have Failed to Show That Future ESA Violations
                        Are Imminent as a Result of Reclamation's
                        Implementation of the 2023 TOP ........................................................ 14

            2.    Plaintiffs Have Failed to Show This Court Has Jurisdiction .......................... 16

                  a.    Plaintiffs Have Failed to Show Article III Standing............................. 16

                  b.    Plaintiffs' Claims Based on the 2022 Allocation and the
                        2023 Flow Reductions Are Moot........................................................ 17

                  c.    Plaintiffs' Claims Based on Potential
                        Future Flow Reductions Are Unripe..................................................... 18

                  d.    This Court Lacks Jurisdiction Under the ESA Citizen Suit Provision .. 21

# TABLE OF CONTENTS

**Page**

    e.    This Court Lacks Jurisdiction Under the Administrative Procedure Act ................................................................. 22

B.    Plaintiffs Have Failed to Show the Requested Injunctive Relief Is Warranted ............ 22

    1.    Plaintiffs Have Failed to Show Irreparable Harm ................................ 22

    2.    Plaintiffs Have Failed to Show the Balance of Harms Supports the Requested Injunctive Relief ............................................ 22

    3.    The Requested Injunction Is Overbroad, Unenforceable, and Fails to Redress the Alleged Irreparable Harm ................. 23

C.    The Court Should Abstain From Exercising Jurisdiction ................................ 24

V.    CONCLUSION ................................................................................ 25

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Federal Cases**

*Abbott Laboratories v. Gardner*,
   387 U.S. 136 (1967)...................................................................................... 19

*All. for the Wild Rockies v. U.S. Dep't of Agric.*,
   772 F.3d 592 (9th Cir. 2014) ............................................................. 12, 13, 14

*AquAlliance v. U.S. Bureau of Reclamation*,
   287 F.Supp.3d 969 (E.D. Cal. 2018)............................................................. 22

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
   273 F.3d 1229 (9th Cir. 2001) ...................................................................... 11

*Ass'n of Am. Med. Colleges v. United States*,
   217 F.3d 770 (9th Cir. 2000) ........................................................................ 19

*Bennett v. Spear*,
   520 U.S. 154 (1997)................................................................................ 14, 22

*Center for Biological Diversity v. Marina Point Development Co.*,
   566 F.3d 794 (9th Cir. 2009) ........................................................................ 17

*City of Erie v. Pap's A.M.*,
   529 U.S. 277 (2000) ...................................................................................... 17

*Coalition For Sustainable Resources, Inc. v. U.S. Forest Service*,
   259 F.3d 1244 (10th Cir. 2001) ............................................................... 20, 21

*Colorado River Water Conservation District v. United States*,
   424 U.S. 800 (1976)...................................................................................... 25

*Colwell v. Dep't of Health & Hum. Servs.*,
   558 F.3d 1112 (9th Cir. 2009) ........................................................................ 9

*Cottonwood Environmental Law Center v. U.S. Forest Service*
   (9th Cir. 2015) 789 F.3d 1075 ...................................................................... 19

*Dahl v. HEM Pharms. Corp.*,
   7 F.3d 1399 (9th Cir. 1993) ............................................................................ 9

*Doe v. Madison School Dist. No. 321*,
   177 F.3d 789 (9th Cir. 1999) ........................................................................ 17

## <u>TABLE OF AUTHORITIES</u> (continued)

<u>Page(s)</u>

**Federal Cases (continued)**

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) ......................................................................... 9

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .................................................................................... 24

*Forest Conservation Council v. Rosboro Lumber Co.,*
  50 F.3d 781 (9th Cir. 1995) ............................................................. 14, 15, 21

*Forest Guardians v. Johanns,*
  450 F.3d 455 (9th Cir. 2006) ....................................................................... 17

*Franklin v. Oregon,*
  622 F.2d 1337 (9th Cir. 1981) ..................................................................... 16

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ...................................................................................... 9

*Gordon v. Norton,*
  322 F.3d 1213 (10th Cir. 2003) ................................................................... 20

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation,*
  484 U.S. 49 (1987) ...................................................................................... 21

*Hernandez v. Sessions,*
  872 F.3d 976 (9th Cir. 2017) ......................................................................... 9

*Humane Soc'y of United States v. Kienzle,*
  333 F.Supp.3d 1236 (D.N.M. 2018) ............................................................ 23

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
  511 U.S. 375 (1994) .................................................................................... 16

*Loux v. Rhay,*
  375 F.2d 55 (9th Cir. 1967) ......................................................................... 16

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................... 16, 17

*Marbled Murrelet v. Babbitt,*
  83 F.3d 1060 (9th Cir. 1996) ....................................................................... 14

*Mazurek v. Armstrong,*
  520 U.S. 968 (1997) ...................................................................................... 8

**TABLE OF AUTHORITIES** (continued)

**Page(s)**

**Federal Cases (continued)**

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
   551 U.S. 644 (2007)............................................................................................ 24

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
   23 F.3d 1508 (9th Cir. 1994) ................................................................... 9, 15, 22

*National Ass'n of Home Builders v. Norton*
   298 F.Supp.2d 68 (D.D.C. 2003), aff'd (D.C. Cir. 2005) 415 F.3d 8 ............... 21

*New England Anti-Vivisection Society v. United States Fish and Wildlife Service*,
   208 F.Supp.3d 142 (D.D.C. 2016)...................................................................... 15

*O'Donnell v. Wien Air Alaksa, Inc.*,
   551 F.2d 1141 (9th Cir. 1977) ............................................................................ 16

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
   523 U.S. 726 (1998)............................................................................................ 18

*Omar v. Sea-Land Service, Inc.*,
   813 F.2d 986 (9th Cir. 1987) .............................................................................. 16

*Oregon Nat. Res. Council v. Allen*,
   476 F.3d 1031 (9th Cir. 2007) ...................................................................... 11, 22

*Oregon Natural Desert Ass'n v. U.S. Forest Service*,
   465 F.3d 977 (9th Cir. 2006) .............................................................................. 20

*Pacific Rivers Council v. Brown*
   (D. Or., Apr. 21, 2003, No. CV 02-243-BR) 2003 WL 21087974................... 14

*Palila v. Hawaii Dept. of Land and Natural Res.*,
   852 F.2d 1106 (9th Cir. 1988) ............................................................................ 14

*San Luis & Delta Mendota Water Authority v. U.S. Dept. of the Interior*,
   870 F.Supp.2d 943 (E.D. Cal. 2012)................................................................... 18

*Simon v. Eastern Ky. Welfare Rights Organization*,
   426 U.S. 26 (1976).............................................................................................. 17

*Southern Utah Wilderness Alliance v. Smith*,
   110 F.3d 724 (10th Cir. 1997) ............................................................................ 18

*Tennessee Valley Auth. v. Hill*,
   437 U.S. 153 ......................................................................................................... 9

## TABLE OF AUTHORITIES (continued)

**Page(s)**

**Federal Cases (continued)**

*United States v. Oregon,*
    44 F.3d 758 (9th Cir. 1994) ...................................................................................... 25

*US W. Commc'ns v. MFS Intelenet, Inc.,*
    193 F.3d 1112 (9th Cir. 1999) ................................................................................. 19

*U.S. v. Morros,*
    268 F.3d 695 (9th Cir. 2001) .................................................................................... 25

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................................. 9, 23

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................................................... 9

*Wolfson v. Brammer,*
    616 F.3d 1045 (9th Cir. 2010) ........................................................................... 19, 21

*Yurok Tribe v. United States Bureau of Reclamation,*
    231 F.Supp.3d 450 (N.D. Cal. 2017) ................................................................. 14, 21

**Statutes**

Oregon Revised Statutes section 539.130 .................................................................... 24

Oregon Revised Statutes section 539.170 .................................................................... 24

Oregon Revised Statutes section 540.210 .................................................................... 24

Oregon Revised Statutes section 540.720 .................................................................... 24

United States Code, Title 5, section 704 ....................................................................... 22

United States Code, Title 16, section 1532 ................................................................... 10

United States Code, Title 16, section 1536 ............................................................. 10, 12

United States Code, Title 16, section 1538 ................................................................... 10

United States Code, Title 43, section 383 ............................................................... 23, 24

**Other Authorities**

Code of Federal Regulations, Title 50, section 222.102 ............................................... 10

Code of Federal Regulations, Title 50, section 402.16 ................................................. 13

## <u>TABLE OF AUTHORITIES</u> (continued)

**<u>Page(s)</u>**

### Other Authorities (continued)

Federal Rules of Civil Procedure, Rule 12 ............................................................................ 16

Federal Rules of Civil Procedure, Rule 19 ............................................................................ 23

House Report No. 97–567 (1982)........................................................................................... 11

"Klamath Project Operating Coordination, Winter/Spring 2023" (the "Joint Statement").............. 7, 17

OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Plaintiffs seek a preliminary injunction enjoining the Bureau of Reclamation ("Reclamation") from allowing water from the Klamath Project ("Project") to be used for agricultural purposes unless the agency can satisfy minimum flow rates in the Klamath River for the benefit of threatened coho salmon and minimum elevation levels in the Upper Klamath Lake ("UKL") for the benefit of endangered suckers as set forth in Reclamation's Interim Operations Plan ("IOP").  Plaintiffs justify this request based on alleged violations of Sections 7 and 9 of the Endangered Species Act ("ESA") arising from Reclamation's implementation in 2023 of a temporary operations protocol that was developed in coordination with, and ultimately approved by, the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS") to minimize the adverse impacts of extreme hydrologic conditions on protected species (the "2023 TOP").  According to Plaintiffs, Reclamation violated Section 7 by reducing river flows pursuant to the 2023 TOP below the minimum  rates specified in NMFS' 2019 biological opinion ("BiOp") without first initiating formal consultation with NMFS, contending the effects of such flow reductions were not analyzed in the BiOp and therefore Reclamation was obligated to initiate formal consultation prior to implementation.  Plaintiffs assert Reclamation violated Section 9 on the ground that the flow reductions exceeded specified minimum flows in the BiOp and therefore caused unlawful take.  Based on these alleged violations, Plaintiffs complain future flow reductions in violation of the ESA are "inevitable" and injunctive relief is therefore warranted.

Plaintiffs have failed to show they are entitled to the relief they seek.  The BiOp *did* authorize Reclamation to deviate from its minimum flow rates in appropriate circumstances so long as proper adaptive management procedures were followed, and it *did* analyze the likely effects such deviations on protected species, finding they would not cause jeopardy.  Reclamation developed the 2023 TOP in coordination with NMFS and the Fish and Wildlife Service ("FWS")[1] (collectively, the "Services") in accordance with the adaptive management procedures set forth in NMFS' BiOp.  Prior to implementation, the Services affirmed the impossibility of satisfying minimum flow rates citing "persistent and severe drought conditions" and confirmed the 2023 TOP's consistency with the "requirements and relevant impacts" analyzed in the applicable BiOps.  Because the likely effects of the

---

[1]    FWS is responsible for protecting endangered suckers in UKL.

1  adaptive management procedures used to develop the 2023 TOP were analyzed and approved in the

2  NMFS' BiOp and Plaintiffs have made no attempt to challenge NMFS' inclusion of such procedures or

3  Reclamation's compliance with them, Plaintiffs have failed to show they are likely to succeed in

4  establishing a violation of Section 7 or 9 of the ESA.

5      Even if Plaintiffs could show some impropriety with Reclamation's implementation of the 2023

6  TOP, however, it would make no difference because this Court lacks jurisdiction to hear Plaintiffs'

7  claims.  Plaintiffs have failed to show they have standing to challenge the 2023 TOP or the future flow

8  reductions Plaintiffs claim are the "inevitable" result of Reclamation's 2023 operations.  Further,

9  Plaintiffs challenge to the 2023 TOP is now moot, as there is no effective relief this Court can grant

10 Plaintiffs to redress the alleged harm.  Conversely, Plaintiffs' claims based on potential future flow

11 reductions in violation of the ESA are unripe, as Plaintiffs have failed to show any definitive

12 commitment to reduce flows in violation of the ESA in future years.

13     At its core, Plaintiffs' grievance appears to be with the outcome of the adaptive management

14 procedures Reclamation and the Services employed to optimize management of the Project's limited

15 supplies and to balance conflicting demands within the Klamath Basin.  Yet Plaintiffs do not challenge

16 the BiOps' inclusion of these procedures, nor the Services' determinations implementing them.  Instead,

17 Plaintiffs invite this Court to issue an injunction that would strip Reclamation of its discretion to manage

18 Project operations and deprive the Services of a vital tool to minimize harm to protected species during

19 times of scarcity, all the while failing to produce appreciable benefits for protected species and wreaking

20 havoc on agricultural communities.  This Court should decline the invitation and deny Plaintiffs' motion.

21 **II.     FACTUAL BACKGROUND**

22     **A.     The 2019 NMFS BiOp**

23     In March of 2019, Reclamation completed reinitiated consultation with the Services pursuant to

24 Section 7(a)(2) of the ESA on the effects of the 2019–2024 Klamath Project Operations Plan (the "2019

25 Operations Plan") on Federally-listed species and their critical habitats, including the listed Southern

26 Oregon/Northern California Coast evolutionarily significant unit of coho salmon ("coho salmon"),

27 Southern Resident killer whales ("killer whales"), and Lost River and shortnose suckers (collectively,

28 "suckers").  Declaration of Nicolas R. Cardella ("Card. Decl."), Ex. A, p. 1.  The Services provided

Reclamation with written biological opinions—the 2019 NMFS BiOp and 2020 FWS BiOp—concluding the 2019 Operations Plan was not likely to jeopardize the continued existence of listed species, nor destroy or adversely modify their critical habitat. *Ibid*.

Among other things, the 2019 NMFS BiOp analyzed the likely effects on listed species from potential deviations to minimum flow rates, which NMFS referred to as the "formulaic approach." As NMFS explained, "real-time hydrologic conditions . . . may warrant the need to deviate from th[e] formulaic approach." 2019 NMFS BiOp, p. 38. "In addition, there may be specific ecologic objectives that water resource managers may want to address that can only be achieved by deviating from the formulaic approach." *Ibid*. "Any time a deviation from the formulaic approach occurs, either by necessity or to address a specific ecological objective, or if it is determined that the formulaic approach results in conditions that are not consistent with the intent of the proposed action, the [Flow Account Scheduling Technical Advisory or "FASTA"] process [] will be followed." *Ibid*. Pursuant to the FASTA meet-and-confer process, "Reclamation, in coordination with the Services, will consider input from Klamath Basin technical experts . . . on real-time adaptive flow management options." NMFS 2019 BiOp, p. 44. Although NMFS recognized that by their nature the precise frequency and magnitude of such deviations could not be predicted, the BiOp analyzed the likely effects of these adaptive management approaches on protected species, *see*, *e.g.*, 2019 NMFS BiOp, pp. 119, 156, 211–14, and ultimately concluded the Project was not likely to cause jeopardy to protected species, including coho salmon and killer whales. *Id.* at pp. 1, 266.

However, NMFS also concluded the Project would cause incidental take of protected species. *Id.* at 266. As a result, the BiOp also included an incidental take statement specifying reasonable and prudent measures ("RPMs") to minimize the amount or extent of incidental take, as well as terms and conditions ("T&Cs") Reclamation was required to comply with to remain eligible for the ESA's incidental take safe harbor. *Id.* at 280. As pertinent here, RPM 1 states: "Reclamation shall take all necessary and appropriate actions within its authorities to minimize take of coho salmon and Southern Residents as a result of implementing the proposed action." *Ibid*. To implement RPM 1, the 2019 NMFS BiOp included T&C 1A. T&C 1A requires Reclamation to manage and monitor EWA distributions and IGD flows in accordance with specified thresholds to ensure the Project's incidental

take does not cause jeopardy to listed species. *Ibid.* Thus, T&C 1A requires Reclamation to manage IGD flows to meet "[t]he minimum daily average flows described in Table 33" from March to September. *Id.* at 280–281. T&C 1A also provided that if, based on the required monitoring, Reclamation determined that "IGD flows are expected to potentially fall outside the thresholds," then Reclamation was required to "immediately notify NMFS and consult with the Services to determine the causative factors." *Id.* at 281. Similar provisions were included in T&C 1c of the FWS BiOp. *See* 2020 FWS BiOp, p. 214.

### B. Reinitiated Consultation

In the winter of 2019, Reclamation requested another formal consultation with the Services after discovering its operations could impact listed species or critical habitat in a manner or to an extent not previously considered. *See* Card. Decl., Ex. A, p. 1. The Services accepted Reclamation's request and Reclamation subsequently prepared and transmitted a Biological Assessment further analyzing the 2019 Operations Plan's potential impacts on listed species and critical habitat. *Ibid.* Upon review, Reclamation and the Services agreed additional time was needed to complete consultation and that an interim operations plan should be developed and submitted to the Services for approval pending completion of the reinitiated consultation. *Id.* at p. 2.

In March of 2020, the parties stipulated to a stay in this case following Reclamation's transmittal of a proposed interim operations plan (the "IOP") to the Services. *See* Doc. 907. The Services subsequently approved the IOP's consistency with the applicable BiOps. *See* Card. Decl., Ex. B.

### C. The Interim Operations Plan

The IOP largely incorporated the 2019 Plan but added augmentation EWA flows in certain years for the benefit of listed species during the spring months. *See* Card. Decl., Exs. A, C. The IOP retained the 2019 Plan's minimum monthly flow rates as well as authorization for adaptive management in accordance with the FASTA meet-and-confer process. *See* Card. Decl, Ex. A, p. 7. As Reclamation explained, the FASTA meet-and-confer process "would be used to allow salmon and sucker biologists from Reclamation and the Services, as well as other Klamath Basin experts, to provide real-time operational input into the use of this water to maximize ecological benefits to SONCC coho and Southern Resident Killer Whales, whether those benefits be improved habitat conditions, minimized

1   disease conditions, or both, while maintaining UKL elevations and conditions protective of Lost River

2   and shortnose suckers."  Card. Decl, Ex. C, p. 3.

3         On April 13, 2020, NMFS approved Reclamation's implementation of the IOP through the 2022

4   water year, finding that the anticipated effects of Project operations under the IOP are consistent with

5   the anticipated effects of the proposed action analyzed in the NMFS BiOp.  Card. Decl, Ex. D, p. 2.  In

6   September of 2022, Reclamation proposed extending the IOP's implementation through the 2024 water

7   year.  *Id.* at p. 1.  Citing persistent historic dry conditions in the Klamath Basin, Reclamation stressed

8   the "vital" need to maintain the IOP's meet-and-confer provisions.  *Id.* at p. 3.  On October 17, 2022,

9   NMFS "affirm[ed] that extending IOP operations is expected to result in effects consistent with the

10   anticipated effects of the proposed action analyzed in NMFS' 2019 [] BiOp" and approved its

11   implementation through March 31, 2024.  Card. Decl, Ex. E, p. 2.

12        **D.**    **The 2022 Annual Operations Plan**

13         Consistent with the T&Cs in the Services' BiOps and the IOP's meet-and-confer process,

14   Reclamation began conferring with the Services on February 25, 2022, after determining that extreme

15   hydrologic conditions prevented satisfaction of the incidental take thresholds in the applicable BiOps.

16   *See* Card. Decl., Exs. F, p. 3, G, pp. 1–2.  Through that process, Reclamation and the Services determined

17   it was necessary to make temporary adjustments "to adaptively manage operations for the remainder of

18   water year 2022 . . . to address immediate and temporary competing needs, including the needs of all

19   threatened and endangered species, in a reasonable and balanced manner informed by real-time

20   hydrological and biological data."  Card. Decl., Ex. F, pp. 3–4.  Thus, the 2022 Annual Operations Plan

21   ("2022 AOP") provided that Reclamation "will adaptively manage the Project Supply"—i.e., the volume

22   of water available for agricultural use from UKL and the Klamath River—so as to "maintain the UKL

23   at or above an end-of-season minimum water surface elevation of 4138.15 ft."  *Id.* at p. 6.

24         The 2022 AOP provided that the precise amount of Project Supply "will be dependent on

25   subsequent inflows to UKL" but was "currently estimated at approximately up to 62,000 AF as a result

26   of projected hydrologic conditions."  *Id.* at pp. 5–6.  In the event UKL elevations were higher than

27   anticipated by initial forecasts, the 2022 AOP provided that "[i]ncreased volumes would be split, with

28   50 percent to remain in /UKL to assist in providing a buffer in the end of season UKL elevation, with

the remaining 50 percent to be distributed as Project Supply for irrigation use and/or refuse purposes." *Id.* at p. 6.  It also noted that if UKL elevations "do not materialize as forecasted" diversions for Project purposes "would be reduced to a rate allowing UKL elevations to remain above 4,138.15 ft." *Ibid.* Further, if conditions arose indicating "a reduction in, or cessation of, Project diversions is insufficient to ensure [the specified] minimum UKL elevation . . . Reclamation would confer with NMFS to determine if a temporary reduction in releases from UKL could be instituted." *Ibid.*

### E.    Fish & Wildlife Services' 2023 Biological Opinion

In the fall of 2022, Reclamation requested consultation with FWS regarding the Project's continued operations under the IOP and its likely effects on Suckers.  2023 FWS BiOp, p. 1.  FWS issued a new BiOp (the "2023 FWS BiOp") shortly thereafter, concluding that Reclamation's proposal to continue operations under the IOP was not likely to cause jeopardy to Suckers or their critical habitat. *Ibid*.  FWS also determined that operations under the IOP were likely to result in incidental take.  *Id.* at 2.  As a result, the agency included a number of terms and conditions in the BiOp's incidental take statement Reclamation was required to satisfy to remain eligible for the ESA Section 7's incidental take safe harbor provision.  *Id.* at 204.  Among other things, FWS required Reclamation to maintain a UKL surface elevation greater than 4142 feet from April 1 through May 31, greater than or equal to 4,140.80 feet through July 14, and greater than 4,138 at all times.  *Id.* at 218.  Recognizing that "drought or other factors beyond Reclamation's control could result in UKL elevations being missed," FWS required Reclamation to engage with FWS in a meet-and-confer process to ensure UKL elevations are met and to reinitiate consultation if Reclamation determined it was unable to do so.  *Id.* at 218–19.

### F.    Reclamation's 2023 Temporary Operating Plan

Due to persistent historic drought conditions, the IOP's meet-and-confer process was used in 2021, 2022, and 2023 to develop temporary operations plans for Project operations.  *See* Card. Decl., Exs. F, p. 1, H, p. 1, I, p. 1.  No legal challenges were mounted against Reclamation's use of the meet-and-confer process or its implementation of temporary operations plans until Plaintiffs challenged Reclamation's implementation of the 2023 temporary operating plan (the "2023 TOP") in this case. Declaration of Gene Souza ("Souza Decl."), ¶ 4.

*///*

1    In accordance with the 2023 FWS BiOp's requirements, the 2023 TOP sought to "achieve a

2  March 31 [UKL] elevation of 4142 feet [] in order to meet ESA requirements for suckers" (the "TOP

3  Goal").   Card. Decl., Ex. J, p. 3.   The 2023 TOP noted that reductions in UKL releases through Link

4  River Dam "may result in reductions in Klamath River flows at Iron Gate Dam (IGD) of up to 30%

5  below current BiOp minimums but that "[n]o reductions in UKL releases would occur if Reclamation

6  determines the TOP Goal can be meet without them." *Ibid.*   The 2023 TOP also required habitat survey

7  data to be used on a weekly basis to inform adaptive management decisions to increase or decrees the

8  IGD flow reduction target.  *Ibid.*   Reclamation also committed not to make any agricultural or refuge

9  deliveries while flow reductions are occurring.  *Id.* at p. 7.   The TOP was made effective from January

10  20, 2023 through March 31, 2023.  *Id.* at p. 3.   It expressly provided for a return to the IOP operational

11  model no later than April 1, 2023 unless Reclamation determined that extreme hydrological conditions

12  were likely to continue past April 1, in which case Reclamation would develop an annual operations

13  plan to replace the TOP.  *Id.* at p. 7.

14    On February 13, 2023, Reclamation, NMFS, and FWS published a joint statement, entitled

15  "Klamath Project Operating Coordination, Winter/Spring 2023" (the "Joint Statement") approving a

16  revised version of the 2023 TOP developed in accordance with the inter-agency meet-and-confer process

17  specified in the Services' respective BiOps.[2]  Card. Decl., Ex. I.  In the Joint Statement, Reclamation

18  and the Services affirmed that "the past three years of persistent and severe drought conditions have

19  contributed to water supplies in the Klamath River Basin that have been insufficient to meet the

20  minimum biological requirements for Endangered Species Act-listed species affected by the Klamath

21  Project."  *Id.* at p. 1.   The agencies agreed that "it is increasingly likely that without reductions in river

22  flows, Upper Klamath Lake level minimums specified in the [FWS 2023 BiOp] for sucker spawning

23  habitat will be missed again this year and that full implementation of a surface flushing flow for salmon

24  specified in the [2019 NMFS BiOp] will be at risk."  *Ibid.*   The letter then outlined Reclamation's

25  approach to Project operations for the remainder of the year, noting all three agencies "agree[d] that

26

27

---

[2]    Unless otherwise noted subsequent references to the 2023 TOP refer to the 2023 TOP as revised by the Joint Statement.

th[e] approach is appropriate in light of extreme uncertainty and potentially conflicting water needs for ESA-listed species in the Basin."  As the Joint Statement explained:

> Reclamation will reduce Iron Gate Dam minimum flows from the currently-provided minimums specified in the NMFS 2019 Biological Opinion by 11 percent effective February 14, 2023, in order to increase the likelihood of filling Upper Klamath Lake to meet USFWS Biological Opinion minimums for listed sucker fish.
>
> . . . .
>
> Reclamation, with NMFS and other parties, will monitor and assess the impacts of reductions in minimum flows to salmon redds and rearing habitat in the Klamath River.  If, once reduced flows have stabilized in the relevant stretch of the River, monitoring shows that reduced flows have not dewatered more than three redds (i.e., ten percent of the redds currently identified at risk), Reclamation will reduce flows by an additional five percent.
>
> . . . .
>
> Any further needs associated with flow reductions will be determined by Reclamation after working with the other agencies through the adaptive management process, considering the agency's recommendations and complete and up-to-date hydrologic and forecast information.  If the agencies do not concur about needed reductions at the regional level, the issue will be elevated for further discussion and resolution before reductions are made.

*Id.* at p. 2.

On February 14, Reclamation began reducing flows 11% below planned rates[3] as specified in the revised 2023 TOP.  In accordance with the requirements of the 2023 TOP, monitoring was conducted on February 16 and 17 and no dewatered reds were discovered.  JN10.  As such, Reclamation reduced flows by an additional 5% between February 25 and March 1 before incrementally ramping flows back up to the Table 33 rates, which were reached on March 14.  Souza Decl., ¶ 5.  Commencing March 14, there was significant precipitation and snow in the Klamath Basin region, preventing further surveys due to road closures and likely mitigating any potential effects associated with the flow reductions.  Souza Decl., ¶ 6.

## III.   STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  "A plaintiff seeking a preliminary injunction must establish that he is likely

---

[3]     Although Reclamation proposed to operate the Project with certain flow rates throughout the year, the 2019 NMFS BiOp does not require minimum flows in all months, only from March through September.  *See* 2019 NMFS BiOp, Table 33.

to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

While "the balance of hardships and the public interest tips heavily in favor of protected species" in ESA cases, that does not mean "courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA." *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994) (citing *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174). Even in ESA cases, "courts are not mechanically obligated to grant an injunction for every violation of law." *Ibid.*; see *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

At the same time, if the injunction is mandatory rather than prohibitory, it is subject to "heightened scrutiny" and cannot be granted "unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); see also *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017). A mandatory injunction is one "that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

"The burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). "The burden of establishing ripeness and standing rests on the party asserting the claim." *Colwell v. Dep't of Health & Hum. Servs.*, 558 F.3d 1112, 1121 (9th Cir. 2009).

## IV.   ARGUMENT

### A.   Plaintiffs Have Failed to Show a Likelihood of Success on the Merits

As explained below, Plaintiffs have failed to show they are likely to succeed on their claims because Plaintiffs have failed to demonstrate any reasonably certain actual or imminent future violation of the ESA. Plaintiffs have failed to show Reclamation violated Section 9's prohibition against unlawful take or Section 9's consultation requirements. Yet, even if Plaintiffs could make such a showing, it would be of no moment because Plaintiffs have failed to show this Court has jurisdiction to hear Plaintiffs' claims. Consequently, Plaintiffs' cannot show they are likely to succeed on the merits and their motion for preliminary injunction must be denied.

1.   **Plaintiffs Have Failed to Show a Reasonably Certain, Actual or Imminent Future Violation of the ESA**

Plaintiffs have failed to carry their burden of showing Reclamation's implementation of the 2023 TOP violated Section 7's consultation requirement or Section 9's prohibition against unlawful take.  The 2023 TOP was developed pursuant to, and in accordance with, the adaptive management processes required by the applicable BiOps during extreme hydrologic conditions.  The likely effects of these procedures, including reduced IGD flows below the rates specified in the 2019 NMFS BiOp, were analyzed by NMFS as part of the proposed action and the agency concluded they were not likely to cause jeopardy to listed species.  Reclamation, NMFS, and FWS all agreed that persistent and severe drought conditions in 2022 and 2023 necessitated the development of temporary operating procedures to optimize the use of limited resources, that Reclamation proceeded in accordance with the applicable T&Cs in developing the temporary procedures, and that the procedures ultimately developed appropriately balanced the agency's numerous, competing obligations in a manner consistent with the impacts analyzed in the applicable BiOps.  Plaintiffs have therefore failed to show Reclamation's implementation of the 2023 TOP violated Section 7's consultation requirements or Section 7's prohibition against unlawful take.  Furthermore, because Plaintiffs have failed to show a violation of the ESA, there are no grounds upon which to conclude future ESA violations are imminent and reasonably certain to occur.  Accordingly, Plaintiffs' motion for preliminary injunction must be denied.

a.   **Plaintiffs Have Failed to Show Reclamation's Implementation of the 2023 TOP Violated Section 9's Prohibition Against Unlawful Take**

Section 9 of the ESA prohibits the taking of an endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B).  The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  NMFS has defined "harm" to include "[s]ignificant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including breeding, spawning, rearing, migrating, feeding or sheltering."  50 C.F.R. § 222.102.

If it is determined that the proposed action is likely to result in incidental take, an incidental take statement ("ITS") must be prepared.  16 U.S.C. § 1536(b)(4).  An ITS "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during

1   activities that are otherwise lawful and in compliance with its terms and conditions." *Arizona Cattle*

2   *Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1239 (9th Cir. 2001).

3   "Congress preferred take 'be specified in terms of a numerical limitation.'" *Oregon Nat. Res. Council v.*

4   *Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007) (quoting H.R.Rep. No. 97–567, at 27 (1982)).  However, a

5   "surrogate is permissible if no number may be practically obtained" and the surrogate is "able to perform

6   the functions of a numerical limitation"—i.e., it is able to "set forth a trigger that, when reached, results

7   in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the

8   parties to re-initiate consultation." *Arizona Cattle Growers' Ass'n*, 273 F.3d at 1249.  Additionally, an

9   ITS may use a "combination of numbers and estimates" in appropriate situations.  *Id.*

10   Here, the 2019 NMFS BiOp used several "surrogates" to establish incidental take, including "the

11   minimum daily flows described in Table 33" of the BiOp.  2019 NMFS BiOp, p. 268.  As the BiOp

12   explains: "If any of the[] four thresholds are not met, the amount or extent of incidental take to coho

13   salmon will be considered exceeded ***unless*** NMFS determines that extraordinary hydrologic conditions

14   rather than the effects of the proposed action were responsible" for the exceedance.  *Ibid.* (emphasis

15   added).   As NMFS explained, this approach was necessary "[d]ue to the inherent biological

16   characteristics of aquatic species, such as coho salmon, the large size and variability of the Klamath

17   River, the operational complexities of managing Klamath River flows, and the difficulty in both locating

18   deceased coho salmon in this environment and then determining cause of harm." *Id.* at 267.

19   Plaintiffs have failed to show Reclamation's implementation of the 2023 TOP caused take in

20   violation of Section 9 because Plaintiffs have failed to show the 2023 flow reductions exceeded the take

21   permitted in the ITS.  Plaintiffs contend unlawful take occurred because Reclamation reduced flows in

22   2023 to rates below those specified in ITS, thereby exceeding NMFS' surrogate take threshold.  *See*

23   Doc. 1117, p. 26, n 4.  However, while it is true some of the 2023 flow reductions resulted in IGD flow

24   rates less than those specified in Table 33, alone that is insufficient to establish the ITS was exceeded.

25   The incidental take threshold is exceeded only if the surrogate thresholds are not met ***and*** the effects of

26   the proposed action were responsible for the exceedance.  2019 NMFS BiOp, p. 268.  Thus, even if a

27   surrogate threshold is exceeded, so long as NMFS determines that "extraordinary hydrologic conditions

28

rather than the effects of the proposed action were responsible" for the exceedance, no unlawful take occurs. *Id.*

That is what occurred here. Although when the draft 2023 TOP was first published NMFS was skeptical whether extraordinary hydrologic conditions were the "sole" reason flow reductions were necessary, Card. Decl., Ex. L, p. 4, the ITS does not require NMFS to determine that extraordinary hydrologic conditions were the "sole" reason for the inability to meet a surrogate threshold. *See* 2019 NMFS BiOp, p. 268. That NMFS opined Project deliveries "could have" contributed to UKL elevations is also immaterial. Card. Decl., Ex. L, p. 5. NMFS proposed several measures to minimize the potential contributions of Project deliveries, *see ibid.*, which Reclamation incorporated into the final 2023 TOP. *See* Card. Decl., Ex. I, pp. 2–3. There is no suggestion NMFS concluded Project deliveries were the predominant cause of the 2023 flow reductions. On the contrary, the Joint Statement approving the challenged flow reductions identified "persistent and severe drought conditions" as the culprit. *Id.* at p. 1. Unlike the December 2022 letter commenting on the draft 2023 TOP, the Joint Statement made no suggestion that Project deliveries were a significant—let alone predominant—contributing factor. *See* Card. Decl., Ex. I. Further, the 2023 TOP provided that "[i]f the agencies do not concur about needed reductions at the regional level, the issue will be elevated for further discussion and resolution before reductions are made," yet there is no suggestion the issue was elevated so as to suggest a lack of concurrence regarding the needed reductions. *Id.* at 3.

Under these circumstances, Plaintiffs have failed to show they are likely to prevail on their claim that Reclamation's implementation of the 2023 TOP caused unlawful take in violation of Section 9 of the ESA.

**b.      Plaintiffs Have Failed to Show Reclamation's Implementation of the 2023 TOP Violated Section 7's Consultation Requirement**

"Section 7(a)(2) of the ESA requires federal agencies to ensure, in consultation with the appropriate wildlife agency, that any action authorized or carried out by the agency 'is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification' of designated critical habitat." *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 601 (9th Cir. 2014) (quoting 16 U.S.C. § 1536(a)(2)). "The ESA

implementing regulations further require agencies to reinitiate consultation if 'new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered.'" *Id.* (quoting 50 C.F.R. § 402.16(b)).

Plaintiffs have failed to show they are likely to prevail on their claim that Reclamation violated Section 7 by not initiating or re-initiating formal consultation with NMFS prior to implementing the 2023 TOP.  NMFS analyzed the likely effects of the Project's 2019–2024 operations in the 2019 BiOp, *see, e.g.*, 2019 NMFS BiOp, pp. 119, 156, 211–14; *see also id.* at p. 34, and concluded the Project was not likely to cause jeopardy to coho salmon or killer whales.  *Id.* at pp. 1, 266.  After Reclamation and NMFS re-initiated consultation in the winter of 2019, the agencies agreed that an interim operations plan should be developed pending completion of the re-initiated consultation.  Card. Decl., Ex. A, p. 2.  Following inter-agency coordination and consultation with stakeholders, Reclamation developed the IOP.  *Id.* at Ex. C, pp. 1–2.  NMFS approved the IOP and affirmed it was developed in accordance with the 2019 BiOp and its likely effects on listed species were within the scope of effects analyzed in the 2019 BiOp.  *Id.* at Ex. B, p. 2.  The IOP's meet-and-confer provisions were modeled on the 2019 BiOp's FASTA process, and the likely effects of potential adaptive management strategies, including reductions to IGD flows below the minimum rates, were analyzed in the 2019 BiOp.  *See, e.g.*, 2019 NMFS BiOp, pp. 119, 156, 211–14.  Indeed, the 2019 BiOp's incidental take T&Cs not only authorized, but in fact required, Reclamation to develop adaptive management strategies in consultation with NFMS when extraordinary hydrological conditions prevented satisfaction of minimum flow rates.  *Id.* at pp. 280–81; *see also id.* at p. 119.  This is what occurred in 2022 and 2023, as Reclamation and the Services all agree.  *See* Card. Decl., Exs. G, I.  Plaintiffs cannot reasonably contend otherwise.  Nor can Plaintiffs show incidental take thresholds were exceeded so as to require reinitiated consultation.  *See supra* at § IV.A.1.a.  Plaintiffs' claim that Reclamation's implementation of the 2023 TOP violated Section 7's consultation requirement therefore lacks merit.

While Plaintiffs complain that agricultural releases in 2022 necessitated the flow reductions in 2023, Plaintiffs have failed to make any showing that these releases somehow triggered Section 7 consultation requirements.  The 2022 releases were made pursuant to the 2022 AOP.  *See* Souza Decl., ¶ 7.  NMFS reviewed the 2022 AOP and agreed that "water year 2022 is critically dry and the Klamath

Basin is experiencing extraordinary hydrologic conditions," that "Reclamation has taken actions to closely coordinate with the Services consistent with the process outline in terms and Condition 1A of the NMFS 2019 Biological Opinion," that "NMFS analyzed Reclamation's proposed action" and that it was "not likely to result in adverse effects to listed species or critical habitat beyond those considered in NMFS' 2019 Biological Opinion." Card. Decl., Ex. G, pp. 1–2. Plaintiffs do not challenge these determinations nor contend the releases were made contrary to the 2022 AOP or otherwise in a manner likely to cause take in excess of the amounts permitted in the ITS. *See generally* Doc. 1117. As such, there is no basis for concluding the 2022 releases for agriculture somehow triggered Section 7 consultation requirements.[4]

### c.   Plaintiffs Have Failed to Show That Future ESA Violations Are Imminent as a Result of Reclamation's Implementation of the 2023 TOP

The ESA's definition of take encompasses past or current harm, as well as the prospect of an "imminent threat of harm" to a protected species. *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 605 (9th Cir. 2014). Thus, the Ninth Circuit has held that the ESA citizen suit provision provides a cause of action to enjoin "imminent" future violations that are "reasonably certain to occur." *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787 (9th Cir. 1995); see *Pacific Rivers Council v. Brown* (D. Or., Apr. 21, 2003, No. CV 02-243-BR) 2003 WL 21087974, at *3 ("[T]he action to be enjoined [] must be imminent."); see also *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995) (plaintiffs must show "an imminent threat of injury to wildlife" to obtain injunctive relief under the ESA); *Palila v. Hawaii Dept. of Land and Natural Res.*, 852 F.2d 1106, 1109 (9th Cir. 1988); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064 (9th Cir. 1996).

Plaintiffs contend that imminent future ESA violations are "inevitable" due to Reclamation's reduction of flows below the Table 33 minimums pursuant to the 2023 TOP. Doc. 1117, p. 28.

---

[4]     Plaintiffs' motion suggests NMFS violated an alleged duty under 50 C.F.R. § 402 to complete reinitiated consultation in connection with the 2022 agricultural deliveries and the 2023 flow reductions. However, Plaintiffs have brought suit under the ESA's citizen suit provision, (Doc. 1115, ¶ 7), and the ESA's citizen suit provision does not provide a cause of action against NMFS for an alleged "failure to perform [its] duties as administrator of the ESA." *Bennett v. Spear*, 520 U.S. 154, 174 (1997); *Yurok Tribe v. United States Bureau of Reclamation*, 231 F.Supp.3d 450, 460 (N.D. Cal. 2017) ("[T]he Supreme Court has held that Section 1540(g)(1)(A) does not provide a cause of action to sue the Secretary (which includes the Secretary of the Interior, Secretary of Commerce, and their delegate services, such as NMFS) for failure to perform [its] duties as administrator of the ESA.") (internal quotations omitted). Therefore, any such claim must fail.

1    However, Plaintiffs' claim lacks merit.   Beginning April 1, 2023, Reclamation resumed Project

2    operations pursuant to the IOP, and it will continue to operate the Project pursuant to the IOP at least

3    through the 2024 water year, pending completion of the ongoing reinitiated consultation with NMFS.

4    Card. Decl., Exs. D, p. 2, J, p. 5.   Although Reclamation could announce another temporary operating

5    plan containing flow reductions below the Table 33 minimums, it has not done so and Plaintiffs do not

6    contend the agency has made any definitive commitment to implement flow reductions in the future or

7    taken any official action toward that end.

8         Because Plaintiffs have failed to show Reclamation's implementation of flow reductions

9    pursuant to the 2023 TOP violated the ESA, there is no basis for a conclusion that "imminent"

10   future violations are "reasonably certain to occur."   *Forest Conservation Council v. Rosboro Lumber*

11   *Co.*, 50 F.3d 781, 787 (9th Cir. 1995).

12        Even if Plaintiffs could show the 2023 flow reductions violated the ESA, however, the Project

13   is now operating pursuant to the IOP and, according to Plaintiffs, it was Reclamation's ***deviation*** from

14   the IOP that caused unlawful take in violation of the ESA.   Card. Decl., Ex. K, p. 2 ("Had the IOP been

15   followed, it would not have been necessary to propose a direct take of a threatened species by drastic

16   flow reductions"), p. 3 ("It is Reclamation's departure from the IOP that caused this crisis, not an

17   unforeseen drought").   Yet Plaintiffs have not presented any evidence that a new operations protocol

18   will be implemented in the reasonably foreseeable future or that Reclamation has definitively committed

19   to future flow reductions below the Table 33 minimums.

20        Accordingly, Plaintiffs have failed to show "imminent" ESA violations are "reasonably certain

21   to occur" so as to warrant prophylactic injunctive relief.   See *National Wildlife Federation v. Burlington*

22   *Northern R.R., Inc.*, 23 F.3d 1508 (9th Cir. 1994) (plaintiffs failed to show sufficient likelihood of

23   irreparable future injury to ESA protected species based on defendant's possible future acts); *New*

24   *England Anti-Vivisection Society v. United States Fish and Wildlife Service*, 208 F.Supp.3d 142, 174

25   (D.D.C. 2016) (lack of "concrete plans" or "any specification of when" injury will occur "insufficient

26   to establish imminent injury").

27   ///

28   ///

## 2.   <u>Plaintiffs Have Failed to Show This Court Has Jurisdiction</u>

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 (1994).  "They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Ibid.* (internal citations omitted).  "It is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Ibid.* (internal citations omitted).

The Supplemental Complaint asserts that it is "brought pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1)(A), and the Administrative Procedure Act ('APA'), 5 U.S.C. § 706(2)(A)" and that this Court "has jurisdiction pursuant to 16 U.S.C. § 1540(g)(1) and 28 U.S.C. §§ 1331 and 1362." (Doc. 1115, ¶ 7.)  As explained below, Plaintiffs have failed to meet their burden of establishing this Court has jurisdiction to hear the Supplemental Complaint's claims.[5]

### a.   **Plaintiffs Have Failed to Show Article III Standing**

To have standing, a plaintiff must satisfy three elements.  First, the plaintiff must have "suffered an injury in fact." See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Second, there must be a "causal connection" between the alleged injury and the challenged conduct.  *Id.* at 560–561.  And third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 561.

An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Here, Plaintiffs have failed to demonstrate any "concrete and particularized" injury arising from the 2022 allocation to agriculture or the 2023 flow reductions, or any imminent likelihood of future injury.

---

[5]    In addition to the arguments in this Section, this Court also lacks jurisdiction pursuant to the prior exclusive jurisdiction doctrine.  See Doc. 1041, pp. 98–103.  Further, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P., Rule 12(h)(3); see also *O'Donnell v. Wien Air Alaska, Inc.*, 551 F.2d 1141, 1145 n. 3 (9th Cir. 1977) ("[I]t is well settled that the court must dismiss sua sponte at any time its lack of jurisdiction appears by any means").  "A judge . . . may dismiss an action *sua sponte* for lack of jurisdiction." *Franklin v. Oregon*, 622 F.2d 1337, 1344 (9th Cir. 1981) (Emphasis added). Indeed, "if the court lacks subject matter jurisdiction, it is not required to issue a summons or follow the other procedural requirements." *Id.*; see also *Loux v. Rhay*, 375 F.2d 55, 58 (9th Cir. 1967) (Where subject matter jurisdiction was lacking, "it was not within the scope of the Court's authority to do more than note its lack of jurisdiction to proceed further with the case").  Moreover, sua sponte dismissal "may be made without notice where the claimant cannot possibly win relief." *Omar v. Sea-Land Service, Inc.*, 813 F.2d 986, 991 (9th Cir. 1987).  Accordingly, to the extent the Court agrees with KID on any of the jurisdictional arguments set forth herein, the Court may dismiss the Supplemental Complaint sua sponte.

See *supra* at § IV.A.1.c.  Rather, Plaintiffs claims of injury are entirely "conjectural or hypothetical," depending on unfounded assumptions about the cause of the 2023 flow reductions, future hydrologic conditions, and Reclamation's future operational plans.  *Lujan*, 504 U.S. at 560

To establish the requisite "causal connection" between the alleged injury and the challenged conduct, a plaintiff must show that the alleged injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'"  *Id.* at 560–561 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976).  Plaintiffs cannot satisfy this requirement because Plaintiffs cannot show that the alleged harm to listed species was caused by Reclamation's Project operations, as opposed to extreme hydrologic conditions outside Reclamation's control, *see supra* at § IV.A.1.a, or the competing and conflicting demands of the multiple protected species in the Klamath Basin.  See Card. Decl., Ex. I, p. 2 (noting that 2023 flow reductions were needed "in light of extreme uncertainty and potentially conflicting water needs for ESA-listed species in the Basin").  For the same reasons, Plaintiffs cannot show that it is "likely," as opposed to merely "speculative," that the alleged injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 561.

### b.    Plaintiffs' Claims Based on the 2022 Allocation and the 2023 Flow Reductions Are Moot

Article III limits federal court jurisdiction to "cases or controversies."  *Doe v. Madison School Dist. No. 321*, 177 F.3d 789, 797 (9th Cir. 1999).  As such, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Center for Biological Diversity v. Marina Point Development Co.*, 566 F.3d 794, 804 (9th Cir. 2009).  "A claim is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Ibid.*  "The basic question is whether there exists a present controversy as to which effective relief can be granted." *Ibid.*; see also *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006) ("Federal courts lack jurisdiction to consider moot questions").

Plaintiffs' challenge to the 2023 TOP is moot because there is no effective relief this Court can grant to redress the alleged injuries Plaintiffs claim to have suffered as a result of the 2023 TOP's implementation.  According to Plaintiffs, the alleged ESA violations for which they now seek injunctive

relief were caused by Reclamation's implementation of the 2023 TOP and would not have occurred if Reclamation had continued to operate the Project pursuant to the IOP.  *See* Card. Decl., Ex. K, pp. 2–3.

However, the 2023 TOP expired on March 31, 2023.  *See* Card. Decl. Ex. J, p. 3; *see also* Doc. 1117, p. 28.  As of April 1, 2023, Reclamation resumed Project operations pursuant to the IOP, and it will continue to do so at least through the 2024 water year, pending completion of the ongoing reinitiated consultation with NMFS.  Card. Decl., Exs. D, p. 2, J, p. 5.  Because the 2023 TOP is no long in effect, an order directing Reclamation to cease implementation of the 2023 TOP would not provide effective relief to Plaintiffs.  Similarly, an injunction prohibiting Reclamation from delivering water for irrigation unless it complies with the 2019 BiOp and IOP will not provide any effective relief because Reclamation has already committed to implementing the IOP until it completes the current, reinitiated consultation in 2024.  See *San Luis & Delta Mendota Water Authority v. U.S. Dept. of the Interior*, 870 F.Supp.2d 943, 953–958 (E.D. Cal. 2012) (holding that challenge to Reclamation's reduction of water deliveries was mooted by completion of the action where there was no "continuing practice" of ordering such reductions and any "continuing effects" of action could no longer be repaired or mitigated).  Likewise, there is no point ordering Reclamation to consult on the Project's operations under the now-expired 2023 TOP when Reclamation and the Services are already engaged in re-initiated consultation to develop a new, long-term operations plan.  For the same reasons, Plaintiffs' requested declaratory relief would not provide effective relief.  Plaintiffs have not shown "a continuing violation or practice" or that Reclamation is "likely to violate section 7(a)(2) in the near future."  *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 729–30 (10th Cir. 1997); *see supra* at § IV.A.1.c.

### c.      Plaintiffs' Claims Based on Potential Future Flow Reductions Are Unripe

"[T]he ripeness requirement is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33 (1998) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–149 (1967)).  As such, evaluating ripeness requires an analysis of "both the fitness of the issues

1   for judicial decision and the hardship to the parties of withholding court consideration." *Abbott*

2   *Laboratories*, *supra*, 387 U.S. at 149.  In the administrative context, courts are directed to consider:

3   "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention

4   would inappropriately interfere with further administrative action; and (3) whether the courts would

5   benefit from further factual development of the issues presented." *Cottonwood Environmental Law*

6   *Center v. U.S. Forest Service* (9th Cir. 2015) 789 F.3d 1075, 1083–1084 (internal citations omitted).  In

7   the Ninth Circuit, "a claim is fit for decision if the issues raised are primarily legal, do not require further

8   factual development, and the challenged action is final." *Wolfson v. Brammer*, 616 F.3d 1045, 160 (9th

9   Cir. 2010) (internal quotations omitted); see *US W. Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112,

10  1118 (9th Cir. 1999).

11      Plaintiffs' claim that future flow reductions in violation of the ESA are the "inevitable result" of

12  Reclamation's implementation of the 2023 TOP.  However, all three factors of the ripeness analysis

13  weigh strongly against a finding of ripeness.

14      First, judicial intervention would inappropriately interfere with further administrative action due

15  to the ongoing consultations between Reclamation and NMFS to develop a new long-term operations

16  plan for the Project.  As the Ninth Circuit has explained, the "core question" when evaluating ripeness

17  in the administrative context is "whether the agency has **completed** its decisionmaking process." *Ass'n*

18  *of Am. Med. Colleges v. United States*, 217 F.3d 770, 780 (9th Cir. 2000) (emphasis added).  That is not

19  the case here.  As NMFS explained to Reclamation: "Extensive coordination between our agencies is

20  ongoing and includes collaboration over modeling, Project details, potential operations strategies, and

21  expected environmental conditions that will exist leading into, and after, dam removal on the Klamath

22  River." *See* Card. Decl. Exs. E, pp. 1–2, D, p. 2.  If this Court were to prescribe new operations protocols

23  before consultation is completed, it could severely hamstring the expert agencies' ability to develop new

24  operational strategies based on the latest biological and hydrological science.  It could also create

25  bureaucratic momentum against operational strategies precluded or obviated by the requested

26  injunction, such as a negotiated agreement between the parties.  Consequently, this Court should decline

27  to order mandatory injunctive relief until there has been final agency action regarding the Project's

28  future operations.

Significantly, Plaintiffs do not contend that either Reclamation or NMFS "has rendered its last word on the matter" of flow reductions. *Oregon Natural Desert Ass'n v. U.S. Forest Service*, 465 F.3d 977, 984 (9th Cir. 2006). As such, judicial review at this time "will not promote efficacy in the administration" of the ESA. *Gordon v. Norton*, 322 F.3d 1213, 1220 (10th Cir. 2003) (holding that plaintiff's ESA claims were unripe where challenged decision of FWS regarding protected wolves did not constitute "final agency action"). Here, as in *Gordon*, NMFS "has specialized expertise in the conservation and reintroduction of [the protected species] and should be permitted to decide how to appropriately balance the interests of the plaintiffs and the [species'] recovery efforts." *Gordon*, *supra*, 322 F.3d at 1220. Exercising jurisdiction over this case before NMFS has formulated a new or revised biological opinion and before Reclamation has committed to a new operations plan "will only undermine these efforts." *Id.* at 1221; see *Coalition For Sustainable Resources, Inc. v. U.S. Forest Service*, 259 F.3d 1244 (10th Cir. 2001) (holding ESA claims unripe where challenged agency action was not final and resolution "might impede rather than promote efficient administration of the Endangered Species Act").

Second, the Court will benefit substantially from further factual development. Plaintiffs claim is not "purely legal" and therefore "the court must exercise 'greater caution . . . prior to concluding [it] is ripe for review." *Id.* at 1219 (quoting *Coal. For Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1250 (10th Cir. 2001). Indeed, Plaintiff's claim that future flow reductions will inevitably violate Sections 7 and 9 of the ESA involves extremely complicated, disputed factual issues, including whether and to what extent flow reductions actually cause unlawful take of protected species, whether and to what extent new scientific data warrants modifications to NMFS' conservation strategies, the likelihood that Reclamation will implement flow reductions that cause unlawful take in the future, and the feasibility of operational strategies capable of mitigating the Project's impacts on protected species, among other things. Resolution of these factual issues, or at least a meaningful opportunity to develop them through discovery, will vastly improve this Court's ability to render a decision that facilitates, rather than undermines, Reclamation's compliance with applicable law, including the ESA.

Finally, delaying intervention until after there has been some "final agency action" will not cause hardship to Plaintiffs. "To meet the hardship requirement, a litigant must show that withholding review

would result in ***direct and immediate*** hardship." *Wolfson*, *supra*, 616 F.3d at 1060 (emphasis added). Any hardship that was caused by the 2022 allocation to agriculture or the 2023 flow reductions is irrelevant because these claims are moot. See *supra* at § IV.A.2.b. Even if that were not the case, however, any hardship from these events has already occurred and cannot be enhanced or reduced by withholding review until there is final agency action to reduce flows in violation of the ESA. See *National Ass'n of Home Builders v. Norton* 298 F.Supp.2d 68, 80 (D.D.C. 2003), aff'd (D.C. Cir. 2005) 415 F.3d 8. The relevant question is whether "direct and immediate hardship" will result from withholding review until there has been final agency action to implement flow reductions in violation of the ESA and Plaintiffs have made no showing of such hardship. *Wolfson*, *supra*, 616 F.3d at 1060. Instead, Plaintiffs focus exclusively on the harm allegedly caused by the now-expired 2023 TOP. (See Doc. 1117, pp. 30–33.)

Accordingly, Plaintiffs' claims regarding potential future flow reductions are unripe. See *Coal. For Sustainable Res., Inc.*, 259 F.3d at 1250 (ESA citizen suit challenging plan's failure to provide flow needed by endangered species was not ripe where agency had not yet rejected possibility of implementing alternative management techniques, delay was not unreasonable, species were not facing immediate jeopardy, and judicial intervention might have impeded Forest Service's efforts).

### d. This Court Lacks Jurisdiction Under the ESA Citizen Suit Provision

"[T]he ESA citizen suit provision provides a cause of action for ongoing and imminent future violations, but not for wholly past violations." *Yurok Tribe v. United States Bureau of Reclamation*, 231 F.Supp.3d 450, 464 (N.D. Cal. 2017); see *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 58–59 (1987); *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787 (9th Cir. 1995). Assuming *arguendo* Plaintiffs' could show the 2022 agriculture allocation or the 2023 flow reductions violated the ESA, they would be "wholly past violations," which are not actionable under the ESA's citizen suit provision. As to Plaintiffs' concerns regarding future flow reductions, Plaintiffs have not shown any "ongoing" nor "imminent" violations of the ESA that would necessitate the injunctive relief authorized by the ESA citizen suit provision. *Yurok Tribe v. United States Bureau of Reclamation*, 231 F.Supp.3d 345, 464 (N.D. Cal. 2017). Accordingly, this Court lacks jurisdiction to hear Plaintiffs' claims under the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A).

1

**e.    This Court Lacks Jurisdiction Under the Administrative Procedure Act**

To the extent this Court has jurisdiction pursuant to the ESA's citizen suit provision, it cannot also have jurisdiction pursuant to the Administrative Procedure Act ("APA").  See *AquAlliance v. U.S. Bureau of Reclamation*, 287 F.Supp.3d 969, 1062 (E.D. Cal. 2018) ("If a claim falls within the scope of the ESA's citizen suit provision, review under the APA is unavailable and cannot be used as an alternative means to obtain judicial review of a claim that fails to comply with the procedural requirements of the citizen suit provision.").  Regardless, even if there were no other adequate remedy for Plaintiffs' claims, Plaintiffs have failed to allege any "final agency action" sufficient to invoke jurisdiction under the APA.  See 5 U.S.C. § 704.  An agency's failure to initiate or reinitiate consultation under the ESA does not constitute "final agency action" within the meaning of the APA.  See *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1035–1036 (9th Cir. 2007); see also *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) ("final agency action" must "mark the 'consummation' of the agency's decisionmaking process" and "be one by which rights or obligations have been determined, or from which legal consequences will flow").

**B.    Plaintiffs Have Failed to Show the Requested Injunctive Relief Is Warranted**

As explained below, even if Plaintiffs could show a likelihood of success on the merits, they have nevertheless failed to demonstrate they are entitled to the injunctive relief they request.

**1.    Plaintiffs Have Failed to Show Irreparable Harm**

Plaintiffs have not met their burden of showing they suffered irreparable harm as a result of the 2022 allocation to agriculture or the 2023 flow reductions.  See *supra* at § IV.A.1.a–b.  Further, Plaintiffs have not met their burden of showing imminent future harm as a result of future flow reductions in violation of the ESA.  See *supra* at § IV.A.1.c.

**2.    Plaintiffs Have Failed to Show the Balance of Harms Supports the Requested Injunctive Relief**

While "the balance of hardships and the public interest tips heavily in favor of protected species" in ESA cases, that does not mean "courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA."  *Nat'l Wildlife Fed'n.*, 23 F.3d at 1511.  Plaintiffs seek an injunction locking in flow requirements for the benefit of threatened coho salmon and

1    endangered killer whales in a manner that could result in harm to endangered Lost River and Shortnose

2    suckers by reducing UKL elevations below levels specified in the 2023 FWS BiOp.  However, Plaintiffs

3    have failed to show that the alleged benefits to one threatened species and one endangered species

4    outweigh the potential harm to two endangered species, or to explain how Reclamation is to manage

5    UKL releases when supplies are insufficient to satisfy both minimum flows and UKL elevations.  *See*

6    *Humane Soc'y of United States v. Kienzle*, 333 F.Supp.3d 1236, 1240 (D.N.M. 2018) (ESA provides

7    "various levels of protection depending upon how a species is classified" with "endangered" species

8    being "entitled to the highest level of protection").[6]  Moreover, where, as here, the net benefits to

9    protected species are uncertain, the Court should give heightened consideration to the certain and severe

10   adverse effects the requested injunction will cause on agricultural communities.  *See* Card. Decl., Ex.

11   M, pp. 36–38.

12            3.     **The Requested Injunction Is Overbroad, Unenforceable, and Fails to**

13                   **Redress the Alleged Irreparable Harm**

14            Plaintiffs have failed to show they are likely to prevail in demonstrating a violation of the ESA.

15   However, even if they could make the requisite showing, any such violation would be de minimus and

16   therefore would not warrant injunctive relief.  See *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311

17   (1982).  Further, Plaintiffs have not presented any evidence that minimum flows are required in every

18   month of the year to avoid jeopardy to protected species.  Indeed, such a conclusion is contrary to the

19   2019 NMFS BiOp's findings, which only required minimum flows in March through September.  2019

20   NMFS BiOp, Table 33.  Additionally, Plaintiffs have failed to show the requested injunction will redress

21   the harm they allegedly suffered.  Contrary to Plaintiffs' contentions, many agricultural water users,

22   including KID, operate the Project facilities that divert water from UKL for agricultural use and they do

23   not require Reclamation's approval or assistance to do so under their respective contracts.  They also

24   have adjudicated water rights under Oregon state law that Reclamation is obligated to respect in carrying

25   out its duties under the Reclamation Act.  *See* 43 U.S.C. § 383; *see also* Doc. 1041, pp. 81–96.  As a

26

27   [6]      Because Plaintiffs seek relief that could harm Lost River and shortnose suckers, FWS is a necessary party under
     F.R.C.P. Rule 19, as are the tribes with cultural interests in these species.  Consequently, the Court should order these parties

28   joined before ruling on Plaintiffs' motion.  To the extent any necessary parties are also indispensable, the case should be
     dismissed.

result, prohibiting Reclamation "from providing deliveries of water from UKL for irrigation" will not prevent reduced flows caused by agricultural diversions.  Doc. 1117, p. 28.  Additionally, Plaintiffs have failed to show that the requested injunction would redress the alleged harm given the competing and sometimes conflicting needs of Lost River and Shortnose in UKL.  Finally, Plaintiffs' requested injunction is unenforceable.  Plaintiffs request this Court to "prohibit Reclamation from providing deliveries of water from UKL for irrigation unless Reclamation can meet its full ESA obligations" as specified.  *Ibid.*  Plaintiffs decline to explain, however, how it will be determined that "Reclamation can meet its full ESA obligations" so as to permit deliveries for irrigation given the reliability of weather forecasts, predictions about species' behavior, the possibility of unforeseen events, and other real-time conditions affecting Project operations.  *Ibid.* Nor how the agency would address conflicting needs among protected species when supplies are insufficient to meet their needs.

## C.    The Court Should Abstain From Exercising Jurisdiction

The Court should abstain from exercising jurisdiction under the *Burford* abstention doctrine.  *See* Doc. 1040, pp. 31–32.  *Burford* abstention is required here.  A request for an injunction is an action in equity.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).  Plaintiffs' claims present difficult questions of state law bearing on policy problems of substantial public import that transcend this particular case.  Specifically, Plaintiffs' claim under Section 7 of the ESA presents difficult questions regarding the nature and effect of water rights under Oregon state law.  The Oregon state legislature addressed these difficult policy questions when it established a statutory process for comprehensive water rights adjudications.  *See* ORS §§ 539.130(4), 539.170, 540.210, 540.720.  Further, the nature and effect of water rights under Oregon state law are inextricable from the ESA claims at issue in this case.[7] Finally, federal review will obviously disrupt state efforts to establish a coherent policy.  Indeed, it already has.  Significantly, there is no question of preemption in this case and, unlike previous cases, the Plaintiffs here do ask the Court to decide "'who is entitled to how much water.'" (Doc. 1102, p. 16

---

[7]       Section 7's "no-jeopardy duty covers only *discretionary* agency actions and does not attach to actions . . . that an agency is required by statute to undertake once certain specified triggering events have occurred." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) (emphasis added).  And pursuant to Section 8 of the Reclamation Act, "in carrying out the provisions of this Act," Reclamation "*shall* proceed in conformity" with Oregon state law "relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder." 43 U.S.C. § 383 (emphasis added).  Thus, whether Reclamation's Project operations are discretionary so as to require compliance with Section 7 of the ESA turns on the nature and effect of water rights under Oregon state law.  The federal issue is therefore inextricably intertwined with complex state law issues.

1  (quoting *U.S. v. Morros*, 268 F.3d 695, 705 (9th Cir. 2011).)  Plaintiffs seek an injunction ordering

2  Reclamation to provide specific amounts of water at specific times for specific purposes, even when

3  other users such as KID are entitled to that water under Oregon state law.

4      The Court should also abstain from exercising jurisdiction under *Colorado River Water*

5  *Conservation District v. United States*, 424 U.S. 800 (1976).  As this Court has previously considered a

6  request from KID to abstention under *Colorado River*, in the interest of efficiency KID will only analyze

7  the *Colorado River* factors to the extent the analysis in this case is materially different from KID's

8  previous analysis.  *See* Doc. 1040, pp. 10–23.

9      This case is "substantially similar" to the KBA currently pending in Klamath County Circuit

10  Court.  Although the legal issues are different, in both cases the relief sought—i.e., rights to receive a

11  specific quantities of water at specific times with specific priorities—is functionally equivalent and both

12  involve substantially the same parties.  The Plaintiffs could have, and should have, asserted a claim for

13  a right to use water stored in UKL for instream purposes in the KBA.  *See United States v. Oregon*, 44

14  F.3d 758, 768 (9th Cir. 1994).  However, they declined to do so, preferring to litigate their claims in a

15  California federal court under the guise of enforcing the ESA.  Even so, any rights held by the Yurok

16  Tribe could have, and should have, been defended by the federal government in the KBA,

17  notwithstanding the tribe's absence.  *See Colorado River*, 424 U.S. at 812.

18      The fifth factor—"whether state or federal law controls"—is neutral.  This case requires

19  consideration of both federal and state law, and these issues are inextricably intertwined.  *See supra*.

20  **V.**  **CONCLUSION**

21      For the reasons stated above, KID respectfully requests that this Court deny Plaintiffs' motion

22  for preliminary injunction.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    Dated: April 14, 2023                   WANGER JONES HELSLEY PC

2

3                                  By: __/s/ *Nicolas R. Cardella*_____

4                                       John P. Kinsey
                                          Nicolas R. Cardella

5                                          Attorneys for KLAMATH IRRIGATION
                                          DISTRICT

6

7                                   RIETMANN LAW, P.C.

8                                   By: __/s/ *Nathan R. Riemann*_____
                                          Nathan R. Rietmann,

9                                          Attorneys for KLAMATH IRRIGATION
                                          DISTRICT

10                                          *Pro hac vice*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28