TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

ROBERT P. WILLIAMS, Senior Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: 202-307-6623; Fax: 202-305-0275
Email: robert.p.williams@usdoj.gov

THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233; Fax: 303-844-1350
Email: thomas.snodgrass@usdoj.gov

***Attorneys for Federal Defendants and
Cross-Claimant United States***

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF RECLAMATION and NATIONAL MARINE FISHERIES SERVICE, <br><br> Defendants, <br><br> and <br><br> KLAMATH WATER USERS ASSOCIATION, THE KLAMATH TRIBES, and KLAMATH IRRIGATION DISTRICT, <br><br> Intervenor-Defendants <br><br> UNITED STATES OF AMERICA, <br><br> Cross-Claimant, | Case No. 3:19-cv-04405-WHO <br><br> (Related Case No. 3:16-cv-04294-WHO) <br> (Related Case No. 3:16-cv-06863-WHO) <br><br> **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (ECF 1117)** <br><br> DATE:  May 10, 2023 <br> TIME: 2:00 p.m. <br> LOCATION: Videoconference <br><br> Judge:  Honorable William H. Orrick |

YUROK TRIBE, PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS, and INSTITUTE FOR
FISHERIES RESOURCES,

and

HOOPA VALLEY TRIBE,

Joined as Cross-Claimants,

v.

KLAMATH WATER USERS ASSOCIATION
and OREGON WATER RESOURCES
DEPARTMENT,

Crossclaim-Defendants,

and

KLAMATH IRRIGATION DISTRICT,

Intervenor-Defendant.

KLAMATH WATER USERS ASSOCIATION,

Counterclaimant,

v.

UNITED STATES OF AMERICA,

Counterclaim-Defendant.

OREGON WATER RESOURCES
DEPARTMENT,

Counterclaimant,

v.

UNITED STATES OF AMERICA,

Counterclaim-Defendant.

# TABLE OF CONTENTS

**PAGE**

I.  Introduction .................................................................................................................... 1

II. Standards of Review ........................................................................................................ 6

    A. Preliminary Injunction ............................................................................................... 6

    B.  Merits ......................................................................................................................... 6

III. Factual Background ......................................................................................................... 7

    A. The Klamath Project and Reclamation's Competing ESA Obligations for Affected Species in UKL and the Klamath River ...................................................... 7

    B. Reclamation's ESA Compliance at the Klamath Project ........................................... 8

    C. In-Season Adaptive Management of Klamath Project Operations Due to Extraordinary Drought Conditions ......................................................................... 10

IV. Argument ....................................................................................................................... 11

    A. Plaintiffs Are Not Likely to Succeed on the Merits of their Claims ......................... 11

        1. Plaintiffs' Supplemental Complaint is Moot ...................................................... 11

        2. The Supplemental Com[laint Seeks to Favor Salmon Over Suckers .................. 18

        3. The 2023 TOP Complied with the BiOps, ITSs, and the ESA ........................... 20

    B. Plaintiffs Fail to Show a Likelihood of Irreparable Harm ......................................... 23

    C. Plaintiffs Fail to Satisfy the Balance of the Equities and Public Interest Prongs ...... 25

V.  Conclusion ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE**

*Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123 (N.D. Ala. 2006) ........................................ 22

*Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84 (D.D.C. 2000) ........................................................ 16

*Burke v. Barnes*, 479 U.S. 361 (1987) ........................................................................................ 12

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ...................................................................... 16

*Conyers v. Reagan*, 765 F.2d 1124 (D.C. Cir. 1985) .................................................................. 11

*Del Monte Fresh Produce N.A. v. United States*, 706 F. Supp. 2d 116 (D.D.C. 2010) ................. 16

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) ............................................... 25

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir. 2003) ........................................ 13

*Garcia v. Google*, 786 F.3d 733 (9th Cir. 2015) ........................................................................ 23

*Grand Canyon Trust v. U.S. Bureau of Recl.*, 691 F.3d 1008 (9th Cir. 2012) ............................... 6

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49 (1987) .............................. 16

*In re: Operation of the Missouri River Sys. Litig.*, 363 F. Supp. 2d 1145 (D. Minn. 2004) ........... 22

*Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150 (D. Or. 2018) ............................................. 6

*Klamath Tribes v. U.S. Bureau of Recl.*, 537 F. Supp. 3d 1183 (D. Or. 2021) ...................... passim

*Klamath Tribes v. U.S. Bureau of Recl.* No. 18-cv-03078-WHO,
  2018 WL 3570865 (N.D. Cal. July 25, 2018) ......................................................................... 15

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) .............................................................. 15, 16

*Marlyn Nutraceuticals v. Mucos Pharma*, 571 F.3d 873 (9th Cir. 2009) ...................................... 6

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) .................................................................. 7

*McDermott v. Ampersand Publ'g*, 593 F.3d 950 (9th Cir. 2010) ................................................ 24

*Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024 (9th Cir. 2010) .......................................... 7

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ......................................... 6, 9, 14

*Munaf v. Geren*, 553 U.S. 674 (2008) ........................................................................................ 6

*Nat'l Min. Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007 (D.C. Cir. 2001) .................................. 13

*Nat'l Wildlife Fed. v. NMFS*, 422 F.3d 782 (9th Cir. 2005) .......................................................... 14

*Noem v. Haaland*, 41 F.4th 1013 (8th Cir. 2022) .......................................................................... 17

*Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004) .......................................................... 16

*Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889 (D. Or. 2012) ............................................... 17

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
    No. 04–3096–PA, 2007 WL 1072112 (D. Or. Apr. 3, 2007) .................................................... 12

*People Who Care v. Rockford Bd. of Educ., School Dist.* No. 205, 111 F.3d 528 (7th Cir. 1997) .................. 14

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410 (9th Cir. 1990) ...................... 24

*Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996) ............................................................................ 13

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*,
    499 F.3d 1108 (9th Cir. 2007) .............................................................................................. 6

*Rio Grande Silvery Minnow v. Bureau of Recl.*, 601 F.3d 1096 (10th Cir. 2010) .................. 11, 12, 15, 16

*River Runners for Wilderness v. Martin*, 593 F.3d 1064 (9th Cir. 2010) ........................................ 7

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014) ............................ 7

*Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 611 F.3d 483 (9th Cir. 2010) ................ 24

*Yurok Tribe v. U.S. Bureau of Recl.* No. 19-CV-04405-WHO,
    2020 WL 2793945 (N.D. Cal. May 29, 2020) ............................................................... 3, 19, 25

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .......................................................... 6, 10, 24

**STATUTES**

5 U.S.C. § 706 ............................................................................................................................ 6
5 U.S.C. § 706(1) ....................................................................................................................... 6
16 U.S.C. § 1531(b) ................................................................................................................. 25
16 U.S.C. § 1533(d) ........................................................................................................... 19, 25
16 U.S.C. § 1536(a)(2) ....................................................................................................... 19, 25
16 U.S.C. § 1536(o)(2) ....................................................................................................... 22, 25
16 U.S.C. § 1540(g)(1)(A) ........................................................................................................ 15

**RULES**

Fed. R. Civ. P. 65(d)(1)(B) ....................................................................................................... 13

## FEDERAL REGULATIONS

50 C.F.R. § 223.203 ............................................................................................................... 19, 25
50 C.F.R. § 402.14 ...................................................................................................................... 23
50 C.F.R. § 402.14(i)(4) ............................................................................................................. 12
50 C.F.R. § 402.16(a)(1) ............................................................................................................ 12

## FEDERAL REGISTER

53 Fed. Reg. 27,130 (July 18, 1988) ............................................................................................ 7
62 Fed. Reg. 24,588 (May 6, 1997) .............................................................................................. 7
64 Fed. Reg. 24,049 (May 5, 1999) .............................................................................................. 7
69 Fed. Reg. 76,673 (Dec. 22, 2004) ........................................................................................... 7
70 Fed. Reg. 69,903 (Nov. 18, 2005) ........................................................................................... 7
77 Fed. Reg. 73,740 (Dec. 11, 2012) ........................................................................................... 7

1    **I.      Introduction**

2          Plaintiffs have filed a supplemental complaint challenging temporary operating procedures

3    that the U.S. Bureau of Reclamation ("Reclamation") authorized at the Klamath Project between

4    January and March 2023 (the "2023 TOP") in response to excessively dry hydrological conditions

5    that were present in the Klamath Basin at that time.  The express purpose of the 2023 TOP was to

6    meet Endangered Species Act ("ESA") requirements by ensuring that Upper Klamath Lake ("UKL")

7    reached an elevation of 4,142 feet by April 1, which was required for sucker spawning, and also

8    providing an additional 0.4 feet of volume for a required surface flushing flow in April for salmon in

9    the Klamath River.  During historically severe drought conditions in the Klamath Basin, prior to the

10   2023 TOP, the required sucker spawning elevation had not been met for three years running (2020-

11   2022), and Reclamation had not been able to implement full flushing flows in those years either.

12   Given the precarious status and low population numbers of endangered suckers in UKL and the

13   consecutive years of not sustaining the required spawning level, as well as the prevalence and

14   deleterious effects of *C. shasta* disease on salmon in the Klamath River, Reclamation developed the

15   2023 TOP to prioritize achieving the required UKL elevation by April 1.

16         In a February 13, 2023 joint coordination plan, Reclamation, the National Marine Fisheries

17   Service's ("NMFS"), and the U.S. Fish & Wildlife Service ("FWS") stated that, "in light of extreme

18   uncertainty and potentially conflicting water needs for ESA-listed species in the Basin," it was

19   appropriate under the 2023 TOP to "reduce Iron Gate Dam minimum flows from the currently-

20   provided minimums specified in the NMFS biological opinion ["BiOp"] by 11 percent effective

21   February 14, 2023, in order to increase the likelihood of filling Upper Klamath Lake to meet USFWS

22   [BiOp] minimums for listed sucker fish," with additional adjustments possible based on River

23   monitoring and hydrology updates.  ECF 1116-2 at 10 of 589.  Flows were nominally reduced under

24   the 2023 TOP by an additional 5% on February 25, 2023; however, this resulted in virtually no actual

25   change in flow volume because the minimum BiOp base flows increase on March 1.  Flows remained

26   at this level until March 14, 2023, when TOP operations ceased.  The 2023 TOP allowed no Project

27   irrigation while it was in effect, and Reclamation has otherwise delayed the start of Project irrigation

28   this year from the typical April 1 start date to at least May 1 to preserve UKL elevation.  Reclamation

developed the 2023 TOP in accordance with the long-term operations plan for the Project (the "2018 Plan/2020 IOP"), and the Services' associated BiOps and incidental take statements ("ITSs"), which contemplated adaptive management where Reclamation could not fully and simultaneously meet all ESA requirements. The 2023 TOP relied upon real-time adaptive management, input from Basin stakeholders, conferral with Tribes, and monitoring to appropriately manage risk in light of uncertainty.

On the basis of their challenge to the 2023 TOP, Plaintiffs seek a preliminary injunction that would effectively amount to a programmatic court-ordered directive to "manage irrigation deliveries more conservatively." ECF 1117 at 21. Plaintiffs ask the Court to: (1) impose a blanket ban against any Project irrigation unless and until Reclamation can guarantee that it will fully and simultaneously meet all ESA obligations; and (2) impose a September 30 end of season UKL elevation of 4,139.2 feet, more than a foot over the minimum elevation specified in FWS' BiOp and ITS. Plaintiffs' motion must be denied, as Plaintiffs cannot meet their heavy burden to justify these extraordinary requests. Initially, Plaintiffs have no likelihood of success on the merits because they are pursuing claims that are moot. The 2023 TOP has expired under its own terms, the particular hydrologic conditions that prompted it have passed, and Reclamation has returned to implementing its scheduled operations under the 2018 Plan/2020 IOP, consistent with the governing BiOps and ITSs. Plaintiffs do not contend that Reclamation is currently violating the ESA and they make no showing that Reclamation is likely to reduce Klamath River flows below BiOp minimums again in the foreseeable future. Thus, no relief is appropriately available on Plaintiffs' claims. Plaintiffs cannot avoid the mootness of their challenge to the inoperative 2023 TOP by requesting a preliminary injunction that is wholly untethered to the TOP, as such an injunction is not appropriately available relief on their claims. Injunctions must be narrowly tailored to remedying or redressing the legal violation alleged, and they also must be sufficiently detailed as required by Federal Rule of Civil Procedure 65. Here, Plaintiffs' requested injunctions are not narrowly tailored to any alleged deficiency in the 2023 TOP, but rather seek vague and programmatic relief that is not appropriately available. As Plaintiffs' supplemental complaint is moot, the Court should deny the preliminary injunction request on this basis alone and proceed no further.

Regardless, Plaintiffs' attack on the 2023 TOP is not likely to succeed on the merits. Fundamentally, Plaintiffs' supplemental complaint fails because it implicitly asks this Court to declare that, when Reclamation was forced to choose between meeting minimum river flows for salmon or lake elevations for suckers, it was required to choose minimum flows. This claim has no basis in law. This Court and the District of Oregon have rightfully rejected previous requests by Plaintiffs and by the Klamath Tribes to either favor salmon over suckers or vice versa. In denying Plaintiffs' attempt to override Reclamation's operational decisions to protect suckers in 2020, this Court observed that:

> [W]ater in the UKL is dangerously low, threatening endangered suckers. Water allocated to irrigation has been significantly reduced. [] That requires the Bureau to exercise its discretion under the Interim Plan to address these competing needs, especially those of *all* [ESA-listed] species, in a reasonable and informed way. The Yurok Tribe may disagree with the Bureau's decision, but that disagreement does not provide grounds to lift the stay.

*Yurok Tribe v. U.S. Bureau of Recl.*, No. 19-CV-04405-WHO, 2020 WL 2793945, at *5 (N.D. Cal. May 29, 2020) (internal citation omitted). Similarly, the District of Oregon found in 2021 that the Klamath Tribes are not likely to succeed on the merits of their claims that Reclamation's 2021 TOP should have favored the needs of suckers over salmon. *Klamath Tribes v. U.S. Bureau of Recl.*, 537 F. Supp. 3d 1183 (D. Or. 2021) ("*Klamath Tribes I*").[1] These holdings apply with full force here. Plaintiffs disagree with Reclamation's decision to reduce several weeks of winter/early spring river flows for salmon to preserve water in UKL for sucker spawning and a spring flushing flow for salmon, but Reclamation did so in a reasonable and informed way to best meet the needs of all listed species, in coordination with the Services, which the BiOps and ITSs allow.

Plaintiffs' claims that the 2023 TOP violated Sections 7 and 9 of the ESA lack merit, as Reclamation's operations complied with the terms and conditions of the Services' ITSs. Term and Condition 1c ("Term 1c") of FWS' 2020 ITS required Reclamation to monitor UKL elevations for any decrease in elevation outside of the requisite boundary conditions and, if such a decrease occurred, to determine the causative factors and immediately confer with FWS to adaptively manage and take corrective actions. Term and Condition 1A ("Term 1A") of NMFS' ITS similarly required

---

[1] A summary judgment hearing in *Klamath Tribes I* is scheduled for April 18, 2023, and a summary judgment hearing is set for April 25, 2023 in a second case filed by the Klamath Tribes in the District of Oregon challenging the 2022 TOP ("*Klamath Tribes II*").

1    Reclamation to immediately notify NMFS and confer to determine the causative factors if minimum

2    Klamath River flows were projected to not be met.  Reclamation followed these requirements and

3    reasonably developed the 2023 TOP to meet ESA requirements.  The ITS provisions required in-

4    season conferral with the Services on how to best respond to changing hydrology, not completion of

5    new consultations as Plaintiffs contend.  Indeed, the District of Oregon rejected a similar argument

6    by the Klamath Tribes in *Klamath Tribes I* that Reclamation was required to complete reinitiated

7    consultation before it could implement the 2021 TOP.  537 F. Supp. 3d at 1191.

8            Plaintiffs' complaints regarding preceding irrigation allocations in the summer, fall, and winter

9    of 2022 are immaterial to the lawfulness of the 2023 TOP and otherwise lack merit.  Operational

10   decisions from 2022 were separate, completed agency actions that are not challenged in the

11   supplemental complaint and do not bear on whether it was reasonable to implement the 2023 TOP

12   as conditions existed in January 2023.  Moreover, summer 2022 operations are immaterial here as

13   they left UKL *higher than was required* in the 2018 BA/2020 IOP and FWS' BiOp and ITS at the end of

14   the irrigation season on September 30, 2022.  The reason Reclamation projected UKL would not

15   reach the requisite April 1 elevation despite having exceeded the September 30 end of season

16   elevation was due to ensuing historically dry conditions and low inflows to UKL, which Plaintiffs

17   themselves acknowledge "were among the lowest on record since the Dust Bowl in the 1920s."  ECF

18   1117 at 21.  The authorized Project irrigation diversions that occurred between October 2022 and

19   January 2023 were those scheduled under the 2018 Plan/2020 IOP and analyzed in the Services' no

20   jeopardy BiOps and ITSs.  Notably, Reclamation maintained minimum Klamath River flows per the

21   NMFS BiOp and ITS throughout all of 2022.  Plaintiffs criticize Reclamation – with the benefit of

22   hindsight – for not having deviated from scheduled operations in the fall and winter of 2022 at the

23   same time they contend that Reclamation was prohibited from deviating from scheduled operations

24   via the 2023 TOP.  Plaintiffs cannot logically maintain both arguments.

25           Though Plaintiffs challenge the 2023 TOP, their true complaint appears to be with the end of

26   season elevation in FWS' BiOp and ITS, which Plaintiffs effectively ask this Court to override even

27   as they do not challenge the BiOp or ITS.  Plaintiffs may prefer a more conservative overall approach

28   to Klamath Project operations, but a court decree, much less a preliminary injunction, is not the

1    appropriate means to effectuate such a programmatic change.  Any changes in Project operations to

2    ensure ESA compliance should be made through the proper administrative process.  Moving

3    forward, Reclamation plans to operate the Klamath Project under the 2018 Plan/2020 IOP through

4    the end of September 2024, at which time it anticipates concluding new consultations with FWS and

5    NMFS on a new long-term operations plan that will include consideration of significant changes to

6    the Klamath River with removal of four dams on its mainstem below the Project.  Prior to that,

7    Reclamation intends to complete reinitiated consultations with FWS by September 30, 2023 and

8    NMFS by March 31, 2024, when their current BiOps are each set to expire, respectively.  These

9    consultations can address any operational changes that may be deemed necessary.

10        Plaintiffs fail the irreparable harm prong of the preliminary injunction test for much the same

11   reason that their supplemental complaint is moot.  Plaintiffs can show no likelihood of harm from

12   the agency action they challenge – the 2023 TOP – as it is expired.  To that end, Plaintiffs' claims of

13   irreparable harm are backwards looking, focusing on past harms allegedly incurred while the 2023

14   TOP was in effect.  The law, however, requires Plaintiffs to show that irreparable harm is likely to

15   occur absent the injunction *in the future*.  Conspicuously absent is a showing that Klamath River flows

16   are *likely* to be reduced below minimums in the future unless Plaintiffs' requested injunction is

17   granted.  Plaintiffs would have the Court impose their sweeping injunction in the absence of any

18   continuing effects of the 2023 TOP and even though Reclamation is presently in full compliance with

19   the Services' BiOps and ITSs, as an insurance policy against the mere *possibility* that Reclamation

20   could reduce river flows below minimums in 2024.  On its face, this theory fails to carry Plaintiffs'

21   burden.  The Supreme Court has made it clear that a preliminary injunction cannot issue based on

22   mere speculation regarding possible future events.

23        Lastly, the balance of the equities and the public interest prongs weigh against Plaintiffs'

24   requested injunction, as it is predicated on Plaintiffs' attempt to invalidate the 2023 TOP, which

25   sought to balance the competing needs of listed species rather than to elevate non-ESA objectives

26   over the needs of suckers and salmon.  Plaintiffs' assertion that the Ninth Circuit weighs these factors

27   in favor of protecting listed species is misplaced here considering Plaintiffs' underlying legal claims.

28

1    **II.     Standards of Review**

2         **A.   Preliminary Injunction**

3         A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as

4    of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citations omitted); *Winter v. Nat. Res. Def.*

5    *Council*, 555 U.S. 7, 24 (2008). "It is not enough for a court considering a request for injunctive relief

6    to ask whether there is a good reason why an injunction should *not* issue; rather, a court must

7    determine that an injunction *should* issue under the traditional four-factor test." *Monsanto Co. v.*

8    *Geertson Seed Farms*, 561 U.S. 139, 158 (2010). The four-factor test requires the moving party to show

9    that "he is likely to succeed on the merits [of his claims], that he is likely to suffer irreparable harm in

10   the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction

11   is in the public interest." *Winter*, 555 U.S. at 20. "[T]he already high standard for granting a

12   preliminary injunction is further heightened when the type of injunction sought is a 'mandatory

13   injunction.'" *Innovation L. Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1156 (D. Or. 2018) (citation omitted).

14   A mandatory injunction goes "well beyond simply maintaining the status quo" and is "particularly

15   disfavored" and "not issued in doubtful cases." *Marlyn Nutraceuticals v. Mucos Pharma*, 571 F.3d 873,

16   878-79 (9th Cir. 2009) (citation omitted).

17        **B.   Merits**

18        Plaintiffs' supplemental complaint is subject to review under the standards of the

19   Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See, e.g.*, *Grand Canyon Trust v. U.S. Bureau of*

20   *Recl.*, 691 F.3d 1008, 1016 (9th Cir. 2012) ("We review Reclamation and FWS's compliance with the

21   ESA . . . under the standard set forth in the APA") (citation omitted). Thus, to show a likelihood of

22   success, Plaintiffs must show that the 2023 TOP was "arbitrary, capricious, an abuse of discretion, or

23   otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A). To do so, Plaintiffs must overcome

24   the APA's standard of review, which is "highly deferential, presuming the agency action to be valid

25   and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action*

26   *Legal Fund United Stockgrowers of Am. v. USDA*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citation omitted).

27        The Ninth Circuit has affirmed the narrow and deferential nature of the APA standard,

28   noting that it sets a "high threshold" to establish that agency action or inaction is unlawful. *River*

1   *Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010) (per curiam) (citation omitted).

2   The court's role is "not to make its own judgment" on the matters considered and resolved by the

3   agency, as the standard of review "does not allow the court to overturn an agency decision because it

4   disagrees with the decision." *Id.* at 1070. Rather, "an agency must have discretion to rely on the

5   reasonable opinions of its own qualified experts even if, as an original matter, a court might find

6   contrary views more persuasive." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). "Where

7   the agency has relied on 'relevant evidence [such that] a reasonable mind might accept as adequate to

8   support a conclusion,' its decision is supported by 'substantial evidence.'" *San Luis & Delta-Mendota*

9   *Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted). Courts must uphold a

10  reasonable agency action "even if the administrative record contains evidence for and against its

11  decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010).

12  **III.    Factual Background**

13          **A. The Klamath Project and Reclamation's Competing ESA Obligations for Affected**
              **Species in UKL and the Klamath River**

14

15          The Klamath Project is a complex federal water management project located in southern

16  Oregon and northern California operated by Reclamation. The main source of water used in the

17  Project comes from UKL, a shallow, naturally occurring lake located in Oregon. Due to its size and

18  depth, the lake has limited capacity. UKL is inhabited by populations of the shortnose sucker and

19  the largest remaining population of the Lost River sucker, both of which are listed as endangered

20  throughout their range. 53 Fed. Reg. 27,130 (July 18, 1988). UKL and its tributaries are designated

21  critical habitat for the species. 77 Fed. Reg. 73,740 (Dec. 11, 2012).

22          Additionally, the Klamath River and its tributaries in California are inhabited by the Southern

23  Oregon/Northern California Coast ("SONCC") coho salmon, listed as threatened. 62 Fed. Reg.

24  24,588 (May 6, 1997). Most of the Klamath River below Iron Gate Dam is designated critical habitat

25  for the coho salmon. 64 Fed. Reg. 24,049 (May 5, 1999). Chinook salmon that inhabit the Klamath

26  River, though not listed under the ESA, are a primary prey species for the Southern Resident killer

27  whale, listed as endangered. 70 Fed. Reg. 69,903 (Nov. 18, 2005); 69 Fed. Reg. 76,673 (Dec. 22,

28  2004). Habitat needs of Chinook salmon are similar to those of SONCC coho salmon, and the

1   species are impacted similarly by flows in the Klamath River.

2          FWS is the ESA consulting agency for the two species of suckers in UKL, and NMFS is the

3   consulting agency for the SONCC coho salmon and the killer whale.  Dating to the early 2000s,

4   Reclamation has completed a series of ESA Section 7 consultations with NMFS and FWS on

5   successive operations plans for the Klamath Project.  Depending on water supply in a given year,

6   suckers can have countervailing needs to those of the SONCC coho salmon and killer whale.

7   Generally speaking, water released from Link River Dam (located at the southern end of UKL) flows

8   into the Klamath River.  Salmon populations in the river and, in turn, killer whales in the ocean, are

9   affected by downstream flows in the Klamath River, which in turn are affected by Project operations

10  at Link River Dam, particularly the stretch beginning at Iron Gate Dam.  Diverting from UKL for

11  irrigation or releasing water from UKL through Link River Dam to increase Klamath River flows for

12  salmon lowers UKL levels for suckers.

13      **B.  Reclamation's ESA Compliance at the Klamath Project**

14          Reclamation completed reinitiated ESA consultation with the Services on the 2018 Plan in

15  early 2019, receiving separate BiOps that concluded operations under the 2018 Plan were not likely to

16  jeopardize the continued existence of any listed species or to destroy or adversely modify designated

17  critical habitat.  Each BiOp was accompanied by an ITS exempting anticipated incidental takes

18  caused by otherwise lawful Project operations in accordance with the specified terms and conditions.

19  Regarding Klamath River flows for salmon, the 2018 Plan includes an Environmental Water Account

20  ("EWA") with a minimum of 400,000 AF of water to be used to support minimum average daily

21  flows below Iron Gate Dam on the Klamath River (407,000 in even numbered years), namely 950

22  cubic feet per second ("cfs") in January and February, 1,000 cfs in March, 1,325 cfs in April, 1,175 cfs

23  in May, and 1,025 cfs in June.  NMFS BiOp at 26.  In addition, the 2018 Plan provides approximately

24  50,000 AF within the EWA (in years with March 1/April 1 EWA less than 576,000 AF) that can be

25  shaped as a "surface flushing flow" or in another manner that NMFS determines best meets SONCC

26  coho salmon needs.  The objective of a surface flushing flow is to disturb surface sediment along the

27  river bottom and disrupt the life cycle of *Manayunkia speciose* (a worm species), which is a secondary

28  host for the *C. shasta* parasite.  The *C. shasta* parasite is central to salmonid disease dynamics in the

    Klamath River.  The NMFS ITS uses the minimum flows for March-September as a surrogate for the

amount and extent of exempted incidental take.  *Id.* at 267-69, 280-81.

Shortly after the 2018 Plan and the 2019 BiOps and ITSs were issued, Plaintiffs initiated the instant litigation in July 2019 by challenging the Plan and NMFS' 2019 BiOp and ITS and asking the Court to order Reclamation to provide greater flows for the Klamath River.  In October 2019, Plaintiffs moved for a preliminary injunction; however, in March 2020, the parties agreed to stay the case out of deference to Reclamation's second reinitiated ESA consultation on a new long-term operations plan to supersede the 2018 Plan, and contingent on Reclamation's supplementation of the 2018 Plan with the 2020 IOP, which provided additional Klamath River flows via "augmentation" of the EWA in certain specified conditions.

NMFS determined in April 2020 that the 2020 IOP would result in effects consistent with its effects analysis in the 2019 BiOp and ITS.  However, in light of the changes to the 2018 Plan via the 2020 IOP, FWS issued a replacement BiOp in April 2020 that analyzed the effects of the changed operations on suckers and their designated critical habitat.  FWS' 2020 BiOp concluded that operating the Project consistent with various specified "boundary elevations" in UKL was not likely to jeopardize the continued existence of suckers or destroy or adversely modify their critical habitat. FWS issued an ITS along with its new BiOp, which exempted incidental take of suckers caused by Project operations that were consistent with the specified terms and conditions.  Chief among those conditions was operating the Project to avoid UKL surface elevations below: (1) 4,142 feet in April or May in two consecutive years or any year in which EWA augmentation is provided under the 2020 IOP, or below the corresponding April or May elevations observed in 2010 (which was a particularly dry year and is considered a benchmark in the BiOp); (2) 4,140.0 feet by July 15 in any year, 4,140.5 feet by July 15 in more than one year, or 4,140.8 feet by July 15 in more than 2 years; (3) 4,138.25 feet in September in more than one water year; or (4) 4,138.00 feet at any time.  Ex. A at 213.  The 2020 FWS BiOp and ITS expired on January 13, 2023, and they were replaced by a new BiOp and ITS that contain FWS' analysis of the effects of an additional nine months of Project operations under the 2018 Plan/2020 IOP, through September 30, 2023.  ECF 1116-2 at 319 of 589.  The new BiOp again found operations under the 2018 Plan/2020 IOP were not likely to jeopardize suckers or adversely modify their critical habitat, and the new ITS mandates achieving the same boundary conditions.

Though Reclamation's reinitiated consultation on a long-term operations plan was initially

expected to be completed by September 30, 2022, as of the date of this filing, that consultation remains ongoing and the 2018 Plan/2020 IOP remains operative along with the 2019 NMFS BiOp and 2023 FWS BiOp. Reclamation has extended the 2018 Plan/2020 IOP through September 2024, at which time it anticipates having completed reinitiated consultation with NMFS and FWS on a new long-term operations plan that will take into account the scheduled removal of four hydroelectric dams on the Klamath River. Reclamation intends to complete reinitiated consultation with FWS by the end of September 30, 2023 to analyze the effects of operating under the 2018 Plan/2020 IOP between October 1, 2023 and September 30, 2024.

### C. In-Season Adaptive Management of Klamath Project Operations Due to Extraordinary Drought Conditions

Water year 2020 ushered in persistent severe drought conditions in the Klamath Basin. For water year 2023, accumulated precipitation in the Klamath Basin had been below average through December 22, 2022, resulting in exceptionally low inflows to UKL. ECF 1101-1 at 47 of 152. Flows in the Williamson River, which account for approximately 50% of total inflow to UKL in any given year, broke records for minimum flows in the river during the 104-year period of record for 21 days between October 1, 2022 and January 19, 2023. *Id.* The low tributary flows led to net inflows to UKL through December 21, 2022 that represented the lowest volume in the 41-year period of record. *Id.* at 48 of 152.

Considering the low observed inflows and Reclamation's projections that UKL would not reach the required April 1, 2023 elevation of 4,142 feet for suckers under scheduled operations, Reclamation adopted the 2023 TOP in January 2023 with the goal of "meet[ing] ESA requirements for suckers" plus an additional 0.4 feet for a surface flushing flow in April for the benefit of salmon. *Id.* at 46 of 152. The key provisions of the TOP were that:

- Reductions in UKL releases could result in reductions in Klamath River flows at Iron Gate Dam (IGD) of up to 30% below BiOp minimums.
- All non-ESA releases of stored water or diversions of live flow from the Klamath River were stopped immediately and remained shut off while flow reductions were in place. No agricultural or refuge deliveries were made while flow reductions were occurring.
- Reclamation would collaborate with the Services and Tribes within the Klamath Basin to develop habitat survey programs to inform adaptive management decisions on a weekly basis, while monitoring inflow forecasts for any changes.
- Reclamation would return to scheduled operations under the 2018 Plan/2020 IOP as

soon as the target UKL elevation would be met and by no later than April 1, 2023.
*Id.* at 50 of 152.

As the 2023 TOP was implemented, river flows were reduced on February 14, 2023 by 11%,
followed by a nominal additional reduction of 5% on February 25, 2023, which produced essentially
no actual change in flows given that BiOp minimum flow requirements increase by 50 cfs on March
1.  ECF 1117 at 11-12; NMFS BiOp at 26.  FWS conducted monitoring of salmon redds in three
different stretches of the Klamath River with Yurok and Karuk Tribal partners before and after the
initial 11% flow reduction.  ECF 1116-2 at 12-13 of 589.  FWS did not find that any redds had been
dewatered but noted that 4 of 51 redds identified in the second stretch would likely be dewatered by
additional flow reductions.  *Id.*  FWS noted that monitoring was limited by poor visibility.  *Id.*

IV.    **Argument**

A.  **Plaintiffs Are Not Likely to Succeed on the Merits of their Claims**

1.  **Plaintiffs' Supplemental Complaint is Moot**

The supplemental complaint challenges Reclamation's 2023 TOP, and Plaintiffs' motion for
preliminary injunction argues that "harm [is] likely to occur under the 2023 TOP."  ECF 1101 at 21
of 56; ECF 1117 at 17.  That cannot be, however, as the TOP has expired under its own terms and
Reclamation has returned to its scheduled Project operations, under which it is currently meeting
minimum ESA Klamath River flow requirements for SONCC salmon and plans to implement a
surface flushing flow in April.  Reclamation intends to continue operating the Project in accordance
with the 2018 Plan/2020 IOP through the end of September 2024.  Given these basic, incontestable
facts, the supplemental complaint is moot.

As the 2023 TOP has expired, it effectively ceases to exist, and no relief is appropriately
available against it.  *See Rio Grande Silvery Minnow v. Bureau of Recl.*, 601 F.3d 1096, 1113 (10th Cir.
2010) ("to the extent that the Environmental Groups seek a declaration that [superseded BiOps] are
legally infirm due to Reclamation's failure to consult using the full scope of its discretion, we are not
situated to issue a *present* determination with real-world effect because those [BiOps] no longer are
operational—for all material purposes, they no longer exist").  The mere fact that Plaintiffs "also seek
declaratory relief does not affect [the Court's] mootness determination."  *Conyers v. Reagan*, 765 F.2d
1124, 1127 (D.C. Cir. 1985).  As with injunctive relief, there must be a "live controversy" for a court

1    to award declaratory relief. *Burke v. Barnes*, 479 U.S. 361, 364 (1987). Here, there is no live dispute

2    over the expired 2023 TOP and a declaratory judgment that the TOP violated the ESA would have

3    no effect in the real world. *See Rio Grande Silvery Minnow*, 601 F.3d at 1112 (finding the plaintiffs'

4    challenges to BiOps superseded by a new BiOp were moot in part because "any declaration that the

5    [superseded BiOps] were insufficient due to Reclamation's failure to fully consult would be wholly

6    without effect in the real world"). Presumably, in challenging the 2023 TOP, Plaintiffs want this

7    Court to prospectively dictate how Reclamation may allocate water in the future, which would not be

8    appropriate. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, No. 04–3096–PA, 2007 WL 1072112, at *5

9    (D. Or. Apr. 3, 2007) ("Plaintiffs also argue that declaratory relief would be helpful to 'ensure that the

10    [new] BiOp complies with the law and does so in a timely manner' and that declaratory relief would

11    'clarify and settle' defendants' legal obligations. I agree with defendants, however, such justifications

12    are so vague as to make Article III's 'case or controversy' requirement meaningless. Courts should

13    not micromanage an agency's procedures under the guise of judicial review"). The appropriate

14    recourse if Plaintiffs could show the 2023 TOP violated the ESA would be for Reclamation to

15    reinitiate consultation (50 C.F.R. §§ 402.14(i)(4); 402.16(a)(1)); however, Plaintiffs do not seek

16    reinitiated consultation.

17          Just before it adopted the 2023 TOP, Reclamation completed reinitiated consultation with

18    FWS on extending the 2018 Plan/2020 IOP through the end of September 2023, which resulted in a

19    new BiOp and ITS that superseded the preceding ones. Notably, while the new ITS continues to

20    provide a meet and confer process to ensure that Reclamation adaptively manages under certain

21    circumstances to meet boundary conditions, unlike the old ITS, the new ITS provides that, if

22    "Reclamation determines that UKL elevations cannot be attained through changes in project

23    operations for any reason, Reclamation shall immediately reinitiate consultation" with FWS. ECF

24    1116-2 at 553 of 589. This provision of the new FWS ITS moots Plaintiffs' central attack on the

25    2023 TOP, which is based on Plaintiffs' interpretation of the old, superseded ITS. Plaintiffs argue

26    that implementing the 2023 TOP to meet UKL elevations for suckers was unlawful because, in their

27    view, those elevations were merely aspirational guidelines under the old ITS, which Reclamation

28    should have disregarded in favor of making releases for salmon flows. ECF 1117 at 1-2, 10, 18-19.

1      Regardless of whether Plaintiffs' interpretation of the old ITS is correct (and it is not), the

2   new ITS unequivocally makes the April 1 UKL elevation a mandatory requirement, as Plaintiffs

3   themselves concede.  ECF 1117 at 10.  Thus, Plaintiffs' attack on the 2023 TOP based on their

4   interpretation of the old, superseded ITS, is moot.  *See, e.g.*, *Forest Guardians v. U.S. Forest Serv.*, 329

5   F.3d 1089, 1096 (9th Cir. 2003) (finding that, even where an ESA challenge is not to the BiOp itself,

6   "the validity of the challenge necessarily rises or falls with the validity of the [BiOp]," and that,

7   accordingly, ESA Section 7 and 9 challenges to permits were moot where they had been issued in

8   accordance with a BiOp and ITS that had been superseded); *Ramsey v. Kantor*, 96 F.3d 434, 446 (9th

9   Cir. 1996) (holding that the rule of mootness applies where an agency "would no longer be relying on

10   the particular biological opinion that was being challenged, but rather upon a new opinion" and

11   "where an agency will be basing its ruling on different criteria or factors in the future"); *see also Nat'l*

12   *Min. Ass'n v. U.S. Dep't of Interior*, 251 F.3d 1007, 1011 (D.C. Cir. 2001) ("The old set of rules, which

13   are the subject of this lawsuit, cannot be evaluated as if nothing has changed. A new system is now in

14   place").  Here, any new operations plan that Reclamation may issue in the future will not be based on

15   the old, superseded FWS ITS.

16      Plaintiffs cannot avoid the mootness of their challenge to the 2023 TOP with any claim that

17   the Court can still grant them effective relief via their preliminary injunction.  Simply stated, the

18   requested injunction is not appropriately available relief on the supplemental complaint.  Initially,

19   Plaintiffs' request for an open-ended programmatic order forbidding Reclamation from "mak[ing]

20   allocations or deliveries of water from Upper Klamath Lake ("UKL") for irrigation unless . . .

21   Reclamation can meet its full ESA obligations" to Klamath River-dependent species "as set out in"

22   the 2018 Plan/2020 IOP and NMFS BiOp and ITS (ECF 1117-2 at 1) does not comport with

23   Federal Rule of Civil Procedure 65.  Rule 65 requires that a preliminary injunction "state its terms

24   specifically" and "describe in reasonable detail – and not by referring to the complaint or other

25   document – the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1)(B), (C).  Plaintiffs appear

26   to be asking the Court to compress and convert the ESA, the BiOps and ITSs, and the 2018

27   Plan/2020 IOP into a court order that uses unduly vague language and gives unduly vague direction.

28   The clearest and most-detailed statements of Reclamation's obligations under the ESA are the plain

1    language of the statute, its implementing regulations, and the governing BiOps and ITSs.  A court-

2    imposed order generally forbidding Reclamation from authorizing any irrigation in 2023 unless it can

3    guarantee meeting its full ESA obligations into next year and beyond would not sufficiently inform

4    Reclamation what particular acts are restrained or required.

5            Rather than solving a problem, Plaintiffs' requested injunction would merely state it.  The

6    problem with fully meeting ESA obligations at the Klamath Project in early 2023 was not

7    Reclamation's lack of understanding of what the ESA requires or any deviation by Reclamation from

8    the 2018 Plan/2020 IOP or the governing BiOps and ITSs in the fall and winter of 2022.  As

9    explained above, Reclamation exceeded the September 30, 2022 end of year UKL elevation and the

10   ensuing fall and winter irrigation diversions were as scheduled under the 2018 Plan/2020 IOP and

11   analyzed in the governing BiOps and ITSs.[2]  The problem was that Reclamation determined the

12   ensuing hydrological conditions in the Klamath Basin and inflows to UKL were trending

13   extraordinarily dry and low, respectively, during that period, causing UKL not to refill as would be

14   expected based on the period of record.

15           Plaintiffs' second requested injunction asks the Court to impose a September 30 end of

16   season elevation in UKL 4,139.2 feet.  ECF 1117-2 at 2.  Plaintiffs do not limit this request to any

17   particular water year type.  In a dry year, Plaintiffs' request could raise the minimum elevation in

18   FWS's BiOp and ITS by more than a foot, from 4,138 feet.  Both of Plaintiffs' requested injunctions

19   here run afoul of this Circuit's long-established precedent that injunctive relief must be narrowly

20   tailored to remedy the identified legal deficiency.  *See Nat'l Wildlife Fed. v. NMFS*, 422 F.3d 782, 800

21   (9th Cir. 2005) (remanding to the district court because the injunctive relief was not narrowly tailored

22   to the identified statutory deficiency); *see also Monsanto*, 561 U.S. at 164-66.  A remedy "must be

23   tailored to the violation, rather than the violation's being a pretext for the remedy."  *People Who Care v.*

24   *Rockford Bd. of Educ., School Dist.* No. 205, 111 F.3d 528, 534 (7th Cir. 1997) (Posner, J.).  A plaintiff

25   "cannot seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the

26

27   [2] Given that Reclamation surpassed the September 30, 2022 end of season UKL elevation, Plaintiffs'
     complaints that Reclamation drew down UKL during the summer of 2022 by authorizing additional
28   irrigation water in the 2022 TOP are misplaced.  ECF 1117 at 1, 8, 10, 19.

1    Department [of the Interior] or the halls of Congress, where programmatic improvements are

2    normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  Indeed, the Klamath Tribes

3    sought a similarly broad preliminary injunction forcing Reclamation to raise UKL elevations during

4    the irrigation season of 2018 and this Court rejected it, as it "would be an extraordinary remedy."

5    *Klamath Tribes v. U.S. Bureau of Recl.*, No. 18-cv-03078-WHO, 2018 WL 3570865, at *9 (N.D. Cal. July

6    25, 2018).

7           Rather than being narrowly tailored to prevent or redress any infirmity in the 2023 TOP,

8    Plaintiffs' requested injunctions are wholly untethered to it and, for that matter, to any existing

9    agency action.  Plaintiffs argue that "Reclamation needs to manage irrigation deliveries more

10   conservatively" (ECF 1117 at 21), and they ask this Court to institute that programmatic goal, using

11   the 2023 TOP as a pretext.  In effect, Plaintiffs seek to potentially override the end of season

12   elevation in the 2018 Plan/2020 IOP and 2023 FWS BiOp and ITS and insert one into the NMFS

13   BiOp and ITS where none exists, without even challenging those agency actions, much less showing

14   that they are unlawful.  Plainly, Plaintiffs may not use a pretextual preliminary injunction motion as a

15   short-cut or substitute for a proper legal challenge, where the targeted agency actions are reviewed on

16   their administrative records under the APA's standards of review.

17          Lastly, Plaintiffs' requested injunctions are not appropriately available relief because they are

18   based on speculation regarding hypothetical future hydrology and operational decisions that could

19   transpire a year from now.  *See Rio Grande Silvery Minnow*, 601 F.3d at 1112 (finding "concerns about

20   whether Reclamation will appropriately consult with the FWS in response to changing water demand

21   conditions are far too speculative to support a claim for declaratory relief" because "[a]ny such relief

22   would amount to an advisory opinion regarding the scope of Reclamation's discretion and such an

23   opinion would clearly be improper").  Indeed, if either of Plaintiffs' premises did not occur, then its

24   injunctions would have been entered unnecessarily.

25          Enjoining hypothetical future actions would not only contradict basic ripeness and APA

26   principles – which require Plaintiffs to challenge an operative final agency action – but the ESA itself.

27   The ESA's citizen suit provision authorizes a cause of action "to enjoin any person . . . who is alleged

28   to be *in violation* of any provision of this chapter or regulation issued under the authority thereof."  16

1  U.S.C. § 1540(g)(1)(A) (emphasis added); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*,

2  484 U.S. 49, 58-59 (1987) (holding that the phrase "to be in violation" in the nearly identical citizen

3  suit provision in the Clean Water Act only permits a plaintiff to bring a suit "to enjoin or otherwise

4  abate an ongoing violation" and noting that "the harm sought to be addressed by the citizen suit lies

5  in the present or the future, not in the past").  Here, Reclamation is not "in violation of" the ESA

6  because of the expired 2023 TOP, nor is it "in violation of" the ESA because of hypothetical future

7  operations.  Thus, Plaintiffs' injunctions are not available relief under the ESA.

8         Plaintiffs conspicuously fail to address the expiration of the 2023 TOP in their motion for

9  preliminary injunction.  Plaintiffs distract from it by presenting generalized grievances with

10  Reclamation's management of the Klamath Project and ESA compliance.  Plaintiffs cannot avoid

11  mootness in this manner.  *See Rio Grande Silvery Minnow*, 601 F.3d at 1112 (noting that "the duty to

12  consult is not itself an ongoing agency action subject to challenge," and that a plaintiff "cannot

13  challenge the scope of consultation untethered from the federal agencies' efforts to develop a

14  biological opinion)."  Rather, "allegations of legal wrongdoing must be grounded in a concrete and

15  particularized factual context; they are not subject to review as free-floating, ethereal grievances."  *Id.*

16  at 1111-12 (citation omitted).

17         In fact, to establish a right to judicial review in the first instance, Plaintiffs "must direct [their]

18  attack against some particular 'agency action' that causes [them] harm."  *Lujan*, 497 U.S. at 891; *see also*

19  *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure is reviewable,

20  an on-going program or policy is not, in itself, a 'final agency action' under the APA") (citation

21  omitted); *Am. Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 102 (D.D.C. 2000) ("[C]ourts have repeatedly

22  refused to entertain the type of programmatic attack on the general day-to-day operations of the

23  agency that the plaintiffs are waging here") (citation omitted).  "Such broad review of agency

24  operations is just the sort of 'entanglement' in daily management of the agency's business that the

25  Supreme Court has instructed is inappropriate."  *Del Monte Fresh Produce N.A. v. United States*, 706 F.

26  Supp. 2d 116, 119 (D.D.C. 2010); *accord Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66-67 (2004)

27  (explaining that the limitation of final agency action in the APA is intended to: (1) "protect agencies

28  from undue judicial interference" and (2) "avoid judicial entanglement in abstract policy

disagreements which courts lack both expertise and information to resolve").  In the present posture of this case, the only final agency action before the Court is the 2023 TOP, and that action is null and void, having expired by its terms.  Plaintiffs cannot show they are entitled to judicial review because they remain generally dissatisfied with Reclamation's operational decisions in 2022 and under the 2023 TOP, even though it is expired.

The exception to the mootness doctrine for actions capable of repetition yet evading review does not apply here.  The exception applies in "extraordinary circumstances" where: "(1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again.'"  *Or. Nat. Desert Ass'n v. Sabo*, 854 F. Supp. 2d 889, 911 (D. Or. 2012) (citations omitted).  Here, while the 2023 TOP likely satisfies the first criterion, the second criterion is not satisfied because it is not reasonable to expect that Plaintiffs will be subjected to the "same action" again.  A TOP is not a routine action that is expected to reoccur.  To the contrary, the expectation is that the planned operations under the 2018 Plan/2020 IOP will be implemented.  TOPs are adaptive in-season actions that are required only if extraordinary conditions prevent implementation of scheduled operations.  Reclamation implemented TOPs in 2021, 2022, and 2023 because unanticipated drought conditions outside of the period of record in the Klamath Basin arose in each of those years that would not allow Reclamation to fully and simultaneously maintain the competing operational conditions set forth in the 2018 Plan/2020 IOP as originally planned.  Given that the water supply, with changing hydrology and weather conditions, varies from year-to-year, it is not reasonable to expect that the same conditions underlying a particular TOP will prevail indefinitely.  Rather, it is reasonable to expect hydrological conditions to eventually return to those within the period of record for the Klamath Basin, which will allow the operations set forth in the 2018 Plan/2020 IOP to be implemented (i.e., without TOPs).  In fact, the very goal of the 2023 TOP was to refill UKL so that scheduled operations under the 2018 Plan/2020 IOP can resume, avoiding the need for a TOP this spring/summer.

Furthermore, even if a winter 2024 TOP could reasonably be expected, it would not be the "same action" as the 2023 TOP.  *See, e.g., Noem v. Haaland*, 41 F.4th 1013, 1017 (8th Cir. 2022) (noting that, "[i]n arbitrary and capricious review, even small factual differences can matter," and holding that

1   challenge to agency's denial of July 4 fireworks permit was not capable of repetition, even though

2   state applicant intended to reapply, because the circumstances surrounding each application "are

3   likely to be different") (citation omitted).  Any future TOP would be a separate and distinct agency

4   action implemented in response to the particular hydrology that year, the status and needs of listed

5   species, and consistent with the governing Service BiOps and ITSs.  Notably, any future TOP could

6   not be subject to Plaintiffs' attack based on the superseded 2020 FWS ITS.  In addition, Reclamation

7   does not take a singular approach to meeting its ESA requirements.  The 2021 and 2022

8   spring/summer TOPs were distinct from one another, and both are distinct from the 2023 TOP, as

9   each TOP considered and adapted to that year's particular conditions.  In fact, the 2023 TOP was the

10  only action Reclamation has implemented that resulted in flows below BiOp minimums.  The history

11  of otherwise maintaining BiOp minimum flows shows that the 2023 TOP is not likely to recur.

12          In *Klamath Tribes I*, the Klamath Tribes challenge the 2021 TOP for allegedly favoring salmon

13  over suckers by not proposing reductions to minimum Klamath River flows to preserve UKL

14  elevations.  Plaintiffs' attack on the 2023 TOP here is the opposite of the Klamath Tribes' attack on

15  the 2021 TOP.  In *Klamath Tribes II*, the Klamath Tribes challenge the 2022 TOP for not proposing

16  reductions to minimum Klamath River flows and irrigation diversions to preserve UKL elevations.

17  *Klamath Tribes v. U.S. Bureau of Recl.*, Case No.: 1:22−cv−00680−CL (ECF 21).  Given that the various

18  TOPs are all distinct from one another, this exception to the mootness doctrine does not apply here.

19          **2.  The Supplemental Complaint Seeks to Favor Salmon Over Suckers**

20          Though Plaintiffs avoid expressly arguing that Reclamation was required to favor salmon

21  over suckers, that is effectively the crux of their challenge to the 2023 TOP.  At its core, Plaintiffs ask

22  this Court to declare that, when Reclamation was faced with a forecasted choice between either

23  meeting UKL spawning elevation for suckers or minimum river flows salmon, it was legally required

24  to choose salmon flows.  Plaintiffs seek to obscure this reality by requesting injunctive relief that

25  targets the Project's future irrigation allocation; however, as explained above, that is not appropriately

26  available relief on a challenge to the 2023 TOP, which did concern that allocation.

27          Plaintiffs want this Court to declare that minimum Klamath River flows for salmon are

28  "inviolate" whereas UKL elevations for suckers are, in Plaintiffs' view, a mere "aspirational

guideline" that Reclamation was required to disregard in favor of salmon releases.  ECF 1117 at 1, 18-19.  That is simply erroneous.  As explained above, the governing 2023 FWS BiOp and ITS mandate that Reclamation hold UKL to an elevation of 4,142.00 feet as of April 1.  ECF 1116-2 at 553 of 589.  Furthermore, suckers and salmon are subject to equal protections under the ESA.  *See* 16 U.S.C. § 1536(a)(2) (Section 7(a)(2) requirements extending to "any endangered species or threatened species"); *id.* § 1533(d) (Section 9 prohibition against take of endangered species); 50 C.F.R. § 223.203 (NMFS rule extending the Section 9 take prohibition to the listed West Coast salmonid species, including threatened SONCC coho salmon, except as specifically limited by that regulation).  To Federal Defendants' knowledge, in the history of the ESA, no court has ever ruled that a federal agency was required to favor one listed species over another where their respective needs conflicted.  To do so here would inappropriately substitute the Court's and Plaintiff's judgment for Reclamation's professional judgment, exercised under challenging circumstances.  Indeed, this Court and the District of Oregon have rightfully rejected previous claims by Plaintiffs and by the Klamath Tribes that salmon must be favored over suckers, and vice versa.  As noted above, when Plaintiffs previously sought a temporary restraining order in the midst of 2020's historic drought that would have compelled Reclamation to make additional releases from UKL to the Klamath River that Reclamation had declined to implement to preserve UKL elevations for suckers, this Court denied the request.  *Yurok Tribe*, 2020 WL 2793945.  That rationale and holding applies with full force to Plaintiffs' challenge to the 2023 TOP.

This Court's 2020 ruling comports with that of the District of Oregon in the following spring of 2021, when the Klamath Tribes moved for a preliminary injunction that would have required Reclamation to leave more water in UKL for suckers at the expense of salmon.  *See Klamath Tribes I*, 537 F. Supp. 3d at 1184.  The court denied the Tribes' request after concluding that they were not likely to prevail on the merits of their claims that the 2021 TOP violated the ESA.  *Id.*  The court found that, under the difficult circumstances presented, the 2021 TOP reflected a reasonable decision based on Reclamation's competing ESA obligations for listed species consistent with the meet and confer provisions of the BiOps and ITSs, observing that:

Plaintiffs ask this Court to limit the flow of water coming out of Upper Klamath Lake

to the detriment of a threatened salmon population, an endangered Orca population that depends on salmon recovery, and irrigation interests. The Court declines to do so. Here, the Defendant Bureau, in coordination with expert agencies and all competing interests, is better equipped to serve the public interest than a judge with a law degree. And while the interim plan and decisions being made by the Bureau may result in the incidental taking of an endangered species, the Bureau has taken the appropriate steps under the Endangered Species Act to address the difficult drought situation that is presenting itself this year in the Klamath Basin.

*Id.* at 1185.

Here, the Court should follow its own prior ruling and that of the District of Oregon in finding that Plaintiffs are not likely to succeed on the merits of their challenge to the 2023 TOP. Plaintiffs' attack on the TOP is inappropriately one-sided.  Plaintiffs' preliminary injunction motion is singularly focused on arguments that reduced Klamath River flows under the 2023 TOP harmed salmon.  ECF 1117 at 13-18.  Plaintiffs ignore the harms to suckers that were anticipated if UKL had failed to reach the April 1 UKL elevation of 4,142 feet for spawning for a fourth consecutive year, contrary to FWS' BiOp and ITS.  In the joint coordination plan (which Plaintiffs ignore), Reclamation, NMFS, and FWS explained the relative risks:

As the water year has progressed, recent monitoring information has confirmed the presence of salmon redds on the Klamath River, which has increased the likelihood of coho salmon mortality if river flows are reduced below the minimums specified in the NMFS 2019 Biological Opinion.  At the same time, it is increasingly likely that without reductions in river flows, Upper Klamath Lake level minimums specified in the USFWS Biological Opinion for sucker spawning habitat will be missed again this year and that full implementation of a surface flushing flow for salmon specified in the NMFS Biological Opinion will be at risk.

ECF 1116-2 at 9 of 589.  Under Plaintiffs' apparent reasoning, Reclamation was bound to violate the ESA in early 2023 no matter what it did, even if it had decided not to trim UKL releases as Plaintiffs desired.  As explained below, Plaintiffs present no meritorious legal argument that, under the circumstances, the 2023 TOP violated the ESA even if Plaintiffs' allegations of harm to salmon were true.  Plaintiffs ignore that trimming winter UKL releases under the 2023 TOP was a reasonable decision that offered potential benefits for salmon by increasing the likelihood that sufficient water volumes would be available in UKL to allow Reclamation to implement a full flushing flow in the Klamath River.  *See id.*

### 3.   The 2023 TOP Complied with the BiOps, ITSs, and the ESA

Plaintiffs appear to simply presume that the 2023 TOP violated the NMFS BiOp because it

allowed Klamath River flows to go below the minimum flows that were analyzed.  Plaintiffs' legal

analysis is limited to a footnote, where they argue in conclusory fashion that, because operations

under the 2023 TOP did not comport with the BiOp and did not undergo their own independent

consultation, any incidental take of salmon that occurred while Reclamation was implementing the

2023 TOP violated ESA Section 9.  ECF 1117 at 18 n.4.  In *Klamath Tribes I*, the court rejected an

analogous argument that Reclamation's 2021 TOP violated the FWS ITS and, in turn, ESA Section 9

because the TOP continued to allow lake releases to support river minimums even as UKL was

below the elevation required by the ITS.  The court noted that:

> While Upper Klamath Lake levels have fallen outside the scope of what was
> considered in the 2020 BiOp, the Bureau … continued to comply with the terms and
> conditions by engaging in ongoing consultation with the Services and creating the
> temporary operating procedures. The Bureau is also not responsible for the
> unprecedented drought this year. As a threshold matter, the Klamath Tribes have not
> shown they are likely to succeed on the merits.

*Klamath Tribes I*, 537 F. Supp. 3d at 1192.

The same was true here.  Though operations under the 2023 TOP did not adhere to the

specific flows analyzed in the NMFS BiOp, those operations nonetheless conformed to the Services'

ITSs, which contemplated that Reclamation would adaptively manage Project operations if it could

not achieve full implementation of the formulaic distribution in the 2018 Plan/2020 IOP.  FWS

Term 1c required Reclamation to, in pertinent part, "immediately consult with the Service concerning

the causes" of any "projected or realized progressive decrease in [UKL] elevation that would fall

outside of the boundary conditions for the [BiOp's] effects analysis," and "adaptively manage and

take corrective actions."  Ex. A at 213.  NMFS Term 1A similarly states, in pertinent part, that

"Reclamation shall immediately notify NMFS and consult with the Services to determine the

causative factors" if Reclamation determines that minimum flows "have not been met or EWA

spending and/IGD flows are expected to potentially fall outside the thresholds."  NMFS BiOp at

281.  Only if "NMFS determines that causative factors are not due to extraordinary hydrologic

conditions" must Reclamation, "in consultation with the Services . . . determine and take in-season

corrective actions including adjustments to avoid falling outside the thresholds."  *Id.*  In short, the

2023 TOP was a corrective action within the meaning of FWS Term 1c, implemented because

1    Reclamation projected it would not be possible to fully and simultaneously meet its competing ESA

2    obligations for salmon and suckers as planned in the 2018 Plan and 2020 IOP.  Reclamation "cannot

3    control the weather," and a court "cannot hold [it] responsible for the absence of rain."  *Alabama v.*

4    *U.S. Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1134 (N.D. Ala. 2006) ("[t]akes that result from acts

5    of nature . . . cannot be blamed on the Corps") (citations omitted); *In re: Operation of the Missouri River*

6    *Sys. Litig.*, 363 F. Supp. 2d 1145, 1175 (D. Minn. 2004).  Given the uncertainty surrounding

7    hydrology, Reclamation needed to be able to reasonably plan in a manner that balanced potentially

8    competing needs for a limited resource.

9        Plaintiffs contend that the 2023 TOP violated NMFS' BiOp because NMFS opposed it (ECF

10   1117 at 9-11); however, Plaintiffs point to NMFS' initial concerns over the proposed TOP while

11   ignoring the pertinent fact that NMFS ultimately stated that, "in light of extreme uncertainty and

12   potentially conflicting water needs for ESA-listed species in the Basin," it was appropriate to "reduce

13   Iron Gate Dam minimum flows from the currently-provided minimums specified in the NMFS 2019

14   Biological Opinion by 11 percent effective February 14, 2023, in order to increase the likelihood of

15   filling Upper Klamath Lake to meet USFWS Biological Opinion minimums for listed sucker fish."

16   ECF 1116-2 at 10 of 589.  The operational decisions in the 2023 TOP followed months of weekly

17   coordination meetings between Reclamation and the Services and coordination with the Tribes that

18   concluded with Reclamation's decision to allow the reduced flows at a point in time in which

19   Reclamation determined it had no choice but to do so if UKL elevations were to be met.  *Id.*

20   Because Reclamation complied with terms and conditions of the ITSs, Plaintiffs are not likely to

21   succeed on their Section 9 claim.  *See* 16 U.S.C. § 1536(o)(2) (ESA stating that "*any taking* that is in

22   compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a

23   prohibited taking of the species concerned") (emphasis added).

24       Plaintiffs further argue that the 2023 TOP violated ESA Section 7 because Reclamation was

25   required to complete a new ESA consultation on the TOP before implementing it.  ECF 1117 at 18-

26   20.  Again, the *Klamath Tribes I* court rejected a virtually identical argument by the Klamath Tribes

27   that Reclamation was required to complete a new consultation before it could implement the 2021

28   TOP.  The court found that:

> To the extent that the Bureau was required to engage in informal consultation with USFWS, they have satisfied this burden by maintaining regular communication with the Services as they determined the causes for the low elevation of Upper Klamath Lake and developed temporary operating procedures to address the situation. The Bureau is also engaged in formal reinitiated consultation with USFWS and NMFS and has been since November 2019.

*Klamath Tribes I*, 537 F. Supp. 3d at 1191.

The same was true here. The Services' then-governing ITS provisions required in-season conferral on how to best respond to hydrological circumstances that prevented meeting the ITS requirements, not completion of new consultations. *See* 50 C.F.R. § 402.14. Like the 2021 TOP, Reclamation developed the 2023 TOP within the framework of the consultations it had already done on the 2018 Plan/2020 IOP. Plaintiffs' claim that Reclamation had to complete new consultations before it could implement the 2023 TOP defeats the very purpose of those ITS adaptive management provisions discussed above. Reclamation acknowledges the need for a new long-term operations plan for the Klamath Project that accounts for the possibility of unprecedented and prolonged drought conditions such as were experienced between 2020 and 2023, and it remains in consultation with the Services on such a plan. This is a complicated task, further complicated by the planned removal of several hydroelectric dams on the Klamath River, which is hoped to improve habitat conditions for salmon. The manner and sufficiency of the Project's ESA compliance should be determined in coordination with the expert consulting agencies through those complex consultations rather than by unilateral court order.

## B.  Plaintiffs Fail to Show a Likelihood of Irreparable Harm

Because Plaintiffs are not likely to prevail on the merits of their claims, the Court need not consider the remaining preliminary injunctive relief factors. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) ("Because it is a threshold inquiry, when a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* elements]") (citations omitted). Regardless, Plaintiffs fail to satisfy those remaining factors.

Fundamentally, Plaintiffs fail the irreparable harm prong for the same reason that their supplemental complaint is moot. The 2023 TOP has expired, and Reclamation has returned to scheduled operations under the 2018 Plan/2020 IOP in accordance with the Services' BiOps and ITSs. Thus, under the status quo, Reclamation's operation of the Klamath Project is in compliance

with the ESA.  *See Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990) (action agency complies with the ESA so long as its "decision to rely on a [] biological opinion [was not] arbitrary or capricious").  Plaintiffs fail to show that irreparable harm is likely to occur under this status quo.  Plaintiffs' supplemental complaint does not challenge the 2018 Plan/2020 IOP or the Services' BiOps or ITSs, much less prove that operations under the status quo are likely to result in irreparable harm to salmon.

To the contrary, as explained above (*supra*, § IV.A.1), Plaintiffs' requested preliminary injunction is based entirely on speculation regarding possible future hydrology and operational decisions that could be made to deviate from the status quo a year from now.  In this way, Plaintiffs' request is precisely the sort that the Supreme Court disapproved of in *Winter*, 555 U.S. 7.  In that case, the Court rejected the notion that a preliminary injunction can be issued "based only on a 'possibility' of irreparable harm."  *Id.* at 21.  As the Ninth Circuit has explained, "[t]he *Winter* Court reasoned that the issuance of a preliminary injunction based only on the possibility of irreparable harm is inconsistent with the extraordinary nature of the remedy."  *Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n*, 611 F.3d 483, 491 (9th Cir. 2010) (citation omitted); *see also McDermott v. Ampersand Publ'g*, 593 F.3d 950, 957 (9th Cir. 2010) (noting that *Winter* "[s]hunn[ed] the more lenient standard adopted by our circuit").  As Plaintiffs' preliminary injunction is based, at most, on a *possibility* of harm rather than on a showing that harm is *likely* to occur, their motion for preliminary injunction must be denied.  Indeed, though Plaintiffs' motion vacillates between past, present, and future verb tenses alleging that salmon and its critical habitat either have been harmed, are being harmed, or will be harmed by the 2023 TOP, those claims are necessarily backwards looking given that the 2023 TOP has expired.  The law requires a showing that *future* harm is likely.  As Plaintiffs make no such showing, their motion must be denied.  In fact, though Plaintiffs now claim the end of season UKL elevation must be raised to avoid potential irreparable harm, Plaintiffs previously agreed to stay their original complaint and attendant preliminary injunction motion in this matter on a number of conditions, including that Reclamation would, in the 2020 IOP, agree to *lower* the end of season UKL elevation from 4,138.26 feet to 4,138.00 feet.  ECF 907-1 at 5.

### C.  Plaintiffs Fail to Satisfy the Balance of the Equities and Public Interest Prongs

The Ninth Circuit has found that the balance of the equities and the public interest prongs of the preliminary injunction standard "merge" when the federal government is a party to a preliminary injunction request.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  Here, Plaintiffs devote a single paragraph to these factors, conclusorily asserting that they weigh in favor of granting their preliminary injunction because the Ninth Circuit presumes the factors favor protecting listed species.  ECF 1117 at 25.  The problem with this argument is that – while Plaintiffs claim that their preliminary injunction seeks to protect listed species – as explained above, the supplemental complaint upon which it is based would *disadvantage* ESA-listed suckers by invalidating the 2023 TOP that was implemented to protect them.  Given that Plaintiffs' supplemental complaint does not seek to uniformly benefit listed species, the balance of equities and public interest prongs do not weigh in favor of granting a preliminary injunction based on that complaint.  *See Yurok Tribe*, 2020 WL 2793945 at *5; *Klamath Tribes I*, 537 F. Supp. 3d at 1185; 16 U.S.C. § 1531(b) (ESA is intended "to provide a means whereby the ecosystems upon which endangered species *and* threatened species depend may be conserved") (emphasis added); *see also id.* §§ 1536(a)(2), 1533(d); 50 C.F.R. § 223.203.

### V.  Conclusion

For all the reasons above, Plaintiffs' motion for preliminary injunction should be denied.

DATED April 14, 2023

s/ *Robert P. Williams*
ROBERT P. WILLIAMS, Sr. Trial Attorney
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044
Tel: 202-307-6623
robert.p.williams@usdoj.gov

THOMAS K. SNODGRASS, Senior Attorney
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Telephone: 303-844-7233
thomas.snodgrass@usdoj.gov

**Attorneys for Federal Defendants**