SOMACH SIMMONS & DUNN
A Professional Corporation
BRITTANY K. JOHNSON, ESQ. (SBN 282001)
PAUL S. SIMMONS, ESQ. (SBN 127920)
RICHARD S. DEITCHMAN, ESQ. (SBN 287535)
500 Capitol Mall, Suite 1000
Sacramento, CA 95814
Telephone: (916) 446-7979
bjohnson@somachlaw.com
psimmons@somachlaw.com
rdeitchman@somachlaw.com

Attorneys for Defendant-Intervenor, Crossclaim-Defendant,
and Counterclaimant KLAMATH WATER USERS
ASSOCIATION

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF RECLAMATION and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants,<br><br>and<br><br>KLAMATH WATER USERS ASSOCIATION, THE KLAMATH TRIBES, and KLAMATH IRRIGATION DISTRICT,<br><br>Intervenor-Defendants. | Case No. 3:19-cv-04405-WHO<br><br>(Related Case No. 3:16-cv-04294-WHO)<br>(Related Case No. 3:16-cv-06863-WHO)<br><br>KLAMATH WATER USERS ASSOCIATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing Date:   May 10, 2023<br>Hearing Time:   2:00 p.m.<br>Courtroom:      Via Videoconference<br>Judge: Honorable William H. Orrick |
| UNITED STATES OF AMERICA,<br><br>Cross-Claimant,<br><br>YUROK TRIBE, PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, and INSTITUTE FOR FISHERIES RESOURCES,<br><br>and<br><br>HOOPA VALLEY TRIBE,<br><br>Joined as Cross-Claimants, | |

SOMACH SIMMONS & DUNN
A Professional Corporation

v.

KLAMATH WATER USERS ASSOCIATION and
OREGON WATER RESOURCES
DEPARTMENT,

          Crossclaim-Defendants,

   and

KLAMATH IRRIGATION DISTRICT,

          Intervenor Cross-Defendant.

KLAMATH WATER USERS ASSOCIATION,

          Counterclaimant,

   v.

UNITED STATES OF AMERICA,

          Counterclaim-Defendant.

OREGON WATER RESOURCES
DEPARTMENT,

          Counterclaimant,

   v.

UNITED STATES OF AMERICA,

          Counterclaim-Defendant.

**SOMACH SIMMONS & DUNN**
**A Professional Corporation**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF ISSUES TO BE DECIDED ...................................................2

III.  FACTUAL BACKGROUND ................................................................................2

    A.   Upper Klamath Lake, the Klamath River, and the Klamath Project..................2

    B.   Listed Species....................................................................................................3

    C.   Project Operations and ESA Consultation Since 2020 ......................................4

        1.   Reclamation Agrees to Operate Under the Interim Plan.......................4

        2.   2020 Operations (October 2019 Through September 2020)...................5

        3.   2021 Operations (October 2020 Through September 2021)...................5

        4.   2022 Operations (October 2021 Through September 2022)...................6

        5.   New FWS BiOp and 2023 Operations
           (October 2022 Through Today) ...............................................................7

        6.   Water Year 2023 Operations (October 2022 Through Today) ..............8

IV.   ARGUMENT .......................................................................................................12

    A.   Plaintiffs Cannot Obtain the Requested Injunction Because the
        Alleged ESA Violations Were Wholly in the Past...........................................12

    B.   Legal Standards Applicable to Plaintiffs' Motion for Preliminary
        Injunction .........................................................................................................13

    C.   Plaintiffs Have Not Established Serious Questions Going to the
        Merits or a Likelihood of Success on the Merits .............................................14

        1.   Legal Standard .....................................................................................14

             a.   ESA Section 7 and Section 9 ....................................................14

             b.   Scope of Review .......................................................................15

        2.   Plaintiffs' Section 9 Claim Fails on Both Theories of Take ................16

             a.   Much of Plaintiffs' Evidence Relates to Flow
                Reductions Greater Than Those That Actually Occurred........16

             b.   Plaintiffs Have Not Proven That Coho Redds Were
                Dewatered or That Any Harm Occurred from Reduced
                Flows in the Klamath River ......................................................17

c.     Plaintiffs Fail to Prove that Reclamation Committed "Take" By Habitat Modification................................18

d.     Reclamation Complied with the ITS and Is Exempt from Liability ........................................................20

3.     The Record Before the Court Shows Reclamation Analyzed the Effects of the 2023 TOP on Listed Species and Thus Complied with Section 7(a)(2)............................................21

D.     There Is No Likelihood of Future Irreparable Harm.........................................22

E.     The Injunction Is Not in the Public Interest, and the Agencies Have Already Balanced the Hardships ........................................................22

F.     The Requested Injunction Far Exceeds What Is Permissible at This Stage of Litigation............................................................24

V.     CONCLUSION ........................................................................................25

SOMACH SIMMONS & DUNN
A Professional Corporation

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011)................................................................. 14

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM*,
    273 F.3d 1229 (9th Cir. 2001)............................................................... 15

*Cascadia Wildlands v. Thrailkill*,
    49 F. Supp. 3d 774 (D. Or. 2014) ................................................. 14, 23

*City of Austin v. Kinder*,
    528 F. Supp. 3d 670 (W.D. Tex. 2021)................................................. 12

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015)............................................................... 14

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011)............................................................... 24

*Karuk Tribe v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012)............................................... 14, 15, 22

*Klamath Tribes v. U.S. Bureau of Reclamation*,
    537 F. Supp. 3d 1183 (D. Or. 2021) ...................................................... 1

*Klamath Tribes v. U.S. Bureau of Reclamation*,
    No. 18-cv-03078-WHO, 2018 U.S. Dist. LEXIS 124741
    (N.D. Cal. July 25, 2018) ..................................................................... 13

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*,
    23 F.3d 1508 (9th Cir. 1994)......................................................... 12, 20

*NRDC v. Bernhardt*
    No. 1:05-cv-01207 LJO-EPG, 2019 U.S. Dist. LEXIS 30649 at *94
    (E.D. Cal. 209) ...................................................................................... 22

*NRDC v. Norton*,
    No. 1:05-cv-01207 LJO-EPG, 2016 U.S. Dist. LEXIS 145788 at *93 n.11
    (E.D. Cal. Oct. 20, 2016) ............................................................... 12, 22

*NRDC v. Zinke*,
    347 F. Supp. 3d 465 (E.D. Cal. 2018)................................................. 15

*In re Oil Spill*,
    792 F. Supp. 2d 926 (E.D. La. 2011) .................................................. 12

SOMACH SIMMONS & DUNN
A Professional Corporation

*Our Children's Earth v. Leland Stanford Junior Univ.*,
   No. 13-cv-00402-EDL, 2015 U.S. Dist. LEXIS 176517
   (N.D. Cal. Dec. 11, 2015) ................................................................. 18, 19

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
   739 F.2d 1415 (9th Cir. 1984) ............................................................ 24

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ................................................................. 13, 14, 22

*Yurok Tribe v. U.S. Bureau of Reclamation*,
   231 F. Supp. 3d 450 (N.D. Cal. 2017) ......................................... 12, 13, 15

*Yurok Tribe v. U.S. Bureau of Reclamation*,
   No. 19-cv-04405-WHO, 2020 U.S. Dist. LEXIS 94484
   (N.D. Cal. May 29, 2020) ................................................................. 1

**Statutes**

16 U.S.C. section
   1532(19) ................................................................................ 15
   1536(a)(2) .............................................................................. 14
   1536(a)(3) .............................................................................. 14
   1536(b)(3) .............................................................................. 15
   1536(b)(4) .............................................................................. 15
   1536(b)(4)(C)(i)-(ii) .................................................................. 15
   1536(o)(2) .............................................................................. 15
   1538(a)(1)(B) .......................................................................... 15
   1540(g) .................................................................................. 12

**Regulations**

50 C.F.R. section
   17.3(c)(3) .............................................................................. 15
   222.102 ................................................................................. 19
   402.10-402.16 .......................................................................... 14
   402.14(h)(2) ............................................................................ 15
   402.14(h)(3) ............................................................................ 15
   402.14(i)(1) ............................................................................ 15
   402.14(i)(1)(i)-(ii) .................................................................... 15

53 Fed. Reg. 274130 (July 18, 1988) ....................................................... 4

**Other Authorities**

"Endangered Species Consultation Handbook" at 4-24 ...................................... 19

SOMACH SIMMONS & DUNN
A Professional Corporation

1

## I.      INTRODUCTION

Water year 2023 is the fourth year of drought in the Klamath Basin.  For the previous three years, the U.S. Bureau of Reclamation (Reclamation) has provided minimum flows in the Klamath River for the benefit of threatened coho salmon and other fish species by using water stored by the Klamath Project (Project) in Upper Klamath Lake (UKL).  During this period, the lake itself, which is critical habitat for endangered sucker species, has been drawn down lower and lower each year.  The agricultural water users relying on Project water for irrigation supplies have received zero allocation some years and a fraction of their demand in others.  Refuges have gone dry.  But the Klamath River has flowed at minimum levels.

In 2023, UKL inflows continued to be at record lows, and Reclamation proposed reductions in river flows to improve the likelihood that UKL would refill.  After months of coordination with the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (FWS) (collectively, "Services"), Reclamation reduced river flows a modest amount while monitoring the river for potential dewatering of coho redds.  No dewatering occurred.  Yet, Plaintiffs ran to court to challenge this action and request relief that would result in more water shortage and ruin for the agricultural communities devasted by the prolonged drought.

The Court should deny Plaintiffs' motion for preliminary injunction because Plaintiffs fail to make any of the showings required to obtain the extraordinary relief that they seek, especially that the alleged harm is likely to occur in the future.  But the Court should also deny Plaintiffs' motion because these difficult water supply challenges cannot be solved on a motion.  They require extensive coordination among the three federal agencies, tribes, irrigation districts, water users, and other stakeholders to implement operations that balance the interests of both species and account for water supply needs.  This Court and the District Court of Oregon have recognized as much.[1]  Intervenor Klamath Water Users Association (KWUA) asks that this Court reach the same conclusion again and deny Plaintiffs' motion.

---

[1] *Yurok Tribe v. U.S. Bureau of Reclamation*, No. 19-cv-04405-WHO, 2020 U.S. Dist. LEXIS 94484 at *17-18 (N.D. Cal. May 29, 2020) (denying temporary restraining order); *Klamath Tribes v. U.S. Bureau of Reclamation*, 537 F. Supp. 3d 1183, 1185 (D. Or. 2021) (denying temporary restraining order) (recognizing "the Defendant Bureau, in coordination with expert agencies and all competing interests, is better equipped to serve the public interest than a judge with a law degree").

SOMACH SIMMONS & DUNN
A Professional Corporation

## II.   STATEMENT OF ISSUES TO BE DECIDED[2]

1.   Whether Plaintiffs can obtain an injunction under the Endangered Species Act (ESA) citizen suit provision when Plaintiffs fail to show that Reclamation is likely to violate the ESA in the future by implementing flow reductions under the 2023 temporary operating procedures for the Klamath Project?

2.   Whether Plaintiffs are likely to succeed on the merits of their claim that Reclamation violated ESA Section 9 when the evidence shows the flow reductions did not dewater any redds or actually kill or injure juveniles, the impact on juvenile rearing habitat was insignificant, and Reclamation maintained compliance with the incidental take statement?

3.   Whether Plaintiffs are likely to succeed on the merits of their claim that Reclamation violated ESA Section 7(a)(2) when evidence before the court shows Reclamation fully analyzed the effects of the flow reductions on listed species?

4.   Whether Plaintiffs have made a "clear showing" that irreparable harm will occur absent an injunction?

5.   Whether Plaintiffs have made a "clear showing" that the balance of hardships tips in their favor and that the requested injunction is in the public interest?

6.   Whether Plaintiffs' requested relief satisfies the legal standard for a preliminary injunction?

## III.   FACTUAL BACKGROUND

### A.   Upper Klamath Lake, the Klamath River, and the Klamath Project

The Klamath Basin occupies about 10 million acres in south-central Oregon and northern California.  STIPDX-001559.[3]  In the uppermost watershed, various rain- and snowmelt-fed streams flow into UKL, a naturally occurring lake in south-central Oregon.  STIPDX-002166-67. The natural outlet of UKL was on the southern end, where water would flow over a reef when water levels in the lake were above the reef in late winter and spring when runoff was relatively high.  STIPDX-001078, 2387, 5569, 6966.  Today, Link River Dam provides operable water storage and controlled release of water from UKL to the Klamath River.  Link River Dam was constructed in the early 1920s.  STIPDX-001078, 7143.  Installation of the dam involved removal

---

[2] Plaintiffs' Supplemental Complaint includes four causes of action.  ECF No. 1115 ¶¶ 70-74 (alleging violation of ESA Section 7 in First Claim); *id.* ¶¶ 70-74 (alleging violation of ESA Section 9 in Second Claim), *id.* ¶¶ 98-104 (alleging violation of Reclamation Act in Third Claim); *id.* ¶¶ 105-13 (alleging violation of National Environmental Policy Act [NEPA] in Fourth Claim).  In their motion, Plaintiffs only proceed on the claims under ESA Section 7 and Section 9.  ECF No. 1117 at 3 (Statement of Issues).

[3] Plaintiffs explain the citations to "STIPDX" at ECF No. 1116 at 2.

SOMACH SIMMONS & DUNN
A Professional Corporation

or lowering of the reef at UKL's outlet, and construction of the dam, which allows for both raising and lowering of the lake level.  STIPDX-001078, 1668-69, 6953, 6966-68, 7011, 7143-44.

The total volume of water in UKL at elevation 4143.30 feet (full pool) is approximately 849,000 acre-feet (AF).  STIPDX-000978, 1561.  The "active storage"—approximately 500,000 AF—is the water between approximately elevation 4136.00 and 4143.30 feet that can be controlled by operation of Link River Dam.  STIPDX-000968, 1561.  The volume in UKL below active storage is not capable of being released by Link River Dam or diverted at A Canal. STIPDX-001561, 1564, 1566, 1663, 1668-69.

The Klamath River proper begins downstream of Link River Dam and flows approximately 240 miles before it reaches the Pacific Ocean, being joined by over 100 tributaries as it flows downstream.  STIPDX-001559, 6572-605; Kirby Decl. ¶ 52, n.3.  On the mainstem of the Klamath River, there are also four dams used solely in hydropower generation, owned by a private utility.  STIPDX-001548.  Salmon in the Klamath River cannot move upstream beyond Iron Gate Dam, which is approximately 60 miles downstream of Link River Dam.  STIPDX-001622, 1742, 6453.  Thus, there is attention to volumes of flow that occur below Iron Gate Dam.

The Project is a reclamation project authorized in 1905 under the Reclamation Act of 1902. The Project area lies to the south and east of UKL.  STIPDX-002303 (map of Project lands). Reclamation constructed irrigation works and contracted with individuals or irrigation districts who agreed to repay allocated construction costs and reimburse ongoing operations costs; in exchange, these entities receive water delivered through Project facilities or facilities they themselves constructed.  *See* STIPDX-000971, 973, 2267-73.  Water is diverted from the Klamath system at A Canal on the southeast end of UKL or locations just downstream of Link River Dam.  STIPDX-000971.  Water diversions through the Project are also the water source for two National Wildlife Refuges (Refuge): Tule Lake Refuge and Lower Klamath Refuge.  STIPDX-000961, 999-1000. The Project's irrigated land area is about 200,000 acres.  STIPDX-000971, 2311.

**B.    Listed Species**

This motion concerns coho, a "threatened" species under the ESA that primarily uses tributaries of the Klamath River for spawning and rearing and the mainstem river for migration to

SOMACH SIMMONS & DUNN
A Professional Corporation

and from the ocean. In addition, relevant here are two "endangered" species under the ESA: the shortnose sucker and the Lost River sucker. 53 Fed. Reg. 274130 (July 18, 1988). Surface water elevations in UKL are set and maintained to protect the endangered suckers which inhabit the lake. Diversion of water from UKL, or release of water from UKL to the Klamath River, lowers water levels (lake levels) resulting in less water being available for endangered suckers.

**C.  Project Operations and ESA Consultations Since 2020**

**1.  Reclamation Agrees to Operate Under the Interim Plan**

In April of 2019, Reclamation completed a reinitiated ESA Section 7 consultation with the Services. STIPDX-001542-1918, 1919-2140. Reclamation proposed an action for operation of the Project that it developed in discussion with the Services that was intended to result in non-jeopardy biological opinions (BiOps), and the Services each issued non-jeopardy BiOps. *Id.*; *see also* STIPDX-001407. Reclamation then adopted and implemented the 2019-2024 Operations Plan for the Klamath Project.

Plaintiffs subsequently filed a complaint in this action challenging the adequacy of the NMFS 2019 BiOp and Reclamation's compliance with Section 7 and NEPA. Am. Compl., ECF No. 17. Ultimately, the parties entered into a stipulation to stay the case, which the court granted. ECF No. 908.[4] The stay was conditioned on compliance with the Interim Operations Plan (Interim Plan). ECF No. 907, ¶¶ 3-4. The Interim Plan was adopted on March 27, 2020, and was to remain in effect until the earlier of September 30, 2022, or the completion of the reinitiated consultation with the Services. *Id.*; STIPDX-001397. The Interim Plan states that when certain hydrologic conditions are met, Reclamation will provide Environmental Water Account (EWA) "augmentation" flows of 40,000 AF. STIPDX-001397-99. "The 40,000 AF of EWA augmentation would be comprised of 23,000 AF from Project Supply and 17,000 AF from volume within UKL." STIPDX-001397. Because of the potential use of water from UKL,

---

[4] In September 2021, this Court lifted the stay of this litigation at the parties' request for purposes of litigating the U.S. Crossclaim against KWUA and Oregon Water Resources Department. ECF No. 961. The parties briefed ESA-related issues raised in the Crossclaim and the Counterclaims filed by KWUA. The Court recently ruled on those legal issues on February 6, 2023. ECF No. 1102. KWUA filed a notice of appeal of that order on April 4, 2023. ECF No. 1120. KWUA maintains that Reclamation lacks discretion to curtail, or direct the curtailment of, storage, diversion, and delivery of irrigation water to benefit ESA-listed species. KWUA respects that the Court has ruled to the contrary as part of the Crossclaim and Counterclaim, and reserves its position and defenses pending appeal.

SOMACH SIMMONS & DUNN
A Professional Corporation

1   Reclamation again consulted with FWS, and FWS issued a new BiOp on the Interim Plan.

2   STIPDX-000942-1207.  The 2020 FWS BiOp similarly reached a no-jeopardy conclusion.  *Id.*

3      A string of consecutive dry years began in 2020.  In both 2021 and 2022, it was

4   impossible for the Project to be operated as the Interim Plan had contemplated.  The same proved

5   to be true for 2023.  For each year, Reclamation had to devise different, interim operation plans to

6   supplant the Interim Plan, following the meet-and-confer provisions in the respective BiOps.

7      **2.      2020 Operations (October 2019 Through September 2020)**

8      In 2020, the Klamath Basin hydrology was very dry, and by May 2020, it became clear

9   the National Resource Conservation Service's (NRCS) forecasting used in the water operations

10  and planning model had "over-forecasted" for April.  The model then "under-forecasted" for May

11  2020.  The revised model calculations caused Reclamation to announce a significant reduction in

12  Project Supply (from 140,000 to 80,000 AF), causing confusion and uncertainty for water users

13  that had already planted based on the April allocation.  Kirby Decl. ¶¶ 10-11.  The June 2020

14  NRCS forecast again adjusted for the under-forecast, and the allocation for irrigation diversions

15  in June returned to approximately 140,000 AF.  The ultimate 2020 allocation to the Project,

16  however, was still less than 40% of the typical irrigation need for the season.  *Id.* ¶ 11.

17     By the end of the 2020 irrigation season, the UKL elevation was at 4138.21 feet, which

18  amounts to only 14,000 AF above the minimum elevation of 4138 feet in the Interim Plan.

19  Through creative and cooperative efforts by farmers in Tulelake ID, approximately 9,000 AF was

20  delivered to the Tule Lake Refuge to avoid reduced Tule Lake elevations for suckers and mitigate

21  botulism outbreaks occurring at the Refuge.  An additional 4,500 AF was added to this effort in

22  mid-July of 2020 for the Lower Klamath Refuge.  Kirby Decl. ¶¶ 12-13.  The amount of water

23  ultimately released from the "EWA" was approximately 415,000 AF.  Kirby Decl. ¶ 13.  There

24  were no days during which minimum Iron Gate flows were not provided.  *Id.*

25     **3.      2021 Operations (October 2020 Through September 2021)**

26     In water year 2021, there was very limited winter precipitation.  The resulting inflows

27  from the tributaries of UKL were extremely low.  Very little runoff, limited carryover storage in

28  UKL from 2020, and greater releases from UKL required to meet Iron Gate minimum flows due

SOMACH SIMMONS & DUNN
A Professional Corporation

1    to lower accretions (i.e., side flows) between Link River Dam and Iron Gate Dam all contributed

2    to a low UKL elevation at the start of the irrigation season.  Kirby Decl. ¶ 14.

3          On April 13, 2021, in letters to the Services, Reclamation stated that it could not comply

4    with the terms of the Interim Plan: "Critically dry and extraordinary hydrologic conditions in the

5    Klamath River Basin will prevent full simultaneous satisfaction of requirements for ESA-listed

6    species in [UKL] and the Klamath River, as specified in the [Interim Plan], even without water

7    deliveries to the Klamath Project (Project)."  STIPDX-000391, 400; Kirby Decl. ¶¶ 16-17.

8          The initial calculation of Project Supply was 33,000 AF.  That announcement was

9    modified based on anticipated non-Project diversions by Klamath Drainage District (KDD), and

10   ultimately **zero** water was diverted from Reclamation facilities for irrigation.  Kirby Decl. ¶ 18.

11         The Tule Lake Refuge received zero water allocation.  As a result, Sump 1A, a water body

12   on Tule Lake Refuge, went dry.  This water body, which covers over 9,000 acres, had not gone dry

13   in thousands of years.  Kirby Decl. ¶ 21.  To retain some amount of water in the only remaining wet

14   area of Tule Lake Refuge, actions were taken to borrow water for the Refuge from downstream

15   PacifiCorp reservoirs, and the "borrow" was repaid by foregone diversion of Lost River water.

16   During September 2021, approximately 700 AF was diverted at Ady Canal to provide water to

17   Lower Klamath Refuge based on a water right transfer from Wood River Valley.  *Id.* ¶ 20.

18         During the 2021 irrigation season, approximately 260,00 AF of water flowed into UKL,

19   yet 400,000 AF of water was released for flows in the Klamath River.  No reductions in releases

20   to the river were made even though the drought had become more severe.[5]  Kirby Decl. ¶ 15.

21         **4.    2022 Operations (October 2021 Through September 2022)**

22         There was minimal winter 2022 precipitation, and beginning March UKL elevation was

23   approximately 2.5 feet lower than 2021 and 1 foot lower than 2020.  The elevation of UKL was at

24   4140.61 feet, equivalent to a storage volume of 323,385 AF.  The April and May 2020 BiOp

25   "boundary condition" of 4142.0 feet equates to a storage volume of 444,018 AF, meaning that the

26   lake needed 120,633 AF of additional water to meet the boundary condition.  Kirby Decl. ¶ 22.

27   _____

28   [5] Reclamation's operation of UKL in 2021 is subject to a pending lawsuit in the District of Oregon.  *The Klamath Tribes v. U.S. Bureau of Reclamation*, Case No. 1:21-cv-0556-CV (Complaint filed April 13, 2021).

Inflow forecasts projected that UKL would not exceed 4142.0 feet at any point in 2022. At no point, either in March 2022 or later as conditions continued to deteriorate, did Reclamation ever indicate altering the amount of water to be released to the Klamath River.  *Id.* ¶¶ 23-24.

By March 17, 2022, UKL had only increased to a water surface elevation of 4140.79 feet, meaning that UKL was still 105,863 AF short of achieving 4142.0 feet by April 1.  Over the intervening two weeks prior to April 1, the total inflows to UKL were 26,903 AF.  Due to the hydrology and river releases, at no point was it possible to meet the 4142.0 feet elevation under any circumstances (i.e., regardless of Project diversions).  Kirby Decl. ¶ 26.

On April 11, 2022, Reclamation released another temporary operations plan and announced that Reclamation would operate UKL such that water surface elevations will remain at or above 4138.15 feet.[6]  The 2022 plan stated that Reclamation will "adaptively manage the Project Supply," provided an estimated Project Supply of 62,000 AF, and announced a "surface flushing flow" to be completed on or around April 15-17.  Kirby Decl. ¶¶ 28-29.

Under Reclamation's adaptive management, the actual observed end of May 2022 UKL elevation was 4140.74 feet, which exceeded modeled projections from April.  The actual observed end of September 2022 UKL elevation was 4138.71 feet, which also exceeded the projections from April.  The actual Project Supply was 89,000 AF.  Kirby Decl. ¶¶ 27-28.  The total EWA volume released to the Klamath River in 2022 was 384,661.  *Id.* ¶ 32.  Minimum Iron Gate flows were maintained throughout 2022.  *Id.*

### 5.     New FWS BiOp and 2023 Operations (October 2022 Through Today)

Under its terms, the Interim Plan covered operations through September 2022, at which point Reclamation intended to complete the consultation that was reinitiated in November 2019. Goldman Decl. Ex. 2 at 2 (BOR005499), ECF No. 1101-1.  Accordingly, the 2020 FWS BiOp covers the period until September 30, 2022.  STIPDX-000942.

On September 19, 2022, Reclamation proposed extending the Interim Plan through October 2024 "to allow for comprehensive analysis in the ongoing ESA consultation of

---

[6] Reclamation's operation of UKL in 2022 is subject to a second, pending lawsuit in the District of Oregon.  *The Klamath Tribes v. U.S. Bureau of Reclamation*, Case No. 1:22-cv-0680-CL (Complaint filed May 9, 2022).

SOMACH SIMMONS & DUNN
A Professional Corporation

1    environmental conditions that will exist leading into and after the impending removal of

2    PacifiCorp dams on the Klamath River[.]"  Goldman Decl. Ex. 2 at 1 (BOR005498), ECF

3    No. 1101-1.  In response, NMFS affirmed that extending Interim Plan operations "is expected to

4    result in effects consistent with the anticipated effects of the proposed action" analyzed in the

5    2019 NMFS BiOp, which as issued was applicable through March 31, 2024.  NMFS also stated

6    that the agencies would need to discuss how to address ESA requirements from April 1 to

7    October 1, 2024.  Goldman Decl. Ex. 3 at 1-2 (BOR005774-5), ECF No. 1101-1 at 23-24.

8         Because the 2020 FWS BiOp was set to expire on September 30, 2022, FWS issued a new

9    BiOp for the period January 13, 2023, through September 30, 2023 (2023 FWS BiOp).  ECF

10   No. 1116-2 at 319-589 (JN317-587).  Critically, FWS changed the Incidental Take Statement

11   (ITS) terms and conditions (T&C) with which Reclamation must fully comply to be exempt from

12   the take prohibition of Section 9 of the ESA.

13        In the 2020 FWS BiOp, T&C 1c provided the "boundary conditions" for the effects

14   analysis—UKL surface elevations at certain times of the year, like the April and May elevation of

15   4142 feet.  If Reclamation could not maintain these elevations, T&C 1c provided that

16   "Reclamation shall immediately consult with the Service concerning the causes to adaptively

17   manage and take corrective actions."  STIPDX-001170.  In 2021 and 2022 when UKL elevations

18   did not reach 4142 feet in April and May, Reclamation proceeded under this provision to

19   maintain its take coverage.  The terms and conditions of the 2023 FWS BiOp contain stricter

20   boundary conditions, and the meet and confer process is materially different.  "If during the meet

21   and confer processes described here Reclamation determines that UKL elevations cannot be

22   attained through changes in project operations for any reason, Reclamation shall immediately

23   reinitiate consultation with the Service."  ECF No. 1116-2 at 553 (JN551).

24        **6.    Water Year 2023 Operations (October 2022 Through Today)**

25        The 2023 water year began significantly drier than normal.  The period from October

26   through December was characterized by mostly dry, stagnated conditions in between several large

27   precipitation events.  Kirby Decl. ¶¶ 34-36.  By December 2022, despite some precipitation

28   events, UKL inflow was on pace to be among the lowest cumulative inflow for the period of

SOMACH SIMMONS & DUNN
A Professional Corporation

record. Kirby Decl. ¶ 34. And flows in the main tributaries to UKL were also at record lows. ECF No. 1116-2 at 24 (JN22) ("Flows in Williamson River, which is the largest tributary to UKL . . . has now broken records for minimum flows in the river during the 104-year period of record for nine days so far in November"). In response to "extraordinary hydrologic conditions," on December 9, 2022, Reclamation shared a draft document with stakeholders that was referred to as the "Strawman Plan." ECF No. 1116-2 at 24 (JN22). This proposal stated that Reclamation had invoked the "meet and confer" provisions of the 2019 NMFS BiOp and had already met twice with NMFS and FWS. *Id.* at 26 (JN24). The proposal identified the primary operational objective as filling UKL to meet water surface elevation of 4142.4 feet by April 1, which would satisfy the terms and conditions of the 2023 FWS BiOp for April and May and allow for a full surface flushing flow. To accomplish this, Reclamation proposed reducing mean daily releases out of UKL by up to 40%. *Id.* at 38 (JN36). The proposal further provided that Reclamation would not make any water available for agricultural or refuge diversions when flow reductions were in effect and that Project deliveries would be delayed to June 1. *Id.* at 30, 38 (JN28, 36).

Reclamation requested stakeholder feedback and technical assistance from NMFS and FWS. NMFS provided multiple comment letters to Reclamation on the December proposal. Responding to the potential 40% reduction, NMFS disagreed with Reclamation's expertise, stated that the early season forecasts in January or February were not reliable enough to make water management decisions, and recommended corrective actions to stop any refuge deliveries and diversions for fall/winter flooding. Goldman Decl. Ex. 7 at 2-3, ECF No. 1101-1 at 55-56. Even with Reclamation's assessment of the hydrologic conditions, NMFS recommended obtaining "meaningful input from NMFS, affected Tribes, and other stakeholders," and waiting until "more reliable hydrological information becomes available in mid-January." *Id.* at 57-58.

As inflow conditions worsened through January, NMFS continued to disagree that "the Klamath Basin is experiencing extraordinary hydrologic conditions currently in Water Year 2023 . . . ." Goldman Decl. Ex. 8 at 1, ECF No. 1101-1 at 61. NMFS claimed that Reclamation's "overly precautionary approach to future water supply is biased as a result of Reclamation's expectations that water year 2023 will be dry, given that recent years have been dry." *Id.* at 62.

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

1  NMFS commented that Reclamation must develop a monitoring plan before any flow reductions

2  occur and that the volume of water stored as a result of the flow reductions should be used to

3  augment EWA volume and river flows in May and June of water year 2023.  *Id.*  As late as

4  January 25, 2023, NMFS would not concur that "hydrological conditions are 'extraordinarily

5  dry' " for purposes of T&C 1a in the 2019 NMFS BiOp.  *Id.*, Ex. 9 at 2, ECF No. 1101-1 at 66.

6         Reclamation continued to refine its proposal.  On January 26, 2023, Reclamation adopted

7  the "Klamath Project January 2023 Temporary Operating Procedure" for the period January 20,

8  2023 through March 31, 2023 (2023 TOP).  Goldman Decl. Ex. 6, ECF No. 1101-1 at 44.  The

9  2023 TOP summarized the hydrologic conditions, including the record low tributary flows

10  through December, and at that point the, seventh driest accumulated UKL inflow in the period of

11  record.  *Id.* at 48.  Accordingly, the 2023 TOP provides for reductions in UKL releases of up to

12  30% below minimums to meet the TOP goal of 4142.40 feet by March 31 for ESA requirements

13  for suckers and a surface flushing flow in the Klamath River.  *Id.* at 46.  The 2023 TOP also

14  includes all measures from NMFS's comments, including monitoring and habitat survey data to

15  inform adaptive management and the condition that no agricultural or refuge deliveries would be

16  made while flow reductions occur.  *Id.* at 50-51.

17         The 2023 TOP was accompanied by a Supplemental Environmental Assessment

18  (2023 SEA), analyzing a range of flow reductions between 0-30% and evaluating the effects of the

19  2023 TOP on both suckers and salmon species.  Goldman Decl. Ex. 12, ECF No. 1101-1 at 90-139.

20  The 2023 SEA analyzed the various hydrologic forecasts in detail, discussed the effects of different

21  flow reductions on habitat and the risks of dewatering redds, and evaluated the population impacts

22  to coho salmon.  The 2023 SEA also documented the dozens of meetings that Reclamation had

23  since October 2022 with agencies, Tribes, water users, and other stakeholders.  *Id.* at 128-33.

24         After releasing the 2023 TOP in January, Reclamation still did not reduce flows in the

25  Klamath River.  The federal agencies continued to meet.  FWS and tribal fisheries agencies

26  conducted a survey of the Klamath River for redds in January 24-26, 2023 (the "pre-action

27  survey").  ECF No. 116-2 at 3-5 (JN1-3).  The pre-action survey observed 51 redds in Reach 2, of

28  which it was considered that approximately 31 would be at risk of dewatering if flows dropped.

1   *Id.* at 3 (JN1).  No redds were observed or at risk of dewatering in Reach 1 or Reach 3.  *Id.*  On

2   February 8, 2023, NMFS submitted additional comments on Reclamation's recommended flow

3   reductions of 21%.  ECF No. 1116-2 at 58-65 (JN56-63).

4       All this work culminated in a three-agency "Klamath Project Operating Coordination,

5   Winter/Spring 2023" agreement on February 13, 2023 (Coordination Agreement). ECF No. 1116-2

6   at 9-11 (JN7-9).  Reclamation, NMFS, and FWS agreed that "the past three years of persistent and

7   severe drought conditions have contributed to water supplies in the Klamath River Basin that have

8   been insufficient to meet the minimum biological requirements" as defined in the respective BiOps.

9   *Id.* at 9 (JN7).  Accordingly, the agencies agreed that the approach set forth in the Coordination

10  Agreement "is appropriate in light of extreme uncertainty and potentially conflicting water needs

11  for ESA-listed species in the Basin." *Id.* at 9-10 (JN7-8).  The measures include a 11% reduction in

12  Iron Gate minimum flows from the minimums specified in the 2019 BiOp, monitoring to assess the

13  impacts to redds, and further reductions of 5% if monitoring results show that reduced flows have

14  not dewatered more than three redds.  *Id.* at 10 (JN8).  The agencies agreed that any water stored in

15  UKL as a result of the flow reductions will be used solely for ESA compliance.  *Id.*

16      The 11% flow reduction began on February 14, 2023.  Kirby Decl. ¶ 43.  On February 16

17  and 17, 2023, FWS and tribal fisheries staff again surveyed the river ("post-action survey").  ECF

18  No. 1116-2 at 12-15 (JN10-13).  The post-action survey found that none of the 31 redds at risk

19  were found dewatered, but that 4 of the 31 redds had depths of less than an inch of water.  "In the

20  area of dense redds encountered by survey crews during the pre-action survey, crews estimated an

21  approximately 6 inch drop in stage with the 11% discharge reduction." *Id.* at 13 (JN11).  Because

22  no redds had been dewatered, pursuant to the Coordination Agreement, Reclamation implemented

23  the additional 5% reduction on February 25, 2023.  Kirby Decl. ¶ 46.

24      On March 1, the minimum Iron Gate flow under the 2019 BiOp increased to 1,000 cfs.

25  To remain consistent with the 16% reduction, Reclamation directed that flows at Iron Gate Dam

26  be increased by 42 cfs, to a daily mean rate of 840 cfs.  Kirby Decl. ¶ 50.  On March 4, significant

27  wet weather hit northern California, beginning 11 consecutive days of rain.  *Id.* ¶ 51.  By

28  March 14, flows at Iron Gate Dam exceeded the 1,000 cfs minimum under the 2019 BiOp.  *Id.*

**SOMACH SIMMONS & DUNN**
**A Professional Corporation**

¶ 53.  On March 16, Reclamation ceased reductions under the 2023 TOP.

Even with the flow reductions along with improved late March hydrology, UKL did not quite make it to 4142.00 by the end of March, reaching an April 1, 2023 UKL elevation of 4141.95—just over half of one inch below 4142.00.  The 2023 TOP Iron Gate flow reduction resulted in holding the equivalent of approximately 0.10 feet of water depth in UKL, meaning that if the Iron Gate flow reductions were not implemented, the April 1 UKL elevation would have been approximately 4141.85 feet, approximately two inches below 4142.00.  Kirby Decl. ¶ 55.

## IV.    ARGUMENT

### A.    Plaintiffs Cannot Obtain the Requested Injunction Because the Alleged ESA Violations Were Wholly in the Past

Plaintiffs seek a preliminary injunction prohibiting Reclamation from delivering irrigation water during this water year unless certain conditions are met to "avoid a reoccurrence" of the alleged ESA violations.  ECF No. 1117 at 28.  To obtain a preliminary injunction, however, Plaintiffs must show that "there is a reasonable likelihood of *future* violations of the ESA."  *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994) (emphasis added) ("The plaintiff must make a showing that a violation of the ESA is at least likely in the future").  This Court previously recognized this line of authority in *Yurok Tribe v. U.S. Bureau of Reclamation*, 231 F. Supp. 3d 450, 463-65 (N.D. Cal. 2017) (*Yurok Tribe*).[7]  Indeed, the Court noted that the "parties do not dispute that the ESA's citizen suit provision only provides a cause of action to enjoin ongoing violations or to prevent imminent future violations."  *Id.* at 463.  In 2017, the Court was persuaded that plaintiffs had "made a strong showing" that the alleged ESA violation in 2014 and 2015—exceedance of the allowed infection rates in the ITS—was likely to occur again in 2017, and thus that Plaintiffs had plead a valid Section 9 claim.[8]  *Id.* at 464-65.  Unlike

---

[7] Other courts have similarly denied injunctive relief to citizens suing under 16 U.S.C. § 1540(g) when the alleged injury is wholly past ESA violations.  *See City of Austin v. Kinder*, 528 F. Supp. 3d 670, 680 (W.D. Tex. 2021) (stating that courts "may not offer remedies in statutorily authorized citizen suits for 'wholly past violations' ") (citing *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir.1986) and *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 67 (1987)); *In re Oil Spill*, 792 F. Supp. 2d 926, 932-33 (E.D. La. 2011) (rejecting plaintiffs' request for an injunction because alleged ESA violations occurred wholly in the past) (citing *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 785 (9th Cir. 1995)).

[8] The Court was also ruling on a motion to dismiss the Section 9 claim in *Yurok Tribe*, which involves a lower standard of plausibility.  *See NRDC v. Norton*, No. 1:05-cv-01207 LJO-EPG, 2016 U.S. Dist. LEXIS 145788 at *93

SOMACH SIMMONS & DUNN
A Professional Corporation

1  *Yurok Tribe*, Plaintiffs before this Court now cannot make the showing that Reclamation is likely

2  to commit future ESA violations based on flow reductions under the 2023 TOP.

3  Plaintiffs acknowledge that the 2023 TOP has lapsed. ECF No. 1117 at 28 ("By the time

4  the Court hears argument on this motion, the 2023 TOP will no longer be in effect"). And under

5  the terms of the 2023 TOP, the stated objective was to fill UKL prior to April 1 to meet the 2023

6  FWS BiOp requirements and provide a surface flushing flow. There was no intent to continue the

7  flow reductions at Iron Gate Dam later in the 2023 water year or any other water year. Plaintiffs

8  also describe the alleged harm to coho salmon in past terms. *See, e.g.*, ECF No. 1117 at 23

9  ("Reclamation's flow reductions severely *degraded* the river habitat and *killed* Coho Salmon

10  eggs, thereby causing take in violation of the ESA") (emphasis added). Nowhere in Plaintiffs'

11  motion is there any serious discussion of the future. Plaintiffs have not identified any risk to coho

12  salmon that will occur after Reclamation ceased the flow reductions on March 16, 2023, or the

13  expiration of the 2023 TOP under its terms on March 30, 2023.

14  Because the 2023 TOP is no longer in effect, and Plaintiffs provide no evidence that

15  operations under the Interim Plan in 2023 will result in the same alleged ESA violation, this Court

16  should deny Plaintiffs' motion for preliminary injunction on this ground alone.

**B.  Legal Standards Applicable to Plaintiffs' Motion for Preliminary Injunction**

18  A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

19  clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22

20  (2008) (*Winter*). Plaintiffs must demonstrate that: (1) they are likely to succeed on the merits;

21  (2) they are likely to suffer irreparable harm absent an injunction; (3) the balance of equities tips

22  in their favor; and (4) an injunction is in the public interest. *Id*. at 20. Therefore, under the

23  precedent in *Winter*, the burden remains on Plaintiffs to establish all four factors to obtain a

24  preliminary injunction based on an ESA violation. *See, e.g.*, *Klamath Tribes v. U.S. Bureau of*

25  *Reclamation*, No. 18-cv-03078-WHO, 2018 U.S. Dist. LEXIS 124741 at *25-26, 47-52 (N.D. Cal.

26  July 25, 2018) (this Court weighing the balance of equities and public interest factors and

27  _____

28  n.11 (E.D. Cal. Oct. 20, 2016). Plaintiffs are before the Court now on a motion for preliminary injunction seeking extraordinary relief.

SOMACH SIMMONS & DUNN
A Professional Corporation

recognizing plaintiff's proposed remedy is not in the species' best interest). The "ESA strips courts of at least some of their equitable discretion" in determining the third and fourth prongs of the traditional four-part test. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1089-91 (9th Cir. 2015).

Plaintiffs cite the "sliding scale" standard from *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011). Under that precedent, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. "*Cottrell* clarifies that district courts retain discretion to employ a sliding scale, and that plaintiffs are entitled to judicial application of the lesser 'serious questions' test upon satisfactory showing on the other three *Winter* prongs." *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 778 (D. Or. 2014).

Plaintiffs cannot show a likelihood of success on the merits of their ESA claims, nor are there "serious questions" going to the merits. Rather, the evidence before the Court demonstrates that these claims are without merit. Moreover, Plaintiffs cannot show irreparable harm to the species, that the requested injunction is in the public interest, or that the balance of hardships tips in their favor *at all*. The 2023 TOP represented a balancing of objectives between species, and three federal agencies collectively determined that it was necessary to reduce river flows a modest amount in order to improve the chances of filling UKL for the first time in three years. Plaintiffs fail to meet their burden on all four factors.

**C.**   **Plaintiffs Have Not Established Serious Questions Going to the Merits or a Likelihood of Success on the Merits**

   **1.**   **Legal Standard**

      **a.**   **ESA Section 7 and Section 9**

Section 7(a)(2) of the ESA also a procedural requirement on action agencies to consult with the FWS and NMFS on the potential impacts of a proposed action on endangered and threatened species and their critical habitat. *Id.* § 1536(a)(2), (3); *see also* 50 C.F.R. §§ 402.10-402.16; *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1028-29 (9th Cir. 2012) (*Karuk Tribe*).

SOMACH SIMMONS & DUNN
A Professional Corporation

1  Action agencies satisfy their procedural obligations through formal or informal consultations.  "If

2  the wildlife agency determines during informal consultation that the proposed action is 'not likely

3  to adversely affect any listed species or critical habitat,' formal consultation is not required and

4  the process ends." *Id.* at 1028 (citing 50 C.F.R. § 402.14(b)(1)).  Formal consultation results in

5  the issuance of a BiOp that analyzes the effects of the proposed action and includes the consulting

6  agency's conclusion as to whether the proposed action likely will or will not jeopardize the

7  continued existence of the listed species or destroy or adversely modify its critical habitat.

8  16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(h)(2), (3).

9    Where a BiOp determines that a proposed action will result in incidental take of a listed

10  species but not violate the action agency's substantive Section 7(a)(2) obligation to avoid

11  jeopardy, the consulting agency must include an ITS with its BiOp.  16 U.S.C. § 1536(b)(4);

12  50 C.F.R. § 402.14(i)(1); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM*,

13  273 F.3d 1229, 1239 (9th Cir. 2001).  An ITS specifies the amount or extent of incidental take

14  permitted and includes measures to minimize "take."  16 U.S.C. § 1536(b)(4)(C)(i)-(ii); 50 C.F.R.

15  § 402.14(i)(1)(i)-(ii).

16    Section 9 of the ESA prohibits the "take" of any fish or wildlife that is listed as an

17  endangered species.  16 U.S.C. § 1538(a)(1)(B).  "Take" is defined as "to harass, harm, pursue,

18  hunt, shoot, wound, kill, trap, capture, or collect . . . ." *Id.* § 1532(19).  The implementing ESA

19  regulations further defined "harm."  50 C.F.R. § 17.3(c)(3).  "Take" that is consistent with the

20  terms and conditions of an ITS is exempt from liability under Section 9.  16 U.S.C. § 1536(o)(2).

21         **b.**  **Scope of Review**

22    Plaintiffs have brought their ESA Section 7 and 9 claims under the ESA citizen suit

23  provision.  Suppl. Compl. ¶ 7, ECF No. 1115.  This Court has previously found that the

24  Administrative Procedure Act's (APA) record review provision does not apply to claims brought

25  under the citizen suit provision and that the Court may consider evidence outside the

26  administrative record. *Yurok Tribe*, 231 F. Supp. 3d at 467-69; *see also NRDC v. Zinke*,

27  347 F. Supp. 3d 465, 500-01 (E.D. Cal. 2018) (holding that review of a Section 9 claim under the

28  citizen suit provisions is not limited to an administrative record).

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

### 2.   Plaintiffs' Section 9 Claim Fails on Both Theories of Take

Plaintiffs offer two arguments on why Reclamation's flow reduction under the 2023 TOP caused take in violation of ESA Section 9.  First, Plaintiffs contend that reducing flows below the minimum flows required by the 2019 NMFS BiOp minimum is "reasonably certain" to dewater redds.  ECF No. 1117 at 14-15.  Second, Plaintiffs argue that the reduction in river flows will degrade and diminish the amount and quality of habitat needed for juvenile rearing.  *Id.* at 23-26.  Intervenor addresses each theory of take in turn.

### a.   Much of Plaintiffs' Evidence Relates to Flow Reductions Greater Than Those That Actually Occurred

As explained above, Reclamation consulted with the Services, tribes, and stakeholders for many months before implementing an 11% flow reduction on February 14, 2023.  In December, Reclamation proposed a reduction up to 40%.  Kirby Decl. ¶¶ 37; JN22.  Thus, most of NMFS's comments from December and January were directed at the maximum reduction.  *See, e.g.*, ECF 1101-1 at 57 (Dec. 22, 2022 NMFS Letter on Reclamation's December proposal) (noting Iron Gate flows "could be reduced by 40% or greater").  Over time, and after extensive feedback and dozens of meetings, Reclamation refined the proposal, proposing a lesser flow reduction, created a monitoring plan, and added conditions that the water stored could be used only for ESA compliance.  These changes were part of the Coordination Agreement.  *See* section III.C.6, *supra*.  Moreover, the actual reductions that occurred were for a shorter period in time than the period covered by the 2023 TOP and ultimately coincided with significant wet weather events in March.

Plaintiffs' argument relies on general assumptions about habitat based on the Hardy reports.  And they point to written evidence related to the earlier December proposal.  Plaintiffs offer very little argument and evidence that speaks to the actual flow reductions that occurred or the documented hydrology of the river and tributaries from February 14 to March 16.  Focusing on actual conditions rather than hypotheticals, Plaintiffs' take claim is plainly without merit.

SOMACH SIMMONS & DUNN
A Professional Corporation

**b.    Plaintiffs Have Not Proven That Coho Redds Were Dewatered or That Any Harm Occurred from Reduced Flows in the Klamath River**

Plaintiffs' claim that coho redds were dewatered is belied by their own declarant's statements.  As Mr. Belchik states, the pre-action survey found 31 redds at risk of dewatering.  Belchik Decl. ¶¶ 44, 56 (citing JN1).  After the 11% reduction, the post-action survey found that "**no redds had yet been dewatered**."  *Id.* ¶ 48 (citing JN10) (emphasis added).  However, four redds "were in less than an inch of water" and at risk of dewatering with additional reductions in flow.  *Id.*  Plaintiffs' showing of "take" rests entirely on assumptions about what happened to these four redds after the post-action survey and the additional 5% reduction.

Plaintiffs argue the 5% reduction that began on February 25 caused water depths to drop by 1.2 inches, which "almost certainly" dewatered the four redds that were in less than 1 inch of water.  ECF No. 1117 at 15.  As explained by Mr. Kirby, Intervenor's water resources engineering expert, to reach this conclusion that water depths dropped 1.2 inches, Mr. Belchick focuses on the observation in the post-action survey that the river was approximately 6 inches lower between the pre-action survey and the post-action survey.  Mr. Belchik attributes this 6-inch change solely to the 11% reduction in Iron Gate flows that began on February 14.  Based on this assumption, he extrapolates from the 6-inch drop and reasons that the additional 5% reduction must have lowered the water depth by an additional 1.2 inches.  Kirby Decl. ¶ 62.

However, the period leading up to the pre-action survey (January 24-26) was characterized by relatively dry hydrology.  The hydrographs from the Klamath River gage at Seiad Valley and the tributaries to the Klamath River that flow into this reach show that prior to the 11% reduction on February 14, river stages were gradually decreasing.  Kirby Decl. ¶¶ 57-59 & Exs. B, C.  Mr. Belchik also fails to account for accretions from the Shasta River, creeks, and drainages.  Heavy precipitation and accrued snowpack would have an impact on these side flows and on the redd survey area, and potentially mitigate river stage loss as a result of Iron Gate discharge reductions.  Kirby Decl. ¶ 60 & Ex. A.  Gage data further shows that the initial flow reduction that occurred on February 14 represented less than one-third of the total drop observed at the Seiad gage between the pre-action and post-action surveys, and that at **most, the second**

**flow reduction potentially caused a drop (for 1 day) of 0.6 inches**.  Based on actual gage data, no redds identified during the surveys were apparently dewatered.  *Id.* ¶ 62.

Moreover, Mr. Belchik's assumption that the four redds were dewatered ignores the process of redd construction by female spawners.  Mr. Berge, Intervenor's fisheries expert, explains how females dig redds, with dislodged material covering the egg pocket.  The mound of material sits on top of the egg pocket in front of a tailspill where material on the mound (the crest of the redd nearest the surface of the water) ends and the undisturbed streambed below the redd begins.  Berge Decl. ¶¶ 3-4.  Measuring the depth of the mound of the redd (from water surface to mound) does not capture the location of the embryos which are actually deposited in much larger material that create the egg pocket.  There are no fertilized eggs in the mound.  *Id.* ¶ 5.  The depth of the egg pocket is on average 10 inches (up to 20) below the initiation of spawning at the gravel surface (prior to the creation of the mound).  The vulnerability of the redd mound surface to being dewatered does not mean that the redd pocket is disturbed in any way.  *Id.* ¶ 5 (Figure 1).

In sum, Plaintiffs' evidence does not support that a "take" occurred from redd dewatering.  To the contrary, actual gage data and fundamental knowledge of redd construction shows that the four redds surveyed at risk of dewatering were not dewatered after the 5% additional reduction because the water stage dropped at most 0.6 inches for one day, and the fertilized eggs in the egg pocket would have been buried 10 inches lower in the substrate.  Any other harm to hypothetical redds is completely speculative.  Plaintiffs cannot succeed on the merits of this Section 9 claim.

### c.    Plaintiffs Fail to Prove that Reclamation Committed "Take" By Habitat Modification

Plaintiffs also allege that Reclamation caused "harm" to salmon by diminishing juvenile rearing habitat.  ECF No. 1117 at 22.  In cases where plaintiffs allege "take" via habitat modification, courts look to whether "harm" occurred.  *See Our Children's Earth v. Leland Stanford Junior Univ.*, No. 13-cv-00402-EDL, 2015 U.S. Dist. LEXIS 176517 at *17-19 (N.D. Cal. Dec. 11, 2015).  "Harm" means "an act which *actually* kills or injures wildlife.  Such act may include *significant* habitat modification or degradation where it *actually* kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."

50 C.F.R. § 222.102 (emphasis added).  Without more, "mere habitat degradation is not always sufficient to equal harm."  *Our Children's Earth*, 2015 U.S. Dist. LEXIS 176517 at *20 (quoting *Ariz. Cattle Growers*, 273 F.3d at 1238).

To prove their habitat modification claim, Plaintiffs rely on an estimation that 10-20% reductions in flow below minimums would result in 5-11% reductions in juvenile rearing habitat, and speculation that the "harm" experienced in 2005 will reoccur in 2023.  ECF No. 1117 at 24-25.  It is questionable whether the 6% modeled estimate of habitat availability accurately represents actual conditions given the significant precipitation that occurred in March.  *See* Kirby Decl. ¶ 54.  Even assuming the estimate is accurate, and that salmon habitat was reduced by 6%, this is still far from a *significant* modification.  The estimated 6% change in habitat is a minor change for salmonids in the winter and one that is unlikely to result in a measurable change in behavior or movement.  Density dependence is not a factor during this time period compared to when habitat is limited in the summer months, and coho have adapted to variability in flow in fall/winter.  *See* Berge Decl. ¶ 7.

Moreover, Reclamation reduced Iron Gate flows[9] to ensure sufficient water would be available in UKL for a Surface Flushing Flow this summer when juveniles are outmigrating and juvenile habitat is more limited.  ECF No. 1116-2 at 21 (JN19) ("Relative to the risk of missing a flushing flow this spring, and the associated increased risk of disease-related mortality, the impacts to salmon this winter are likely relatively less severe"); *id.* at 7 (JN5) ("we predict that the additional disease-mitigating benefits of achieving 6,030 cfs for a single-day modified flushing flow far outweigh the additional risks to juvenile salmon incurred from the 5% further decrease of IGD discharges").  The reduction in flows was also temporary.  *See* "Endangered Species Consultation Handbook" at 4-24 ("a proposed action producing a single, short-term effect is less likely to jeopardize the continued existence of a species than a long-term chronic event or the permanent alteration of a species' habitat").

As to the second part of the "harm" standard, Plaintiffs provide no evidence of actual

[9] The scientific validity of the minimum flows, and whether meeting them provides meaningful benefits to the salmon, is a matter of dispute amongst the parties.  *See generally* ECF No. 45-1 (2019 Berge Decl.).

SOMACH SIMMONS & DUNN
A Professional Corporation

harm to juveniles from February 14 to March 16, 2023.  *See generally* ECF No. 1117 at 15-18.

Instead, Plaintiffs recount operations from 2005.  Plaintiffs provide no explanation why

conditions in 2005 are relevant to events in 2023, other than "below-minimum flows" occurred

for some amount of time in both years.[10]  *Id.* at 17.  Before the Court on this motion in 2023 is

modeling, gage data, agency analysis, and expert opinion that all show the flow reductions under

the 2023 TOP were not significant changes to juvenile rearing habitat.  Plaintiffs have failed to

meet their burden and are not likely to succeed on their habitat modification claim.

### d.    Reclamation Complied with the ITS and Is Exempt from Liability

Plaintiffs are also unlikely to succeed on the Section 9 claim because Reclamation

complied with the ITS in the 2019 NMFS BiOp and is thus shielded from liability.  Known as the

"meet and confer" provision, T&C 1A requires Reclamation, if it expects thresholds will not be

met, to "immediately notify NMFS and consult with the Services to determine the causative

factors."  STIPDX-001824.  If flows from Iron Gate Dam are expected to, but have not yet

dropped below minimum levels, "and NMFS determines that causative factors are not due to

extraordinary hydrologic conditions, Reclamation, in consultation with the Services, shall

determine and take in-season corrective actions including adjustments to avoid falling [below

minimum flows]."  STIPDX-001812.  Reclamation began meeting with NMFS as early as

October 7, 2022, and extensively conferred with NMFS through January 2023.  ECF No. 1101-1

at 99, 128-32.  These communications allowed NMFS to provide meaningful input on

Reclamation's proposed actions, and that input resulted in material changes to the final action.

*See* section III.C.6, *supra*.

Although the correspondence shows NMFS was unwilling to concur that "extraordinary

hydrologic conditions" existed through January, in February, the three federal agencies agreed

that the flow reductions as identified and conditioned in the Coordination Agreement were

"appropriate" given the conditions at that point in the water year.  *Id.*  The extensive coordination

---

[10] Plaintiffs cite *Nat'l Wildlife Fed'n*, 23 F.3d at 1512, for the proposi-tion that "past takings are 'instructive, especially if there is evidence that future similar takings are likely.' "  *Id.*  While the Ninth Circuit stated that evidence of past takings may be instructive to show future takings, it affirmed the district court's denial of a motion for preliminary injunction, finding that there was "no clear evidence" that a future "take" of a protected species was likely.  23 F.3d at 1511.  Similarly, here, there is no clear evidence of future harm.

SOMACH SIMMONS & DUNN
A Professional Corporation

with NMFS throughout the year culminating in NMFS's concurrence in flow reductions, as

outlined in the Coordination Agreement, was appropriate and satisfies T&C 1A in the 2019

NMFS BiOp.  Plaintiffs fail on this element of their Section 9 claim as well.

### 3. The Record Before the Court Shows Reclamation Analyzed the Effects of the 2023 TOP on Listed Species and Thus Complied with Section 7(a)(2)

Plaintiffs argue a procedural violation of the ESA—a failure to consult.  There is no

allegation of a substantive Section 7 violation—that reduced flows at Iron Gate Dam jeopardized

the survival of the species or adversely modified its critical habitat.  *See generally* ECF No. 1117

at 18-19.; Suppl. Compl. ¶ 73, ECF No. 1115.  Although not clearly articulated, Plaintiffs

seemingly argue that Reclamation's reduction of flows is not consistent with the proposed action

analyzed in the 2019 NMFS BiOp, and that Reclamation should have completed formal

consultation prior to implementing the flow reductions.  Plaintiffs' argument is all form over

substance, and critically, Plaintiffs omit any discussion of Reclamation's 2023 SEA, which

plainly contains the information and analysis that Plaintiffs claim Reclamation failed to do.

Starting in October 2022, Reclamation proceeded under the ITS in the 2019 NMFS BiOp,

which includes a provision to cover years when Reclamation would not be able to implement the

minimum flow schedule.  *See* section III.C.5, *supra*; STIPDX-001811.  When NMFS refused to

concur that "extraordinary hydrologic conditions" justified deviations from the minimum flow

schedule in December, Reclamation produced the 2023 SEA.  In that document, Reclamation

evaluated the effects of the 2023 TOP—Iron Gate flow reductions from 0-30%—on both coho

and sucker species as well as other fish, wildlife, and bird species.  Goldman Decl. Ex. 12 at 18-

36, ECF No. 1101-1.  Reclamation recognized that "flow reduction of 10, 20, and 30% would

reduce the quantity of habitat available in the mainstem river," but based on the habitat modeling,

that the "relatively short-term impact to habitat does not result in an adverse modification to coho

critical habitat."  *Id.* at 33.  Plaintiffs do not challenge the ITS terms and conditions in the 2019

NMFS BiOp, or even mention the 2023 SEA.  *See generally* ECF No. 1117 at 26-27.  Plaintiffs

just argue as if that document does not exist.  To the extent that Plaintiffs argue reinitiation was

1    required, they do not explain why the 2023 SEA does not provide the analysis of the effects or

2    operational modifications that were not considered in the 2019 BiOp.

3         Moreover, Plaintiffs' suggestion that Project diversions in the summer of 2022 or

4    fall/winter diversions in December of 2022 were not authorized or subject to consultation is

5    without merit.  The 2022 Project Supply determinations were part of Reclamation's adaptive

6    management under the Interim Plan, and the fall/winter diversions of water year 2023, were also

7    authorized under the Interim Plan.  Kirby Decl. ¶¶ 30, 40; Declaration of Scott White ¶¶ 13-14.

8         The "ultimate question presented in any consultation" is "whether a project will cause

9    jeopardy or adverse modification to a species." *NRDC v. Bernhardt*, No. 1:05-cv-01207 LJO-EPG,

10   2019 U.S. Dist. LEXIS 30649 at *94 (E.D. Cal. 2019).  Reclamation answered that question when

11   it produced the 2023 SEA to supplement the 2019 NMFS BiOp, and NMFS provided its sign-off in

12   the Coordination Agreement.  Plaintiffs do not explain why this had to be a formal consultation.

13   And informal consultations do not "require a specific form." *Id.* at 38; *see also Karuk Tribe*,

14   681 F.3d at 1006 ("The burden imposed by the consultation requirement need not be great . . .

15   informal consultation need be nothing more than discussion and correspondence with the

16   appropriate wildlife agency").  Reclamation satisfied its procedural obligation under Section 7, and

17   Plaintiffs are unlikely to succeed on this claim.

18   **D.    There Is No Likelihood of Future Irreparable Harm**

19        Plaintiffs must also make a "clear showing" that they are "likely to suffer irreparable harm

20   absent an injunction." *Winter*, 555 U.S. at 7, 20.  Above, Intervenor explains that: (1) no redds

21   were dewatered; (2) changes to rearing habitat for the short term flows were reduced were

22   insignificant; (3) minimum flows were restored on March 16; and (4) the 2023 TOP is no longer

23   in effect. *See* section IV.A, *supra*.  For these reasons, there is no likelihood of future irreparable

24   harm.  And for the reasons stated below, the requested injunction would not have the effect of

25   mitigating any alleged harm.  Plaintiffs have failed to make the necessary showing for this factor.

26   **E.    The Injunction Is Not in the Public Interest, and the Agencies Have Already
            Balanced the Hardships**

27

28        Intevenor does not dispute the importance of the tribes' interests, but it is wrong and

SOMACH SIMMONS & DUNN
A Professional Corporation

SOMACH SIMMONS & DUNN
A Professional Corporation

inappropriate to suggest that no injury to farm and rural communities can matter, regardless of how serious.[11]  There is no authority to support that farm communities must always lose when hardships and equities are balanced, and here, these factors weigh against granting injunctive relief.  Hundreds of family farmers, farmworkers, rural businesses, agricultural and wildlife assets, and rural communities would suffer if the Court grants the preliminary injunction.  Declaration of Rob Unruh in Support of Klamath Water Users Association's Opposition to Plaintiffs' Motion for Preliminary Injunction (Unruh Decl.) ¶ 11.  To produce food and maintain the viability of communities in the Project area, irrigation water is essential, and the proposed preliminary injunction would limit or eliminate entirely irrigation water availability this year.  Kirby Decl. ¶ 67.  Hundreds of farm and ranch families would not be able to sustain their businesses and support themselves.  Unruh Decl. ¶¶ 6, 8, 11.

Moreover, uncertainty regarding water availability can have impacts.  Unruh Decl. ¶ 8. Investment decisions by farmers must be made before the growing season, and if there is a chance that water will no longer be available later in the irrigation season, the farmer will lose the entirety of the investment.  *Id.*  Water shortage the last three years has had a devastating impact on the rural Klamath Basin economy, *id.* ¶¶ 9 11, and has caused damage to the local environment, Kirby Decl. ¶ 70. Even this early spring, water shortage has resulted in dust and air quality degradation throughout the Project area.  *Id.*  In addition, a Project shutoff would leave the Lower Klamath and Tule Lake Refuges without water for wetlands and waterfowl habitat.  *Id.* ¶¶ 69-70.

Plaintiffs' recommended management of a multi-benefit Project for a singular species ignores these impacts to the other fish species and wildlife in the basin that rely on the Project, further weighing against granting the extraordinary requested relief.  This single-species focus is evident in telling statements describing the boundary conditions of the FWS BiOps where Plaintiffs refuse to treat the lake elevations FWS deems necessary for sucker species in the same manner as it approaches minimum flow schedule NMFS deems necessary for salmon.  *See, e.g.*,

---

[11] Courts may balance the likelihood of irreparable harm with public interest impacts, including economic impacts. For example, in *Cascadia Wildlands v. Thrailkill*, the District of Oregon balanced the likelihood of irreparable harm to owl habitat with "the public's interest in the economic and environmental benefits" a fire recovery plan in denying a motion for a preliminary injunction.  49 F. Supp. 3d 774, 778 (D. Or. 2014).

SOMACH SIMMONS & DUNN
A Professional Corporation

1  ECF No. 1117 at 20.  These two conflicting water supply demands are managed by the federal

2  agencies, and the Coordination Agreement and implementing actions by Reclamation represent a

3  careful balancing of these interests.  The Court does not need to rebalance the hardships between

4  species and other interests in the Basin after three federal agencies spent four months, dozens of

5  meetings, and significant staff resources to reach a solution.

6  **F.  The Requested Injunction Far Exceeds What Is Permissible at This Stage of Litigation**

7

8  Plaintiffs request that the Court set a new minimum end-of-September elevation of

9  4139.2 feet, and prohibit Reclamation from making irrigation deliveries unless its operations can

10  comply with this elevation.  ECF No. 1117 at 20-21.  This relief is unnecessary and unjustified.

11  To obtain injunctive relief, Plaintiffs must show a threat of injury that is "concrete and

12  particularized; the threat must be actual and imminent, not conjectural or hypothetical."  *Ctr. for*

13  *Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011).  Here, there is no imminent or actual

14  threat to coho; Reclamation will be operating to provide minimum flows for the rest of 2023 and

15  has ensured that it can provide a surface flushing flow as well.

16  Moreover, a preliminary injunction "is not a preliminary adjudication on the merits but

17  rather a device for preserving the status quo" before final resolution of the merits.  *Sierra On-*

18  *Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415 (9th Cir. 1984).  Plaintiffs' requested relief

19  goes far beyond preserving the status quo, and instead seeks to rewrite the operating criteria for

20  the Project, wiping out the agricultural community in the process after an extremely difficult,

21  prolonged period of drought.  In that regard, maintaining UKL at a higher elevation at the end of

22  September will not ensure that the UKL elevation will be higher the next April because there is

23  not a relationship that can be drawn simply and solely between an October 1 elevation of 4139.2

24  and the ability of the lake to be managed to 4142.0 on April 1.  Kirby Decl. ¶ 65 & Ex. D.  The

25  controlling factors for lake elevation landing at 4142.0 on April 1 include inflow to UKL and Link

26  River Dam releases from UKL.  In particular, Link River Dam releases for the purpose of meeting

27  Iron Gate flows are by far the main driver in determining UKL elevations.  *Id.*  In the fall and

28  winter, the UKL control logic also allows Reclamation to modify Link River Dam releases to fill

1   UKL under drier than normal conditions. *Id.* ¶ 66. Plaintiffs do not address issues like the UKL

2   control logic at all. There is no justification for why Plaintiffs picked 4139.2 feet, other than it is

3   higher than the current minimum boundary condition in the 2023 FWS BiOp.

4        The requested injunction includes no obvious end date, suggesting the relief could extend

5   into 2024. Significantly, Plaintiffs fail to account for the potential effects that the requested relief

6   may have on the removal of the four hydroelectric dams in the Klamath River by the Klamath River

7   Renewal Corporation (KRRC). According to the plans submitted to the Federal Energy Regulatory

8   Commission (FERC), prior to January 1, 2024, KRRC intends to lower water levels behind

9   J.C. Boyle, Copco 1, and Iron Gate Dams to their minimum allowable operating levels. After

10  January 1, 2024, KRRC will initiate a coordinated drawdown and removal of these three dams.

11  KRRC's plans for drawdown assume that storage levels and release rates from UKL during 2024

12  will be consistent with the operations plan analyzed in NMFS' 2019 BiOp, which includes the

13  magnitude and timing of expected reservoir water surface elevations, inflows, and outflows.

14  KRRC's plans were carefully analyzed by FERC and various consultants. Now, without any

15  analysis, the Plaintiffs' request would alter these hydrologic assumptions. Kirby Decl. ¶ 68.

16       This is the risk of rewriting operations plans in litigation without the extensive coordination

17  of the responsible agencies. It is an attempt to shortcut the difficult but necessary process of

18  developing operation plans through coordination and collaboration with the agencies, to the

19  detriment of the communities, wildlife, and environments that rely on the Project. The Court

20  should not reward Plaintiffs by granting the requested relief.

21                              **V.    CONCLUSION**

22       For all these reasons, Plaintiffs have failed to make any of the showings necessary for

23  obtaining preliminary injunctive relief. KWUA respectfully requests that the Court deny their

24  motion for preliminary injunction.

25                                        SOMACH SIMMONS & DUNN, PC
    DATED: April 14, 2023          By   *s/ Brittany K. Johnson*
26                                        Brittany K. Johnson, Attorneys for Defendant-
                                          Intervenor, Crossclaim-Defendant, and
27                                        Counterclaimant Klamath Water Users Association

28

SOMACH SIMMONS & DUNN
A Professional Corporation